IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEMIR D. SIRAZI, GREENSTONE )
CAPITAL L.L.C. and MARDINI, INC., )
)
Plaintiffs, )
v. ) Case No. 1:12-cv-00653
)
GENERAL MEDITERRANEAN )
HOLDING, SA, ORIFARM, SA, and )
NADHMI AUCHI, )
)
Defendants. )

## MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY
## OF JOHN VANSANTEN AND DANIEL VAN VLEET

Pursuant to Fed. R. Evid. 702, Plaintiffs move *in limine* to exclude the testimony of

Defendants' real estate appraisal "expert," John VanSanten and the valuation opinions of the

Defendants' other expert, Daniel Van Vleet. Mr. VanSanten's opinions are not the product of

reliable principles and methods. Further, Mr. VanSanten has completely failed to reliably apply

the principles and methods he has used to the facts of this case. As such, his opinions fail to

satisfy the standards of admissibility set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993) and Rule 702. Mr. Van Vleet's

valuation opinions are entirely dependent on VanSanten's opinions and thus, they too fail to

satisfy the standards of admissibility required by *Daubert* and Rule 702.

As set forth more fully below, VanSanten improperly manipulated the inputs of his

analysis to reach a preordained valuation opinion using a discounted cash flow methodology that

has been called a "black art" by the 7th Circuit. This approach is a "black art" subject to

enhanced scrutiny precisely because it can easily be manipulated to obtain almost any desired

result. He also applied this methodology in a manner that significantly violated the Uniform

Standards of Professional Appraisal Practice ("USPAP.") These errors led VanSanten to the unsupportable and improper conclusion that the market value of the 62 acre Parcel at issue in this case never rose above $76 million between October 1, 2005 and April 1, 2014. (VanSanten Dep., Ex. 1, 63:13-17.) This conclusion is directly at odds with nearly every piece of data in this case, including Defendants' actual purchase of the Parcel for approximately $130 million on November 1, 2005. In order to avoid having to account for the Defendants' actual purchase in his opinions, VanSanten performed an undocumented "analysis" that the $130 million sale should be entirely discounted. He then failed to consider extensive record evidence that this sale price was consistent with other actual offers and valuations for the Parcel. Because VanSanten's methodology fails to meet the standards for expert admissibility, this Court should exclude his opinions in their entirety. Further, because Van Vleet relies solely on VanSanten's analysis to reach his valuation conclusion, his opinions should also be excluded.

## BACKGROUND

Through a Settlement Agreement entered into in May 2006, Plaintiffs held a security interest in any and all "proceeds" generated by Antoin Rezko's ownership interests in Heritage Development Partners, LLC ("Heritage"). Heritage was a vehicle through which Rezko held ownership interests in a 62 acre parcel of land in Chicago's South Loop ("the Parcel"). The Parcel was directly owned by Riverside District Development, LLC ("RDD"). RDD, was in turn owned by Heritage and GMH. In connection with the Parcel, GMH was entitled to a preferred payment of its original investment of approximately $130 million plus 12% annual interest and then the parties were to equally divide all further income. At the time of the Settlement Agreement, Rezko owned approximately 78.6% of Heritage. At different points in time, Rezko

exercised all or part of his ownership in Heritage through a holding company whose sole assets were Heritage, MT Property Holdings, LLC.

The Settlement Agreement between Plaintiffs and Rezko required Rezko to seek Plaintiffs' consent prior to any sale of his ownership interests in Heritage, whether direct or indirect. Notwithstanding Plaintiffs' security interest, Defendants acquired Rezko's ownership interest in a series of three transactions knowing that none of the proceeds would go to Plaintiffs. In those transactions, Defendants provided Rezko with capital totaling $7.5 million and forgave debts totaling approximately $23 million.

In an attempt to claim that Plaintiffs' security interest was negligible and was insufficient to secure the debts owed under the Settlement Agreement, Defendants have offered four appraisal reports for the Parcel prepared by John VanSanten for the dates of October 1, 2005; July 24, 2007; February 11, 2008; and April 1, 2014. Then, based on VanSanten's appraisals, Defendants have also offered the expert opinions of Daniel Van Vleet that the value of Heritage and MT Property Holdings, LLC was negligible. (Van Vleet Report, Ex. 2 at ¶¶ 60-73.) Van Vleet arrived at his opinion by applying GMH's right to a preferred payment as an offset against the "market value" of the Parcel provided by VanSanten. (Van Vleet Dep., Ex. 3, at 238:9-16.) As Van Vleet explained, he "solely used Mr. VanSanten's appraisal reports" in reaching his opinions. (*Id.* at 238:15-16.) Thus, Van Vleet's valuation opinions are entirely dependent on VanSanten. However, as shown below, VanSanten's methodology was both unreliable and applied in an unreliable manner, which renders both opinions inadmissible.

## ARGUMENT

Under the standards articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993) and *Kumho Tire*

*Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), it is the district court's role to act as a gatekeeper for expert testimony and to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *United States v. Fujii*, 152 F. Supp. 2d 939, 940 (N.D. Ill. 2000) (citing *Daubert* at 592-93). Thus, under Rule 702, an expert can only offer testimony if "the testimony is the product of reliable principles and methods; and the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702 (c)-(d).

## I. VANSANTEN FAILS TO RELIABLY APPLY THE PRINCIPLES AND METHODS OF DISCOUNTED CASH FLOW ANALYSIS TO THE FACTS OF THIS CASE.

In each report, VanSanten used the same general methodology to reach his conclusions. (VanSanten Dep., Ex. 1, 61:2-62:3.) VanSanten calculated the "market value" of the Parcel by relying solely on a discounted cash flow ("DCF") analysis, a form of analysis within the income capitalization approach of real estate appraisal. He never calculated "market value" through either the sales comparison approach or the cost approach, the other recognized forms of valuation in the field of real estate appraisal. (VanSanten Dep., Ex. 1, at 292:17-293:22.) Likewise, VanSanten did not employ any version of the income capitalization approach other than DCF. (VanSanten Dep., Ex. 1, 114:21-115:5.)

DCF purports to arrive at a present valuation by projecting future revenue for an asset and then applying a discount rate to this future income to arrive at its present value. Courts have widely recognized that valuations depending upon DCF can be easily manipulated to suit the purposes of the party relying upon them, leading to highly unreliable results. In rejecting the use

of this methodology in a recent case, Judge Pallmeyer summarized the 7th Circuit's dim view on DCF:

> [T]he Seventh Circuit has recognized the malleability of DCF analysis, observing that it is "highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate. It is a simple matter to increase or reduce the outcome of a cash flow analysis by 200% by making changes in assumptions that appear by themselves to be insignificant." ... In more colorful language, the Seventh Circuit recently described the process of discounted cash flow analysis as "something of a black art" and "almost impossible for private companies, for which uncertainties abound."

*Gecker v. Flynn (In re Emerald Casino, Inc.)*, No. 11 C 4714, 2014 U.S. Dist. LEXIS 139804, at *492-493 (N.D. Ill. Sept. 30, 2014) (finding expert's opinion unreliable "[g]iven the malleability and sensitivity of DCF analysis" and "the combination of undisclosed and flawed inputs in [the expert's] analysis") (internal citations omitted; *citing Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir. 1985); *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010); and *Olsen v. Floit*, 219 F.3d 655, 658 (7th Cir. 2000).)  Another court explained even more bluntly that "[a] skilled practitioner can come up with just about any value he or she wants depending upon what is plugged into the variables, particularly the projected growth and discount rates. *City P'ship Co. v. Lehman Bros.*, 344 F. Supp. 2d 1241, 1250 (D. Colo. 2004).

The manner in which VanSanten employed DCF is a case in point for how it can be manipulated to reach untenable conclusions.  VanSanten assigned projected revenue streams that had no basis whatsoever in fact or even logic, and then manipulated or ignored other factors in a highly misleading and dishonest manner.  For starters, VanSanten completely disregarded the "highest and best use" of the property – an essential factor in any real estate appraisal – in the DCF analysis he actually applied. Thus, VanSanten initially admitted that the highest and best use of the Parcel was for mixed use development. (*E.g.* VanSanten 2005 Valuation Report, Ex. 4, at 51.) As VanSanten explained in his reports:

> The subject is zoned PD 904, Planned Development. Based on an analysis of the zoning ordinance noted in the previous section of this report, the subject site may be improved with a variety of retail, office, and residential uses…The subject will be developed into a mixed-use property with multiple phases, over an extended period of time… The analysis indicates that the most productive use of the subject site is for mixed-use development. This use is legally permissible, physically possible, and financially feasible. The highest and best use of the subject site as if vacant and ready for development is concluded to be for mixed-use, residential and commercial development, consistent with PD 904.

(*E.g.* VanSanten 2005 Valuation Report, Ex. 4, at 51.) Indeed, given that the Parcel was the largest piece of undeveloped urban real estate in the United States, it presented a prime development opportunity and this surely was its highest and best use.

However, while purporting to acknowledge that the highest and best use for the Parcel was mixed use development, VanSanten's projected revenue completely ignores this highest and best use. Instead, VanSanten constructs an entirely different use of the property – holding it vacant, dividing it, and selling it off. (*See e.g.* VanSanten 2005 Valuation Report, Ex. 4, at i.) He then estimated the value of each of these development parcels through deriving the price per square foot of floor area based on sales of other similar properties. (*Id.*) And then VanSanten assumed that these development parcels would have to be sold off "over an extended period," approximately 10 years. (*Id.*)

It is clear that VanSanten rejected the acknowledged "highest and best use" of the property solely in order to delay the achieved revenue over ten years and thus subject it to a substantial discount factor. By arbitrarily electing to project future sales of *undeveloped* parts of the Parcel, VanSanten, unsurprisingly, was able to conclude that the Parcel was far less valuable than the sum of its constituent parts. The extent of this manipulation is breathtaking. For example, using the numbers in his 2005 appraisal, applying VanSanten's *own* calculations of the price per square foot that he derived using the sales comparison approach to the square footage of the Parcel, the value for the entire Parcel would be $131,888,960, over $60 million more than

6

his appraisal for the property. (VanSanten Dep., Ex. 1, 121:10-127:12.) But by arbitrarily stretching out the revenue for ten years he achieved Defendants' litigation objectives by valuing the Parcel at $60 million less. VanSanten arrived at this radically different valuation using even more arbitrary and manipulated assumptions. He thus projected only minimal growth in the value of the undeveloped land value of 3%, but employed a huge discount rate of 17% and assessed other completely arbitrary amounts for expenses against the Parcel as well. Unsurprisingly, this cratered its valuation. (*E.g.* VanSanten 2005 Report, Ex. 4, at 65-68.) And it is important to recognize that what makes the DCF approach so unreliable is not only that each assumption is arbitrary but that there are so many levers to manipulate that the expert can easily come to any conclusion his client needs and provide some plausible (though) arbitrary explanation. Thus, even when DCF can be used in some manner, "it is only reliable when it can be verified by alternative methods to DCF or by real world valuations, including especially, valuations performed by potential third-party buyers." *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 Del. Ch. LEXIS 43, 75 (Del. Ch. Mar. 9, 2011.)

In this case, however, to achieve his objective, VanSaten also had to ignore powerful, undisputed evidence of the Parcel's higher valuation, including valuations performed by both potential and actual third-party buyers. VanSanten justified his use of the malleable DCF approach because he claimed the $131,888,960 valuation for the entire Parcel generated by the sales comparison approach did not represent the market value of the Parcel "because you're not going to find one buyer who can pay all of this for this." (VanSanten Dep., Ex. 1, at 128:21-23.) The problem for VanSanten is that the undisputable facts show there was a buyer for the entire Parcel during the relevant time period: GMH. Remarkably, he attributed no significance to this actual sale and valuation of the Parcel:

Q.    And it's your testimony that no single buyer would buy it for $131,888,960 as of October 2005?

A.    That's correct.

Q.    Isn't it odd that GMH bought the property for $130 million in November 2005?

* * *

A.    It's a coincidence

(VanSanten Dep., Ex. 1, at 129:16-130:1.)

The only attempted explanation provided in any of VanSanten's reports for ignoring the actual sale and the radical difference between his valuation and the purchase price paid by GMH at nearly the identical time is a cursory dismissal buried in some of his reports. It states in relevant part "[a]lthough the previous transaction is considered in our analysis, it is given limited weight because it was reportedly non-arm's length in nature." (*See e.g.* Ex. 5, VanSanten 2007 Valuation Report at 5.) No further analysis is provided and nowhere else in any of VanSanten's reports is the $130 million 2005 transaction discussed. (VanSanten Dep., Ex. 1, 71:3-16.) Further, there is nothing in VanSanten's work file that discusses why the $130 million sale was not an arm's length transaction. (*Id.* at 71:17-20.) At his deposition, VanSanten took the position that GMH's purchase of the Parcel was not arms-length because "the buyer and the seller were effectively the same parties, just kind of doing a deal between themselves." (VanSanten Dep., Ex. 1, 64:23-65:3.) However, the undisputed record evidence is that GMH agreed to purchase the Parcel from Roosevelt/Clark Development, LP in 2005 for approximately $130,000,000. (Def. Local Rule 56.1 Statement, Doc. #257 at ¶¶ 2-3.) Nowhere is there evidence that GMH effectively owned Roosevelt/Clark Development, LP or that it sold the

8

Parcel to itself as VanSanten claims.[1]

Further, VanSanten failed to consider critical evidence that shows that the 2005 transaction price was, if anything, an underpayment. Prior to the sale by Roosevelt-Clark to GMH, Lehman Brothers made an offer of purchase of $135 million. A letter providing notice to the limited partners of Roosevelt-Clark's intention to accept the GMH offer explained as follows:

> As you are aware, the Partnership previously had entered into a contract to sell the Property to GMH for $123 million, which was scheduled to close at the end of April. While we were soliciting approval of the sale from the Limited Partners, we received an unsolicited proposal from Belrad Group, LLC and Lehman Bros. Holdings, Inc., (collectively, "Lehman") to purchase the property for $130 million. ***Before we could even respond to Lehman, they amended their proposal, raising it to $135 million***.... Significantly, GMH agreed to increase their purchase offer to approximately $130 million, which is the substantial economic equivalent of the Lehman proposal at $135 million, as described below. Lehman did not follow up on our invitation to conduct a dialogue about their offer, and the other proposals we received were problematic for various reasons, primarily being the length of time required for due diligence activities. Based on our careful evaluation of the alternatives available, we determined that the modified GMH offer was in the best interest of the Partnership. Accordingly, we have entered into a Real Estate Purchase and Sale Agreement ("Agreement") with GMH at the price of $130 million.

(Notice to Limited Partners, Ex. 6)(emphasis added). Until his deposition, VanSanten did not know that Lehman Brothers made an offer of purchase for $135 million. (VanSanten Dep., Ex. 1, 68:21-24.) VanSanten also failed to consider several other pieces of record evidence that suggested his discounted cash flow conclusions were wildly out of line with how third parties valued the Parcel:

- In February 2006, Broadway Bank extended financing to Riverside District Development only after an appraisal confirming the Parcel had a value of not less than $110 million. (Broadway Bank loan document, Ex. 7, at 14; VanSanten Dep., Ex. 1 , 223:4-223:21);

---

[1] Indeed, this claim seems fabricated out of thin air, because at his deposition, VanSanten could not point to any specific record evidence that supported this claim other than whole depositions for which he had insufficient time to find the supposedly supporting passages. (VanSanten Dep., Ex. 1, at 78:1-79:17.)

- In approximately March of 2006, Defendants entered into an agreement to sell the retail portion of the property for $105 million. (PPO, Ex. 8, at 8; VanSanten Dep., Ex. 1, 197:7-11);

- On October 3, 2006, Defendants received an offer to purchase the property for $160 million. (10/3/2006 Bruce Letter, Ex. 9; VanSanten Dep., Ex. 1, 216:22-218:6);

- In December 2006, Defendants entered into a letter of understanding to sell a portion of the Parcel for $150 million; (Moody Memorandum of Understanding, Ex. 10; VanSanten Dep., Ex. 1, 206:18-208:23); and

- On March 6, 2007, Defendants entered into a letter of intent to sell the Parcel for $255 million. (Kelleher Letter, Ex. 11; VanSanten Dep., Ex. 1, 218:14-219:11.)

VanSanten also failed to consider any of the sales of Class A units in Heritage, which, derived their value exclusively from the Parcel, and would only have had value if Heritage was worth more than GMH's preferred payment. (VanSanten Dep., Ex. 1, 198:6-201:23.) Clearly, any one of these shows that the GMH transaction was a more reliable indication of value that VanSanten's DCF projections.

VanSanten also failed to consider the revenue projections that the developers of the property were conducting themselves, based on the expected revenues from developing the Parcel – the agreed highest and best use. This sort of projection is common in the industry, and is commonly referred to as a pro forma. The effect of VanSanten's failure to choose the correct input is illustrated by two pro formas from within GMH's production dated March of 2006. These pro formas, which projected the cash flows that would come from developing the Parcel, estimated that the gross sales that would be obtained would be $349,735,000. (3/28/2006 Pro Formas, Ex. 12.) In contrast, VanSanten calculated gross sales from holding the property and not developing it at $152,423,000 and $169,016,000 for 2005 and 2007 respectively. (VanSanten Dep., Ex. 1, 97:8-98:10.) Even reducing gross sales to account for nearly $120 million in projected construction costs, these results are wildly out of line with VanSanten's conclusions

10

about value. In reaching his opinions, VanSanten did not obtain or consider these pro formas. In fact, there are numerous other pro formas contradicting VanSanten's conclusions that GMH failed to provide Mr. VanSanten, and thus he never considered them. (Pro Formas, Group Ex. 13; VanSanten Dep., Ex. 1, 86:16-100:1, 101:15-112:23, 192:2-22; VanSanten Rule 26 Disclosure, Ex. 14.)

VanSanten's failure to use the correct inputs in his DCF analysis or otherwise reliably apply DCF to the facts of the case renders his opinions inadmissible under *Daubert* and Rule 702. As this Circuit has recognized in other contexts, where factual deficiencies result from "faulty methods and lack of investigation" an expert should be excluded. *Brown v. Burlington Northern Santa Fe Ry.*, 765 F.3d 765, 773 (7th Cir. 2014). And Courts within this district have found that flawed inputs plugged into a DCF analysis rendered the entire opinion unreliable. *Gecker v. Flynn (In re Emerald Casino, Inc.)*, No. 11 C 4714, 2014 U.S. Dist. LEXIS 139804 (N.D. Ill. Sept. 30, 2014).

## II.   VANSANTEN FAILS TO FOLLOW A RELIABLE APPRAISAL METHODOLOGY.

VanSanten's DCF analysis is also inadmissible because VanSanten did not employ DCF in a manner that is consistent with the explicit standards required in the real estate appraisal field. Part of the Court's gatekeeper role in assessing the admissibility of expert testimony "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Hartman v. EBSCO Indus.*, 758 F.3d 810, 818-819 (7th Cir. 2014) (citing *Kumho*, 526 U.S. at 152). Within the field of appraisal, the Uniform Standards of Professional Appraisal Practice ("USPAP") provides the minimal intellectual rigor that an appraiser must follow to render a reliable and therefore, admissible opinion. VanSanten

11

certified that each of his four reports complied with USPAP. (2005 VanSanten Valuation Report, Ex. 4, at 73; 2007 VanSanten Valuation Report, Ex. 5, at 75; 2008 VanSanten Valuation Report, Ex. 15, at 75; 2014 VanSanten Valuation Report, Ex. 16, at 78.) At his deposition, he explained that "USPAP is really the rules and regulations, the guidelines that we all have to follow." (VanSanten Dep., Ex. 1, 57:18-20.) Accordingly, if a real estate appraiser significantly violates USPAP, the testimony cannot be the product of "reliable principles and methods" and does not exhibit the "same level of intellectual rigor" that characterizes practice in the field of real estate appraisal. An appraisal report that significantly violates USPAP does not employ a "reliable method" and cannot meet the standards of Rule 702. As shown below, the DCF analysis performed by VanSanten bears faint resemblance to any appropriate use of DCF within the appraisal field and renders his opinion inadmissible.

### A. VanSanten Violated USPAP By Using a Discounted Cash Flow Analysis Outside of the Context Of Developing A Value Opinion Using Another Valuation Approach.

Because "even slight input errors can be magnified and can produce unreasonable results," USPAP specifically cautions against relying exclusively on DCF to determine value:

> DCF analysis is an additional tool available to the appraiser and *is best applied in developing value opinions in the context of one or more other approaches*. This statement focuses on the criteria for proper DCF analysis and does not imply that DCF analysis is or should be the only method employed.

(USPAP, Ex. 17, at Statement on Appraisal Standards No. 2, emphasis added.) USPAP further cautions that "[t]he results of DCF analysis should be tested and checked for errors and reasonableness." (*Id.*) In rendering his opinions, VanSanten completely disregarded the USPAP requirement that DCF be used "in the context of one or more other approaches." VanSanten failed to develop a value opinion using any other approach. Instead, he depended entirely upon

his DCF analysis and did not calculate a value for the Parcel using any other methodology to ensure that his DCF calculations were reasonable:

> Q.    But you didn't develop a value for the ultimate 62-acre property [using the sales comparison approach], correct?
>
> A.    For the entire parcel in aggregate I did not develop an opinion via the sales comparison approach.
>
> Q.    And you didn't develop an opinion as to the total overall value using the cost approach, correct?
>
> A.    Correct.
>
> *   *   *
>
> Q.    You didn't use a value derived through the cost approach or a value derived through the sales comparison approach for the full 62 acres to act as a check on the final conclusions on your discounted cash flow analysis, did you?
>
> A.    No.
>
> *   *   *
>
> Q.    [F]or the overall parcel and aggregate, was there any other value for the parcel you used as a doublecheck to make sure that value was accurate?
>
> A.    No, I don't think so.

(VanSanten Dep. Ex. 1, 292:17-293:22.)

### B.    VanSanten Violated USPAP by Failing to Provide Analysis that Substantiates His Claim that the $130 Million Sale to GMH Was Not an Arm's Length Transaction.

Given the importance of market transactions involving the subject property, USPAP specifically requires an appraiser to analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal. (USPAP, Ex. 17, at Standards Rule 1-5(b).) USPAP also requires an appraiser to maintain a work file that includes "all other data, information, and documentation necessary to support the appraiser's opinions and conclusions." (*Id.* at Record Keeping Rule.) However, as shown above, the **only** explanation of the GMH purchase provided in any of VanSanten's reports is in a short section on the ownership history of the Parcel that appears in some of his reports and does not substantiate his claim that the

13

transaction was not an arm's length transaction. (*See e.g.* Ex. 5, 2007 VanSanten Valuation Report at 5; VanSanten Dep., Ex. 1, 71:3-16.) Further, there is nothing in VanSanten's work file that discusses why the $130 million sale was not an arm's length transaction. (*Id.* at 71:17-20.) The total absence of documentation supporting this critical piece of his analysis violates USPAP.

### C. VanSanten Further Violated USPAP by Failing to Consider The Extensive Record Evidence that Was Inconsistent With His Value Conclusions.

USPAP also requires appraisers to "collect, verify, and analyze all information necessary for credible assignment results." (USPAP, Ex. 17, Standards Rule 1-4.) VanSanten entirely disregarded this requirement. First, he failed to consider any of the numerous offers or other transactions that reflected values for the Parcel far above his own. (VanSanten Dep., Ex. 1, 68:21-24; 197:7-11; 206:18-208:23; 216:22-218:6; 218:14-219:11; 223:4-223:21.) Second, he failed to consider any of the sales of Class A units in Heritage, which derived their value exclusively from the Parcel. (VanSanten Dep., Ex. 1, 199:3-201:23.) Third, he failed to consider any of the pro formas put together by developers of the Parcel. (Pro Formas, Group Ex. 13; VanSanten Dep., Ex. 1, 86:16-100:1, 101:15-112:23, 192:2-22; VanSanten Rule 26 Disclosure, Ex. 14.) These failures to consider critical record evidence mean that VanSanten cannot possibly be deemed to have considered all information necessary for credible appraisal results. This head-in-the-sand approach to real estate appraisal is a direct violation of USPAP Standards Rule 1-4.

### III. VAN VLEET'S VALUATION OPINIONS SHOULD BE EXCLUDED BECAUSE HE RELIED STRICTLY ON VANSANTEN'S INADMISSIBLE OPINIONS IN REACHING HIS CONCLUSIONS.

In an attempt to claim that Plaintiffs' security interest was insufficient to secure the debts owed under the Settlement Agreement, Defendants have also offered a valuation opinion provided by Daniel Van Vleet, who has concluded that the "fair market value" of Rezko's

14

ownership interests (through Heritage and MT Property Holdings, LLC) was, at all relevant times, negligible. (Van Vleet Report, Ex. 2 at ¶¶ 60-73.) Van Vleet arrived at this opinion by applying GMH's right to a preferred payment as an offset against the "market value" of the Parcel provided by VanSanten. (Van Vleet Dep., Ex. 3, 238:9-16.) As Van Vleet explained, he "solely used Mr. VanSanten's appraisal reports" as valuations for the Parcel in reaching his valuation opinions for Heritage and MT Property Holdings. (*Id.* at 238:15-16.) Thus, Van Vleet's valuation opinions are entirely dependent on VanSanten. Under Rule 702(b), an expert may offer an opinion only if it is "based on sufficient facts or data." Without VanSanten's opinions, Van Vleet has no basis whatsoever for his valuation opinion and this opinion therefore fails to satisfy Rule 702(b).

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court enter an order barring the testimony of John VanSanten in its entirety and barring the valuation opinion testimony of Daniel Van Vleet.

Respectfully submitted,

SEMIR D. SIRAZI, GREENSTONE
CAPITAL L.L.C. and MARDINI, INC.

Gregory J. Scandaglia
William J. Ryan
Seth R. Yohalem
SCANDAGLIA & RYAN
55 E. Monroe Street, Suite 3440
Chicago, Illinois 60603
(312) 580-2020

By:    /s/ Gregory J. Scandaglia
                One of Their Attorneys

15

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2014, a copy of the foregoing **Motion *In Limine* to Exclude the Testimony of John Vansanten and Daniel Van Vleet** was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Joseph D. Ryan
Scott B. Dolezal
Joseph D. Ryan, P.C.
jryan@ryanlawoffices.com
sdolezal@ryanlawoffices.com

Terrence J. Sheahan
Freeborn & Peters
tsheahan@freebornpeters.com

Patricia S. Spratt
Shefsky & Froelich
pspratt@taftlaw.com

/s/ Gregory J. Scandaglia
Scandaglia & Ryan
55 East Monroe Street, Suite 3440
Chicago, Illinois 60603
Phone: (312) 580-2020
Fax: (312) 782-3806
E-mail: gscandaglia@scandagliaryan.com

16