# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF ILLINOIS

3                  EASTERN DIVISION

4

5  SEMIR D. SIRAZI, GREENSTONE          )

6  CAPITAL L.L.C., and MARDINI, INC., )

7          Plaintiffs,                  )

8              vs.                      )  Case No. 1:12-cv-00653

9  GENERAL MEDITERRANEAN HOLDING, SA, )

10  ORIFARM, SA, and  NADHMI AUCHI,     )

11          Defendants.                 )

12

13          Videotaped Deposition of JOHN W.

14  VANSANTEN, taken before GREG S. WEILAND, CSR, RMR,

15  CRR, pursuant to the Federal Rules of Civil

16  Procedure for the United States District Court

17  pertaining to the taking of depositions, at

18  Suite 3440, 55 East Monroe Street, in the City of

19  Chicago, Cook County, Illinois, commencing at 8:41

20  o'clock a.m., on the 12th day of June, 2014.

21

22

23

24

Page 2

1 PRESENT:
2
3 ON BEHALF OF THE PLAINTIFFS:
4     SCANDAGLIA & RYAN
5     BY: MR. SETH R. YOHALEM
6         MR. WILLIAM J. RYAN
7     55 East Monroe Street
8     Suite 3440
9     Chicago, Illinois 60603
10    (312) 580-2020
11    E-mail: syohalem@scandagliaryan.com
12        wryan@scandagliaryan.com
13
14 ON BEHALF OF THE DEFENDANTS:
15    LAW OFFICES OF JOSEPH D. RYAN, P.C.
16    BY: MR. JOSEPH D. RYAN
17    1896 Sheridan Road
18    Suite 240
19    Highland Park, Illinois 60035
20    (847) 432-5971
21    E-mail: jryan@ryanlawoffices.com
22
23 ALSO PRESENT:
24    MR. KAYNE SCHWARZ, The Videographer.

Page 3

1         INDEX
2 June 12th, 2014
3 TESTIMONY OF JOHN W. VANSANTEN
4                    PAGE
5 Examination by Mr. Yohalem .........................16
6
7         REQUEST TO PRODUCE
8         PAGE 291, LINE 15
9
10        DEPOSITION EXHIBITS
11 NUMBER        DESCRIPTION        PAGE
12 Exhibit 2 (Previously identified)        200
13     First Amendment to Operating Agreement of
14     Heritage Development Partners, LLC, Bates
15     labeled CONFIDENTIAL SIRAZI-G013754 through
16     013756
17 Exhibit 4 (Previously identified)        193
18     Heritage Development Partners, LLC,
19     Confidential Private Placement Memorandum,
20     March 17, 2006, Bates labeled HDP 0048
21     through 0070
22 Exhibit 45 (Previously identified)        257
23     Pledge Agreement, Security Agreement, and
24     Assignment (LLC Interests)

Page 4

1         DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER        DESCRIPTION        PAGE
3 Exhibit 48 (Previously identified)        260
4     Facsimile Transmission dated March 30th,
5     2007, Bates labeled CONFIDENTIAL
6     SIRAZI-G016724
7 Exhibit 198 (Previously identified)        262
8     Facsimile Transmission dated February 6th,
9     2008, Bates labeled CONFIDENTIAL-SIRAZI
10    G008012
11 Exhibit 312        37
12    Riverside Park, Southwest Corner of
13    Roosevelt Road and Clark Street, Summary
14    Real Estate Appraisal Report as of
15    October 1, 2005
16 Exhibit 313        37
17    Riverside Park, Southwest Corner of
18    Roosevelt Road and Clark Street, Summary
19    Real Estate Appraisal Report as of July 24,
20    2007
21
22
23
24

Page 5

1         DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER        DESCRIPTION        PAGE
3 Exhibit 314        37
4     Riverside Park, Southwest Corner of
5     Roosevelt Road and Clark Street, Summary
6     Real Estate Appraisal Report as of
7     February 11, 2008
8 Exhibit 315        37
9     Riverside Park, Southwest Corner of
10    Roosevelt Road and Clark Street, Summary
11    Real Estate Appraisal Report as of April 1,
12    2014
13 Exhibit 316        37
14    Riverside Park Appraisals - Rule 26
15    Disclosures, May 14, 2014
16 Exhibit 317        82
17    Riverside Development District, Southwest
18    Corner of Roosevelt Road and South Clark
19    Street, Self-Contained Appraisal Report as
20    of April 1, 2009
21 Exhibit 318        86
22    E-mail dated 7/15/2005 from Nordeen to
23    Haldeman, et al., Bates labeled GMH Native
24    073977

2 (Pages 2 - 5)

1     DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 319                    93
4     Series of e-mails, Bates labeled GMH Native
5     056857 through 056858
6 Exhibit 320                    96
7     Projected Pro Forma, Rezmar Development
8     Group, Riverside District Development, Bates
9     labeled GMH Native 073704 through 073705
10 Exhibit 321                   99
11     Condensed Project Pro Forma, Rezmar
12     Development Group, Riverside District
13     Development, Bates labeled GMH Native 073706
14 Exhibit 322                   100
15     Document titled Presenting an Investment
16     Opportunity in Heritage Development
17     Partners, LLC, Bates labeled GMH Native
18     083182 through 083188
19 Exhibit 323                   101
20     Excel spreadsheet, Riverside District,
21     Vertical Construction Estimates (in 2005
22     dollars), Bates labeled GMH Native 073828
23     through 073898
24

1     DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 328                    111
4     Excel spreadsheet, Riverside District,
5     Leveraged Development Pro Forma (adjusted
6     for inflation) Bates labeled GMH Native
7     073733 073800
8 Exhibit 329                    112
9     Excel spreadsheet, Riverside District,
10     Development Pro Forma - Phases 1A thru 1C,
11     $330/SSF Condo Pricing, Bates labeled GMH
12     Native 056873 through 056914
13 Exhibit 330                   133
14     Korpacz Real Estate Survey, Third Quarter
15     2005
16 Exhibit 331                   133
17     Korpacz Real Estate Survey, Second Quarter
18     2007 (marked but not identified)
19 Exhibit 332                   133
20     Korpacz Real Estate Survey, Fourth Quarter
21     2007 (marked but not identified)
22
23
24

1     DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 324                    106
4     Excel spreadsheet, Riverside District,
5     Development Pro Forma - Phases 1A thru 1C,
6     $370/SSF Condo Pricing, Bates labeled GMH
7     Native 047248 through 047289
8 Exhibit 325                    107
9     Excel spreadsheet, Riverside District,
10     Development Pro Forma - Phases 1A thru 1C,
11     $390/SSF Condo Pricing, Bates labeled GMH
12     Native 047098 through 047139
13 Exhibit 326                   109
14     Excel spreadsheet, Riverside District,
15     Development Pro Forma - Phases 1A thru 1C,
16     $350/SSF Condo Pricing, Bates labeled GMH
17     Native 021951 through 021992
18 Exhibit 327                   110
19     Excel spreadsheet, Riverside District,
20     Vertical Construction Estimates (in 2005
21     dollars), Bates labeled GMH Native 074019
22     through 074089
23
24

1     DEPOSITION EXHIBITS (CONTINUED)
2 NUMBER          DESCRIPTION          PAGE
3 Exhibit 333                    133
4     Willing Buyers Outnumber Quality Offerings,
5     PwC Real Estate Investor Survey, First
6     Quarter 2014 (marked but not identified)
7 Exhibit 334                    153
8     Notice to Limited Partners of
9     Roosevelt/Clark Development, L.P., Bates
10     labeled GMH Native 047871 through 047874
11 Exhibit 335                   176
12     Series of e-mails, Bates labeled GMH Native
13     074944 through 074945
14 Exhibit 336                   191
15     Excel spreadsheet, Riverside District,
16     Development Pro Forma - Phases 1A thru 1C,
17     $410/SSF Condo Pricing, Bates labeled GMH
18     Native 047014 through 047055
19 Exhibit 337                   202
20     Crain's Chicago Business Print Story, Rezko
21     sells Loop project for $131M, Bates labeled
22     SIRAZI-JVS000428 through 000429
23
24

3 (Pages 6 - 9)

Page 10

1     DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION         PAGE
3  Exhibit 338                206
4      Moody Group International, Ltd., Memorandum
5      of Understanding, Bates labeled GMH Native
6      065592 through 065598
7  Exhibit 339                210
8      Facsimile Transmittal Sheet dated 12/13/05,
9      with attachments, Bates labeled GMH Native
10     028985  through 028992
11 Exhibit 340                211
12     Real Estate Purchase Agreement, Bates
13     labeled GMH Native 007919 through 007946
14 Exhibit 341                213
15     Riverside District Development, LLC, Key
16     Activity and Accomplishment Report by
17     Calendar Year Objective, First Quarter 2006,
18     Bates labeled GMH Native 005459 through
19     005463
20 Exhibit 342                216
21     Letter dated October 3, 2006, Bates labeled
22     GMH Native 072901 through 072903
23
24

Page 11

1     DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION         PAGE
3  Exhibit 343                218
4      Letter of Intent dated March 6, 2007, Bates
5      labeled CONFIDENTIAL SIRAZI-G005822 through
6      005824
7  Exhibit 344                221
8      Complete Appraisal - Summary Report of
9      Riverside Park, Southwest Corner of
10     Roosevelt and Clark Streets, Chicago, Cook
11     County, Illinois 60622, as of March 23,
12     2004, Bates labeled CONFIDENTIAL
13     SIRAZI-G000232 through 000370
14 Exhibit 345                223
15     Loan Agreement, Bates labeled GMH Native
16     036655 through 036680
17 Exhibit 346                224
18     Closing Checklist, Broadway Bank,
19     $24,000,000 Loan To Riverside District
20     Development, LLC, Bates labeled GMH Native
21     070619 through 070624
22
23
24

Page 12

1     DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION         PAGE
3  Exhibit 347                225
4      Closing Binder for $27,000,000 Loan from
5      Mutual Bank to Riverside District
6      Development, LLC, July 13, 2006, Bates
7      labeled GMH-00002863 through 00003095
8  Exhibit 348                246
9      Newsmax, British Tycoon Remains Bullish on
10     Chicago Development, Tuesday, February 12,
11     2008, Bates labeled SIRAZI-JVS000315
12     through000318
13 Exhibit 349                253
14     Riverside Development District - West
15     Township, Southwest Corner of Roosevelt Road
16     & Clark Street, Summary of Real Estate
17     Appraisal Report as of January 1, 2012,
18     Bates labeled SIRAZI-JVS001356 through
19     001507
20 Exhibit 350                259
21     Pledge and Collateral Agreement, Bates
22     labeled FP-SR 000798 through 000801
23
24

Page 13

1     DEPOSITION EXHIBITS (CONTINUED)
2  NUMBER        DESCRIPTION         PAGE
3  Exhibit 351                261
4      Heritage Development Partners, LLC, Unit
5      Purchase Agreement, Bates labeled FP-SR
6      014806 through 014822
7  Exhibit 352                262
8      Pledges by Tony Rezko, Bates labeled FP-SR
9      009865 through 009969
10 Exhibit 353                263
11     E-mail dated 06 November 2006, Bates labeled
12     CONFIDENTIAL SIRAZI-G005725
13 Exhibit 354                265
14     Handwritten notes, Bates labeled
15     SIRAZI-JVS000004 through 000008
16 Exhibit 355                269
17     Handwritten notes dated 4/21/14, Bates
18     labeled SIRAZI-JVS000009 through 000010
19 Exhibit 356                273
20     Handwritten notes dated 5/16/14, Bates
21     labeled SIRAZI-JVS000011 through 000013
22
23
24

4 (Pages 10 - 13)

1      DEPOSITION EXHIBITS (CONTINUED)

2  NUMBER      DESCRIPTION      PAGE

3  Exhibit 357          286

4      Handwritten notes, To Do List (For Each

5      Report), Bates labeled SIRAZI-JVS000017

6      through 000026

7  Exhibit 358          288

8      Letter dated February 25, 2014, SRR

9      letterhead, Bates labeled SIRAZI-JVS000027

10     through 000031

11 Exhibit 359         290

12     Invoice dated May 15, 2014, Bates labeled

13     SIRAZI-JVS000035 through 000040

14 Exhibit 360         302

15     Article, How to Review a Commercial Real

16     Estate Appraisal Report: How Can an Attorney

17     Ascertain the Merit of an Appraisal?

18 Exhibit 361         310

19     Sales Opportunity Evaluation, Riverside

20     Park, Chicago, Illinois, March, 2005, Bates

21     labeled GMH Native 007752 through007802

22 Exhibit 362         320

23     Uniform Standards of Professional Appraisal

24     Practice, 2014-2015 Edition

1      THE VIDEOGRAPHER:  My name is

2  Kayne Schwarz representing Veritext Legal Solutions.

3  The date today is June 12, 2014, and the time is

4  approximately 8:41 a.m.

5      This deposition is being held in the

6  office of Scandaglia & Ryan located at 55 East

7  Monroe Street, Suite 3440, Chicago, Illinois 60603.

8      The caption of this case is Semir D.

9  Sirazi, et al., versus General Mediterranean

10 Holding, et al., in the United States District

11 Court, Northern District of Illinois, Eastern

12 Division.

13     The name of the witness is John VanSanten.

14     At this time, the attorneys will identify

15 themselves and the parties they represent, after

16 which our court reporter, Greg Weiland of Veritext,

17 will swear in the witness and we can proceed.

18     MR. YOHALEM:  Seth Yohalem for the

19 Plaintiffs.

20     MR. RYAN:  Joseph Ryan on behalf of the

21 Defendants.

22     MR. SIRAZI:  Semir Sirazi, Plaintiff.

23      (Witness sworn.)

24

1       JOHN W. VANSANTEN

2  after being first duly sworn, testified as follows:

3       EXAMINATION

4  BY MR. YOHALEM:

5     Q.  Good morning, Mr. VanSanten.  I'm sure

6  you've given many depositions before, but we're

7  going to go over some ground rules, you're probably

8  familiar with them, but just so there's a clean

9  record.

10     I have to ask questions, you have to give

11 answers, and the court reporter has to take down

12 your answers.

13     So will you verbalize your answers instead

14 of nodding or shaking your head?

15     A.  Yes.

16     Q.  And I'm sure you've gone over this, but if

17 your counsel objects to a question I ask, you still

18 have to go ahead and answer the question unless he

19 specifically instructs you not to answer the

20 question.  I don't anticipate any of those today

21 because you're an expert witness, but do you

22 understand that generally you have to answer

23 questions notwithstanding objections?

24     A.  Yes, I do.

1     Q.  Is there any reason here today you can't

2  give accurate and truthful testimony?

3     A.  No.

4     Q.  What did you do to prepare for today's

5  deposition?

6     A.  I spent time reviewing the reports that I

7  prepared and going back through the work files with

8  all the supporting documentation.

9     Q.  Did you meet with anyone?

10     A.  I did.

11     Q.  Who did you meet with?

12     A.  I met with Attorney Ryan.

13     Q.  Did you meet with anyone else?

14     A.  I met with members of my staff who worked

15 with me on the project.

16     Q.  And who are they?

17     A.  Nick McGinn and Ryan Korth.

18     Q.  Okay.  How long did you meet with Mr. Ryan

19 for?

20     A.  We met I would say for a couple of hours

21 Monday and a couple of hours on Tuesday.

22     Q.  And how long did you meet with your staff

23 for?

24     A.  Over the course of probably four or five

Page 18

1 days, several hours. I don't know how many.
2 Q. You mentioned your staff is composed of
3 Nick McGinn and Ryan Korth.
4 What is Nick McGinn's title or
5 designation?
6 A. Nick is an associate in my group.
7 Q. Does he have any appraisal training?
8 A. He does.
9 Q. Is he a registered appraiser, a certified
10 appraiser?
11 A. He is, yes.
12 Q. And is he an MAI?
13 A. He is not.
14 Q. And what about Mr. Korth, is he a
15 certified appraiser?
16 A. Mr. Korth is a certified appraiser, and he
17 is an MAI.
18 Q. Before we get into your reports, I sort of
19 want to ask you generally, what sort of documents
20 when you are preparing an appraisal such as this one
21 do you like to rely upon and inform yourself of?
22 A. Well, there's documents that are
23 property-specific that would describe the property,
24 for instance; maybe a site plan; also things related

Page 19

1 to government regulation of the property, like the
2 zoning. And then we would also then do market
3 research into transactions and trends in the market
4 that would impact the properties.
5 Those are some of the things that we would
6 look at.
7 Q. Okay. With respect to the
8 document-specific -- sorry.
9 With respect to the property-specific
10 documents that you'd want to review, how do you
11 determine what document-specific, you know,
12 materials and data to review for any given
13 assignment?
14 A. There's kind of a standard set of
15 documents that you like to see for any appraisal
16 assignment, so it's sort of a standard protocol.
17 Q. And what are those standard documents that
18 you like to see for any appraisal assignment?
19 A. Again, it would be for like a vacant
20 parcel of land like this, you'd want to see a site
21 plan or a survey that shows the acreage of the site.
22 You'd want to take a look at the property taxes to
23 find out what the property taxes have been for the
24 property, a legal description. Any kind of

Page 20

1 transaction history as far as previous sales of the
2 property you'd want to take a look at.
3 That's probably not an exhaustive list,
4 but those are some of the things.
5 Q. Sure. How do you typically go about
6 getting those items? Do you ever ask the client for
7 them, or do you just go to public resources to get
8 them?
9 A. Usually both. We will certainly ask the
10 client for those kind of documents, and then we will
11 also look at public records as well.
12 Q. And I understand information is not always
13 available for properties you're appraising, right?
14 As a general matter, sometimes there's data you
15 would like to have but aren't able to review it for
16 whatever reason; is that correct?
17 A. Some data can be more challenging to get
18 than others.
19 Q. And for this case, how was the data that
20 your team reviewed and you reviewed?
21 A. I think it was very good.
22 Q. Very good. I'd like to ask you
23 specifically about when you're doing a discounted
24 cash flow analysis, what sort of data, what sort of

Page 21

1 data do you like to look at to do an appraisal based
2 on discounted cash flow analysis?
3 A. Well, in general, there's a few different
4 inputs that go into a discounted cash flow analysis.
5 You have the revenue aspect, which is the income
6 that would be produced by the property, so you'd
7 want to take a look at that. You have expenses that
8 would be associated with the property, so you'd want
9 to take a look at the expenses.
10 There would also be typically an
11 absorption period for a property like this; that is,
12 a period over which the parcels would be sold off.
13 And then lastly, there would be a rate of
14 return or a discount rate which reflects what a
15 typical investor would require for investments in
16 the property.
17 Q. Okay. And just taking these one by one,
18 you said one of the inputs you would look at is the
19 documents related to the income that the property
20 would generate; is that correct?
21 A. Yes.
22 Q. What limits would you put on what
23 documents you would not want to review for
24 income-generating documents?

6 (Pages 18 - 21)

Page 22

1    A.  I don't think I'd put any limits.
2    Q.  So, for instance, if there's a pro forma
3 of the property, you'd want to see what the
4 pro forma was, right?
5    A.  If there was a pro forma, yes.
6    Q.  Okay.  And if there were specific models
7 of how much the property would make in the
8 marketplace, would you want to see that?
9    A.  If there's, if there's something out there
10 like that, yeah, I'd like to see it.
11    Q.  And what if there were market surveys
12 about the amount of money that a property could be
13 expected to generate, would you want to see that?
14    A.  Sure, that's something I'd want to take a
15 look at.
16    Q.  Okay.  For the expenses side of the
17 inputs, what specific types of documents would you
18 want to look at to determine the expenses that the
19 property would incur?
20    A.  Well, you mentioned a pro forma.  If there
21 was a pro forma out there that had some forecasted
22 expenses, I'd want to take a look at that, but I
23 would also rely on sort of industry averages or
24 norms from my own experience in appraising

Page 23

1 properties like this as to what those typical
2 expenses might be.
3    Q.  If there is a pro forma available, is that
4 better or worse than industry averages?
5    A.  I wouldn't say it's better or worse.  It's
6 just another piece of data that we might consider.
7    Q.  Okay.  And you would need to see the
8 pro forma to determine its worth one way or another,
9 right?
10    A.  Yes.
11    Q.  Would you want to see any development
12 plans, you know, if the developer had put together
13 development plans for the property?
14    A.  If the developer had development plans,
15 I'd want to take a look at those, yes.
16    Q.  And what about drawings or architectural
17 plans or anything like that, would you want to take
18 a look at those?
19    A.  That's another piece of data that I would
20 want to take a look at, yes.
21    Q.  What about other transactions in the
22 marketplace involving the property itself, would you
23 want to take a look at those?
24    A.  Yeah, I think I mentioned before that

Page 24

1 previous sales of the property is something I'd
2 definitely want to take a look at.
3    Q.  And what about other market transactions
4 that involved the property that aren't sales,
5 per se, of the property?
6    A.  I'm not sure I understand your question.
7    Q.  Sure.  For instance, what if a bank gives
8 a loan on a property premised on the specific value
9 of the property, would that be something you'd want
10 to see?
11    A.  I don't think that's particularly
12 relevant.
13    Q.  Would you want to see other appraisals of
14 the property?
15    A.  Not necessarily, no.
16    Q.  What about sales of ownership interest in
17 the property?
18    A.  Do you mean like fractional interests in
19 the property?
20    Q.  Yeah, like a percentage of the return
21 value of the property.
22    A.  I -- you know, it might be interesting
23 information, but at the end of the day I don't think
24 it would be all that important to my analysis.

Page 25

1    Q.  And why wouldn't it be important to your
2 analysis?
3    A.  Because I was hired to actually appraise
4 the entire property, the fee simple interest in the
5 property, and a transaction involving a minority
6 interest is not a transfer of the fee simple
7 interest, so it really has no relevance.
8    Q.  Wouldn't the value of the fee simple
9 interest be reflected in a transfer of a minority
10 percentage ownership of the fee simple interest?
11    A.  You know, there's so many discounts and
12 things that get applied when you have a fractional
13 interest that there's no way of knowing whether a
14 transaction like that would be reflective of market
15 value or not.
16    Q.  And how would you know without actually
17 looking at the transfers whether they would be
18 reflective of the market value or not?
19    A.  In my mind and in my experience, any time
20 I've ever looked at something like that, it's not a
21 reliable indication of market value.
22    Q.  And just to follow up, we will get to this
23 later, but when you say market value, what
24 specifically do you mean?

7 (Pages 22 - 25)

Page 26

1    A.  I'm sorry, can you repeat that?
2    Q.  When you say market value, what
3  specifically do you mean?
4    A.  Well, market value, actually the
5  definition is contained within my reports, but it's
6  a willing buyer, a willing seller, both
7  knowledgeable and not motivated by anything unusual.
8  I can read the definition from my report, but that's
9  generally the definition.
10    Q.  And just so I'm understanding the
11  relationship between transactions of an ownership
12  interest in a parcel and the market value of the
13  parcel as a whole, are you saying that one can't be
14  determined from the other because there's so many
15  contingencies involved?
16    A.  I guess what I'm saying is that a
17  transaction involving a different interest than what
18  I'm appraising is not necessarily a good indication
19  or a reliable indication for value.
20    Q.  Okay.  So I guess what I'm trying to
21  understand is why is it not a good indication of
22  value to compare an ownership interest in a portion
23  of the property with the property as a whole?
24    A.  But it's an apples-to-oranges comparison.

Page 27

1  You're not comparing like interests.
2    Q.  So it would be impossible to derive one
3  value from another, is that what you're saying?
4    A.  In my opinion, yes.
5    Q.  Another of the, another of the
6  documents -- excuse me.
7        Another of the data pieces you said you'd
8  want to review when putting together your appraisal
9  was the absorption period; is that correct?
10    A.  That's one of the elements that would go
11  into a discounted cash flow.
12    Q.  And how would you go about determining the
13  absorption period?
14    A.  Well, I would rely primarily on market
15  data, and in the case of the subject there were
16  really four primary things that I looked at in terms
17  of the absorption period.
18    Q.  We can get to the specifics later.
19        When you say absorption period, what
20  exactly do you mean?
21    A.  Well, in this case, we have a 60-acre
22  parcel of land that the City in their planned
23  development has identified as being made up of
24  24 separate parcels.

Page 28

1        And so when I talk about an absorption
2  period, it's the period over which if I'm the owner
3  of the property and I wanted to sell that property
4  off how long would it take me to sell all 24
5  parcels, and it's typically a period of several
6  years for that to happen.
7    Q.  And so what market data would you look at
8  to determine how long it would take to sell the 24
9  parcels involved in this case?
10    A.  Well, in this case, I looked at four
11  different things, and I'm happy to describe those.
12    Q.  Sure.  Why don't we.
13    A.  Okay.  First would be looking at
14  transaction history from similar developments that
15  are similar in scale and location, so, for instance,
16  and I cite these in my report, you have the
17  Dearborn Park development, which was a 51-acre
18  development that started in the late '70s and was
19  developed and finally completed in the mid '90s, so
20  it was roughly around 15 years it took for that
21  development to be fully built out.
22        Central Station is another big large-scale
23  development that has taken place in that South Loop
24  area, and they had 71 acres, and they started

Page 29

1  development on that in the '90s, and to this day
2  they're still working on that, so we're over
3  20 years later and they're still not done.  So those
4  are two things that I looked at.
5        There was also a study commissioned by the
6  City Department of Planning and Development specific
7  to this property in 2003, and it specifically states
8  in that study that the final absorption of the
9  property would be in year 11, so they indicated
10  roughly 11 years.
11        The third thing that I looked at then was
12  trends for demographics and the different parts of
13  the market, like the retail market, the office
14  market and the residential market, in that South
15  Loop area, looking at the trends in demand and how
16  demand is going to increase going forward and based
17  on that the number of units that are in the supply,
18  how long it's going to take to sell those off.
19        And then lastly, you know, we have the
20  benefit of hindsight to some degree here because
21  we're obviously -- our first date of value is 2005.
22  Here we are nine years later and it still hasn't
23  been developed, so it's, you know, I think it's
24  reasonable to conclude that it's going to be an

8 (Pages 26 - 29)

Page 30

1  extended period of time for the property to be sold
2  off.
3      Q.  So I think the first thing you mentioned
4  was the transaction history of similar parties, and
5  you mentioned Dearborn Park and Central Station; is
6  that correct?
7      A.  Yes.
8      Q.  Were those properties being sold off
9  undeveloped or developed?
10     A.  It's my understanding that both -- they
11  had a combination of both.  Like, for instance,
12  Dearborn Park, I know that Phase 1, Draper Kramer
13  developed that primarily themselves, and that was
14  like roughly 24 acres I think.  Phase 2 they
15  actually sold off all the parcels to individual
16  developers and then subsequently developed them.
17         Central Station has been a combination of
18  both sites being sold off to individual developers
19  as well as the primary developer doing some of it
20  themselves.
21     Q.  And when you look at those two sites, did
22  you look at both Phase 1 and Phase 2 data for
23  determining the absorption period?
24     A.  I considered both, yes.

Page 31

1      Q.  And how long was the Phase 2 time between
2  beginning to sell off undeveloped parcels and
3  actually selling them off?
4      A.  I don't remember that off the top of my
5  head.
6      Q.  Okay.  You mentioned that the second data
7  point you had was a study in 2003 commissioned by
8  the City of Chicago; is that correct?
9      A.  Yes.
10     Q.  And was that studying the selling off of
11  developed or undeveloped pieces of the 62 acres?
12     A.  So this was a study focused specifically
13  on the retail market for River Park, but they also
14  went into analyzing the entire development as
15  proposed under the planned development.
16     Q.  And under the planned development, it was
17  developed, correct?
18     A.  It was -- under the planned development,
19  it would be developed over a period of time, and the
20  final units wouldn't be sold until 11 years after
21  they started under that projection.
22     Q.  Correct.  But they'd be sold as developed
23  units, not as undeveloped units, correct?
24     A.  I believe that's correct, yes.

Page 32

1      Q.  The third thing you said you looked at
2  were trends for the demographics in the South Loop
3  area; is that correct?
4      A.  Yes.
5      Q.  And what, you know, what specific trends
6  were reflected for undeveloped units or undeveloped
7  parcels of land?
8      A.  So the trends we looked at was demand for
9  retail space as well as office space as well as
10  residential units, trying to get a sense for what
11  the level of demand would be for each of those.
12     Q.  Okay.  And so all of those were developed,
13  you know, the absorption period was for developed
14  property?
15     A.  Sure, but it's a direct correlation then
16  with demand for land to be able to build those
17  units.
18     Q.  Okay.  But the specific studies you looked
19  at were for developed property, correct?
20     A.  It's for developed space, right.
21     Q.  Okay.  And you said the last thing you
22  have is hindsight that nothing has been done nine
23  years later; is that correct?
24     A.  Right.

Page 33

1      Q.  And are you aware of any efforts to sell
2  off the property parcel by parcel that are taking
3  place in the last nine years?
4      A.  I am aware of at least one, yes.
5      Q.  And what is that one?
6      A.  Well, as I recall from reading articles,
7  there was an effort at one point to sell the main
8  sort of retail piece there which fronts on Roosevelt
9  Road, and I think maybe an offer had actually even
10  been made at one time.
11         And then the other thing I actually should
12  point out too is I know that there was an effort
13  that the property was listed for sale at one time,
14  and it's my understanding that the thought there was
15  that they'd be open to selling the property in bulk
16  or subdividing it and selling off parcels
17  individually, and they received any offers.
18     Q.  Why did you decide that the South Loop was
19  the appropriate market to look at?
20     A.  Because that's where the subject is
21  located.
22     Q.  And is it your conclusion -- did you base
23  your conclusions on the fact that the South Loop was
24  the pertinent market to compare the property with

9 (Pages 30 - 33)

Page 34

1 other properties in?
2    A. I'm not sure I understand your question.
3    Q. I'll rephrase.
4      Were your conclusions in your expert
5 reports based on looking at market data in the
6 South Loop exclusively?
7    A. I wouldn't say exclusively, but that was
8 the primary focus certainly.
9    Q. And you defined the market to be the
10 South Loop of Chicago, right?
11    A. Yes.
12    Q. You didn't define it to be the
13 United States, for instance, or the world or the
14 Midwest region or anything like that, right?
15    A. That's correct.
16    Q. Okay. And would you agree that the
17 decision of what market to base your analysis on
18 could significantly affect the ultimate outcome of
19 your analysis?
20    A. Yes.
21    Q. How do you decide whether to look at a
22 property as a, you know, specific neighborhood
23 property, to look at the neighborhood market versus
24 to look at a national market for the property, what

Page 35

1 criteria do you use to make that decision?
2    A. I'm not sure I understand the question.
3    Q. Why did you choose to use the South Loop
4 rather than the Midwest or the nation as a whole as
5 the pertinent market to compare this property with
6 other sales and other information for?
7    A. Well, I mean, there's an old saying in
8 real estate, location, location, location, and
9 location really is a very critical part of what
10 derives value.
11      And so looking at transactions that are as
12 close to our subject property in terms of location
13 in my mind is a very important part of the analysis.
14    Q. So like, for instance, if you were
15 appraising the Willis Tower, you would look only to
16 properties in the immediate downtown Chicago area
17 because location, location, location is what
18 matters?
19    A. No. The Willis Tower obviously is a very
20 different animal.
21    Q. How so?
22    A. It's a multistory office building as
23 opposed to a 60-acre parcel of land.
24    Q. Would one criteria you'd look at be who

Page 36

1 the possible buyers are?
2    A. Sure.
3    Q. And would you agree that the possible
4 buyers for the entire 62-acre parcel were
5 international investors and national investors
6 rather than strictly local investors?
7    A. I would say that the pool of potential
8 buyers could include international buyers.
9    Q. Okay. And did you determine who the
10 potential international buyers were in this case,
11 the particular buyers?
12    A. I don't understand the question.
13    Q. Did you look at who the particular
14 potential international buyers for the 62-acre
15 parcel were in this case?
16    A. I didn't attempt to try and identify
17 specific buyers.
18    Q. Okay. And you mentioned one of the
19 possible buyers of a piece of it was the DeBartolo
20 Group; is that right?
21    MR. RYAN: He didn't mention that.
22 BY MR. YOHALEM:
23    Q. Maybe I misheard you.
24    A. No, I didn't mention that.

Page 37

1    Q. I'm sorry. You said that there was part
2 of the parcel that was previously -- that there was
3 previously an offer for sale for, correct?
4    A. I recall, yes, that there was.
5    Q. And do you remember who the buyer was in
6 that potential sale?
7    A. I don't remember who it was specifically.
8      (Exhibit 312, Exhibit 313,
9      Exhibit 314, Exhibit 315 and
10      Exhibit 316 were marked for
11      identification.)
12 BY MR. YOHALEM:
13    Q. These are Exhibits 312 through
14 Exhibits 316. Go ahead and take them. They are
15 your expert reports for this case as well as the
16 disclosures made by defendants in this case.
17      Do you want to take a look at them and
18 just verify that that is, in fact, what they are.
19    A. Yes, this appears to be my reports and my
20 disclosures.
21    Q. Okay. The first thing I'd like to ask you
22 about is your disclosure, which is Exhibit 316, and
23 specifically I'd like to ask about where under Roman
24 numeral III it says List of Documents Considered.

10 (Pages 34 - 37)

Page 38

1        Do you see that?
2     A.   Yes.
3     Q.   And are these, in fact, all of the
4  documents you considered in preparing your
5  appraisal, your four appraisals at issue in this
6  case?
7     A.   Yes.
8     Q.   Under Number 5 of the List of Documents
9  Considered, you list market analyst research --
10  excuse me, Market Analysis Research.
11        Do you see that?
12     A.   Yes.
13     Q.   How did you choose these firms as the
14  firms to use for market analysis research?
15     A.   Well, in each case these are very
16  well-known experts in the area that practice in
17  these specific markets, and these publications are
18  widely circulated and relied upon by folks in the
19  industry, so I think they're reliable sources of
20  information.
21     Q.   Why didn't you include any research from
22  Appraisal Research Group?
23     A.   That just wasn't one that we considered.
24     Q.   Do you have any opinion on Appraisal

Page 39

1  Research Group and the quality of their data for the
2  Chicago South Loop area?
3     A.   I know that Appraisal Research has been
4  around a long time. I think they've got a
5  reasonable reputation.
6     Q.   Have you used their data before in making
7  appraisals?
8     A.   I don't think so, no.
9     Q.   Do you know if market participants in the
10  South Loop for developments typically rely on
11  Appraisal Research Group data?
12     A.   I don't know.
13     Q.   Under Number 1, it says deposition
14  transcripts for Michael Rumman, Edward Wynn and
15  Anton Rezko.
16        Do you see that?
17     A.   Yes.
18     Q.   And I assume the Anton Rezko is
19  Antoin Rezko or Tony Rezko, correct?
20     A.   Yes, yes.
21     Q.   How did you decide on just reviewing these
22  three deposition transcripts?
23     A.   Well, actually Attorney Ryan suggested
24  that I review those transcripts just for some

Page 40

1  additional background on the case.
2     Q.   You're aware that other market
3  participants in this case have been deposed,
4  correct?
5        MR. RYAN:  You said "market participants"?
6        MR. YOHALEM:  Yes.
7  BY MR. YOHALEM:
8     Q.   Are you aware that other market
9  participants have been deposed in this case?
10     A.   I'm not sure what you mean by "market
11  participants."
12     Q.   Sure.  Are you aware that General
13  Mediterranean Holdings is the owner of the property
14  or General Mediterranean Holdings through Riverside
15  District Development is the owner of the property?
16     A.   Yes.
17     Q.   And are you aware that Mohammed Al-Miqdadi
18  is an officer at General Mediterranean Holdings in
19  charge of developing the property for General
20  Mediterranean Holdings?
21     A.   Yes.
22     Q.   Are you aware that he gave a deposition in
23  this case?
24     A.   I don't know.

Page 41

1     Q.   Okay.  And you didn't ask to see any of
2  his testimony, did you?
3        MR. RYAN:  Objection.  How would he be
4  able to ask if he doesn't know there was a
5  deposition taken?
6  BY MR. YOHALEM:
7     Q.   You can answer the question.
8     A.   I don't know.
9     Q.   If you knew that he had been deposed,
10  would you have asked to see his testimony?
11     A.   Not necessarily, no.
12     Q.   Did you ever talk to Mr. Al-Miqdadi?
13     A.   I have, yes.
14     Q.   Did you take any notes of your
15  conversation with Mr. Al-Miqdadi?
16     A.   Yes, there are some notes.
17     Q.   Did you take those notes?
18     A.   I believe the notes actually were taken by
19  Nick McGinn who works with me.
20     Q.   How long did you talk to Mr. Al-Miqdadi
21  for?
22     A.   Well, I've talked to him on more than one
23  occasion related to -- once related to the previous
24  assignment that I had done, but then specifically to

11 (Pages 38 - 41)

Page 42

1 these four, I would say maybe an hour at the most.
2     Q.  What specific questions did you or
3 Mr. McGinn -- excuse me.
4         Was anyone else part of that conversation
5 in this case?
6     A.  Attorney Ryan was on that call as well.
7     Q.  Anyone else?
8     A.  I believe there were two other folks from
9 Riverside Development District.
10    Q.  Who were they?
11    A.  And I don't remember their names,
12 honestly.
13    Q.  Would you be able to find them in your
14 work file?
15    A.  I might be able to, yeah.
16    Q.  And just for the record, you've brought
17 your entire work file with you here today?
18    A.  Yes.
19    Q.  Why don't you take a minute and tell me
20 who else was involved in that conversation, if you
21 have it.
22    A.  I only have the first names.  It was a
23 gentleman by the name of Ken and a woman named Mary,
24 but I don't have the last names.

Page 43

1     Q.  Okay.  So sitting here today, you can't
2 identify the first and last names of the individuals
3 you talked to from Riverside District Development in
4 forming your --
5     A.  I can identify the first names, not the
6 last names.
7     Q.  Okay.  What specifically did the people
8 involved in Riverside District Development tell you
9 about the property that you relied upon in, you
10 know, putting together your report?
11    A.  Well, the purpose of the call, you know,
12 we had done a lot of our own research and found a
13 lot of a number of things that we really just wanted
14 to confirm by talking to Mohammed and Ken and Mary,
15 and those things included, number one, we had read
16 about efforts to procure TIF funding to help with
17 the infrastructure improvements at the site and that
18 that was critical to the success of the development.
19 We wanted to confirm with them that that was, in
20 fact, the case and get a sense for the magnitude of
21 what that TIF funding might ultimately need to be,
22 so they were looking into that for us.
23        There was also a reference to an expense
24 related to grading the site and environmental

Page 44

1 remediation, and there was a figure of $6 million
2 that we'd come across.  We wanted to confirm that
3 that was, in fact, an expense that they expected to
4 incur, and they were able to confirm that.
5         There was an indication in the planned
6 development that the City approved that the owners
7 would have to make a one-time cash payment of
8 $400,000 to I think it was to help with access to
9 the property, stoplights and what have you.  We
10 wanted to confirm whether or not that cash payment
11 had actually been made by them yet or not, and they
12 confirmed that it had not been made yet.
13        We also -- one of the things that we saw
14 in the study that was done for the City Department
15 of Planning was that the concept was that the big
16 piece of retail mixed use that fronts on Roosevelt
17 Road would likely be the first piece that needed to
18 be sold off.  We wanted to get a sense from them as
19 to whether that's how they viewed this as well, that
20 that would be the first piece of the development
21 that would likely be sold off, and they confirmed,
22 yeah, that that would be.
23        I think, I think that was the gist of it.
24    Q.  Okay.  Did you have any conversations with

Page 45

1 them regarding the sale to General Mediterranean
2 Holdings in 2005?
3         MR. RYAN:  Objection.  There was no sale
4 to General Mediterranean Holdings in 2005.
5 BY MR. YOHALEM:
6     Q.  You can answer the question.
7     A.  No.
8     Q.  Did you have any conversations about the
9 sale in 2005 generally with the representatives of
10 Riverside District Development and General
11 Mediterranean Holdings?
12    A.  I don't recall that, no.
13    Q.  Was the Ken who you spoke to Ken Haldeman
14 by any chance?
15    A.  You know, I don't remember.
16    Q.  Okay.  And did you have any other
17 conversations with anyone that, you know, contained
18 information on which you based the conclusions in
19 your report?
20    A.  I don't understand your question.
21    Q.  Sure.  Are any of the conclusions in your
22 report based on conversations as opposed to
23 documents that you had with anyone else besides that
24 one conversation with representatives of Riverside

12 (Pages 42 - 45)

Page 46

1 District Development?
2    A. There were multiple, so many conversations
3 with various folks in the marketplace, I couldn't
4 even tell you how many there were, you know. Just
5 researching the market, verifying transactions,
6 talking to brokers. We had a lot of conversations
7 with a lot of different people.
8    Q. And are those conversations reflected in
9 your notes?
10    A. Yes.
11    Q. All of them?
12    A. They should be, yeah.
13    Q. And when you say various participants in
14 the marketplace, did you talk to any of the people
15 who placed offers on, you know, either the property
16 or portions of the property?
17    A. Are you talking about the subject
18 property?
19    Q. Yes.
20    A. No.
21    Q. Okay. And did you have any conversations
22 with any of the folks from Riverside District
23 Development about the offers they received for the
24 property?

Page 47

1    A. I recall I may have talked generally about
2 them.
3    Q. But you didn't talk specifically about any
4 particular offers?
5    A. I think -- I honestly don't remember.
6    Q. One of the criteria you have to do in
7 performing an appraisal of market value is to
8 analyze any current offers for sale, correct?
9    A. Yes.
10    Q. And that's, in fact, required, correct?
11    A. Yes.
12    Q. Did you ever ask Mr. Al-Miqdadi if there
13 were any current offers for sale of the property?
14    A. Yes.
15    Q. What was his answer?
16    A. No.
17    Q. Did you have any discussions with
18 Mr. Al-Miqdadi about, you know, GMH's discussions
19 with the City of Chicago about the City of Chicago
20 acquiring the property?
21    A. About the City of Chicago acquiring the
22 property?
23    Q. Yes.
24    A. I don't recall having a conversation with

Page 48

1 Mr. Miqdadi about that specifically. I've read
2 articles to that effect.
3    Q. You didn't ask Mr. Al-Miqdadi about it
4 though?
5    A. I don't remember if we asked that
6 specifically or not.
7    Q. Did you ever ask to speak to Mr. Nadhmi
8 Auchi as part of your diligence in preparing your
9 appraisal reports?
10    A. I did not.
11    Q. And you are aware that he is the ultimate
12 person in control of General Mediterranean Holdings,
13 correct?
14    A. I believe that's correct, yes.
15    Q. And any decision to buy or sell the
16 property is going to be made by Mr. Auchi, correct?
17        MR. RYAN: Objection, foundation.
18 BY MR. YOHALEM:
19    Q. You can answer.
20    A. I don't know.
21    Q. Okay. If Mr. Auchi were the person who
22 was going to make any ultimate decision on whether
23 to buy or sell the property, would you have wanted
24 to talk to him?

Page 49

1    A. It's my understanding that Mr. Al-Miqdadi
2 is his representative and is as knowledgeable about
3 the property as anybody.
4    Q. Are you aware that Mr. Auchi is a
5 billionaire?
6    A. I don't know.
7        MR. RYAN: Did you say billionaire?
8        MR. YOHALEM: Yes.
9        MR. RYAN: Foundation. It doesn't make
10 any difference. He doesn't know. Go ahead.
11 BY MR. YOHALEM:
12    Q. As part of your diligence doing your
13 report, you reviewed several newspaper articles
14 about Mr. Auchi, correct?
15    A. Correct.
16    Q. And they reported him to be a billionaire,
17 correct?
18    A. I think there's some reference to that,
19 yes.
20    Q. Okay. One of the ways he made these
21 billions of dollars was in real estate development,
22 correct?
23    A. I don't know how he made his money.
24    Q. Do you remember what the article said

13 (Pages 46 - 49)

Page 50

1  about how he made his money?
2  A.  I don't recall.
3  Q.  Do you have any reason to question
4  Mr. Auchi's expertise in real estate?
5  A.  I don't know anything about Mr. Auchi
6  other than articles that have been written.
7  Q.  Did you talk to anyone from the City of
8  Chicago about the City's plans for the property?
9  A.  Yes, that was part of our due diligence.
10  Q.  And are those reflected in your notes?
11  A.  Yes.
12  Q.  Could you find those specific notes?
13  MR. RYAN:  While he's doing that, can I
14  have not the previous question but the one before
15  that read back.
16  (Record read.)
17  THE WITNESS:  I'm not able to locate those
18  notes, but I know we did have a conversation with
19  the City.
20  BY MR. YOHALEM:
21  Q.  So you're saying, you know, sitting here
22  today with full access to your work file you can't
23  find any notes reflecting your conversations with
24  the City of Chicago?

Page 51

1  A.  That's correct, yes.
2  Q.  Okay.  When you talked to the owners and
3  developers of RDD, did you ask them for any
4  pro formas that they had created?
5  A.  There were -- they were not aware of any
6  pro formas that had been created.
7  Q.  And they told you that specifically?
8  A.  Yes.
9  Q.  And they told you they were not aware of
10  any pro formas that were created at any time during
11  GMH's development?
12  A.  We asked for financial projections, and
13  there was not anything available.
14  Q.  And if there were anything available,
15  would you have wanted to review it in preparing your
16  appraisal?
17  A.  That's another piece of data that I would
18  have wanted to take a look at.
19  Q.  Would it cause you concerns if they had
20  done projections that contradicted your appraisal
21  conclusions?
22  A.  Not necessarily, no.
23  Q.  And why not?
24  A.  Well, we were -- I was very thorough in my

Page 52

1  own market analysis, and what I was hired to do was
2  prepare my own independent opinion of value.
3  So in the context of preparing that
4  independent opinion of value, I look at data from
5  various sources, and I rely most heavily on that
6  which I believe is most reliable and indicative of
7  what's happening in the marketplace.  Any developer
8  can put together a pro forma which may or may not be
9  based on reality.
10  So in my experience, while I would
11  typically ask for a pro forma, even if they had one
12  that they gave me, I wouldn't necessarily put much
13  weight on it.
14  Q.  But you'd have to look at it to see
15  whether to put weight on it one way or another,
16  correct?
17  A.  Again, I would rely on my own research and
18  my own analysis.  I would look at the pro forma.  If
19  it seemed to jibe with what I'm seeing in the
20  marketplace, then I'd say okay, it makes sense.  If
21  it doesn't and I feel strongly about the research
22  that I've done, then it wouldn't cause me issues one
23  way or the other.
24  Q.  Did you do your own pro forma?

Page 53

1  A.  Yes.
2  Q.  And where is it -- is it in your report?
3  A.  It's the discounted cash flow analysis.
4  Q.  Okay.  And just looking at your 2 -- why
5  don't we look at your 2007 report.
6  Can you tell me which pages your pro forma
7  appears on?
8  A.  It's summarized on Page 70.
9  Q.  Yes.  Is that the entire pro forma is on
10  Page 70, or just the summary is on Page 70?
11  A.  That's the summary on Page 70.  All the
12  analysis that goes into that is preceding that,
13  so ...
14  Q.  Okay.  So can you just tell me the pages
15  that the entire analysis consists of?
16  A.  Well, it's the whole report.
17  Q.  Okay.  That's what I'm confused by.
18  So is the pro forma your entire report, or
19  is it going to be the discounted cash flow analysis
20  that you did?
21  A.  Well, the pro forma, and I wouldn't
22  actually even call it a pro forma, but it's my
23  projection of what the value of the property would
24  be --

14 (Pages 50 - 53)

Page 54

1    Q.  Okay.
2    A.  -- based on these cash flows, but it's --
3 the whole report is just that.
4    Q.  But you would agree that this doesn't take
5 the form of a traditional pro forma, correct?
6    A.  No, I wouldn't agree with that.
7    Q.  So this is -- your expert report is what a
8 pro forma usually looks like?
9    A.  I'm not sure I understand the question.
10    Q.  Sure.  Pro formas usually are fairly
11 detailed Excel spreadsheets, correct?
12        MR. RYAN:  I'm going to object, form,
13 context of the question.
14        Go ahead.
15        THE WITNESS:  I don't agree with that.
16 BY MR. YOHALEM:
17    Q.  Okay.
18    A.  I've seen a variety of pro formas.
19    Q.  Okay.  What percentage of your work is as
20 a testifying expert?
21    A.  Me personally or the firm?
22    Q.  You personally.
23    A.  Me personally, I'd say probably less than
24 10 percent of my time is spent actually testifying

Page 55

1 in cases.
2    Q.  Okay.  My question is a little bit
3 different.  I'm not asking about specifically
4 sitting for deposition.  I mean working on a case on
5 which you are testifying expert.
6        What percentage of your time is spent
7 doing that?
8    A.  I would say maybe 25 percent, 30 percent.
9    Q.  And what's the remainder of your time
10 spent doing?
11    A.  Well, as the leader of our real estate
12 group, a lot of my time is spent on administrative
13 and management issues, but specific to the actual
14 producing of expert opinions, I would say the rest
15 of my time is spent on matters like what we call
16 financial reporting, which is valuations that are
17 done for the purposes of accounting.  The other big
18 chunk of time would be valuations for trusts and
19 estate type matters for high-net-worth individuals
20 who need to do some estate planning or trust
21 planning.
22    Q.  How many times have you been a testifying
23 expert in a case?
24    A.  Where I've actually testified?

Page 56

1    Q.  No, where you've been retained to be a
2 testifying expert.
3    A.  I don't know.  It's many times.
4    Q.  More than you can count?
5    A.  Yes.
6    Q.  How many times have you had your
7 deposition taken?
8    A.  I would say 15 to 20 times, something like
9 that.
10    Q.  I want to turn to, just staying with the
11 2007 report, which is Exhibit 313, if you could turn
12 to Page 75.
13    A.  Yes.
14    Q.  I just wanted to understand what some of
15 these certifications mean.
16        Can you tell me what the first one, it
17 says the statements and facts contained in this
18 report are true and correct means?
19    A.  Well, it's just that.  I mean, that's sort
20 of self-explanatory that the statements of the facts
21 about the -- in the report, whether it's the
22 physical description of the property or the real
23 estate taxes, for instance, things that are known
24 things, they are true and correct.

Page 57

1    Q.  Okay.  And it's important that the facts
2 in the report and upon which the report are based
3 are true and correct, correct?
4    A.  Yes.
5    Q.  Okay.  The one, two, three, four, five,
6 sixth bullet point down says, "My analyses, opinions
7 and conclusions were developed in this report was
8 prepared in conformity with the Uniform Standards of
9 Professional Appraisal Practice of the Appraisal
10 Foundation as well as the Code of Professional
11 Ethics and Standards of Professional Appraisal
12 Practice of the Appraisal Institute."
13        Do you see that?
14    A.  Yes.
15    Q.  Can you tell me what the Code of
16 Professional Ethics and Standards of Professional
17 Appraisal Practice of the Appraisal Institute is?
18    A.  Sure.  Well, first of all, USPAP is really
19 the rules and regulations, the guidelines that we
20 all have to follow, and when I use USPAP, that's the
21 acronym for Uniform Standards of Professional
22 Appraisal Practice.
23    Q.  And that's the first one that you're
24 referring to?

15 (Pages 54 - 57)

Page 58

1    A.  Right.
2    Q.  Okay.  I'll let you finish.  I'm sorry.
3    A.  Okay.  So the Appraisal Institute, which
4  is the organization that confers the MAI
5  designation, we have our own set of ethics and
6  standards that go above and beyond what USPAP calls
7  for, so it's really a set of supplemental standards
8  and ethical guidelines that we as members of the
9  Appraisal Institute must follow.
10    Q.  Okay.  So USPAP is sort of the minimal
11  standard that all appraisers have to follow; is that
12  right?
13    A.  Yes.
14    Q.  And the Code of Professional Ethics and
15  Standards of Professional Appraisal Practice is a
16  heightened code that all MAIs have to follow; is
17  that right?
18    A.  That's correct, yes.
19    Q.  And so if an appraisal report fails to
20  conform to USPAP, it's in violation of the minimal
21  code that all appraisers have to follow, correct?
22    A.  That's correct, yes.
23    Q.  And does USPAP, is USPAP limited to
24  appraisals of real property?

Page 59

1    A.  No.  It actually USPAP covers personal
2  property as well as financial valuation as well.
3    Q.  So someone performing a financial
4  valuation would also have to conform to USPAP then?
5    A.  I'm not a financial valuation expert, so I
6  don't know the answer to that.
7    Q.  But USPAP by its own terms regulates
8  financial valuation, correct?
9        MR. RYAN:  If you know.
10        THE WITNESS:  Excuse me?
11        MR. RYAN:  I'm objecting on foundation.
12        THE WITNESS:  I don't know.
13  BY MR. YOHALEM:
14    Q.  Okay.  Have you ever testified against --
15  have you ever testified in litigation where other
16  appraisers, you know, represent the other parties in
17  the case?
18    A.  Yes.
19    Q.  And have you ever -- have those other
20  appraisers ever violated USPAP when you've gone
21  against them?
22    A.  Yes, I believe that has happened.
23    Q.  And when that's happened, you know, what
24  has been your opinion on the validity of their

Page 60

1  conclusions?
2    A.  My opinion of the validity of their
3  conclusions is that they're not valid.
4    Q.  And in part because they violate USPAP
5  they're not valid, correct?
6    A.  Correct.
7    Q.  So if an appraisal report violates USPAP,
8  it is not a valid appraisal, correct?
9        MR. RYAN:  Objection, foundation,
10  hypothetical.
11        THE WITNESS:  I don't think that
12  necessarily follows.  It depends on the specific
13  violation.
14  BY MR. YOHALEM:
15    Q.  So are there minor violations of USPAP
16  that are okay?
17    A.  I think, I think it's possible for there
18  to be a minor violation of USPAP that doesn't
19  undermine the credibility of the whole report.
20    Q.  What would be examples of minor violations
21  of USPAP that are acceptable?
22    A.  Well, an example might be, and this is
23  hypothetical, but the certification that we're
24  looking at right now, this is a prescribed

Page 61

1  word-for-word document that USPAP says must be
2  included in the report.  If for some reason someone
3  inadvertently excluded one of these bullet points,
4  you'd say they're technically in violation of USPAP,
5  but that wouldn't necessarily undermine the
6  credibility of the whole report.
7    Q.  Anything else you can think of that would
8  be a violation of USPAP that wouldn't undermine the
9  credibility of a report?
10    A.  I'm sure there's others, but that's one
11  example.
12    Q.  We can come back later to that.
13        Now would be a good time for a break.  I
14  think we've been going for about an hour.  It's up
15  to you.  I can keep going.
16        MR. RYAN:  I don't care.  I can keep
17  going.  It's up to you.
18        THE WITNESS:  I'm fine.
19        MR. YOHALEM:  Okay.  We will keep going.
20  BY MR. YOHALEM:
21    Q.  Staying with Exhibit 313, which is the
22  2007 appraisal, your conclusion is that the -- let
23  me back up a second actually.
24        Throughout your four reports for the

16 (Pages 58 - 61)

Page 62

1  subject property that are part of this litigation,
2  you used the same general methodology, correct?
3      A.  Yes.
4      Q.  And for all the four same reports, you
5  used the discounted cash flow analysis, correct?
6      A.  That's correct.
7      Q.  And is it fair to say that the value of
8  the parcel would have stayed within the range of,
9  you know, what the four reports dictated the value
10  to be generally over the duration of the time
11  between the first report and the last report?
12      MR. RYAN:  Can I have that question read
13  back?
14      MR. YOHALEM:  I'll rephrase.
15  BY MR. YOHALEM:
16      Q.  Have there been any significant market
17  fluctuations that would make the value of the
18  parcel, you know, be far different during the
19  duration of the four reports than the conclusions
20  you reach in the four reports?
21      A.  Yes.
22      Q.  And what would those market fluctuations
23  be?
24      A.  Well, as we all know, the economy went

Page 63

1  through a very prolonged and difficult recession
2  beginning roughly around 2008, which had a huge
3  impact on the real estate market, and values went
4  down as a result of that and continued to go down,
5  you know, based on my research in the Chicago area
6  roughly until around 2012 or so, when then the
7  values started to bounce back again.
8      Q.  Okay.  So there was a time period between
9  2008 and 2012 where the market value of the parcel
10  might have been below any of the values in your
11  report; is that correct?
12      A.  Yes.
13      Q.  Is there any time during the duration of
14  your report when the market value of the parcel
15  might have been significantly above the valuations
16  reached in your report?
17      A.  No.
18      Q.  Okay.  I started to start with the 2007
19  report, but I actually want to start with the 2005
20  report.  That's Exhibit 312, if you want to get it
21  in front of you.
22      If you could turn to romanette ii, which
23  is where you state your market value conclusion the
24  first time?

Page 64

1      A.  Yes.
2      Q.  So your conclusion is that the market
3  value of the 62-acre parcel as of October 1st,
4  2005, was $70 million, correct?
5      A.  Yes.
6      Q.  And you are, I'm sure you are aware, you
7  mentioned in your reports, that number is
8  significantly different than the sale price that was
9  reached one month later between General
10  Mediterranean Holdings and Roosevelt Clark
11  Development, correct?
12      A.  I'm sorry, could you repeat that?
13      Q.  Yeah.  So your market value is for
14  October 1st, 2005, at $70 million, correct?
15      A.  Yes.
16      Q.  Okay.  And you are aware that on
17  November 1st, 2005, the property sold for in
18  excess of $130 million, correct?
19      A.  Yes.
20      Q.  Okay.  What is the reason why that
21  transaction doesn't undermine the conclusion that
22  your market value of $70 million is accurate?
23      A.  Well, it's my understanding that that
24  $130 million transaction was between related

Page 65

1  parties; in other words, the buyer and the seller
2  were effectively the same parties, just kind of
3  doing a deal between themselves.
4      I don't know what the motivation was in
5  that transaction, but just by virtue of the fact
6  that it was between related parties, I would not put
7  any reliance on that at all.  It's certainly not
8  reflective of market value.
9      Q.  So it's your understanding that more was
10  paid in the 2005 transaction by a factor of
11  $60 million than what the property was actually
12  worth at the time?
13      A.  If they had asked me as of that date what
14  the market value of the property was, I would have
15  told them $70 million.
16      Q.  Okay.  And it's your understanding that
17  the transaction was between the parties themselves,
18  is that what you said?
19      A.  It's my understanding that they were
20  related, you know, it was the same individuals on
21  both sides of the transactions, maybe different
22  configurations.  I don't -- I'm not completely
23  familiar with the structure, but they were
24  definitely related.

17 (Pages 62 - 65)

Page 66

1  Q.  Did you study the structure of the
2  transaction at all?
3  A.  I did not.
4  Q.  Where did you get your understanding that
5  the transaction was the same individuals on both
6  sides not at arm's length?
7  A.  Well, I read those three deposition
8  transcripts, and also it was my understanding from
9  Attorney Ryan that that was the case as well.
10  Q.  Are you aware of other contemporaneous
11  offers for the parcel at the exact same time that
12  came in around $130 million from other parties that
13  bid on the property?
14  A.  I'm not aware of any, no.
15  Q.  Would that have affected your conclusion
16  that the $130 million number was not reflective of
17  market value?
18  A.  Are you saying offers or actual closed
19  transactions?
20  Q.  Well, offers that were rejected.
21  A.  I would not put any weight on offers.
22  Q.  Why not?
23  A.  It's not a meeting of the minds.  It's
24  not -- who knows what the motivation is, and who

Page 67

1  knows why they backed out.  Maybe they determined
2  that it's not worth what they originally offered.
3  Q.  Okay.  I want to rephrase though.
4      If an offer is made and the seller rejects
5  the offer, wouldn't that be indicative of the fact
6  that the amount offered is the minimal amount of the
7  value of the property?
8  A.  No.
9  Q.  Why not?
10  A.  There could be a whole host of reasons why
11  the seller rejected.  I don't know what that
12  ultimate reason was.
13  Q.  You would have to investigate it, right?
14  A.  Again, it's a deal that never happened,
15  that never closed, so I would put no weights and no
16  reliance on it at all.
17  Q.  Right.  But there was a deal that closed
18  for $131 million, that you're also putting no
19  reliance on the deal that did close, right?
20  A.  You know, as appraisers we have to be very
21  careful when analyzing every transaction, and you'll
22  see that we did this in our report where we verified
23  the details of every sale to make sure, number one,
24  that it's an arm's length transaction and not

Page 68

1  between related parties, because as soon as we see
2  that, it makes the whole transaction unreliable.
3  Q.  And so what exactly is your understanding
4  of the relationship of the parties in the 2005
5  transaction?
6  A.  I don't have a thorough knowledge of it.
7  It's just my understanding that Mr. Rezko as well as
8  GMH, they were on both sides of the transaction in
9  terms of control and ownership, and it was a deal
10  done to -- I don't even remember exactly, but just
11  was not a reflection of the market value.
12  Q.  Are you aware that there were limited
13  partners in Roosevelt Clark, the seller of the
14  property, who thought the value given by GMH was too
15  low for the property?
16  A.  I don't know.
17  Q.  And were you aware that a lawsuit was
18  filed because the value of the sale was too low
19  according to the limited partners?
20  A.  I don't know that.
21  Q.  And I think you testified to this, but you
22  don't know that Lehman Brothers made an offer for
23  $135 million at the same time, do you?
24  A.  No.

Page 69

1  Q.  And that's irrelevant to your analysis as
2  well?
3  A.  Again, it's not a closed transaction.
4  Q.  And also irrelevant that Moody Group made
5  an offer for $150 million for a piece of the
6  property shortly after the transaction closed?
7  A.  I'm not aware of that.  I have no
8  knowledge of that.
9  Q.  If you did have knowledge, would you
10  conclude it was irrelevant?
11  A.  Again, it's not a closed transaction.
12      MR. YOHALEM:  Why don't we take a short
13  break now.
14      THE VIDEOGRAPHER:  The time is now
15  9:46 a.m.  We are off the record.
16      (Whereupon, a recess was taken
17      from 9:46 a.m. to 9:56 a.m.)
18      THE VIDEOGRAPHER:  This is the beginning
19  of Disk Number 2.  The time is now 9:56 a.m.  We are
20  on the record.
21  BY MR. YOHALEM:
22  Q.  Mr. VanSanten, before we went on -- let me
23  back up.
24      During break, did you discuss any of your

18 (Pages 66 - 69)

Page 70

1 testimony with counsel or anyone else?
2    A.  Yes, we talked a little bit about it.
3    Q.  And what were your discussions about your
4 testimony during break?
5    A.  Just keep telling the truth.
6    Q.  Nothing else was said --
7    A.  No.
8    Q.  -- besides keep telling the truth?
9         Was anything discussed about the 2005 sale
10 during the break?
11    A.  No.
12    Q.  Okay.  Before we took the break, we were
13 discussing the 2005 sale that you discounted as a
14 non-arm's length transaction, correct?
15    A.  Yes.
16    Q.  I just want to be clear about what exactly
17 you did to reach that conclusion.
18         Was that a conclusion you yourself reached
19 about the sale, or was it a conclusion, an
20 assumption that you made about the sale based on
21 what you were told by counsel and others?
22    A.  No, it was a conclusion that I reached
23 based on looking at the deposition transcripts and
24 the way they described the transaction and who was

Page 71

1 involved and the various parties, and then it was
2 also confirmed by conversations with Attorney Ryan.
3    Q.  Can you show me where in your report you
4 actually analyze that 2005 sale?
5    A.  Well, it wouldn't be in the 2005 report
6 because our date of value is before that.
7    Q.  Sure.
8    A.  So, for instance, the 2007.
9    Q.  Let me speed up this process.  I know on
10 Page 5 of your 2007 report you have an ownership
11 history that discusses it.
12    A.  Right.
13    Q.  Other than the ownership history, is there
14 any other portion of your reports that discusses why
15 it's not an arm's length transaction sale?
16    A.  No.
17    Q.  Is there anywhere in your work file that
18 discusses why it's not an arm's length transaction
19 sale?
20    A.  No.
21    Q.  Okay.  And do you have any notes about why
22 it's not an arm's length transaction sale that are
23 not in your work file?
24    A.  Anything should be in the work file.

Page 72

1    Q.  But sitting here, you're not aware of any
2 notes that discuss why it's not an arm's length
3 transaction sale?
4    A.  No.
5    Q.  So if someone wanted to replicate your
6 analysis of why it wasn't an arm's length
7 transaction sale, how would they do that exactly?
8    A.  Well, they would look at the deposition
9 transcripts that I reviewed which describe that
10 transaction, and then they would have a conversation
11 with someone knowledgeable of the transaction like I
12 did with Mr. Ryan.
13    Q.  And just so I'm clear, are you basing some
14 of your conclusions specifically on the facts that
15 Mr. Ryan told you?
16    A.  No.  It's, as I said, I reviewed the
17 deposition transcripts, gathered the facts from
18 those, and then I confirmed that information with
19 Mr. Ryan, so ...
20    Q.  Okay.  But you didn't review any of the
21 deposition transcripts of any of the buyers of the
22 property, right?
23    A.  I don't think that's correct, no.  As I
24 recall, I reviewed the deposition transcripts for

Page 73

1 Mr. Rumman, Tony Rezko, and one other individual,
2 and as I indicated before, those guys were on both
3 sides of the transaction, so you're the seller and
4 the buyer.
5    Q.  Okay.  Let me -- maybe I'm not being
6 clear.
7         Did Mr. Rumman put up any money as part of
8 the transaction in 2005?
9    A.  I don't -- I don't know.
10    Q.  Okay.  Did Mr. Rezko put up any money as
11 part of the transaction in 2005?
12    A.  I don't know.
13    Q.  Did Mr. Wynn put up any money as part of
14 the transaction in 2005?
15    A.  I don't know.
16    Q.  Was it in any of their depositions?
17    A.  I don't recall.
18    Q.  Okay.  So when you say that they were part
19 of the buyers, what do you mean by that?
20    A.  It's my understanding that they were
21 principals in the entities that acquired the
22 property.
23    Q.  Was it your understanding that they were
24 principals in Riverside District Development?

19 (Pages 70 - 73)

Page 74

1    A.  I don't understand the whole structure.
2  There was a lot of different ownership structures.
3  But it was my understanding, again, that they were
4  on both sides of the transaction.
5    Q.  Were they principals in General
6  Mediterranean Holdings?
7    A.  I don't know.
8    Q.  Okay.  Are you aware that General
9  Mediterranean Holdings is the only entity that put
10  up capital as part of the 2005 transaction?
11    A.  I don't know that.
12    Q.  Okay.  Would it affect your analysis one
13  way or another?
14    A.  No.
15    Q.  And you didn't want to review any of the
16  GMH transcripts at well?
17    A.  I didn't think it was relevant.
18    Q.  Did Mr. Ryan tell you they weren't
19  relevant?
20    A.  No.
21    Q.  You just concluded that on your own?
22    A.  Yes.
23    Q.  But Mr. Ryan told you that the Wynn,
24  Rumman and Rezko transcripts were relevant, right?

Page 75

1    A.  He suggested that I review those.
2    Q.  Okay.  And did he specifically suggest
3  that you review them to analyze the 2005
4  transaction?
5    A.  No.  He just said I should review those.
6    Q.  If Rezko, Rumman and Wynn were not
7  principals in part of the entity that bought the
8  property in 2005, would that change your analysis as
9  to whether it was an arm's length transaction or
10  not?
11    A.  I would need to know more beyond that.
12    Q.  How do you define a buyer of property?
13    A.  I mean, I guess the buyer could be a
14  company; it could be an individual.
15    Q.  I understand that.  How do you -- what
16  is -- when you say they were not -- they were part
17  of the buyer, what are you basing -- what are you
18  trying to convey by saying that?
19    A.  What I'm trying to convey is that so if
20  you have a company that buys or an entity that buys
21  a property, the people who have an ownership stake
22  in that company then would be part of the buyers.
23    Q.  Do you know what a preferred return is?
24    A.  I've heard the term.  I can't say that I

Page 76

1  can give you a definition of what it is.
2    Q.  Do you know what Mr. Rezko's ownership
3  stake in Riverside District Development was, if any?
4    A.  I don't know.
5    Q.  Do you know what Mr. Wynn's ownership
6  stake in Riverside District Development was, if any?
7    A.  I don't know.
8    Q.  Do you know what Mr. Rumman's ownership
9  stake in Riverside District Development was, if any?
10    A.  I don't know.
11    Q.  Do you know if General Mediterranean
12  Holdings considered Rezko, Rumman and Wynn part of
13  the buyers of part of the 2005 transaction?
14    A.  I don't know.
15    Q.  Do you know if Rezko himself considered
16  himself one of the buyers in the 2005 transaction?
17    A.  I don't know.
18    Q.  Was it in his deposition transcript?
19    A.  It may have been.  I don't recall.
20    Q.  Do you know if Mr. Rumman considered
21  himself one of the buyers in the 2005 transaction?
22    A.  I don't know.
23    Q.  Do you remember seeing it in his
24  deposition transcript?

Page 77

1    A.  I don't recall.
2    Q.  Okay.  Do you know if Mr. Wynn considered
3  himself one of the buyers in part of the 2005
4  transaction?
5    A.  I don't know.
6    Q.  And do you know if he said anything about
7  it in his deposition transcript?
8    A.  I don't recall.
9    Q.  And did you highlight any portions of
10  their deposition transcripts that related to why you
11  concluded it was not an arm's length transaction?
12    A.  No.
13    Q.  And is that because -- is that your usual
14  custom and practice, to leave no record of the
15  deposition testimony you relied upon in reaching
16  your conclusions that it wasn't an arm's length
17  transaction?
18    A.  I don't understand your question.
19    Q.  Is it your custom and practice as a
20  testifying expert to leave no record of the basis
21  for your conclusion that it wasn't an arm's length
22  transaction?
23    A.  I don't think that would be an accurate
24  statement.

20 (Pages 74 - 77)

Page 78

1    Q.   Okay.  So if someone wanted to go see what
2  in the depositions made you conclude that it wasn't
3  an arm's length transaction, how would they be able
4  to do that?
5    A.   They could read the transcript.
6    Q.   And just figure out from the whole
7  transcript what you -- what made you think that it
8  wasn't an arm's length transaction?
9    A.   I'm very confident they would come to the
10  same conclusion that I did.
11    Q.   And as part of the 2005 transaction, if at
12  the time the transaction actually closed neither
13  Rezko, Rumman nor Wynn had any portion of the
14  ownership of the property, would that change your
15  analysis as to whether it was an arm's length
16  transaction?
17    A.   I don't know.
18    Q.   Why don't you know?
19    A.   I would have to know more about the whole
20  circumstance behind it.
21    Q.   Did you ever ask Mr. Ryan whether
22  Mr. Rezko, Mr. Wynn or Mr. Rumman took an ownership
23  stake in the parcel as part of the 2005 transaction?
24    A.   I don't recall asking that specific

Page 79

1  question.
2    Q.   Okay.  And do you recall anywhere in the
3  deposition transcripts any testimony about any of
4  those persons taking an ownership interest in the
5  parcel as part of the 2005 transaction?
6    A.   I recall -- well, you know what, I don't
7  remember specifically.
8    Q.   Okay.  How long would it take you sitting
9  here today to find in the deposition transcripts the
10  testimony you're relying upon to conclude that there
11  weren't arm's length transactions?
12    A.   Those are pretty lengthy transcripts which
13  occurred over several days.  I'm sure it would take
14  a while for me to find the specific spot.
15    Q.   Okay.  So you wouldn't be able to do it
16  immediately?
17    A.   No.
18    Q.   Okay.  Would you agree that your analysis
19  of the 2005 transaction was important to your
20  appraisal report?
21    A.   I'm not sure I understand the question.
22    Q.   Yeah.  Was your analysis of the 2005
23  transaction important to your conclusions as to
24  value of the property in 2005?

Page 80

1    A.   That was one factor to be considered.
2    Q.   And, in fact, we discussed earlier USPAP.
3  It's one factor that's required to be considered
4  under USPAP?
5    A.   Right.
6    Q.   Okay.  Would you expect another appraiser
7  appraising the property for the period of time where
8  the transaction -- excuse me.
9        USPAP requires you to analyze past sales,
10  correct?
11    A.   Within a three-year period of time, right.
12    Q.   And if an appraisal report, you know,
13  reaches conclusions about value and discusses a
14  transaction, you would expect the appraiser to
15  analyze that transaction, right?
16    A.   I'm sorry, could you repeat that?
17    Q.   Yeah.  I'm not asking a very good
18  question.
19        If there's a transaction that is mentioned
20  in an appraisal report, you'd expect the appraiser
21  to analyze that transaction, right?
22    A.   A transaction involving the subject
23  property?
24    Q.   Yes.

Page 81

1    A.   Yes.
2    Q.   Okay.  And it would be an important piece
3  of analysis to analyze whether or not it was an
4  arm's length transaction, right?
5    A.   Yes.
6    Q.   And it was important enough that you
7  mentioned in your appraisal report that it was not
8  an arm's length transaction, and that's the reason
9  why you discounted the significance of that; is that
10  correct?
11    A.   Yes.
12    Q.   And you would expect another appraiser
13  analyzing the same, you know, the same piece of
14  property and the same transaction to reach the same
15  conclusion and put it in his report, right?
16    A.   If they've done their appropriate due
17  diligence, yes.
18    Q.   Okay.  And so an appraiser who didn't put
19  that in his report about the transaction would not
20  have done their appropriate due diligence, right?
21    A.   With regard to that specific factor, yes.
22    Q.   Okay.
23        MR. YOHALEM:  Go ahead and mark this 317.
24

1          (Exhibit 317 was marked for
2     identification.)
3 BY MR. YOHALEM:
4     Q.   Mr. VanSanten, you've been handed what's
5 been marked as Exhibit 317.  This is a real estate
6 appraisal done as of, effective as of April 1st,
7 2009.
8          Do you see that?
9     A.   Yes.
10    Q.   Okay.  And it was done by your firm,
11 correct?
12    A.   Yes.
13    Q.   Okay.  Now, it wasn't you who did it,
14 right?  It was someone else at your firm?
15    A.   Right.
16    Q.   And the person who did it at your firm was
17 Korin Arvila; is that correct?
18    A.   Neither one of these people are working
19 for the firm anymore, but it was Korin Arvila and
20 Jeff Pelegrin.
21    Q.   All right.  Were they fired from your
22 firm?
23    A.   I don't know the circumstances of their
24 departure.

1     Q.   Do you consider them incompetent
2 appraisers?
3     A.   I don't have an opinion one way or the
4 other.  I never actually worked with them, so ...
5     Q.   Did you work simultaneously at your firm
6 with them?
7     A.   They were before my time at SRR.
8     Q.   So you replaced them at SRR?
9     A.   I don't know the exact timing, so I don't
10 know if I necessarily replaced one, but ...
11    Q.   Do you know if they were asked to leave
12 SRR?
13    A.   I believe Mr. Pelegrin actually was.  I
14 don't know about Ms. Arvila.
15    Q.   Why was Mr. Pelegrin asked to leave?
16    A.   I don't know the answer to that.
17    Q.   Okay.  I'd like to turn to Page 3 of the
18 report.
19          Do you see under Current Ownership and
20 Sales History of the Subject Property?
21    A.   Yes.
22    Q.   Do you see it discusses the
23 November 1st, 2005 sale?
24    A.   Yes.

1     Q.   And there's no mention in this discussion
2 of it not being an arm's length transaction, is
3 there?
4     A.   No, there does not appear to be.
5     Q.   Do you think your firm violated USPAP in
6 generating the 2009 report?
7     A.   No.
8     Q.   Why not?
9     A.   Well, I think they clearly made a mistake
10 in not referencing the fact that it was not an arm's
11 length transaction, but I don't think it rises to
12 the level of being a USPAP violation.
13    Q.   Okay.  You can put Exhibit 317 to the
14 side.
15          Did you ever review Exhibit 317 as part of
16 your appraisal in this case?
17    A.   I took a look at it.  I can't say that I
18 spent a lot of time reviewing it.
19    Q.   Did you ever review the work file for the
20 appraisal which is Exhibit 317 as part of your work
21 for this case?
22    A.   No.
23    Q.   Why not?
24    A.   I don't think it was particularly

1 relevant.  It was -- I was asked to prepare my own
2 independent opinion of value as of four specific
3 dates.  I didn't think that the work files
4 associated with this was relevant.
5     Q.   You didn't have any curiosity as to why
6 Exhibit 317 didn't conclude that the 2005 sale was
7 not an arm's length transaction?
8     A.   I wasn't particularly concerned with that,
9 no.
10    Q.   Sorry, I have another question.  If you
11 can look back at Page 3 of Page 317 -- Exhibit 317.
12    A.   On which page, I'm sorry?
13    Q.   Exhibit -- sorry, Page 3 of Exhibit 317.
14    A.   Okay.
15    Q.   Do you see the statement under the Current
16 Ownership and Sales History of the Subject Property
17 that says, "Based on the analysis in this appraisal,
18 the commercial real estate market at the time of the
19 sale was very different from the current market,
20 and, therefore, the current value is not
21 surprisingly much lower than the indicated sales
22 price?
23    A.   Yes.
24    Q.   Was that a true statement, that the

22 (Pages 82 - 85)

Page 86

1 commercial real estate market at the time of the
2 sale was very different from the current market?
3   A.  I would say that the market, the state of
4 the market in 2009 was certainly different than the
5 state of the market when -- when that November 2005
6 transaction took place.
7   Q.  And would you say that that would explain
8 the difference between $130 million and $59 million?
9   A.  No.
10   Q.  Okay.  You can put Exhibit 317 aside.
11       (Exhibit 318 was marked for
12       identification.)
13       MR. RYAN:  318?
14       MR. YOHALEM:  318, yes.
15 BY MR. YOHALEM:
16   Q.  Mr. VanSanten, you've been handed what's
17 been marked as Exhibit 318.
18       You see this is an e-mail from
19 Eric Nordeen to Ken Haldeman, Daniel Mahru, copying
20 Michael Rumman?
21   A.  Uh-huh.
22   Q.  Does this refresh your recollection as to
23 whether Ken Haldeman was the Ken you spoke to from
24 Riverside District Development?

Page 87

1   A.  No, I still don't remember.
2   Q.  Okay.  Do you see that this e-mail
3 attaches pro formas to it?
4   A.  It does appear to have pro formas
5 attached, yes.
6   Q.  Okay.  I want to talk first about -- and
7 it contains summaries of pro formas, right?
8       MR. RYAN:  What e-mail?
9 BY MR. YOHALEM:
10   Q.  The e-mail contains summaries of
11 pro formas, correct?
12   A.  I don't know what this is.  I guess it
13 talks about pro formas.  I'm not sure what.
14   Q.  Okay.  It talks about the three pro formas
15 that are attached, correct?
16   A.  I guess.  I haven't seen the attachments,
17 so ...
18   Q.  Okay.  The first paragraph talks about the
19 land development pro forma, right?
20   A.  Yes.
21   Q.  Okay.  And that estimates the land buy-out
22 price to have increased from 130 million to
23 155 million, correct?
24   A.  That's what it says.

Page 88

1   Q.  That's quite different from your
2 conclusions, correct?
3   A.  Yes.
4   Q.  The second thing it talks about is the
5 annual price escalation being 10 percent, correct?
6   A.  Yes.
7   Q.  That too is quite different from your
8 conclusions, correct?
9   A.  You know, it varies from date of value to
10 date of value.  I know I had escalations in there.
11 I don't think they rose to as high as 10 percent
12 though.
13   Q.  In fact, they're consistently well below
14 10 percent, correct?
15   A.  I think that's correct, yes.
16   Q.  When you did your pro formas, did you ever
17 evaluate the current dollar sales prices of parcels
18 for specific units?
19   A.  I'm not sure I understand the question.
20   Q.  Yeah.  When you did you -- you said you
21 did a pro forma in your reports.
22       Did you ever analyze the specific current
23 sales prices for units for condos and for townhomes?
24   A.  In the Market Analysis section, I looked

Page 89

1 at the affordability of different sale prices of
2 units and how many people within the market area
3 could actually afford units at the given prices.
4   Q.  Okay.  So is the answer to my question yes
5 or no?
6   A.  Well, I think I analyzed sale prices of
7 units in that context.
8   Q.  Okay.  Did you ever do a pro forma based
9 on sales prices of units?
10   A.  No.
11   Q.  Okay.  The second pro forma summarized is
12 a vertical mixed use pro forma.
13       Do you see that?
14   A.  Yes.
15   Q.  Okay.  The first thing it talks about is
16 rental rates, correct?
17   A.  Yes.
18   Q.  That's $42 per square foot for triple net,
19 right?
20   A.  That's what it says here, yes.
21   Q.  Do you know what triple net is?
22   A.  Yes.
23   Q.  What's triple net?
24   A.  Well, triple net is commonly referred to

23 (Pages 86 - 89)

Page 90

1 in a lease of space, whether it might be retail
2 space or office space, as net to the landlord.
3    Q.   So that's after all expenses are taken
4 out, right?
5    A.   Correct, yes.
6    Q.   In doing your pro formas, did you analyze
7 the rates of triple net in 2005?
8    A.   No.
9    Q.   Okay.  Bullet point 3 under vertical mixed
10 use pro forma analyzes residential sales prices.
11       Do you see that?
12    A.   Yes.
13    Q.   And the residential sales prices are at
14 $410 per square foot, correct?
15    A.   That's what it says, yes.
16    Q.   And that's radically different from your
17 conclusions about residential sales prices per
18 square foot, correct?
19    A.   No, I didn't make any conclusions about
20 residential sale prices her square foot.
21    Q.   So you didn't analyze residential sale
22 prices per square foot?
23    A.   For condo units, no.
24    Q.   Okay.  Why didn't you?

Page 91

1    A.   Because I'm valuing vacant land.
2    Q.   And why did you do -- well, we will get to
3 that, okay.
4       Do you see the next bullet point down is
5 residential parking prices?
6    A.   Yes.
7    Q.   That was valued at 36,000 per space,
8 correct?
9    A.   That's what it says.
10    Q.   And you didn't do any valuation of
11 residential parking prices, did you?
12    A.   No.
13    Q.   The next pro forma is for lofts, townhomes
14 and condos, correct?
15    A.   Yes.
16    Q.   Okay.  And that has condo sales prices at
17 $410 per square foot, correct?
18    A.   Yes.
19    Q.   And I think we went over this, but did you
20 analyze condo sales prices as part of your report?
21    A.   On a per-square-foot basis, no.
22    Q.   Okay.  And it has townhome sale prices by
23 a square foot basis as well, correct?
24    A.   Correct.

Page 92

1    Q.   And its townhome sale prices, square foot
2 prices are 320 to $350, correct?
3    A.   Yes, right.
4    Q.   And did you analyze townhome sale prices
5 per square foot?
6    A.   No.  No.
7    Q.   Okay.  Next thing it analyzes again is
8 residential parking prices.
9       Do you see that?
10    A.   Yes.
11    Q.   And you didn't analyze residential parking
12 prices, did you, right?
13    A.   No.
14    Q.   These pro formas were as the land if it
15 were to be developed, correct?
16       MR. RYAN:  Objection, foundation.
17       THE WITNESS:  I don't know what these
18 pro formas were based on.
19 BY MR. YOHALEM:
20    Q.   Okay.  If you had known about these
21 pro formas and you were talking on the phone with
22 Ken Haldeman, would you have asked him about it?
23    A.   You know, I would probably have asked him
24 about it.  I view it as interesting information, but

Page 93

1 at the end of the day, it doesn't really play into
2 my valuation.
3    Q.   Okay.  You can put Exhibit 318 aside.
4       (Exhibit 319 was marked for
5       identification.)
6 BY MR. YOHALEM:
7    Q.   I've handed you what's been marked as
8 Exhibit 319.  This is another e-mail attaching
9 pro formas.
10       Do you see that?
11    A.   Yes.
12    Q.   Also to Ken Haldeman.
13       Do you see that?
14    A.   Yes.
15    Q.   Okay.  And this says, "Ken, here is a
16 combined pro forma for the north end of the site as
17 discussed."
18       Do you see that?
19    A.   Yes.
20    Q.   And they did it based on two ways, right,
21 400 -- $400 per square foot pricing and $350 per
22 square foot pricing, right?
23    A.   That appears to be, yes.
24    Q.   Okay.  And those were the numbers that

24 (Pages 90 - 93)

Page 94

1 U.S. Equities was comfortable with, right, according
2 to the e-mail?
3    A.   According to the e-mail, yes.
4    Q.   And are you aware that U.S. Equities was
5 providing financing for the project?
6    A.   I'm not aware of that, no.
7    Q.   Do you see that based on these pro formas
8 it makes estimates of land values?
9    A.   No, I don't see that.
10   Q.   Under Observations, do you see bullet
11 point 2?
12       MR. RYAN:  Objection to foundation.
13 BY MR. YOHALEM:
14   Q.   Do you see bullet point 2?
15   A.   I see a second bullet point there, yes.
16   Q.   Okay.  This says, "As modeled, the
17 combined cash flows would justify the following land
18 valuations for this segment of the site," correct?
19   A.   Yes.
20   Q.   Okay.  And the first thing it does is
21 explains that the pro forma based on the $400 per
22 square foot case, correct?
23   A.   That appears to be correct, yes.
24   Q.   And this appears to be applying the income

Page 95

1 capitalization rate, correct?
2       MR. RYAN:  Objection, foundation.
3       THE WITNESS:  I have no idea what this is
4 applying.
5 BY MR. YOHALEM:
6    Q.   Okay.  Well, according to the document, it
7 reaches land valuation conclusions for that parcel
8 of land at 12 percent at $400 per square foot of
9 121 million, correct?
10       MR. RYAN:  Objection, foundation.
11       THE WITNESS:  Honestly I can't tell.
12 There's such limited information here, I can't tell
13 what they're doing.
14 BY MR. YOHALEM:
15   Q.   Okay.  Would you have asked Ken Haldeman
16 about this e-mail if you had it when you talked to
17 him on the phone?
18       MR. RYAN:  Objection, speculation.
19       THE WITNESS:  If I had it, I might have
20 asked him about it.
21 BY MR. YOHALEM:
22   Q.   Are you surprised no one from Riverside
23 District Development told you about these pro formas
24 that they did when you asked specifically about

Page 96

1 them?
2       MR. RYAN:  He didn't say he asked
3 specifically about these type of pro formas.
4 BY MR. YOHALEM:
5    Q.   You can answer.
6    A.   I didn't ask specifically for this type of
7 pro forma.
8    Q.   You didn't ask for pro formas?
9    A.   Not for a pro forma like this, no.
10   Q.   You can put Exhibit 319 to the side.
11       (Exhibit 320 was marked for
12       identification.)
13 BY MR. YOHALEM:
14   Q.   You've been handed what's been marked as
15 Exhibit 320.  This is another document produced by
16 GMH in this litigation.  This is another project
17 pro forma.
18       Do you see that?
19   A.   Yes.
20   Q.   It's for the Riverside District
21 Development, correct?
22   A.   Correct.
23   Q.   And it calculates sales valuation,
24 correct?

Page 97

1    A.   I'm not sure what it's calculating.
2    Q.   Do you see under Revenue where it says
3 Sales Valuation?
4    A.   I see that heading, yes.
5    Q.   Okay.  And do you see that it calculates
6 an amount for gross sales?
7    A.   Yes.
8    Q.   The amount it calculates is 349,735,000,
9 correct?
10   A.   Yes.
11   Q.   Now, did you calculate an amount for gross
12 sales of the property?
13   A.   I did.
14   Q.   What was your amount for gross sales of
15 the property?
16   A.   I think it varies from year to year.
17   Q.   Did you calculate one for 2006?
18   A.   No.
19   Q.   Okay.  Did you calculate 2005 gross sales?
20   A.   I did.
21   Q.   And what was your number for that?
22   A.   Sorry.  I'm referring to Page 68 of my
23 2005 report, and in the far right-hand column about
24 two-thirds of the way down, you can see the total

Page 98

1 income estimated at 152,423,000.

2 Q. Okay. So your number differed from

3 Rezmar's by approximately $200 million, correct?

4 A. Yes.

5 Q. Okay. And can you look at your numbers

6 for 2007.

7 A. Okay.

8 Q. What are your numbers for 2007 for gross

9 sales?

10 A. 169,016,000.

11 Q. So you're off by approximately

12 $180 million compared to the Rezmar pro forma; is

13 that correct?

14 A. There's a difference of that amount, yes.

15 Q. You can put Exhibit 320 aside -- one more

16 question.

17 If you had known about Exhibit 320 from

18 GMH's production in this case, would you have asked

19 GMH about it when you talked to them?

20 A. Yes, I probably would have asked about it.

21 Q. Okay. And would you have expected GMH to

22 provide you documents such as Exhibit 320 when you

23 asked for financial information and modeling that

24 was done for the site?

Page 99

1 A. I would have expected that they'd provide

2 me any information they had.

3 Q. Okay. Including this Exhibit 320?

4 A. Sure.

5 Q. Okay.

6 (Exhibit 321 was marked for

7 identification.)

8 BY MR. YOHALEM:

9 Q. This is another pro forma that's been

10 marked as Exhibit 321.

11 Would you have expected that GMH would

12 have given you this document when you asked about --

13 asked for financial information related to the

14 project if they had it?

15 A. This looks like it ties directly into the

16 document we looked at before, so yeah, I would have

17 suspected that would have been provided too.

18 Q. So you would have asked representatives of

19 Riverside District Development about this document

20 if you had had it when you talked to them, correct?

21 A. I would have had a discussion with them

22 about it, yes.

23 Q. And this again reaches a total sales

24 valuation number of $349,735,000, correct?

Page 100

1 A. Correct.

2 Q. Okay. Put that exhibit to the side.

3 (Exhibit 322 was marked for

4 identification.)

5 BY MR. YOHALEM:

6 Q. This is an investment opportunity offering

7 that was put together and was part of GMH's

8 production in this case.

9 If you could take a quick look through the

10 document, would you have expected GMH to provide you

11 with this document when you asked for financial

12 information about the site?

13 A. No.

14 Q. Okay. Do you see the last page of the

15 document puts together a financial summary?

16 A. I'm sorry.

17 Q. It's GMH Native 83188.

18 A. Yes, okay.

19 Q. And do you see that this puts together an

20 estimate of the amount of proceeds that would end up

21 in Heritage's hands based on projected development

22 of the property?

23 MR. RYAN: Foundation, object on

24 foundation grounds.

Page 101

1 THE WITNESS: I don't -- I don't really

2 follow this.

3 BY MR. YOHALEM:

4 Q. So you just don't understand what

5 Exhibit 322 is?

6 A. No.

7 Q. Okay. Would you have asked anyone from

8 GMH about Exhibit 322 if you had it available in

9 your phone call with them?

10 A. No.

11 Q. Put Exhibit 322 aside.

12 (Exhibit 323 was marked for

13 identification.)

14 BY MR. YOHALEM:

15 Q. You've been handed what's been marked as

16 Exhibit 323.

17 Do you see that?

18 A. Yes.

19 Q. Do you see that that's a detailed Excel

20 spreadsheet that's an estimate of the vertical

21 construction?

22 A. It appears that's what it's titled, yes.

23 Q. Would you have expected that GMH would

24 have provided you with this document when you

26 (Pages 98 - 101)

Page 102

1 requested financial information about the
2 development of the site?
3    A.   No.
4    Q.   Why not?
5    A.   Well, because I'm valuing the property as
6 vacant. The development of these units and
7 buildings over time and their pro forma wouldn't
8 necessarily be relevant to my own independent
9 analysis.
10    Q.   How would you conclude that the highest
11 and best use was to sell the property as vacant
12 without examining the potential gains from
13 developing the property?
14    A.   Well, to be clear, the property is vacant,
15 and I was asked to value the land as if vacant, and
16 so that's exactly what I did. I valued the property
17 based on what a typical buyer would pay for the
18 property as vacant, and the process that I went
19 through is the only method for coming up with a
20 reliable indication of market value for the land as
21 it exists.
22    Q.   When a -- who would be a typical buyer
23 buying the land as vacant?
24    A.   It would be a developer.

Page 103

1    Q.   And the purpose of the developer acquiring
2 the land would be to develop it, correct?
3    A.   Correct.
4    Q.   And so the income that the developer could
5 generate by developing the land would be relevant to
6 the purchase price that it paid for the property,
7 correct?
8    A.   Correct.
9    Q.   So wouldn't you have to do a determination
10 about what the developer could expect to earn by
11 developing the property to adequately --
12    A.   I've effectively done that through my
13 analysis of other comparable land sales in the
14 immediate area. It takes that all under
15 consideration.
16    Q.   But you didn't take -- you don't think it
17 would have been relevant to take into consideration
18 the actual development plans and pro formas for the
19 actual parcel?
20    A.   You know, there's a tremendous amount of
21 speculation and assumptions that went into this
22 pro forma which may or may not be based in reality.
23 What I look at in my analysis is actual closed
24 transactions of similar land sales in the area.

Page 104

1 Those are the best and only reliable indication of
2 what market value of the subject property is.
3    Q.   Do you see the conclusion on Page 1 that
4 the land purchase price is $286 million?
5    A.   I'm sorry, which, which page are you
6 referring to?
7    Q.   323, the first page of the exhibit.
8       Do you see the conclusion for total of the
9 land purchase price is $286,300,000, correct?
10    MR. RYAN:  Where is that?
11    MR. YOHALEM:  At the bottom of where it
12 says Land Purchase Price, the total at the bottom.
13    THE WITNESS:  I see that number, the
14 286 million.
15 BY MR. YOHALEM:
16    Q.   Are you familiar with the term "land
17 purchase price"?
18    A.   Sure.
19    Q.   And does land purchase price mean the cost
20 of the land while vacant, the price that the land
21 while vacant will command?
22    MR. RYAN:  Objection, foundation. He
23 didn't create this document.
24

Page 105

1 BY MR. YOHALEM:
2    Q.   What do you understand the term "land
3 purchase price" to mean?
4    A.   I understand it to be a price that someone
5 is willing to pay for land.
6    Q.   Vacant, correct?
7    A.   Correct.
8    Q.   Undeveloped?
9    A.   Correct.
10    Q.   Okay. And so in this pro forma generated
11 by Riverside District Development and not shared
12 with you by GMH, they conclude the land purchase
13 price is $286,300,000 for the parcel?
14    MR. RYAN:  Objection, foundation.
15    THE WITNESS:  It appears that that's what
16 their estimate of what it might be is.
17 BY MR. YOHALEM:
18    Q.   Okay. And you consider that totally
19 irrelevant to your analysis?
20    A.   Again, I conducted my own independent
21 analysis based on actual closed transactions as
22 opposed to hypothetical projections that are thrown
23 out there.
24    Q.   You can put Exhibit 323 to the side.

27 (Pages 102 - 105)

Page 106

1          (Exhibit 324 was marked for
2          identification.)
3 BY MR. YOHALEM:
4    Q.  You've been handed what's been marked as
5 Exhibit 324.  This is another document in GMH's
6 production in this case, also called a pro forma,
7 Development Pro Forma.
8        Do you see that?
9    A.  Yes.
10    Q.  And would you have expected GMH to provide
11 this document to you when you asked for financial
12 documents about the development of the land?
13    A.  They may have or may have not.
14    Q.  Would you have discussed this document
15 when you talked to GMH and its representatives on
16 the phone?
17    A.  If I had this, I probably would have
18 discussed it with them, yes.
19    Q.  Okay.  And this reflects the development
20 pro forma for $370 per square foot condo pricing,
21 correct?
22    A.  I'm not sure what it reflects.
23    Q.  Okay.  You'd have to talk to them to know
24 what it reflects exactly?

Page 107

1    A.  Right.
2    Q.  You can put Exhibit 324 to the side.
3          (Exhibit 325 was marked for
4          identification.)
5 BY MR. YOHALEM:
6    Q.  You've been handed what's been marked as
7 Exhibit 325.  This is another document from GMH's
8 production.
9        You weren't provided this document, right?
10    A.  No, I was not.
11    Q.  And would you have expected GMH to provide
12 this document to you when you asked for financial
13 information about the parcel?
14    A.  I don't -- I don't know whether they would
15 have provided this or not.
16    Q.  Okay.  Do you see that it's titled
17 Development Pro Forma?
18    A.  Yes.
19    Q.  And do you see it has various numbers,
20 looks like they're expressed in multiples of 1,000.
21        Do you see that?
22    A.  This is very hard to read, so I can't
23 really tell what's there.
24    Q.  Okay.  Would you have discussed

Page 108

1 Exhibit 325 when you spoke to representatives of GMH
2 and Riverside District Development on the phone
3 about the property if you had it with you?
4    A.  Yeah, I mean, at the end of the day you're
5 got a lot of great models and projections and what
6 have you, so I certainly would have wanted to
7 discuss that to understand what their reasoning was,
8 but at the end of the day, it would be one piece of
9 the puzzle of my own independent analysis, so it
10 goes to the weight of how much emphasis I would put
11 on something like this.  It's got no foundation in
12 fact.  It's just a bunch of numbers that someone put
13 together, and you can't value the property without
14 doing your own independent research of actual closed
15 transactions.
16    Q.  Put Exhibit 325 to the side.
17        Did you do any independent research about
18 closed transactions for individual condo units?
19    A.  No.
20    Q.  Did you do any independent research for
21 actual closed transactions for townhome units?
22    A.  No.
23    Q.  And did you do any independent research
24 for closed transactions about office rents?

Page 109

1    A.  No.  I was valuing a piece of vacant land,
2 not an improved condo or townhouse or office
3 building.
4    Q.  Okay.  And did you do any independent
5 analysis of approved transactions of retail rents?
6    A.  No.
7          (Exhibit 326 was marked for
8          identification.)
9 BY MR. YOHALEM:
10    Q.  This is yet another -- you've been handed
11 what's been marked as Exhibit 326.  This is another
12 document from GMH's production in this case titled
13 Development Pro Forma.
14        Do you see that?
15    A.  Yes.
16    Q.  That's valuing condos at $350 per square
17 foot.
18        Do you see that?
19    A.  Yes.
20    Q.  And would you have expected them to have
21 provided you with this document when you asked for
22 financial information about the site?
23    A.  They might have.
24    Q.  Okay.  And if you had had document -- if

28 (Pages 106 - 109)

Page 110

1 you had had Exhibit 326 with you when you spoke to
2 representatives of Riverside District Development
3 and GMH on the telephone, would you have discussed
4 Exhibit 326 with them?
5    A.   I probably would have asked them about it.
6    Q.   Okay.  Put Exhibit 326 to the side.
7            (Exhibit 327 was marked for
8            identification.)
9 BY MR. YOHALEM:
10    Q.   You've been handed what's been marked as
11 Exhibit 327.  This is another document from GMH's
12 production appearing to total land purchase price
13 again.
14       Do you see that?
15    A.   Yes.
16    Q.   Okay.  And if you had -- would you have
17 expected GMH to have provided you with Exhibit 327
18 when you asked them for financial information about
19 Riverside District Development?
20    A.   Yes.
21    Q.   And if you had had Exhibit 327 with you
22 when you spoke to GMH and Riverside District
23 Development about the property, would you have asked
24 them about Exhibit 327?

Page 111

1    A.   Yes.
2    Q.   Put Exhibit 327 aside.
3            (Exhibit 328 was marked for
4            identification.)
5 BY MR. YOHALEM:
6    Q.   Exhibit 328 is another pro forma that was
7 within GMH's production.
8       Do you see that?
9    A.   Yes.
10    Q.   Okay.  And this purports to calculate the
11 leveraged development pro forma adjusted for
12 inflation.
13       Do you see that?
14    A.   Yes.
15    Q.   And it concludes the total net revenue at
16 $308,269,891, correct?
17    A.   Yes.
18    Q.   Okay.  Would you have expected GMH to
19 provide you with Exhibit 328 when you asked them for
20 financial information about the property?
21    A.   Yes.
22    Q.   And would you have discussed Exhibit 328
23 with GMH when you talked to them on the phone about
24 the property?

Page 112

1    A.   Yes.
2    Q.   You can put Exhibit 328 to the side.
3            (Exhibit 329 was marked for
4            identification.)
5 BY MR. YOHALEM:
6    Q.   And Exhibit 329 is yet another development
7 pro forma from GMH's production.
8       Do you see that?
9    A.   Yes.
10    Q.   And would you have expected GMH to provide
11 you with this document when you asked them for
12 financial information about Riverside District
13 Development?
14    A.   Yes.
15    Q.   And would you have discussed Exhibit 329
16 with GMH when you talked to the representatives in
17 preparing your appraisal report?
18    A.   Yes.
19    Q.   You can put Exhibit 329 to the side.
20       I believe all your -- we've talked about
21 this already, but all of your appraisals use the
22 same general methodology, correct?
23    A.   Yes.
24    Q.   And the summary of that methodology is --

Page 113

1 you know, the final reconciliation is on page, for
2 instance, Page 71 of your 2005 appraisal report,
3 correct?
4       MR. RYAN:  Which one again now?
5       MR. YOHALEM:  Exhibit, Exhibit 312.
6       THE WITNESS:  And which page are you
7 talking about?
8 BY MR. YOHALEM:
9    Q.   Page 71.
10    A.   So could you repeat the question?
11    Q.   Yeah, sure, I'll do it now.
12       The box on Page 371 that talks about
13 summary of market value conclusions, do you see
14 that?
15    A.   Correct.
16    Q.   That summarizes the three approaches that
17 could have been used for this property in your
18 appraisal report, correct?
19    A.   That summarizes the three traditional
20 approaches to value and what my conclusion was for
21 each.
22    Q.   Okay.  So I just want to go through them.
23       So you didn't get a conclusion to value
24 using a cost approach, correct?

29 (Pages 110 - 113)

Page 114

1    A.  Correct.
2    Q.  And you didn't get a conclusion to value
3  using the sales comparison approach, did you?
4    A.  Well, I need to clarify that the unit
5  prices for the individual parcels of land were
6  determined all through the sales comparison
7  approach, but the overall value of the property was
8  determined through the income and capitalization
9  approach.
10    Q.  Okay.  So you didn't determine the overall
11  value of the property through the sales comparison
12  approach, correct?
13    A.  Correct.
14    Q.  Okay.  So the only determination of value,
15  overall value for the property is from the income
16  capitalization approach, correct?
17    A.  That's correct, yes.
18    Q.  Okay.  Within the income capitalization
19  approach, you used a discounted cash flow analysis,
20  correct?
21    A.  That's correct.
22    Q.  And you didn't use any other type of
23  income capitalization approach besides the
24  discounted cap --

Page 115

1    A.  No.
2    Q.  Excuse me, I'll finish the question.
3       -- besides the discounted cash flow
4  analysis, correct?
5    A.  That's correct.
6    Q.  Why didn't you try to use an income
7  approach for the property?
8    A.  I did.
9    Q.  I'll rephrase.
10       Why didn't you try and reach a conclusion
11  about value of the property using expected income
12  from developing the property?
13    A.  I did.  I estimated an income based on
14  selling off the parcels over a period of time.
15    Q.  Okay.
16    A.  Which is the appropriate way to value this
17  property.
18    Q.  How can you value the land without knowing
19  what could be built and what a developer can afford
20  to pay for it?
21    A.  Well, actually I did know what could be
22  built, and that's what I incorporated into my
23  analysis.  There's a very thorough discussion within
24  the report referencing the planned development as to

Page 116

1  what could be built there, and that's how I based my
2  analysis.
3    Q.  Did you ever do an analysis of the amount
4  of money a developer could receive for developing
5  the property and selling off developed units of the
6  property rather than undeveloped parcels of the
7  property?
8    A.  I'm not sure I understand your question.
9    Q.  Yeah.  Did you ever do an analysis of what
10  a developer could expect to make as income
11  developing the property rather than selling off
12  parcels of the property?
13    A.  I did not, no.
14    Q.  Okay.  And why didn't you?
15    A.  Well, you're talking about the scope of
16  this project was 60 acres, 24 different parcels, an
17  approved floor/area ratio over 6,900,000 square
18  feet.  It would require so much speculation and so
19  many assumptions it would render the analysis
20  unreliable.
21       In this case, we have very, very good
22  sales data of land, vacant land transactions that I
23  used in my analysis to compare to the subject, and
24  in my opinion, that's the most reliable indication

Page 117

1  of what the value of this property is because it
2  reflects what other buyers and sellers had agreed to
3  on similar transactions.
4    Q.  If you had such good sales data, why
5  didn't you do the sales comparison approach to get a
6  final value?
7       MR. RYAN:  Objection.  He said he did
8  incorporate into the income capitalization.
9  BY MR. YOHALEM:
10    Q.  You can answer my question.  That's an
11  incorrect speaking objection.
12    A.  I did incorporate it into my analysis.
13  It's a very thorough sales comparison approach
14  analysis.
15    Q.  Do you understand that there's a
16  difference between the sales comparison approach and
17  a discounted cash flow analysis using potential
18  sales of parcels?
19    A.  I don't understand your question.
20    Q.  Okay.  Maybe -- why don't we turn back to
21  Page 71.  Maybe that will clarify things.
22       Okay.  In your box there's something
23  called the sales comparison approach, correct?
24    A.  Correct.

30 (Pages 114 - 117)

Page 118

1    Q. You did not apply the sales comparison
2 approach to reach a market value indication, did
3 you?
4    A. I did, and it starts on Page 52 of my
5 report.
6    Q. Okay. So in your box on Page 71 where it
7 says "sales comparison approach not applied," that's
8 not accurate?
9    A. The sales comparison approach was not
10 applied for valuing the entire parcel. It was
11 valued for -- it was applied for valuing the
12 components that make up the parcel.
13    Q. And so my question to you is, why didn't
14 you apply the sales comparison approach to value the
15 total parcel?
16    A. Because there aren't any other sales of
17 60-acre parcels of land in the area to compare it
18 to.
19    Q. Okay. So is it your understanding that
20 the -- did you look at national sales of like
21 properties?
22    A. I wouldn't do that.
23    Q. Why not?
24    A. Because national sales are coming from

Page 119

1 totally different locations, totally different
2 markets, and would not be relevant to the South Loop
3 on the south side of Chicago.
4    Q. Okay. Why don't you turn to Page 62 of
5 your 2005 report.
6    A. Of my which report?
7    Q. 2005 report, the one you're on.
8    A. Okay.
9    Q. Okay. Do you see at the end of
10 residential sites you say, "We conclude to an
11 estimated value of $23 per square foot of FAR for
12 these parcels"?
13    A. Yes.
14    Q. What does FAR mean?
15    A. It's floor/area ratio.
16    Q. Okay. When you say that "we conclude to
17 an estimate value of $23 per square foot of
18 floor/area ratio for these parcels," what did you
19 mean by that?
20    A. That means for those identified parcels, I
21 estimate that the market value as of 2005 would have
22 been $23 per square foot of FAR.
23    Q. Okay. And then for the large mixed use
24 site, you say you conclude a value of $15 per square

Page 120

1 foot of FAR; is that correct?
2    A. That's correct, yes.
3    Q. So the market value in 2005 for those
4 parcels was $15 per square foot, correct?
5    A. Correct.
6    Q. Okay. And then for the mixed use and
7 retail sites, the market value in 2005 per square
8 foot was $26 of FAR; is that correct?
9    A. That's correct.
10    MR. YOHALEM: Okay. Why don't we take a
11 short break.
12    THE VIDEOGRAPHER: The time is now
13 10:58 a.m. We are off the record.
14    (Whereupon, a recess was taken
15    from 10:48 a.m. to 11:08 a.m.)
16    THE VIDEOGRAPHER: This is the beginning
17 of Disk Number 3. The time is now 11:08 a.m. We
18 are on the record.
19 BY MR. YOHALEM:
20    Q. Mr. VanSanten, before we took a break, we
21 were discussing Page 62 of your report, your 2005
22 report.
23    During the break, did you discuss your
24 testimony with anyone?

Page 121

1    A. No.
2    Q. Did you discuss anything else about this
3 case with anyone?
4    A. No.
5    Q. You were talking about Page 62 of your
6 2005 report where you broke it down, you broke the
7 parcel down into three different sets of parcels on
8 the 62-acre lot, correct?
9    A. Correct.
10    Q. Okay. Can you tell me how many square
11 feet were part of the residential sites that you
12 valued at $23 per square foot?
13    A. Well, the table on Page 68, which is the
14 summary of the discounted cash flow, this lays out
15 the sale of each of the various parcels, and it
16 gives you the square footage for each of those
17 parcels, and so that's where those figures are.
18    Q. Sure. Just so I can get a clean number,
19 what would be the total for the residential sites?
20 I have a calculator if it would help you.
21    A. Yeah.
22    Q. Here you go.
23    A. No, I've got my own calculator.
24    Q. Sure.

31 (Pages 118 - 121)

Page 122

1    A.  Hold on a second.
2        I haven't actually added it up that way,
3  so it might take me a little bit to figure it out.
4    Q.  That's fine.  Like I said, I have a
5  calculator if that would help.
6        And you know, just I'll of course let you
7  do whatever you think is appropriate.  I note that
8  the other two -- excuse me.  The large mixed use
9  site does state the square footage, but the other
10  two do not, I guess.
11    A.  Right.  And actually maybe an easier place
12  to look would be on Page 39.
13    Q.  Yeah.
14    A.  Where I've got the description of the
15  properties, and you can see all the residential
16  sites there.  You can just add those up to come up
17  with a net area.
18    Q.  Yeah.  Do you want to do that?
19    A.  Okay.
20    Q.  Sir, just to interrupt before we waste a
21  lot of time, on Page 39 is there a way to derive
22  FAR, or would you then multiply by the FAR rate to
23  get the total square footage?
24    A.  No, the FAR is spelled out in the zoning

Page 123

1  section.
2    Q.  Right.
3    A.  And it's dictated by the planned
4  development.
5    Q.  Right, yeah.  I guess the number I'm
6  trying to get is the --
7    A.  The total FAR?
8    Q.  Yeah, the square foot, yeah, right.
9    A.  The square footage of the site?
10    Q.  The square footage of the FAR.
11    A.  Of the FAR, okay.
12    Q.  Yeah.
13    A.  All right.  So that's on Page 42.  If you
14  look at that chart, you can see there it has, and
15  this is all dictated by the City and their Planned
16  Development Number 904, so it's verbatim from that,
17  but you have the column with the net land area,
18  square footage, and then do you see the calculation
19  where we applied the maximum FAR as dictated by the
20  City to come up with a maximum FAR square footage
21  then for each of those parcels.
22    Q.  Okay.  So can you sitting here now add up
23  the maximum FAR, the maximum allowable FAR for each
24  of the three categories that you've described in the

Page 124

1  sales comparison approach, just so we have a clean
2  number that we all agree on?
3    A.  Sure.
4        All right.  I've got it.
5    Q.  Okay.  So what do you have as the total
6  FAR for the residential sites for Category 1?
7    A.  3,077,308.
8    Q.  Okay.  And what do you have -- for the
9  large mixed use site, you have 680,000 square feet;
10  is that right?
11    A.  No, it's 3,031,396.
12    Q.  Wait, I'm sorry, you've lost me for a
13  second.  The large mixed use site, what is that?
14    A.  3,031,396.
15    Q.  And what is it for the mixed use retail
16  site?
17    A.  801,536.
18    Q.  Sorry, 801,000?
19    A.  536.
20    Q.  Okay.  So for the residential sites, you
21  calculated the per square footage of FAR at $23 per
22  square foot, correct?
23    A.  Correct.
24    Q.  So using a market value of $23 per square

Page 125

1  foot of FAR, what does the market value of 3,777,308
2  come out to?
3        MR. RYAN:  I thought he said it was market
4  value.  You made a mistake.
5        Can you read the question back?
6        MR. YOHALEM:  Improper speaking objection.
7        MR. RYAN:  Can I ask him to read the
8  question back?
9        MR. YOHALEM:  No, the witness can answer
10  my question.
11        MR. RYAN:  I said can I have the question
12  read back.
13        MR. YOHALEM:  I know what you said, and
14  it's improper.  I know exactly what you're trying to
15  do, and it's improper.
16        MR. RYAN:  I can have the question read
17  back to me.
18  BY MR. YOHALEM:
19    Q.  You can go ahead and answer the question.
20        Using a market value of $23 per square
21  foot of FAR and an FAR of $3,777,000 --
22  70,308 square feet, what do you get for the market
23  value of the residential sites?
24    A.  That wouldn't be the market value of the

32 (Pages 122 - 125)

Page 126

1 residential sites.
2    Q.  Okay.  What would you get when you
3 multiply those two numbers together?
4    A.  It comes out to 70,778,084.
5    Q.  What do you get when you multiply the
6 3,031,396 FAR square feet by your calculation of $15
7 per square foot of FAR per market value for the
8 large mixed use sites?
9    A.  That calculation is not the market value,
10 but it's 45,470,940.
11      MR. RYAN:  45 what?
12      THE WITNESS:  45,470,940.
13 BY MR. YOHALEM:
14    Q.  And what do you get when you multiply the
15 800,536 square feet of FAR by the $26 a square foot
16 for mixed use retail sites?
17    A.  It's 20,839,936.
18    Q.  And what do you get when you add those
19 three together?
20    A.  137,088,960.
21    Q.  I just wanted to double-check one of your
22 calculations.  Can you redo the residential site
23 calculation multiplying the FAR you calculated at
24 3,777,308 times 23, because I get a slightly

Page 127

1 different number.
2    A.  And I should correct the actual FAR is
3 3,077,308.
4    Q.  Okay.  That's probably the distinction.
5 Okay.
6      And so using your numbers, you get a total
7 value of 131,880,960; is that correct?
8      MR. RYAN:  Objection, improper
9 characterization.
10      THE WITNESS:  That's not value.  That's if
11 you do the math, that's what the calculation comes
12 out to.
13 BY MR. YOHALEM:
14    Q.  And that would be value using the sales
15 comparison approach, understanding that you disagree
16 with using a sales comparison approach?
17      MR. RYAN:  No, I'm not going to -- no,
18 objection, improper characterization.
19 BY MR. YOHALEM:
20    Q.  You can answer the question.
21    A.  I -- could you ask it again?
22    Q.  Yeah.  If you applied the sales comparison
23 approach, whether it was proper or not, I understand
24 that it's your opinion that it's not proper, the

Page 128

1 number you would get using the values you concluded
2 as the market value per square foot of FAR is
3 $131,880,960, correct?
4      MR. RYAN:  Objection, form, improper
5 characterization.
6      THE WITNESS:  That's not correct.
7 BY MR. YOHALEM:
8    Q.  Okay.  What's incorrect about that?
9    A.  That's a calculation using these numbers,
10 but it's not an indication of market value via the
11 sales comparison approach.
12    Q.  How would you do a market value using the
13 sales comparison approach if not using the market
14 value per square foot of FAR?
15    A.  Well, there's a very big distinction which
16 is important to understand here, is that this is
17 what we would call the retail price of each of these
18 lots, but it's going to take many years to sell them
19 off at that price.  You can't sell them all today
20 for that price.
21      So that's where the discounted cash flow
22 analysis comes into play because you're not going to
23 find one buyer who can pay all of this for this.
24    Q.  Okay.  So just, just so I understand, if

Page 129

1 you were doing a sales comparison approach, why
2 wouldn't you look at parcels that were the size of
3 the 62 acres which were sold rather than smaller
4 units that couldn't be sold if you were trying to
5 figure out the sales comparison approach?
6    A.  Because there's no transactions like that
7 that exist.
8    Q.  So is it your testimony that it is
9 impossible to do a sales comparison approach that
10 yields a number for market value for a property as
11 big as 62 acres?
12    A.  It's my testimony that in the particular
13 circumstance surrounding the subject as of these
14 dates of value, there are no other 60-acre sale
15 transactions out there which to compare it to.
16    Q.  And it's your testimony that no single
17 buyer would buy it for $131,888,960 as of
18 October 2005?
19    A.  That's correct.
20    Q.  Isn't it odd that GMH bought the property
21 for $130 million in November 2005?
22      MR. RYAN:  Form.  Objection, form.
23 BY MR. YOHALEM:
24    Q.  You can answer.

33 (Pages 126 - 129)

Page 130

1    A.  It's a coincidence.
2    Q.  Ironic, huh?
3        Okay.  Let's go to your income
4  capitalization approach.  The first thing I want to
5  talk about is discount rate.
6        How did you pick a 17 percent discount
7  rate?  It's on Page 67 of your 2005 report.
8    A.  Sure.  Well, I relied on -- there's an
9  investor survey that's very well-known, very heavily
10 relied upon by real estate participants throughout
11 the industry called Korpacz Real Estate Investor
12 Survey.  They publish it quarterly, and they provide
13 capitalization rates and discount rates for a
14 variety of different property types.
15       In particular, I relied in this case on
16 the section they call their national development
17 land market, which looks at and surveys investors
18 who are investing in development land just like the
19 subject property and asking them what kind of rate
20 of return do you typically require on an investment
21 of this nature.  And so that's where I obtained the
22 information to base my conclusion on for the
23 discount rate.
24    Q.  Do you have this survey that you based

Page 131

1  your conclusion on in your work file?
2    A.  I do.
3    Q.  Could you show it to me?  And maybe we
4  should take a short break and I'll make copies so I
5  can make it an exhibit.
6        MR. RYAN:  Let him find it first to make
7  sure he has it and then we can take a break.
8        MR. YOHALEM:  Sure, that's fine.
9        THE WITNESS:  Just so we're clear, I would
10 be citing a different one for each of the dates of
11 values.
12       MR. YOHALEM:  Okay.  Why don't you pull
13 all of them then just so we have them all.
14       THE WITNESS:  So there's the third quarter
15 2005.
16       MR. YOHALEM:  I didn't realize they
17 weren't in the same place.  Maybe it would make more
18 sense to go through 2005 first and then do the
19 others, but it's up to you.
20       MR. RYAN:  I think why don't we find them
21 all, because you're going to copy all of them,
22 right?
23       MR. YOHALEM:  Yes.
24       MR. RYAN:  Then we will end up breaking

Page 132

1  four times.
2        MR. YOHALEM:  Okay.  That's fine.  I just
3  don't want to get his files out of order or
4  anything.  There's different things in different
5  places.
6        MR. RYAN:  Now you understand why I sent
7  you that e-mail about the file and how it was
8  produced to me.  Remember, you were asking about the
9  e-mails in advance and things like that?
10       MR. YOHALEM:  Right.
11       MR. RYAN:  That's what I'm saying; it was
12 just placed in different files all over the place.
13       THE WITNESS:  So this is the second
14 quarter of 2007.
15       So this is actually first quarter 2007 and
16 first quarter 2008.
17       And here's the 2014 for the current.
18       MR. YOHALEM:  Okay.  Why don't we take a
19 short break, and I'll get those all photocopied and
20 use them as exhibits.
21       THE VIDEOGRAPHER:  The time is now
22 11:32 a.m.  We are off the record.
23       (Whereupon, a recess was taken
24        from 11:32 a.m. to 11:44 a.m.)

Page 133

1        THE VIDEOGRAPHER:  The time is now
2  11:44 a.m.  We are on the record.
3        (Exhibit 330 was marked for
4         identification.)
5  BY MR. YOHALEM:
6    Q.  Mr. VanSanten, you've been handed what's
7  been marked as Exhibit 330, which is the third
8  quarter 2005 Korpacz Real Estate Investor Survey.
9        Do you see that?
10   A.  Yes.
11   Q.  Before the break, you had testified that
12 you based your discount rate upon numbers within
13 this survey; is that correct?
14   A.  That's correct, yes.
15   Q.  Can you tell me which specific part of
16 this survey discusses the numbers that you base your
17 report on?
18   A.  Yes.  It's on Page -- it's on Page 38 of a
19 survey called National Development Land Market.
20   Q.  Okay.  Any particular part of the page, or
21 is it just the range that's --
22   A.  It's the range and it has the average
23 underneath it.
24   Q.  Okay.  Do you know how this survey is put

34 (Pages 130 - 133)

Page 134

1 together?
2     A.  My understanding is that they survey
3 investors who are active in the market for this type
4 of property and collect the responses from those
5 surveys and compile them into the table that you see
6 here with the range as well as the average for all
7 those respondents.
8     Q.  Okay.  Do you know who the specific
9 investors were who were surveyed?
10     A.  Off the top of my head I don't, but
11 Korpacz in the back of their survey typically will
12 include a list of the respondents.  And this
13 actually is not the entire document.  This is just
14 the pages specific to national land development.
15     Q.  When you were preparing your report, did
16 you look at the specific investors surveyed as part
17 of this survey?
18     A.  I know I've looked at that from time to
19 time.  I don't recall specifically on this one.
20     Q.  Okay.  Do you know whether the
21 investors -- well, let me ask, does Korpacz report
22 the specific investor with a specific rate of
23 return, or does it just list total investors?
24     A.  You know, I don't recall.  I'd have to

Page 135

1 look at that section of the report again.  But
2 again, you know, this is widely relied upon by
3 everybody in the real estate industry.
4     Q.  Okay.  Do you know, the survey is a
5 national survey, correct?
6     A.  Yes, it is.
7     Q.  So it's what an investor would expect to
8 make in the national real estate market; is that
9 correct?
10     A.  No, I don't think that's correct.  I think
11 it's the respondents are from all across the
12 country.
13     Q.  Are the respondents specifically active in
14 the Chicago real estate market?
15     A.  I don't know that off the top of my head,
16 no.
17     Q.  Who are the respondents?  Do you have any
18 knowledge of who the respondents are?
19     A.  I know it's institutional investors as
20 well as developers who are active in the land
21 development market.  I can't tell you specifically
22 who they are without going back to the full survey.
23     Q.  And is it your testimony that none of
24 those institutional investors would have bought the

Page 136

1 62 acres as a complete entity or that these were --
2 I just don't quite understand your testimony as to
3 who they are.
4     Are they people who would buy the entire
5 62 acres, or are they people who would buy
6 individual parcels of the 62 acres?
7     A.  Well, so the land development market
8 survey that they do is targeting specifically
9 investors who would buy a large tract of land that
10 would then be developed over a period of several
11 years, just like the subject property.  And then the
12 discount rate or yield rate is asking them, well,
13 what kind of a yield would you want to get on that
14 investment for a property like this, just like the
15 subject property.
16     Q.  Now, what specifically about the subject
17 property makes you think that it wouldn't get a
18 yield just like all the other properties these
19 investors invest in?
20     A.  I don't think I said that.
21     Q.  So the subject property would get an
22 18 percent premier yield?
23     A.  Well, no.  I mean, as you can see here in
24 my report, I indicate that I think the appropriate

Page 137

1 yield rate would be 17 percent, slightly below the
2 average as indicated by the survey.
3     Q.  This is not -- maybe I misstated my
4 question.
5     You give a discount rate of 17 percent,
6 correct?
7     A.  Correct.
8     Q.  Right.  My question is, why would you
9 think that an investor who bought the 62 acres would
10 be unable to get a yield rate of 17 percent on the
11 62 acres?
12     A.  I don't think that's what I'm saying.  I'm
13 saying that an investor looking at the risk
14 associated with this project would view it to be
15 slightly less risky than the average development
16 that these surveyors are responding to, so that's
17 why the discount rate is actually a little bit lower
18 than the average.
19     You understand the correlation there.  If
20 I use a higher discount rate, it would actually be a
21 lower value.
22     Q.  Yeah, I do understand that.
23     But my question is, what you used as a
24 discount rate was the rate of return reported in the

35 (Pages 134 - 137)

Page 138

1 survey, reported in the Korpacz Real Estate Investor
2 Survey of institutional investors, correct?
3    A. Not just institutional investors but any
4 type of developer who would be interested in a
5 property like the subject.
6    Q. Right. So typically when they develop a
7 property like the subject, they get a rate of return
8 of, you know, somewhere between 11 percent and
9 25 percent, correct?
10    A. Correct.
11    Q. Okay. So my question is, looking at the
12 specific 62-acre parcel, is there any reason why an
13 investor shouldn't expect to get a return of
14 11 percent to 25 percent on the 62-acre parcel?
15    A. No. In my mind, they would get a return
16 at 17 percent. That's what they would be demanding
17 if they were to purchase this property.
18    Q. So why would they accept a 3 percent
19 return versus a 17 percent return on the property?
20    A. I don't understand the question. I'm
21 not --
22    Q. Okay. Maybe I'm not understanding your
23 methodology.
24    So an investor would expect a 17 percent

Page 139

1 return on the property, correct?
2    A. Right.
3    Q. Okay. And you valued the property's, you
4 know, market value -- excuse me.
5    You valued the value of the land
6 undeveloped on a per-square-footage basis we just
7 talked about at $131 million, you know, if you were
8 to apply the sales comparison approach.
9    MR. RYAN: Objection. That's not his
10 testimony.
11    THE WITNESS: Yeah, I didn't say that.
12    MR. RYAN: Really.
13 BY MR. YOHALEM:
14    Q. Okay. Well, what appreciation rate do you
15 use for the land?
16    A. I think it might vary from date of value
17 to date of value. For the 2005 report, as you'll
18 see on Page 65, I indicate that on average the price
19 for land is projected to increase at a rate about
20 3 percent per year.
21    Q. So the return of an investor on the land
22 would be 3 percent a year for the 62 acres, correct?
23    A. No.
24    Q. So what would be the return? That's what

Page 140

1 I'm --
2    A. 17 percent.
3    Q. Okay.
4    A. That's the yield that they'd be looking
5 for on their investment.
6    Q. I understand that's the yield they'd be
7 looking for on their investment. I guess what I'm
8 wondering is -- I understand what you're saying.
9    Okay. So you're saying that they would
10 not invest in the land unless it could yield
11 17 percent, and for that reason the land value must
12 be much lower than it otherwise would be; is that
13 correct?
14    A. I'm not sure that's exactly how I
15 described it.
16    MR. RYAN: Objection, form.
17 BY MR. YOHALEM:
18    Q. You're saying the present value of the
19 land would be considerably below the $131 million
20 that the price per square foot comes out to because
21 an investor would expect a yield of 17 percent and
22 pay less for the land; is that correct?
23    MR. RYAN: Objection, form.
24    THE WITNESS: Yeah, I don't really

Page 141

1 understand the question.
2 BY MR. YOHALEM:
3    Q. Okay. I'm not -- okay.
4    GMH bought the property for development in
5 2005, correct?
6    MR. RYAN: Objection, form.
7    THE WITNESS: I think wasn't it Riverside
8 Development District that bought the land?
9 BY MR. YOHALEM:
10    Q. Riverside District Development bought the
11 land in 2005, correct?
12    A. Yes.
13    Q. The purchase price was 130 million give or
14 take, correct?
15    A. I believe that's correct, yes.
16    Q. Is there any reason to believe that they
17 didn't expect a 17 percent rate of return when they
18 bought the land in 2005?
19    A. I don't know what they expected.
20    Q. Okay. Did you investigate what they
21 expected?
22    A. I didn't specifically ask them that, no.
23    Q. Okay. And we looked at some pro formas
24 that had very high yields, correct?

36 (Pages 138 - 141)

Page 142

1  MR. RYAN: Objection, foundation.
2  THE WITNESS: I don't know what kind of
3  yields the pro formas had.
4  BY MR. YOHALEM:
5  Q.  Okay. When an institutional investor
6  comes up with a number for an internal rate of
7  return, how do they go about doing that?
8  A.  Well, from talking to participants who
9  actually invest in these types of properties, my
10  understanding is they look at what their anticipated
11  cash flows are going to be over however long it's
12  going to take to sell that property off, and then
13  they look at the risk profile associated with that
14  investment, you know, how much risk is there that
15  this will actually come to fruition, because over a
16  ten-year period a lot of things can happen, and so
17  they want to be compensated then for that risk.
18  Q.  Okay. Is the rate of 17 percent that you
19  used or the discount rates that you used throughout
20  your reports the amount that a major investor, you
21  know, with millions of dollars in assets or tens of
22  millions of dollars in assets should expect to get
23  on his assets if he invested them in the
24  marketplace?

Page 143

1  A.  The discount rates that I use in each of
2  my reports are what a typical investor would
3  require. It's not for any specific investor. It's
4  for a, quote-unquote, typical investor.
5  Q.  So a typical investor of real estate, if
6  they had capital on hand, would be able to get a
7  return of approximately 17 percent, is that your
8  understanding of the --
9  A.  That's what they would be looking for in
10  order to invest in the property.
11  Q.  So here's what I'm trying to understand.
12  If the land, if the land investment yields a
13  17 percent return or that's what an investor would
14  expect but the land appreciation is only 3 percent,
15  why would an investor choose to sell it over a
16  nine-year time horizon as the highest and best use?
17  MR. RYAN: Form. Objection, form.
18  THE WITNESS: I don't understand the
19  question.
20  BY MR. YOHALEM:
21  Q.  Okay. The land is only appreciating at
22  3 percent, correct, according to your report?
23  A.  According to my -- yeah, based on my
24  projections, over that ten-year period of time, it

Page 144

1  will increase on average 3 percent a year.
2  Q.  But typically if a developer owns land
3  they can develop the land, correct?
4  A.  Yes, they can develop the land.
5  Q.  And typically if they develop the land,
6  they would get a return of approximately 17 percent;
7  that's what they would need to buy land, correct?
8  A.  No, that's not what I'm saying.
9  Q.  Okay. So what are you saying about the
10  17 percent that an investor expects when they invest
11  in land?
12  A.  Well, you know, the easiest way to maybe
13  understand it is to look at that discounted cash
14  flow page on Page 68, because this really lays it
15  all out.
16  And so as an investor, I'm looking at this
17  property and I'm saying I'm going to sell these
18  parcels off as quickly as I can, but realistically,
19  based on the condition of the market and the
20  specifics around this property, it's going to take
21  me nine years to sell off all the parcels. And I
22  know what the individual parcels are valued at
23  because we've done an analysis to figure out what
24  that would be, so I can then calculate what those

Page 145

1  cash flows would be year after year after year after
2  those parcels are sold off.
3  And then knowing that I need to get a
4  17 percent rate of return to compensate me for the
5  risk associated with this, I'm going to discount
6  those cash flows back at 17 percent to tell me what
7  I'm willing to pay for it today in order to get that
8  return.
9  Q.  So what I don't understand though is why,
10  if you were -- why if an investor bought a piece of
11  land in 2005 would they conclude that the highest
12  and best use is holding the land and selling it off
13  parcel by parcel rather than developing the land?
14  A.  You see that all the time. I mentioned
15  that with the Central Station development that they
16  did that, with the Dearborn Park development that
17  they did that. It happened -- it happens quite
18  often. That's how developers would typically look
19  at something like this.
20  Q.  Neither of those developers sold it off
21  parcel by parcel when they developed though,
22  correct?
23  A.  No, that's not true.
24  Q.  Central Park --

Page 146

1    A.  Parts of it were definitely sold off
2  parcel by parcel as well as Dearborn Park.
3    Q.  Were either Central Station or Dearborn
4  sold off entirely parcel by parcel without any
5  development by the developer?
6    A.  I don't think so, no.
7    Q.  Okay.  So for this particular property,
8  why do you think a developer would choose not to
9  develop it at all but instead to hold it over ten
10  years and just sell it off parcel by parcel?
11    A.  Well, I'm not actually saying that's
12  definitely what a developer would do.  I'm saying
13  for purposes of determining what the value of the
14  property is that this is the best way and most
15  reliable way to do that.  Any given developer might
16  do it differently, but this is how a typical
17  developer would look at it.
18    Q.  Did GMH ever look at it this way from your
19  understanding of conversations with them?
20    A.  I don't know.
21    Q.  And have they ever marketed the property
22  in such a manner to suggest that whoever buys it
23  should just hold it and sell it off parcel by
24  parcel?

Page 147

1    A.  Yes.
2    Q.  What specific materials are you referring
3  to?
4    A.  I know from reading deposition transcripts
5  again that they had CBRE list the property for sale
6  without any specific asking price and that they were
7  open to either selling the whole thing in bulk or
8  selling it off individual parcels.
9    Q.  How long did that listing last?
10    A.  I don't know how long it lasted.
11    Q.  Did it last for nine years?
12    A.  I don't know.
13    Q.  Did you ever ask anyone from GMH how long
14  they were willing to sell it parcel by parcel?
15    A.  I don't understand that question.
16    Q.  Okay.  I'm trying to understand what you
17  mean by fair market value.
18      If you were advising GMH in November 2005
19  and they had just bought the parcel for 131 million,
20  were you suggesting they sell it for $70 million?
21    A.  I would tell them that they overpaid by a
22  significant amount.
23    Q.  And would you say that they should sell it
24  for $70 million in October-November of 2005?

Page 148

1    A.  I wouldn't say anything what they should
2  sell it for.  If they asked me what the market value
3  was, I'd tell them $70 million.
4    Q.  Okay.  What if someone had offered
5  Roosevelt Clark $135 million in October of 2005 or
6  September of 2005, would you have told them to take
7  it?
8    A.  I can't answer that without knowing all
9  the parameters of the deal and what was motivating
10  it.
11    Q.  What would you need to know to tell them
12  not to take a deal that's worth twice as much as the
13  value?
14      MR. RYAN:  Objection, speculation.
15      THE WITNESS:  I mean, I would tell them
16  that the market value is $70 million.  You can take
17  whatever you want.
18  BY MR. YOHALEM:
19    Q.  You have a report for April 1st --
20  excuse me.
21      You have a report for effective
22  April 1st, 2014, correct, in this litigation?
23    A.  Yes.
24    Q.  And you valued the market value of the

Page 149

1  property today at $61 million; is that correct?
2    A.  That's correct.
3    Q.  Would you recommend that GMH sell the
4  property today for $61 million?
5    A.  If they wanted to sell the property and
6  asked me what they could reasonably get for it, I
7  would tell them $61 million.
8    Q.  We will come back to the income
9  capitalization approach.  I have a few other
10  questions.
11      If you want to turn to --
12      MR. RYAN:  Are you switching exhibits, or
13  are you staying?
14      MR. YOHALEM:  No, stay with your 2005
15  report.
16  BY MR. YOHALEM:
17    Q.  Under the Ownership History section of the
18  2005 report, do you see that?
19    A.  Yes.
20      MR. RYAN:  Sorry, what page are you on,
21  Seth?
22      MR. YOHALEM:  Page 5.
23      MR. RYAN:  Page 5.
24

38 (Pages 146 - 149)

Page 150

1  BY MR. YOHALEM:
2      Q.  You say that as of the effective date of
3  this report, title to the subject was held by
4  LaSalle Bank National Association trust number.
5      Do you see that?
6      A.  Yes.
7      Q.  And then you say according to the public
8  records, this party acquired the property on
9  February 14th, 2002, for a price of $72,300,000,
10  correct?
11      A.  Yes.
12      Q.  Who is this party that you're referring
13  to?
14      A.  The LaSalle Bank National Association
15  trust number.
16      Q.  So is the trust number a party?
17      A.  That's -- well, that's the owner of
18  record, and that's the party that acquired it in
19  2002.
20      Q.  Okay.  And is it your understanding that
21  the party that acquired it in November 2005 was the
22  LaSalle Bank National Association Trust
23  Number 127726?
24      MR. RYAN:  Objection.  It doesn't say

Page 151

1  2005.
2  BY MR. YOHALEM:
3      Q.  You can answer.  I know what my question
4  was.  You can answer.
5      A.  No, that's not what I say.  2002 is when
6  they bought it.
7      Q.  Right.  And my question is, is the buyer
8  in November 2005 to your understanding LaSalle Bank
9  National Association Trust Number 127726?
10      A.  No.
11      Q.  Who is your understanding of who the buyer
12  is in November 1st, 2006?
13      A.  2006?
14      Q.  Excuse me, November 1st, 2005.
15      A.  In 2005, my understanding is it's the
16  Riverside Development District.
17      Q.  Riverside District Development, okay.
18      The next thing you say is, "The price of
19  this previous transaction has been considered in our
20  analysis."
21      Do you see that?
22      A.  Yes.
23      Q.  Anywhere in your analysis do you actually
24  specifically analyze the price of $72,300,000?

Page 152

1      A.  I discuss it right here in the Ownership
2  History, but that's it.
3      Q.  That's it, okay.  The next thing you say
4  is, "To our knowledge, there have not been any other
5  recorded transfers of the subject within the last --
6  the past three years."
7      Do you see that?
8      A.  Yes.
9      Q.  Okay.  And are you aware of any transfers
10  between a buyer and the trust or putting it into the
11  trust?
12      A.  I, no, was not aware of that.
13      Q.  Did you investigate it at all?
14      A.  Yes.
15      Q.  Okay.  The last sentence you say is,
16  "Furthermore, the property is not currently listed
17  for sale, and there are no outstanding offers or
18  options for the sale of the property."
19      Do you see that?
20      A.  Yes.
21      Q.  And indeed that's, that's something that's
22  required by USPAP to analyze, correct?
23      A.  Yes.
24      Q.  And was it an important part of your

Page 153

1  analysis for the October 1st, 2005 valuation the
2  analysis that there were no outstanding offers or
3  options for the sale of the property and that the
4  property wasn't currently listed for sale?
5      A.  That was one piece of information that
6  needed to be considered.
7      Q.  Okay.
8      (Exhibit 334 was marked for
9      identification.)
10      MR. RYAN:  What number are we on?
11      THE COURT REPORTER:  334.
12  BY MR. YOHALEM:
13      Q.  You've been handed what's been marked as
14  Exhibit 344 [sic].  I want you to look at the
15  Background section of 334, and once you've had a
16  chance to review that first paragraph, let me know.
17      A.  Just the first paragraph?
18      Q.  Yeah, or first two paragraphs if you'd
19  like.  You can read the whole document if you'd like
20  to take a few minutes, whatever you prefer.
21      A.  Okay.
22      Q.  The first thing I'd like to ask is when
23  you requested financial information from GMH, would
24  you have expected that they'd turn over this sort of

39 (Pages 150 - 153)

Page 154

1 document to you?
2     MR. RYAN: I'm going to object to the form
3 of the question, use of "financial."
4 BY MR. YOHALEM:
5     Q.  You can answer.
6     A.  I wouldn't necessarily expect them to hand
7 this to me, no.
8     Q.  Okay.  If this document were available to
9 you, would you have analyzed it in forming your
10 appraisal?
11     A.  I would have reviewed it.
12     Q.  Would you have discussed it with
13 representatives from GMH?
14     A.  Yes.
15     Q.  Okay.  If the representations in this
16 letter are true, is your statement that there --
17 that as of October 1st, 2005, there are no
18 outstanding offers or options for sale of the
19 property, would that be consistent with the facts
20 described in this letter?
21     A.  No, it would not.
22     Q.  Okay.  And is the transaction described in
23 the letter consistent with an arm's length
24 transaction or not arm's length transaction?

Page 155

1     MR. RYAN: Objection, foundation.
2     THE WITNESS:  I can't tell from my brief
3 reading of this.
4 BY MR. YOHALEM:
5     Q.  The letter refers to the potential
6 purchaser as GMH, correct?
7     A.  Yes.
8     Q.  Okay.  It doesn't refer to the potential
9 purchaser as LaSalle Bank Trust, correct?
10     A.  Correct.
11     Q.  Okay.  And it doesn't refer to the
12 potential purchaser as Antoin Rezko, right?
13     A.  Correct.
14     Q.  Or Michael Rumman?
15     A.  Correct.
16     Q.  Or Ed Wynn?
17     A.  Correct.
18     Q.  Okay.  It also describes another potential
19 purchaser as Lehman Brothers, correct?
20     A.  Yes.
21     Q.  In fact, it describes an offer received
22 from Lehman Brothers, correct?
23     A.  Yes.
24     Q.  And Lehman Brothers, I know it no longer

Page 156

1 exists, but at the time was a sophisticated
2 institutional investor, correct?
3     A.  I don't have an opinion about
4 Lehman Brothers.  They obviously went down the tube,
5 so they weren't doing everything right.
6     Q.  Is it your understanding that
7 Lehman Brothers' real estate investment practice had
8 anything to do with why it went down the tubes?
9     A.  I don't know.
10     Q.  Okay.  Lehman Brothers had the assets to
11 close a transaction like this, correct?
12     A.  I don't know.
13     Q.  Does the fact that Roosevelt Clark turned
14 down an offer of $130 million from
15 Lehman Brothers -- excuse me, $135 from
16 Lehman Brothers affect your analysis in any way that
17 the market value of the property in October of 2005
18 was $70 million?
19     A.  No.
20     Q.  Okay.  Put Exhibit 334 aside.
21     I'm actually at a good breaking spot for
22 lunch.  I don't know if that works with you guys.
23     MR. RYAN: Do you want to take a break?
24     THE WITNESS:  That's fine.

Page 157

1     MR. RYAN: What time is it now?
2     MR. YOHALEM:  12:15.
3     MR. RYAN: Do you want to take a half
4 hour, maybe 45 minutes at most?
5     MR. YOHALEM:  Maybe 45 minutes.
6     MR. RYAN: It always works that way.
7     THE VIDEOGRAPHER: The time is now
8 12:15 p.m.  We are off the record.
9         (Whereupon, a lunch recess was
10         taken from 12:15 p.m. to
11         1:01 p.m.)
12     THE VIDEOGRAPHER: This is the beginning
13 of Disk Number 4.  The time is now 1:01 p.m.  We are
14 on the record.
15 BY MR. YOHALEM:
16     Q.  Good afternoon, Mr. VanSanten.
17     Did you discuss your testimony during
18 lunch at all?
19     A.  No.
20     Q.  Did you discuss anything else about this
21 case during lunch?
22     A.  No.
23     Q.  Turning back to your 2005 appraisal for
24 Riverside Park, Exhibit 312, could you turn back to

40 (Pages 154 - 157)

Page 158

1 Page 5, please.
2   A.  Okay.
3   Q.  Let me ask you first sort of generally,
4 you mentioned earlier you had discussions with the
5 City of Chicago as part of preparing your appraisal,
6 correct?
7   A.  Yes.
8   Q.  Do you remember who specifically you spoke
9 to at the City of Chicago?
10   A.  Well, it would have been one of my team
11 members, Nick McGinn, but I know he spoke with folks
12 with the City Department of Planning to get a sense
13 for what was the latest on the property in terms of
14 zoning and what have you and also to get a copy of
15 that study that had been done back in 2003 for them.
16   Q.  Okay. And do you know who specifically at
17 the Department of Planning he would have spoken to?
18   A.  I don't know.
19   Q.  Okay. Was one reason why it was important
20 to talk to the City of Chicago Department of
21 Planning to know what the entitlements would be for
22 the property going forward?
23   A.  Well, when you say "entitlements," are you
24 referring to the planned development that had been

Page 159

1 approved by the City?
2   Q.  Yeah.
3   A.  Yes.
4   Q.  And it was important to know what the
5 property would be zoned for, correct?
6   A.  Correct.
7   Q.  And that's because being allowed to
8 develop a property in a certain manner significantly
9 affects its value, correct?
10   A.  Yes.
11   Q.  And once you have an entitlement to
12 develop a property, it makes the property worth
13 considerably more, correct?
14   A.  Well, it depends.
15   Q.  With respect to this property, having the
16 ability to develop it according to plan
17 significantly increases its value, correct?
18     MR. RYAN: Objection, foundation,
19 speculation.
20     Go ahead.
21     THE WITNESS: It increases it relative to
22 what?
23 BY MR. YOHALEM:
24   Q.  To not having that entitlement.

Page 160

1   A.  Like I said, I don't know what the
2 alternative would be. There could be some
3 entitlement that's better, so I can't answer that.
4   Q.  Sure. If -- if -- sure. If the property
5 as it currently stands, the property as it currently
6 stands does not have any entitlement, correct? It
7 needs to be renewed?
8   A.  As I understand, the PD has expired on the
9 property.
10   Q.  And so my question to you is, the value of
11 the property now versus the value -- is lower than
12 the value of the property would be once there's a
13 planned development that's approved by the City,
14 correct?
15   A.  I don't think that's true.
16   Q.  Do you think it's unrelated to the two?
17   A.  Well, no. I mean, it certainly is a huge
18 component, but I guess when you think about the
19 highest and best use analysis that I've done here in
20 each of my four reports, you certainly look at the
21 zoning and the planned development that's been
22 approved, but, for instance, on the 2014 date of
23 value, we know that the planned development has
24 expired, but I don't think it would be appropriate

Page 161

1 then to value it based on the current zoning, which
2 is a DS3, because in all likelihood, once you go
3 back to the City and negotiate with them, they're
4 going to approve something significantly better than
5 that.
6     So at the end of the day, that's why I
7 don't think -- it depends. You have to take a look
8 at it.
9   Q.  Did you do any analysis of what the
10 entitlements were on the property in 2002?
11   A.  I don't know.
12   Q.  Okay. Do you know whether the sales
13 transaction in 2002 for 72,300,000 was for a
14 property that was permitted to be developed in any
15 particular way?
16   A.  I don't -- I don't know.
17   Q.  Okay. Would that affect its value one way
18 or another?
19   A.  Well, anybody who purchases a property
20 purchases it with an idea in mind of what they think
21 they can do with it and what they think the City is
22 going to approve for them. I don't know what was in
23 the mind of the purchaser in this particular case
24 back in 2002.

41 (Pages 158 - 161)

Page 162

1    Q.  So would the City approval affect -- the
2  existence or nonexistence of a City approval have
3  any effect on value one way or another in your mind?
4        MR. RYAN:  Objection, objection.
5        THE WITNESS:  I don't understand the
6  question.
7  BY MR. YOHALEM:
8    Q.  Yeah.  So when trying to determine the
9  value of the property, would the fact that the
10  property had been approved for development as of
11  2005 make the property worth more than, you know, it
12  otherwise would have been if it didn't have that
13  entitlement with the City?
14        MR. RYAN:  Objection, asked and answered.
15        THE WITNESS:  Again, I think, you know, as
16  a potential buyer you have to look at what, even if
17  the entitlement hasn't technically been approved by
18  the City, you have to look at what they likely would
19  approve of, and so I'm going to base my purchase
20  decision on that.
21  BY MR. YOHALEM:
22    Q.  And what if the City does not give the
23  same zoning entitlements?
24    A.  Then it would likely change the value.

Page 163

1    Q.  Okay.  And when you spoke to the City of
2  Chicago, did they discuss what it was likely to do
3  in terms of zoning entitlements?
4    A.  Yeah, my understanding is that they've
5  rezoned it to I think it's a DS3 or a DS5 really
6  because they want to force the owner or whoever buys
7  it to come back to the City and work with them on a
8  planned development.
9        And so the DS3 is not necessarily where
10  it's going to end up now.  They're more than likely
11  going to approve something very different than that,
12  and the best evidence of what they will approve is
13  what they did in the Planned Development 904.
14    Q.  And before 2004 and before the City
15  approved a planned development, how would someone
16  know what the City would likely approve or not
17  approve?
18    A.  Well, by having discussions with the City,
19  looking at their comprehensive plan for the
20  South Loop area and going through that due diligence
21  process.
22    Q.  In your discussions or your team's
23  discussions with the City, were any discussions had
24  as to how the property acquired its entitlements in

Page 164

1  2004?
2    A.  It's my understanding it went through the
3  normal zoning process to get the planned development
4  approved.
5    Q.  And what are you basing that understanding
6  on?
7    A.  Just looking at the history and then
8  talking with folks at the City Department of
9  Planning.
10    Q.  You're aware that Tony Rezko had all sorts
11  of connections to City Hall, correct?
12    A.  I don't know what kind of relationships
13  Mr. Rezko had.
14    Q.  You haven't read the newspaper?
15    A.  I've read the newspaper, so I know what's
16  alleged.  I don't know what is truthful there
17  though.
18    Q.  If you could turn to Page 24 of your 2005
19  report.
20    A.  Yes.
21    Q.  You talk here about absorption analysis,
22  correct?
23    A.  Yes.
24    Q.  And I think we discussed briefly

Page 165

1  absorption analysis earlier, but under your
2  discounted -- excuse me, under your income
3  capitalization approach, you apply an absorption
4  analysis based on the amount of time it would take
5  to sell the properties, correct?
6    A.  I estimate an absorption period based on
7  how long it would take to sell those 24 parcels.
8    Q.  Right.  Okay.  And so my question is, what
9  factors did you use that went into the absorption
10  analysis?
11    A.  Well, I think I discussed this before.
12  I'm happy to go back over it.
13        There are really four big things that I
14  looked at in trying to determine what the
15  appropriate absorption period would be for the
16  subject.  Do you want me to go back through those?
17    Q.  Yes, I'll discuss a couple of them
18  specifically.  Let me just refresh myself.  I
19  believe I have them.
20        So you looked at -- you know, why don't
21  you tell me again.  I thought I had them in my
22  notes, but I think I had something else.  Sorry.  Go
23  ahead.
24    A.  Okay.  So the four main things that I

42 (Pages 162 - 165)

Page 166

1 looked at, one is to look at the actual experience
2 of developments that were similar in scope and are
3 located in that general area. So the two big ones
4 that are a prime comparison is the Dearborn Park
5 development, which was 51 acres and took roughly
6 15 years to sell out, and then the Central Station
7 development, which was about 71 acres and started in
8 the '90s and is still to this day selling off some
9 of the parcels that make up that development.
10      So that was one thing that I looked at.
11      A second thing that I looked at was the
12 study that had been commissioned by the City
13 Department of Planning, and that was back in 2003,
14 and they specifically indicate there that the final
15 sellout would occur in year 11.
16      And then another one that I looked at was
17 this market analysis here that you referred to on
18 Page 24, looking at the demand for space in the
19 retail market and the office market and in the
20 residential market to get a sense for based on
21 current supply and the new construction that's
22 coming in and the demand how long would it take to
23 absorb all that space.
24      And then lastly is really a retrospective

Page 167

1 look. Knowing what we know now, you can see that
2 back in -- we're nine years out from 2005, and
3 nothing has happened to the property, so it's some
4 additional evidence that it's going to take a long
5 time to actually develop this thing.
6   Q. Okay. Did you do any analysis for how
7 long parcels, individual parcels stayed on the
8 market when they were sold?
9   A. That's something that I looked at for each
10 of the sales that we have.
11   Q. And were there any individual parcels of
12 vacant land that sat on the market unsold for ten
13 years that you came across?
14   A. I don't recall them.
15   Q. Were there any individual parcels of land
16 that sat on the market for nine years that went
17 unsold?
18   A. I don't recall.
19   Q. Okay. Individual parcels of land that sat
20 on the market for eight years that went unsold?
21   A. I don't recall.
22   Q. Individual parcels of land that sat on the
23 market for seven years that went unsold?
24   A. I don't recall.

Page 168

1   Q. Any individual parcels of land that went
2 on the market for six years that went unsold?
3   A. I don't recall.
4   Q. Any individual parcels of land that sat on
5 the market for five years that went unsold?
6   A. I don't recall.
7   Q. Any individual parcels of land that went
8 on the market that remained unsold for four years?
9   A. I don't recall.
10   Q. For three years?
11   A. I don't recall.
12   Q. Two years?
13   A. I don't recall.
14   Q. Okay. Did you look at that information in
15 preparing your report?
16   A. That's something that we definitely looked
17 at. I just don't recall off the top of my head.
18   Q. Okay. Do you want to take a minute and
19 look through your work file and see if you have
20 anywhere that reflects your analysis of how long
21 individual vacant parcels stayed on the market.
22   A. I have the backup documentation for all of
23 the sales, and every one of those documents would
24 typically indicate how long the property was on the

Page 169

1 market.
2   Q. You say the backup documentation.
3   A. It's not in the report. It's in my work
4 file.
5   Q. Do you want to just pull it, you know?
6 I'll give you five minutes, if you want to pull out
7 whatever is the longest amount of time that a parcel
8 sat on the property --
9   A. It's going to take me a while to go
10 through all of the sales.
11   Q. How many sales did you look at?
12   A. Well, I think there's seven or eight sales
13 in each of the reports, so we've got 30, like
14 roughly 30, 32 sales.
15   Q. Okay. You don't know whether any of those
16 sales stayed on the market for any amount of time?
17   A. Off the top of my head, I don't know how
18 long those were all on the market.
19   Q. Okay. And do each of your sales data
20 sheets reflect how long each of those were on the
21 market?
22   A. Yes.
23   Q. Okay. Is it the case that usually a
24 vacant parcel of land stays on the market for ten

43 (Pages 166 - 169)

Page 170

1 years before being sold?
2    A.  It just depends on the circumstances.
3    Q.  Okay.  Would you agree that someone
4 selling a vacant parcel of land could significantly
5 discount the price and sell it more quickly than ten
6 years?
7    A.  All other things equal, I would say that
8 if you lower your price, you might be able to sell
9 it more quickly.
10    Q.  Okay.  So if a piece of land were worth,
11 say, a market value of $10 million, if you sold it
12 for $5 million, would you agree it would probably
13 sell very quickly?
14    A.  All things equal, it would probably sell
15 faster.
16    Q.  Okay.  In your analysis, did you take into
17 account the possibility that whoever was selling off
18 each of the parcels of the 62 acres might discount
19 the price to sell those parcels faster than the
20 ten-year horizon you estimate?
21    A.  No.
22    Q.  Okay.  In 2005, the retail and residential
23 markets were very strong, correct?
24    A.  Yes.

Page 171

1    Q.  Okay.  Markets do change over time though,
2 right?
3    A.  Absolutely.
4    Q.  Okay.  In doing your analysis, did you
5 take into account how the market would change over
6 time or how the market did change over time at all?
7    A.  Absolutely, and you'll see that reflected
8 in the changes in the values and the assumptions
9 that go into it for each of the different dates of
10 value.
11    Q.  How did you decide which parcels of land
12 would be sold when you were doing your income
13 capitalization approach?
14    A.  Well, I describe it in my report, but the
15 large, what I referred to as the large mixed use
16 parcel, if you look at, and actually I think I have
17 a map that shows how it's laid out, but it's the
18 parcels that front along Roosevelt Road, and because
19 of the -- there's severe problems with the site in
20 terms of accessibility and the ability to actually
21 develop the site, because, for instance, Roosevelt
22 Road is 38 feet above grade level of the site.
23 There's -- on the Clark Street side there's railroad
24 tracks running along the entire length of the site.

Page 172

1 On the west side you have the Chicago River, and on
2 the south side again you have railroad tracks.  So
3 you have some major, major infrastructure problems
4 that need to be addressed in order to be able to do
5 anything with this site.
6        So logistically when you think about the
7 parcels that are most likely to sell first to make
8 this all work, it's going to be those parcels that
9 are right on Roosevelt Road because those have to be
10 developed in order to be able to access the rest of
11 the site, and it's also the most desirable because
12 it has that frontage along Roosevelt Road.  So that
13 was in my opinion a logical conclusion.
14        Plus if you refer back to the study that
15 was done for the City Department of Planning, that's
16 exactly what they say in their report in terms of
17 the phasing of the project.  So we're very
18 consistent with what the actual City Department of
19 Planning had been looking at as well.
20    Q.  Did you take into account the possibility
21 that a sale of the parcel adjoining Roosevelt Road
22 would affect the value of the other parcels being
23 sold off?
24    A.  It's -- you'll see actually and I've got

Page 173

1 an assumption in here that says that all the
2 infrastructure costs and everything will be funded
3 by the City, so we're assuming that all that stuff
4 will be taken care of, and that's factored into the
5 value conclusion for each of the different pieces.
6        If for some reason the City didn't, that
7 would have a dramatic impact on the property value.
8    Q.  I want to go specifically through some of
9 the expenses you identify as operating expenses in
10 the income capitalization approach.
11    A.  Which page are you referring to?
12    Q.  Page 65.
13    A.  Okay.
14    Q.  The first thing you talk about is sales
15 commission.
16    A.  Yes.
17    Q.  Is that the amount that will be paid to
18 whoever sells the parcels, is that --
19    A.  Yes.
20    Q.  Okay.  The second cost is site
21 preparation.
22        Do you see that?
23    A.  Yes.
24    Q.  You had mentioned that, I thought you had

44 (Pages 170 - 173)

Page 174

1 just mentioned that one of the assumptions you made
2 was that the City would take care of all the site
3 preparation, you know.
4      Did I misunderstand what you said?
5      A.  Well, let me clarify for you.  So there's
6 a $6 million cost that was budgeted for site grading
7 and environmental remediation, and that's a cost
8 that's going to have to be incurred by the owner.
9 And in my projection, I projected that to be
10 completed over years 1 and 2.  It's going to have to
11 be done on the front end of the projects because you
12 have to do that before you can do anything else.
13      But then you'll see in the paragraph below
14 that it discussed the fact that infrastructure
15 expenses, including the installation of streets,
16 utility extensions, river walk improvements, parks
17 and open spaces, will all be funded through tax
18 increment financing, so that's an assumption that
19 I'm making that all that will be funded by the City.
20      Q.  How did you get your figure of $6 million?
21      A.  That was provided by GMH.
22      Q.  Did they give you any documentation for
23 that figure?
24      A.  They did not.

Page 175

1      Q.  Did you ask for any documentation for the
2 figure?
3      A.  I don't think I asked for that
4 specifically, no.
5      Q.  Why didn't you ask for any documentation
6 of the figure?
7      A.  Well, I felt I could rely on the
8 information they provided to us.
9      Q.  Did you look at any environmental reports?
10     A.  I did not.
11     Q.  If there were environmental reports made
12 available to you, would you have looked at them?
13     A.  Yes, I would have looked at them.
14     Q.  And would you have discussed the
15 environmental report specifically with GMH?
16     A.  Well, I did specifically discuss the
17 impact of the environmental issues and the fact that
18 it was going to cost them $6 million to take care of
19 it.
20     Q.  Did you identify -- just so I'm clear, is
21 the $6 million figure a conclusion of yours, or is
22 that an assumption of yours?
23     A.  That is an assumption based on information
24 provided by GMH.

Page 176

1           (Exhibit 335 was marked for
2           identification.)
3 BY MR. YOHALEM:
4      Q.  You've been handed what's been marked as
5 Exhibit 335.
6      A.  Yes.
7      Q.  This is an estimation for environmental
8 services that was provided by Environmental
9 Protection Industries to Michael Musa.
10          Do you see that?
11     A.  Yes.
12     Q.  And Michael Musa forwarded it on to
13 Ken Haldeman.
14          Do you see that?
15     A.  Yes.
16     Q.  GMH didn't provide this document to you,
17 did it?
18     A.  No.
19     Q.  Would you have considered it if it had
20 been provided to you?
21     A.  Yes.
22     Q.  And it has the estimate for disposing of
23 the contaminated soil at 2,200,000, 2.5 million,
24 correct?

Page 177

1      A.  Yes.
2      Q.  Are there any other environmental
3 remediation costs that you're aware of that aren't
4 described herein?
5      A.  I don't know.
6      Q.  And does this refresh your recollection as
7 to whether Ken Haldeman was the person at Riverside
8 District Development that you spoke to, the Ken that
9 you spoke to in your meeting?
10     A.  I don't know.
11     Q.  Okay.  Would this document make you want
12 to get hard documentation from GMH on the $6 million
13 figure that they told you?
14     A.  So, I mean, to clarify, first of all, the
15 $6 million figure, as I understand it, which was
16 provided to me by GMH, included more than just the
17 environmental remediation.  It also included grading
18 of the land.
19          So, you know, having looked at this, it
20 makes total sense that the environmental would be
21 something less than the $6 million because you still
22 have to pay for the grading of the site.
23     Q.  And did you ask for any documentation from
24 GMH about the mass grading prices?

45 (Pages 174 - 177)

Page 178

1    A.   I didn't.  I just asked them what the
2  dollar amount was.
3    Q.   And do you know whether this company, EPI,
4  was going to do any of the mass grading?
5    A.   I don't know.
6    Q.   Okay.  Was the estimate of $6 million
7  provided to you by GMH an estimate in 2014 dollars
8  or 2006 dollars?
9    A.   This is 2005 dollars.
10    Q.   2005 dollars?
11    A.   Right.
12    Q.   And do you know how they derived an
13  estimate for 2005 dollars in 2014?
14    A.   I don't know.
15    Q.   Did you ask them how they derived a number
16  for 2005 dollars in 2014?
17    A.   Yeah, they told me that they had consulted
18  with an environmental engineer, and I'm not sure
19  about the grading costs, where that came from, but
20  they said the combination was $6 million back in
21  2005.
22    Q.   Do you know who the environmental engineer
23  they consulted with was?
24    A.   I don't know.

Page 179

1    Q.   Do you know who they consulted with about
2  mass grading costs?
3    A.   No, I don't.
4    Q.   Okay.  Item Number 4 is Administration and
5  Overhead.
6        Do you see that?  I'm sorry, on Page 66 of
7  your --
8    A.   Yes.
9    Q.   -- 2005 report.
10        Can you explain what administration and
11  overhead is?
12    A.   It's -- well, as I describe in this part
13  of the report, it's office salaries, advertising,
14  professional fees, you know, sort of administrative
15  oversight of the project.
16    Q.   If the only thing that was being done on
17  the project was selling off empty parcels of land,
18  what administration would be required?
19    A.   Well, I imagine there would be a whole
20  host of administrative duties that would be required
21  in terms of preparing documents, coordinating with
22  brokers.  There's a number of different things that
23  it would have to do.
24    Q.   Preparing what sort of documents?

Page 180

1    A.   Documents that might be requested by
2  potential buyers that want to see documents about
3  the property.  There's a number of different things
4  that I would imagine.
5    Q.   How many people do you think would be
6  needed to do the administration to coordinate with a
7  broker to sell off empty pieces of property?
8    A.   I don't know.
9    Q.   Did you consider that in your analysis?
10    A.   No.  What I considered was an industry
11  standard for what typical administration fees would
12  be.
13    Q.   Did the industry standard take into
14  account the manner that the property was being
15  developed?
16    A.   Again, it's for a property typical or
17  similar to this, what would be a typical
18  administrative expense be.
19    Q.   What specific examples did you use to come
20  up with the 3 percent administrative -- 3 to
21  5 percent administrative expense for a property such
22  as this?
23    A.   Well, I mean, over the course of my
24  career, I've appraised several land development type

Page 181

1  projects like this, and from every one that I've
2  been involved in, they're always looking for
3  administrative fees between 3 and 5 percent.
4    Q.   Okay.  And are any of those properties in
5  your work file?
6    A.   No.
7    Q.   Okay.  Is there anything else in your work
8  file that would show us how you came up with a
9  number of 3 to 5 percent?
10    A.   No.
11    Q.   Okay.  One last question on Exhibit 335,
12  which I know we've put aside.  It's the EPI
13  estimate.
14        Did GMH ever give you different numbers
15  for 2014 dollars, 2008 dollars, 2007 dollars and
16  2005 dollars for grading and environmental?
17    A.   No.
18    Q.   And what's your understanding of how they
19  differentiated from those time periods?
20    A.   Well, what I did in my analysis is I took
21  that figure and then just escalated it at an
22  inflationary rate for each of the subsequent dates
23  of value.
24    Q.   Okay.  Why don't you turn to Page 68.

46 (Pages 178 - 181)

Page 182

1     A.   Okay.
2     Q.   We talked a second ago about the expenses
3  on the property.
4          How is it that you got to a figure of
5  $20,800,000 over a ten-year span?
6     A.   I'm sorry, what are you referring to?
7     Q.   Oh, sure.  If you -- do you see under
8  Expenses it says Total Expenses?
9     A.   Yes.
10     Q.   At the end of Total, it says Total
11  Expenses, 20,809,776, correct?
12     A.   Yes.
13     Q.   And I guess my question is, doesn't that
14  seem high for a property that is, you know, sitting
15  vacant and just being sold off parcel by parcel?
16     A.   No.
17     Q.   Okay.  Just getting back to the
18  environmental piece -- well, I'll show you that
19  later when we discuss other reports.
20          Item Number 5 on Page 66, it's condominium
21  association dues.
22     A.   Yes.
23     Q.   Do you see that?
24     A.   Yes.

Page 183

1     Q.   What do you mean by condominium
2  association dues?
3     A.   Well, at some point in the project as
4  things are starting to be developed, you're going to
5  have fees associated with the condominium
6  association that are going to need to be paid, and
7  the assumption here is that the owner will have to
8  pay that initially, but then as the properties are
9  sold off the developers will gradually take on the
10  responsibility for having to pay that.
11     Q.   Who is it being paid to I guess is what
12  I'm trying to understand.
13     A.   Well, it's an expense to cover things like
14  routine maintenance and, you know, different things
15  within sort of a normal development.
16     Q.   What would be routine maintenance of an
17  undeveloped piece of land?
18     A.   Well, initially none, but obviously as you
19  go through this ten-year period, you're having
20  parcels being developed, and there are going to be
21  maintenance issues now with maintaining the
22  property.  And so as that expense is being incurred,
23  that has to be picked up by the owners.
24     Q.   I think I'm missing something.  You're

Page 184

1  selling undeveloped parcels, correct?
2     A.   Right.
3     Q.   So what is the maintenance that needs to
4  be done once someone else buys a parcel and develops
5  it on the remaining undeveloped parcels?
6     A.   Well, on the remaining undeveloped
7  parcels, you're right, there's not going to be much
8  in the way of maintenance there, but you have some
9  maintenance that is being incurred then on the parts
10  that had been developed at that point, so there's
11  going to be an expense associated with that.
12          And what I'm projecting is that initially
13  it's going to be the owner who is responsible for
14  that, and then over time it's going to be gradually
15  phased into the --
16     Q.   Why would it be the owner who is
17  responsible of that instead of the purchasers of the
18  parcel?
19     A.   That's just typically how you see these
20  developments go until they reach a threshold, or I
21  think here I identify it as when you have 60 percent
22  of it sold, then the responsibility to transfer to
23  the association or subdevelopers of the property.
24     Q.   When you were doing comparable sales to

Page 185

1  derive market value, did you take into account or
2  did you look at any of those instances who was
3  paying the condo dues?
4     A.   That wouldn't have been a part of any of
5  those sales.
6     Q.   Okay.
7     A.   But let me clarify, but it would have been
8  implied in the fact of what they actually paid for
9  those sites.
10     Q.   Okay.  So why would it have been implied
11  by what they actually paid for those sites?
12     A.   Well, if you look at all the sales that
13  I've used as a basis of comparison in my report,
14  they're all very comparable in that they're mixed
15  use, bought for mixed use developments of
16  residential and commercial, and in every case a
17  developer had in mind what they thought they could
18  do with it in terms of the revenues and the expenses
19  and then what kind of return they needed to get in
20  order to arrive at a value.
21          So implicit in every one of those sale
22  prices is those projections that a developer has
23  gone through, so that's why it's already implied.
24     Q.   In any of your comparable sales was the

47 (Pages 182 - 185)

Page 186

1  land evaluated a parcel that the developer had
2  bought and then sold off pieces of that parcel?
3      A.  I don't think so.  I don't recall that,
4  no.
5      Q.  So how would condo association dues be
6  implied in those sales if the same fact pattern
7  doesn't exist for those parcels that you're
8  projecting here?
9      A.  Well, I mean a great example is the sale
10  that occurred directly across the street, what they
11  called the Roosevelt Collection in 2007, which is
12  really kind of a scaled down version of our subject
13  property, and it had over 3 million square feet of
14  FAR that was allowable.  The buyer purchased that
15  for $10.46 per square foot of FAR in 2007, and it
16  was going to have multiple phases just like ours.
17      I'm quite sure that that buyer when they
18  bought it had projections in mind in terms of the
19  phasing of the development and the expenses that
20  would be incurred along the way.
21      So it's a great example and a great basis
22  of comparison because it's literally right across
23  the street and has the same physical challenges,
24  same accessibility challenges as ours, so that's a

Page 187

1  great example of what the value of our property
2  would likely be.
3      Q.  And just so I'm clear, in 2007 someone
4  bought the entire Roosevelt Collection --
5      A.  Yes.
6      Q.  -- is that correct?
7      For $10 a square foot?
8      A.  Right.
9      Q.  They didn't buy just a piece of it parcel
10  by parcel, right?
11      A.  They bought the whole thing for $10.46 per
12  FAR foot.
13      Q.  I want to turn to the sales comparison
14  approach you used for 2005 for a few minutes.
15      My first question is, do you see Number 11
16  on Page 58?
17      A.  Yes.
18      Q.  When you say that all of the comparable
19  land sales have the same highest and best use of the
20  subject, no adjustments are necessary, does that
21  mean you concluded that for each of the comparable
22  sales the owner would hold it and sell off parcels
23  of the sale for ten years?
24      A.  No.  It means that the highest and best

Page 188

1  use of each of those sales was consistent with the
2  highest and best use of each of the parcels that I'm
3  valuing on an individual basis.
4      Q.  Okay.  So when you say that all of the
5  comparable land sales have the same highest and best
6  use, you're not talking about the subject 62-acre
7  parcel, you're talking about the individual parcels?
8      A.  That make up the 62 acres.
9      Q.  Okay.  But the individual parcels, as
10  we've discussed, are not the subject property,
11  right?  They are the component pieces of the
12  62 acres?
13      A.  The individual, the 24 individual parcels
14  are what makes up the overall 62-acre piece.
15      Q.  Okay.  Maybe I can come at this another
16  way.
17      Turn to Page 50 of your report -- sorry,
18  Page 51 of your report.  Under Conclusion, you say,
19  "The highest and best use of the subject site as if
20  vacant and ready for development is concluded to be
21  for mixed use, residential and commercial
22  development consistent with PD 904."
23      Do you see that?
24      A.  Yes.

Page 189

1      Q.  What do you mean by that?
2      A.  Well, what I mean by that is the highest
3  and best use is to develop those parcels consistent
4  with the planned development that was approved by
5  the City.
6      Q.  Okay.  But didn't you base your report on
7  the highest and best use of not developing the
8  parcels but selling them off piece by piece?
9      A.  No.
10      Q.  You didn't base your analysis on selling
11  them off piece by piece?
12      MR. RYAN:  That's a different question.
13      THE WITNESS:  That's not the question you
14  asked.
15  BY MR. YOHALEM:
16      Q.  Okay.  Maybe I misheard your answer.
17      Wasn't your analysis of the value of the
18  highest and best use of the subject 62 acres that
19  the 62 acres not be developed right away but instead
20  be held and sold off a parcel by parcel?
21      MR. RYAN:  Objection, form.
22      THE WITNESS:  That's not, that's not what
23  my conclusion is.
24

48 (Pages 186 - 189)

Page 190

1 BY MR. YOHALEM:
2    Q.  Okay.  So what's your conclusion as to the
3 highest and best use of the parcel?
4    A.  My conclusion, as I state here, is to be
5 for a mixed use residential and commercial
6 development consistent with that planned
7 development.
8    Q.  So why didn't you do an analysis based on
9 a developer building a mixed use residential and
10 commercial development upon acquisition of the
11 property?
12    A.  Because the appropriate way to look at
13 this is, because I'm dealing with a vacant piece of
14 land, is to look at what other sales of vacant land
15 that are similar to this have sold for.  That's
16 going to be your best indication of the value of the
17 land as it exists today.
18    Q.  Okay.  But those other vacant sales were
19 going to be developed right away, right?
20    A.  I think some of them were going to be
21 developed right away and some still are undeveloped
22 to this day.
23    Q.  But the purpose when they were acquired
24 was to develop them right away, correct?

Page 191

1       MR. RYAN:  Objection, foundation.
2       THE WITNESS:  My understanding is that in
3 each case they were ultimately planning on
4 developing them.  Whether it was right away or to
5 hold it for a while, I don't know.
6 BY MR. YOHALEM:
7    Q.  Okay.  So the highest and best use of
8 those properties was to develop right away, correct,
9 as assumed in your report?
10       MR. RYAN:  Objection, form.
11       THE WITNESS:  And when you say "those
12 properties," which properties are you referring to?
13 BY MR. YOHALEM:
14    Q.  The comparable sale properties that you
15 looked at.
16    A.  The comparable sale properties that I
17 looked at, the highest and best use was to develop
18 them with a mixed use development.
19    Q.  And not to hold them vacant, correct?
20    A.  Correct.
21    Q.  Okay.
22       (Exhibit 336 was marked for
23       identification.)
24

Page 192

1 BY MR. YOHALEM:
2    Q.  To close the loop, I meant to get to this
3 before lunch, but you've been handed what's been
4 marked as Exhibit 336.  This is another development
5 pro forma for Riverside District Development.
6       Do you see that?
7    A.  Yes.
8    Q.  That contemplates $410 per square foot for
9 condo pricing, correct?
10    A.  Yes.
11    Q.  And would you have expected GMH to provide
12 you with this document when you requested financial
13 information for the property?
14    A.  Yes.
15    Q.  And would you have discussed this document
16 with GMH when you talked to them on the telephone?
17    A.  Yes.
18    Q.  And this document purports to do the same
19 analysis for what someone would do if they developed
20 the land right away, correct?
21    A.  I don't know what this does.
22    Q.  Okay.  You can put 336 aside.
23       This actually doesn't need to be marked.
24 You've been handed what's been marked previously as

Page 193

1 Exhibit 4.
2    A.  I'm sorry, I don't have it.
3       (Exhibit 4 was identified.)
4 BY MR. YOHALEM:
5    Q.  I'm sorry.  You've been marked [sic]
6 what's been marked previously as Exhibit 4.
7       Was this document ever provided to you?
8    A.  No.
9    Q.  This is a Confidential Private Placement
10 Memorandum for Heritage Development Partners, LLC.
11       Do you see that?
12    A.  Yes.
13    Q.  Are you aware that Heritage Development
14 Partners, LLC, had 50 percent of the development
15 rights to Riverside District Development after -- as
16 of 2006?
17    A.  I don't know what percentage ownership
18 they had.
19    Q.  Okay.  Did you ever discuss that in your
20 meetings with Joe Ryan?
21    A.  No.
22    Q.  On Page 7 of the document, it's describing
23 the project.
24       Do you see that?

49 (Pages 190 - 193)

Page 194

1    A.   Yes.
2    Q.   The second paragraph down talks about,
3  "Heritage/RDD has retained the following service
4  providers to provide the following services."
5       Do you see that?
6    A.   Yes.
7    Q.   The first one is Antunovich Associates
8  will provide planning and architecture services for
9  the site.
10      Do you see that?
11   A.   Yes.
12   Q.   Did you have any discussions with
13  Antunovich Associates preparing your appraisal
14  concerning the planning and architecture services
15  they were providing for RDD in 2006?
16   A.   No.
17   Q.   Okay.  The next one is Knight E/A, Inc.
18  will provide site engineering and infrastructure
19  services.
20      Do you see that?
21   A.   Yes.
22   Q.   Did you have any discussions with anyone
23  at Knight E/A, Inc., concerning the engineering and
24  infrastructure services they were providing for

Page 195

1  Riverside District Development in 2006?
2    A.   No.
3    Q.   Bullet Point Number 3 is The McGarey Group
4  will provide retail and leasing services.
5       Do you see that?
6    A.   Yes.
7    Q.   Did you have any discussions with anyone
8  at The McGarey Group for what retail and leasing
9  services they were providing in 2006?
10   A.   No.
11   Q.   Okay.  Why didn't you discuss any of the
12  services being provided to the project as of 2006 as
13  part of your diligence in this matter?
14   A.   I wasn't aware that any of these entities
15  were even involved.
16   Q.   If you were aware, if you were told that
17  these entities were involved, would you have gone
18  and talked to them?
19   A.   I can't tell from here whether or not that
20  would have been relevant to my analysis or not.
21   Q.   The next piece says, "The Riverside
22  District property has received planned unit
23  development zoning approval from the City of Chicago
24  reflected in PD 904, and there are more than 20

Page 196

1  letters of intent with retail tenants, representing
2  approximately 45 percent of the total retail space."
3       Do you see that?
4    A.   Yes.
5    Q.   Did you take into account the fact that
6  there were 20 letters of intent with retail tenants
7  representing 45 percent of the total retail space in
8  2006?
9    A.   I was not aware of that.
10   Q.   Okay.  Would that be a relevant fact to
11  conducting an appraisal of a property?
12   A.   That's a piece of information that I would
13  probably consider if I knew about that.
14   Q.   Okay.  And would you have discussed that
15  with GMH when you met with them?
16   A.   Yes.
17   Q.   And, in fact, would you agree that the
18  fact that there were 20 letters of intent before the
19  thing was even -- before the project was even built
20  representing 45 percent of the retail space suggest
21  that they would have been able to find tenants very
22  easily to occupy the retail space?
23   A.   I -- I don't know that.
24   Q.   Okay.  Page 8 talks about RDD has entered

Page 197

1  into a real estate purchase agreement.
2       Do you see that?
3    A.   Where on Page 8?
4    Q.   Second paragraph.
5       Do you see that?
6    A.   Yes, I do see it.
7    Q.   Did you consider in your analysis the
8  retail purchase agreement -- real estate purchase
9  agreement entered into between RDD and DeBartolo
10  Development LLC?
11   A.   No.
12   Q.   Would the fact that the DeBartolo
13  Development LLC entered into a real estate purchase
14  agreement with a purchase price of $105 million for
15  a piece of the property have influenced your
16  appraisal conclusions?
17   A.   No.
18   Q.   If you could turn to Page 3 of Exhibit 4.
19   A.   Is it romanette (iii)?
20   Q.   Page 3.
21   A.   Page 3, okay.  Okay.
22   Q.   Do you see the overview of the deal
23  structure?
24   A.   Yes.

50 (Pages 194 - 197)

Page 198

1    Q.   When you were evaluating the owners -- or,
2 sorry, the buyers and sellers of the 2005
3 transaction, did you have any understanding of the
4 ownership structure of RDD as reflected in Page 3 of
5 Exhibit 4?
6    A.   I didn't, I didn't have any of those
7 specifics, no.
8    Q.   Okay. And do you see that Heritage only
9 receives value from the property after GMH receives
10 a preferred return of $137 million plus 12 percent
11 return going forward?
12    A.   Yes, I see that.
13    Q.   Okay. And do you see that this document
14 is an offering memorandum or a private placement
15 memorandum for shares in Heritage.
16        Do you see that?
17    A.   I'm sorry, where are you referring to?
18    Q.   Yeah, you can look at, you can look at the
19 title of the document on the first page or you can
20 look through the description of the offering,
21 whatever you need to see that --
22    A.   Is there a specific page I can look to?
23    Q.   Yeah, why don't you look at Page 1, the
24 summary of the offer. Once you've had a chance to

Page 199

1 review it, let me know.
2    A.   Okay.
3    Q.   So do you see that the offering memorandum
4 is describing an offering of Class A units in
5 Heritage?
6    A.   Yes.
7    Q.   And those units represent an ownership
8 interest in the underlying property subject to a
9 preferred return to GMH of $137 million plus
10 12 percent annually, correct?
11    A.   Correct, yes.
12    Q.   Okay. So if the fair market value of the
13 property were as of 2006 approximately $70 million,
14 Heritage's ownership interest in the properties
15 should have been zero, correct?
16        MR. RYAN: Objection, speculation,
17 foundation.
18        THE WITNESS: I don't know. I don't know.
19 I can't tell that from here.
20 BY MR. YOHALEM:
21    Q.   Okay. Are you aware that your colleague,
22 Mr. Van Vleet, did a report in this case?
23    A.   I am.
24    Q.   Are you aware that he calculated the value

Page 200

1 of Heritage based on your appraisal, appraisals of
2 Heritage?
3    A.   Yes.
4    Q.   And did you understand that your
5 appraisals of Heritage were necessary for him to --
6 excuse me, that your appraisals of the property were
7 necessary for him to do a fair market value of
8 Heritage?
9        MR. RYAN: Objection.
10        You can answer if you know.
11        THE WITNESS: My understanding is that
12 that was something that he wanted to incorporate
13 into his analysis. How he used it, I don't know.
14        MR. YOHALEM: You can put Exhibit 4 aside
15 for now. We may come back to it.
16        (Exhibit 2 was identified.)
17 BY MR. YOHALEM:
18    Q.   You've been handed what's been previously
19 marked as Exhibit 2.
20        Do you see that?
21    A.   Yes.
22    Q.   Have you ever reviewed this document
23 before?
24    A.   No.

Page 201

1    Q.   Okay. Do you see Page 2 of the document
2 is Schedule 1 to the Heritage Operating Agreement?
3    A.   Yes.
4    Q.   Do you see that it reflects that there
5 have been three sales of Class A units?
6    A.   I don't know. Is that what this shows?
7    Q.   Do you see where it says capital
8 contribution?
9    A.   Yes.
10    Q.   Do you see where it says Class A units?
11    A.   Yes.
12    Q.   And do you see that the entities that own
13 Class A units made capital contributions?
14    A.   Is that what this is showing? I can't
15 tell.
16    Q.   Okay. Would it have affected your
17 analysis to know that three different independent
18 entities bought Class A units of Heritage valued at
19 $1.25 million per unit in 2006?
20    A.   Weren't they trying to sell like 28 units?
21    Q.   Would it have affected your analysis to
22 know that three people --
23    A.   No, it wouldn't have, no.
24    Q.   Okay. You can put Exhibit 2 aside.

51 (Pages 198 - 201)

Page 202

1      (Exhibit 337 was marked for
2      identification.)
3 BY MR. YOHALEM:
4    Q. This is a document that is a Crain's
5 Chicago Business article.
6      Do you see that?
7    A. Yes.
8    Q. This describes the sale of the unit,
9 correct -- excuse me, a sale of the 62 acres,
10 correct?
11   A. Give me a chance to read it.
12   Q. Sure, go ahead.
13   A. Okay. What was the question?
14   Q. The document describes the sale by Rezko
15 of the project for $131 million to GMH, correct?
16   A. Yes, that appears to be correct.
17   Q. Okay. And do you see that it says -- do
18 you see that it quotes Mr. Ryan, counsel for GMH
19 here today?
20   A. Yes, I do see that.
21   Q. Do you see that he says it's a prime piece
22 of real estate in the City of Chicago?
23   A. Yes, I do see that.
24   Q. Do you see that it says it's in an area

Page 203

1 that has a lot of growth and development, and they
2 foresee it will continue to grow and develop?
3    A. Yes.
4    Q. And do you see the next sentence that
5 says, "General Mediterranean intends to stick with
6 the current plan to development this site"?
7    A. And that they may divide the property and
8 sell it off to other developers, yes, I do see that.
9    Q. Okay. Between -- do you think -- why did
10 you think that whoever bought the property would
11 divide it and sell it off rather than develop it as
12 described here?
13   A. Well, actually that's not how it's
14 described here. It could go either way according to
15 this article.
16   Q. Okay. Does this article make you think
17 that this sale was not an arm's length sale?
18      MR. RYAN: Take your time to read the
19 whole thing.
20      THE WITNESS: Yeah, I'm going to have to
21 read it over again.
22      Yes, it does.
23 BY MR. YOHALEM:
24   Q. What is your conclusion based on this

Page 204

1 article whether it's an arm's length transaction?
2    A. Well, there's a line right there that says
3 the firm is already an investor and general partner
4 in Mr. Rezko's Riverside Park project.
5    Q. And is that why you conclude that it's not
6 an arm's length transaction?
7    A. Not exclusively, but that certainly points
8 in that direction.
9    Q. Do you see that the date of the article is
10 September 29th, 2005?
11   A. Yes.
12   Q. Would you agree that according to this
13 article there was an agreement for sale in place as
14 of September 29th, 2005?
15   A. According to the article, it sounds like
16 there is an agreement in place.
17   Q. Okay. And then if you look back at Page 5
18 of your 2005 appraisal report, Exhibit 312, this
19 contradicts your representation that the property is
20 not currently listed for sale and there are no
21 outstanding offers or options for the sale of the
22 property, correct?
23   A. When you say "this," you're talking about
24 the article?

Page 205

1    Q. The article, yeah.
2    A. Yeah, it appears to contradict that, yes.
3    Q. Okay. And this article was in your work
4 file, right?
5    A. Yes.
6    Q. Okay. Do you know who controlled
7 Roosevelt Clark?
8    A. I don't know who controlled Roosevelt
9 Clark.
10   Q. Is it your understanding that GMH
11 controlled Roosevelt Clark?
12   A. I don't know.
13   Q. Would the seller be considered the person
14 who has the controlling share of Roosevelt Clark?
15   A. I don't know.
16   Q. Okay. For purposes of evaluating an arm's
17 length transaction though, how do you go about
18 evaluating whether, you know, it's an arm's length
19 transaction?
20   A. Well, I mean, it's pretty common sense if
21 you've got the same players on both sides of the
22 transaction, then it's not an arm's length
23 transaction.
24   Q. And if you have some players on one side

52 (Pages 202 - 205)

Page 206

1  of the transaction who don't show up on the other
2  side of the transaction, is that an arm's length
3  transaction?
4      A.  If there are still some players on both
5  sides of the transaction, then I would say yes, it's
6  not an arm's length transaction.
7      Q.  You can put the exhibit aside.
8          One more question for you actually.  Did
9  you ask General Mediterranean Holdings whether they
10 expected to get a 17 percent return on Riverside
11 District Development when they bought it for
12 131 million in October -- excuse me, in November of
13 2005?
14     A.  I don't recall.
15         (Exhibit 338 was marked for
16         identification.)
17 BY MR. YOHALEM:
18     Q.  I believe you've been handed what's --
19 what are we up to, 338?
20         THE COURT REPORTER:  338.
21 BY MR. YOHALEM:
22     Q.  This is a Memorandum of Understanding.
23         Do you see that?
24     A.  Yes.

Page 207

1      Q.  Do you know what a Memorandum of
2  Understanding is?
3      A.  I do not.
4      Q.  Okay.  Do you see that it is a document
5  created by the Moody Group International?
6      A.  That's the title on the letterhead, yes.
7      Q.  Do you know who the Moody Group is?
8      A.  No.
9      Q.  Are you aware that they're an
10 international real estate investment firm?
11     A.  I'm not aware of that, no.
12     Q.  Okay.  Do you see that they are the
13 purchaser for purposes of this Memorandum of
14 Understanding?
15     A.  They're listed as the purchaser, yes.
16     Q.  And do you see that RDD is the seller?
17     A.  Yes.
18     Q.  Okay.  And do you see that they are
19 offering $150 million for a portion of the 62 acres?
20     A.  Under Price it says $150 million.
21     Q.  Okay.  And do you see under Property it
22 says, "This MOU covers the purchase of the real
23 property listed below, and more specifically
24 described in Exhibit A, consisting of a portion of

Page 208

1  the 62 acres of real property"?
2      A.  I'm sorry, I don't see that.  Where?
3      Q.  If you look in bold where it says
4  Property --
5      A.  Yes.
6      Q.  -- do you see that it describes the offer
7  is for a portion of the 62 acres?
8      A.  Yes, I see that.
9      Q.  And if you turn to Page 7, that is
10 Exhibit A.
11         Do you see that?
12     A.  Yes.
13     Q.  And do you see that based on Exhibit A
14 it's approximately, you know, approximately
15 50 percent of the property that's being described by
16 Exhibit A?
17     A.  I can't really tell.  It refers to the
18 parcels inside the red borders, and this is black
19 and white, so I can't tell which part it is.
20     Q.  Did you consider this Memorandum of
21 Understanding when making your appraisal
22 conclusions?
23     A.  I was not aware of this.
24     Q.  If you were aware of it, would you have

Page 209

1  considered it?
2      A.  I would have considered it.
3      Q.  And do you have any reason to doubt that
4  The Moody Group International when it was entering a
5  Memorandum of Understanding to purchase a portion of
6  the property for $150 million in 2005 understood
7  that it would be getting a return of at least
8  17 percent?
9      A.  I really don't know.
10     Q.  Okay.  You can put Exhibit 338 aside.
11         Do you think -- do you have any reason to
12 question whether the unit -- sorry, one more
13 question.
14         Do you have any reason to question whether
15 the Moody Group Memorandum of Understanding was an
16 arm's length transaction?
17     A.  I have no idea.
18     Q.  Okay.  You can put Exhibit 338 aside.
19         And these should be quick.
20         MR. RYAN:  How about in the next ten
21 minutes can we just take a break?
22         MR. YOHALEM:  Yeah.  Do you want to take a
23 break now?
24         MR. RYAN:  It's up to you, whatever you

53 (Pages 206 - 209)

Page 210

1 want to do.
2 MR. YOHALEM: I have a bunch of documents
3 I've got to go through, so why don't we take a break
4 now and come back.
5 THE VIDEOGRAPHER: The time is now
6 2:08 p.m. We are off the record.
7 (Whereupon, a recess was taken
8 from 2:08 p.m. to 2:16 p.m.)
9 THE VIDEOGRAPHER: This is the beginning
10 of Disk Number 5. The time is now 2:16 p.m. We are
11 on the record.
12 (Exhibit 339 was marked for
13 identification.)
14 BY MR. YOHALEM:
15 Q. Mr. VanSanten, you've been handed what's
16 been marked as Exhibit 339.
17 Do you see that this is a facsimile from
18 Michael Rumman to Mohammed Hashim?
19 A. Yes.
20 Q. Do you have an understanding as to who
21 Mohammed Hashim is?
22 A. No, I do not.
23 Q. Do you know whether that Mohammed -- do
24 you know whether that's Mohammed Al-Miqdadi?

Page 211

1 A. I don't know.
2 Q. Do you have any reason to question whether
3 that's Mohammed Al-Miqdadi?
4 A. It's two different names, so I have no
5 idea if it's the same person or not.
6 Q. Did you consider Exhibit 339 in rendering
7 your appraisal?
8 A. I haven't seen this before.
9 Q. Okay. And were you aware of the Moody
10 Group Memorandum of Understanding at all in doing
11 your appraisal?
12 A. No.
13 Q. Okay.
14 (Exhibit 340 was marked for
15 identification.)
16 BY MR. YOHALEM:
17 Q. You've been handed what's been marked as
18 Exhibit 340.
19 Do you see that?
20 A. Yes.
21 Q. And this is a Real Estate Purchase
22 Agreement between Riverside District Development,
23 LLC, and DeBartolo Development, LLC.
24 Do you see that?

Page 212

1 A. Yes.
2 Q. Do you see under Agreement to Sell and
3 Purchase that the agreement is to purchase
4 16.9 acres out of the 62 acres?
5 A. Yes.
6 Q. And do you see that the purchase price
7 effective March 3rd, 2006, is $105 million?
8 A. Yes.
9 Q. And did you consider this document when
10 putting together your appraisals?
11 A. You know, I was aware that there had been
12 an offer made by DeBartolo Development just from
13 reading the deposition transcripts, but I didn't
14 have any of the details, and I have not seen this
15 document before.
16 Q. Would you have considered this document if
17 it were made available to you?
18 A. I would have considered it, but again it
19 wasn't -- it never resulted in a closed transaction,
20 so I wouldn't have given it any weight.
21 Q. And you do see that the document is
22 signed, right?
23 A. Where is the signature? Where are the
24 signatures?

Page 213

1 Q. Page 25.
2 A. Yes, it appears to be signed.
3 Q. So when you say there wasn't a closed
4 transaction, what specifically do you have in mind?
5 A. The sale never went through.
6 Q. Okay. But the Real Estate Purchase
7 Agreement did go through, correct?
8 A. I'm not sure what you mean by that.
9 Q. This document was signed, correct?
10 A. The document was signed, yes.
11 Q. Okay. Do you know why the sale didn't go
12 through?
13 A. I do not know.
14 Q. Okay. Did you investigate why the sale
15 didn't go through?
16 A. No.
17 Q. Okay. Put Exhibit 340 to the side.
18 (Exhibit 341 was marked for
19 identification.)
20 BY MR. YOHALEM:
21 Q. This document is a Key Activity and
22 Accomplishment Report for the first quarter of 2006
23 for Riverside District Development LLC.
24 Do you see that?

54 (Pages 210 - 213)

Page 214

1    A. Yes.
2    Q. Okay. Do you see that Key Activities and
3 Accomplishments under Bullet Point Number 1?
4    A. Yes.
5    Q. And do you see that it says, "Successfully
6 negotiated the sale contract for Phase 1, plus
7 option for additional parcels to the DeBartolo
8 Development Group?
9    A. Yes.
10    Q. And do you see that it says the purchase
11 price with included options exceeds $170 million?
12    A. Yes.
13    Q. Do you have any reason to question whether
14 that sale contract was an arm's length transaction?
15    A. I don't know.
16    Q. Okay. So do you have any reasons to
17 question whether it was an arm's length transaction?
18    A. I would question any transaction. I don't
19 know anything specific about this.
20    Q. But you have no specific reasons to
21 question whether that was an arm's length
22 transaction?
23    A. Again, I would question any transaction as
24 to whether it's arm's length or not. I don't have

Page 215

1 enough knowledge about this to make that
2 determination.
3    Q. Okay. And you didn't go and investigate
4 whether it was an arm's length transaction, did you?
5    A. I don't know. It never closed, so ...
6    Q. Okay. And you don't know why it never
7 closed?
8    A. I don't know.
9    Q. And did you investigate why it didn't
10 close?
11    A. All I needed to know was that it didn't
12 close.
13    Q. Would it make a difference whether it was
14 DeBartolo who pulled out or whether it was RDD that
15 pulled out?
16    A. It wouldn't make a difference to me.
17    Q. Why not?
18    A. Well, again, I have to focus on actual
19 transactions that closed. Why a transaction doesn't
20 close could be as a result of a whole host of
21 different issues.
22    Q. The purchase of the parcel by GMH on
23 November 1st, 2005, that did close though, right?
24    A. I'm sorry, can you repeat the question?

Page 216

1    Q. The purchase of the parcel by GMH on
2 November 1st, 2005, that transaction did close,
3 correct?
4    A. I thought it was Riverside Development
5 District that purchased it.
6    Q. The transaction in which Riverside
7 District Development acquired the property on
8 November 1st, 2005, for in excess of $130 million,
9 that transaction did close, correct?
10    A. It's my understanding that closed.
11    Q. Okay. And both Moody, the Moody offer
12 Memorandum of Understanding and the DeBartolo sale
13 purchase prices were in excess of the amount of the
14 transaction that closed by GMH, correct?
15    A. I don't remember what the Moody one was.
16 The DeBartolo one was for sure.
17    Q. Okay. Okay. You can put Exhibit 341 to
18 the side.
19        (Exhibit 342 was marked for
20        identification.)
21 BY MR. YOHALEM:
22    Q. You've been handed what's been marked as
23 Exhibit 342.
24        Do you see that?

Page 217

1    A. Yes.
2    Q. And this is an offer letter from
3 Developers Diversified Realty Corporation, correct?
4    A. I don't know. I need to take a look and
5 read it here.
6        It looks like what I would describe as a
7 nonbinding letter of intent.
8    Q. It's a nonbinding letter of intent that's
9 signed, correct?
10    A. It was signed by Timothy Bruce I guess.
11    Q. And he's the executive vice president of
12 development for Developers Diversified Realty,
13 correct?
14    A. That's what it says here, yes.
15    Q. Are you familiar with Developers
16 Diversified Realty?
17    A. I am not.
18    Q. Okay. Were you aware of this offer?
19    A. I was not.
20    Q. Would you have analyzed this offer if you
21 were made aware of it?
22    A. I would have looked at it, yes.
23    Q. Would you have asked GMH why they turned
24 it down?

55 (Pages 214 - 217)

Page 218

1    A.  I would have asked the question, yes.
2    Q.  And this offer is for $160 million,
3  correct?
4    A.  Correct.
5    Q.  Okay.  You can put Exhibit 342 to the
6  side.
7          (Exhibit 343 was marked for
8          identification.)
9  BY MR. YOHALEM:
10    Q.  You've been handed what's been marked as
11  Exhibit 343, which is a letter of intent.
12        Do you see that?
13    A.  Yes.
14    Q.  And if you turn to the last page, do you
15  see that it's signed by Garrett Kelleher and also by
16  Mohammed Al-Miqdadi and also by Nadhmi Auchi and
17  also by Antoin Rezko?
18    A.  I do see that, yes.
19    Q.  And it is a letter of intent for the
20  62 acres, correct?
21    A.  Correct.
22    Q.  And it's dated March 6th, 2007, correct?
23    A.  Yes.
24    Q.  And the purchase price for the property

Page 219

1  that's described in this letter of intent is
2  $255 million, correct?
3    A.  Correct.
4    Q.  Did you consider this document when
5  rendering your appraisal?
6    A.  I wasn't aware of this document.
7    Q.  Okay.  Were you aware of an offer -- a
8  letter of intent between Garrett Kelleher and
9  Riverside District Development for sale of the
10  property for $255 million on March 6, 2007?
11    A.  I don't recall.
12    Q.  Okay.  Did you ever discuss the letter of
13  intent with anyone at GMH?
14    A.  No.
15    Q.  Would you have discussed the possible
16  Kelleher sale with someone at GMH if you had known
17  about it?
18    A.  Yes.
19    Q.  Are you aware that Nadhmi Auchi was asked
20  about whether $255 million represented a fair price
21  at his deposition?
22    A.  I don't know.
23    Q.  Okay.  Would you have considered whether
24  Nadhmi Auchi, the seller of the property, thought

Page 220

1  $255 million was a fair price on March 6, 2007, if
2  you had been aware of it?
3    A.  I don't know.  I'd have to know the
4  context of the whole situation.
5    Q.  You can put Exhibit 343 aside.
6        What is your understanding of the real
7  estate market in the South Loop between 2004 and
8  2008?
9    A.  That's a pretty broad question.  Is there
10  something specific?
11    Q.  Sure.  Were values going up or down
12  between 2004 and 2008?
13    A.  Well, from 2004 up through about 2007, in
14  general values were going up, and then after that
15  they started falling off after the economic
16  collapse.
17    Q.  And what time did they start falling off
18  specifically?
19    A.  That would have been in 2008.  I think the
20  early signs were already showing in the beginning of
21  2008.
22    Q.  Okay.  You can go ahead and mark this.
23          (Exhibit 344 was marked for
24          identification.)

Page 221

1  BY MR. YOHALEM:
2    Q.  Do you see that this is a Complete
3  Appraisal-Summary Report prepared March 23rd,
4  2004, by Appraisal Research Counselors?
5    A.  Yes.
6    Q.  And do you see that on Page 1 of the
7  report -- or, sorry, Page 2 of the certification, it
8  says that they reached a conclusion as to market
9  value of the property on March 23rd, 2004, of
10  $110 million?
11    A.  Yes.
12    Q.  In preparing your appraisal reports, did
13  you review this appraisal report?
14    A.  I did not.
15    Q.  Would you have considered it if you had
16  received it?
17    A.  No.
18    Q.  Why not?
19    A.  Well, the problem with looking at
20  appraisals that have been prepared by other firms is
21  that a very critical part of the process for anyone
22  who is appraising a property is the whole market
23  research and verification process, and I can tell
24  you from experience that it's not the same at every

56 (Pages 218 - 221)

Page 222

1  appraisal firm; that is, the extent of the due
2  diligence that they put into an assignment, the
3  amount of verification that they spend verifying to
4  make sure that their analysis is accurate varies
5  significantly.
6       At the end of the day, I was asked to
7  provide my own independent opinion of value. What
8  somebody else estimated that market value would have
9  absolutely no relevance to my assignment.
10   Q.  Okay. Would you agree that their estimate
11  of market value was radically different than your
12  estimate of market value?
13   A.  Their value conclusion is different than
14  my value conclusion.
15   Q.  Okay. You can put Exhibit 344 aside.
16      And, sorry, what makes you believe that
17  you are right and they are not right with respect to
18  this particular appraisal assignment?
19   A.  Well, I know the process that I went
20  through to do my research and analysis, and I'm very
21  confident of that research and analysis and my
22  conclusions. I have no idea how much effort went
23  into their analysis and whether it's accurate or
24  not.

Page 223

1          (Exhibit 345 was marked for
2           identification.)
3  BY MR. YOHALEM:
4    Q.  This is a Loan Agreement between Riverside
5  District Development and Broadway Bank.
6       Do you see that?
7    A.  Yes.
8    Q.  And it's dated February 14, 2006.
9       Do you see that?
10   A.  Yes.
11   Q.  And do you -- if you can turn to Page 13
12  and 14, let me know when you're there.
13      Do you see that a condition precedent to
14  the obligation of Broadway Bank to extend the loan
15  to Riverside District Development under L was an
16  appraisal confirming that the premise has an
17  appraised value of not less than $110 million?
18   A.  Yes.
19   Q.  Did you consider this document in
20  rendering your appraisal?
21   A.  I have not seen this document.
22   Q.  If you had received this document, would
23  you have asked General Mediterranean Holdings about
24  it?

Page 224

1    A.  No.
2    Q.  Okay. You can put the document aside.
3          (Exhibit 346 was marked for
4           identification.)
5  BY MR. YOHALEM:
6    Q.  This is a Closing Checklist for a
7  $24 million loan to RDD.
8       Do you see that?
9    A.  Yes, I do.
10   Q.  And do you see that the -- one of the
11  miscellaneous things that's required for the
12  checklist is an appraisal review with a value not
13  less than $131 million on miscellaneous B, Roman
14  numeral VI.B?
15   A.  I'm sorry, what page are you referring to?
16   Q.  Page 5.
17   A.  Yes, I see that.
18   Q.  And would it have affected your
19  appraisal -- excuse me.
20      Were you ever aware of Exhibit 346?
21   A.  No.
22   Q.  Would you have asked GMH about
23  Exhibit 346?
24   A.  No.

Page 225

1          (Exhibit 347 was marked for
2           identification.)
3  BY MR. YOHALEM:
4    Q.  Mr. VanSanten, you've been handed what's
5  been marked as Exhibit 347.
6    A.  Yes.
7    Q.  Do you see that? This is a Closing Binder
8  between Mutual Bank and Riverside District
9  Development about a $27 million loan.
10      Do you see that?
11   A.  Yes.
12   Q.  And if I can turn your attention to Bates
13  number GMH-2876, let me know when you're there.
14   A.  Okay.
15   Q.  Do you see that one of the requirements
16  for this loan is that the lender receive an
17  appraisal for the property of not less than
18  $120 million?
19   A.  Yes.
20   Q.  And do you know whether or not this loan
21  closed?
22   A.  I don't know.
23   Q.  Did you investigate whether or not this
24  loan closed?

Page 226

1    A.  No.
2    Q.  And would you have discussed this loan
3  with GMH if you had known about it?
4    A.  No.
5    Q.  Mr. VanSanten, we've been going through
6  quite a number of documents between appraisals,
7  offers, letter of intents, all of which -- all with
8  numbers significantly above any of your appraised
9  values.
10       Do you just think all of these market
11  participants were incorrect and you're correct?
12    A.  I believe I'm correct.
13    Q.  Is it normal for this many market
14  participants to make mistakes about conclusions of
15  market value?
16    A.  Well, clearly the fact that most or all of
17  these transactions didn't go through, they obviously
18  made mistakes in their initial offer.
19    Q.  When you've testified in other cases, has
20  your -- have your appraisals often been in conflict
21  with this many number of offers and other
22  appraisals?
23    A.  I don't recall off the top of my head.
24    Q.  I want to go back again to your 2005

Page 227

1  appraisal report, and I want to try and understand
2  some of these comparable sales that you cite.
3        Okay.  So if you could turn to Page 59.
4    A.  Okay.
5    Q.  The first sale is a -- excuse me.
6        My first question is, you say Subject
7  Property.
8        Do you see that?
9    A.  Yes.
10    Q.  So under the headings, it says Site Size
11  Square Foot.
12        Do you see that?
13    A.  Yes.
14    Q.  And you have 60,763 square feet.
15        Do you see that?
16    A.  Yes.
17    Q.  Where does that number come from?
18    A.  Well, you'll see that's actually footnoted
19  down below.  It represents the characteristics of
20  the average residential development site, so that's
21  an average of all those parcels.
22    Q.  So you averaged the different parcels
23  rather than choosing a particular parcel?
24    A.  For purposes of this analysis, that's

Page 228

1  correct.
2    Q.  Okay.  Why did you do that?
3    A.  Well, because we've got several different
4  parcels all -- you know, we're trying to estimate
5  what the market value would be without knowing
6  necessarily which ones would sell first and trying
7  to get an indication of what the average value would
8  be for those average size sites.
9    Q.  Different parcels had different plans for
10  them, right?
11    A.  Correct.  So this particular subject
12  refers to those residential sites which we discussed
13  earlier.
14    Q.  Okay.  So the first, the first property
15  you list is 800 to 880 South Clark Street; is that
16  correct?
17    A.  That's correct.
18    Q.  And that sold for 13,343,000; is that
19  correct?
20    A.  That's correct, yes.
21    Q.  And what was the date of the sale?
22    A.  That was December of 2005.
23    Q.  So it was right around the same time
24  period as the 62 acres, correct?

Page 229

1    A.  Correct.
2    Q.  And its price per square foot -- sorry,
3  price per max floor area foot was $12.41, correct?
4    A.  That's correct, yes.
5    Q.  And the square footage of the 62 acres was
6  how much exactly, the maximum square footage?
7    A.  The maximum square footage for the
8  residential portion, which is what we're looking at
9  here, was about 3,077,308, but the average was about
10  279,000 per parcel.
11    Q.  Okay.  And if you just multiplied the
12  price per square foot for the South Clark Street
13  sale with the square footage for the 62 acres, you
14  would get a number well above your appraised value,
15  correct?
16    A.  I'm sorry, I don't understand the
17  question.
18    Q.  Yeah.  If you multiplied the price per
19  square foot from the 800 to 880 South Clark Street
20  sale by the maximum area of square footage for the
21  62 acres, you would get a number well above your
22  appraised value, correct?
23    A.  I don't know.
24    Q.  Okay.  Do you know how many units the 800

58 (Pages 226 - 229)

Page 230

1  to 880 South Clark Street property was titled for?
2     A.  I think it's probably in my backup file.
3     Q.  Okay.  It's not in your report though?
4     A.  It's not in the report, no.
5     Q.  Did you analyze the entitlements?
6     A.  Actually let me back up a second.  I do
7  have writeups of each of these sales in the back of
8  my report.  I don't know if I put the number of
9  units in there or not.
10       No, it doesn't look like it.
11     Q.  Why don't you find -- if you don't mind
12  finding this specific sale where it says number of
13  units in your backup file.
14     A.  Okay.
15       I don't actually see in here where it
16  shows the number of units.  It does -- we do know
17  the maximum floor area ratio for those, and that's
18  really the key factor here.
19     Q.  Why don't you look through your other
20  properties, too, and let me know if any of them show
21  the number of units that are allowed to be
22  constructed.
23     A.  It's going to take me a while.  I've got
24  32 sales to look through.

Page 231

1     Q.  That's fine.  I assume they all have the
2  same format.
3     A.  Yeah, but in some cases we were able to
4  determine the number of units and in some cases we
5  weren't.
6     Q.  Okay.  Why don't we look at just the 2005
7  sales comparisons.  Let me know what numbers you
8  looked at the number of units for.
9     A.  So Sale Number 2 it looks like was 271
10  units.
11       MR. RYAN:  What was that number again?
12  I'm sorry.
13       THE WITNESS:  271.  Actually that's not
14  correct.  I see conflicting information.  There's
15  another article that says it was 479 units, yeah,
16  479 units.
17       Sale Number 5 looks like it was 249 units.
18       And then I don't see it for the other
19  sales.  Sale 7 is actually the sale for the Target
20  Store that was built directly across the street from
21  the subject property, that's Number 7, so there were
22  no residential units in that.
23  BY MR. YOHALEM:
24     Q.  Okay.  And so the only one of the sales

Page 232

1  for which you were able to obtain any information
2  about how many units could be developed was Sale 5;
3  is that correct?
4     A.  No, I think there were two of them.  I
5  think it was Sale -- was it Sale 2 and Sale 5, I
6  believe.
7     Q.  Sale 2 had conflicting information you
8  said.
9     A.  There was one article that said 200 some
10  and another article that said 479.
11     Q.  Is this -- is the development plan
12  something that's available from the City of Chicago?
13     A.  Sometimes yes; sometimes no.
14     Q.  Did you make a request to the City of
15  Chicago for the development plans for these parcels?
16     A.  Every one of these we requested the
17  information with regard to the deeds, the transfer
18  declarations, the development plans.
19     Q.  And none of them were available besides 5
20  and 2?
21     A.  Well, you know, the focus of my analysis
22  was to look at the total allowable floor/area ratio,
23  which is really what drives the value for these
24  things.  Certainly the number of units plays into

Page 233

1  that as well, but it can skew the analysis if you
2  focus on that exclusively.
3       So floor/area ratio is a much more
4  reliable indicator, and I have that for every single
5  sale.
6     Q.  So did you specifically make any analysis
7  of any of these sales based on number of units?
8     A.  No.
9     Q.  And did you make a determination of price
10  per unit for any of these sales?
11     A.  No, I did not.
12     Q.  And did you compare your conclusions based
13  on square footage with any conclusions based on a
14  price-per-unit analysis?
15     A.  No.
16     Q.  Okay.  And just one last question.  For
17  Sale 5, it's your testimony that the record, your
18  records show that there are 249 allowable units; is
19  that correct?
20     A.  That's -- I think there's a note in here
21  that that was the number, right.
22     Q.  And I see the maximum floor area for
23  Site 5 is 186,030 feet, square feet; is that
24  correct?

59 (Pages 230 - 233)

Page 234

1    A.  Correct, right.
2    Q.  Wouldn't those be tiny units that were
3 allowed to be built?
4    A.  I haven't done the math.
5    Q.  Do you want to use your calculator and
6 determine the square footage per unit based on
7 these?
8    A.  I can do that if you give me a couple
9 minutes.
10       They're 750-square-foot units, so that
11 doesn't seem -- I mean, that could be studios.
12    Q.  There's no common area at all on the site?
13    A.  I'm sure there's some common area.  I
14 mean, I've seen studios as small as 500 square feet.
15 So, I mean, that's the problem with focusing on sale
16 price per unit is that you don't know whether
17 they're talking about 100 studio units or
18 100 two-bedroom units, and so your analysis can be a
19 real apples-to-oranges comparison if you focus on
20 that exclusively.
21    Q.  Do you have any record in your work file
22 of the requests that were made to the City of
23 Chicago for the plans of development?
24    A.  In terms of record, I don't know what you

Page 235

1 mean by a record.
2    Q.  Yeah.  If I wanted to see proof that you
3 actually went and asked the City of Chicago for
4 plans of development for these properties, what
5 could you point me to other than your testimony?
6    A.  Well, in my work file, you'll see the
7 backup documentation that we were able to obtain to
8 verify all the details of these sales, whether it's
9 notes from conversations, copies of the deeds,
10 copies of the transfer declarations, copies of the
11 zoning ordinance.  Anything we were able to obtain
12 is included in the file.
13    Q.  And my question though is about what you
14 say you tried to obtain but were unable to.
15       Is there anything in your file that
16 documents the efforts that were made to reach out to
17 the City of Chicago to get plans of development for
18 these properties?
19    A.  Well, I think it's pretty self-evident
20 when you see that several of the sales have that
21 documentation while others don't.  I mean, clearly
22 we made the effort to get it on every single one
23 that we could.
24    Q.  When analyzing the development, you

Page 236

1 concluded that a portion of it would be dedicated to
2 office space, correct?
3    A.  Yes.
4    Q.  And what did you base that conclusion on?
5    A.  Well, just kind of a general sense that I
6 think there's 680,000 square feet that was approved
7 in the planned development for, quote-unquote,
8 commercial developments, which could consist of
9 retail or office or I think even hotel might have
10 been one of the potential uses.
11       And so generally what you're going to see
12 is not an exclusively just retail or just office.
13 You're going to see a mix of that.  But given the
14 fact that it's located around Roosevelt Road, retail
15 is going to be the predominant use.
16       So in my view, of that 680,000 square
17 feet, the bulk of it is going to be retail
18 typically, and then there would be some associated
19 with office.
20    Q.  Did you look at any plans of development
21 that included any office space?
22    A.  Did I look at any plans of development,
23 for the subject property?
24    Q.  Yeah.

Page 237

1    A.  I don't recall a specific plan that
2 included that.
3    Q.  Did you ask GMH whether they were planning
4 on building office space on the property?
5    A.  I don't recall if we asked that question
6 or not.
7    Q.  It would have affected your analysis if it
8 was all retail, correct?
9    A.  I don't know that it would necessarily
10 affect the end result.  It would have been a
11 slightly different analysis though.
12    Q.  A piece of your analysis was on the value
13 of the property as being developed as office space,
14 correct?
15    A.  There's an assumption that 200,000 square
16 feet would be developed as office, right.
17    Q.  Okay.  If you turn to Page 75 of your
18 report, that's for Assumptions and Limiting
19 Conditions; is that correct?
20    A.  Yes.
21    Q.  Did this section supposed to list all
22 of your assumptions and limiting conditions?
23    A.  This section is really kind of a standard
24 boilerplate that we include in all our reports.

60 (Pages 234 - 237)

Page 238

1    Q.   So did you list other assumptions
2  elsewhere in your report?
3    A.   If there are other assumptions that are
4  specific to the subject property, that would be
5  indicated elsewhere.
6    Q.   Elsewhere, okay.  And just for my own
7  edification, where in your report do you say that it
8  is an assumption that there will be 200,000 square
9  feet of office space?
10   A.   Well, it refers to it on Page 27 of my
11 report under Office Demand.  You'll see the second
12 paragraph there where I say that the projected
13 office space at the subject will contain
14 approximately 200,000 square feet.
15   Q.   And, sorry, when you say the projected
16 office space of the subject will contain
17 approximately 200,000 square feet, you don't say
18 it's an assumption anywhere in that paragraph, do
19 you?
20   A.   I think you're getting into semantics.
21 I'm stating that that's part of our analysis that
22 200,000 square feet would be office.
23   Q.   You don't say that you assume that it
24 would be 200,000 square feet of office, do you?

Page 239

1    A.   I don't say I assume.  I say it will.
2    Q.   But you don't actually know that it will;
3  you just assume that to be the case, correct?
4    A.   Yes.
5    Q.   And that was the same for all four of your
6  reports, correct?
7    A.   Correct.
8    Q.   Why was the highest and best use
9  developing any office space when we saw earlier
10 retail rents were commanding $42 triple net?
11   A.   Well, again, if you look at the highest
12 and best use, what I say is that it's consistent
13 with the Plan Development 904.  In my view, you're
14 going to have some proportion of that total
15 commercial space that is likely going to be office
16 as opposed to just straight retail.
17       However, at the end of the day, it's not
18 going to make a significant difference in the
19 conclusion of what that land value is.
20   Q.   Does anything in Plan Development 904
21 require there to be 200,000 square feet of office
22 space?
23   A.   It doesn't require it, no.
24   Q.   But does it --

Page 240

1    A.   It does allow for it.
2    Q.   Does it say anywhere that there will be
3  200,000 square feet of office space?
4    A.   No.
5        MR. YOHALEM:  Why don't we take a short
6  break.
7        THE VIDEOGRAPHER:  The time is now
8  3:01 p.m.  We are off the record.
9        (Whereupon, a recess was taken
10       from 3:01 p.m. to 3:15 p.m.)
11       THE VIDEOGRAPHER:  The time is now
12 3:15 p.m.  We are on the record.
13 BY MR. YOHALEM:
14   Q.   Mr. VanSanten, if you could turn to
15 Page 71 of your 2005 report.
16   A.   Yes.
17   Q.   At the bottom you say, "The cost
18 associated with these improvements has been
19 estimated at $98 million."
20       Do you see that?
21   A.   Yes.
22   Q.   Where does that number come from?
23   A.   That was a figure that was provided to me
24 by GMH in that phone conversation.

Page 241

1    Q.   Was that your sole source of information
2  that the TIF would be $98 million?
3    A.   Well, I saw other articles that showed
4  they had applied for up to $140 million in TIF
5  funds.  I think the point here is that it's not so
6  much the dollar amount itself that makes a
7  difference; it's the fact that the City would pay
8  for those costs regardless of what it is, and that's
9  really the key thing that this assumption is
10 pointing out.
11   Q.   Would you agree that if there were a
12 higher TIF it would increase the value of the
13 property?
14   A.   Not necessarily, no.
15   Q.   Why not?
16   A.   Well, it's my understanding that the TIF
17 funds have a direct correlation with the actual cost
18 of these items, like the public streets and the
19 river walk improvements and utility extensions, all
20 of which needed to be taken care of in order for
21 them to realize any value at this property.
22       So to the extent the City would offer more
23 TIF funds, it's likely because the cost is higher.
24   Q.   Did anyone from the City tell you that TIF

61 (Pages 238 - 241)

Page 242

1 funds were strictly connected to costs of developing
2 public spaces?
3     A. I don't recall a conversation with the
4 City about that, no.
5     Q. Did you ask the City about that?
6     A. No.
7     Q. So did GMH tell you that the TIF funds
8 were directly connected to the costs of public
9 spaces?
10     A. Yes.
11     Q. And why do you think GMH would know that?
12     A. I think any developer or potential
13 investor would want to know that because without
14 that funding this property would be essentially
15 worthless.
16     Q. Did GMH say that the City had told them
17 that?
18     A. I don't recall.
19     Q. And do you know who at GMH told you that?
20     A. It was in that conversation with Mohammed
21 and Ken and Mary.
22     Q. Do you know whether it was Mohammed, Ken
23 or Mary who said it?
24     A. I'm not sure which one.

Page 243

1     Q. And you don't know who Ken and Mary are
2 beyond their first names, correct?
3     A. Correct.
4     Q. Let me ask you quickly, what is your
5 understanding of the relevance of market value to
6 this case?
7     A. You know, I don't honestly know exactly
8 how it fits into the whole case. I was just asked
9 to value the property, which is what I did.
10     Q. Market value is not the same thing as what
11 GMH valued the property at, correct?
12     A. Not necessarily, correct.
13     Q. And, in fact, GMH could have a totally
14 different value of the property than what the market
15 value is, right?
16     A. They could certainly have a different
17 opinion of value as opposed to what the actual
18 market value is.
19     Q. And if you wanted to know what GMH's value
20 of the property was, a better place to look would be
21 what GMH says the property is worth and what the
22 market value of the property is worth, correct?
23     A. I'm sorry, could you repeat that?
24     Q. Yeah. If you wanted to know what GMH

Page 244

1 valued the property at, a better place to look would
2 be what GMH said the property was worth and what the
3 market value of the property was worth?
4         MR. RYAN: Objection, foundation,
5 speculation.
6         THE WITNESS: If I wanted to know what
7 GMH's opinion of the value of the property is, they
8 would be the person to ask.
9 BY MR. YOHALEM:
10     Q. And is there a term of art for what an
11 individual entity values a piece of property as?
12     A. Well, there's different definitions of
13 value. I think in terms of investment value is
14 typically something you might refer to as value to a
15 specific investor as opposed to market value.
16     Q. And investment value is something that can
17 be appraised also, correct?
18     A. It can be, yeah.
19     Q. Have you ever done an appraisal for
20 investment value?
21     A. I don't recall that I ever have, no.
22     Q. Has anyone at your firm ever done an
23 appraisal for investment value?
24     A. I don't know.

Page 245

1     Q. And do you think you could have done an
2 appraisal for investment value in this case?
3     A. Having not done that, I don't know.
4     Q. Okay. And my last question on this may be
5 redundant, but market value does not necessarily
6 equal investment value for GMH, correct?
7     A. It could be different things.
8     Q. Okay. And so someone should not draw from
9 your report a conclusion that you are estimating
10 something that is necessarily connected to GMH's
11 investment value on the property, correct?
12     A. I don't know the answer to that.
13     Q. Your appraisal is for market value,
14 correct?
15     A. I was asked to estimate the market value
16 of the property, correct.
17     Q. Okay. And so other than, you know, other
18 than the fact that GMH might use market value as one
19 criteria, there's nothing inherently that connects
20 GMH's investment value to market value, correct?
21     A. I don't know the answer to that.
22     Q. Okay. If there were an offer to GMH that
23 came in like at say $100 million, would your
24 recommendation be to GMH that they should take that

62 (Pages 242 - 245)

Page 246

1 offer?

2     MR. RYAN: Objection, foundation,

3 speculation.

4     THE WITNESS: I can't make any

5 recommendation as to what GMH should do. I can tell

6 them what my opinion of market value is though.

7 BY MR. YOHALEM:

8   Q. And your opinion of market value is that

9 it would be significantly lower than $100 million,

10 correct?

11   A. My opinion of market value on 2005 is

12 $70 million.

13   Q. Okay. And your market value today is

14 $61 million; is that correct?

15   A. Correct.

16   Q. Okay.

17     (Exhibit 348 was marked for

18     identification.)

19 BY MR. YOHALEM:

20   Q. Sorry, just a second.

21     You've been handed what's been marked as

22 Exhibit 348.

23     Do you see that?

24   A. Yes.

Page 247

1   Q. And this is a document from your work

2 file, correct?

3   A. Yes.

4   Q. And it's a document you considered in

5 preparing your report, correct?

6   A. Yes.

7   Q. The first sentence, the first paragraph

8 of -- well, let me back up a second.

9     The date for this article is

10 February 12th, 2008, correct?

11   A. Yes.

12   Q. And that is essentially the same time as

13 one of your appraisals, correct? You did an

14 appraisal February 11, 2008, correct?

15   A. Yes, that's correct.

16   Q. And this article is dated February 12th,

17 2008, correct?

18   A. Yes.

19   Q. So it's basically the same time as your --

20   A. It appears so, yes.

21   Q. Okay. The first thing I want to draw your

22 attention to is the first paragraph that says, "One

23 of Britain's most successful businessmen says he

24 remains bullish on investing in the American economy

Page 248

1 and wants to complete a proposed $2 billion real

2 estate development near downtown Chicago."

3     Do you see that?

4   A. Yes.

5   Q. And is it your understanding that the real

6 estate development as developed would be worth

7 $2 billion based on this paragraph?

8   A. I don't know what he's referring to there.

9   Q. Do you understand it to be referring to

10 the 62 acres?

11   A. It looks like it is referring to the

12 62 acres, yes.

13   Q. Okay. The next paragraph describes what

14 the parcel just west of Chicago's Loop Riverside

15 Park would include, right?

16   A. Yes.

17   Q. And it's residential, retail and

18 commercial space, correct?

19   A. Correct.

20   Q. And do you understand commercial space to

21 mean office space?

22   A. That's sort of a broad category that could

23 encompass office, it could encompass retail, so yes.

24   Q. Okay. And according to this, it says

Page 249

1 Auchi is worth $3.1 billion, right?

2   A. That's what the article said, yes.

3   Q. Do you have any reason to question that?

4   A. I have no knowledge of Mr. Auchi's wealth.

5   Q. Okay. Page 2, I want to draw your

6 attention to the second paragraph down.

7   A. Which paragraph?

8   Q. The second paragraph.

9   A. Yes.

10   Q. Sorry, let's start with the first

11 paragraph. The first paragraph says, "Because of

12 his reputation as a developer of projects around the

13 world, Auchi says he was a natural target for Rezko,

14 who put together a concept to develop vacant land in

15 a gentrifying neighborhood along the Chicago River

16 just west of downtown."

17     Do you see that?

18   A. Yes.

19   Q. Do you understand based on this article

20 that Auchi has a reputation as a developer of

21 projects around the world?

22     MR. RYAN: Foundation. Objection,

23 foundation.

24     THE WITNESS: That's what the article

63 (Pages 246 - 249)

Page 250

1 alleges, yes.
2 BY MR. YOHALEM:
3     Q.  And when you consulted this article in
4 your work file, is that what you understood it to
5 mean?
6     A.  That's what the article indicates.
7     Q.  Okay.  The next sentence says, "Many liken
8 Auchi's fame in Britain and the Middle East to that
9 of Donald Trump in the U.S."
10        Do you see that?
11    A.  Yes.
12    Q.  Do you understand that from this article
13 Auchi is a successful real estate developer?
14    A.  Well, I know the comparison to Donald
15 Trump, I'm not sure whether that's good or bad, so I
16 don't know what to take from that.
17    Q.  Okay.  The fourth paragraph down says,
18 "Auchi estimates he has close to $300 million
19 invested in U.S. and Canadian firms in real estate
20 alone."
21        Do you see that?
22    A.  Yes.
23    Q.  Any reason to question that he has that
24 type of real estate investments in the U.S. and

Page 251

1 Canada?
2     A.  I don't have any knowledge about his
3 investments.
4     Q.  Okay.  Three more paragraphs down, it
5 says, "In all, GMH has invested close to
6 $170 million to acquire the Chicago property, giving
7 the company 80 percent control of the holding
8 company that owns the land."
9        Do you see that?
10    A.  Yes.
11    Q.  So as of the date of this article, GMH's
12 investment is close to $170 million, correct?
13        MR. RYAN:  Objection, foundation.
14        THE WITNESS:  According to the article,
15 yes.
16 BY MR. YOHALEM:
17    Q.  Do you have any reason to question the
18 article?
19    A.  I don't know.  I don't have any knowledge
20 about that.
21    Q.  Okay.  I want to turn your attention to
22 Page 3 of the article at the very bottom.
23        Do you see that?
24    A.  Yes.

Page 252

1     Q.  Do you see the last sentence says, "The
2 tycoon says he could easily walk away from the
3 Chicago development by selling the land he owns for
4 a profit, but he has been reluctant to do so"?
5        Do you see that?
6     A.  Yes.
7     Q.  Do you think Mr. Auchi, who as we've
8 learned is a real estate tycoon and a billionaire,
9 do you think --
10        MR. RYAN:  Objection -- sorry.
11 BY MR. YOHALEM:
12    Q.  -- do you think he was mistaken when he
13 said he could walk away from the Chicago development
14 by selling the land he owns for a profit --
15        MR. RYAN:  Objection, foundation.
16 BY MR. YOHALEM: --
17    Q.  -- in 2008?
18        MR. RYAN:  -- speculation and improper
19 characterization of facts.
20 BY MR. YOHALEM:
21    Q.  You can answer.
22        Do you think Mr. Auchi, when he said he
23 could easily walk away from the Chicago development
24 by selling the land he owns for a profit, on

Page 253

1 February 12th, 2008, was mistaken?
2     A.  I mean, it sounds to me like someone who
3 has got a pretty darn big ego and would never admit
4 to a mistake even if he made one.
5     Q.  So do you think he was just not admitting
6 to his mistake there?
7     A.  I don't know.
8     Q.  Okay.  You can put 348 aside.
9        How did this document end up in your work
10 file?
11    A.  Which one?
12    Q.  Our Exhibit 348.
13    A.  I believe it would have been research that
14 Nick, Nick McGinn had completed and he printed it
15 off and put it in the file.
16    Q.  And did you review the article in
17 rendering your conclusions?
18    A.  Yes.
19        (Exhibit 349 was marked for
20        identification.)
21        MR. RYAN:  349, right?
22        THE COURT REPORTER:  Yes, that's right.
23 BY MR. YOHALEM:
24    Q.  I'm handing you what's been marked as

64 (Pages 250 - 253)

Page 254

1  Exhibit 349. This is a Summary Real Estate
2  Appraisal Report I believe you were a part of
3  preparing in November of 2012.
4      Do you see that?
5      A.  Yes.
6      Q.  Did you rely on any of the parts of your
7  analysis that were in your work file for Exhibit 349
8  in rendering your appraisal opinions in this case?
9      A.  I'm sorry, could you repeat the question?
10     Q.  Yeah. So in 2012, you did an appraisal
11 report for the property at issue in this case,
12 correct?
13     A.  Correct.
14     Q.  My question is, were any of the materials
15 that you used in November 2012 materials that you
16 relied on in preparing your appraisal reports in
17 this case?
18     A.  Well, in general, what I did is I pulled a
19 copy of the actual report to look at, but I don't
20 recall actually looking at the work file that was
21 utilized.
22     Q.  This was my question. Did you generate an
23 entirely new work file --
24     A.  Yes.

Page 255

1      Q.  -- in this case?
2      A.  Yes.
3      Q.  And a new analysis unrelated to the
4  analysis you had done in 2012?
5      A.  Yes.
6      Q.  Based on, you know, newly going and
7  looking at information; is that correct?
8      A.  Yes.
9      Q.  And other than that, your 2012 opinion is
10 irrelevant to your opinions in this; is that
11 correct?
12     MR. RYAN:  I didn't hear the question.
13 BY MR. YOHALEM:
14     Q.  Other than, other than the fact that you
15 had done the work previously, your 2012 opinions are
16 irrelevant to your conclusions in this case, right?
17     A.  My conclusions in this case are not
18 dependent upon the analysis I did in 2012.
19     Q.  Okay. And you're not relying on the
20 appraisal report from 2012 as anything that you're
21 basing your conclusions on in this case, are you?
22     A.  No.
23     Q.  Okay. Just one question. If you turn to
24 romanette (i) of your 2012 report.

Page 256

1      A.  Okay.
2      Q.  This is a letter to James Field, correct?
3      A.  Yes.
4      Q.  And do you know who Mr. Field is?
5      A.  Yes, he's an attorney with the firm of
6  Field and Goldberg.
7      Q.  And it says, "The intended use of this
8  appraisal is for tax appeal purposes."
9      Do you see that?
10     A.  That's correct, yes.
11     Q.  And the purpose of using an appraisal in a
12 tax appeal is trying to reduce property taxes,
13 correct?
14     A.  That's correct, yes.
15     Q.  And the way you reduce property taxes is
16 to convince the tax assessor that the property is
17 worth less than its assessed value, correct?
18     A.  Correct.
19     Q.  So it would be in the interest of GMH to
20 get an assessment or an appraisal as low as
21 possible, you know, to convince the tax assessor
22 that their taxes are too high, correct?
23     A.  I'm sure as the owner they would like to
24 get as low a value as possible for that.

Page 257

1      Q.  Okay. You can put 349 aside.
2      (Exhibit 45 was identified.)
3  BY MR. YOHALEM:
4      Q.  Mr. VanSanten, you've been handed what's
5  been marked previously as Exhibit 45.
6      Do you see that?
7      A.  Yes.
8      Q.  This is a Pledge Agreement and assignment
9  of LLC interest.
10     Do you see that?
11     A.  I haven't had a chance to look at it.
12     Q.  Okay.
13     A.  So I see it's titled a Pledge Agreement.
14     Q.  Do you see that it is a loan to Antoin, to
15 Rezko Property Holdings?
16     A.  Okay, so I see Rezko Property Holdings as
17 the borrower.
18     Q.  Okay. And do you see that Semir Financial
19 is the lender?
20     A.  I guess they're referred to as the
21 pledgee? Where are you looking?
22     Q.  Yeah, that's fine, pledge, yes, Semir
23 Financial is the pledgee I guess.
24     And the pledge has made a loan of

1 $5 million to the borrower, correct?
2    A.   That appears correct, yes.
3    Q.   And the pledgor is a member in MT Property
4 Holdings.
5        Do you see that in letter F?
6    A.   It says the pledgor is a member in
7 MT Property Holdings.
8    Q.   Okay.  And do you see that the pledgor is
9 pledging his ownership interest -- sorry.
10       The pledgor is pledging the profits, cash
11 flow and other distributions payable with respect to
12 his membership interest in MT Property Holdings?
13   A.   I'm sorry, where, is there a specific
14 paragraph?
15   Q.   Paragraph F.
16   A.   F.
17       Okay.  I'm sorry, could you repeat the
18 question?
19   Q.   Yeah.  Do you see that the pledgor, in
20 order to receive this $5 million loan, is pledging
21 his profits, cash flow and other distributions
22 payable with respect to the membership interests?
23   A.   You know, I guess this seems like a legal
24 document.  I can't really interpret what's going on

1 with it.
2    Q.   Okay.  Were you aware that Antoin Rezko
3 received a $5 million loan on June 16th, 2006,
4 premised on his putting up his ownership interest in
5 the property as collateral and as a pledge?
6    A.   No, I'm not aware of that.
7    Q.   And did you consider this document in any
8 way in rendering your appraisal?
9    A.   No.
10   Q.   We should be able to go through these
11 quickly hopefully.
12       (Exhibit 350 was marked for
13        identification.)
14 BY MR. YOHALEM:
15   Q.   You've been handed --
16       MR. RYAN:  Do you have a copy for me?
17       MR. YOHALEM:  I'm sorry, I wrote on it.
18       MR. RYAN:  That's okay.  What number?
19       MR. YOHALEM:  350.
20       MR. RYAN:  350.
21 BY MR. YOHALEM:
22   Q.   This is another Pledge and Collateral
23 Agreement between Rezko Property Holdings and
24 Dr. Malek.

1        Do you see that?
2    A.   Yes.
3    Q.   And again, Rezko is pledging a piece of
4 his ownership in the property for his -- you know,
5 to secure his debts.
6        Were you aware of this pledge?
7    A.   No.
8    Q.   And did you consider it in your analysis?
9    A.   No.
10   Q.   You can put Exhibit 350 aside.
11       (Exhibit 48 was identified.)
12 BY MR. YOHALEM:
13   Q.   You've been handed what's previously been
14 marked as Plaintiff's Exhibit 48.
15       Do you see it's a $3.5 million wire
16 transfer to Antoin Rezko?
17       Do you see that?
18       Excuse me, a $3.5 million wire transfer to
19 Freeborn & Peters as a personal loan to Mr. Rezko.
20   A.   Yes.
21   Q.   Did you consider this $3.5 million loan in
22 any of your analysis?
23   A.   No.
24   Q.   Okay.  Did you consider the fact that GMH

1 made the loan in part based on Rezko's ownership
2 interest in the property?
3    A.   No.
4        MR. RYAN:  I'm sorry, I was looking at
5 something.  Can you read back the last question.
6        (Record read.)
7        (Exhibit 351 was marked for
8         identification.)
9        MR. RYAN:  And the last question, I'm just
10 going to object, maybe a little late, to form and
11 foundation.
12 BY MR. YOHALEM:
13   Q.   You've been handed what's been marked as
14 Exhibit 351.  This is a Unit Purchase Agreement
15 between Orifarm and Tony Rezko.
16       Do you see that?
17   A.   Yes.
18   Q.   And it's purchased -- are you aware that
19 GMH on July 24th, 2007, forgave promissory notes
20 to Tony Rezko for $26 million plus and paid off a
21 $1.4 million promissory note in exchange for Rezko's
22 ownership interest in the underlying property?
23   A.   I'm not aware of that.
24   Q.   Okay.  Would it have affected your

66 (Pages 258 - 261)

Page 262

1 analysis?

2    A. No.

3    Q. And that is a closed transaction, right?

4    A. I don't know.

5       (Exhibit 198 was identified.)

6 BY MR. YOHALEM:

7    Q. And were you aware that on February -- in

8 February 2008 GMH paid $3.8 million to buy out the

9 remainder of Mr. Rezko's interest in the 62-acre

10 parcel of property that you've appraised?

11    A. I was not aware of that, no.

12    Q. And that wouldn't have affected your

13 analysis?

14    A. No.

15       (Exhibit 352 was marked for

16       identification.)

17     MR. RYAN: This is probably a good sign

18 that he is going through these documents at a faster

19 clip.

20 BY MR. YOHALEM:

21    Q. You've been handed a large document

22 consisting of numerous pledges by Tony Rezko of his

23 ownership interest in the property in exchange for

24 various debts he owed.

Page 263

1     Did you consider any of these pledges in

2 rendering your appraisal opinion as to the value of

3 the property?

4    A. I've never seen this document before.

5    Q. And are you aware of any of the pledges

6 described in this document?

7    A. No, I'm not aware of any pledges.

8    Q. And did you analyze them in conjunction

9 with appraising the value of the property?

10    A. No.

11    Q. You can put 352 aside.

12     MR. RYAN: Is it okay if I take the

13 Redwelds with me? I didn't anticipate carrying all

14 of this home.

15     MR. YOHALEM: Yes, we will get you

16 something.

17       (Exhibit 353 was marked for

18       identification.)

19 BY MR. YOHALEM:

20    Q. You've now been handed what's Exhibit 353.

21 This is an e-mail from Michael Rumman to

22 Mohammed Al-Miqdadi.

23     Do you see that?

24    A. Yes.

Page 264

1    Q. And do you see it's from November of 2006?

2    A. Yes.

3    Q. And do you see that it discusses that Tony

4 and Mr. Auchi are targeting $300 million on the

5 property?

6    A. I see that that's what it says here.

7    Q. And do you see that it's discussing

8 another pro forma on the property?

9    A. I see it references a pro forma.

10    Q. And just to be clear, you asked for pro

11 formas from Mr. Al-Miqdadi, correct?

12    A. Yes.

13    Q. And he didn't provide any to you?

14    A. Right.

15    Q. Did you consider this document in any way?

16    A. No.

17    Q. Put Exhibit 353 aside -- oh, one more.

18     Would you have discussed Exhibit 353 with

19 Mr. Al-Miqdadi when you spoke to him on the

20 telephone?

21    A. I'm sure I would have discussed it.

22    Q. Okay. You can put Exhibit 353 aside.

23       (Exhibit 354 was marked for

24       identification.)

Page 265

1 BY MR. YOHALEM:

2    Q. You've been handed what's been marked as

3 Exhibit 354.

4     Do you see that?

5    A. Yes.

6    Q. Is this your handwriting?

7    A. Yes, it is.

8    Q. The first thing I'd like to ask you about

9 is where it says "waterfall distribution to Sirazi,

10 Sirazi's suing client," do you see that?

11    A. Yes.

12    Q. Do you know what that's in reference to?

13    A. Yeah, I think this was probably a

14 conversation early on with Mr. Ryan where he was

15 just kind of giving a background on the case.

16    Q. Two lines up from the bottom of that page,

17 there's something that I can't read. It says first

18 company dash preferred return.

19     Do you see that?

20    A. Yes.

21    Q. And what do you understand that to be

22 referring to?

23    A. I honestly don't recall what that was

24 specifically.

67 (Pages 262 - 265)

Page 266

1    Q.   And were these notes from one of your
2  first meetings with Mr. Ryan?
3    A.   I believe so, yes.
4    Q.   The second page, two lines, two lines
5  down, can you read what that says?
6    A.   Two lines down, where it says "GMH bought
7  out Tony Rezko"?
8    Q.   If that's what it -- yes, that's what
9  it --
10   A.   Yes, that's what I was reading.
11   Q.   Can you just read that full statement?
12   A.   Yeah, it says, "GMH bought out Tony
13  Rezko."
14   Q.   And beneath that that says two
15  transactions, 7/07 and 7/08, correct?
16   A.   Correct, right.
17   Q.   But after being told about these two
18  transactions, you never investigated them or
19  analyzed them, correct?
20   A.   Correct.
21   Q.   Next further down do you see where it says
22  "damage experts"?
23   A.   Yes.
24   Q.   Do you see below that it says "Argue land

Page 267

1  worth a lot of money, so much GMH can get 12 percent
2  return, all paid in capital too"?
3    A.   Yes, I see that.
4    Q.   What was your understanding of what you
5  were writing down there?
6    A.   Again, I don't remember the specifics. I
7  think it was just some background again on the case
8  of what each side was looking at.
9    Q.   But you were made aware that GMH got a
10  preferred return, correct?
11   A.   Well, it looks like here he did mention
12  that in the conversation, yes.
13   Q.   You didn't analyze any of the transactions
14  involving any of the entities, right?
15   A.   Correct.
16   Q.   Okay. Lower down, looks like it says "in
17  excess of $400 million."
18      Do you see that?
19   A.   Yes.
20   Q.   What were you meaning to write down by
21  that?
22   A.   I -- honestly I don't know what that was
23  in reference to.
24   Q.   Did Mr. Ryan ever suggest that the land

Page 268

1  was worth $400 million in the conversation?
2    A.   No, I don't recall that at all.
3    Q.   Where did you get the $400 million figure
4  from?
5    A.   I don't recall what that came from.
6    Q.   Okay. If you could turn to the third page
7  of the document. Do you see where it says "2005,
8  $131 million"?
9    A.   I don't see that. Where is that?
10   Q.   I think -- I'm sorry, it's on the last
11  page of the document.
12   A.   Yes.
13   Q.   Do you understand that to be a reference
14  to the sale in 2005?
15   A.   Yes.
16   Q.   And anywhere here does it say that it was
17  not an arm's length sale?
18   A.   I don't think it specifically says that
19  here, no.
20   Q.   Okay. And then it looks like there's
21  something at the bottom of the page. It looks like
22  it's been cut off in the copy.
23      Do you see that?
24   A.   Yes.

Page 269

1    Q.   And that's "structure of transaction."
2      Do you see that?
3    A.   Yes.
4    Q.   Do you have that file with you here today
5  where that sentence can be read?
6    A.   I should.
7      Yes, I have it here.
8    Q.   And what does the sentence say?
9    A.   So it says "Structure of transaction, GMH
10  would get 12 percent preferred return on projects
11  and on capital investment," I think. I think I
12  can't read my own writing.
13   Q.   Okay. And from that information, is that
14  what you concluded was a non-arm's length
15  transaction?
16   A.   No.
17   Q.   You can put Exhibit 354 aside.
18          (Exhibit 355 was marked for
19          identification.)
20  BY MR. YOHALEM:
21   Q.   You've been handed what's been marked as
22  Exhibit 355.
23      Do you see that?
24   A.   Yes.

Page 270

1    Q.   This is someone else's handwriting it
2  looks like.
3    A.   I believe this is Nick's handwriting.
4    Q.   Okay.  It refers to a meeting on 4/21/14;
5  is that correct?
6    A.   Yes.
7    Q.   And you were part of that meeting?
8    A.   Yes.
9    Q.   The first thing it says is "32 million
10  Class B shares."
11       Do you see that?
12    A.   Yes.
13    Q.   Do you understand what was referred to by
14  that?
15       MR. RYAN:  Objection, foundation,
16  speculation.  It's not his notes.
17       THE WITNESS:  Yeah, I mean, these are not
18  my notes, so I don't know.
19  BY MR. YOHALEM:
20    Q.   Did you discuss Class B shares at your
21  4/21/14 meeting?
22    A.   I don't recall that specifically, but I
23  don't know.
24    Q.   Did you take any notes in the meeting?

Page 271

1    A.   I did not.
2    Q.   Why not?
3    A.   Because Nick was taking notes.
4    Q.   Is it your custom and practice as a
5  litigation expert not to take notes that can be used
6  to impeach your testimony?
7    A.   Well, clearly I have lots of notes in my
8  file, so ...
9    Q.   No notes from this meeting though, right?
10    A.   I don't have any from this meeting, no.
11    Q.   Okay.  Do you see that this meeting
12  also -- well, going down the page, it says
13  "July 2007, GMH buy-out."
14       Do you know what the rest of that says?  I
15  can't read the handwriting.
16    A.   Which line are you referring to?
17    Q.   July '07, one, two, three, four, five,
18  six, seven lines down.
19    A.   Yeah, I can't read that either.
20    Q.   Okay.  Do you see further down it says
21  "July '07, forgive approximately $27 million GMH
22  Rezko 200,000"?
23    A.   Yes, I see that, yes.
24    Q.   The next line is "Gave 1.4 to buy out

Page 272

1  Rumman."
2       Do you see that?
3    A.   Yes.
4    Q.   And then it says February '08 -- below it
5  it says "February '08, 4 million second
6  transaction"?
7    A.   Yes.
8    Q.   And then you say 4 million -- and then the
9  notes say "equals 4 million Rezko plus debt
10  forgiveness, approximately 31 million"?  Do you see
11  that?
12    A.   Yes.
13    Q.   And then it says in the left-hand margin
14  "131 million, question mark."
15    A.   Yes, I see that.
16    Q.   Why were you discussing all these
17  transactions if you weren't going to consider them
18  in your analysis?
19    A.   Well, if you note on the top, you'll see
20  that in addition to myself and Nick, Dan Van Vleet,
21  my colleague, was also in attendance at that
22  meeting, and as I recall, this is some general
23  background that was really more relevant to the
24  analysis that he was doing as opposed to what I was

Page 273

1  doing.
2    Q.   Okay.  Do you see at the bottom of the
3  page it says "no trial date set yet, probably
4  December 1st"?
5    A.   Yes.
6    Q.   Who told you that?
7    A.   Nobody.  This is Nick's notes, so I don't
8  know who said that.
9    Q.   Do you have any recollection of that being
10  said at the meeting?
11    A.   I don't recall that.
12    Q.   Have you set aside time in your calendar
13  for December for a trial date?
14    A.   I have not.
15    Q.   You can put Exhibit 355 aside.
16       (Exhibit 356 was marked for
17       identification.)
18  BY MR. YOHALEM:
19    Q.   These notes -- you've been handed what's
20  been marked as Exhibit 356.
21    A.   Yes.
22    Q.   Do you know who wrote these notes?
23    A.   I think this would have been Nick again.
24    Q.   Okay.  Why didn't you take notes of this

69 (Pages 270 - 273)

Page 274

1 meeting?

2    A.   Again, Nick was taking notes. I didn't
3 think there was any need for two of us to take
4 notes.

5    Q.   Is this the meeting you referred to
6 earlier where Mohammed Al-Miqdadi and then Ken and
7 Mary were present?

8    A.   Yes.

9    Q.   And these were the notes you were relying
10 on earlier?

11    A.   Yes. And actually I should clarify. This
12 is a phone call, not a meeting in person.

13    Q.   Okay, it was a conference call.

14       Okay. Do you see the third line down,
15 there is a dash that says "environmental and capital
16 cost estimated at approximately 6 million"?

17    A.   Yeah, although I think it says
18 "environmental and grading costs."

19    Q.   I'm sorry, maybe I misread it.

20       Then right underneath that there's a dash
21 that says "is this accurate, question mark."

22       Do you see that?

23    A.   Yes.

24    Q.   But no investigation was done by you to

Page 275

1 determine whether that was accurate, correct?

2    A.   No, this was the investigation to
3 determine that. We were trying to confirm with
4 ownership whether that was a realistic number or not
5 and where that came from.

6    Q.   Where did the number first come from
7 before you confirmed with ownership?

8    A.   I don't remember where we saw it. It was
9 referenced somewhere, and I honestly don't remember
10 where, but I know rather than just take it we wanted
11 to confirm with them that that was, in fact, an
12 expense they expected to incur.

13    Q.   And with your work file here today, can
14 you identify where that fee came from if not from
15 this meeting?

16    A.   I -- no.

17    Q.   Okay. The next bullet point down, can you
18 read what that says to me? Sorry, the next dash
19 down. Looks like nine parcels I think.

20    A.   Yeah, it says "nine parcels comprising the
21 main shopping area plaza will be sold to a single
22 developer," and this section would sell first. So
23 we were just confirming again with them whether that
24 was a -- the way they were looking at it, whether

Page 276

1 that was a reasonable assumption.

2    Q.   Okay. And that was an assumption that was
3 made for your analysis, correct?

4    A.   Correct.

5    Q.   It was not a fact; it was just an
6 assumption?

7    A.   Correct.

8    Q.   Okay. The next line down says "the total
9 estimated absorption period."

10       Do you see that?

11    A.   Yes.

12    Q.   It says "previously estimated at
13 approximately five years by a developer contact."

14       Do you see that?

15    A.   Uh-huh.

16    Q.   You rejected that five-year estimate,
17 correct?

18    A.   I'm not sure what that refers to. I don't
19 recall the five-year.

20    Q.   And your appraisal value would have been
21 considerably higher if you were using a five-year
22 absorption period, correct?

23       MR. RYAN:   Objection to the form.

24       THE WITNESS:   I don't know what the final

Page 277

1 conclusion would be, if it was five years.

2 BY MR. YOHALEM:

3    Q.   You never ran that analysis?

4    A.   No.

5    Q.   Okay. You have a discount rate of
6 17 percent per year, correct?

7    A.   It's a discount rate over the course of
8 the cash flow, the holding period.

9    Q.   Of 17 percent per year, right?

10    A.   17 percent.

11    Q.   And so 17 percent over five years would be
12 a significant amount, correct?

13       MR. RYAN:   Objection, form.

14       THE WITNESS:   I don't know the answer to
15 that.

16 BY MR. YOHALEM:

17    Q.   How would you go about calculating your
18 analysis if it were a five-year absorption period?

19    A.   Well, first of all I would have to
20 substantiate that that was a realistic time period,
21 which I've got all sorts of evidence to support that
22 it would be significantly longer than that and
23 nothing to indicate that it would be as short as
24 five years.

70 (Pages 274 - 277)

Page 278

1    Q.   What is the developer contact who
2  estimated it at five years?
3    A.   I don't know what that's referring to.
4  That's not my note.
5    Q.   You didn't take any notes of that meeting,
6  correct?
7    A.   Correct.
8    Q.   There's a line in the middle of the page.
9       Do you see that?
10    A.   Yes.
11    Q.   And you say -- and the note says
12  "protection dash absorption ten-year plan."
13       Do you see that?
14    A.   I think it says projection.
15    Q.   Is projection, not protection?
16    A.   Yeah.
17    Q.   Do you know why there's a line in the
18  middle of the page?
19    A.   I don't know.
20    Q.   Is that a different call or meeting?
21    A.   I don't know.
22    Q.   If you turn the page, about halfway --
23  sorry, about two lines down, there is a heading
24  titled Assumptions to Ask About.

Page 279

1       Do you see that?
2    A.   Yes.
3    Q.   Okay.  And we've already talked about the
4  TIF funds for infrastructure being one of your
5  assumptions, correct?
6    A.   Yes.
7    Q.   And there's also a $400,000 one-time
8  payment to the City.
9       That's an assumption as well?
10    A.   That's actually required in the plan
11  development.
12    Q.   So it's --
13    A.   It's not an assumption; it's a fact.
14    Q.   Okay.  Do you see on the bottom there is
15  another line, correct, like about two-thirds of the
16  way down the page?
17    A.   Okay.
18    Q.   And right beneath the line there is
19  something that says "DeBartolo approximately
20  150 million, trying to tie up property."
21       Do you see that?
22    A.   Yes.
23    Q.   And right underneath that there's
24  something that appears to be a dollar sign,

Page 280

1  225 million.
2       Do you see that?
3    A.   Yes.
4    Q.   Do you know what that's in reference to?
5    A.   I don't know.
6    Q.   And do you know -- and the next line says
7  "glance so you know about them."
8       Do you see that?
9    A.   Right.  I think this was referring to
10  these deposition transcripts that Mr. Ryan suggested
11  that I review.
12    Q.   These are the transcripts you were basing
13  your conclusion that it wasn't an arm's length
14  transaction, correct?
15    A.   Those are the transcripts where in part I
16  determined that that transaction was not arm's
17  length.
18    Q.   He told you just to glance at them so you
19  know about them?
20    A.   He suggested I review them just for
21  additional background.
22    Q.   Okay.  But what was written down was
23  glance, not review, correct?
24    A.   I didn't write that.  That was Nick's

Page 281

1  note.
2    Q.   And what Nick wrote down based on the
3  meeting that you didn't take notes for was glance so
4  you know about them, right?
5    A.   That's what's on the page here.
6    Q.   If you turn the page again, there is a
7  heading for 5/1/14.
8       Do you see that?
9    A.   Yes.
10    Q.   And it says "John."
11       Do you see that?
12    A.   Yes.
13    Q.   And do you understand that to refer to
14  you?
15    A.   Yes.
16    Q.   And it says "no e-mails, only phone
17  calls."
18       Do you see that?
19    A.   Yes.
20    Q.   The next thing it says is "office subranet
21  okay."
22       Do you see that?
23    A.   Yes.
24    Q.   Is the reason why you were instructed not

Page 282

1 to generate e-mails was so there was no record of
2 what analysis you were performing?
3    A.  No.  I think I was just reminding Nick
4 that, you know, standard protocol within the firm
5 when you're doing a litigation assignment is to
6 refrain from using e-mails.
7    Q.  And what is the reason why you refrain
8 from using e-mails?
9    A.  That's just the standard practice.
10    Q.  Is it because you can be impeached by
11 things that are said via e-mail but there's no
12 record of a phone call?
13    A.  Again, that's just standard protocol in
14 the firm.
15    Q.  Is the reason why an office subranet is
16 okay is because that is not maintained as a record?
17    A.  I don't know what you mean.
18    Q.  The next line down is office -- why don't
19 you tell me what the next line down says.
20    A.  It says office submarket okay.
21    Q.  Office submarket okay.  So that's
22 unrelated to no e-mails, only phone calls?
23    A.  I'm not sure I understand what you mean.
24    Q.  What is office submarket supposed to refer

Page 283

1 to?
2    A.  I don't know.  I don't know what Nick is
3 referring to there.
4    Q.  Okay.  The last line on the page, the last
5 dash on the page looks like it says "don't include
6 ARC data."
7        Do you see that?
8    A.  Yes.
9    Q.  What is ARC data?
10    A.  I'm not sure what he's referring to there
11 either.  I know there was some discussion about that
12 study done by the City planning department, and he
13 had come across that somewhere, and I suggested that
14 we should chase that down and get a copy of it since
15 it was specific to the subject property.
16    Q.  Okay.  My question though is specifically
17 the "don't include ARC data."
18        Do you know what ARC refers to?
19    A.  I'm not sure off the top of my head, no.
20    Q.  Is it Appraisal Research Company?
21    A.  It could be.
22    Q.  And is the reason why he wasn't to include
23 ARC data because it undermined conclusions in your
24 report?

Page 284

1    A.  No.
2    Q.  Do you know what the ARC data is?
3    A.  I think he may have been referring to the
4 prior appraisal that had been done.
5    Q.  And why was he writing not to include
6 that, the data from that appraisal?
7    A.  Well, for the very exact reason I told you
8 before is that we would never rely on somebody
9 else's opinion in order to form our own opinion.
10    Q.  Why did it say don't include ARC data
11 rather than don't include ARC appraisal?
12    A.  I don't know why he wrote data, but I
13 definitely told him that, you know, we don't ever
14 rely on somebody else's opinion of value in forming
15 our own.
16    Q.  You never even got the 2004 appraisal,
17 correct?
18    A.  It's not in my work file for any of these
19 reports.
20    Q.  So why would you have even thought to ask
21 whether to worry about the ARC appraisal from 2004
22 that you never even knew about or received?
23    A.  I don't know the answer to that.  I think
24 it's possible it may have been included in the 2009

Page 285

1 work file, which was done by my predecessors.
2    Q.  And did you agree with the 2009 -- did
3 anyone on your team review the 2009 work file?
4    A.  No.
5    Q.  And how do you know whether or not it was
6 involved in the 2009 work file?
7    A.  Well, Nick told me that it was in the work
8 file, but we didn't actually review it.
9    Q.  Did Nick review the work file, the 2009
10 work file?
11    A.  I don't know.
12    Q.  Did Nick work on the 2009 work file?
13    A.  No.
14    Q.  So how does he know that it was in the
15 2009 work file?
16    A.  I believe he probably saw it there.
17    Q.  ARC also publishes market data, right?
18    A.  Yes, they do.
19    Q.  And it's considered one of the leading
20 data firms for Chicago's South Loop area, correct?
21    A.  I don't know about that, no.
22    Q.  In fact, you can go ahead and buy ARC
23 market data for the South Loop, correct?
24    A.  I don't know that.

72 (Pages 282 - 285)

Page 286

```
 1     Q.  Do you have any reason to question that?
 2     A.  I don't have any knowledge about what they
 3  have available.
 4     Q.  Okay.  Have you ever used ARC data?
 5     A.  I have not.
 6            (Exhibit 357 was marked for
 7            identification.)
 8  BY MR. YOHALEM:
 9     Q.  We're up to 357.  Is Exhibit 357 more of
10  Nick's notes?
11     A.  It appears to be, yes.
12     Q.  Okay.  Do you see the second line down
13  says "rework overviews" and then Mike in square?
14     A.  It says "regional overviews."
15     Q.  It says "regional overviews," and Mike in
16  square?
17     A.  Yes.
18     Q.  And it says "oldest on F drive is 2009."
19        Do you see that?
20     A.  Yes.
21     Q.  What is he referring to by the oldest on
22  the F drive that's 2009?
23     A.  Well, if you look at our reports, you'll
24  see we do -- have included kind of a generic
```

Page 287

```
 1  regional overview of the Chicago region, which is
 2  really just looking at demographics and employment
 3  trends and what have you, and so we needed to have
 4  one prepared for each of the different dates of
 5  value.  Oftentimes what we will do rather than
 6  having to reinvent the wheel is we will go back to a
 7  report that may have been done around the same time
 8  to see if there's already one written up for that
 9  particular area.
10        And so what we did is we looked on our F
11  drive, which is in the computer system, to see if
12  there were any reports on other properties that had
13  been written around the same time where we could
14  pull that regional overview and just save us some
15  time and save the client some expense.
16     Q.  And so did you pull the regional overview
17  from the 2009 appraisal report for the subject
18  property?
19     A.  I don't think so.  I think we ended up
20  having to redo all of these.
21     Q.  So when it says "oldest on F drive," what
22  was the 2009 on F drive being referred to there?
23     A.  That was showing that the oldest regional
24  overview we had for the Chicago metropolitan area
```

Page 288

```
 1  was from 2009.
 2     Q.  So there was no -- it wasn't specifically
 3  referring to the 2009 appraisal report prepared by
 4  your firm about the subject property?
 5     A.  I don't think so, no.
 6     Q.  You can put 357 aside.
 7     A.  I wouldn't mind a quick bathroom break
 8  unless we're going to be done soon.
 9        MR. YOHALEM:  No, we've got a ways to go
10  still.
11        THE VIDEOGRAPHER:  The time is now
12  4:13 p.m.  We are off the record.
13            (Whereupon, a recess was taken
14            from 4:13 p.m. to 4:21 p.m.)
15        THE VIDEOGRAPHER:  This is the beginning
16  of Disk Number 6.  The time is now 4:21 p.m.  We are
17  on the record.
18            (Exhibit 358 was marked for
19            identification.)
20  BY MR. YOHALEM:
21     Q.  Mr. VanSanten, right before we went to
22  break you were handed Exhibit 358.
23        Do you see that?
24     A.  Yes.
```

Page 289

```
 1     Q.  This is the retainer letter SRR reached in
 2  this matter with General Mediterranean Holdings and
 3  Joe Ryan, correct?
 4     A.  Correct, yes.
 5     Q.  Okay.  And your underlying real estate
 6  appraisal was set at a fixed amount of 35,000 to
 7  $40,000; is that correct?
 8     A.  Correct, yes.
 9     Q.  And by that, did you mean that you
10  wouldn't exceed $40,000 in the amount of work you
11  incurred?
12     A.  For preparation of the reports themselves,
13  yes.
14     Q.  Okay.  So if you did more work you
15  wouldn't get paid for it, right?
16     A.  Yes.
17     Q.  So it was in your interest -- not in your
18  interest.
19        It was in your interest to be as efficient
20  as possible, correct?
21     A.  I wish I could tell you that we didn't go
22  over, but we went over by quite a bit ultimately in
23  the time we spent.
24     Q.  On Page 1, it says Your/Client's
```

73 (Pages 286 - 289)

1 Responsibilities.
2      Do you see that?
3      A. I'm sorry, what page? Yes.
4      Q. The first sentence down says, "In order
5 for us to maximize the value of our work and keep
6 the project on schedule, it is important for us to
7 be provided with information we request from you and
8 your client promptly."
9      Do you see that?
10      A. Yes.
11      Q. And we talked earlier about you not
12 receiving any of the pro formas you requested.
13      Would you agree that GMH did not live up
14 to that part of their responsibilities?
15      A. We didn't get those pro formas, so we
16 didn't get them.
17      Q. Okay. You can put Exhibit 358 aside.
18           (Exhibit 359 was marked for
19           identification.)
20 BY MR. YOHALEM:
21      Q. You've been handed what's been marked as
22 Exhibit 359.
23      These were SRR's invoices through May 15,
24 2014, correct?

1      A. This is -- it's actually for services
2 through the end of April, and so this is for all the
3 professional time we had into the job as of the end
4 of April.
5      Q. Have you devoted more time since the end
6 of April?
7      A. Significantly more time, yes.
8      Q. And are those time entries recorded
9 anywhere?
10      A. They're recorded on our system, but we
11 have not actually issued a final invoice yet.
12      Q. But the information is available within
13 your system right now?
14      A. It is within the system, yes.
15      MR. YOHALEM: Okay. Joe, we would put
16 forward a formal request for that information and
17 reserve all rights.
18 BY MR. YOHALEM:
19      Q. Does this invoice accurately reflect the
20 amount of time you spent on the project through the
21 end of April?
22      A. Yes.
23      Q. And so through the end of April, in
24 preparing four appraisal reports totaling, you know,

1 hundreds and hundreds of pages, you spent a total of
2 13.5 hours; is that correct?
3      A. Up through the end of April, that's
4 correct, yes.
5      Q. Okay. You can put Exhibit 359 to the
6 side.
7      We talked earlier about discounted cash
8 flow analysis, and I just wanted to fully understand
9 what you did and didn't do, because I know you did
10 it in conjunction with the sales comparison
11 approach.
12      You didn't derive an actual value using
13 the sales comparison approach, right?
14      A. I estimated market value for each of the
15 individual parcels using the sales comparison
16 approach.
17      Q. But you didn't develop a value for the
18 ultimate 62-acre property, correct?
19      A. For the entire parcel in aggregate I did
20 not develop an opinion via the sales comparison
21 approach.
22      Q. And you didn't develop an opinion as to
23 the total overall value using the cost approach,
24 correct?

1      A. Correct.
2      Q. And you didn't use either appraisal using
3 a cost approach or an appraisal using the -- excuse
4 me.
5      You didn't use a value derived through the
6 cost approach or a value derived through the sales
7 comparison approach for the full 62 acres to act as
8 a check on the final conclusions on your discounted
9 cash flow analysis, did you?
10      A. No.
11      Q. Okay. And did you rely on any other
12 numbers valuing the 62 acres to act as a check on
13 the discounted cash flow analysis?
14      A. Well, as I stated before, it was the sales
15 comparison approach for each of the individual
16 parcels, and then for the overall parcel in
17 aggregate it was a discounted cash flow analysis.
18      Q. Right. I guess my question is for the
19 overall parcel and aggregate, was there any other
20 value for the parcel you used as a double-check to
21 make sure that value was accurate?
22      A. No, I don't think so.
23      Q. And in your report, is there any analysis
24 for why you didn't attempt to use the cost approach

Page 294

1 in rendering an appraisal in this case?
2     A.  Well, I mean, it's pretty much common
3 sense the cost approach is really only applicable
4 for improved property where you have buildings where
5 you're actually estimating replacement cost for the
6 buildings, so since we're talking about vacant land,
7 the cost approach clearly is not applicable here.
8     Q.  But are any of those -- is any of that
9 analysis in your report?
10     A.  I don't know if that specific reasoning is
11 spelled out in there, but that's definitely the
12 reason why.
13     Q.  Okay.  And for the sales comparison
14 analysis, where in your report, and we can use the
15 2005 report or another report if you think that's
16 better, do you specifically explain why the sales
17 comparison analysis is not suitable for finding a
18 present value, a fair market value for the property
19 as of the effective date?
20     A.  I mean, as I said before, it's simply
21 because there aren't any sales of 60-acre parcels
22 that you can compare it to.
23     Q.  And where is that analyzed in your report,
24 just so I know for my own edification?

Page 295

1     A.  Well, I mean, on Page 53 I describe --
2     MR. RYAN:  Is this Exhibit 312?  I'm
3 sorry.
4     THE WITNESS:  This is 312, yeah.
5     MR. RYAN:  Okay.  On what page are you?
6     THE WITNESS:  On Page 53 I describe the
7 valuation analysis and why we're taking the approach
8 that we're taking.  I don't specifically state there
9 that the sales comparison approach for the overall
10 aggregate site is not -- you're not able to apply
11 it.
12 BY MR. YOHALEM:
13     Q.  Okay.  So where in your report do you say
14 why the sales comparison approach is not suitable
15 for rendering any value for the overall site?
16     A.  I don't know that I say that specifically
17 in the report.
18     Q.  Okay.  Do you say it in any of your
19 reports for any of the effective dates?
20     A.  I don't know.
21     Q.  And sitting here testifying, can you think
22 of any place in any of your reports where you say
23 why you didn't use the sales comparison approach to
24 derive a value for the full 62 acres?

Page 296

1     A.  I don't know that I explicitly state that
2 in the reports.
3     Q.  Okay.  And do you ever explain in your
4 reports why you didn't use the income approach based
5 on the pro formas that were available?
6     A.  Well, again, I did apply the income
7 approach, and I applied it in the appropriate way
8 for this particular property.
9     Q.  Okay.  There are two ways to do an income
10 capitalization approach, right?
11     A.  Well, there's a direct capitalization
12 approach and a discounted cash flow analysis, right.
13     Q.  And you didn't do the direct
14 capitalization approach, right?
15     A.  The direct cap would definitely not be
16 appropriate for this.
17     Q.  And where in your report do you explain
18 why the direct capitalization approach would be --
19     A.  Well, it's -- direct capitalization is
20 generally only applied when you have a stable cash
21 flow.  We clearly don't have stable cash flows here.
22     Q.  We knew that there were -- we've looked at
23 the fact that 45 percent of the retail space was
24 already under letter of intent rental agreements,

Page 297

1 correct?
2     A.  I'm sorry, could you ask that question
3 again?
4     Q.  45 percent of the retail space was under
5 letter of intent rental agreements, correct?
6     A.  I recall that there was some letter of
7 intent for some space in the retail portion, right.
8     Q.  Okay.  I don't want to get too far afield.
9     Where in your reports, if at all, do you
10 specifically state why the income capitalization
11 approach, the direct approach is not suitable?
12     MR. RYAN:  Objection, form.
13     THE WITNESS:  You know, on Page 64, I
14 discuss the two different methods and why we're
15 applying the discounted cash flow analysis.  I think
16 it's pretty self-evident.
17 BY MR. YOHALEM:
18     Q.  Okay.  And is that the only paragraph you
19 can think of in your report that discusses it?
20     A.  I discuss in several places why the
21 discounted cash flow analysis is being applied and
22 why that's the most appropriate way to value the
23 property.
24     Q.  And just so the record is clear, other

75 (Pages 294 - 297)

Page 298

1  than this second paragraph on Page 64, do you
2  discuss anywhere why the capitalization approach is
3  inappropriate?
4     A.  I don't believe so, no.
5     Q.  Okay.  Did you do anything to test the DCF
6  analysis you did for errors?
7     A.  Yes.
8     Q.  What did you do?
9     A.  I had two other colleagues go through it
10 line by line multiple times just double-checking,
11 triple-checking to make sure that there weren't any
12 errors.
13    Q.  And did you test it for reasonableness?
14    A.  Yes, I mean, in terms of the overall value
15 conclusion.
16    Q.  How did you go about testing it for
17 reasonableness?
18    A.  Well, if you look at the value conclusion
19 and you do the calculation to figure out what that
20 is on a per FAR foot, it comes right in within range
21 of, for instance, that Roosevelt Collection site,
22 and, as a matter of fact, we're just slightly above
23 what that property sold for.
24        So, you know, there is your reasonableness

Page 299

1  check right there.
2     Q.  Did you actually do that check?
3     A.  Yeah, absolutely.
4     Q.  Where is it in your report or your work
5  file?
6     A.  Well, if you look at the -- if you look at
7  the DCF on Page 68 of my 2005 report, you can see a
8  column in there where it does a calculation of what
9  that value per FAR foot is, what that comes out to,
10 which is about $10.13 per FAR foot.
11        The Roosevelt Collection sale sold for
12 10.46 per FAR foot, and it's directly across the
13 street from our subject property.
14    Q.  Right.  My question is specifically about
15 does your report anywhere put the two side by side
16 and explain why one is a suitable check for the
17 other?
18    A.  I didn't spell that out in the report, no.
19    Q.  Okay.  And did you do it in your work file
20 anywhere?
21    A.  I don't know that it's illustrated in my
22 work file either, but it's a check that we
23 definitely did.
24    Q.  Just to tie up a few other loose ends, on

Page 300

1  Page 51 of your 2005 report, we talked about highest
2  and best use earlier.
3         Why did you calculate highest and best use
4  as if vacant rather than highest and best use if
5  fully developed?
6     A.  Because it's a vacant parcel of land.
7     Q.  Ten years into the future though it could
8  be fully developed, correct?
9     A.  Hypothetically it could be, yes.
10    Q.  And you didn't compare what the value of
11 the land would be worth fully developed in ten years
12 versus vacant in ten years, did you?
13    A.  Boy, would that be speculative, I mean, to
14 try and estimate here is what the property would be
15 worth ten years from now and then somehow trying to
16 figure out how that translates to value today, boy,
17 I sure wouldn't want to go down that path.
18    Q.  Do you expect the property will be sold
19 off parcel by parcel?
20    A.  I anticipate that that's the most likely
21 scenario, yes.
22    Q.  Not that it will be developed as one
23 property?
24    A.  I anticipate the most likely scenario is

Page 301

1  that these parcels will be sold off as illustrated
2  in my discounted cash flow analysis and developed
3  then by those respective developers.
4     Q.  And isn't one of the things that makes the
5  property unique that it is the largest single
6  continuous acreage in the downtown of a major city
7  in the United States that's undeveloped?
8     A.  That is certainly a unique aspect to it,
9  sure.
10    Q.  So why would there be an advantage of
11 destroying that uniqueness and subdividing it into
12 different developments?
13    A.  I wouldn't characterize it that way.
14    Q.  How would you characterize it?
15    A.  I would characterize it as it being so
16 large that it's going to take an extremely long
17 period of time in order to develop the site and that
18 a reasonable investor is going to look at that in
19 terms of that very long time horizon and how it's
20 likely to play out through various cycles in the
21 market.
22    Q.  Did you discuss this report with any
23 specific large investors?
24    A.  I'm sorry, could you repeat that?

76 (Pages 298 - 301)

Page 302

1    Q.   Yeah, I'll rephrase.
2         In putting together your appraisal reports
3    for this case, did you discuss, you know, likely
4    conduct by -- you know, did you go to talk to any
5    large investors about what they would do with the
6    project?
7    A.   Again, I would refer to historical
8    evidence of what happened with like kind projects of
9    similar scope, Central Station, Dearborn Park being
10   prime examples of what happened.  I think that's the
11   best evidence.
12        And then even the owners themselves when
13   they were marketing the property said they'd be open
14   to the idea of selling off individual parcels as
15   well as one sale to a buyer.
16   Q.   Go ahead and mark this.
17            (Exhibit 360 was marked for
18            identification.)
19   BY MR. YOHALEM:
20   Q.   Exhibit 360 is an interview you appear to
21   have done with some sort of a publication, is that
22   correct, SRR Journal?
23   A.   Yeah, this was a journal that our firm
24   publishes on a semiannual basis.

Page 303

1    Q.   Do you know who the SRR Journal
2    interviewer was for you?
3    A.   Yes, it was a gentleman by the name of
4    Chris Casey.
5    Q.   Okay.  Did you know the questions in
6    advance?
7    A.   I'm sure we rehearsed some of these, yes.
8    Q.   Okay.  So you had time to think about it
9    and review it --
10   A.   Yes.
11   Q.   -- and to consider the answers?
12   A.   Right.
13   Q.   Do you stand by all of your answers in the
14   SRR Journal?
15   A.   Yes.
16   Q.   I want to turn your attention to Page 2.
17   A.   Okay.
18   Q.   First, the first question, you have an
19   answer.  About three-quarters of the way down, your
20   answer, you say -- the question is about exposure
21   time, correct?
22        MR. RYAN:  Where are you?
23   BY MR. YOHALEM:
24   Q.   Yes, let's back up.  The first question on

Page 304

1    Page 2 is, "Real estate appraisals, unlike business
2    valuations, specifically discuss and ascertain the
3    marketing period and exposure time for the
4    property," correct?
5    A.   Yes.
6    Q.   And it's asking you to explain how
7    exposure time influences opinions and what should be
8    done in determining these assumptions, correct?
9    A.   Yes.
10   Q.   Okay.  As part of your answer, you say,
11   "Exposure time is a retrospective look which answers
12   how long a property has been exposed to the market
13   prior to selling on the valuation date."
14   A.   Right.
15   Q.   "Marketing period is a prospective
16   analysis.  How long will the property have to be on
17   the market from today in order to sell?  If the real
18   estate market is relatively stable, then these two
19   concepts are going to be very similar in duration.
20   However, if the market is appreciating or
21   depreciating significantly, the time periods may be
22   dissimilar."
23        You know, we talked about the up and down
24   of the real estate market between 2009 and 2014,

Page 305

1    correct?
2    A.   Yes, I recall that I guess.
3    Q.   And the exposure time of the property that
4    you were describing -- when you were describing how
5    long the market, the property has been unsold by
6    GMH, that's exposure time, right?
7    A.   No.  Exposure time is exactly how I
8    describe it here.  When I estimate a value as of a
9    specific date, the exposure time is the amount of
10   time the property would have had to have been
11   marketed before that date in order to sell at that
12   price.
13   Q.   And how is that different from marketing
14   period?
15   A.   Marketing time is looking forward then, so
16   that's if I estimate the value as of today how long
17   am I going to have to have it on the market in order
18   for it to sell at that price.
19   Q.   But when you were doing your 2005
20   calculations, were you determining exposure time or
21   marketing time?
22   A.   Both.
23   Q.   And what was exposure?  What were your
24   conclusions as to exposure time?

77 (Pages 302 - 305)

Page 306

1    A.  Well, if you look at my 2005 report, on
2  Page 7, you'll see I have my conclusion of both
3  exposure time and marketing time, which in this case
4  I estimated to be approximately 12 months for both.
5    Q.  So you had the same amount of time for
6  both?
7    A.  Yes.
8    Q.  Okay.  Would you agree that the market was
9  appreciating considerably through between 2005 and
10  2012 -- excuse me, 2005 and 2008?
11    A.  There was a cycle going on over that
12  period of time.
13    Q.  But between 2005 and 2008, was the market
14  appreciating or depreciating?
15    A.  It was appreciating for a period of that
16  time and then it started dropping.
17    Q.  Between 2005 and the start of 2008, was
18  the market appreciating?
19    A.  In general, yes.
20    Q.  And between 2008 and 2012, was the market
21  going down?
22    A.  In general, yes.
23    Q.  Okay.  Further down the page, the question
24  is, "What other critical subjects within a report

Page 307

1  should be reviewed?"
2        Do you see that?
3    A.  Yes.
4    Q.  You have an answer.  You say, "The market
5  analysis.  Has the appraiser properly identified the
6  market for the property?"
7    A.  Yes.
8    Q.  Do you see that?
9    A.  Yes.
10    Q.  And you use the example of a very small
11  industrial property which has a local or regional
12  market versus the Willis Tower where the market is
13  national or perhaps even international.
14        Do you see that?
15    A.  Yes.
16    Q.  Would you call this property like a small,
17  very small industrial property or more like the
18  Willis Tower?
19    A.  I would say it's like neither.
20    Q.  Okay.  The next sentence you say is, "Who
21  are the potential buyers/investors?  Are they
22  looking for properties locally, regionally,
23  nationally or internationally?"
24        Do you see that?

Page 308

1    A.  Yes.
2    Q.  Who were the potential buyers or investors
3  for the 62 acres?
4    A.  It's really a large pool of potential
5  investors that would include local developers,
6  regional developers and even international
7  developers.
8    Q.  So it's an international market or it
9  includes an international market?
10    A.  It could include an international market,
11  yes.
12    Q.  The next question down, you say four lines
13  from the bottom, "And since our conclusions may be
14  highly sensitive to the information reported, it is
15  critical that verification occurs with public
16  records and/or a party to the transaction, such as
17  the buyer, the seller, or the broker involved."
18        Do you see this?
19    A.  Yes.
20    Q.  "Not only will this confirm the accuracy
21  of data but it will allow the appraiser to
22  understand the motivations at the time of the sale
23  and whether or not it is an arm's length
24  transaction."

Page 309

1        Do you see that?
2    A.  Yes.
3    Q.  Okay.  Did you discuss with -- we've gone
4  over you did not discuss with anyone at GMH the
5  nature of the 2005 transaction, correct?
6    A.  Correct.
7    Q.  And you didn't discuss with anyone at
8  Roosevelt Clark the nature of the 2005 transaction,
9  correct?
10    A.  Correct.
11    Q.  And you didn't discuss any, you know, the
12  2005 transaction with any of the brokers involved,
13  did you?
14    A.  I don't -- it was my understanding it
15  wasn't even exposed on the market, so I'm not sure
16  there were brokers involved at all.
17    Q.  What are you basing your understanding
18  that it wasn't exposed on the market to?
19    A.  Again, my reading of the deposition
20  transcripts and the fact that this was a
21  related-party transaction that was essentially
22  forced because there were loans coming due.
23    Q.  Mark this.  We're going to come back to
24  Exhibit 360.  361.

78 (Pages 306 - 309)

1          (Exhibit 361 was marked for
2          identification.)
3 BY MR. YOHALEM:
4    Q.   Exhibit 361 is a Sales Opportunity
5 Evaluation.
6        Do you see that?
7    A.   Yes.
8    Q.   And it's for Riverside Park, correct?
9    A.   It appears to be, yes.
10   Q.   It's dated March 2005, correct?
11   A.   Yes.
12   Q.   Do you know what a Sales Opportunity
13 Evaluation is?
14   A.   No.
15   Q.   Is it related to marketing a property?
16   A.   I don't know.
17   Q.   Did you review this document when you were
18 concluding that the property wasn't exposed to the
19 market?
20   A.   No.
21   Q.   What documents did you review when you
22 concluded the property wasn't exposed to the market
23 in 2005?
24   A.   I believe that would have just been some

1 information that was told to me verbally, and I
2 don't remember who mentioned that to me.
3    Q.   Okay.  Was it told to you by
4 Mohammed Al-Miqdadi?
5    A.   I don't remember.
6    Q.   Is it anywhere in your work file who told
7 it to you?
8    A.   No.
9    Q.   And did you do any verification of the
10 2005 transaction with public records?
11   A.   Yes.
12   Q.   What were those verification -- what was
13 that verification?
14   A.   There's copies of the public records for
15 the subject property that show a transaction in
16 2005.
17   Q.   Okay.  And how do those show that it
18 wasn't an arm's length transaction?
19   A.   I am not sure that they do.
20   Q.   Okay.  The next question is, "Should the
21 verification itself" -- sorry, going back to
22 Exhibit 360, the next question is, "Should the
23 verification itself be cited within the report?  Who
24 is consulted when and in relation to what particular

1 transactions?"
2        Do you see that?
3        MR. RYAN:  I'm not sure.  Where are you?
4        MR. YOHALEM:  Top, top of Page 2, top
5 right column of Page 2.
6        THE WITNESS:  Yes.
7 BY MR. YOHALEM:
8    Q.   And your answer is, "Whenever possible,
9 I've witnessed too many litigious situations whereby
10 an attorney crosses an expert only to have their
11 verification nonexistent or poorly documented.  It
12 really diminishes the credibility of the analysis."
13       Do you agree with that statement you made?
14   A.   Yes, I do.
15   Q.   And where in your report is the
16 verification of the fact that the 2005 transaction
17 was not an arm's length transaction cited within the
18 report?
19   A.   It's within the deposition transcripts
20 that I read of the three individuals that I
21 referenced before.
22   Q.   Okay.  And just to be very particular,
23 where is the verification cited within your reports?
24   A.   The verification of that, in particular

1 where that came from is not specifically cited in
2 the report.
3    Q.   Okay.  Going on towards the bottom of the
4 page, there's a question that says, "Moving onto the
5 concept of highest and best use, it strikes me to be
6 of tremendous importance -- significance to the
7 appraisal, but I get the impression that it's not
8 fully examined by a lot of appraisers as well as the
9 reviewers of appraisal reports.  Would you agree
10 with that, and if so, is it an area which should be
11 critically examined?"
12       And you write back -- and you respond,
13 "Absolutely.  I think a lot of times appraisers tend
14 to gloss over this concept, which can be a
15 significant problem as it is pivotal -- as it is a
16 pivotal analysis underlying the entire appraisal.
17 If highest and best use analysis is wrong, the
18 valuation conclusion is likely wrong, likely to be
19 wrong."
20       Do you still agree with that statement
21 that you made in 2011?
22   A.   Yes.
23   Q.   Page 3, top right column, there's a
24 question about -- there's a question that begins,

Page 314

1 "The sales comparison approach to me and I think any
2 person outside of the real estate profession."
3 MR. RYAN: I'm not sure what page.
4 BY MR. YOHALEM:
5 Q. Page 3, top right column, "is simply the
6 most intuitive approach."
7 Do you see that?
8 A. Yes.
9 Q. And you write back -- and you say back,
10 "The main reason this approach may not be utilized
11 is that there is insufficient applicable data."
12 Do you see that?
13 A. Yes.
14 Q. Was there insufficient applicable data to
15 apply the sales comparison approach in this case?
16 MR. RYAN: Objection, form.
17 THE WITNESS: With regard to the value of
18 the subject property overall, I would say yes.
19 BY MR. YOHALEM:
20 Q. Okay. What efforts were made to locate
21 comparable sales of 62-acre properties, properties
22 similar to a 62-acre property?
23 A. Research to public databases as well as
24 services like CoStar, LoopNet, different services

Page 315

1 that we rely upon for sale transactions.
2 Q. Did you look at any large developments in
3 other cities?
4 A. Which other cities?
5 Q. Any other cities.
6 A. No.
7 Q. Okay. Did you look at any information
8 outside of the Chicago market itself?
9 A. With regard to actual sales, no.
10 Q. Top of Page 4, there's a question that
11 says, "When is the income capitalization approach
12 appropriate?"
13 Do you see that?
14 A. Yes.
15 Q. And you say, "For the most part, whenever
16 there is sufficient income data available to result
17 in a reliable indication of value."
18 Do you see that?
19 A. Yes.
20 Q. Was there any income data available in
21 this case to render a reliable indication of value?
22 A. Absolutely. But I should also clarify
23 that this article is referring to an improved
24 property, whether it be an office building or a

Page 316

1 retail shopping center, something that's where a
2 building already exists and there's cash flow
3 present. What we're valuing here is a vacant piece
4 of land, which is very different.
5 Q. Other than this property, in any of your
6 appraisals have you ever used a discounted cash flow
7 analysis based entirely on prospective sales of
8 subparcels of a property to calculate the value of
9 the overall property?
10 A. Many times, yes.
11 Q. Can you think of any examples where you've
12 done that sitting here today?
13 A. Yeah, it's -- it's standard subdivision
14 analysis that any appraiser who knows what they're
15 doing would apply for a property like this. I've
16 appraised many subdivisions over the course of my
17 career, and it's the exact same approach, exact same
18 methodology.
19 Q. And you always do it without verifying a
20 sales comparison approach or a cost approach?
21 A. I would never include a cost approach
22 because, again, that's only applicable for an
23 improved property. If there's sufficient data
24 available of similar size sale transactions, then I

Page 317

1 would apply it. If there aren't, then I wouldn't.
2 Q. Last question on the bottom right of
3 Page 4 says, "In reconciling the different
4 approaches, cost, sales comparison and income
5 capitalization, I assume in general you prefer to
6 see some consistency between their respective
7 conclusions, but what happens if you do not? How do
8 you derive a conclusion of value given that
9 circumstance? Essentially how do you reconcile the
10 various methodologies with or without consistency?"
11 And you say back, "All things being equal,
12 you'd like to see them be within a reasonable range
13 of each other," correct?
14 A. That's what I say, right.
15 Q. And then you say, "If they are not, the
16 first approach, the first course of action is to
17 recheck the underlying assumptions of each
18 approach," correct?
19 A. Yes.
20 Q. Okay. But there are no other values you
21 could calculate that you could determine whether or
22 not you reached a similar value as your discounted
23 cash flow analysis, correct?
24 A. Yeah, and to be clear, it's not a

80 (Pages 314 - 317)

Page 318

1 requirement in any appraisal that you apply all
2 three approaches. Again, it goes to the reliability
3 of the analysis, the data that's available, and for
4 this particular property the approach that I've
5 taken is the same approach anybody else would have
6 taken valuing this property.
7    Q.  Okay. And later in the answer you say,
8 "If you have a lot of great sales, then a sales
9 comparison approach would be a very powerful,
10 reliable approach."
11        Do you see that?
12    A.  Yes.
13    Q.  But it's your testimony that you don't
14 have a lot of great sales in this case?
15    A.  No, that's not my testimony. My testimony
16 is I've got terrific sales, 32 of them roughly
17 between the four reports, that help me estimate the
18 market value of each of the individual parcels.
19        I don't have sales of 62-acre parcels that
20 I can compare to an aggregate for the subject
21 property because there just aren't those
22 transactions out there.
23    Q.  But there was a sale of a 62-acre parcel
24 for twice the value, essentially twice the value you

Page 319

1 appraised it at, correct?
2    A.  But there's a problem with that
3 transaction in the fact that it's not an arm's
4 length sale, so it's not a reliable indication of
5 value.
6    Q.  And so you discounted the significance of
7 that value significantly?
8    A.  So I didn't rely on it at all. It's not a
9 reliable transaction.
10    Q.  Okay. You can put document 360 aside.
11        Can I ask how much time I have left?
12    THE VIDEOGRAPHER:  Just a second.
13    MR. RYAN:  It's about a half hour.
14    THE VIDEOGRAPHER:  A half hour exactly.
15    MR. YOHALEM:  I think it will go more
16 efficiently if we take a short break and I'll just
17 reorganize my thoughts, because I want to move on to
18 a separate section, if that's okay with you guys,
19 and then hopefully we can wrap up.
20    MR. RYAN:  You might get a few Redwelds,
21 is that all right, your secretary or someone can
22 bring a few in?
23    THE VIDEOGRAPHER:  The time is now 4:57
24 p.m. We are off the record.

Page 320

1        (Whereupon, a recess was taken
2         from 4:57 p.m. to 5:08 p.m.)
3    THE VIDEOGRAPHER:  The time is now
4 5:08 p.m. We are on the record.
5        (Exhibit 362 was marked for
6         identification.)
7 BY MR. YOHALEM:
8    Q.  Mr. VanSanten, you've been handed what's
9 been marked as Exhibit 362. This is a printed out
10 copy of a 2014-2015 USPAP.
11        Do you see that?
12    A.  Yes.
13    Q.  And you testified earlier.
14        Are you familiar with USPAP?
15    A.  Yes, I am.
16    Q.  And USPAP consists of various things,
17 right? There are various components to USPAP?
18    A.  There's different sections to USPAP.
19    Q.  Okay. There is a section that is
20 generally the I guess the introductory sections that
21 include the definitions, the preamble, the ethics
22 rule, the record keeping rule, the competency rule,
23 the scope of work rule, the jurisdictional exception
24 rule, correct?

Page 321

1    A.  What page are you referring to?
2    Q.  Sure. If you go to U-vii, that's the
3 Table of Contents. It's not a particular page.
4    A.  I'm sorry, which page was that again?
5    Q.  Here, if that helps [indicating], U-viii.
6    A.  Romanette viii, okay, yes.
7    Q.  And so there are three components, right?
8 There is the sort of introductory section that
9 includes the definition, preamble and so forth,
10 correct?
11    A.  Correct.
12    Q.  Then there's the standards and standards
13 rules, correct?
14    A.  Yes.
15    Q.  Then there's the statements on appraisal
16 standards, correct?
17    A.  Right.
18    Q.  And all of those are a part of USPAP,
19 correct?
20    A.  That's correct, yes.
21    Q.  And when you do an appraisal report, you
22 have to certify it under USPAP, correct?
23    A.  Correct.
24    Q.  And you have to comply with each and every

81 (Pages 318 - 321)

Page 322

1 requirement of USPAP stated herein, correct?
2    A.   Correct.
3    Q.   And a report that doesn't comply -- that
4 doesn't follow the language articulated in the
5 various pieces of USPAP would not be in conformity
6 with the regulations of the appraisal industry,
7 correct?
8    A.   I'm sorry, could you ask that again?
9    Q.   Yes.  If an appraiser violates a standard
10 of USPAP, he is departing from the recognized
11 standards for the appraisal industry, correct?
12    A.   In general, yes.
13    Q.   Are there any exceptions you can think of
14 to that rule?
15    A.   Yeah, I think I said it before, you know,
16 if it's just a clerical error, a typographical
17 error, an inadvertent omission, I would say that
18 that doesn't rise to the level of being a USPAP
19 violation.
20    Q.   Okay.  When you say an inadvertent
21 omission, do you mean an inadvertent omission of
22 things that are totally irrelevant to value?
23    A.   I think it would depend on the particular
24 situation.

Page 323

1    Q.   Okay.  Is there any USPAP -- is there any
2 piece of USPAP that you're relying on to say that an
3 inadvertent omission is not a violation of USPAP?
4    A.   I don't know if there's a specific
5 language that says that, no.
6    Q.   Okay.  Is there anything in any advisory
7 opinion that says minor omissions are not a
8 violation of USPAP?
9    A.   You know, I would just refer to all the
10 USPAP classes I've taken over the years where
11 instructors will specifically tell you that, you
12 know, these are certainly the guidelines, you want
13 to stick to them, but, you know, a typographical
14 error doesn't rise to the level of being a USPAP
15 violation necessarily.  It depends on the
16 circumstances.
17    Q.   Okay.  I want you to turn to Standards
18 Rule 1-5, Page U-20.
19    A.   Yes.
20    Q.   The first question is, would you agree
21 that Standards Rule 1-5 applied to your report?
22    A.   Yes.
23    Q.   Okay.  And Standards Rule 1-5 states that
24 when the valuation -- when the value opinion to be

Page 324

1 developed is market value, an appraiser must, if
2 such information is available to the appraiser in
3 the normal course of business, and (a) is "analyze
4 all agreements of sale, options and listings of the
5 subject property current as of the effective date of
6 the appraisal."
7        Do you see that?
8    A.   Yes.
9    Q.   Would you agree that you did -- you
10 rendered a value and opinion for market value in
11 your 2005 appraisal?
12    A.   Yes.
13    Q.   And would you agree that if information
14 was available to you about agreements for sale of
15 the subject property, you had to analyze it for the
16 year 2005 appraisal?
17    A.   Yeah, if the information was made
18 available to me, then yes.
19    Q.   And you didn't analyze the agreement for
20 sale that was in place as of October 2005 when you
21 did your appraisal, did you?
22    A.   Which agreement of sale are you talking
23 about?
24    Q.   An agreement of sale between General

Page 325

1 Mediterranean Holdings and Roosevelt Clark
2 Developers.
3    A.   I did, as a matter of fact, in my 2007,
4 2008 and 2014 reports.
5    Q.   In your 2005 report, did you analyze the
6 agreement of sale between Roosevelt Clark and
7 General Mediterranean Holdings?
8    A.   No, because it happened after my date of
9 value.
10    Q.   Are you aware that there was an agreement
11 of sale that was in place at the time of your date
12 of value?
13    A.   No.
14    Q.   Okay.  Do you recall we looked at earlier
15 an exhibit from your work file that described an
16 agreement to sell the property to GMH by
17 Roosevelt Clark that was made public in the
18 newspaper as of September 29th, 2005?
19    A.   I do.
20    Q.   And that stated that there was an
21 agreement for sale in place, correct?
22    A.   Correct.
23    Q.   But if you go back to your 2005 appraisal,
24 Page 5, you say that, "To our knowledge, there have

82 (Pages 322 - 325)

Page 326

1 not been any other recorded transfers. Furthermore,
2 the property is not currently listed for sale, and
3 there are no outstanding offers or options for the
4 sale of the property," correct?
5    A.   Correct.
6    Q.   And that statement was inaccurate,
7 correct?
8    A.   In light of that article that we looked
9 at, yes.
10    Q.   Okay.  And you had that article available
11 to you, correct?
12    A.   It was in the work file, yes.
13    Q.   The Standards Rule 1-6 immediately beneath
14 that --
15    A.   Yes.
16    Q.   -- would you agree that Standards Rule 1-6
17 applied to your four appraisals in this case?
18    A.   Yes.
19    Q.   Standards Rule 1-6 required you to
20 reconcile the quality and quantity of data available
21 and analyzed within the approaches used, correct?
22    A.   Correct.
23    Q.   And it also required you to reconcile the
24 applicability of relevance of the approaches,

Page 327

1 methods and techniques used to arrive at the value
2 conclusion, correct?
3    A.   Right.
4    Q.   But you didn't reconcile the applicability
5 of the sales comparison analysis anywhere
6 specifically in your report, did you?
7    A.   Well, actually we need to take a step back
8 here.  Standard 1 refers to the actual appraisal,
9 not the document that reports the appraisal.  So in
10 my analysis in my appraisal I did absolutely
11 reconcile the applicability and relevancy
12 approaches.  It wasn't reported necessarily in a
13 summary report because a summary report doesn't
14 include every detail, but in the appraisal I
15 performed, which really refers to the analysis that
16 I completed, I absolutely did do that.
17    Q.   So put another way, the analysis that you
18 completed as to why you shouldn't apply the sales
19 comparison approach was not stated in your report
20 but it was done in your work file; is that correct?
21    A.   It was part of the analysis that I did.
22    Q.   And but only reflected in your work file,
23 correct?
24    A.   Correct.

Page 328

1    Q.   Okay.  If you could turn to Standards
2 Rule 2-1.
3    A.   Yes.
4    Q.   Does Standards Rule 2-1 apply to your
5 reports in this case?
6    A.   Yes.
7    Q.   And, in fact, this specifically does apply
8 to a written report, correct?
9    A.   Correct.
10    Q.   And 2-1(c) requires you to -- excuse me.
11        2-1(b) requires you to make sure that your
12 written report contains sufficient information to
13 enable the intended users of the appraisal to
14 understand the report properly, correct?
15    A.   Correct.
16    Q.   But an intended user of the appraisal
17 would not be able to look at your report to
18 understand why you didn't use the sales comparison
19 approach to derive a value, would they?
20    A.   Is that a question?
21        MR. RYAN:  I don't know.
22 BY MR. YOHALEM:
23    Q.   Yes, that's a question.
24    A.   I'm sorry, could you ask it again?

Page 329

1        MR. YOHALEM:  Do you want to reread.
2        (Question read.)
3        THE WITNESS:  Well, I've stated this
4 before.  I did include a sales comparison approach
5 in valuing the individual parcels, and that's very
6 clear.
7 BY MR. YOHALEM:
8    Q.   But my question is that someone looking at
9 your report would not be able to discern from your
10 report why you elected not to use the sales
11 comparison approach to derive a value for the entire
12 62 acres, would they?
13    A.   Well, some of them looking at my report
14 would absolutely conclude that it contained
15 sufficient information to enable them to understand
16 the report properly, and so by virtue of that, I've
17 complied with that rule.
18    Q.   Okay.  Okay.  You didn't conduct a sales
19 comparison valuation for the entire property though,
20 just parcels, right?
21        MR. RYAN:  Asked and answered.
22        THE WITNESS:  The sales comparison
23 approach I applied was specific to the individual
24 parcels that make up the larger parcel.

83 (Pages 326 - 329)

1 BY MR. YOHALEM:
2     Q. Standards Rule 2-1(c), do you see that?
3     A. Yes.
4     Q. Does that accurately -- does that apply to
5 your written reports?
6     A. Yes.
7     Q. And that says you clearly and accurately
8 must disclose all assumptions, correct?
9     A. Yes.
10     Q. But you didn't disclose that the
11 development of the property as an office space was
12 an assumption, did you?
13     A. I did.
14     Q. We've been over this, but where do you say
15 that development of the property as an office space
16 was an assumption you used in your report?
17     A. I've referred you to the specific page
18 before. I'm happy to go back there again.
19     On Page 27, I say the projected office
20 space at the subject will contain approximately
21 200,000 square feet.
22     Q. Right. And nowhere there do you say it's
23 an assumption, do you?
24     A. Again, I think you're talking semantics.

1 I clearly state that I'm assuming 200,000 square
2 feet is going to be office.
3     Q. Okay. We can move on.
4     Standards Rule -- sorry, let's move on
5 to -- if you could turn to Standards Rule 1.1 on
6 U-16.
7     MR. RYAN: I'm sorry, what was that page
8 again?
9     MR. YOHALEM: U-16.
10     THE WITNESS: Yes.
11 BY MR. YOHALEM:
12     Q. Do you agree that Standards Rule 1-1
13 applies to your property appraisal reports?
14     A. Yes.
15     Q. Okay. And would you agree that Standards
16 Rule 1-1(b) requires you to not commit a substantial
17 error or omission or commission that significantly
18 affects an appraisal?
19     A. Yes.
20     Q. Is it your opinion that failing to
21 consider in the agreement for sale between GMH and
22 Roosevelt Clark was not a substantial error or
23 omission in your 2005 report?
24     A. I think you're mischaracterizing my

1 testimony. I said I did consider that absolutely in
2 my analysis. I didn't necessarily spell it out in
3 the report that I prepared, but as part of my
4 appraisal, I absolutely considered it as I've
5 discussed before.
6     Q. Can you turn to the record keeping rule,
7 which is on U-10.
8     Would you agree that the record keeping
9 rule applies to your work in this case?
10     A. Yes.
11     Q. And under the record keeping rule, you
12 have to maintain a work file; isn't that correct?
13     A. That's correct, yes.
14     Q. And the work file has to contain summaries
15 of all oral reports or testimony or a transcript of
16 testimony that you're relying upon; isn't that
17 correct?
18     A. Correct.
19     Q. And did you do that in this case?
20     A. Yes.
21     Q. And so every oral report that you are
22 relying upon is summarized in your work file?
23     A. Yes.
24     Q. And if you didn't include an oral report

1 of every -- excuse me.
2     If you didn't include a summary of every
3 oral report that you are relying upon in your
4 appraisal, you would be in violation of USPAP,
5 correct?
6     A. Well, let me clarify. I think when
7 they're talking about oral reports here, they're
8 talking about someone providing an estimate of
9 value, an appraisal, if you will, orally as opposed
10 to in a written report. That's what they're
11 referring to here in the record keeping rule.
12     Q. Okay. Well, did you provide any oral
13 reports of value prior to your final appraisal
14 reports in this case?
15     A. No.
16     Q. The next bullet point down says you have
17 to include in your work file all other data,
18 information and documentation necessary to support
19 your opinions, correct?
20     A. Yes.
21     Q. And to support your conclusions and to
22 show compliance with USPAP, correct?
23     A. Correct.
24     Q. And would you agree that if you failed to

84 (Pages 330 - 333)

Page 334

1 retain all data, information and documentation that
2 supports your opinions and conclusions you would be
3 in violation of USPAP?
4    A.  It's possible that could be a USPAP
5 violation, yes.
6    Q.  Okay.  And so if you didn't maintain any
7 data, information or documentation that supported
8 your opinion that the 2005 transaction were not
9 an -- was not an arm's length transaction, that
10 would be a violation of USPAP, correct?
11    A.  But I did include that in my work file.
12    Q.  Okay.  And the only data in your work file
13 that reflects that, as you've testified here today,
14 are the deposition testimony of Michael Rumman,
15 Antoin -- Michael Rumman, Antoin Rezko and Ed Wynn;
16 is that correct?
17    A.  That's my primary source for that
18 information, yes.
19    Q.  Okay.  If you'd turn to U-71.
20    A.  Okay.
21    Q.  U-71 is a statement by, you know,
22 concerning discounted cash flow analysis, correct?
23    A.  Yes.
24    Q.  And discounted cash flow analysis is the

Page 335

1 primary analytical tool you used in this report,
2 correct?
3    A.  That's one of the analytical tools I used.
4    Q.  It's the only analytical tool you used
5 that rendered a value decision, a value opinion,
6 correct?
7    A.  No, that's not correct.
8    Q.  What other analytical tools did you use to
9 render a value opinion in your report?
10    A.  The sales comparison approach was a very
11 significant part of the analysis that I prepared.
12    Q.  And what value opinions were rendered for
13 the 62 acres using the sales comparison approach --
14    A.  The --
15    Q.  -- let me finish -- that were distinct
16 from the discounted cash flow analysis you did?
17    A.  The -- each of the -- the discounted cash
18 flow analysis was totally dependent upon the sales
19 comparison approach that I applied before in
20 estimating the value of the individual parcels.
21    Q.  Okay.  Let me try this another way.
22       Did you use any approach other than the
23 discounted cash flow approach analysis to reach a
24 conclusion of value?

Page 336

1    A.  Yes.
2    Q.  And what conclusion of value did you reach
3 other than what was reached through your discounted
4 cash flow analysis for the 62 acres?
5    A.  I reached a conclusion of value for each
6 of the parcels that make up the 62 acres, which was
7 then incorporated into the discounted cash flow
8 analysis.
9    Q.  But you didn't reach a separate conclusion
10 of value for the 62 acres other than through the
11 discounted cash flow analysis, correct?
12    A.  Again, I estimated -- I did reach a
13 conclusion of value for each of the parcels that
14 make up the 62 acres using the sales comparison
15 approach.
16    Q.  Okay.  What is the value of the 62-acre
17 property using any approach other than the
18 discounted cash flow analysis that you were able to
19 come up with?
20    A.  I don't -- I don't have an answer for
21 that.
22    Q.  Okay.
23       THE VIDEOGRAPHER:  Counsel, ten minutes.
24

Page 337

1       MR. YOHALEM:  Okay.
2 BY MR. YOHALEM:
3    Q.  Will you agree with the statement made
4 under the heading The Issue that because DCF
5 analysis is profit-oriented and depending on the
6 analysis of uncertain future events it is vulnerable
7 to misuse?
8    A.  Yes, I would agree with that.
9    Q.  Okay.  Would you agree that DCF -- would
10 you agree with the statement three paragraphs under
11 the heading that says, "DCF analysis is an
12 additional tool available to the appraiser and is
13 best applied in developing value opinions in the
14 context of one or more other approaches"?
15    A.  Yes, I would agree with that.
16    Q.  Okay.  If you could turn to the second
17 page of the discounted cash flow analysis statement
18 found at U-72.
19    A.  Yes.
20    Q.  Three paragraphs down, the second sentence
21 says, "Surveys of investor opinion and yield indices
22 are also useful in the" --
23       MR. RYAN:  I apologize, I've got to catch
24 up with you.

85 (Pages 334 - 337)

Page 338

1    MR. YOHALEM: 2303.
2    MR. RYAN: What was that?
3    MR. YOHALEM: Line 2303.
4    MR. RYAN: Okay. Thank you.
5 BY MR. YOHALEM:
6    Q. It says, "Surveys of investor opinion and
7 yield indices are also useful in the rate selection
8 process but only when the type of and market for the
9 real estate being appraised is consistent with the
10 type of and market for the real estate typically
11 acquired by the investors interviewed in the
12 survey."
13    Do you see that?
14    A. Yes.
15    Q. Do you agree with that statement?
16    A. Yes.
17    Q. 2310 says, "The results of DCF analysis
18 should be tested and checked for errors and
19 reasonableness."
20    Do you agree with that?
21    A. Yes.
22    Q. The next sentence says, "Because of the
23 compounding effects in the projection of income and
24 expenses, even slight input errors can be magnified

Page 339

1 and can produce unreasonable results."
2    Do you agree with that?
3    A. Yes.
4    Q. And again, you have nowhere in your work
5 file that specifically describes how you tested the
6 results for reasonableness, correct?
7    A. I just explained how I tested the results
8 for reasonableness.
9    Q. Okay. We don't have to go back through
10 that testimony that you said earlier.
11    Would you agree that if you made different
12 assumptions, such as a five-year absorption period
13 instead of a ten-year absorption period, it would
14 significantly alter your discounted cash flow
15 conclusions?
16    MR. RYAN: Objection, form.
17    THE WITNESS: If you change the inputs,
18 it's going to have an impact on the value conclusion
19 more than likely.
20 BY MR. YOHALEM:
21    Q. And if you change the inputs from an
22 18 percent discount rate to, say, a 10 percent
23 discount rate, it would significantly alter the
24 conclusions as well, correct?

Page 340

1    A. It would change the conclusions.
2    Q. And if you altered the land appreciation
3 rate from 3 percent to 10 percent or something to
4 that effect, it would also significantly affect the
5 conclusions, correct?
6    A. It would change the conclusions.
7    MR. YOHALEM: Give me one minute off the
8 record, and then I'll go back on the record.
9    THE VIDEOGRAPHER: The time is now 5:32
10 p.m. We are off the record.
11    (Whereupon, a recess was taken
12    from 5:32 p.m. to 5:33 p.m.)
13    THE VIDEOGRAPHER: The time is now
14 5:33 p.m. We are on the record.
15    MR. YOHALEM: Just back on the record to
16 say that I have no further questions.
17    MR. RYAN: That's it. I have no
18 questions.
19    THE VIDEOGRAPHER: This concludes today's
20 deposition. The time is now 5:34 p.m. We are off
21 the record.
22    (Whereupon, the deposition was
23    concluded at 5:34 p.m.)
24

Page 341

1 STATE OF ILLINOIS )
2    ) SS:
3 COUNTY OF C O O K )
4    The within and foregoing deposition of the
5 witness, JOHN W. VANSANTEN, was taken before GREG S.
6 WEILAND, CSR, RMR, CRR, at Suite 3440, 55 East
7 Monroe Street, in the City of Chicago, Cook County,
8 Illinois, commencing at 8:41 o'clock a.m., on the
9 12th day of June, 2014.
10    The said witness was first duly sworn and
11 was then examined upon oral interrogatories; the
12 questions and answers were taken down in shorthand
13 by the undersigned, acting as stenographer and
14 Notary Public; and the within and foregoing is a
15 true, accurate and complete record of all the
16 questions asked of and answers made by the
17 aforementioned witness at the time and place
18 hereinabove referred to.
19    The signature of the witness was not
20 waived and the deposition was submitted to the
21 deponent as per copy of the attached letter.
22    The undersigned is not interested in the
23 within case, nor of kin or counsel to any of the
24 parties.

86 (Pages 338 - 341)

Page 342

1     Witness my signature on this 20th day of
2 June, 2014.
3
4

    _____

5 GREG S. WEILAND, CSR, RMR, CRR
    License No. 084-003472
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 344

    DEPOSITION REVIEW
    CERTIFICATION OF WITNESS

1
2
    ASSIGNMENT NO: 1879406
3  CASE NAME: Sirazi, Semir D. v. General Mediterranean
    DATE OF DEPOSITION: 6/12/2014
4     WITNESS NAME: John W. VanSanten
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
    as part of the record of my testimony.
10
    I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____
    Date      John W. VanSanten
14
    Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
    They have listed all of their corrections
18     in the appended Errata Sheet;
    They signed the foregoing Sworn
19     Statement; and
    Their execution of this Statement is of
20  their free act and deed.
21     I have affixed my name and official seal
22 this _____ day of _____, 20____.
23  _____
    Notary Public
24
25  _____
    Commission Expiration Date

---

Page 343

1     DEPOSITION REVIEW
    CERTIFICATION OF WITNESS
2
    ASSIGNMENT NO: 1879406
3  CASE NAME: Sirazi, Semir D. v. General Mediterranean
    DATE OF DEPOSITION: 6/12/2014
4     WITNESS' NAME: John W. VanSanten
5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have made no changes to the testimony
    as transcribed by the court reporter.
8
9  _____
    Date      John W. VanSanten
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
    They have read the transcript;
13     They signed the foregoing Sworn
    Statement; and
14     Their execution of this Statement is of
    their free act and deed.
15
    I have affixed my name and official seal
16 this _____ day of _____, 20____.
17
18  _____
19     Notary Public
20
 _____
    Commission Expiration Date
21
22
23
24
25

---

Page 345

1     ERRATA SHEET
    VERITEXT LEGAL SOLUTIONS MIDWEST
2     ASSIGNMENT NO: 1879406
3 PAGE/LINE(S) /    CHANGE    /REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 Date      John W. VanSanten
21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22 DAY OF _____, 20____.
23
    _____
24     Notary Public
25     _____
    Commission Expiration Date

87 (Pages 342 - 345)

[& - 1879406]

| & | | |
|---|---|---|
| **&** 2:4 12:16 15:6 260:19 | | |

**0**

000008 13:15
000010 13:18
000013 13:21
000026 14:6
00002863 12:7
00003095 12:7
000031 14:10
000040 14:13
000370 11:13
000429 9:22
000798 12:22
000801 12:22
001507 12:19
0048 3:20
005459 10:18
005463 10:19
005824 11:6
00653 1:8
0070 3:21
007752 14:21
007919 10:13
007946 10:13
009865 13:9
009969 13:9
013756 3:16
014806 13:6
014822 13:6
021951 7:17
021992 7:17
028985 10:10
028992 10:10
036655 11:16
036680 11:16
047014 9:18
047055 9:18
047098 7:12
047139 7:12
047248 7:7
047289 7:7

047871 9:10
047874 9:10
056857 6:5
056858 6:5
056873 8:12
056914 8:12
06 13:11
065592 10:6
065598 10:6
07 271:17,21
070619 11:21
070624 11:21
072901 10:22
072903 10:22
073704 6:9
073705 6:9
073706 6:13
073733 8:7
073800 8:7
073828 6:22
073898 6:23
073977 5:24
074019 7:21
074089 7:22
074944 9:13
074945 9:13
08 272:4,5
083182 6:18
083188 6:18
084-003472 342:5

**1**

1 4:15 5:11,20 12:17
  30:12,22 39:13
  104:3 124:6 174:10
  198:23 201:2 214:3
  214:6 221:6 289:24
  327:8
1,000 107:20
1-1 331:12,16
1-5 323:18,21,23
1-6 326:13,16,19
1.1 331:5
1.25 201:19

1.4 261:21 271:24
10 54:24 88:5,11,14
  170:11 187:7 332:7
  339:22 340:3
10.13 299:10
10.46 186:15 187:11
  299:12
100 6:14 234:17,18
  245:23 246:9
101 6:19
105 197:14 212:7
106 7:3
107 7:8
109 7:13
10:48 120:15
10:58 120:13
11 5:7 29:9,10 31:20
  138:8,14 166:15
  187:15 247:14
110 7:18 221:10
  223:17
111 8:3
112 8:8
11:08 120:15,17
11:32 132:22,24
11:44 132:24 133:2
12 12:10 15:3 95:8
  198:10 199:10
  267:1 269:10 306:4
12.41 229:3
12/13/05 10:8
120 225:18
121 95:9
127726 150:23
  151:9
12:15 157:2,8,10
12th 1:20 3:2 247:10
  247:16 253:1 341:9
13 12:6 223:11
13,343,000 228:18
13.5 292:2
130 64:18,24 66:12
  66:16 86:8 87:22
  129:21 141:13
  156:14 216:8

131 67:18 139:7
  140:19 147:19
  202:15 206:12
  224:13 268:8
  272:14
131,880,960 127:7
  128:3
131,888,960 129:17
131m 9:21
133 8:13,16,19 9:3
135 68:23 148:5
  156:15
137 198:10 199:9
137,088,960 126:20
14 5:15 223:8,12
140 241:4
14th 150:9
15 3:8 14:12 28:20
  56:8 119:24 120:4
  126:6 166:6 290:23
150 69:5 207:19,20
  209:6 279:20
152,423,000 98:1
153 9:7
155 87:23
16 3:5 331:6,9
16.9 212:4
160 218:2
169,016,000 98:10
16th 259:3
17 3:20 130:6 137:1
  137:5,10 138:16,19
  138:24 140:2,11,21
  141:17 142:18
  143:7,13 144:6,10
  145:4,6 206:10
  209:8 277:6,9,10,11
170 214:11 251:6,12
176 9:11
18 136:22 339:22
180 98:12
186,030 233:23
1879406 343:2
  344:2 345:2

**1896** 2:17
**191** 9:14
**193** 3:17
**198** 4:7 262:5
**1:01** 157:11,13
**1:12** 1:8
**1a** 7:5,10,15 8:10
  9:16
**1c** 7:5,10,15 8:10
  9:16
**1st** 64:3,14,17 82:6
  83:23 148:19,22
  151:12,14 153:1
  154:17 215:23
  216:2,8 273:4

**2**

**2** 3:12 30:14,22 31:1
  53:4 69:19 94:11,14
  174:10 200:16,19
  201:1,24 221:7
  231:9 232:5,7,20
  248:1,7 249:5
  303:16 304:1 312:4
  312:5
**2,200,000** 176:23
**2-1** 328:2,4,10,11
  330:2
**2.5** 176:23
**20** 29:3 56:8 195:24
  196:6,18 323:18
  343:16 344:22
  345:22
**20,800,000** 182:5
**20,809,776** 182:11
**20,839,936** 126:17
**200** 3:12 98:3 232:9
**200,000** 237:15
  238:8,14,17,22,24
  239:21 240:3
  271:22 330:21
  331:1
**2002** 150:9,19 151:5
  161:10,13,24

**2003** 29:7 31:7
  158:15 166:13
**2004** 11:12 163:14
  164:1 220:7,12,13
  221:4,9 284:16,21
**2005** 4:15 6:21 7:20
  8:15 14:20 29:21
  45:2,4,9 63:19 64:4
  64:14,17 65:10 68:4
  70:9,13 71:4,5 73:8
  73:11,14 74:10 75:3
  75:8 76:13,16,21
  77:3 78:11,23 79:5
  79:19,22,24 83:23
  85:6 86:5 90:7
  97:19,23 113:2
  119:5,7,21 120:3,7
  120:21 121:6
  129:18,21 130:7
  131:15,18 133:8
  139:17 141:5,11,18
  145:11 147:18,24
  148:5,6 149:14,18
  150:21 151:1,8,14
  151:15 153:1
  154:17 156:17
  157:23 162:11
  164:18 167:2
  170:22 178:9,10,13
  178:16,21 179:9
  181:16 187:14
  198:2 204:10,14,18
  206:13 209:6
  215:23 216:2,8
  226:24 228:22
  231:6 240:15
  246:11 268:7,14
  294:15 299:7 300:1
  305:19 306:1,9,10
  306:13,17 309:5,8
  309:12 310:10,23
  311:10,16 312:16
  324:11,16,20 325:5
  325:18,23 331:23
  334:8

**2006** 3:20 10:17,21
  12:6 13:11 97:17
  151:12,13 178:8
  193:16 194:15
  195:1,9,12 196:8
  199:13 201:19
  212:7 213:22 223:8
  259:3 264:1
**2007** 4:5,20 8:18,21
  11:4 53:5 56:11
  61:22 63:18 71:8,10
  98:6,8 132:14,15
  181:15 186:11,15
  187:3 218:22
  219:10 220:1,13
  261:19 271:13
  325:3
**2008** 4:9 5:7 12:11
  63:2,9 132:16
  181:15 220:8,12,19
  220:21 247:10,14
  247:17 252:17
  253:1 262:8 306:10
  306:13,17,20 325:4
**2009** 5:20 82:7 84:6
  86:4 284:24 285:2,3
  285:6,9,12,15
  286:18,22 287:17
  287:22 288:1,3
  304:24
**2011** 313:21
**2012** 12:17 63:6,9
  254:3,10,15 255:4,9
  255:15,18,20,24
  306:10,20
**2014** 1:20 3:2 5:12
  5:15 9:6 14:8,12
  15:3 132:17 148:22
  160:22 178:7,13,16
  181:15 290:24
  304:24 325:4 341:9
  342:2
**2014-2015** 14:24
  320:10

**202** 9:19
**206** 10:3
**20th** 342:1
**210** 10:7
**211** 10:11
**213** 10:14
**216** 10:20
**218** 11:3
**221** 11:7
**223** 11:14
**224** 11:17
**225** 12:3 280:1
**23** 11:11 119:11,17
  119:22 121:12
  124:21,24 125:20
  126:24
**2303** 338:1,3
**2310** 338:17
**23rd** 221:3,9
**24** 4:19 27:24 28:4,8
  30:14 116:16
  164:18 165:7
  166:18 188:13
  224:7
**24,000,000** 11:19
**240** 2:18
**246** 12:8
**249** 231:17 233:18
**24th** 261:19
**25** 14:8 55:8 138:9
  138:14 213:1
**253** 12:13
**255** 219:2,10,20
  220:1
**257** 3:22
**259** 12:20
**26** 5:14 120:8
  126:15 261:20
**260** 4:3
**261** 13:3
**262** 4:7 13:7
**263** 13:10
**265** 13:13
**269** 13:16

| | | | |
|---|---|---|---|
| **27** 225:9 238:10 271:21 330:19 | **31** 272:10 | **334** 9:7 153:8,11,15 156:20 | **355** 13:16 269:18,22 273:15 |
| **27,000,000** 12:4 | **310** 14:18 | **335** 9:11 176:1,5 181:11 | **356** 13:19 273:16,20 |
| **271** 231:9,13 | **312** 2:10 4:11 37:8 37:13 63:20 113:5 157:24 204:18 295:2,4 | **336** 9:14 191:22 192:4,22 | **357** 14:3 286:6,9,9 288:6 |
| **273** 13:19 | | | **358** 14:7 288:18,22 290:17 |
| **279,000** 229:10 | | **337** 9:19 202:1 | |
| **28** 201:20 | **313** 4:16 37:8 56:11 61:21 | **338** 10:3 206:15,19 206:20 209:10,18 | **359** 14:11 290:18,22 292:5 |
| **286** 14:3 104:4,14 | **314** 5:3 37:9 | **339** 10:7 210:12,16 211:6 | **36,000** 91:7 |
| **286,300,000** 104:9 105:13 | **315** 5:8 37:9 | **340** 10:11 211:14,18 213:17 | **360** 14:14 302:17,20 309:24 311:22 319:10 |
| **2876** 225:13 | **316** 5:13 37:10,14 37:22 | | |
| **288** 14:7 | | **341** 10:14 213:18 216:17 | **361** 14:18 309:24 310:1,4 |
| **290** 14:11 | **317** 5:16 81:23 82:1 82:5 84:13,15,20 85:6,11,11,13 86:10 | **342** 10:20 216:19,23 218:5 | **362** 14:22 320:5,9 |
| **291** 3:8 | | | **37** 4:11,16 5:3,8,13 |
| **29th** 204:10,14 325:18 | **318** 5:21 86:11,13 86:14,17 93:3 | **343** 11:3 218:7,11 220:5 | **370** 7:6 106:20 |
| **2:08** 210:6,8 | **319** 6:3 93:4,8 96:10 | **344** 11:7 153:14 220:23 222:15 | **371** 113:12 |
| **2:16** 210:8,10 | **32** 169:14 230:24 270:9 318:16 | **3440** 1:18 2:8 15:7 341:6 | **38** 133:18 171:22 |
| | | | **39** 122:12,21 |
| **3** | **320** 6:6 14:22 92:2 96:11,15 98:15,17 98:22 99:3 | **345** 11:14 223:1 | **390** 7:11 |
| **3** 10:21 83:17 85:11 85:13 90:9 120:17 138:18 139:20,22 143:14,22 144:1 180:20,21 181:3,9 186:13 195:3 197:18,20,21 198:4 251:22 313:23 314:5 340:3 | | **346** 11:17 224:3,20 224:23 | **3:01** 240:8,10 |
| | **321** 6:10 99:6,10 | | **3:15** 240:10,12 |
| | **322** 6:14 100:3 101:5,8,11 | **347** 12:3 225:1,5 | **3rd** 212:7 |
| | **323** 6:19 101:12,16 104:7 105:24 | **348** 12:8 246:17,22 253:8,12 | **4** |
| | **324** 7:3 106:1,5 107:2 | **349** 12:13 253:19,21 254:1,7 257:1 | **4** 3:17 157:13 179:4 193:1,3,6 197:18 198:5 200:14 272:5 272:8,9 315:10 317:3 |
| **3,031,396** 124:11,14 126:6 | | **349,735,000** 97:8 99:24 | |
| **3,077,308** 124:7 127:3 229:9 | **325** 7:8 107:3,7 108:1,16 | **35,000** 289:6 | |
| | **326** 7:13 109:7,11 110:1,4,6 | **350** 7:16 12:20 92:2 93:21 109:16 259:12,19,20 260:10 | **4/21/14** 13:17 270:4 270:21 |
| **3,777,000** 125:21 | | | **40,000** 289:7,10 |
| **3,777,308** 125:1 126:24 | **327** 7:18 110:7,11 110:17,21,24 111:2 | | **400** 93:21,21 94:21 95:8 267:17 268:1,3 |
| **3.1** 249:1 | **328** 8:3 111:3,6,19 111:22 112:2 | **351** 13:3 261:7,14 | |
| **3.5** 260:15,18,21 | | **352** 13:7 262:15 263:11 | **400,000** 44:8 279:7 |
| **3.8** 262:8 | **329** 8:8 112:3,6,15 112:19 | **353** 13:10 263:17,20 264:17,18,22 | **410** 9:17 90:14 91:17 192:8 |
| **30** 55:8 169:13,14 | **330** 8:11,13 133:3,7 | | **42** 89:18 123:13 239:10 |
| **300** 250:18 264:4 | **331** 8:16 | **354** 13:13 264:23 265:3 269:17 | |
| **302** 14:14 | **332** 8:19 | | **432-5971** 2:20 |
| **308,269,891** 111:16 | **333** 9:3 | | **45** 3:22 126:11 157:4,5 196:2,7,20 |
| **30th** 4:4 | | | |

**[45 - accounting]**

257:2,5 296:23
297:4
**45,470,940** 126:10
126:12
**479** 231:15,16
232:10
**48** 4:3 260:11,14
**4:13** 288:12,14
**4:21** 288:14,16

**5**

**5** 38:8 71:10 149:22
149:23 158:1
170:12 180:21
181:3,9 182:20
204:17 210:10
224:16 231:17
232:2,5,19 233:17
233:23 258:1,20
259:3 325:24
**5/1/14** 281:7
**5/16/14** 13:20
**50** 188:17 193:14
208:15
**500** 234:14
**51** 28:17 166:5
188:18 300:1
**52** 118:4
**53** 295:1,6
**536** 124:19
**55** 1:18 2:7 15:6
341:6
**58** 187:16
**580-2020** 2:10
**59** 86:8 227:3
**5:08** 320:2,4
**5:33** 340:12,14
**5:34** 340:20,23

**6**

**6** 11:4 44:1 174:6,20
175:18,21 177:12
177:15,21 178:6,20
219:10 220:1
274:16 288:16

**6,900,000** 116:17
**6/12/2014** 343:3
344:3
**60** 27:21 35:23
65:11 116:16
118:17 129:14
184:21 294:21
**60,763** 227:14
**60035** 2:19
**60603** 2:9 15:7
**60622** 11:11
**61** 149:1,4,7 246:14
**62** 31:11 36:4,14
64:3 119:4 120:21
121:5,8 129:3,11
136:1,5,6 137:9,11
138:12,14 139:22
170:18 188:6,8,12
188:14 189:18,19
202:9 207:19 208:1
208:7 212:4 218:20
228:24 229:5,13,21
248:10,12 262:9
292:18 293:7,12
295:24 308:3
314:21,22 318:19
318:23 329:12
335:13 336:4,6,10
336:14,16
**64** 297:13 298:1
**65** 139:18 173:12
**66** 179:6 182:20
**67** 130:7
**68** 97:22 121:13
144:14 181:24
299:7
**680,000** 124:9 236:6
236:16
**6th** 4:8 218:22

**7**

**7** 193:22 208:9
231:19,21 306:2
**7/07** 266:15

**7/08** 266:15
**7/15/2005** 5:22
**70** 53:8,10,10,11
64:4,14,22 65:15
147:20,24 148:3,16
156:18 199:13
246:12
**70,308** 125:22
**70,778,084** 126:4
**70s** 28:18
**71** 28:24 113:2,9
117:21 118:6 166:7
240:15 334:19,21
**72** 337:18
**72,300,000** 150:9
151:24 161:13
**75** 56:12 237:17
**750** 234:10

**8**

**8** 196:24 197:3
**80** 251:7
**800** 228:15 229:19
229:24
**800,536** 126:15
**801,000** 124:18
**801,536** 124:17
**82** 5:16
**83188** 100:17
**847** 2:20
**86** 5:21
**880** 228:15 229:19
230:1

**9**

**904** 123:16 163:13
188:22 195:24
239:13,20
**90s** 28:19 29:1 166:8
**93** 6:3
**96** 6:6
**98** 240:19 241:2
**99** 6:10
**9:46** 69:15,17
**9:56** 69:17,19

**a**

**a.m.** 1:20 15:4 69:15
69:17,17,19 120:13
120:15,15,17
132:22,24,24 133:2
341:8
**ability** 159:16
171:20
**able** 20:15 32:16
41:4 42:13,15 44:4
50:17 78:3 79:15
143:6 170:8 172:4
172:10 196:21
231:3 232:1 235:7
235:11 259:10
295:10 328:17
329:9 336:18
**absolutely** 171:3,7
222:9 299:3 313:13
315:22 327:10,16
329:14 332:1,4
**absorb** 166:23
**absorption** 21:11
27:9,13,17,19 28:1
29:8 30:23 32:13
164:21 165:1,3,6,9
165:15 276:9,22
277:18 278:12
339:12,13
**accept** 138:18
**acceptable** 60:21
**access** 44:8 50:22
172:10
**accessibility** 171:20
186:24
**accomplishment**
10:16 213:22
**accomplishments**
214:3
**account** 170:17
171:5 172:20
180:14 185:1 196:5
**accounting** 55:17

accuracy 308:20
accurate 17:2 64:22
  77:23 118:8 222:4
  222:23 274:21
  275:1 293:21
  341:15
accurately 291:19
  330:4,7
acknowledge
  343:11 344:16
acquire 251:6
acquired 73:21
  150:8,18,21 163:24
  190:23 216:7
  338:11
acquiring 47:20,21
  103:1
acquisition 190:10
acre 27:21 28:17
  35:23 36:4,14 64:3
  118:17 121:8
  129:14 138:12,14
  188:6,14 262:9
  292:18 294:21
  314:21,22 318:19
  318:23 336:16
acreage 19:21 301:6
acres 28:24 30:14
  31:11 116:16 129:3
  129:11 136:1,5,6
  137:9,11 139:22
  166:5,7 170:18
  188:8,12 189:18,19
  202:9 207:19 208:1
  208:7 212:4,4
  218:20 228:24
  229:5,13,21 248:10
  248:12 293:7,12
  295:24 308:3
  329:12 335:13
  336:4,6,10,14
acronym 57:21
act 293:7,12 343:14
  344:20

acting 341:13
action 317:16
active 134:3 135:13
  135:20
activities 214:2
activity 10:16
  213:21
actual 55:13 66:18
  103:18,19,23
  105:21 108:14,21
  127:2 166:1 172:18
  215:18 241:17
  243:17 254:19
  292:12 315:9 327:8
add 122:16 123:22
  126:18
added 122:2
addition 272:20
additional 40:1
  167:4 214:7 280:21
  337:12
addressed 172:4
adequately 103:11
adjoining 172:21
adjusted 8:5 111:11
adjustments 187:20
administration
  179:4,10,18 180:6
  180:11
administrative
  55:12 179:14,20
  180:18,20,21 181:3
admit 253:3
admitting 253:5
advance 132:9
  303:6
advantage 301:10
advertising 179:13
advising 147:18
advisory 323:6
affect 34:18 74:12
  156:16 161:17
  162:1 172:22
  237:10 340:4

affixed 343:15
  344:21
afford 89:3 115:19
affordability 89:1
afield 297:8
aforementioned
  341:17
afternoon 157:16
aggregate 292:19
  293:17,19 295:10
  318:20
ago 182:2
agree 34:16 36:3
  54:4,6,15 79:18
  124:2 170:3,12
  196:17 204:12
  222:10 241:11
  285:2 290:13 306:8
  312:13 313:9,20
  323:20 324:9,13
  326:16 331:12,15
  332:8 333:24 337:3
  337:8,9,10,15
  338:15,20 339:2,11
agreed 117:2
agreement 3:13,23
  3:23 10:12 11:15
  12:21 13:5 197:1,8
  197:9,14 201:2
  204:13,16 211:22
  212:2,3 213:7 223:4
  257:8,13 259:23
  261:14 324:19,22
  324:24 325:6,10,16
  325:21 331:21
agreements 296:24
  297:5 324:4,14
ahead 16:18 37:14
  49:10 54:14 81:23
  125:19 159:20
  165:23 202:12
  220:22 285:22
  302:16
al 5:23 15:9,10
  40:17 41:12,15,20

47:12,18 48:3 49:1
  210:24 211:3
  218:16 263:22
  264:11,19 274:6
  311:4
alleged 164:16
alleges 250:1
allow 240:1 308:21
allowable 123:23
  186:14 232:22
  233:18
allowed 159:7
  230:21 234:3
alter 339:14,23
altered 340:2
alternative 160:2
amendment 3:13
american 247:24
amount 22:12 67:6
  67:6 97:6,8,11,14
  98:14 100:20
  103:20 116:3
  142:20 147:22
  165:4 169:7,16
  173:17 178:2
  216:13 222:3 241:6
  277:12 289:6,10
  291:20 305:9 306:5
analyses 57:6
analysis 20:24 21:2
  21:4 24:24 25:2
  34:17,19 35:13
  38:10,14 52:1,18
  53:3,12,15,19 62:5
  69:1 72:6 74:12
  75:8 78:15 79:18,22
  81:3 85:17 88:24
  102:9 103:13,23
  105:19,21 108:9
  109:5 114:19 115:4
  115:23 116:2,3,9,19
  116:23 117:12,14
  117:17 128:22
  144:23 151:20,23
  153:1,2 156:16

[analysis - appreciating]

160:19 161:9
164:21 165:1,4,10
166:17 167:6
168:20 170:16
171:4 180:9 181:20
189:10,17 190:8
192:19 195:20
197:7 200:13
201:17,21 222:4,20
222:21,23 227:24
232:21 233:1,6,14
234:18 237:7,11,12
238:21 254:7 255:3
255:4,18 260:8,22
262:1,13 272:18,24
276:3 277:3,18
282:2 292:8 293:9
293:13,17,23 294:9
294:14,17 295:7
296:12 297:15,21
298:6 301:2 304:16
307:5 312:12
313:16,17 316:7,14
317:23 318:3 327:5
327:10,15,17,21
332:2 334:22,24
335:11,16,18,23
336:4,8,11,18 337:5
337:6,11,17 338:17
**analyst** 38:9
**analytical** 335:1,3,4
335:8
**analyze** 47:8 71:4
75:3 80:9,15,21
81:3 88:22 90:6,21
91:20 92:4,11
151:24 152:22
230:5 263:8 267:13
324:3,15,19 325:5
**analyzed** 89:6 154:9
217:20 266:19
294:23 326:21
**analyzes** 90:10 92:7
**analyzing** 31:14
67:21 81:13 235:24

**animal** 35:20
**annual** 88:5
**annually** 199:10
**answer** 16:18,19,22
41:7 45:6 47:15
48:19 59:6 83:16
89:4 96:5 117:10
125:9,19 127:20
129:24 148:8 151:3
151:4 154:5 160:3
189:16 200:10
245:12,21 252:21
277:14 284:23
303:19,20 304:10
307:4 312:8 318:7
336:20
**answered** 162:14
329:21
**answers** 16:11,12,13
303:11,13 304:11
341:12,16
**anticipate** 16:20
263:13 300:20,24
**anticipated** 142:10
**antoin** 39:19 155:12
218:17 257:14
259:2 260:16
334:15,15
**anton** 39:15,18
**antunovich** 194:7
194:13
**anybody** 49:3
161:19 318:5
**anymore** 82:19
**apologize** 337:23
**appeal** 256:8,12
**appear** 84:4 87:4
302:20 343:11
344:15
**appearing** 110:12
**appears** 37:19 53:7
93:23 94:23,24
101:22 105:15
202:16 205:2 213:2
247:20 258:2

279:24 286:11
310:9
**appended** 344:11,18
**apples** 26:24 234:19
**applicability** 326:24
327:4,11
**applicable** 294:3,7
314:11,14 316:22
**applied** 25:12 118:7
118:10,11 123:19
127:22 241:4 296:7
296:20 297:21
323:21 326:17
329:23 335:19
337:13
**applies** 331:13
332:9
**apply** 118:1,14
139:8 165:3 295:10
296:6 314:15
316:15 317:1 318:1
327:18 328:4,7
330:4
**applying** 94:24 95:4
297:15
**appraisal** 4:14,19
5:6,11,19 11:8
12:17 14:16,17,23
18:7,20 19:15,18
21:1 27:8 38:5,22
38:24 39:3,11 47:7
48:9 51:16,20 57:9
57:9,11,12,17,22
58:3,9,15,19 60:7,8
61:22 79:20 80:12
80:20 81:7 82:6
84:16,20 85:17
112:17 113:2,18
154:10 157:23
158:5 194:13
196:11 197:16
200:1 204:18
208:21 211:7,11
219:5 221:3,4,12,13
222:1,18 223:16,20

224:12,19 225:17
227:1 244:19,23
245:2,13 247:14
254:2,8,10,16
255:20 256:8,11,20
259:8 263:2 276:20
283:20 284:4,6,11
284:16,21 287:17
288:3 289:6 291:24
293:2,3 294:1 302:2
313:7,9,16 318:1
321:15,21 322:6,11
324:6,11,16,21
325:23 327:8,9,10
327:14 328:13,16
331:13,18 332:4
333:4,9,13
**appraisals** 5:14
24:13 38:5 39:7
58:24 112:21 200:1
200:5,6 212:10
221:20 226:6,20,22
247:13 304:1 316:6
326:17
**appraise** 25:3
**appraised** 180:24
223:17 226:8
229:14,22 244:17
262:10 316:16
319:1 338:9
**appraiser** 18:9,10
18:15,16 80:6,14,20
81:12,18 307:5
308:21 316:14
322:9 324:1,2
337:12
**appraisers** 58:11,21
59:16,20 67:20 83:2
313:8,13
**appraising** 20:13
22:24 26:18 35:15
80:7 221:22 263:9
**appreciating** 143:21
304:20 306:9,14,15
306:18

appreciation 139:14
143:14 340:2
approach 113:24
114:3,7,9,12,16,19
114:23 115:7 117:5
117:13,16,23 118:2
118:7,9,14 124:1
127:15,16,23
128:11,13 129:1,5,9
130:4 139:8 149:9
165:3 171:13
173:10 187:14
292:11,13,16,21,23
293:3,6,7,15,24
294:3,7 295:7,9,14
295:23 296:4,7,10
296:12,14,18
297:11,11 298:2
314:1,6,10,15
315:11 316:17,20
316:20,21 317:16
317:18 318:4,5,9,10
327:19 328:19
329:4,11,23 335:10
335:13,19,22,23
336:15,17
approaches 113:16
113:20 317:4 318:2
326:21,24 327:12
337:14
appropriate 33:19
81:16,20 115:16
122:7 136:24
160:24 165:15
190:12 296:7,16
297:22 315:12
approval 162:1,2
195:23
approve 161:4,22
162:19 163:11,12
163:16,17
approved 44:6
109:5 116:17 159:1
160:13,22 162:10
162:17 163:15

164:4 189:4 236:6
approximately 15:4
98:3,11 143:7 144:2
196:2 199:13
208:14,14 238:14
238:17 271:21
272:10 274:16
276:13 279:19
306:4 330:20
april 5:11,20 82:6
148:19,22 291:2,4,6
291:21,23 292:3
arc 283:6,9,17,18,23
284:2,10,11,21
285:17,22 286:4
architectural 23:16
architecture 194:8
194:14
area 28:24 29:15
32:3 35:16 38:16
39:2 63:5 89:2
103:14,24 116:17
118:17 119:15,18
122:17 123:17
163:20 166:3
202:24 229:3,20
230:17 232:22
233:3,22 234:12,13
275:21 285:20
287:9,24 313:10
argue 266:24
arm's 66:6 67:24
70:14 71:15,18,22
72:2,6 75:9 77:11
77:16,21 78:3,8,15
79:11 81:4,8 84:2
84:10 85:7 154:23
154:24 203:17
204:1,6 205:16,18
205:22 206:2,6
209:16 214:14,17
214:21,24 215:4
268:17 269:14
280:13,16 308:23
311:18 312:17

319:3 334:9
arrive 185:20 327:1
art 244:10
article 14:15 49:24
202:5 203:15,16
204:1,9,13,15,24
205:1,3 231:15
232:9,10 247:9,16
249:2,19,24 250:3,6
250:12 251:11,14
251:18,22 253:16
315:23 326:8,10
articles 33:6 48:2
49:13 50:6 241:3
articulated 322:4
arvila 82:17,19
83:14
ascertain 14:17
304:2
aside 86:10 93:3
98:15 101:11 111:2
156:20 181:12
192:22 200:14
201:24 206:7
209:10,18 220:5
222:15 224:2 253:8
257:1 260:10
263:11 264:17,22
269:17 273:12,15
288:6 290:17
319:10
asked 41:10 48:5
51:12 65:13 83:11
83:15 85:1 92:22,23
95:15,20,24 96:2
98:18,20,23 99:12
99:13,18 100:11
101:7 102:15
106:11 107:12
109:21 110:5,18,23
111:19 112:11
148:2 149:6 162:14
175:3 178:1 189:14
217:23 218:1
219:19 222:6

223:23 224:22
235:3 237:5 243:8
245:15 264:10
329:21 341:16
asking 55:3 78:24
80:17 130:19 132:8
136:12 147:6 304:6
aspect 21:5 301:8
assessed 256:17
assessment 256:20
assessor 256:16,21
assets 142:21,22,23
156:10
assignment 3:24
19:13,16,18 41:24
222:2,9,18 257:8
282:5 343:2 344:2
345:2
associate 18:6
associated 21:8 85:4
137:14 142:13
145:5 183:5 184:11
236:18 240:18
associates 194:7,13
association 150:4,14
150:22 151:9
182:21 183:2,6
184:23 186:5
assume 39:18 231:1
238:23 239:1,3
317:5
assumed 191:9
assuming 173:3
331:1
assumption 70:20
173:1 174:18
175:22,23 183:7
237:15 238:8,18
241:9 276:1,2,6
279:9,13 330:12,16
330:23
assumptions 103:21
116:19 171:8 174:1
237:18,22 238:1,3
278:24 279:5 304:8

317:17 330:8
339:12
**attached** 87:5,15
341:21 344:7
**attaches** 87:3
**attaching** 93:8
**attachments** 10:9
87:16
**attempt** 36:16
293:24
**attendance** 272:21
**attention** 225:12
247:22 249:6
251:21 303:16
**attorney** 14:16
17:12 39:23 42:6
66:9 71:2 256:5
312:10
**attorneys** 15:14
**auchi** 1:10 48:8,16
48:21 49:4,14 50:5
218:16 219:19,24
249:1,13,20 250:13
250:18 252:7,22
264:4
**auchi's** 50:4 249:4
250:8
**authorize** 344:11
**available** 20:13 23:3
51:13,14 101:8
154:8 175:12
212:17 232:12,19
286:3 291:12 296:5
315:16,20 316:24
318:3 324:2,14,18
326:10,20 337:12
**average** 133:22
134:6 137:2,15,18
139:18 144:1
227:20,21 228:7,8
229:9
**averaged** 227:22
**averages** 22:23 23:4
**aware** 33:1,4 40:2,8
40:12,17,22 48:11

49:4 51:5,9 64:6,16
66:10,14 68:12,17
69:7 72:1 74:8 94:4
94:6 152:9,12
164:10 177:3
193:13 195:14,16
196:9 199:21,24
207:9,11 208:23,24
211:9 212:11
217:18,21 219:6,7
219:19 220:2
224:20 259:2,6
260:6 261:18,23
262:7,11 263:5,7
267:9 325:10

**b**

**b** 224:13 270:10,20
328:11 331:16
**back** 17:7 50:15
61:12,23 62:13 63:7
69:23 85:11 117:20
125:5,8,12,17
134:11 135:22
145:6 149:8 157:23
157:24 158:15
161:3,24 163:7
165:12,16 166:13
167:2 172:14
178:20 182:17
200:15 204:7
210:4 226:24 230:6
230:7 247:8 261:5
287:6 303:24
309:23 311:21
313:12 314:9,9
317:11 325:23
327:7 330:18 339:9
340:8,15
**backed** 67:1
**background** 40:1
153:15 265:15
267:7 272:23
280:21

**backup** 168:22
169:2 230:2,13
235:7
**bad** 250:15
**bank** 11:18 12:5
24:7 150:4,14,22
151:8 155:9 223:5
223:14 225:8
**base** 33:22 34:17
130:22 133:16
162:19 189:6,10
236:4
**based** 21:1 29:16
34:5 45:18,22 52:9
54:2 57:2 63:5
70:20,23 85:17 89:8
92:18 93:20 94:7,21
100:21 102:17
103:22 105:21
115:13 116:1
130:24 133:12
143:23 144:19
161:1 165:4,6
166:20 175:23
190:8 200:1 203:24
208:13 233:7,12,13
234:6 248:7 249:19
255:6 261:1 281:2
296:4 316:7
**basically** 247:19
**basing** 72:13 75:17
164:5 255:21
280:12 309:17
**basis** 77:20 91:21,23
139:6 185:13
186:21 188:3
302:24
**bates** 3:14,20 4:5,9
5:23 6:4,8,13,17,22
7:6,11,16,21 8:6,11
9:9,12,17,21 10:5,9
10:12,18,21 11:4,12
11:15,20 12:6,11,18
12:21 13:5,8,11,14
13:17,20 14:5,9,12

**backup** 168:22
14:20 225:12
**bathroom** 288:7
**bedroom** 234:18
**beginning** 31:2 63:2
69:18 120:16
157:12 210:9
220:20 288:15
**begins** 313:24
**behalf** 2:3,14 15:20
**believe** 31:24 41:18
42:8 48:14 52:6
59:22 83:13 112:20
141:15,16 165:19
206:18 222:16
226:12 232:6
253:13 254:2 266:3
270:3 285:16 298:4
310:24
**beneath** 266:14
279:18 326:13
**benefit** 29:20
**best** 102:11 104:1
143:16 145:12
146:14 160:19
163:12 187:19,24
188:2,5,19 189:3,7
189:18 190:3,16
191:7,17 239:8,12
300:2,3,4 302:11
313:5,17 337:13
**better** 23:4,5 160:3
161:4 243:20 244:1
294:16
**beyond** 58:6 75:11
243:2
**bid** 66:13
**big** 28:22 44:15
55:17 128:15
129:11 165:13
166:3 253:3
**billion** 248:1,7
249:1
**billionaire** 49:5,7,16
252:8

[billions - cases]

billions 49:21
binder 12:4 225:7
bit 55:2 70:2 122:3
  137:17 289:22
black 208:18
boilerplate 237:24
bold 208:3
borders 208:18
borrower 257:17
  258:1
bottom 104:11,12
  240:17 251:22
  265:16 268:21
  273:2 279:14
  308:13 313:3 317:2
bought 75:7 129:20
  135:24 137:9 141:4
  141:8,10,18 145:10
  147:19 151:6
  185:15 186:2,18
  187:4,11 201:18
  203:10 206:11
  266:6,12
bounce 63:7
box 113:12 117:22
  118:6
boy 300:13,16
break 61:13 69:13
  69:24 70:4,10,12
  120:11,20,23 131:4
  131:7 132:19
  133:11 156:23
  209:21,23 210:3
  240:6 288:7,22
  319:16
breaking 131:24
  156:21
brief 155:2
briefly 164:24
bring 319:22
britain 250:8
britain's 247:23
british 12:9
broad 220:9 248:22

broadway 11:18
  223:5,14
broke 121:6,6
broker 180:7 308:17
brokers 46:6 179:22
  309:12,16
brothers 68:22
  155:19,22,24 156:4
  156:7,10,15,16
brought 42:16
bruce 217:10
budgeted 174:6
build 32:16
building 35:22
  109:3 190:9 237:4
  315:24 316:2
buildings 102:7
  294:4,6
built 28:21 115:19
  115:22 116:1
  196:19 231:20
  234:3
bulk 33:15 147:7
  236:17
bullet 57:6 61:3
  90:9 91:4 94:10,14
  94:15 195:3 214:3
  275:17 333:16
bullish 12:9 247:24
bunch 108:12 210:2
business 9:20 202:5
  304:1 324:3
businessmen 247:23
buy 48:15,23 87:21
  129:17 136:4,5,9
  144:7 187:9 262:8
  271:13,24 285:22
buyer 26:6 37:5
  65:1 73:4 75:12,13
  75:17 102:17,22
  128:23 129:17
  151:7,11 152:10
  162:16 186:14,17
  302:15 308:17

buyers 9:4 36:1,4,8
  36:8,10,11,14,17,19
  72:21 73:19 75:22
  76:13,16,21 77:3
  117:2 180:2 198:2
  307:21 308:2
buying 102:23
buys 75:20,20
  146:22 163:6 184:4

c

c 328:10 330:2 341:3
calculate 97:11,17
  97:19 111:10
  144:24 300:3 316:8
  317:21
calculated 124:21
  126:23 199:24
calculates 96:23
  97:5,8
calculating 97:1
  277:17
calculation 123:18
  126:6,9,23 127:11
  128:9 298:19 299:8
calculations 126:22
  305:20
calculator 121:20
  121:23 122:5 234:5
calendar 10:17
  273:12
call 42:6 43:11
  53:22 55:15 101:9
  128:17 130:16
  274:12,13 278:20
  282:12 307:16
called 106:6 117:23
  130:11 133:19
  186:11
calls 58:6 281:17
  282:22
canada 251:1
canadian 250:19
cap 114:24 296:15

capital 1:6 74:10
  143:6 201:7,13
  267:2 269:11
  274:15
capitalization 95:1
  114:8,16,18,23
  117:8 130:4,13
  149:9 165:3 171:13
  173:10 296:10,11
  296:14,18,19
  297:10 298:2
  315:11 317:5
caption 15:8
care 61:16 173:4
  174:2 175:18
  241:20
career 180:24
  316:17
careful 67:21
carrying 263:13
case 1:8 15:8 20:19
  27:15,21 28:9,10
  36:10,15 37:15,16
  38:6,15 40:1,3,9,23
  42:5 43:20 55:4,23
  59:17 66:9 84:16,21
  94:22 98:18 100:8
  106:6 109:12
  116:21 121:3
  130:15 157:21
  161:23 169:23
  185:16 191:3
  199:22 239:3 243:6
  243:8 245:2 254:8
  254:11,17 255:1,10
  255:16,17,21
  265:15 267:7 294:1
  302:3 306:3 314:15
  315:21 318:14
  326:17 328:5 332:9
  332:19 333:14
  341:23 343:3 344:3
cases 55:1 226:19
  231:3,4

casey 303:4
cash 20:24 21:2,4
27:11 44:7,10 53:3
53:19 54:2 62:5
94:17 114:19 115:3
117:17 121:14
128:21 142:11
144:13 145:1,6
258:10,21 277:8
292:7 293:9,13,17
296:12,20,21
297:15,21 301:2
316:2,6 317:23
334:22,24 335:16
335:17,23 336:4,7
336:11,18 337:17
339:14
catch 337:23
categories 123:24
category 124:6
248:22
cause 51:19 52:22
cbre 147:5
center 316:1
central 28:22 30:5
30:17 145:15,24
146:3 166:6 302:9
certain 159:8
certainly 20:9 34:8
65:7 86:4 108:6
160:17,20 204:7
232:24 243:16
301:8 323:12
certificate 344:11
certification 60:23
221:7 343:1 344:1
certifications 56:15
certified 18:9,15,16
certify 321:22
challenges 186:23
186:24
challenging 20:17
chance 45:14 153:16
198:24 202:11
257:11

change 75:8 78:14
162:24 171:1,5,6
339:17,21 340:1,6
344:8 345:3
changes 171:8 343:7
344:7,9
characteristics
227:19
characterization
127:9,18 128:5
252:19
characterize 301:13
301:14,15
charge 40:19
chart 123:14
chase 283:14
check 126:21 293:8
293:12,20 299:1,2
299:16,22
checked 338:18
checking 298:10,11
checklist 11:18
224:6,12
chicago 1:19 2:9
9:20 11:10 12:10
14:20 15:7 31:8
34:10 35:16 39:2
47:19,19,21 50:8,24
63:5 119:3 135:14
158:5,9,20 163:2
172:1 195:23 202:5
202:22 232:12,15
234:23 235:3,17
248:2 249:15 251:6
252:3,13,23 287:1
287:24 315:8 341:7
chicago's 248:14
285:20
choose 35:3 38:13
143:15 146:8
choosing 227:23
chris 303:4
chunk 55:18
circulated 38:18

circumstance 78:20
129:13 317:9
circumstances
82:23 170:2 323:16
cite 28:16 227:2
cited 311:23 312:17
312:23 313:1
cities 315:3,4,5
citing 131:10
city 1:18 27:22 29:6
31:8 44:6,14 47:19
47:19,21 50:7,19,24
123:15,20 158:5,9
158:12,20 159:1
160:13 161:3,21
162:1,2,13,18,22
163:1,7,14,16,18,23
164:8,11 166:12
172:15,18 173:3,6
174:2,19 189:5
195:23 202:22
232:12,14 234:22
235:3,17 241:7,22
241:24 242:4,5,16
279:8 283:12 301:6
341:7
city's 50:8
civil 1:15 343:5
344:5
clarify 114:4 117:21
174:5 177:14 185:7
274:11 315:22
333:6
clark 4:13,18 5:5,10
5:18 9:9 11:10
12:16 64:10 68:13
148:5 156:13
171:23 205:7,9,11
205:14 228:15
229:12,19 230:1
309:8 325:1,6,17
331:22
class 199:4 201:5,10
201:13,18 270:10
270:20

classes 323:10
clean 16:8 121:18
124:1
clear 70:16 72:13
73:6 102:14 131:9
175:20 187:3
264:10 297:24
317:24 329:6
clearly 84:9 226:16
235:21 271:7 294:7
296:21 330:7 331:1
clerical 322:16
client 20:6,10
265:10 287:15
290:8
client's 289:24
clip 262:19
close 35:12 67:19
156:11 192:2
215:10,12,20,23
216:2,9 250:18
251:5,12
closed 66:18 67:15
67:17 69:3,6,11
78:12 103:23
105:21 108:14,18
108:21,24 212:19
213:3 215:5,7,19
216:10,14 225:21
225:24 262:3
closing 11:18 12:4
224:6 225:7
code 57:10,15 58:14
58:16,21
coincidence 130:1
collapse 220:16
collateral 12:21
259:5,22
colleague 199:21
272:21
colleagues 298:9
collect 134:4
collection 186:11
187:4 298:21
299:11

[column - confidential]

column 97:23 123:17 299:8 312:5 313:23 314:5
combination 30:11 30:17 178:20
combined 93:16 94:17
come 44:2 61:12 78:9 122:16 123:20 125:2 142:15 149:8 163:7 180:19 188:15 200:15 210:4 227:17 240:22 275:6 283:13 309:23 336:19
comes 126:4 127:11 128:22 140:20 142:6 298:20 299:9
comfortable 94:1
coming 102:19 118:24 166:22 309:22
command 104:21
commanding 239:10
commencing 1:19 341:8
commercial 14:15 85:18 86:1 185:16 188:21 190:5,10 236:8 239:15 248:18,20
commission 173:15 331:17 343:19 344:25 345:25
commissioned 29:5 31:7 166:12
commit 331:16
common 205:20 234:12,13 294:2
commonly 89:24
company 75:14,20 75:22 178:3 251:7,8 265:18 283:20

comparable 103:13 184:24 185:14,24 187:18,21 188:5 191:14,16 227:2 314:21
compare 26:22 33:24 35:5 116:23 118:17 129:15 233:12 294:22 300:10 318:20
compared 98:12
comparing 27:1
comparison 26:24 114:3,6,11 117:5,13 117:16,23 118:1,7,9 118:14 124:1 127:15,16,22 128:11,13 129:1,5,9 139:8 166:4 185:13 186:22 187:13 234:19 250:14 292:10,13,15,20 293:7,15 294:13,17 295:9,14,23 314:1 314:15 316:20 317:4 318:9 327:5 327:19 328:18 329:4,11,19,22 335:10,13,19 336:14
comparisons 231:7
compensate 145:4
compensated 142:17
competency 320:22
compile 134:5
complete 11:8 136:1 221:2 248:1 341:15
completed 28:19 174:10 253:14 327:16,18
completely 65:22
compliance 333:22
complied 329:17

comply 321:24 322:3
component 160:18 188:11
components 118:12 320:17 321:7
composed 18:2
compounding 338:23
comprehensive 163:19
comprising 275:20
computer 287:11
concept 44:15 249:14 313:5,14
concepts 304:19
concerned 85:8
concerning 194:14 194:23 334:22
concerns 51:19
conclude 29:24 69:10 78:2 79:10 85:6 102:10 105:12 119:10,16,24 145:11 204:5 329:14
concluded 74:21 77:11 128:1 187:21 188:20 236:1 269:14 310:22 340:23
concludes 111:15 340:19
concluding 310:18
conclusion 33:22 61:22 63:23 64:2,21 66:15 70:17,18,19 70:22 77:21 78:10 81:15 104:3,8 113:20,23 114:2 115:10 130:22 131:1 172:13 173:5 175:21 188:18 189:23 190:2,4 203:24 221:8

222:13,14 236:4 239:19 245:9 277:1 280:13 298:15,18 306:2 313:18 317:8 327:2 335:24 336:2 336:5,9,13 339:18
conclusions 33:23 34:4 45:18,21 51:21 57:7 60:1,3 62:19 72:14 77:16 79:23 80:13 88:2,8 90:17 90:19 95:7 113:13 197:16 208:22 222:22 226:14 233:12,13 253:17 255:16,17,21 283:23 293:8 305:24 308:13 317:7 333:21 334:2 339:15,24 340:1,5,6
condensed 6:11
condition 144:19 223:13
conditions 237:19 237:22
condo 7:6,11,16 8:11 9:17 90:23 91:16,20 106:20 108:18 109:2 185:3 186:5 192:9
condominium 182:20 183:1,5
condos 88:23 91:14 109:16
conduct 302:4 329:18
conducted 105:20
conducting 196:11
conference 274:13
confers 58:4
confident 78:9 222:21
confidential 3:15,19 4:5,9 11:5,12 13:12 193:9

[configurations - correct]                                                    Page 12

**configurations**
65:22
**confirm** 43:14,19
44:2,4,10 275:3,11
308:20
**confirmed** 44:12,21
71:2 72:18 275:7
**confirming** 223:16
275:23
**conflict** 226:20
**conflicting** 231:14
232:7
**conform** 58:20 59:4
**conformity** 57:8
322:5
**confused** 53:17
**conjunction** 263:8
292:10
**connected** 242:1,8
245:10
**connections** 164:11
**connects** 245:19
**consider** 23:6 83:1
105:18 180:9
196:13 197:7
208:20 211:6 212:9
219:4 223:19 259:7
260:8,21,24 263:1
264:15 272:17
303:11 331:21
332:1
**considerably** 140:19
159:13 276:21
306:9
**consideration**
103:15,17
**considered** 30:24
37:24 38:4,9,23
76:12,15,20 77:2
80:1,3 151:19 153:6
176:19 180:10
205:13 209:1,2
212:16,18 219:23
221:15 247:4
285:19 332:4

**consist** 236:8
**consistency** 317:6
317:10
**consistent** 154:19,23
172:18 188:1,22
189:3 190:6 239:12
338:9
**consistently** 88:13
**consisting** 207:24
262:22
**consists** 53:15
320:16
**constructed** 230:22
**construction** 6:21
7:20 101:21 166:21
**consulted** 178:17,23
179:1 250:3 311:24
**contact** 276:13
278:1
**contain** 238:13,16
330:20 332:14
**contained** 5:19 26:5
45:17 56:17 329:14
**contains** 87:7,10
328:12
**contaminated**
176:23
**contemplates** 192:8
**contemporaneous**
66:10
**contents** 321:3
**context** 52:3 54:13
89:7 220:4 337:14
**contingencies** 26:15
**continue** 203:2
**continued** 4:1 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
63:4
**continuous** 301:6
**contract** 214:6,14
**contradict** 205:2
**contradicted** 51:20
**contradicts** 204:19

**contribution** 201:8
**contributions**
201:13
**control** 48:12 68:9
251:7
**controlled** 205:6,8
205:11
**controlling** 205:14
**conversation** 41:15
42:4,20 45:24 47:24
50:18 72:10 240:24
242:3,20 265:14
267:12 268:1
**conversations** 44:24
45:8,17,22 46:2,6,8
46:21 50:23 71:2
146:19 235:9
**convey** 75:18,19
**convince** 256:16,21
**cook** 1:19 11:10
341:7
**coordinate** 180:6
**coordinating** 179:21
**copies** 131:4 235:9
235:10,10 311:14
**copy** 131:21 158:14
254:19 259:16
268:22 283:14
320:10 341:21
**copying** 86:19
**corner** 4:12,17 5:4,9
5:18 11:9 12:15
**corporation** 217:3
**correct** 20:16 21:20
27:9 30:6 31:8,17
31:22,23,24 32:3,19
32:23 34:15 37:3
39:19 40:4 47:8,10
48:13,14,16 49:14
49:15,17,22 51:1
52:16 54:5,11 56:18
56:24 57:3,3 58:18
58:21,22 59:8 60:5
60:6,8 62:2,5,6
63:11 64:4,11,14,18

70:14 72:23 80:10
81:10 82:11,17
87:11,15,23 88:2,5
88:8,14,15 89:16
90:5,14,18 91:8,14
91:17,23,24 92:2,15
94:18,22,23 95:1,9
96:21,22,24 97:9
98:3,13 99:20,24
100:1 103:2,3,7,8
104:9 105:6,7,9
106:21 111:16
112:22 113:3,15,18
113:24 114:1,12,13
114:16,17,20,21
115:4,5 117:23,24
120:1,2,4,5,8,9
121:8,9 124:22,23
127:2,7 128:3,6
129:19 133:13,14
135:5,9,10 137:6,7
138:2,9,10 139:1,22
140:13,22 141:5,11
141:14,15,24
143:22 144:3,7
145:22 148:22
149:1,2 150:10
152:22 155:6,9,10
155:13,15,17,19,22
156:2,11 158:6
159:5,6,9,13,17
160:6,14 164:11,22
165:5 170:23
176:24 182:11
184:1 187:6 190:24
191:8,19,20 192:9
192:20 199:10,11
199:15 202:9,10,15
202:16 204:22
213:7,9 216:3,9,14
217:3,9,13 218:3,4
218:20,21,22 219:2
219:3 226:11,12
228:1,11,16,17,19
228:20,24 229:1,3,4

[correct - decide]                                                          Page 13

229:15,22 231:14
232:3 233:19,24
234:1 236:2 237:8
237:14,19 239:3,6,7
243:2,3,11,12,22
244:17 245:6,11,14
245:16,20 246:10
246:14,15 247:2,5
247:10,13,14,15,17
248:18,19 251:12
254:12,13 255:7,11
256:2,10,13,14,17
256:18,22 258:1,2
264:11 266:15,16
266:19,20 267:10
267:15 270:5 275:1
276:3,4,7,17,22
277:6,12 278:6,7
279:5,15 280:14,23
284:17 285:20,23
289:3,4,7,8,20
290:24 292:2,4,18
292:24 293:1 297:1
297:5 300:8 302:22
303:21 304:4,8
305:1 309:5,6,9,10
310:8,10 317:13,18
317:23 319:1
320:24 321:10,11
321:13,16,19,20,22
321:23 322:1,2,7,11
325:21,22 326:4,5,7
326:11,21,22 327:2
327:20,23,24 328:8
328:9,14,15 330:8
332:12,13,17,18
333:5,19,22,23
334:10,16,22 335:2
335:6,7 336:11
339:6,24 340:5
**corrections** 344:17
**correlation** 32:15
137:19 241:17
**cost** 104:19 113:24
173:20 174:6,7

175:18 240:17
241:17,23 274:16
292:23 293:3,6,24
294:3,5,7 316:20,21
317:4
**costar** 314:24
**costs** 173:2 177:3
178:19 179:2 241:8
242:1,8 274:18
**counsel** 16:17 70:1
70:21 202:18
336:23 341:23
**counselors** 221:4
**count** 56:4
**country** 135:12
**county** 1:19 11:11
341:3,7 343:10
344:15
**couple** 17:20,21
165:17 234:8
**course** 17:24 122:6
180:23 277:7
316:16 317:16
324:3
**court** 1:1,16 15:11
15:16 16:11 153:11
206:20 253:22
343:7
**cover** 183:13
**covers** 59:1 207:22
**crain's** 9:20 202:4
**create** 104:23
**created** 51:4,6,10
207:5
**credibility** 60:19
61:6,9 312:12
**criteria** 35:1,24 47:6
245:19
**critical** 35:9 43:18
221:21 306:24
308:15
**critically** 313:11
**crosses** 312:10
**crr** 1:15 341:6 342:5

**csr** 1:14 341:6 342:5
**curiosity** 85:5
**current** 47:8,13
83:19 85:15,19,20
86:2 88:17,22
132:17 161:1
166:21 203:6 324:5
**currently** 152:16
153:4 160:5,5
204:20 326:2
**custom** 77:14,19
271:4
**cut** 268:22
**cv** 1:8
**cycle** 306:11
**cycles** 301:20

### d

**d** 1:5 2:15,16 15:8
343:3 344:3
**damage** 266:22
**dan** 272:20
**daniel** 86:19
**darn** 253:3
**dash** 265:18 274:15
274:20 275:18
278:12 283:5
**data** 19:12 20:14,17
20:19,24 21:1 23:6
23:19 27:7,15 28:7
30:22 31:6 34:5
39:1,6,11 51:17
52:4 116:22 117:4
169:19 283:6,9,17
283:23 284:2,6,10
284:12 285:17,20
285:23 286:4
308:21 314:11,14
315:16,20 316:23
318:3 326:20
333:17 334:1,7,12
**databases** 314:23
**date** 15:3 29:21
65:13 71:6 88:9,10
139:16,17 150:2

160:22 204:9
228:21 247:9
251:11 273:3,13
294:19 304:13
305:9,11 324:5
325:8,11 343:3,9,19
344:3,13,25 345:20
345:25
**dated** 4:4,8 5:22
10:8,21 11:4 13:11
13:17,20 14:8,12
218:22 223:8
247:16 310:10
**dates** 85:3 129:14
131:10 171:9
181:22 287:4
295:19
**day** 1:20 24:23 29:1
93:1 108:4,8 161:6
166:8 190:22 222:6
239:17 341:9 342:1
343:16 344:22
345:22
**days** 18:1 79:13
**dcf** 298:5 299:7
337:4,9,11 338:17
**deal** 65:3 67:14,17
67:19 68:9 148:9,12
197:22
**dealing** 190:13
**dearborn** 28:17
30:5,12 145:16
146:2,3 166:4 302:9
**debartolo** 36:19
197:9,12 211:23
212:12 214:7
215:14 216:12,16
279:19
**debt** 272:9
**debts** 260:5 262:24
**december** 228:22
273:4,13
**decide** 33:18 34:21
39:21 171:11

decision 34:17 35:1
48:15,22 162:20
335:5
declarations 232:18
235:10
dedicated 236:1
deed 343:14 344:20
deeds 232:17 235:9
defendants 1:11
2:14 15:21 37:16
define 34:12 75:12
defined 34:9
definitely 24:2
65:24 146:1,12
168:16 284:13
294:11 296:15
299:23
definition 26:5,8,9
76:1 321:9
definitions 244:12
320:21
degree 29:20
demand 29:15,16
32:8,11,16 166:18
166:22 238:11
demanding 138:16
demographics 29:12
32:2 287:2
departing 322:10
department 29:6
44:14 158:12,17,20
164:8 166:13
172:15,18 283:12
departure 82:24
depend 322:23
dependent 255:18
335:18
depending 337:5
depends 60:12
159:14 161:7 170:2
323:15
deponent 341:21
deposed 40:3,9 41:9
deposition 1:13 3:10
4:1 5:1 6:1 7:1 8:1

9:1 10:1 11:1 12:1
13:1 14:1 15:5 17:5
39:13,22 40:22 41:5
55:4 56:7 66:7
70:23 72:8,17,21,24
76:18,24 77:7,10,15
79:3,9 147:4 212:13
219:21 280:10
309:19 312:19
334:14 340:20,22
341:4,20 343:1,3
344:1,3
depositions 1:17
16:6 73:16 78:2
depreciating 304:21
306:14
derive 27:2 122:21
185:1 292:12
295:24 317:8
328:19 329:11
derived 178:12,15
293:5,6
derives 35:10
describe 18:23
28:11 72:9 171:14
179:12 217:6 295:1
295:6 305:8
described 70:24
123:24 140:15
154:20,22 177:4
203:12,14 207:24
208:15 219:1 263:6
325:15
describes 155:18,21
202:8,14 208:6
248:13 339:5
describing 193:22
199:4 305:4,4
description 3:11 4:2
5:2 6:2 7:2 8:2 9:2
10:2 11:2 12:2 13:2
14:2 19:24 56:22
122:14 198:20
designation 18:5
58:5

desirable 172:11
destroying 301:11
detail 327:14
detailed 54:11
101:19
details 67:23 212:14
235:8
determination
103:9 114:14 215:2
233:9
determine 19:11
22:18 23:8 28:8
36:9 114:10 162:8
165:14 231:4 234:6
275:1,3 317:21
determined 26:14
67:1 114:6,8 280:16
determining 27:12
30:23 146:13 304:8
305:20
develop 103:2 138:6
144:3,4,5 146:9
159:8,12,16 167:5
171:21 189:3
190:24 191:8,17
203:2,11 249:14
292:17,20,22
301:17
developed 28:19
29:23 30:9,13,16
31:11,17,19,22
32:12,13,19,20 57:7
92:15 116:5 136:10
145:21 161:14
172:10 180:15
183:4,20 184:10
189:19 190:19,21
192:19 232:2
237:13,16 248:6
300:5,8,11,22 301:2
324:1
developer 23:12,14
30:19 52:7 102:24
103:1,4,10 115:19
116:4,10 138:4

144:2 146:5,8,12,15
146:17 185:17,22
186:1 190:9 242:12
249:12,20 250:13
275:22 276:13
278:1
developers 30:16,18
51:3 135:20 145:18
145:20 183:9 203:8
217:3,12,15 301:3
308:5,6,7 325:2
developing 40:19
102:13 103:5,11
115:12 116:4,11
145:13 189:7 191:4
239:9 242:1 337:13
development 3:14
3:18 5:17 6:7,8,12
6:13,16 7:5,10,15
8:5,10 9:9,16 10:15
11:20 12:6,10,14
13:4 23:11,13,14
27:23 28:17,18,21
28:23 29:1,6 31:14
31:15,16,18 40:15
42:9 43:3,8,18 44:6
44:20 45:10 46:1,23
49:21 51:11 64:11
73:24 76:3,6,9
86:24 87:19 95:23
96:21 99:19 100:21
102:2,6 103:18
105:11 106:7,12,19
107:17 108:2
109:13 110:2,19,23
111:11 112:6,13
115:24 123:4,16
130:16,18 133:19
134:14 135:21
136:7 137:15 141:4
141:8,10 145:15,16
146:5 151:16,17
158:24 160:13,21
160:23 162:10
163:8,13,15 164:3

166:5,7,9 177:8
180:24 183:15
186:19 188:20,22
189:4 190:6,7,10
191:18 192:4,5
193:10,13,14,15
195:1,23 197:10,13
203:1,6 206:11
211:22,23 212:12
213:23 214:8 216:4
216:7 217:12 219:9
223:5,15 225:9
227:20 232:11,15
232:18 234:23
235:4,17,24 236:7
236:20,22 239:13
239:20 248:2,6
252:3,13,23 279:11
330:11,15
**developments** 28:14
39:10 166:2 184:20
185:15 236:8
301:12 315:2
**develops** 184:4
**devoted** 291:5
**dictated** 62:9 123:3
123:15,19
**differed** 98:2
**difference** 49:10
86:8 98:14 117:16
215:13,16 239:18
241:7
**different** 21:3 26:17
28:11 29:12 35:20
46:7 55:3 62:18
64:8 65:21 74:2
85:19 86:2,4 88:1,7
89:1 90:16 116:16
119:1,1 121:7 127:1
130:14 131:10
132:4,4,12 163:11
171:9 173:5 179:22
180:3 181:14
183:14 189:12
201:17 211:4

215:21 222:11,13
227:22 228:3,9,9
237:11 243:14,16
244:12 245:7
278:20 287:4
297:14 301:12
305:13 314:24
316:4 317:3 320:18
339:11
**differentiated**
181:19
**differently** 146:16
**difficult** 63:1
**diligence** 48:8 49:12
50:9 81:17,20
163:20 195:13
222:2
**diminishes** 312:12
**direct** 32:15 241:17
296:11,13,15,18,19
297:11
**direction** 204:8
**directly** 99:15
186:10 231:20
242:8 299:12
**disagree** 127:15
**discern** 329:9
**disclose** 330:8,10
**disclosure** 37:22
**disclosures** 5:15
37:16,20
**discount** 21:14
130:5,6,13,23
133:12 136:12
137:5,17,20,24
142:19 143:1 145:5
170:5,18 277:5,7
339:22,23
**discounted** 20:23
21:2,4 27:11 53:3
53:19 62:5 70:13
81:9 114:19,24
115:3 117:17
121:14 128:21
144:13 165:2 292:7

293:8,13,17 296:12
297:15,21 301:2
316:6 317:22 319:6
334:22,24 335:16
335:17,23 336:3,7
336:11,18 337:17
339:14
**discounts** 25:11
**discuss** 69:24 72:2
108:7 120:23 121:2
152:1 157:17,20
163:2 165:17
175:16 182:19
193:19 195:11
219:12 270:20
297:14,20 298:2
301:22 302:3 304:2
309:3,4,7,11
**discussed** 70:9 80:2
93:17 106:14,18
107:24 110:3
111:22 112:15
154:12 164:24
165:11 174:14
175:14 188:10
192:15 196:14
219:15 226:2
228:12 264:18,21
332:5
**discusses** 71:11,14
71:18 80:13 83:22
133:16 264:3
297:19
**discussing** 70:13
120:21 264:7
272:16
**discussion** 84:1
99:21 115:23
283:11
**discussions** 47:17,18
70:3 158:4 163:18
163:22,23,23
194:12,22 195:7
**disk** 69:19 120:17
157:13 210:10

288:16
**disposing** 176:22
**dissimilar** 304:22
**distinct** 335:15
**distinction** 127:4
128:15
**distribution** 265:9
**distributions** 258:11
258:21
**district** 1:1,2,16
5:17 6:8,12,20 7:4,9
7:14,19 8:4,9 9:15
10:15 11:19 12:5,14
15:10,11 40:15 42:9
43:3,8 45:10 46:1
46:22 73:24 76:3,6
76:9 86:24 95:23
96:20 99:19 105:11
108:2 110:2,19,22
112:12 141:8,10
151:16,17 177:8
192:5 193:15 195:1
195:22 206:11
211:22 213:23
216:5,7 219:9 223:5
223:15 225:8
**diversified** 217:3,12
217:16
**divide** 203:7,11
**division** 1:3 15:12
**document** 6:15 19:8
19:11 61:1 95:6
96:15 99:12,16,19
100:10,11,15
101:24 104:23
106:5,11,14 107:7,9
107:12 109:12,21
109:24 110:11
112:11 134:13
153:19 154:1,8
176:16 177:11
192:12,15,18 193:7
193:22 198:13,19
200:22 201:1 202:4
202:14 207:4 212:9

[document - errors]

212:15,16,21 213:9
213:10,21 219:4,6
223:19,21,22 224:2
247:1,4 253:9
258:24 259:7
262:21 263:4,6
264:15 268:7,11
310:17 319:10
327:9
documentation 17:8
168:22 169:2
174:22 175:1,5
177:12,23 235:7,21
333:18 334:1,7
documented 312:11
documents 18:19,22
19:10,15,17 20:10
21:19,23,24 22:17
27:6 37:24 38:4,8
45:23 98:2 106:12
168:23 179:21,24
180:1,2 210:2 226:6
235:16 262:18
310:21
doing 20:23 30:19
49:12 50:13 55:7,10
65:3 90:6 95:13
108:14 129:1 142:7
156:5 171:4,12
184:24 211:10
272:24 273:1 282:5
305:19 316:15
dollar 88:17 178:2
241:6 279:24
dollars 6:22 7:21
49:21 142:21,22
178:7,8,9,10,13,16
181:15,15,15,16
donald 250:9,14
double 126:21
293:20 298:10
doubt 209:3
downtown 35:16
248:2 249:16 301:6

dr 259:24
dramatic 173:7
draper 30:12
draw 245:8 247:21
249:5
drawings 23:16
drive 286:18,22
287:11,21,22
drives 232:23
dropping 306:16
ds3 161:2 163:5,9
ds5 163:5
due 50:9 81:16,20
163:20 222:1
309:22
dues 182:21 183:2
185:3 186:5
duly 16:2 341:10
duration 62:10,19
63:13 304:19
duties 179:20

e

e 2:11,21 5:22 6:4
9:12 13:11 86:18
87:2,8,10 93:8 94:2
94:3 95:16 132:7,9
194:17,23 263:21
281:16 282:1,6,8,11
282:22
earlier 80:2 158:4
165:1 228:13 239:9
274:6,10 290:11
292:7 300:2 320:13
325:14 339:10
early 220:20 265:14
earn 103:10
easier 122:11
easiest 144:12
easily 196:22 252:2
252:23
east 1:18 2:7 15:6
250:8 341:6
eastern 1:3 15:11

economic 220:15
economy 62:24
247:24
ed 155:16 334:15
edification 238:7
294:24
edition 14:24
edward 39:14
effect 48:2 162:3
340:4
effective 82:6
148:21 150:2 212:7
294:19 295:19
324:5
effectively 65:2
103:12
effects 338:23
efficient 289:19
efficiently 319:16
effort 33:7,12
222:22 235:22
efforts 33:1 43:16
235:16 314:20
ego 253:3
eight 167:20 169:12
either 46:15 146:3
147:7 203:14
271:19 283:11
293:2 299:22
elected 329:10
elements 27:10
else's 270:1 284:9,14
emphasis 108:10
employment 287:2
empty 179:17 180:7
enable 328:13
329:15
encompass 248:23
248:23
ended 287:19
ends 299:24
engineer 178:18,22
engineering 194:18
194:23

entered 196:24
197:9,13 344:9
entering 209:4
entire 25:4 31:14
36:4 42:17 53:9,15
53:18 118:10
134:13 136:4
171:24 187:4
292:19 313:16
329:11,19 343:5
344:5
entirely 146:4
254:23 316:7
entities 73:21
195:14,17 201:12
201:18 267:14
entitlement 159:11
159:24 160:3,6
162:13,17
entitlements 158:21
158:23 161:10
162:23 163:3,24
230:5
entity 74:9 75:7,20
136:1 244:11
entries 291:8
environmental
43:24 174:7 175:9
175:11,15,17 176:7
176:8 177:2,17,20
178:18,22 181:16
182:18 274:15,18
epi 178:3 181:12
equal 170:7,14
245:6 317:11
equals 272:9
equities 94:1,4
eric 86:19
errata 344:7,10,18
345:1
error 322:16,17
323:14 331:17,22
errors 298:6,12
338:18,24

escalated 181:21
escalation 88:5
escalations 88:10
essentially 242:14
  247:12 309:21
  317:9 318:24
estate 4:14,19 5:6,11
  8:14,17,20 9:5
  10:12 12:16 14:16
  35:8 49:21 50:4
  55:11,19,20 56:23
  63:3 82:5 85:18
  86:1 130:10,11
  133:8 135:3,8,14
  138:1 143:5 156:7
  197:1,8,13 202:22
  207:10 211:21
  213:6 220:7 248:2,6
  250:13,19,24 252:8
  254:1 289:5 304:1
  304:18,24 314:2
  338:9,10
estimate 100:20
  101:20 105:16
  119:17,21 165:6
  170:20 176:22
  178:6,7,13 181:13
  222:10,12 228:4
  245:15 276:16
  300:14 305:8,16
  318:17 333:8
estimated 98:1
  115:13 119:11
  222:8 240:19
  274:16 276:9,12
  278:2 292:14 306:4
  336:12
estimates 6:21 7:20
  87:21 94:8 250:18
estimating 245:9
  294:5 335:20
estimation 176:7
et 5:23 15:9,10
ethical 58:8

ethics 57:11,16 58:5
  58:14 320:21
evaluate 88:17
evaluated 186:1
evaluating 198:1
  205:16,18
evaluation 14:19
  310:5,13
events 337:6
everybody 135:3
evidence 163:12
  167:4 277:21 302:8
  302:11
evident 235:19
  297:16
exact 66:11 83:9
  284:7 316:17,17
exactly 27:20 68:3
  68:10 70:16 72:7
  102:16 106:24
  125:14 140:14
  172:16 229:6 243:7
  305:7 319:14
examination 3:5
  16:3
examined 313:8,11
  341:11
examining 102:12
example 60:22
  61:11 186:9,21
  187:1 307:10
examples 60:20
  180:19 302:10
  316:11
exceed 289:10
exceeds 214:11
excel 6:20 7:4,9,14
  7:19 8:4,9 9:15
  54:11 101:19
exception 320:23
exceptions 322:13
excess 64:18 216:8
  216:13 267:17
exchange 261:21
  262:23

excluded 61:3
exclusively 34:6,7
  204:7 233:2 234:20
  236:12
excuse 27:6 38:10
  42:3 59:10 80:8
  115:2 122:8 139:4
  148:20 151:14
  156:15 165:2 200:6
  202:9 206:12
  224:19 227:5
  260:18 293:3
  306:10 328:10
  333:1
executed 344:10
execution 343:14
  344:19
executive 217:11
exhaustive 20:3
exhibit 3:12,17,22
  4:3,7,11,16 5:3,8,13
  5:16,21 6:3,6,10,14
  6:19 7:3,8,13,18 8:3
  8:8,13,16,19 9:3,7
  9:11,14,19 10:3,7
  10:11,14,20 11:3,7
  11:14,17 12:3,8,13
  12:20 13:3,7,10,13
  13:16,19 14:3,7,11
  14:14,18,22 37:8,8
  37:9,9,10,22 56:11
  61:21 63:20 82:1,5
  84:13,15,20 85:6,11
  85:13,13 86:10,11
  86:17 93:3,4,8
  96:10,11,15 98:15
  98:17,22 99:3,6,10
  100:2,3 101:5,8,11
  101:12,16 104:7
  105:24 106:1,5
  107:2,3,7 108:1,16
  109:7,11 110:1,4,6
  110:7,11,17,21,24
  111:2,3,6,19,22
  112:2,3,6,15,19

113:5,5 131:5 133:3
  133:7 153:8,14
  156:20 157:24
  176:1,5 181:11
  191:22 192:4 193:1
  193:3,6 197:18
  198:5 200:14,16,19
  201:24 202:1
  204:18 206:7,15
  207:24 208:10,13
  208:16 209:10,18
  210:12,16 211:6,14
  211:18 213:17,18
  216:17,19,23 218:5
  218:7,11 220:5,23
  222:15 223:1 224:3
  224:20,23 225:1,5
  246:17,22 253:12
  253:19 254:1,7
  257:2,5 259:12
  260:10,11,14 261:7
  261:14 262:5,15
  263:17,20 264:17
  264:18,22,23 265:3
  269:17,18,22
  273:15,16,20 286:6
  286:9 288:18,22
  290:17,18,22 292:5
  295:2 302:17,20
  309:24 310:1,4
  311:22 320:5,9
  325:15
exhibits 3:10 4:1 5:1
  6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1 14:1
  37:13,14 132:20
  149:12
exist 129:7 186:7
existence 162:2
exists 102:21 156:1
  190:17 316:2
expect 80:6,14,20
  81:12 103:10
  116:10 135:7
  138:13,24 140:21

141:17 142:22
143:14 154:6
300:18
**expected** 22:13 44:3
98:21 99:1,11
100:10 101:23
106:10 107:11
109:20 110:17
111:18 112:10
115:11 141:19,21
153:24 192:11
206:10 275:12
**expects** 144:10
**expense** 43:23 44:3
180:18,21 183:13
183:22 184:11
275:12 287:15
**expenses** 21:7,9
22:16,18,22 23:2
90:3 173:9,9 174:15
182:2,8,8,11 185:18
186:19 338:24
**experience** 22:24
25:19 52:10 166:1
221:24
**expert** 16:21 34:4
37:15 54:7,20 55:5
55:14,23 56:2 59:5
77:20 271:5 312:10
**expertise** 50:4
**experts** 38:16
266:22
**expiration** 343:19
344:25 345:25
**expired** 160:8,24
**explain** 86:7 179:10
294:16 296:3,17
299:16 304:6
**explained** 339:7
**explains** 94:21
**explanatory** 56:20
**explicitly** 296:1
**exposed** 304:12
309:15,18 310:18
310:22

**exposure** 303:20
304:3,7,11 305:3,6
305:7,9,20,23,24
306:3
**expressed** 107:20
**extend** 223:14
**extended** 30:1
**extensions** 174:16
241:19
**extent** 222:1 241:22
**extremely** 301:16

**f**

**f** 258:5,15,16 286:18
286:22 287:10,21
287:22
**facsimile** 4:4,8 10:8
210:17
**fact** 33:23 37:18
38:3 43:20 44:3
47:10 65:5 67:5
80:2 84:10 88:13
108:12 155:21
156:13 162:9
174:14 175:17
185:8 186:6 196:5
196:10,17,18
197:12 226:16
236:14 241:7
243:13 245:18
255:14 260:24
275:11 276:5
279:13 285:22
296:23 298:22
309:20 312:16
319:3 325:3 328:7
**factor** 65:10 80:1,3
81:21 230:18
**factored** 173:4
**factors** 165:9
**facts** 56:17,20 57:1
72:14,17 154:19
252:19
**failed** 333:24

**failing** 331:20
**fails** 58:19
**fair** 62:7 147:17
199:12 200:7
219:20 220:1
294:18
**fairly** 54:10
**falling** 220:15,17
**fame** 250:8
**familiar** 16:8 65:23
104:16 217:15
320:14
**far** 20:1 62:18 97:23
119:11,14,22 120:1
120:8 122:22,22,24
123:7,10,11,19,20
123:23,23 124:6,21
125:1,21,21 126:6,7
126:15,23 127:2
128:2,14 186:14,15
187:12 297:8
298:20 299:9,10,12
**faster** 170:15,19
262:18
**february** 4:8 5:7
12:10 14:8 150:9
223:8 247:10,14,16
253:1 262:7,8 272:4
272:5
**federal** 1:15
**fee** 25:4,6,8,10
275:14
**feel** 52:21
**fees** 179:14 180:11
181:3 183:5
**feet** 116:18 121:11
124:9 125:22 126:6
126:15 171:22
186:13 227:14
233:23,23 234:14
236:6,17 237:16
238:9,14,17,22,24
239:21 240:3
330:21 331:2

**felt** 175:7
**field** 256:2,4,6
**figure** 44:1 78:6
122:3 129:5 144:23
174:20,23 175:2,6
175:21 177:13,15
181:21 182:4
240:23 268:3
298:19 300:16
**figures** 121:17
**file** 42:14,17 50:22
71:17,23,24 84:19
131:1 132:7 168:19
169:4 181:5,8 205:4
230:2,13 234:21
235:6,12,15 247:2
250:4 253:10,15
254:7,20,23 269:4
271:8 275:13
284:18 285:1,3,6,8
285:9,10,12,15
299:5,19,22 311:6
325:15 326:12
327:20,22 332:12
332:14,22 333:17
334:11,12 339:5
**filed** 68:18
**files** 17:7 85:3 132:3
132:12
**final** 29:8 31:20
113:1 117:6 166:14
276:24 291:11
293:8 333:13
**finally** 28:19
**financial** 51:12
55:16 59:2,3,5,8
98:23 99:13 100:11
100:15 102:1
106:11 107:12
109:22 110:18
111:20 112:12
153:23 154:3
192:12 257:18,23
**financing** 94:5
174:18

**[find - four]**

**find** 19:23 42:13
50:12,23 79:9,14
128:23 131:6,20
196:21 230:11
**finding** 230:12
294:17
**fine** 61:18 122:4
131:8 132:2 156:24
231:1 257:22
**finish** 58:2 115:2
335:15
**fired** 82:21
**firm** 54:21 82:10,14
82:16,19,22 83:5
84:5 204:3 207:10
222:1 244:22 256:5
282:4,14 288:4
302:23
**firms** 38:13,14
221:20 250:19
285:20
**first** 3:13 9:5 10:17
16:2 28:13 29:21
30:3 37:21 42:22
43:2,5 44:17,20
56:16 57:18,23
62:11 63:24 87:6,18
89:15 94:20 104:7
130:4 131:6,18
132:15,16 153:16
153:17,18,22 158:3
172:7 173:14
177:14 187:15
194:7 198:19
213:22 227:5,6
228:6,14,14 243:2
247:7,7,21,22
249:10,11 265:8,17
266:2 270:9 275:6
275:22 277:19
290:4 303:18,18,24
317:16,16 323:20
341:10
**fits** 243:8

**five** 17:24 57:5
168:5 169:6 271:17
276:13,16,19,21
277:1,11,18,24
278:2 339:12
**fixed** 289:6
**floor** 116:17 119:15
119:18 229:3
230:17 232:22
233:3,22
**flow** 20:24 21:2,4
27:11 53:3,19 62:5
114:19 115:3
117:17 121:14
128:21 144:14
258:11,21 277:8
292:8 293:9,13,17
296:12,21 297:15
297:21 301:2 316:2
316:6 317:23
334:22,24 335:16
335:18,23 336:4,7
336:11,18 337:17
339:14
**flows** 54:2 94:17
142:11 145:1,6
296:21
**fluctuations** 62:17
62:22
**focus** 34:8 215:18
232:21 233:2
234:19
**focused** 31:12
**focusing** 234:15
**folks** 38:18 42:8
46:3,22 158:11
164:8
**follow** 25:22 57:20
58:9,11,16,21 101:2
322:4
**following** 94:17
194:3,4
**follows** 16:2 60:12
**foot** 89:18 90:14,18
90:20,22 91:17,21

91:23 92:1,5 93:21
93:22 94:22 95:8
106:20 109:17
119:11,17,22 120:1
120:4,8 121:12
123:8 124:22 125:1
125:21 126:7,15
128:2,14 140:20
186:15 187:7,12
192:8 227:11 229:2
229:3,12,19 234:10
298:20 299:9,10,12
**footage** 121:16
122:9,23 123:9,10
123:18,20 124:21
139:6 229:5,6,7,13
229:20 233:13
234:6
**footnoted** 227:18
**force** 163:6
**forced** 309:22
**forecasted** 22:21
**foregoing** 341:4,14
343:13 344:18
**foresee** 203:2
**forgave** 261:19
**forgive** 271:21
**forgiveness** 272:10
**form** 54:5,12 128:4
129:22,22 140:16
140:23 141:6
143:17,17 154:2
189:21 191:10
261:10 276:23
277:13 284:9
297:12 314:16
339:16
**forma** 6:7,11 7:5,10
7:15 8:5,10 9:16
22:2,4,5,20,21 23:3
23:8 52:8,11,18,24
53:6,9,18,21,22
54:5,8 87:19 88:21
89:8,11,12 90:10
91:13 93:16 94:21

96:7,9,17 98:12
99:9 102:7 103:22
105:10 106:6,7,20
107:17 109:13
111:6,11 112:7
192:5 264:8,9
**formal** 291:16
**formas** 51:4,6,10
54:10,18 87:3,4,7
87:11,13,14 88:16
90:6 92:14,18,21
93:9 94:7 95:23
96:3,8 103:18
141:23 142:3
264:11 290:12,15
296:5
**format** 231:2
**forming** 43:4 154:9
284:14
**forth** 321:9
**forward** 29:16
158:22 198:11
291:16 305:15
**forwarded** 176:12
**found** 43:12 337:18
**foundation** 48:17
49:9 57:10 59:11
60:9 92:16 94:12
95:2,10 100:23,24
104:22 105:14
108:11 142:1 155:1
159:18 191:1
199:17 244:4 246:2
249:22,23 251:13
252:15 261:11
270:15
**four** 17:24 27:16
28:10 38:5 42:1
57:5 61:24 62:4,9
62:19,20 85:2 132:1
160:20 165:13,24
168:8 239:5 271:17
291:24 308:12
318:17 326:17

**fourth** 8:20 250:17
**fp** 12:22 13:5,8
**fractional** 24:18
  25:12
**free** 343:14 344:20
**freeborn** 260:19
**front** 63:21 171:18
  174:11
**frontage** 172:12
**fronts** 33:8 44:16
**fruition** 142:15
**full** 50:22 135:22
  266:11 293:7
  295:24
**fully** 28:21 292:8
  300:5,8,11 313:8
**funded** 173:2
  174:17,19
**funding** 43:16,21
  242:14
**funds** 241:5,17,23
  242:1,7 279:4
**further** 266:21
  271:20 306:23
  340:16
**furthermore** 152:16
  326:1
**future** 300:7 337:6

**g**

**g000232** 11:13
**g005725** 13:12
**g005822** 11:5
**g008012** 4:10
**g013754** 3:15
**g016724** 4:6
**gains** 102:12
**garrett** 218:15
  219:8
**gathered** 72:17
**general** 1:9 15:9
  20:14 21:3 40:12,14
  40:18,19 45:1,4,10
  48:12 62:2 64:9
  74:5,8 76:11 112:22

166:3 203:5 204:3
  206:9 220:14
  223:23 236:5
  254:18 272:22
  289:2 306:19,22
  317:5 322:12
  324:24 325:7 343:3
  344:3
**generally** 16:22
  18:19 26:9 45:9
  47:1 62:10 158:3
  236:11 296:20
  320:20
**generate** 21:20
  22:13 103:5 254:22
  282:1
**generated** 105:10
**generating** 21:24
  84:6
**generic** 286:24
**gentleman** 42:23
  303:3
**gentrifying** 249:15
**getting** 20:6 182:17
  209:7 238:20
**gist** 44:23
**give** 16:10 17:2 76:1
  137:5 141:13
  162:22 169:6
  174:22 181:14
  202:11 234:8 340:7
**given** 16:6 19:12
  68:14 89:3 99:12
  146:15 212:20
  236:13 317:8
**gives** 24:7 121:16
**giving** 251:6 265:15
**glance** 280:7,18,23
  281:3
**gloss** 313:14
**gmh** 5:23 6:4,9,13
  6:17,22 7:6,11,16
  7:21 8:6,11 9:10,12
  9:17 10:5,9,13,18
  10:22 11:15,20 12:7

14:21 68:8,14 74:16
  96:16 98:19,21
  99:11 100:10,17
  101:8,23 105:12
  106:10,15 107:11
  108:1 110:3,17,22
  111:18,23 112:10
  112:16 129:20
  141:4 146:18
  147:13,18 149:3
  153:23 154:13
  155:6 174:21
  175:15,24 176:16
  177:12,16,24 178:7
  181:14 192:11,16
  196:15 198:9 199:9
  202:15,18 205:10
  215:22 216:1,14
  217:23 219:13,16
  224:22 225:13
  226:3 237:3 240:24
  242:7,11,16,19
  243:11,13,21,24
  244:2 245:6,18,22
  245:24 246:5 251:5
  256:19 260:24
  261:19 262:8 266:6
  266:12 267:1,9
  269:9 271:13,21
  290:13 305:6 309:4
  325:16 331:21
**gmh's** 47:18 51:11
  98:18 100:7 106:5
  107:7 109:12
  110:11 111:7 112:7
  243:19 244:7
  245:10,20 251:11
**go** 16:7,18 20:5,7
  21:4 27:10,12 37:14
  49:10 54:14 58:6
  63:4 78:1 81:23
  113:22 121:22
  125:19 130:3
  131:18 142:7
  159:20 161:2

165:12,16,22 169:9
  171:9 173:8 183:19
  184:20 202:12
  203:14 205:17
  210:3 213:7,11,15
  215:3 220:22
  226:17,24 259:10
  277:17 285:22
  287:6 288:9 289:21
  298:9,16 300:17
  302:4,16 319:15
  321:2 325:23
  330:18 339:9 340:8
**goes** 53:12 108:10
  318:2
**going** 16:7 17:7
  29:16,16,18,24
  48:16,22 53:19
  54:12 61:14,15,17
  61:19 127:17
  128:18,22 131:21
  135:22 142:11,12
  144:17,20 145:5
  154:2 158:22 161:4
  161:22 162:19
  163:10,11,20 167:4
  169:9 172:8 174:8
  174:10 175:18
  178:4 183:4,6,20
  184:7,11,13,14
  186:16 190:16,19
  190:20 198:11
  203:20 220:11,14
  226:5 230:23
  236:11,13,15,17
  239:14,15,18 255:6
  258:24 261:10
  262:18 271:12
  272:17 288:8
  301:16,18 304:19
  305:17 306:11,21
  309:23 311:21
  313:3 331:2 339:18
**goldberg** 256:6

| good 16:5 20:21,22 | h | hdp 3:20 | historical 302:7 |
|---|---|---|---|
| 26:18,21 61:13 | | head 16:14 31:5 | history 20:1 28:14 |
| 80:17 116:21 117:4 | haldeman 5:23 | 134:10 135:15 | 30:4 71:11,13 83:20 |
| 156:21 157:16 | 45:13 86:19,23 | 168:17 169:17 | 85:16 149:17 152:2 |
| 250:15 262:17 | 92:22 93:12 95:15 | 226:23 283:19 | 164:7 |
| government 19:1 | 176:13 177:7 | heading 97:4 278:23 | hold 122:1 146:9,23 |
| grade 171:22 | half 157:3 319:13,14 | 281:7 337:4,11 | 187:22 191:5,19 |
| grading 43:24 174:6 | halfway 278:22 | headings 227:10 | holding 1:9 15:10 |
| 177:17,22,24 178:4 | hall 164:11 | hear 255:12 | 145:12 251:7 277:8 |
| 178:19 179:2 | hand 97:23 143:6 | heard 75:24 | holdings 40:13,14 |
| 181:16 274:18 | 154:6 272:13 | heavily 52:5 130:9 | 40:18,20 45:2,4,11 |
| gradually 183:9 | handed 82:4 86:16 | heightened 58:16 | 48:12 64:10 74:6,9 |
| 184:14 | 93:7 96:14 101:15 | held 15:5 150:3 | 76:12 206:9 223:23 |
| great 108:5 186:9,21 | 106:4 107:6 109:10 | 189:20 | 257:15,16 258:4,7 |
| 186:21 187:1 318:8 | 110:10 133:6 | help 43:16 44:8 | 258:12 259:23 |
| 318:14 | 153:13 176:4 192:3 | 121:20 122:5 | 289:2 325:1,7 |
| greenstone 1:5 | 192:24 200:18 | 318:17 | home 263:14 |
| greg 1:14 15:16 | 206:18 210:15 | helps 321:5 | honestly 42:12 47:5 |
| 341:5 342:5 | 211:17 216:22 | hereinabove 341:18 | 95:11 243:7 265:23 |
| gross 97:6,11,14,19 | 218:10 225:4 | heritage 3:14,18 | 267:22 275:9 |
| 98:8 | 246:21 257:4 | 6:16 13:4 193:10,13 | hopefully 259:11 |
| ground 16:7 | 259:15 260:13 | 194:3 198:8,15 | 319:19 |
| grounds 100:24 | 261:13 262:21 | 199:5 200:1,2,5,8 | horizon 143:16 |
| group 6:8,12 10:4 | 263:20 265:2 | 201:2,18 | 170:20 301:19 |
| 18:6 36:20 38:22 | 269:21 273:19 | heritage's 100:21 | host 67:10 179:20 |
| 39:1,11 55:12 69:4 | 288:22 290:21 | 199:14 | 215:20 |
| 195:3,8 207:5,7 | 320:8 | high 55:19 88:11 | hotel 236:9 |
| 209:4,15 211:10 | handing 253:24 | 141:24 182:14 | hour 42:1 61:14 |
| 214:8 | hands 100:21 | 256:22 | 157:4 319:13,14 |
| grow 203:2 | handwriting 265:6 | higher 137:20 | hours 17:20,21 18:1 |
| growth 203:1 | 270:1,3 271:15 | 241:12,23 276:21 | 292:2 |
| guess 26:16,20 | handwritten 13:14 | highest 102:10 | huge 63:2 160:17 |
| 75:13 87:12,16 | 13:17,20 14:4 | 143:16 145:11 | huh 86:21 130:2 |
| 122:10 123:5 140:7 | happen 28:6 142:16 | 160:19 187:19,24 | 276:15 |
| 160:18 182:13 | happened 59:22,23 | 188:2,5,19 189:2,7 | hundreds 292:1,1 |
| 183:11 217:10 | 67:14 145:17 167:3 | 189:18 190:3 191:7 | hypothetical 60:10 |
| 257:20,23 258:23 | 302:8,10 325:8 | 191:17 239:8,11 | 60:23 105:22 |
| 293:18 305:2 | happening 52:7 | 300:1,3,4 313:5,17 | hypothetically |
| 320:20 | happens 145:17 | highland 2:19 | 300:9 |
| guidelines 57:19 | 317:7 | highlight 77:9 | |
| 58:8 323:12 | happy 28:11 165:12 | highly 308:14 | i |
| guys 73:2 156:22 | 330:18 | hindsight 29:20 | idea 95:3 161:20 |
| 319:18 | hard 107:22 177:12 | 32:22 | 209:17 211:5 |
| | hashim 210:18,21 | hired 25:3 52:1 | 222:22 302:14 |

| | | | |
|---|---|---|---|
| **identification** 37:11 82:2 86:12 93:5 96:12 99:7 100:4 101:13 106:2 107:4 109:8 110:8 111:4 112:4 133:4 153:9 176:2 191:23 202:2 206:16 210:13 211:15 213:19 216:20 218:8 220:24 223:2 224:4 225:2 246:18 253:20 259:13 261:8 262:16 263:18 264:24 269:19 273:17 286:7 288:19 290:19 302:18 310:2 320:6 | **impeached** 282:10 **implicit** 185:21 **implied** 185:8,10,23 186:6 **importance** 313:6 **important** 24:24 25:1 35:13 57:1 79:19,23 81:2,6 128:16 152:24 158:19 159:4 290:6 **impossible** 27:2 129:9 **impression** 313:7 **improper** 125:6,14 125:15 127:8,18 128:4 252:18 **improved** 109:2 294:4 315:23 316:23 | **income** 21:5,19,24 94:24 98:1 103:4 114:8,15,18,23 115:6,11,13 116:10 117:8 130:3 149:8 165:2 171:12 173:10 296:4,6,9 297:10 315:11,16 315:20 317:4 338:23 **incompetent** 83:1 **incorporate** 117:8 117:12 200:12 **incorporated** 115:22 336:7 344:12 **incorrect** 117:11 128:8 226:11 **increase** 29:16 139:19 144:1 241:12 | 128:10 190:16 228:7 315:17,21 319:4 **indicative** 52:6 67:5 **indicator** 233:4 **indices** 337:21 338:7 **individual** 30:15,18 73:1 75:14 108:18 114:5 136:6 144:22 147:8 167:7,11,15 167:19,22 168:1,4,7 168:21 188:3,7,9,13 188:13 244:11 292:15 293:15 302:14 318:18 329:5,23 335:20 **individually** 33:17 **individuals** 43:2 55:19 65:20 66:5 312:20 |
| **identified** 3:12,17 3:22 4:3,7 8:18,21 9:6 27:23 119:20 193:3 200:16 257:2 260:11 262:5 307:5 **identify** 15:14 36:16 43:2,5 173:9 175:20 184:21 275:14 **ii** 63:22 **iii** 37:24 197:19 **illinois** 1:2,19 2:9,19 11:11 14:20 15:7,11 341:1,8 **illustrated** 299:21 301:1 **imagine** 179:19 180:4 **immediate** 35:16 103:14 **immediately** 79:16 326:13 **impact** 19:4 63:3 173:7 175:17 339:18 **impeach** 271:6 | **improvements** 43:17 174:16 240:18 241:19 **inaccurate** 326:6 **inadvertent** 322:17 322:20,21 323:3 **inadvertently** 61:3 **inappropriate** 298:3 **include** 36:8 38:21 134:12 237:24 248:15 283:5,17,22 284:5,10,11 308:5 308:10 316:21 320:21 327:14 329:4 332:24 333:2 333:17 334:11 **included** 43:15 61:2 177:16,17 214:11 235:12 236:21 237:2 284:24 286:24 **includes** 308:9 321:9 **including** 99:3 174:15 | **increased** 87:22 **increases** 159:17,21 **increment** 174:18 **incur** 22:19 44:4 275:12 **incurred** 174:8 183:22 184:9 186:20 289:11 **independent** 52:2,4 85:2 102:8 105:20 108:9,14,17,20,23 109:4 201:17 222:7 **index** 3:1 **indicate** 136:24 139:18 166:14 168:24 277:23 **indicated** 29:9 73:2 85:21 137:2 238:5 **indicates** 250:6 **indicating** 321:5 **indication** 25:21 26:18,19,21 44:5 102:20 104:1 116:24 118:2 | **industrial** 307:11,17 **industries** 176:9 **industry** 22:23 23:4 38:19 130:11 135:3 180:10,13 322:6,11 **inflation** 8:6 111:12 **inflationary** 181:22 **influenced** 197:15 **influences** 304:7 **inform** 18:21 **information** 20:12 24:23 35:6 38:20 45:18 72:18 92:24 95:12 98:23 99:2,13 100:12 102:1 107:13 109:22 110:18 111:20 112:12 130:22 153:5,23 168:14 175:8,23 192:13 196:12 231:14 232:1,7,17 241:1 255:7 269:13 290:7 291:12,16 308:14 311:1 315:7 324:2 |

324:13,17 328:12
329:15 333:18
334:1,7,18
**infrastructure**
43:17 172:3 173:2
174:14 194:18,24
279:4
**inherently** 245:19
**initial** 226:18
**initially** 183:8,18
184:12
**input** 338:24
**inputs** 21:4,18 22:17
339:17,21
**inside** 208:18
**installation** 174:15
**instance** 18:24 22:2
24:7 28:15 30:11
34:13 35:14 56:23
71:8 113:2 160:22
171:21 298:21
**instances** 185:2
**institute** 57:12,17
58:3,9
**institutional** 135:19
135:24 138:2,3
142:5 156:2
**instructed** 281:24
**instructors** 323:11
**instructs** 16:19
**insufficient** 314:11
314:14
**intended** 256:7
328:13,16
**intends** 203:5
**intent** 11:4 196:1,6
196:18 217:7,8
218:11,19 219:1,8
219:13 296:24
297:5,7
**intents** 226:7
**interest** 24:16 25:4,6
25:7,9,10,13 26:12
26:17,22 79:4 199:8
199:14 256:19

257:9 258:9,12
259:4 261:2,22
262:9,23 289:17,18
289:19
**interested** 138:4
341:22
**interesting** 24:22
92:24
**interests** 3:24 24:18
27:1 258:22
**internal** 142:6
**international** 10:4
36:5,8,10,14 207:5
207:10 209:4
307:13 308:6,8,9,10
**internationally**
307:23
**interpret** 258:24
**interrogatories**
341:11
**interrupt** 122:20
**interview** 302:20
**interviewed** 338:11
**interviewer** 303:2
**introductory** 320:20
321:8
**intuitive** 314:6
**invest** 136:19
140:10 142:9
143:10 144:10
**invested** 142:23
250:19 251:5
**investigate** 67:13
141:20 152:13
213:14 215:3,9
225:23
**investigated** 266:18
**investigation** 274:24
275:2
**investing** 130:18
247:24
**investment** 6:15
100:6 130:20
136:14 140:5,7
142:14 143:12

156:7 207:10
244:13,16,20,23
245:2,6,11,20
251:12 269:11
**investments** 21:15
250:24 251:3
**investor** 9:5 21:15
130:9,11 133:8
134:22 135:7 137:9
137:13 138:1,13,24
139:21 140:21
142:5,20 143:2,3,4
143:5,13,15 144:10
144:16 145:10
156:2 204:3 242:13
244:15 301:18
337:21 338:6
**investors** 36:5,5,6
130:17 134:3,9,16
134:21,23 135:19
135:24 136:9,19
138:2,3 301:23
302:5 307:21 308:2
308:5 338:11
**invoice** 14:12
291:11,19
**invoices** 290:23
**involved** 24:4 26:15
28:9 42:20 43:8
71:1 181:2 195:15
195:17 285:6
308:17 309:12,16
**involving** 23:22 25:5
26:17 80:22 267:14
**ironic** 130:2
**irrelevant** 69:1,4,10
105:19 255:10,16
322:22
**issue** 38:5 254:11
337:4
**issued** 291:11
**issues** 52:22 55:13
175:17 183:21
215:21

**item** 179:4 182:20
**items** 20:6 241:18

**j**

**j** 2:6
**james** 256:2
**january** 12:17
**jeff** 82:20
**jibe** 52:19
**job** 291:3
**joe** 193:20 289:3
291:15
**john** 1:13 3:3 15:13
16:1 281:10 341:5
343:4,9 344:4,13
345:20
**joseph** 2:15,16
15:20
**journal** 302:22,23
303:1,14
**jryan** 2:21
**july** 4:19 12:6
261:19 271:13,17
271:21
**june** 1:20 3:2 15:3
259:3 341:9 342:2
**jurisdictional**
320:23
**justify** 94:17
**jvs000004** 13:15
**jvs000009** 13:18
**jvs000011** 13:21
**jvs000017** 14:5
**jvs000027** 14:9
**jvs000035** 14:13
**jvs000315** 12:11
**jvs000428** 9:22
**jvs001356** 12:18

**k**

**k** 341:3
**kayne** 2:24 15:2
**keep** 61:15,16,19
70:5,8 290:5
**keeping** 320:22
332:6,8,11 333:11

**kelleher** 218:15
219:8,16
**ken** 42:23 43:14
45:13,13 86:19,23
86:23 92:22 93:12
93:15 95:15 176:13
177:7,8 242:21,22
243:1 274:6
**key** 10:15 213:21
214:2 230:18 241:9
**kin** 341:23
**kind** 19:14,24 20:10
65:2 130:19 136:13
142:2 164:12
185:19 186:12
236:5 237:23
265:15 286:24
302:8
**knew** 41:9 196:13
284:22 296:22
**knight** 194:17,23
**know** 18:1 19:11
23:12 24:22 25:11
25:16 29:19,23
30:12 32:5,13 33:12
34:22 39:3,9,12
40:24 41:4,8 43:10
43:11 45:15,17 46:4
46:15 47:18 48:20
49:6,10,23 50:5,18
50:21 56:3 59:6,9
59:12,16,23 62:9,18
62:24 63:5 65:4,20
67:11,20 68:16,20
68:22 71:9 73:9,12
73:15 74:7,11 75:11
75:23 76:2,4,5,7,8
76:10,11,14,15,17
76:20,22 77:2,5,6
78:17,18,19 79:6
80:12 81:13 82:23
83:9,10,11,14,16
87:12 88:9,10 89:21
92:17,23 103:20
106:23 107:14

113:1 115:21 122:6
125:13,14 133:24
134:8,18,20,24
135:2,4,15,19 138:8
139:4,7 141:19
142:2,14,21 144:12
144:22 146:20
147:4,10,12 148:11
151:3 153:16
155:24 156:9,12,22
158:11,16,18,21
159:4 160:1,23
161:11,12,16,22
162:11,15 163:16
164:12,15,16
165:20 167:1 169:5
169:15,17 174:3
177:5,10,19 178:3,5
178:12,14,22,24
179:1,14 180:8
181:12 182:14
183:14 191:5
192:21 193:17
196:23 199:1,18,18
200:10,13 201:6,17
201:22 205:6,8,12
205:15,18 207:1,7
208:14 209:9
210:23,24 211:1
212:11 213:11,13
214:15,19 215:5,6,8
215:11 217:4
219:22 220:3,3
222:19 223:12
225:13,20,22 228:4
229:23,24 230:8,16
230:20 231:7
232:21 234:16,24
237:9 239:2 242:11
242:13,19,22 243:1
243:7,7,19,24 244:6
244:24 245:3,12,17
245:21 248:8
250:14,16 251:19
253:7 255:6 256:4

256:21 258:23
260:4 262:4 265:12
267:22 270:18,23
271:14 273:8,22
275:10 276:24
277:14 278:3,17,19
278:21 280:4,5,6,7
280:19 281:4 282:4
282:17 283:2,2,11
283:18 284:2,12,13
284:23 285:5,11,14
285:21,24 291:24
292:9 294:10,24
295:16,20 296:1
297:13 298:24
299:21 302:3,4
303:1,5 304:23
309:11 310:12,16
322:15 323:4,9,12
323:13 328:21
334:21
**knowing** 25:13
115:18 145:3 148:8
167:1 228:5
**knowledge** 68:6
69:8,9 135:18 152:4
215:1 249:4 251:2
251:19 286:2
325:24
**knowledgeable** 26:7
49:2 72:11
**known** 38:16 56:23
92:20 98:17 130:9
219:16 226:3
**knows** 66:24 67:1
316:14
**korin** 82:17,19
**korpacz** 8:14,17,20
130:11 133:8
134:11,21 138:1
**korth** 17:17 18:3,14
18:16
**kramer** 30:12

**l**

**l** 223:15
**l.l.c.** 1:6
**l.p.** 9:9
**labeled** 3:15,20 4:5
4:9 5:23 6:4,9,13,17
6:22 7:6,11,16,21
8:6,11 9:10,12,17
9:21 10:5,9,13,18
10:21 11:5,12,15,20
12:7,11,18,22 13:5
13:8,11,14,18,21
14:5,9,12,21
**laid** 171:17
**land** 19:20 27:22
32:7,16 35:23 87:19
87:21 91:1 92:14
94:8,17 95:7,8
102:15,20,23 103:2
103:5,13,24 104:4,9
104:12,16,19,20,20
105:2,5,12 106:12
109:1 110:12 114:5
115:18 116:22,22
118:17 123:17
130:17,18 133:19
134:14 135:20
136:7,9 139:5,15,19
139:21 140:10,11
140:19,22 141:8,11
141:18 143:12,12
143:14,21 144:2,3,4
144:5,7,11 145:11
145:12,13 167:12
167:15,19,22 168:1
168:4,7 169:24
170:4,10 171:11
177:18 179:17
180:24 183:17
186:1 187:19 188:5
190:14,14,17
192:20 239:19
249:14 251:8 252:3
252:14,24 266:24

267:24 294:6 300:6
300:11 316:4 340:2
**landlord** 90:2
**language** 322:4
323:5
**large** 28:22 119:23
122:8 124:9,13
126:8 136:9 171:15
171:15 262:21
301:16,23 302:5
308:4 315:2
**larger** 329:24
**largest** 301:5
**lasalle** 150:4,14,22
151:8 155:9
**lasted** 147:10
**lastly** 21:13 29:19
166:24
**late** 28:18 261:10
**latest** 158:13
**law** 2:15
**lawsuit** 68:17
**lays** 121:14 144:14
**leader** 55:11
**leading** 285:19
**learned** 252:8
**lease** 90:1
**leasing** 195:4,8
**leave** 77:14,20 83:11
83:15
**left** 272:13 319:11
**legal** 15:2 19:24
258:23 345:1
**lehman** 68:22
155:19,22,24 156:4
156:7,10,15,16
**lender** 225:16
257:19
**length** 66:6 67:24
70:14 71:15,18,22
72:2,6 75:9 77:11
77:16,21 78:3,8,15
79:11 81:4,8 84:2
84:11 85:7 154:23
154:24 171:24

203:17 204:1,6
205:17,18,22 206:2
206:6 209:16
214:14,17,21,24
215:4 268:17
269:14 280:13,17
308:23 311:18
312:17 319:4 334:9
**lengthy** 79:12
**letter** 10:21 11:4
14:8 154:16,20,23
155:5 217:2,7,8
218:11,19 219:1,8
219:12 226:7 256:2
258:5 289:1 296:24
297:5,6 341:21
**letterhead** 14:9
207:6
**letters** 196:1,6,18
**level** 32:11 84:12
171:22 322:18
323:14
**leveraged** 8:5
111:11
**license** 342:5
**light** 326:8
**likelihood** 161:2
**liken** 250:7
**limited** 9:8 58:23
68:12,19 95:12
**limiting** 237:18,22
**limits** 21:22 22:1
**line** 3:8 204:2
271:16,24 274:14
276:8 278:8,17
279:15,18 280:6
282:18,19 283:4
286:12 298:10,10
338:3 344:7 345:3
**lines** 265:16 266:4,4
266:6 271:18
278:23 308:12
**list** 14:4 20:3 37:24
38:8,9 134:12,23
147:5 228:15

237:21 238:1
**listed** 33:13 152:16
153:4 204:20
207:15,23 326:2
344:7,17
**listing** 147:9 344:7
**listings** 324:4
**literally** 186:22
**litigation** 59:15 62:1
96:16 148:22 271:5
282:5
**litigious** 312:9
**little** 55:2 70:2 122:3
137:17 261:10
**live** 290:13
**llc** 3:14,18,24 6:17
10:15 11:20 12:6
13:4 193:10,14
197:10,13 211:23
211:23 213:23
257:9
**loan** 11:15,19 12:4
24:8 223:4,14 224:7
225:9,16,20,24
226:2 257:14,24
258:20 259:3
260:19,21 261:1
**loans** 309:22
**local** 36:6 307:11
308:5
**locally** 307:22
**locate** 50:17 314:20
**located** 15:6 33:21
166:3 236:14
**location** 28:15 35:8
35:8,8,9,12,17,17,17
**locations** 119:1
**lofts** 91:13
**logical** 172:13
**logistically** 172:6
**long** 17:18,22 28:4,8
29:18 31:1 39:4
41:20 79:8 142:11
147:9,10,13 165:7
166:22 167:4,7

168:20,24 169:18
169:20 301:16,19
304:12,16 305:5,16
**longer** 155:24
277:22
**longest** 169:7
**look** 19:6,22 20:2,11
21:1,7,9,18 22:15
22:18,22 23:15,18
23:20,23 24:2 28:7
30:21,22 33:19
34:21,23,24 35:15
35:24 36:13 37:17
51:18 52:4,14,18
53:5 72:8 84:17
85:11 98:5 100:9
103:23 118:20
122:12 123:14
129:2 134:16 135:1
142:10,13 144:13
145:18 146:17,18
153:14 160:20
161:7 162:16,18
166:1 167:1 168:14
168:19 169:11
171:16 175:9 185:2
185:12 190:12,14
198:18,18,20,22,23
204:17 208:3 217:4
230:10,19,24 231:6
232:22 236:20,22
239:11 243:20
244:1 254:19
257:11 286:23
298:18 299:6,6
301:18 304:11
306:1 315:2,7
328:17
**looked** 25:20 27:16
28:10 29:4,11 32:1
32:8,18 88:24 99:16
134:18 141:23
165:14,20 166:1,10
166:11,16 167:9
168:16 175:12,13

177:19 191:15,17
217:22 231:8
287:10 296:22
325:14 326:8
**looking**  25:17 28:13
29:15 34:5 35:11
43:22 53:4 60:24
70:23 137:13
138:11 140:4,7
143:9 144:16
163:19 164:7
166:18 172:19
181:2 221:19 229:8
254:20 255:7
257:21 261:4 267:8
275:24 287:2
305:15 307:22
329:8,13
**looks**  54:8 99:15
107:20 130:17
217:6 231:9,17
248:11 267:11,16
268:20,21 270:2
275:19 283:5
**loop**  9:21 28:23
29:15 32:2 33:18,23
34:6,10 35:3 39:2
39:10 119:2 163:20
192:2 220:7 248:14
285:20,23
**loopnet**  314:24
**loose**  299:24
**lost**  124:12
**lot**  43:12,13 46:6,7
55:12 74:2 84:18
108:5 121:8 122:21
142:16 203:1 267:1
313:8,13 318:8,14
**lots**  128:18 271:7
**low**  68:15,18 256:20
256:24
**lower**  85:21 137:17
137:21 140:12
160:11 170:8 246:9
267:16

**lunch**  156:22 157:9
157:18,21 192:3

**m**

**magnified**  338:24
**magnitude**  43:20
**mahru**  86:19
**mai**  18:12,17 58:4
**mail**  2:11,21 5:22
13:11 86:18 87:2,8
87:10 93:8 94:2,3
95:16 132:7 263:21
282:11
**mails**  6:4 9:12 132:9
281:16 282:1,6,8,22
**main**  33:7 165:24
275:21 314:10
**maintain**  332:12
334:6
**maintained**  282:16
**maintaining**  183:21
**maintenance**  183:14
183:16,21 184:3,8,9
**mais**  58:16
**major**  142:20 172:3
172:3 301:6
**making**  39:6 174:19
208:21
**malek**  259:24
**management**  55:13
**manner**  146:22
159:8 180:14
**map**  171:17
**march**  3:20 4:4 11:4
11:11 14:20 212:7
218:22 219:10
220:1 221:3,9
310:10
**mardini**  1:6
**margin**  272:13
**mark**  81:23 220:22
272:14 274:21
302:16 309:23
**marked**  8:18,21 9:6
37:10 82:1,5 86:11

86:17 93:4,7 96:11
96:14 99:6,10 100:3
101:12,15 106:1,4
107:3,6 109:7,11
110:7,10 111:3
112:3 133:3,7 153:8
153:13 176:1,4
191:22 192:4,23,24
193:5,6 200:19
202:1 206:15
210:12,16 211:14
211:17 213:18
216:19,22 218:7,10
220:23 223:1 224:3
225:1,5 246:17,21
253:19,24 257:5
259:12 260:14
261:7,13 262:15
263:17 264:23
265:2 269:18,21
273:16,20 286:6
288:18 290:18,21
302:17 310:1 320:5
320:9
**market**  19:2,3 22:11
24:3 25:14,18,21,23
26:2,4,12 27:14
28:7 29:13,13,14,14
31:13 33:19,24 34:5
34:9,17,23,24 35:5
38:9,10,14 39:9
40:2,5,8,10 46:5
47:7 52:1 62:16,22
63:3,9,14,23 64:2
64:13,22 65:8,14
66:17 68:11 85:18
85:19 86:1,2,3,4,5
88:24 89:2 102:20
104:2 113:13 118:2
119:21 120:3,7
124:24 125:1,3,20
125:22,24 126:7,9
128:2,10,12,13
129:10 130:17
133:19 134:3 135:8

135:14,21 136:7
139:4 144:19
147:17 148:2,16,24
156:17 166:17,19
166:19,20 167:8,12
167:16,20,23 168:2
168:5,8,21 169:1,16
169:18,21,24
170:11 171:5,6
185:1 199:12 200:7
220:7 221:8,22
222:8,11,12 226:10
226:13,15 228:5
243:5,10,14,18,22
244:3,15 245:5,13
245:15,18,20 246:6
246:8,11,13 285:17
285:23 292:14
294:18 301:21
304:12,17,18,20,24
305:5,17 306:8,13
306:18,20 307:4,6
307:12,12 308:8,9
308:10 309:15,18
310:19,22 315:8
318:18 324:1,10
338:8,10
**marketed**  146:21
305:11
**marketing**  302:13
304:3,15 305:13,15
305:21 306:3
310:15
**marketplace**  22:8
23:22 46:3,14 52:7
52:20 142:24
**markets**  38:17
119:2 170:23 171:1
**mary**  42:23 43:14
242:21,23 243:1
274:7
**mass**  177:24 178:4
179:2
**materials**  19:12
147:2 254:14,15

**[math - mixed]**                                                                                    Page 27

math  127:11 234:4
matter  20:14 195:13
  289:2 298:22 325:3
matters  35:18 55:15
  55:19
max  229:3
maximize  290:5
maximum  123:19
  123:20,23,23 229:6
  229:7,20 230:17
  233:22
mcgarey  195:3,8
mcginn  17:17 18:3
  41:19 42:3 158:11
  253:14
mcginn's  18:4
mean  24:18 25:24
  26:3 27:20 35:7
  40:10 55:4 56:15,19
  73:19 75:13 104:19
  105:3 108:4 119:14
  119:19 136:23
  147:17 148:15
  160:17 177:14
  180:23 183:1 186:9
  187:21 189:1,2
  205:20 213:8
  234:11,14,15 235:1
  235:21 248:21
  250:5 253:2 270:17
  282:17,23 289:9
  294:2,20 295:1
  298:14 300:13
  322:21
meaning  267:20
means  56:18 119:20
  187:24
meant  192:2
mediterranean  1:9
  15:9 40:13,14,18,20
  45:1,4,11 48:12
  64:10 74:6,9 76:11
  203:5 206:9 223:23
  289:2 325:1,7 343:3
  344:3

meet  17:9,11,13,18
  17:22
meeting  66:23 177:9
  270:4,7,21,24 271:9
  271:10,11 272:22
  273:10 274:1,5,12
  275:15 278:5,20
  281:3
meetings  193:20
  266:2
member  258:3,6
members  17:14 58:8
  158:11
membership  258:12
  258:22
memorandum  3:19
  10:4 193:10 198:14
  198:15 199:3
  206:22 207:1,13
  208:20 209:5,15
  211:10 216:12
mention  36:21,24
  84:1 267:11
mentioned  18:2
  22:20 23:24 30:3,5
  31:6 36:18 64:7
  80:19 81:7 145:14
  158:4 173:24 174:1
  311:2
merit  14:17
met  17:12,14,20
  196:15
method  102:19
methodologies
  317:10
methodology  62:2
  112:22,24 138:23
  316:18
methods  297:14
  327:1
metropolitan
  287:24
michael  39:14 86:20
  155:14 176:9,12
  210:18 263:21

334:14,15
mid  28:19
middle  250:8 278:8
  278:18
midwest  34:14 35:4
  345:1
mike  286:13,15
million  44:1 64:4,14
  64:18,22,24 65:11
  65:15 66:12,16
  67:18 68:23 69:5
  86:8,8 87:22,23
  95:9 98:3,12 104:4
  104:14 129:21
  139:7 140:19
  141:13 147:19,20
  147:24 148:3,5,16
  149:1,4,7 156:14,18
  170:11,12 174:6,20
  175:18,21 176:23
  177:12,15,21 178:6
  178:20 186:13
  197:14 198:10
  199:9,13 201:19
  202:15 206:12
  207:19,20 209:6
  212:7 214:11 216:8
  218:2 219:2,10,20
  220:1 221:10
  223:17 224:7,13
  225:9,18 240:19
  241:2,4 245:23
  246:9,12,14 250:18
  251:6,12 258:1,20
  259:3 260:15,18,21
  261:20,21 262:8
  264:4 267:17 268:1
  268:3,8 270:9
  271:21 272:5,8,9,10
  272:14 274:16
  279:20 280:1
millions  142:21,22
mind  25:19 35:13
  138:15 161:20,23
  162:3 185:17

186:18 213:4
  230:11 288:7
minds  66:23
minimal  58:10,20
  67:6
minor  60:15,18,20
  323:7
minority  25:5,9
minute  42:19
  168:18 340:7
minutes  153:20
  157:4,5 169:6
  187:14 209:21
  234:9 336:23
miqdadi  40:17
  41:12,15,20 47:12
  47:18 48:1,3 49:1
  210:24 211:3
  218:16 263:22
  264:11,19 274:6
  311:4
miscellaneous
  224:11,13
mischaracterizing
  331:24
misheard  36:23
  189:16
misread  274:19
missing  183:24
misstated  137:3
mistake  84:9 125:4
  253:4,6
mistaken  252:12
  253:1
mistakes  226:14,18
misunderstand
  174:4
misuse  337:7
mix  236:13
mixed  44:16 89:12
  90:9 119:23 120:6
  122:8 124:9,13,15
  126:8,16 171:15
  185:14,15 188:21
  190:5,9 191:18

| | | | |
|---|---|---|---|
| modeled 94:16 | name 15:1,13 42:23 | needs 160:7 184:3 | north 93:16 |
| modeling 98:23 | 303:3 343:3,4,15 | negotiate 161:3 | northern 1:2 15:11 |
| models 22:6 108:5 | 344:3,4,21 | negotiated 214:6 | notary 341:14 |
| mohammed 40:17 | named 42:23 | neighborhood 34:22 | 343:10,18 344:15 |
| 43:14 210:18,21,23 | names 42:11,22,24 | 34:23 249:15 | 344:23 345:23 |
| 210:24 211:3 | 43:2,5,6 211:4 | neither 78:12 82:18 | note 122:7 233:20 |
| 218:16 242:20,22 | 243:2 | 145:20 307:19 | 261:21 272:19 |
| 263:22 274:6 311:4 | nation 35:4 | net 55:19 89:18,21 | 278:4,11 281:1 |
| monday 17:21 | national 34:24 36:5 | 89:23,24 90:2,7 | notes 13:14,17,20 |
| money 22:12 49:23 | 118:20,24 130:16 | 111:15 122:17 | 14:4 41:14,16,17,18 |
| 50:1 73:7,10,13 | 133:19 134:14 | 123:17 239:10 | 46:9 50:10,12,18,23 |
| 116:4 267:1 | 135:5,8 150:4,14,22 | never 33:17 67:14 | 71:21 72:2 165:22 |
| monroe 1:18 2:7 | 151:9 307:13 | 67:15 83:4 212:19 | 235:9 261:19 266:1 |
| 15:7 341:7 | nationally 307:23 | 213:5 215:5,6 253:3 | 270:16,18,24 271:3 |
| month 64:9 | native 5:23 6:4,9,13 | 263:4 266:18 277:3 | 271:5,7,9 272:9 |
| months 306:4 | 6:17,22 7:7,12,17 | 284:8,16,22 316:21 | 273:7,19,22,24 |
| moody 10:4 69:4 | 7:21 8:6,12 9:10,12 | new 166:21 254:23 | 274:2,4,9 278:5 |
| 207:5,7 209:4,15 | 9:18 10:5,9,13,18 | 255:3 | 281:3 286:10 |
| 211:9 216:11,11,15 | 10:22 11:15,20 | newly 255:6 | notice 9:8 |
| morning 16:5 | 14:21 100:17 | newsmax 12:9 | notwithstanding |
| motivated 26:7 | natural 249:13 | newspaper 49:13 | 16:23 |
| motivating 148:9 | nature 130:21 309:5 | 164:14,15 325:18 | november 13:11 |
| motivation 65:4 | 309:8 | nick 17:17 18:3,4,6 | 64:17 83:23 86:5 |
| 66:24 | near 248:2 | 41:19 158:11 | 129:21 147:18,24 |
| motivations 308:22 | necessarily 24:15 | 253:14,14 271:3 | 150:21 151:8,12,14 |
| mou 207:22 | 26:18 41:11 51:22 | 272:20 273:23 | 206:12 215:23 |
| move 319:17 331:3 | 52:12 60:12 61:5 | 274:2 281:2 282:3 | 216:2,8 254:3,15 |
| 331:4 | 83:10 102:8 154:6 | 283:2 285:7,9,12 | 264:1 |
| moving 313:4 | 163:9 228:6 237:9 | nick's 270:3 273:7 | number 3:11 4:2 5:2 |
| mt 258:3,7,12 | 241:14 243:12 | 280:24 286:10 | 6:2 7:2 8:2 9:2 10:2 |
| multiple 46:2 | 245:5,10 323:15 | nine 29:22 32:22 | 11:2 12:2 13:2 14:2 |
| 186:16 298:10 | 327:12 332:2 | 33:3 143:16 144:21 | 29:17 38:8 39:13 |
| multiples 107:20 | necessary 187:20 | 147:11 167:2,16 | 43:13,15 64:7 66:16 |
| multiplied 229:11 | 200:5,7 333:18 | 275:19,20 | 67:23 69:19 97:21 |
| 229:18 | need 23:7 43:21 | nodding 16:14 | 98:2 99:24 104:13 |
| multiply 122:22 | 55:20 75:11 114:4 | non 70:14 269:14 | 120:17 121:18 |
| 126:3,5,14 | 144:7 145:3 148:11 | nonbinding 217:7,8 | 123:5,16 124:2 |
| multiplying 126:23 | 172:4 183:6 192:23 | nonexistence 162:2 | 127:1 128:1 129:10 |
| multistory 35:22 | 198:21 217:4 274:3 | nonexistent 312:11 | 142:6 150:4,15,16 |
| musa 176:9,12 | 327:7 | nordeen 5:22 86:19 | 150:23 151:9 |
| mutual 12:5 225:8 | needed 44:17 153:6 | normal 164:3 | 153:10 157:13 |
| **n** | 180:6 185:19 | 183:15 226:13 | 178:15 179:4,22 |
| nadhmi 1:10 48:7 | 215:11 241:20 | 324:3 | 180:3 181:9 182:20 |
| 218:16 219:19,24 | 287:3 | norms 22:24 | 187:15 195:3 |
| | | | 210:10 214:3 |

225:13 226:6,21
227:17 229:14,21
230:8,12,16,21
231:4,8,9,11,17,21
232:24 233:7,21
240:22 259:18
275:4,6 288:16
**numbers** 93:24 98:5
98:8 107:19 108:12
126:3 127:6 128:9
133:12,16 181:14
226:8 231:7 293:12
344:7
**numeral** 37:24
224:14
**numerous** 262:22

**o**

**o** 341:3,3
**o'clock** 1:20 341:8
**object** 54:12 100:23
154:2 261:10
**objecting** 59:11
**objection** 41:3 45:3
48:17 60:9 92:16
94:12 95:2,10,18
104:22 105:14
117:7,11 125:6
127:8,18 128:4
129:22 139:9
140:16,23 141:6
142:1 143:17
148:14 150:24
155:1 159:18 162:4
162:4,14 189:21
191:1,10 199:16
200:9 244:4 246:2
249:22 251:13
252:10,15 270:15
276:23 277:13
297:12 314:16
339:16
**objections** 16:23
**objective** 10:17

**objects** 16:17
**obligation** 223:14
**observations** 94:10
**obtain** 232:1 235:7
235:11,14
**obtained** 130:21
**obviously** 29:21
35:19 156:4 183:18
226:17
**occasion** 41:23
**occupy** 196:22
**occur** 166:15
**occurred** 79:13
186:10
**occurs** 308:15
**october** 4:15 10:21
64:3,14 129:18
147:24 148:5 153:1
154:17 156:17
206:12 324:20
**odd** 129:20
**offer** 33:9 37:3 67:4
67:5 68:22 69:5
155:21 156:14
198:24 208:6
212:12 216:11
217:2,18,20 218:2
219:7 226:18
241:22 245:22
246:1
**offered** 67:2,6 148:4
**offering** 100:6
198:14,20 199:3,4
207:19
**offerings** 9:4
**offers** 33:17 46:15
46:23 47:4,8,13
66:11,18,20,21
152:17 153:2
154:18 204:21
226:7,21 326:3
**office** 15:6 29:13
32:9 35:22 90:2
108:24 109:2
166:19 179:13

236:2,9,12,19,21
237:4,13,16 238:9
238:11,13,16,22,24
239:9,15,21 240:3
248:21,23 281:20
282:15,18,20,21,24
315:24 330:11,15
330:19 331:2
**officer** 40:18
**offices** 2:15
**official** 343:15
344:21
**oftentimes** 287:5
**oh** 182:7 264:17
**okay** 17:18 19:7
21:17 22:6,16 23:7
26:20 28:13 31:6
32:12,18,21 34:16
36:9,18 37:21 41:1
43:1,7 44:24 45:16
46:21 48:21 49:20
51:2 52:20 53:4,14
53:17 54:1,17,19
55:2 57:1,5 58:2,3
58:10 59:14 60:16
61:19 63:8,18 64:16
64:20 65:16 67:3
70:12 71:21 72:20
73:5,10,18 74:8,12
75:2 77:2 78:1 79:2
79:8,15,18 80:6
81:2,18,22 82:10,13
83:17 84:13 85:14
86:10 87:2,6,14,18
87:21 89:4,8,11,15
90:9,24 91:3,16,22
92:7,20 93:3,15,24
94:16,20 95:6,15
97:5,19 98:2,5,7,21
99:3,5 100:2,14,18
101:7 105:10,18
106:19,23 107:16
107:24 109:4,24
110:6,16 111:10,18
113:22 114:10,14

114:18 115:15
116:14 117:20,22
118:6,19 119:4,8,9
119:16,23 120:6,10
121:10 122:19
123:11,22 124:5,8
124:20 126:2 127:4
127:5 128:8,24
130:3 131:12 132:2
132:18 133:20,24
134:8,20 135:4
138:11,22 139:3,14
140:3,9 141:3,3,20
141:23 142:5,18
143:21 144:9 146:7
147:16 148:4
150:20 151:17
152:3,9,15 153:7,21
154:8,15,22 155:8
155:11,18 156:10
156:20 158:2,16,19
161:12,17 163:1
165:8,24 167:6,19
168:14,18 169:15
169:19,23 170:3,10
170:16,22 171:1,4
173:13,20 177:11
178:6 179:4 181:4,7
181:11,24 182:1,17
185:6,10 188:4,9,15
189:6,16 190:2,18
191:7,21 192:22
193:19 194:17
195:11 196:10,14
196:24 197:21,21
198:8,13 199:2,12
199:21 201:1,16,24
202:13,17 203:9,16
204:17 205:3,6,16
207:4,12,18,21
209:10,18 211:9,13
213:6,11,14,17
214:2,16 215:3,6
216:11,17,17
217:18 218:5 219:7

[okay - page]

219:12,23 220:22
222:10,15 224:2
225:14 227:3,4
228:2,14 229:11,24
230:3,14 231:6,24
233:16 237:17
238:6 245:4,8,17,22
246:13,16 247:21
248:13,24 249:5
250:7,17 251:4,21
253:8 255:19,23
256:1 257:1,12,16
257:18 258:8,17
259:2,18 260:24
261:24 263:12
264:22 267:16
268:6,20 269:13
270:4 271:11,20
273:2,24 274:13,14
275:17 276:2,8
277:5 279:3,14,17
280:22 281:21
282:16,20,21 283:4
283:16 286:4,12
289:5,14 290:17
291:15 292:5
293:11 294:13
295:5,13,18 296:3,9
297:8,18 298:5
299:19 303:5,8,17
304:10 306:8,23
307:20 309:3 311:3
311:17,20 312:22
313:3 314:20 315:7
317:20 318:7
319:10,18 320:19
321:6 322:20 323:1
323:6,17,23 325:14
326:10 328:1
329:18,18 331:3,15
333:12 334:6,12,19
334:20 335:21
336:16,22 337:1,9
337:16 338:4 339:9

old 35:7
oldest 286:18,21
 287:21,23
omission 322:17,21
 322:21 323:3
 331:17,23
omissions 323:7
once 41:23 153:15
 159:11 160:12
 161:2 184:4 198:24
ones 166:3 228:6
open 33:15 147:7
 174:17 302:13
operating 3:13
 173:9 201:2
opinion 27:4 38:24
 52:2,4 59:24 60:2
 83:3 85:2 116:24
 127:24 156:3
 172:13 222:11
 243:17 244:7 246:6
 246:8,11 255:9
 263:2 284:9,9,14
 292:20,22 323:7,24
 324:10 331:20
 334:8 335:5,9
 337:21 338:6
opinions 55:14 57:6
 254:8 255:10,15
 304:7 333:19 334:2
 335:12 337:13
opportunity 6:16
 14:19 100:6 310:4
 310:12
opposed 35:23
 45:22 105:22
 239:16 243:17
 244:15 272:24
 333:9
option 214:7
options 152:18
 153:3 154:18
 204:21 214:11
 324:4 326:3

oral 332:15,21,24
 333:3,7,12 341:11
orally 333:9
oranges 26:24
 234:19
order 132:3 143:10
 145:7 172:4,10
 185:20 241:20
 258:20 284:9 290:4
 301:17 304:17
 305:11,17
ordinance 235:11
organization 58:4
oriented 337:5
orifarm 1:10 261:15
originally 67:2
outcome 34:18
outnumber 9:4
outside 314:2 315:8
outstanding 152:17
 153:2 154:18
 204:21 326:3
overall 114:7,10,15
 188:14 292:23
 293:16,19 295:9,15
 298:14 314:18
 316:9
overhead 179:5,11
overpaid 147:21
oversight 179:15
overview 197:22
 287:1,14,16,24
overviews 286:13,14
 286:15
owed 262:24
owner 28:2 40:13,15
 150:17 163:6 174:8
 183:7 184:13,16
 187:22 256:23
owners 44:6 51:2
 183:23 198:1
 302:12
ownership 24:16
 25:10 26:11,22 68:9
 71:10,13 74:2 75:21

76:2,5,8 78:14,22
 79:4 83:19 85:16
 149:17 152:1
 193:17 198:4 199:7
 199:14 258:9 259:4
 260:4 261:1,22
 262:23 275:4,7
owns 144:2 251:8
 252:3,14,24

## p

p.c. 2:15
p.m. 157:8,10,11,13
 210:6,8,8,10 240:8
 240:10,10,12
 288:12,14,14,16
 319:24 320:2,2,4
 340:10,12,12,14,20
 340:23
page 3:4,8,11 4:2
 5:2 6:2 7:2 8:2 9:2
 10:2 11:2 12:2 13:2
 14:2 53:8,10,10,11
 56:12 71:10 83:17
 85:11,11,12,13
 97:22 100:14 104:3
 104:5,7 113:1,2,6,9
 113:12 117:21
 118:4,6 119:4
 120:21 121:5,13
 122:12,21 123:13
 130:7 133:18,18,20
 139:18 144:14,14
 149:20,22,23 158:1
 164:18 166:18
 173:11,12 179:6
 181:24 182:20
 187:16 188:17,18
 193:22 196:24
 197:3,18,20,21
 198:4,19,22,23
 201:1 204:17 208:9
 213:1 218:14 221:6
 221:7 223:11
 224:15,16 227:3

Veritext Legal Solutions Midwest

237:17 238:10
240:15 249:5
251:22 265:16
266:4 268:6,11,21
271:12 273:3 278:8
278:18,22 279:16
281:5,6 283:4,5
289:24 290:3 295:1
295:5,6 297:13
298:1 299:7 300:1
303:16 304:1 306:2
306:23 312:4,5
313:4,23 314:3,5
315:10 317:3 321:1
321:3,4 323:18
325:24 330:17,19
331:7 337:17 344:7
345:3
**pages** 53:6,14
134:14 292:1
**paid** 65:10 103:6
173:17 183:6,11
185:8,11 261:20
262:8 267:2 289:15
**paragraph** 87:18
153:16,17 174:13
194:2 197:4 238:12
238:18 247:7,22
248:7,13 249:6,7,8
249:11,11 250:17
258:14,15 297:18
298:1
**paragraphs** 153:18
251:4 337:10,20
**parameters** 148:9
**parcel** 19:20 26:12
26:13 27:22 33:2,2
35:23 36:4,15 37:2
62:8,18 63:9,14
64:3 66:11 78:23
79:5 95:7 103:19
105:13 107:13
118:10,12,15 121:7
138:12,14 145:13
145:13,21,21 146:2

146:2,4,4,10,10,23
146:24 147:14,14
147:19 169:7,24
170:4 171:16
172:21 182:15,15
184:4,18 186:1,2
187:9,10 188:7
189:20,20 190:3
215:22 216:1
227:23 229:10
248:14 262:10
292:19 293:16,19
293:20 300:6,19,19
318:23 329:24
**parcels** 21:12 27:24
28:5,9 30:15 31:2
32:7 33:16 88:17
114:5 115:14 116:6
116:12,16 117:18
118:17 119:12,18
119:20 120:4 121:7
121:15,17 123:21
129:2 136:6 144:18
144:21,22 145:2
147:8 165:7 166:9
167:7,7,11,15,19,22
168:1,4,7,21 170:18
170:19 171:11,18
172:7,8,22 173:18
179:17 183:20
184:1,5,7 186:7
187:22 188:2,7,9,13
189:3,8 208:18
214:7 227:21,22
228:4,9 232:15
275:19,20 292:15
293:16 294:21
301:1 302:14
318:18,19 329:5,20
329:24 335:20
336:6,13
**park** 2:19 4:12,17
5:4,9,14 11:9 14:20
28:17 30:5,12 31:13
145:16,24 146:2

157:24 166:4 204:4
248:15 302:9 310:8
**parking** 91:5,11
92:8,11
**parks** 174:16
**part** 35:9,13 37:1
42:4 48:8 49:12
50:9 60:4 62:1 73:7
73:11,13,18 74:10
75:7,16,22 76:12,13
77:3 78:11,23 79:5
84:15,20 91:20
100:7 121:11
133:15,20 134:16
152:24 158:5
179:12 185:4
195:13 208:19
221:21 238:21
254:2 261:1 270:7
280:15 290:14
304:10 315:15
321:18 327:21
332:3 335:11 344:9
**participants** 39:9
40:3,5,9,11 46:13
130:10 142:8
226:11,14
**particular** 36:11,13
47:4 129:12 130:15
133:20 146:7
161:15,22 222:18
227:23 228:11
287:9 296:8 311:24
312:22,24 318:4
321:3 322:23
**particularly** 24:11
84:24 85:8
**parties** 15:15 30:4
59:16 65:1,2,6,17
66:12 68:1,4 71:1
341:24
**partner** 204:3
**partners** 3:14,18
6:17 9:8 13:4 68:13
68:19 193:10,14

**parts** 29:12 146:1
184:9 254:6
**party** 150:8,12,16
150:18,21 308:16
309:21
**path** 300:17
**pattern** 186:6
**pay** 102:17 105:5
115:20 128:23
140:22 145:7
177:22 183:8,10
241:7
**payable** 258:11,22
**paying** 185:3
**payment** 44:7,10
279:8
**pd** 160:8 188:22
195:24
**pelegrin** 82:20
83:13,15
**people** 43:7 46:7,14
75:21 82:18 89:2
136:4,5 180:5
201:22
**percent** 54:24 55:8,8
88:5,11,14 95:8
130:6 136:22 137:1
137:5,10 138:8,9,14
138:14,16,18,19,24
139:20,22 140:2,11
140:21 141:17
142:18 143:7,13,14
143:22 144:1,6,10
145:4,6 180:20,21
181:3,9 184:21
193:14 196:2,7,20
198:10 199:10
206:10 208:15
209:8 251:7 267:1
269:10 277:6,9,10
277:11 296:23
297:4 339:22,22
340:3,3
**percentage** 24:20
25:10 54:19 55:6

193:17
performed 327:15
performing 47:7
59:3 282:2
period 21:11,12
27:9,13,17,19 28:2
28:2,5 30:1,23
31:19 32:13 63:8
80:7,11 115:14
136:10 142:16
143:24 165:6,15
183:19 228:24
276:9,22 277:8,18
277:20 301:17
304:3,15 305:14
306:12,15 339:12
339:13
periods 181:19
304:21
permitted 161:14
person 48:12,21
82:16 177:7 205:13
211:5 244:8 274:12
314:2
personal 59:1
260:19
personally 54:21,22
54:23 343:11
344:15
persons 79:4
pertaining 1:17
pertinent 33:24 35:5
peters 260:19
phase 30:12,14,22
30:22 31:1 214:6
phased 184:15
phases 7:5,10,15
8:10 9:16 186:16
phasing 172:17
186:19
phone 92:21 95:17
101:9 106:16 108:2
111:23 240:24
274:12 281:16
282:12,22

photocopied 132:19
physical 56:22
186:23
pick 130:6
picked 183:23
piece 23:6,19 33:8
36:19 44:16,17,20
51:17 69:5 81:2,13
108:8 109:1 145:10
153:5 170:10
182:18 183:17
187:9 188:14 189:8
189:8,11,11 190:13
195:21 196:12
197:15 202:21
237:12 244:11
260:3 316:3 323:2
pieces 27:7 31:11
173:5 180:7 186:2
188:11 322:5
pivotal 313:15,16
place 28:23 33:3
86:6 122:11 131:17
132:12 204:13,16
243:20 244:1
295:22 324:20
325:11,21 341:17
placed 46:15 132:12
placement 3:19
193:9 198:14
places 132:5 297:20
plaintiff 15:22
plaintiff's 260:14
plaintiffs 1:7 2:3
15:19
plan 18:24 19:21
159:16 163:19
203:6 232:11 237:1
239:13,20 278:12
279:10
planned 27:22 31:15
31:16,18 44:5
115:24 123:3,15
158:24 160:13,21
160:23 163:8,13,15

164:3 189:4 190:6
195:22 236:7
planning 29:6 44:15
55:20,21 158:12,17
158:21 164:9
166:13 172:15,19
191:3 194:8,14
237:3 283:12
plans 23:12,13,14
23:17 50:8 103:18
228:9 232:15,18
234:23 235:4,17
236:20,22
play 93:1 128:22
301:20
players 205:21,24
206:4
plays 232:24
plaza 275:21
please 158:1
pledge 3:23 12:21
257:8,13,22 259:5
259:22 260:6
pledgee 257:21,23
257:24
pledges 13:8 262:22
263:1,5,7
pledging 258:9,10
258:20 260:3
pledgor 258:3,6,8
258:10,19
plus 172:14 198:10
199:9 214:6 261:20
272:9
point 31:7 33:7,12
57:6 90:9 91:4
94:11,14,15 183:3
184:10 195:3 214:3
235:5 241:5 275:17
333:16
pointing 241:10
points 61:3 204:7
pool 36:7 308:4
poorly 312:11

portion 26:22 71:14
78:13 207:19,24
208:7 209:5 229:8
236:1 297:7
portions 46:16 77:9
possibility 170:17
172:20
possible 36:1,3,19
60:17 219:15
256:21,24 284:24
289:20 312:8 334:4
potential 36:7,10,14
37:6 102:12 117:17
155:5,8,12,18
162:16 180:2
236:10 242:12
307:21 308:2,4
powerful 318:9
practice 14:24 38:16
57:9,12,17,22 58:15
77:14,19 156:7
271:4 282:9
preamble 320:21
321:9
precedent 223:13
preceding 53:12
predecessors 285:1
predominant
236:15
prefer 153:20 317:5
preferred 75:23
198:10 199:9
265:18 267:10
269:10
premier 136:22
premise 223:16
premised 24:8 259:4
preparation 173:21
174:3 289:12
prepare 17:4 52:2
85:1
prepared 17:7 57:8
221:3,20 287:4
288:3 332:3 335:11

preparing 18:20
38:4 48:8 51:15
52:3 112:17 134:15
158:5 168:15
179:21,24 194:13
221:12 247:5 254:3
254:16 291:24
prescribed 60:24
present 2:1,23
140:18 274:7
294:18 316:3
presenting 6:15
president 217:11
pretty 79:12 205:20
220:9 235:19 253:3
294:2 297:16
previous 20:1 24:1
41:23 50:14 151:19
previously 3:12,17
3:22 4:3,7 37:2,3
192:24 193:6
200:18 255:15
257:5 260:13
276:12
price 64:8 85:22
87:22 88:5 103:6
104:4,9,12,17,19,20
105:3,4,13 110:12
128:17,19,20
139:18 140:20
141:13 147:6 150:9
151:18,24 170:5,8
170:19 197:14
207:20 212:6
214:11 218:24
219:20 220:1 229:2
229:3,12,18 233:9
233:14 234:16
305:12,18
prices 88:17,23 89:1
89:3,6,9 90:10,13
90:17,20,22 91:5,11
91:16,20,22 92:1,2
92:4,8,12 114:5
177:24 185:22

216:13
pricing 7:6,11,16
8:11 9:17 93:21,22
106:20 192:9
primarily 27:14
30:13
primary 27:16
30:19 34:8 334:17
335:1
prime 166:4 202:21
302:10
principals 73:21,24
74:5 75:7
print 9:20
printed 253:14
320:9
prior 284:4 304:13
333:13
private 3:19 193:9
198:14
pro 6:7,11 7:5,10,15
8:5,10 9:16 22:2,4,5
22:20,21 23:3,8
51:4,6,10 52:8,11
52:18,24 53:6,9,18
53:21,22 54:5,8,10
54:18 87:3,4,7,11
87:13,14,19 88:16
88:21 89:8,11,12
90:6,10 91:13 92:14
92:18,21 93:9,16
94:7,21 95:23 96:3
96:7,8,9,17 98:12
99:9 102:7 103:18
103:22 105:10
106:6,7,20 107:17
109:13 111:6,11
112:7 141:23 142:3
192:5 264:8,9,10
290:12,15 296:5
probably 16:7 17:24
20:3 54:23 92:23
98:20 106:17 110:5
127:4 170:12,14
196:13 230:2

262:17 265:13
273:3 285:16
problem 221:19
234:15 313:15
319:2
problems 171:19
172:3
procedure 1:16
343:5 344:5
proceed 15:17
proceeds 100:20
process 71:9 102:18
163:21 164:3
221:21,23 222:19
338:8
procure 43:16
produce 3:7 339:1
produced 21:6
96:15 132:8
producing 55:14
production 98:18
100:8 106:6 107:8
109:12 110:12
111:7 112:7
profession 314:2
professional 14:23
57:9,10,11,16,16,21
58:14,15 179:14
291:3
profile 142:13
profit 252:4,14,24
337:5
profits 258:10,21
project 6:11 9:21
17:15 94:5 96:16
99:14 116:16
137:14 172:17
179:15,17 183:3
193:23 195:12
196:19 202:15
204:4 290:6 291:20
302:6
projected 6:7
100:21 139:19
174:9 238:12,15

330:19
projecting 184:12
186:8
projection 31:21
53:23 174:9 278:14
278:15 338:23
projections 51:12
51:20 105:22 108:5
143:24 185:22
186:18
projects 174:11
181:1 249:12,21
269:10 302:8
prolonged 63:1
promissory 261:19
261:21
promptly 290:8
proof 235:2
proper 127:23,24
properly 307:5
328:14 329:16
properties 19:4
20:13 23:1 30:8
34:1 35:16 118:21
122:15 136:18
142:9 165:5 181:4
183:8 191:8,12,12
191:14,16 199:14
230:20 235:4,18
287:12 307:22
314:21,21
property 18:23,23
19:1,9,22,23,24
20:2 21:6,8,11,16
21:19 22:3,7,12,19
23:13,22 24:1,4,5,8
24:9,14,17,19,21
25:4,5 26:23,23
28:3,3 29:7,9 30:1
32:14,19 33:2,13,15
33:24 34:22,23,24
35:5,12 40:13,15,19
43:9 44:9 46:15,16
46:18,24 47:13,20
47:22 48:16,23 49:3

50:8 53:23 56:22
58:24 59:2 62:1
64:17 65:11,14
66:13 67:7 68:14,15
69:6 72:22 73:22
75:8,12,21 78:14
79:24 80:7,23 81:14
83:20 85:16 97:12
97:15 100:22 102:5
102:11,13,14,16,18
103:6,11 104:2
108:3,13 110:23
111:20,24 113:17
114:7,11,15 115:7
115:11,12,17 116:5
116:6,7,11,12 117:1
129:10,20 130:14
130:19 134:4
136:11,14,15,17,21
138:5,7,17,19 139:1
141:4 142:12
143:10 144:17,20
146:7,14,21 147:5
149:1,4,5 150:8
152:16,18 153:3,4
154:19 156:17
158:13,22 159:5,8
159:12,12,15 160:4
160:5,9,11,12
161:10,14,19 162:9
162:10,11 163:24
167:3 168:24 169:8
173:7 180:3,7,14,16
180:21 182:3,14
183:22 184:23
186:13 187:1
188:10 190:11
192:13 195:22
196:11 197:15
198:9 199:8,13
200:6 203:7,10
204:19,22 207:21
207:23 208:1,4,15
209:6 216:7 218:24
219:10,24 221:9,22

225:17 227:7
228:14 230:1
231:21 236:23
237:4,13 238:4
241:13,21 242:14
243:9,11,14,20,21
243:22 244:1,2,3,7
244:11 245:11,16
251:6 254:11
256:12,15,16
257:15,16 258:3,7
258:12 259:5,23
260:4 261:2,22
262:10,23 263:3,9
264:5,8 279:20
283:15 287:18
288:4 292:18 294:4
294:18 296:8
297:23 298:23
299:13 300:14,18
300:23 301:5
302:13 304:4,12,16
305:3,5,10 307:6,11
307:16,17 310:15
310:18,22 311:15
314:18,22 315:24
316:5,8,9,15,23
318:4,6,21 324:5,15
325:16 326:2,4
329:19 330:11,15
331:13 336:17
**property's** 139:3
**proportion** 239:14
**proposed** 31:15
248:1
**prospective** 304:15
316:7
**protection** 176:9
278:12,15
**protocol** 19:16
282:4,13
**provide** 98:22 99:1
100:10 106:10
107:11 111:19
112:10 130:12

176:16 192:11
194:4,8,18 195:4
222:7 264:13
333:12
**provided** 99:17
101:24 107:9,15
109:21 110:17
174:21 175:8,24
176:8,20 177:16
178:7 193:7 195:12
240:23 290:7
**providers** 194:4
**providing** 94:5
194:15,24 195:9
333:8
**public** 20:7,11 150:7
241:18 242:2,8
308:15 311:10,14
314:23 325:17
341:14 343:10,18
344:15,23 345:23
**publication** 302:21
**publications** 38:17
**publish** 130:12
**publishes** 285:17
302:24
**pull** 131:12 169:5,6
287:14,16
**pulled** 215:14,15
254:18
**purchase** 10:12 13:5
103:6 104:4,9,12,17
104:19 105:3,12
110:12 138:17
141:13 162:19
197:1,8,8,13,14
207:22 209:5
211:21 212:3,3,6
213:6 214:10
215:22 216:1,13
218:24 261:14
**purchased** 186:14
216:5 261:18
**purchaser** 155:6,9
155:12,19 161:23

207:13,15
**purchasers** 184:17
**purchases** 161:19
161:20
**purports** 111:10
192:18
**purpose** 43:11 103:1
190:23 256:11
**purposes** 55:17
146:13 205:16
207:13 227:24
256:8
**pursuant** 1:15
**put** 21:22 22:1
23:12 52:8,12,15
65:6 66:21 67:15
73:7,10,13 74:9
81:15,18 84:13
86:10 93:3 96:10
98:15 100:2,7
101:11 105:24
107:2 108:10,12,16
110:6 111:2 112:2
112:19 133:24
156:20 181:12
192:22 200:14
201:24 206:7
209:10,18 213:17
216:17 218:5 220:5
222:2,15 224:2
230:8 249:14 253:8
253:15 257:1
260:10 263:11
264:17,22 269:17
273:15 288:6
290:17 291:15
292:5 299:15
319:10 327:17
**puts** 100:15,19
**putting** 27:8 43:10
67:18 152:10
212:10 259:4 302:2
**puzzle** 108:9
**pwc** 9:5

**q**

**quality** 9:4 39:1
326:20
**quantity** 326:20
**quarter** 8:14,17,20
9:6 10:17 131:14
132:14,15,16 133:8
213:22
**quarterly** 130:12
**quarters** 303:19
**question** 16:17,18
16:20 24:6 34:2
35:2 36:12 41:7
45:6,20 50:3,14
54:9,13 55:2 62:12
77:18 79:1,21 80:18
85:10 88:19 89:4
98:16 113:10 115:2
116:8 117:10,19
118:13 125:5,8,10
125:11,16,19
127:20 137:4,8,23
138:11,20 141:1
143:19 147:15
151:3,7 154:3
160:10 162:6 165:8
181:11 182:13
187:15 189:12,13
202:13 206:8
209:12,13,14 211:2
214:13,17,18,21,23
215:24 218:1 220:9
227:6 229:17
233:16 235:13
237:5 245:4 249:3
250:23 251:17
254:9,14,22 255:12
255:23 258:18
261:5,9 272:14
274:21 283:16
286:1 293:18 297:2
299:14 303:18,20
303:24 306:23
308:12 311:20,22

313:4,24,24 315:10
317:2 323:20
328:20,23 329:2,8
**questions** 16:10,23
42:2 149:10 303:5
340:16,18 341:12
341:16
**quick** 100:9 209:19
288:7
**quickly** 144:18
170:5,9,13 243:4
259:11
**quite** 88:1,7 136:2
145:17 186:17
226:6 289:22
**quote** 143:4 236:7
**quotes** 202:18

**r**

**r** 2:5
**radically** 90:16
222:11
**railroad** 171:23
172:2
**ran** 277:3
**range** 62:8 133:21
133:22 134:6
298:20 317:12
**rate** 21:13,14 95:1
122:22 130:5,7,19
130:23 133:12
134:22 136:12,12
137:1,5,10,17,20,24
137:24 138:7
139:14,19 141:17
142:6,18 145:4
181:22 277:5,7
338:7 339:22,23
340:3
**rates** 89:16 90:7
130:13,13 142:19
143:1
**ratio** 116:17 119:15
119:18 230:17
232:22 233:3

**rdd** 51:3 194:3,15
196:24 197:9 198:4
207:16 215:14
224:7
**reach** 62:20 70:17
81:14 115:10 118:2
184:20 235:16
335:23 336:2,9,12
**reached** 63:16 64:9
70:18,22 221:8
289:1 317:22 336:3
336:5
**reaches** 80:13 95:7
99:23
**reaching** 77:15
**read** 26:8 43:15 48:1
50:15,16 62:12 66:7
78:5 107:22 125:5,7
125:12,16 153:19
164:14,15 202:11
203:18,21 217:5
261:5,6 265:17
266:5,11 269:5,12
271:15,19 275:18
312:20 329:2 343:5
343:6,12 344:5,6,17
**reading** 33:6 147:4
155:3 212:13
266:10 309:19
**ready** 188:20
**real** 4:14,19 5:6,11
8:14,17,20 9:5
10:12 12:16 14:15
35:8 49:21 50:4
55:11 56:22 58:24
63:3 82:5 85:18
86:1 130:10,11
133:8 135:3,8,14
138:1 143:5 156:7
197:1,8,13 202:22
207:10,22 208:1
211:21 213:6 220:6
234:19 248:1,5
250:13,19,24 252:8
254:1 289:5 304:1

304:17,24 314:2
338:9,10
**realistic** 275:4
277:20
**realistically** 144:18
**reality** 52:9 103:22
**realize** 131:16
241:21
**really** 25:7 27:16
35:9 43:13 57:18
58:7 93:1 101:1
107:23 139:12
140:24 144:14
163:5 165:13
166:24 186:12
208:17 209:9
230:18 232:23
237:23 241:9
258:24 272:23
287:2 294:3 308:4
312:12 327:15
**realty** 217:3,12,16
**reason** 17:1 20:16
50:3 61:2 64:20
67:12 81:8 138:12
140:11 141:16
158:19 173:6 209:3
209:11,14 211:2
214:13 249:3
250:23 251:17
281:24 282:7,15
283:22 284:7 286:1
294:12 314:10
344:8 345:3
**reasonable** 29:24
39:5 276:1 301:18
317:12
**reasonableness**
298:13,17,24
338:19 339:6,8
**reasonably** 149:6
**reasoning** 108:7
294:10
**reasons** 67:10
214:16,20

recall 33:6 37:4
45:12 47:1,24 50:2
72:24 73:17 76:19
77:1,8 78:24 79:2,6
134:19,24 167:14
167:18,21,24 168:3
168:6,9,11,13,17
186:3 206:14
219:11 226:23
237:1,5 242:3,18
244:21 254:20
265:23 268:2,5
270:22 272:22
273:11 276:19
297:6 305:2 325:14
receive 116:4
225:16 258:20
received 33:17
46:23 155:21
195:22 221:16
223:22 259:3
284:22
receives 198:9,9
receiving 290:12
recess 69:16 120:14
132:23 157:9 210:7
240:9 288:13 320:1
340:11
recession 63:1
recheck 317:17
recognized 322:10
recollection 86:22
177:6 273:9
recommend 149:3
recommendation
245:24 246:5
reconcile 317:9
326:20,23 327:4,11
reconciliation 113:1
reconciling 317:3
record 16:9 42:16
50:16 69:15,20
77:14,20 120:13,18
132:22 133:2
150:18 157:8,14

210:6,11 233:17
234:21,24 235:1
240:8,12 261:6
282:1,12,16 288:12
288:17 297:24
319:24 320:4,22
332:6,8,11 333:11
340:8,8,10,14,15,21
341:15 344:9
recorded 152:5
291:8,10 326:1
records 20:11 150:8
233:18 308:16
311:10,14
red 208:18
redo 126:22 287:20
reduce 256:12,15
redundant 245:5
redwelds 263:13
319:20
refer 155:8,11
172:14 244:14
281:13 282:24
302:7 323:9
reference 43:23
49:18 265:12
267:23 268:13
280:4
referenced 275:9
312:21 343:11
344:15
references 264:9
referencing 84:10
115:24
referred 89:24
166:17 171:15
257:20 270:13
274:5 287:22
330:17 341:18
referring 57:24
97:22 104:6 147:2
150:12 158:24
173:11 182:6
191:12 198:17
224:15 248:8,9,11

265:22 271:16
278:3 280:9 283:3
283:10 284:3
286:21 288:3
315:23 321:1
333:11
refers 155:5 208:17
228:12 238:10
270:4 276:18
283:18 327:8,15
reflect 169:20
291:19
reflected 25:9 32:6
46:8 50:10 171:7
195:24 198:4
327:22
reflecting 50:23
reflection 68:11
reflective 25:14,18
65:8 66:16
reflects 21:14
106:19,22,24 117:2
168:20 201:4
334:13
refrain 282:6,7
refresh 86:22
165:18 177:6
regard 81:21 232:17
314:17 315:9
regarding 45:1
regardless 241:8
region 34:14 287:1
regional 286:14,15
287:1,14,16,23
307:11 308:6
regionally 307:22
registered 18:9
regulates 59:7
regulation 19:1
regulations 57:19
322:6
rehearsed 303:7
reinvent 287:6
rejected 66:20 67:11
276:16

rejects 67:4
related 18:24 21:19
41:23,23 43:24
64:24 65:6,20,24
68:1 77:10 99:13
309:21 310:15
relation 311:24
relationship 26:11
68:4
relationships
164:12
relative 159:21
relatively 304:18
relevance 25:7
222:9 243:5 326:24
relevancy 327:11
relevant 24:12
74:17,19,24 85:1,4
102:8 103:5,17
119:2 195:20
196:10 272:23
reliability 318:2
reliable 25:21 26:19
38:19 52:6 102:20
104:1 116:24
146:15 233:4
315:17,21 318:10
319:4,9
reliance 65:7 67:16
67:19
relied 38:18 43:9
77:15 130:8,10,15
135:2 254:16
reluctant 252:4
rely 18:21 22:23
27:14 39:10 52:5,17
175:7 254:6 284:8
284:14 293:11
315:1 319:8
relying 79:10
255:19 274:9 323:2
332:16,22 333:3
remainder 55:9
262:9

[remained - respective]

| | | | |
|---|---|---|---|
| remained 168:8 | 61:2,6,9 62:11,11 | 308:14 327:12 | 192:12 232:16 |
| remaining 184:5,6 | 63:11,14,16,19,20 | reporter 15:16 | 290:12 |
| remains 12:9 247:24 | 67:22 71:3,5,10 | 16:11 153:11 | requests 234:22 |
| remediation 44:1 | 79:20 80:12,20 81:7 | 206:20 253:22 | require 21:15 |
| 174:7 177:3,17 | 81:15,19 83:18 84:6 | 343:7 | 116:18 130:20 |
| remember 31:4 37:5 | 91:20 97:23 112:17 | reporting 55:16 | 143:3 239:21,23 |
| 37:7 42:11 45:15 | 113:2,18 115:24 | reports 17:6 18:18 | required 47:10 80:3 |
| 47:5 48:5 49:24 | 118:5 119:5,6,7 | 26:5 34:5 37:15,19 | 152:22 179:18,20 |
| 68:1 76:23 79:7 | 120:21,22 121:6 | 48:9 61:24 62:4,9 | 224:11 279:10 |
| 87:1 132:8 158:8 | 130:7 133:17 | 62:19,20 64:7 71:14 | 326:19,23 |
| 216:15 267:6 275:8 | 134:15,21 135:1 | 88:21 142:20 143:2 | requirement 318:1 |
| 275:9 311:2,5 | 136:24 139:17 | 160:20 169:13 | 322:1 |
| reminding 282:3 | 143:22 148:19,21 | 175:9,11 182:19 | requirements |
| render 116:19 | 149:15,18 150:3 | 221:12 237:24 | 225:15 |
| 315:21 335:9 | 164:19 168:15 | 239:6 254:16 | requires 80:9 |
| rendered 324:10 | 169:3 171:14 | 284:19 286:23 | 328:10,11 331:16 |
| 335:5,12 | 172:16 175:11 | 287:12 289:12 | reread 329:1 |
| rendering 211:6 | 179:9,13 185:13 | 291:24 295:19,22 | research 19:3 38:9 |
| 219:5 223:20 | 188:17,18 189:6 | 296:2,4 297:9 302:2 | 38:10,14,21,22 39:1 |
| 253:17 254:8 259:8 | 191:9 199:22 | 312:23 313:9 | 39:3,11 43:12 52:17 |
| 263:2 294:1 295:15 | 204:18 213:22 | 318:17 325:4 327:9 | 52:21 63:5 108:14 |
| renewed 160:7 | 221:3,7,13 227:1 | 328:5 330:5 331:13 | 108:17,20,23 221:4 |
| rental 89:16 296:24 | 230:3,4,8 237:18 | 332:15 333:7,13,14 | 221:23 222:20,21 |
| 297:5 | 238:2,7,11 240:15 | represent 15:15 | 253:13 283:20 |
| rents 108:24 109:5 | 245:9 247:5 254:2 | 59:16 199:7 | 314:23 |
| 239:10 | 254:11,19 255:20 | representation | researching 46:5 |
| reorganize 319:17 | 255:24 283:24 | 204:19 | reserve 291:17 |
| repeat 26:1 64:12 | 287:7,17 288:3 | representations | residential 29:14 |
| 80:16 113:10 | 293:23 294:9,14,15 | 154:15 | 32:10 90:10,13,17 |
| 215:24 243:23 | 294:15,23 295:13 | representative 49:2 | 90:20,21 91:5,11 |
| 254:9 258:17 | 295:17 296:17 | representatives 45:9 | 92:8,11 119:10 |
| 301:24 | 297:19 299:4,7,15 | 45:24 99:18 106:15 | 121:11,19 122:15 |
| rephrase 34:3 62:14 | 299:18 300:1 | 108:1 110:2 112:16 | 124:6,20 125:23 |
| 67:3 115:9 302:1 | 301:22 306:1,24 | 154:13 | 126:1,22 166:20 |
| replaced 83:8,10 | 311:23 312:15,18 | represented 219:20 | 170:22 185:16 |
| replacement 294:5 | 313:2 321:21 322:3 | representing 15:2 | 188:21 190:5,9 |
| replicate 72:5 | 323:21 325:5 327:6 | 196:1,7,20 | 227:20 228:12 |
| report 4:14,19 5:6 | 327:13,13,19 328:8 | represents 227:19 | 229:8 231:22 |
| 5:11,19 10:16 11:8 | 328:12,14,17 329:9 | reputation 39:5 | 248:17 |
| 12:17 14:5,16 26:8 | 329:10,13,16 | 249:12,20 | resources 20:7 |
| 28:16 43:10 45:19 | 330:16 331:23 | request 3:7 232:14 | respect 19:7,9 |
| 45:22 49:13 53:2,5 | 332:3,21,24 333:3 | 290:7 291:16 344:9 | 159:15 222:17 |
| 53:16,18 54:3,7 | 333:10 335:1,9 | 344:11 | 258:11,22 |
| 56:11,18,21 57:2,2 | reported 49:16 | requested 102:1 | respective 301:3 |
| 57:7 58:19 60:7,19 | 137:24 138:1 | 153:23 180:1 | 317:6 |

Veritext Legal Solutions Midwest

respond 313:12
respondents 134:7
  134:12 135:11,13
  135:17,18
responding 137:16
responses 134:4
responsibilities
  290:1,14
responsibility
  183:10 184:22
responsible 184:13
  184:17
rest 55:14 172:10
  271:14
result 63:4 215:20
  237:10 315:16
resulted 212:19
results 338:17 339:1
  339:6,7
retail 29:13 31:13
  32:9 33:8 44:16
  90:1 109:5 120:7
  124:15 126:16
  128:17 166:19
  170:22 195:4,8
  196:1,2,6,7,20,22
  197:8 236:9,12,14
  236:17 237:8
  239:10,16 248:17
  248:23 296:23
  297:4,7 316:1
retain 334:1
retained 56:1 194:3
retainer 289:1
retrospective
  166:24 304:11
return 21:14 24:20
  75:23 130:20
  134:23 137:24
  138:7,13,15,19,19
  139:1,21,24 141:17
  142:7 143:7,13
  144:6 145:4,8
  185:19 198:10,11
  199:9 206:10 209:7

265:18 267:2,10
  269:10
revenue 21:5 97:2
  111:15
revenues 185:18
review 14:15 19:10
  19:12 20:15 21:23
  27:8 39:24 51:15
  72:20 74:15 75:1,3
  75:5 84:15,19
  153:16 199:1
  221:13 224:12
  253:16 280:11,20
  280:23 285:3,8,9
  303:9 310:17,21
  343:1 344:1
reviewed 20:20,20
  49:13 72:9,16,24
  154:11 200:22
  307:1
reviewers 313:9
reviewing 17:6
  39:21 84:18
rework 286:13
rezko 9:20 13:8
  39:15,18,19,19 68:7
  73:1,10 74:24 75:6
  76:12,15 78:13,22
  155:12 164:10,13
  202:14 218:17
  249:13 257:15,16
  259:2,23 260:3,16
  260:19 261:15,20
  262:22 266:7,13
  271:22 272:9
  334:15
rezko's 76:2 204:4
  261:1,21 262:9
rezmar 6:7,11 98:12
rezmar's 98:3
rezoned 163:5
right 20:13 22:4
  23:9 32:20,24 34:10
  34:14 36:20 58:1,12
  58:17 60:24 67:13

67:17,19 71:12
  72:22 74:24 80:5,11
  80:15,21 81:4,15,20
  82:14,15,21 87:7,19
  89:19 90:4 92:3,12
  93:20,22 94:1 97:23
  107:1,9 122:11
  123:2,5,8,13 124:4
  124:10 131:22
  132:10 137:8 138:6
  139:2 151:7 152:1
  155:12 156:5 165:8
  171:2 172:9 178:11
  184:2,7 186:22
  187:8,10 188:11
  189:19 190:19,19
  190:21,24 191:4,8
  192:20 204:2 205:4
  212:22 215:23
  222:17,17 228:10
  228:23 233:21
  234:1 237:16
  243:15 248:15
  249:1 253:21,22
  255:16 262:3
  264:14 266:16
  267:14 271:9
  274:20 277:9
  279:18,23 280:9
  281:4 285:17
  288:21 289:15
  291:13 292:13
  293:18 296:10,12
  296:14 297:7
  298:20 299:1,14
  303:12 304:14
  305:6 312:5 313:23
  314:5 317:2,14
  319:21 320:17
  321:7,17 327:3
  329:20 330:22
rights 193:15
  291:17
rise 322:18 323:14

rises 84:11
risk 137:13 142:13
  142:14,17 145:5
risky 137:15
river 31:13 172:1
  174:16 241:19
  249:15
riverside 4:12,17
  5:4,9,14,17 6:8,12
  6:20 7:4,9,14,19 8:4
  8:9 9:15 10:15 11:9
  11:19 12:5,14 14:19
  40:14 42:9 43:3,8
  45:10,24 46:22
  73:24 76:3,6,9
  86:24 95:22 96:20
  99:19 105:11 108:2
  110:2,19,22 112:12
  141:7,10 151:16,17
  157:24 177:7 192:5
  193:15 195:1,21
  204:4 206:10
  211:22 213:23
  216:4,6 219:9 223:4
  223:15 225:8
  248:14 310:8
rmr 1:14 341:6
  342:5
road 2:17 4:13,18
  5:5,10,18 12:15
  33:9 44:17 171:18
  171:22 172:9,12,21
  236:14
roman 37:23 224:13
romanette 63:22
  197:19 255:24
  321:6
roosevelt 4:13,18
  5:5,10,18 9:9 11:10
  12:15 33:8 44:16
  64:10 68:13 148:5
  156:13 171:18,21
  172:9,12,21 186:11
  187:4 205:7,8,11,14
  236:14 298:21

299:11 309:8 325:1
325:6,17 331:22
**rose** 88:11
**roughly** 28:20 29:10
30:14 63:2,6 166:5
169:14 318:16
**routine** 183:14,16
**rule** 5:14 320:22,22
320:22,23,24
322:14 323:18,21
323:23 326:13,16
326:19 328:2,4
329:17 330:2 331:4
331:5,12,16 332:6,9
332:11 333:11
**rules** 1:15 16:7
57:19 321:13 343:5
344:5
**rumman** 39:14 73:1
73:7 74:24 75:6
76:12,20 78:13,22
86:20 155:14
210:18 263:21
272:1 334:14,15
**rumman's** 76:8
**running** 171:24
**ryan** 2:4,6,15,16
15:6,20,20 17:12,17
17:18 18:3 36:21
39:23 40:5 41:3
42:6 45:3 48:17
49:7,9 50:13 54:12
59:9,11 60:9 61:16
62:12 66:9 71:2
72:12,15,19 74:18
74:23 78:21 86:13
87:8 92:16 94:12
95:2,10,18 96:2
100:23 104:10,22
105:14 113:4 117:7
125:3,7,11,16
126:11 127:8,17
128:4 129:22 131:6
131:20,24 132:6,11
139:9,12 140:16,23

141:6 142:1 143:17
148:14 149:12,20
149:23 150:24
153:10 154:2 155:1
156:23 157:1,3,6
159:18 162:4,14
189:12,21 191:1,10
193:20 199:16
200:9 202:18
203:18 209:20,24
231:11 244:4 246:2
249:22 251:13
252:10,15,18
253:21 255:12
259:16,18,20 261:4
261:9 262:17
263:12 265:14
266:2 267:24
270:15 276:23
277:13 280:10
289:3 295:2,5
297:12 303:22
312:3 314:3,16
319:13,20 328:21
329:21 331:7
337:23 338:2,4
339:16 340:17
**ryanlawoffices.com**
2:21

---

**s**

**s** 1:14 341:5 342:5
344:8,8 345:3
**sa** 1:9,10
**salaries** 179:13
**sale** 33:13 37:3,6
45:1,3,9 47:8,13
64:8 67:23 68:18
70:9,13,19,20 71:4
71:15,19,22 72:3,7
83:23 85:6,19 86:2
89:1,6 90:20,21
91:22 92:1,4 121:15
129:14 147:5
152:17,18 153:3,4

154:18 172:21
185:21 186:9
187:23 191:14,16
202:8,9,14 203:17
203:17 204:13,20
204:21 213:5,11,14
214:6,14 216:12
219:9,16 227:5
228:21 229:13,20
230:12 231:9,17,19
231:19 232:2,5,5,5
232:7 233:5,17
234:15 268:14,17
299:11 302:15
308:22 315:1
316:24 318:23
319:4 324:4,14,20
324:22,24 325:6,11
325:21 326:2,4
331:21
**sales** 14:19 20:1
24:1,4,16 35:6 80:9
83:20 85:16,21
88:17,23 89:9 90:10
90:13,17 91:16,20
96:23 97:3,6,12,14
97:19 98:9 99:23
103:13,24 114:3,6
114:11 116:22
117:4,5,13,16,18,23
118:1,7,9,14,16,20
118:24 124:1
127:14,16,22
128:11,13 129:1,5,9
139:8 161:12
167:10 168:23
169:10,11,12,14,16
169:19 173:14
184:24 185:5,12,24
186:6 187:13,19,22
188:1,5 190:14,18
201:5 227:2 230:7
230:24 231:7,19,24
233:7,10 235:8,20
292:10,13,15,20

293:6,14 294:13,16
294:21 295:9,14,23
310:4,12 314:1,15
314:21 315:9 316:7
316:20 317:4 318:8
318:8,14,16,19
327:5,18 328:18
329:4,10,18,22
335:10,13,18
336:14
**sat** 167:12,16,19,22
168:4 169:8
**save** 287:14,15
**saw** 44:13 239:9
241:3 275:8 285:16
**saying** 26:13,16
27:3 35:7 50:21
66:18 75:18 132:11
137:12,13 140:8,9
140:18 144:8,9,17
146:11,12
**says** 37:24 39:13
56:17 57:6 61:1
85:17 87:24 89:20
90:15 91:9 93:15
94:16 97:2 104:12
118:7 173:1 182:8
182:10 195:21
201:7,10 202:17,21
202:24 203:5 204:2
207:20,22 208:3
214:5,10 217:14
221:8 227:10
230:12 231:15
243:21 247:22,23
248:24 249:11,13
250:7,17 251:5
252:1,2 256:7 258:6
264:6 265:9,17
266:5,6,12,14,21,24
267:16 268:7,18
269:9 270:9 271:12
271:14,20 272:4,5
272:13 273:3
274:15,17,21

275:18,20 276:8,12
278:11,14 279:19
280:6 281:10,16,20
282:19,20 283:5
286:13,14,15,18
287:21 289:24
290:4 313:4 315:11
317:3 323:5,7 330:7
333:16 337:11,21
338:6,17,22
**scale** 28:15,22
**scaled** 186:12
**scandaglia** 2:4 15:6
**scandagliaryan.com**
2:11,12
**scenario** 300:21,24
**schedule** 201:2
290:6
**schwarz** 2:24 15:2
**scope** 116:15 166:2
302:9 320:23
**se** 24:5
**seal** 343:15 344:21
**second** 8:17 31:6
61:23 88:4 89:11
94:15 122:1 124:13
132:13 166:11
173:20 182:2 194:2
197:4 230:6 238:11
246:20 247:8 249:6
249:8 266:4 272:5
286:12 298:1
319:12 337:16,20
**secretary** 319:21
**section** 88:24 123:1
130:16 135:1
149:17 153:15
237:21,23 275:22
319:18 320:19
321:8
**sections** 320:18,20
**secure** 260:5
**security** 3:23
**see** 19:15,18,20 22:3
22:8,10,13 23:7,11

24:10,13 38:1,11
39:16 41:1,10 52:14
57:13 67:22 68:1
78:1 82:8 83:19,22
85:15 86:18 87:2
89:13 90:11 91:4
92:9 93:10,13,18
94:7,9,10,14,15
96:18 97:2,4,5,24
100:14,19 101:17
101:19 104:3,8,13
106:8 107:16,19,21
109:14,18 110:14
111:8,13 112:8
113:13 119:9
122:15 123:14,18
133:9 134:5 136:23
139:18 145:14
149:18 150:5
151:21 152:7,19
167:1 168:19 171:7
172:24 173:22
174:13 176:10,14
179:6 180:2 182:7
182:23 184:19
187:15 188:23
192:6 193:11,24
194:5,10,20 195:5
196:3 197:2,5,6,22
198:8,12,13,16,21
199:3 200:20 201:1
201:4,7,10,12 202:6
202:17,18,20,21,23
202:24 203:4,8
204:9 206:23 207:4
207:12,16,18,21
208:2,6,8,11,13
210:17 211:19,24
212:2,6,21 213:24
214:2,5,10 216:24
218:12,15,18 221:2
221:6 223:6,9,13
224:8,10,17 225:7
225:10,15 227:8,12
227:15,18 230:15

231:14,18 233:22
235:2,6,20 236:11
236:13 238:11
240:20 246:23
248:3 249:17
250:10,21 251:9,23
252:1,5 254:4 256:9
257:6,10,13,14,16
257:18 258:5,8,19
260:1,15,17 261:16
263:23 264:1,3,6,7
264:9 265:4,10,19
266:21,24 267:3,18
268:7,9,23 269:2,23
270:11 271:11,20
271:23 272:2,10,15
272:19 273:2
274:14,22 276:10
276:14 278:9,13
279:1,14,21 280:2,8
281:8,11,18,22
283:7 286:12,19,24
287:8,11 288:23
290:2,9 299:7 306:2
307:2,8,14,24
308:18 309:1 310:6
312:2 314:7,12
315:13,18 317:6,12
318:11 320:11
324:7 330:2 338:13
**seeing** 52:19 76:23
**seen** 54:18 87:16
211:8 212:14
223:21 234:14
263:4
**segment** 94:18
**selection** 338:7
**self** 5:19 56:20
235:19 297:16
**sell** 28:3,4,8 29:18
31:2 33:1,7 48:15
48:23 102:11
128:18,19 142:12
143:15 144:17,21
146:10,23 147:14

147:20,23 148:2
149:3,5 165:5,7
166:6 170:5,8,13,14
170:19 172:7 180:7
187:22 201:20
203:8,11 212:2
228:6 275:22
304:17 305:11,18
325:16
**seller** 26:6 65:1 67:4
67:11 68:13 73:3
205:13 207:16
219:24 308:17
**sellers** 117:2 198:2
**selling** 31:3,10
33:15,16 115:14
116:5,11 145:12
147:7,8 166:8 170:4
170:17 179:17
184:1 189:8,10
252:3,14,24 302:14
304:13
**sellout** 166:15
**sells** 9:21 173:18
**semantics** 238:20
330:24
**semiannual** 302:24
**semir** 1:5 15:8,22
257:18,22 343:3
344:3
**sense** 32:10 43:20
44:18 52:20 131:18
158:12 166:20
177:20 205:20
236:5 294:3
**sensitive** 308:14
**sent** 132:6
**sentence** 152:15
203:4 247:7 250:7
252:1 269:5,8 290:4
307:20 337:20
338:22
**separate** 27:24
319:18 336:9

september 148:6
204:10,14 325:18
series 6:4 9:12
service 194:3
services 176:8 194:4
194:8,14,19,24
195:4,9,12 291:1
314:24,24
set 19:14 58:5,7
273:3,12 289:6
seth 2:5 15:18
149:21
sets 121:7
seven 167:23 169:12
271:18
severe 171:19
shaking 16:14
share 205:14
shared 105:11
shares 198:15
270:10,20
sheet 10:8 344:7,10
344:18 345:1
sheets 169:20
sheridan 2:17
shopping 275:21
316:1
short 69:12 120:11
131:4 132:19 240:5
277:23 319:16
shorthand 341:12
shortly 69:6
show 71:3 131:3
181:8 182:18 206:1
230:20 233:18
311:15,17 333:22
showed 241:3
showing 201:14
220:20 287:23
shows 19:21 171:17
201:6 230:16
sic 153:14 193:5
side 22:16 84:14
96:10 100:2 105:24
107:2 108:16 110:6

112:2,19 119:3
171:23 172:1,2
205:24 206:2
213:17 216:18
218:6 267:8 292:6
299:15,15
sides 65:21 66:6
68:8 73:3 74:4
205:21 206:5
sign 262:17 279:24
signature 212:23
341:19 342:1
signatures 212:24
signed 212:22 213:2
213:9,10 217:9,10
218:15 343:13
344:18
significance 81:9
313:6 319:6
significant 62:16
147:22 239:18
277:12 313:15
335:11
significantly 34:18
63:15 64:8 159:8,17
161:4 170:4 222:5
226:8 246:9 277:22
291:7 304:21 319:7
331:17 339:14,23
340:4
signs 220:20
similar 28:14,15
30:4 103:24 117:3
166:2 180:17
190:15 302:9
304:19 314:22
316:24 317:22
simple 25:4,6,8,10
simply 294:20 314:5
simultaneously 83:5
single 129:16 233:4
235:22 275:21
301:5
sir 122:20

sirazi 1:5 3:15 4:6,9
9:22 11:5,13 12:11
12:18 13:12,15,18
13:21 14:5,9,13
15:9,22,22 265:9
343:3 344:3
sirazi's 265:10
site 18:24 19:20,21
43:17,24 93:16
94:18 98:24 100:12
102:2 109:22
119:24 122:9 123:9
124:9,13,16 126:22
171:19,21,22,24
172:5,11 173:20
174:2,6 177:22
188:19 194:9,18
203:6 227:10,20
233:23 234:12
295:10,15 298:21
301:17
sites 30:18,21
119:10 120:7
121:11,19 122:16
124:6,20 125:23
126:1,8,16 185:9,11
228:8,12
sitting 43:1 50:21
55:4 72:1 79:8
123:22 182:14
295:21 316:12
situation 220:4
322:24
situations 312:9
six 168:2 271:18
sixth 57:6
size 129:2 227:10
228:8 316:24
skew 233:1
slight 338:24
slightly 126:24
137:1,15 237:11
298:22
small 234:14 307:10
307:16,17

smaller 129:3
soil 176:23
sold 21:12 30:1,8,15
30:18 31:20,22
44:18,21 64:17
129:3,4 145:2,20
146:1,4 167:8 170:1
170:11 171:12
172:23 182:15
183:9 184:22 186:2
189:20 190:15
228:18 275:21
298:23 299:11
300:18 301:1
sole 241:1
solutions 15:2 345:1
somebody 222:8
284:8,14
soon 68:1 288:8
sophisticated 156:1
sorry 19:8 26:1 37:1
58:2 64:12 80:16
85:10,12,13 97:22
100:16 104:5
124:12,18 149:20
165:22 179:6 182:6
188:17 193:2,5
198:2,17 208:2
209:12 215:24
221:7 222:16
224:15 229:2,16
231:12 238:15
243:23 246:20
249:10 252:10
254:9 258:9,13,17
259:17 261:4
268:10 274:19
275:18 278:23
290:3 295:3 297:2
301:24 311:21
321:4 322:8 328:24
331:4,7
sort 18:18,19 19:16
20:24,24 22:23 33:8
56:19 58:10 153:24

Veritext Legal Solutions Midwest

158:3 179:14,24
183:15 248:22
302:21 321:8
**sorts**  164:10 277:21
**sounds**  204:15 253:2
**source**  241:1 334:17
**sources**  38:19 52:5
**south**  5:18 28:23
29:14 32:2 33:18,23
34:6,10 35:3 39:2
39:10 119:2,3
163:20 172:2 220:7
228:15 229:12,19
230:1 285:20,23
**southwest**  4:12,17
5:4,9,17 11:9 12:15
**space**  32:9,9,20 90:1
90:2,2 91:7 166:18
166:23 196:2,7,20
196:22 236:2,21
237:4,13 238:9,13
238:16 239:9,15,22
240:3 248:18,20,21
296:23 297:4,7
330:11,15,20
**spaces**  174:17 242:2
242:9
**span**  182:5
**speak**  48:7
**speaking**  117:11
125:6
**specific**  18:23 19:8,9
19:11 22:6,17 24:8
29:6 32:5,18 34:22
36:17 38:17 42:2
50:12 55:13 60:12
78:24 79:14 81:21
85:2 88:18,22
133:15 134:8,14,16
134:22,22 138:12
143:3 147:2,6
180:19 198:22
214:19,20 220:10
230:12 237:1 238:4
244:15 258:13

283:15 294:10
301:23 305:9 323:4
329:23 330:17
**specifically**  16:19
20:23 25:24 26:3
29:7 31:12 37:7,23
41:24 43:7 47:3
48:1,6 51:7 55:3
72:14 75:2 79:7
95:24 96:3,6 134:19
135:13,21 136:8,16
141:22 151:24
158:8,16 165:18
166:14 173:8 175:4
175:15,16 207:23
213:4 220:18 233:6
265:24 268:18
270:22 283:16
288:2 294:16 295:8
295:16 297:10
299:14 304:2 313:1
323:11 327:6 328:7
339:5
**specifics**  27:18
144:20 198:7 267:6
**speculation**  95:18
103:21 116:18
148:14 159:19
199:16 244:5 246:3
252:18 270:16
**speculative**  300:13
**speed**  71:9
**spell**  299:18 332:2
**spelled**  122:24
294:11
**spend**  222:3
**spent**  17:6 54:24
55:6,10,12,15 84:18
289:23 291:20
292:1
**spoke**  45:13 86:23
108:1 110:1,22
158:8,11 163:1
177:8,9 264:19

**spoken**  158:17
**spot**  79:14 156:21
**spreadsheet**  6:20
7:4,9,14,19 8:4,9
9:15 101:20
**spreadsheets**  54:11
**square**  89:18 90:14
90:18,20,22 91:17
91:21,23 92:1,5
93:21,22 94:22 95:8
106:20 109:16
116:17 119:11,17
119:22,24 120:4,7
121:10,12,16 122:9
122:23 123:8,9,10
123:18,20 124:9,21
124:22,24 125:20
125:22 126:6,7,15
126:15 128:2,14
139:6 140:20
186:13,15 187:7
192:8 227:11,14
229:2,5,6,7,12,13,19
229:20 233:13,23
234:6,10,14 236:6
236:16 237:15
238:8,14,17,22,24
239:21 240:3
286:13,16 330:21
331:1
**sr**  12:22 13:5,8
**srr**  14:8 83:7,8,12
289:1 302:22 303:1
303:14
**srr's**  290:23
**ss**  341:2
**ssf**  7:6,11,16 8:11
9:17
**stable**  296:20,21
304:18
**staff**  17:14,22 18:2
**stake**  75:21 76:3,6,9
78:23
**stand**  303:13

**standard**  19:14,16
19:17 58:11 180:11
180:13 237:23
282:4,9,13 316:13
322:9 327:8
**standards**  14:23
57:8,11,16,21 58:6
58:7,15 321:12,12
321:16 322:11
323:17,21,23
326:13,16,19 328:1
328:4 330:2 331:4,5
331:12,15
**stands**  160:5,6
**start**  63:18,19
220:17 249:10
306:17
**started**  28:18,24
31:21 63:7,18 166:7
220:15 306:16
**starting**  183:4
**starts**  118:4
**state**  63:23 86:3,5
122:9 190:4 295:8
296:1 297:10 331:1
341:1 343:10
344:15
**stated**  293:14 322:1
325:20 327:19
329:3
**statement**  77:24
85:15,24 154:16
266:11 312:13
313:20 326:6
334:21 337:3,10,17
338:15 343:13,14
344:19,19
**statements**  56:17,20
321:15
**states**  1:1,16 15:10
29:7 34:13 301:7
323:23
**stating**  238:21
**station**  28:22 30:5
30:17 145:15 146:3

166:6 302:9
**stay** 149:14
**stayed** 62:8 167:7
  168:21 169:16
**staying** 56:10 61:21
  149:13
**stays** 169:24
**stenographer**
  341:13
**step** 327:7
**stick** 203:5 323:13
**stoplights** 44:9
**store** 231:20
**story** 9:20
**straight** 239:16
**street** 1:18 2:7 4:13
  4:18 5:5,10,19
  12:16 15:7 171:23
  186:10,23 228:15
  229:12,19 230:1
  231:20 299:13
  341:7
**streets** 11:10 174:15
  241:18
**strictly** 36:6 242:1
**strikes** 313:5
**strong** 170:23
**strongly** 52:21
**structure** 65:23 66:1
  74:1 197:23 198:4
  269:1,9
**structures** 74:2
**studies** 32:18
**studio** 234:17
**studios** 234:11,14
**study** 29:5,8 31:7,12
  44:14 66:1 158:15
  166:12 172:14
  283:12
**studying** 31:10
**stuff** 173:3
**subdevelopers**
  184:23
**subdividing** 33:16
  301:11

**subdivision** 316:13
**subdivisions** 316:16
**subject** 27:15 33:20
  35:12 46:17 62:1
  80:22 83:20 85:16
  104:2 116:23
  129:13 130:19
  136:11,15,16,21
  138:5,7 150:3 152:5
  165:16 186:12
  187:20 188:6,10,19
  189:18 199:8 227:6
  228:11 231:21
  236:23 238:4,13,16
  283:15 287:17
  288:4 299:13
  311:15 314:18
  318:20 324:5,15
  330:20
**subjects** 306:24
**submarket** 282:20
  282:21,24
**submitted** 341:20
**subparcels** 316:8
**subranet** 281:20
  282:15
**subscribed** 343:10
  344:14 345:21
**subsequent** 181:22
**subsequently** 30:16
**substantial** 331:16
  331:22
**substantiate** 277:20
**success** 43:18
**successful** 247:23
  250:13
**successfully** 214:5
**sufficient** 315:16
  316:23 328:12
  329:15
**suggest** 75:2 146:22
  196:20 267:24
**suggested** 39:23
  75:1 280:10,20
  283:13

**suggesting** 147:20
**suing** 265:10
**suitable** 294:17
  295:14 297:11
  299:16
**suite** 1:18 2:8,18
  15:7 341:6
**summaries** 87:7,10
  332:14
**summarized** 53:8
  89:11 332:22
**summarizes** 113:16
  113:19
**summary** 4:13,18
  5:5,10 11:8 12:16
  53:10,11 100:15
  112:24 113:13
  121:14 198:24
  221:3 254:1 327:13
  327:13 333:2
**supplemental** 58:7
**supply** 29:17 166:21
**support** 277:21
  333:18,21
**supported** 334:7
**supporting** 17:8
**supports** 334:2
**supposed** 237:21
  282:24
**sure** 16:5,16 20:5
  22:14 24:6,7 28:12
  32:15 34:2 35:2
  36:2 40:10,12 45:21
  54:9,10 57:18 61:10
  64:6 67:23 71:7
  79:13,21 87:13
  88:19 97:1 99:4
  104:18 106:22
  113:11 116:8
  121:18,24 124:3
  130:8 131:7,8
  140:14 160:4,4
  178:18 182:7
  186:17 202:12
  213:8 216:16

220:11 222:4
  234:13 242:24
  250:15 256:23
  264:21 276:18
  282:23 283:10,19
  293:21 298:11
  300:17 301:9 303:7
  309:15 311:19
  312:3 314:3 321:2
  328:11
**surprised** 95:22
**surprisingly** 85:21
**surrounding** 129:13
**survey** 8:14,17,20
  9:5 19:21 130:9,12
  130:24 133:8,13,16
  133:19,24 134:2,11
  134:17 135:4,5,22
  136:8 137:2 138:1,2
  338:12
**surveyed** 134:9,16
**surveyors** 137:16
**surveys** 22:11
  130:17 134:5
  337:21 338:6
**suspected** 99:17
**swear** 15:17
**switching** 149:12
**sworn** 15:23 16:2
  341:10 343:10,13
  344:14,18 345:21
**syohalem** 2:11
**system** 287:11
  291:10,13,14

**t**

**table** 121:13 134:5
  321:3
**take** 16:11 19:22
  20:2 21:7,9 22:14
  22:22 23:15,17,20
  23:23 24:2 28:4,8
  29:18 37:14,17
  41:14,17 42:19
  51:18 54:4 69:12

79:8,13 100:9
103:16,17 120:10
122:3 128:18 131:4
131:7 132:18
141:14 142:12
144:20 148:6,12,16
153:20 156:23
157:3 161:7 165:4,7
166:22 167:4
168:18 169:9
170:16 171:5
172:20 174:2
175:18 180:13
183:9 185:1 196:5
203:18 209:21,22
210:3 217:4 230:23
240:5 245:24
250:16 263:12
270:24 271:5
273:24 274:3
275:10 278:5 281:3
301:16 319:16
327:7
**taken** 1:14 28:23
41:5,18 56:7 69:16
90:3 120:14 132:23
157:10 173:4 210:7
240:9 241:20
288:13 318:5,6
320:1 323:10
340:11 341:5,12
**takes** 103:14
**talk** 28:1 41:12,20
46:14 47:3 48:24
50:7 87:6 106:23
130:5 158:20
164:21 173:14
302:4
**talked** 41:22 43:3
47:1 51:2 70:2
95:16 98:19 99:20
106:15 111:23
112:16,20 139:7
182:2 192:16
195:18 279:3

290:11 292:7 300:1
304:23
**talking** 43:14 46:6
46:17 92:21 113:7
116:15 121:5 142:8
164:8 188:6,7
204:23 234:17
294:6 324:22
330:24 333:7,8
**talks** 87:13,14,18
88:4 89:15 113:12
194:2 196:24
**target** 231:19
249:13
**targeting** 136:8
264:4
**tax** 174:17 256:8,12
256:16,21
**taxes** 19:22,23 56:23
256:12,15,22
**team** 20:20 158:10
285:3
**team's** 163:22
**technically** 61:4
162:17
**techniques** 327:1
**telephone** 110:3
192:16 264:20
**tell** 42:19 43:8 46:4
53:6,14 56:16 57:15
74:18 95:11,12
107:23 121:10
133:15 135:21
145:6 147:21 148:3
148:11,15 149:7
155:2 165:21
195:19 199:19
201:15 208:17,19
221:23 241:24
242:7 246:5 282:19
289:21 323:11
**telling** 70:5,8
**ten** 142:16 143:24
146:9 167:12
169:24 170:5,20

182:5 183:19
187:23 209:20
278:12 300:7,11,12
300:15 336:23
339:13
**tenants** 196:1,6,21
**tend** 313:13
**tens** 142:21
**term** 75:24 104:16
105:2 244:10
**terms** 27:16 35:12
59:7 68:9 158:13
163:3 171:20
172:16 179:21
185:18 186:18
234:24 244:13
298:14 301:19
**terrific** 318:16
**test** 298:5,13
**tested** 338:18 339:5
339:7
**testified** 16:2 55:24
59:14,15 68:21
133:11 226:19
320:13 334:13
**testifying** 54:20,24
55:5,22 56:2 77:20
295:21
**testimony** 3:3 17:2
41:2,10 70:1,4
77:15 79:3,10
120:24 129:8,12,16
135:23 136:2
139:10 157:17
233:17 235:5 271:6
318:13,15,15 332:1
332:15,16 334:14
339:10 343:6,7
344:6,9,12
**testing** 298:16
**thank** 338:4
**thing** 29:11 30:3
32:1,21 33:11 37:21
88:4 89:15 92:7
94:20 130:4 147:7

151:18 152:3
153:22 166:10,11
167:5 173:14
179:16 187:11
196:19 203:19
241:9 243:10
247:21 265:8 270:9
281:20
**things** 18:24 19:5
20:4 25:12 27:16
28:11 29:4 43:13,15
44:13 56:23,24
117:21 132:4,9
142:16 165:13,24
170:7,14 179:22
180:3 183:4,13,14
224:11 232:24
245:7 282:11 301:4
317:11 320:16
322:22
**think** 20:21 22:1
23:24 24:11,23
29:23 30:3,14 33:9
38:19 39:4,8 44:8
44:23,23 47:5 49:18
60:11,17,17 61:7,14
68:21 72:23 74:17
77:23 78:7 84:5,9
84:11,24 85:3 88:11
88:15 89:6 91:19
97:16 103:16 122:7
131:20 135:10,10
136:17,20,24 137:9
137:12 139:16
141:7 146:6,8
160:15,16,18,24
161:7,20,21 162:15
163:5 164:24
165:11,22 169:12
171:16 172:6 175:3
180:5 183:24
184:21 186:3
190:20 203:9,10,16
209:11 220:19
226:10 230:2 232:4

232:5 233:20
235:19 236:6,9
238:20 241:5
242:11,12 244:13
245:1 252:7,9,12,22
253:5 265:13 267:7
268:10,18 269:11
269:11 273:23
274:3,17 275:19
278:14 280:9 282:3
284:3,23 287:19,19
288:5 293:22
294:15 295:21
297:15,19 302:10
303:8 313:13 314:1
316:11 319:15
322:13,15,23
330:24 331:24
333:6
**third** 8:14 29:11
32:1 131:14 133:7
268:6 274:14
**thirds** 97:24 279:15
**thorough** 51:24 68:6
115:23 117:13
**thought** 33:14 68:14
125:6 165:21
173:24 185:17
216:4 219:24
284:20
**thoughts** 319:17
**three** 39:22 57:5
66:7 80:11 87:14
113:16,19 121:7
123:24 126:19
152:6 168:10 201:5
201:17,22 251:4
271:17 303:19
312:20 318:2 321:7
337:10,20
**threshold** 184:20
**through000318**
12:12
**through007802**
14:21

**thrown** 105:22
**tie** 279:20 299:24
**ties** 99:15
**tif** 43:16,21 241:2,4
241:12,16,23,24
242:7 279:4
**time** 15:3,14 17:6
25:19 30:1 31:1,19
33:10,13 39:4 44:7
51:10 54:24 55:6,9
55:12,15,18 61:13
62:10 63:8,13,24
65:12 66:11 68:23
69:14,19 78:12 80:7
80:11 83:7 84:18
85:18 86:1 102:7
115:14 120:12,17
122:21 132:21
133:1 134:18,19
143:16,24 145:14
156:1 157:1,7,13
165:4 167:5 169:7
169:16 171:1,6,6
181:19 184:14
203:18 210:5,10
220:17 228:23
240:7,11 247:12,19
273:12 277:20
279:7 287:7,13,15
288:11,16 289:23
291:3,5,7,8,20
301:17,19 303:8,21
304:3,7,11,21 305:3
305:6,7,9,10,15,20
305:21,24 306:3,3,5
306:12,16 308:22
319:11,23 320:3
325:11 340:9,13,20
341:17
**times** 55:22 56:3,6,8
126:24 132:1
298:10 313:13
316:10
**timing** 83:9

**timothy** 217:10
**tiny** 234:2
**title** 18:4 150:3
198:19 207:6
**titled** 6:15 101:22
107:16 109:12
230:1 257:13
278:24
**today** 15:3 16:20
17:1 42:17 43:1
50:22 79:9 128:19
145:7 149:1,4
190:17 202:19
246:13 269:4
275:13 300:16
304:17 305:16
316:12 334:13
**today's** 17:4 340:19
**told** 51:7,9 65:15
70:21 72:15 74:23
95:23 148:6 177:13
178:17 195:16
242:16,19 266:17
273:6 280:18 284:7
284:13 285:7 311:1
311:3,6
**tony** 13:8 39:19 73:1
164:10 261:15,20
262:22 264:3 266:7
266:12
**tool** 335:1,4 337:12
**tools** 335:3,8
**top** 31:4 134:10
135:15 168:17
169:17 226:23
272:19 283:19
312:4,4,4 313:23
314:5 315:10
**total** 97:24 99:23
104:8,12 110:12
111:15 118:15
121:19 122:23
123:7 124:5 127:6
134:23 177:20
182:8,10,10 196:2,7

232:22 239:14
276:8 292:1,23
**totaling** 291:24
**totally** 105:18 119:1
119:1 243:13
322:22 335:18
**tower** 35:15,19
307:12,18
**townhome** 91:22
92:1,4 108:21
**townhomes** 88:23
91:13
**townhouse** 109:2
**township** 12:15
**tracks** 171:24 172:2
**tract** 136:9
**traditional** 54:5
113:19
**training** 18:7
**transaction** 20:1
25:5,14 26:17 28:14
30:4 64:21,24 65:5
65:10,17 66:2,5
67:21,24 68:2,5,8
69:3,6,11 70:14,24
71:15,18,22 72:3,7
72:10,11 73:3,8,11
73:14 74:4,10 75:4
75:9 76:13,16,21
77:4,11,17,22 78:3
78:8,11,12,16,23
79:5,19,23 80:8,14
80:15,19,21,22 81:4
81:8,14,19 84:2,11
85:7 86:6 151:19
154:22,24,24
156:11 161:13
198:3 204:1,6
205:17,19,22,23
206:1,2,3,5,6
209:16 212:19
213:4 214:14,17,18
214:22,23 215:4,19
216:2,6,9,14 262:3
269:1,9,15 272:6

280:14,16 308:16
308:24 309:5,8,12
309:21 311:10,15
311:18 312:16,17
319:3,9 334:8,9
**transactions** 19:3
23:21 24:3 26:11
35:11 46:5 65:21
66:19 79:11 103:24
105:21 108:15,18
108:21,24 109:5
116:22 117:3 129:6
129:15 215:19
226:17 266:15,18
267:13 272:17
312:1 315:1 316:24
318:22
**transcribed** 343:7
**transcript** 76:18,24
77:7 78:5,7 332:15
343:5,12 344:5,11
344:17
**transcripts** 39:14,22
39:24 66:8 70:23
72:9,17,21,24 74:16
74:24 77:10 79:3,9
79:12 147:4 212:13
280:10,12,15
309:20 312:19
**transfer** 25:6,9
184:22 232:17
235:10 260:16,18
**transfers** 25:17
152:5,9 326:1
**translates** 300:16
**transmission** 4:4,8
**transmittal** 10:8
**tremendous** 103:20
313:6
**trends** 19:3 29:12,15
32:2,5,8 287:3
**trial** 273:3,13
**tried** 235:14
**triple** 89:18,21,23
89:24 90:7 239:10

298:11
**true** 56:18,24 57:3
85:24 145:23
154:16 160:15
341:15
**trump** 250:9,15
**trust** 55:20 150:4,15
150:16,22 151:9
152:10,11 155:9
**trusts** 55:18
**truth** 70:5,8
**truthful** 17:2 164:16
**try** 36:16 115:6,10
227:1 300:14
335:21
**trying** 26:20 32:10
75:18,19 123:6
125:14 129:4
143:11 147:16
162:8 165:14
183:12 201:20
228:4,6 256:12
275:3 279:20
300:15
**tube** 156:4
**tubes** 156:8
**tuesday** 12:10 17:21
**turn** 56:10,11 63:22
83:17 117:20 119:4
149:11 153:24
157:24 164:18
181:24 187:13
188:17 197:18
208:9 218:14
223:11 225:12
227:3 237:17
240:14 251:21
255:23 268:6
278:22 281:6
303:16 323:17
328:1 331:5 332:6
334:19 337:16
**turned** 156:13
217:23

**turning** 157:23
**twice** 148:12 318:24
318:24
**two** 29:4 30:21 42:8
57:5 93:20 97:24
122:8,10 126:3
153:18 160:16
166:3 168:12 211:4
232:4 234:18
265:16 266:4,4,6,14
266:17 271:17
274:3 278:23
279:15 296:9
297:14 298:9
299:15 304:18
**tycoon** 12:9 252:2,8
**type** 55:19 96:3,6
114:22 134:3 138:4
180:24 250:24
338:8,10
**types** 22:17 130:14
142:9
**typical** 21:15 23:1
102:17,22 143:2,4,5
146:16 180:11,16
180:17
**typically** 20:5 21:10
28:5 39:10 52:11
130:20 134:11
138:6 144:2,5
145:18 168:24
184:19 236:18
244:14 338:10
**typographical**
322:16 323:13

**u**

**u** 321:2,5 323:18
331:6,9 332:7
334:19,21 337:18
**u.s.** 94:1,4 250:9,19
250:24
**uh** 86:21 276:15
**ultimate** 34:18
48:11,22 67:12

292:18
**ultimately** 43:21
191:3 289:22
**unable** 137:10
235:14
**uncertain** 337:6
**underlying** 199:8
261:22 289:5
313:16 317:17
**undermine** 60:19
61:5,8 64:21
**undermined** 283:23
**underneath** 133:23
274:20 279:23
**undersigned** 341:13
341:22
**understand** 16:22
20:12 24:6 26:21
34:2 35:2 36:12
45:20 54:9 56:14
74:1 75:15 77:18
79:21 88:19 101:4
105:2,4 108:7 116:8
117:15,19 127:23
128:16,24 132:6
136:2 137:19,22
138:20 140:6,8
141:1 143:11,18
144:13 145:9
147:15,16 160:8
162:5 177:15
183:12 200:4 227:1
229:16 248:9,20
249:19 250:12
265:21 268:13
270:13 281:13
282:23 292:8
308:22 328:14,18
329:15
**understanding** 10:5
26:10 30:10 33:14
49:1 64:23 65:9,16
65:19 66:4,8 68:3,7
73:20,23 74:3
118:19 127:15

134:2 138:22
142:10 143:8
146:19 150:20
151:8,11,15 156:6
163:4 164:2,5
181:18 191:2 198:3
200:11 205:10
206:22 207:2,14
208:21 209:5,15
210:20 211:10
216:10,12 220:6
241:16 243:5 248:5
267:4 309:14,17
**understood** 209:6
250:4
**undeveloped** 30:9
31:2,11,23 32:6,6
105:8 116:6 139:6
183:17 184:1,5,6
190:21 301:7
**uniform** 14:23 57:8
57:21
**unique** 301:5,8
**uniqueness** 301:11
**unit** 13:4 114:4
195:22 201:19
202:8 209:12
233:10,14 234:6,16
261:14
**united** 1:1,16 15:10
34:13 301:7
**units** 29:17 31:20,23
31:23 32:6,10,17
88:18,23 89:2,3,7,9
90:23 102:6 108:18
108:21 116:5 129:4
199:4,7 201:5,10,13
201:18,20 229:24
230:9,13,16,21
231:4,8,10,15,16,17
231:22 232:2,24
233:7,18 234:2,10
234:17,18
**unquote** 143:4
236:7

**unreasonable** 339:1
**unrelated** 160:16
255:3 282:22
**unreliable** 68:2
116:20
**unsold** 167:12,17,20
167:23 168:2,5,8
305:5
**unusual** 26:7
**use** 35:1,3 38:14
44:16 57:20 89:12
90:10 102:11
112:21 114:22
115:6 119:23 120:6
122:8 124:9,13,15
126:8,16 132:20
137:20 139:15
143:1,16 145:12
154:3 160:19 165:9
171:15 180:19
185:15,15 187:19
188:1,2,6,19,21
189:3,7,18 190:3,5
190:9 191:7,17,18
234:5 236:15 239:8
239:12 245:18
256:7 293:2,5,24
294:14 295:23
296:4 300:2,3,4
307:10 313:5,17
328:18 329:10
335:8,22
**useful** 337:22 338:7
**user** 328:16
**users** 328:13
**uses** 236:10
**uspap** 57:18,20 58:6
58:10,20,23,23 59:1
59:4,7,20 60:4,7,15
60:18,21 61:1,4,8
80:2,4,9 84:5,12
152:22 320:10,14
320:16,17,18
321:18,22 322:1,5
322:10,18 323:1,2,3

323:8,10,14 333:4
333:22 334:3,4,10
**usual** 77:13
**usually** 20:9 54:8,10
169:23
**utility** 174:16
241:19
**utilized** 254:21
314:10

**v**

**v** 343:3 344:3
**vacant** 19:19 91:1
102:6,11,14,15,18
102:23 104:20,21
105:6 109:1 116:22
167:12 168:21
169:24 170:4
182:15 188:20
190:13,14,18
191:19 249:14
294:6 300:4,6,12
316:3
**valid** 60:3,5,8
**validity** 59:24 60:2
**valuation** 59:2,4,5,8
91:10 93:2 95:7
96:23 97:3 99:24
153:1 295:7 304:13
313:18 323:24
329:19
**valuations** 55:16,18
63:15 94:18 304:2
**value** 24:8,21 25:8
25:15,18,21,23 26:2
26:4,12,19,22 27:3
29:21 35:10 47:7
52:2,4 53:23 62:7,9
62:17 63:9,14,23
64:3,13,22 65:8,14
66:17 67:7 68:11,14
68:18 71:6 79:24
80:13 85:2,20 88:9
88:10 102:15,20
104:2 108:13

113:13,20,23 114:2
114:7,11,14,15
115:11,16,18 117:1
117:6 118:2,14
119:11,17,21,24
120:3,7 124:24
125:1,4,20,23,24
126:7,9 127:7,10,14
128:2,10,12,14
129:10,14 137:21
139:4,5,16,17
140:11,18 146:13
147:17 148:2,13,16
148:24 156:17
159:9,17 160:10,11
160:12,23 161:1,17
162:3,9,24 170:11
171:10 172:22
173:5,7 181:23
185:1,20 187:1
189:17 190:16
198:9 199:12,24
200:7 221:9 222:7,8
222:11,12,13,14
223:17 224:12
226:15 228:5,7
229:14,22 232:23
237:12 239:19
241:12,21 243:5,9
243:10,14,15,17,18
243:19,22 244:3,7
244:13,13,14,15,16
244:20,23 245:2,5,6
245:11,13,15,18,20
245:20 246:6,8,11
246:13 256:17,24
263:2,9 276:20
284:14 287:5 290:5
292:12,14,17,23
293:5,6,20,21
294:18,18 295:15
295:24 297:22
298:14,18 299:9
300:10,16 305:8,16
314:17 315:17,21

[value - wheel]

316:8 317:8,22
318:18,24,24 319:5
319:7 322:22
323:24 324:1,10,10
325:9,12 327:1
328:19 329:11
333:9,13 335:5,5,9
335:12,20,24 336:2
336:5,10,13,16
337:13 339:18
**valued** 91:7 102:16
118:11 121:12
139:3,5 144:22
148:24 201:18
243:11 244:1
**values** 63:3,7,10
94:8 128:1 131:11
171:8 220:11,14
226:9 244:11
317:20
**valuing** 91:1 102:5
109:1,16 118:10,11
188:3 293:12 316:3
318:6 329:5
**van** 199:22 272:20
**vansanten** 1:14 3:3
15:13 16:1,5 69:22
82:4 86:16 120:20
133:6 157:16
210:15 225:4 226:5
240:14 257:4
288:21 320:8 341:5
343:4,9 344:4,13
345:20
**varies** 88:9 97:16
222:4
**variety** 54:18
130:14
**various** 46:3,13 52:5
71:1 107:19 121:15
262:24 301:20
317:10 320:16,17
322:5
**vary** 139:16

**verbalize** 16:13
**verbally** 311:1
**verbatim** 123:16
**verification** 221:23
222:3 308:15 311:9
311:12,13,21,23
312:11,16,23,24
**verified** 67:22
**verify** 37:18 235:8
**verifying** 46:5 222:3
316:19
**veritext** 15:2,16
345:1
**version** 186:12
**versus** 15:9 34:23
138:19 160:11
300:12 307:12
**vertical** 6:21 7:20
89:12 90:9 101:20
**vi.b** 224:14
**vice** 217:11
**videographer** 2:24
15:1 69:14,18
120:12,16 132:21
133:1 157:7,12
210:5,9 240:7,11
288:11,15 319:12
319:14,23 320:3
336:23 340:9,13,19
**videotaped** 1:13
**view** 92:24 137:14
236:16 239:13
**viewed** 44:19
**vii** 321:2
**viii** 321:5,6
**violate** 60:4
**violated** 59:20 84:5
**violates** 60:7 322:9
**violation** 58:20
60:13,18 61:4,8
84:12 322:19 323:3
323:8,15 333:4
334:3,5,10
**violations** 60:15,20

**virtue** 65:5 329:16
**vleet** 199:22 272:20
**vs** 1:8
**vulnerable** 337:6

**w**

**w** 1:13 3:3 16:1
341:5 343:4,9 344:4
344:13 345:20
**wait** 124:12
**waived** 341:20
**walk** 174:16 241:19
252:2,13,23
**want** 18:19 19:10,20
19:22 20:2 21:7,8
21:23 22:3,8,13,14
22:18,22 23:11,15
23:17,20,23 24:2,9
24:13 27:8 37:17
56:10 63:19,20 67:3
70:16 74:15 87:6
113:22 122:18
130:4 132:3 136:13
142:17 148:17
149:11 153:14
156:23 157:3 163:6
165:16 168:18
169:5,6 173:8
177:11 180:2
187:13 209:22
210:1 226:24 227:1
234:5 242:13
247:21 249:5
251:21 297:8
300:17 303:16
319:17 323:12,17
329:1
**wanted** 28:3 43:13
43:19 44:2,10,18
48:23 51:15,18
56:14 72:5 78:1
108:6 126:21 149:5
200:12 235:2
243:19,24 244:6
275:10 292:8

**wants** 248:1
**waste** 122:20
**waterfall** 265:9
**way** 23:8 25:13
52:15,23 70:24
74:13 83:3 97:24
115:16 122:2,21
144:12 146:14,15
146:18 156:16
157:6 161:15,17
162:3 184:8 186:20
188:16 190:12
203:14 256:15
259:8 264:15
275:24 279:16
296:7 297:22
301:13 303:19
327:17 335:21
**ways** 49:20 93:20
288:9 296:9
**we've** 61:14 112:20
144:23 169:13
181:12 188:10
226:5 228:3 252:7
279:3 288:9 296:22
309:3 330:14
**wealth** 249:4
**weight** 52:13,15
66:21 108:10
212:20
**weights** 67:15
**weiland** 1:14 15:16
341:6 342:5
**went** 31:14 62:24
63:3 69:22 91:19
102:18 103:21
156:4,8 164:2 165:9
167:16,20,23 168:1
168:2,5,7 213:5
222:19,22 235:3
288:21 289:22
**west** 12:14 172:1
248:14 249:16
**wheel** 287:6

**white**  208:19
**widely**  38:18 135:2
**william**  2:6
**willing**  9:4 26:6,6
　105:5 145:7 147:14
**willis**  35:15,19
　307:12,18
**wire**  260:15,18
**wish**  289:21
**witness**  15:13,17,23
　16:21 50:17 54:15
　59:10,12 60:11
　61:18 92:17 95:3,11
　95:19 101:1 104:13
　105:15 113:6 125:9
　126:12 127:10
　128:6 131:9,14
　132:13 139:11
　140:24 141:7 142:2
　143:18 148:15
　155:2 156:24
　159:21 162:5,15
　189:13,22 191:2,11
　199:18 200:11
　203:20 231:13
　244:6 246:4 249:24
　251:14 270:17
　276:24 277:14
　295:4,6 297:13
　312:6 314:17 329:3
　329:22 331:10
　339:17 341:5,10,17
　341:19 342:1 343:1
　343:4,11 344:1,4,15
**witnessed**  312:9
**woman**  42:23
**wondering**  140:8
**word**  61:1,1
**words**  65:1
**work**  17:7 42:14,17
　50:22 54:19 71:17
　71:23,24 83:5 84:19
　84:20 85:3 131:1
　163:7 168:19 169:3
　172:8 181:5,7 205:3

234:21 235:6 247:1
　250:4 253:9 254:7
　254:20,23 255:15
　275:13 284:18
　285:1,3,6,7,9,10,12
　285:12,15 289:10
　289:14 290:5 299:4
　299:19,22 311:6
　320:23 325:15
　326:12 327:20,22
　332:9,12,14,22
　333:17 334:11,12
　339:4
**worked**  17:14 83:4
**working**  29:2 55:4
　82:18
**works**  41:19 156:22
　157:6
**world**  34:13 249:13
　249:21
**worry**  284:21
**worse**  23:4,5
**worth**  23:8 55:19
　65:12 67:2 148:12
　159:12 162:11
　170:10 243:21,22
　244:2,3 248:6 249:1
　256:17 267:1 268:1
　300:11,15
**worthless**  242:15
**wrap**  319:19
**write**  267:20 280:24
　313:12 314:9
**writeups**  230:7
**writing**  267:5
　269:12 284:5
**written**  50:6 280:22
　287:8,13 328:8,12
　330:5 333:10
**wrong**  313:17,18,19
**wrote**  259:17 273:22
　281:2 284:12
**wryan**  2:12
**wynn**  39:14 73:13
　74:23 75:6 76:12

77:2 78:13,22
　155:16 334:15
**wynn's**  76:5

**y**

**yeah**  22:10 23:24
　24:20 42:15 44:22
　46:12 64:13 79:22
　80:17 88:20 99:16
　108:4 113:11 116:9
　121:21 122:13,18
　123:5,8,8,12 127:22
　137:22 139:11
　140:24 143:23
　153:18 159:2 162:8
　163:4 178:17
　198:18,23 203:20
　205:1,2 209:22
　229:18 231:3,15
　235:2 236:24
　243:24 244:18
　254:10 257:22
　258:19 265:13
　266:12 270:17
　271:19 274:17
　275:20 278:16
　295:4 299:3 302:1
　302:23 316:13
　317:24 322:15
　324:17
**year**  10:17 29:9
　80:11 97:16,16
　139:20,22 142:16
　143:16,24 144:1
　145:1,1,1 166:15
　170:20 182:5
　183:19 276:16,19
　276:21 277:6,9,18
　278:12 324:16
　339:12,13
**years**  28:6,20 29:3
　29:10,22 31:20
　32:23 33:3 128:18
　136:11 144:21
　146:10 147:11

152:6 166:6 167:2
　167:13,16,20,23
　168:2,5,8,10,12
　170:1,6 174:10
　187:23 276:13
　277:1,11,24 278:2
　300:7,11,12,15
　323:10
**yield**  136:12,13,18
　136:22 137:1,10
　140:4,6,10,21
　337:21 338:7
**yields**  129:10 141:24
　142:3 143:12
**yohalem**  2:5 3:5
　15:18,18 16:4 36:22
　37:12 40:6,7 41:6
　45:5 48:18 49:8,11
　50:20 54:16 59:13
　60:14 61:19,20
　62:14,15 69:12,21
　81:23 82:3 86:14,15
　87:9 92:19 93:6
　94:13 95:5,14,21
　96:4,13 99:8 100:5
　101:3,14 104:11,15
　105:1,17 106:3
　107:5 109:9 110:9
　111:5 112:5 113:5,8
　117:9 120:10,19
　125:6,9,13,18
　126:13 127:13,19
　128:7 129:23 131:8
　131:12,16,23 132:2
　132:10,18 133:5
　139:13 140:17
　141:2,9 142:4
　143:20 148:18
　149:14,16,22 150:1
　151:2 153:12 154:4
　155:4 157:2,5,15
　159:23 162:7,21
　176:3 189:15 190:1
　191:6,13 192:1
　193:4 199:20

200:14,17 202:3
203:23 206:17,21
209:22 210:2,14
211:16 213:20
216:21 218:9 221:1
223:3 224:5 225:3
231:23 240:5,13
244:9 246:7,19
250:2 251:16
252:11,16,20
253:23 255:13
257:3 259:14,17,19
259:21 260:12
261:12 262:6,20
263:15,19 265:1
269:20 270:19
273:18 277:2,16
286:8 288:9,20
290:20 291:15,18
295:12 297:17
302:19 303:23
310:3 312:4,7 314:4
314:19 319:15
320:7 328:22 329:1
329:7 330:1 331:9
331:11 337:1,2
338:1,3,5 339:20
340:7,15

**z**

**zero**   199:15
**zoned**   159:5
**zoning**   19:2 122:24
158:14 160:21
161:1 162:23 163:3
164:3 195:23
235:11