DX 315

# RIVERSIDE PARK
## SOUTHWEST CORNER OF ROOSEVELT ROAD AND CLARK STREET
## CHICAGO, ILLINOIS 60605

**Summary Real Estate Appraisal Report
as of April 1, 2014**

Issued: May 14, 2014





STOUT | RISIUS | ROSS



EXHIBIT

315

bw 6/12/14

PENGAD 800-631-6989





*For more information, please contact one of the following members of the engagement team:*

John W. VanSanten, MAI, MRICS
Managing Director
312.752.3384
jvansanten@srr.com

Ryan T. Korth, MAI
Vice President
312.752.3387
rkorth@srr.com



**STOUT | RISIUS | ROSS**

Atlanta | Chicago | Cleveland | Dallas | Detroit | Houston
Los Angeles | New York | Washington, D.C.

**www.srr.com**

May 14, 2014

Joseph D. Ryan, Esq.
Law Offices of Joseph D. Ryan, P.C.
1896 Sheridan Road
Highland Park, Illinois 60035

**RE:  *Real Estate Appraisal of Vacant Land at the southwest corner of Roosevelt Road and Clark Street,***
*Chicago, Illinois 60605*
*Stout Risius Ross, Inc. Project#: 4926823*

Dear Mr. Ryan:

In accordance with your request, this letter and accompanying summary appraisal report present our opinion of the market value of the fee simple interest in the real property located at the southwest corner of Roosevelt Road and Clark Street, Chicago, Illinois 60605 (the "subject").  The date of value is April 1, 2014 (the "valuation date").  The intended use of the appraisal is for litigation support purposes by the Law Offices of Joseph D. Ryan, P.C. (the "client").

The subject is vacant land located at the southwest corner of Roosevelt Road and Clark Street in the South Loop neighborhood of Chicago.  The property was approved as Planned Development ("PD") 904 by the City of Chicago in March of 2004.  However, development of the planned community never began, and the approval expired six years later.  The property was recently re-zoned for uses that are not consistent with the prior approval.  Based on our analysis, the highest and best use of the subject is consistent with the previously approved planned development.  Additionally, because the City previously approved PD 904, this is considered to be the best indication of what the City would likely approve (or something very similar) in the future.  For these reasons, PD 904 is described herein and our analysis of the subject is based on the characteristics of this approval.

The subject contains 59.5 gross acres, or 2,590,519 SF of land, based on PD 904.  Also according to the PD, the property contains 1,348,187 SF, or 30.95 acres, of net developable land area, which is separated into 24 developable land parcels.  The property is approved for a maximum of 4,614 dwelling units and 680,000 SF of commercial space.  The commercial component includes retail and office development, and the residential component includes town homes, lofts, mid-rise, and high-rise residential development.

The subject is a large tract of vacant land located along the Chicago River, in close proximity to the Chicago Central Business District ("CBD").  There are very few undeveloped parcels along the River and there are no undeveloped parcels near the CBD that are similar to the subject in terms of size.

We conclude that the Income Capitalization Approach, or more specifically, the Discounted Cash Flow method, is most appropriate to value a property such as the subject.  The subject is a large parcel that will likely be developed into a mixture of uses throughout multiple development phases over an extended period of time.  As such, our analysis divides the subject into 24 development parcels in accordance with the previously approved PD, and projects a "sell-off" of these parcels over an extended period.  The appropriate value of each development parcel is estimated by the Sales Comparison Approach, which analyzes recent sales of smaller residential and mixed-use sites within close proximity to the subject.

This appraisal conforms with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation, as well as the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

---

Southwest Corner of Roosevelt Road & Clark Street     - i -         Valuation & Financial Opinions
Chicago, Illinois



Based on the analysis presented in this report, the market value of the fee simple interest in the subject is concluded to be:

| Market Value Conclusion | | | |
|---|---|---|---|
| Premise | Interest Appraised | Valuation Date | Market Value Conclusion |
| 1  Market Value | Fee Simple | April 1, 2014 | $61,000,000 |

Extraordinary Assumption:  This report assumes that all costs related to infrastructure improvements upon/within those portions of the site allocated as right-of-way areas, public property, parks and open spaces will be funded through Tax Increment Financing ("TIF") funds.  This includes, but is not limited to, all public streets, riverwalk improvements and utility extensions throughout the property.  The cost associated with these improvements has been estimated at $98 million.

This letter is invalid as an opinion of value if detached from the appraisal report and exhibits.  The report contains a description of the procedures, methodologies, and conclusions.  This letter and the accompanying report are solely intended for the client for the purpose stated herein, and are not to be referred to or distributed, in whole or in part, without our prior written consent.  The reported value opinions are applicable for the stated date and purpose only, and may not be appropriate for any other date or purpose.  The reported value opinions are qualified by certain assumptions, limiting conditions, definitions, and a certification included in the accompanying report.

Yours very truly,

**STOUT RISIUS ROSS, INC.**


John W. VanSanten, MAI, MRICS
Managing Director
Illinois Certified General Appraiser
License #:  553.001073
Expiration Date:  September 30, 2015
312.752.3384
jvansanten@srr.com

Ryan T. Korth, MAI
Vice President
Illinois Certified General Appraiser
License #:  553.002141
Expiration Date:  September 30, 2015
312.752.3387
rkorth@srr.com



# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Summary of Salient Data | 1 |
| II. | Assignment Overview | 4 |
| III. | Regional Overview | 8 |
| IV. | Neighborhood Analysis | 14 |
| V. | Market Analysis | 21 |
| VI. | Legal and Physical Description | 40 |
| VII. | Real Estate Taxes | 51 |
| VIII. | Highest and Best Use | 54 |
| IX. | Sales Comparison Approach | 57 |
| X. | Income Capitalization Approach | 68 |
| XI. | Reconciliation of Value | 75 |
| XII. | Certification | 77 |

# EXHIBITS

**Exhibit A**..................................................................Assumptions and Limiting Conditions

**Exhibit B**................................................................................Appraisal Definitions

**Exhibit C**................................................................................ Subject Photographs

**Exhibit D**..............................................................Comparable Property Data Sheets

**Exhibit E**..............................................................Planned Development #904

**Exhibit F**................................................................................Appraisal Licenses

**Exhibit G**................................................................Statement of Qualifications

# Section I
# Summary of Salient Data

# I. SUMMARY OF SALIENT DATA

| Summary of Salient Data and Conclusions | |
|---|---|
| **Location** | |
| 1 Subject Name | Riverside Park |
| 2 Address | Southwest Corner of Roosevelt Road and Clark Street |
| 3 City | Chicago |
| 4 County | Cook |
| 5 State | Illinois |
| 6 Zip Code | 60605 |
| **Parcel Numbers** | |
| 7 Parcel 1 | 17-21-202-001 |
| 8 Parcel 2 | 17-21-203-004 |
| 9 Parcel 3 | 17-21-203-005 |
| 10 Parcel 4 | 17-21-203-006 |
| 11 Parcel 5 | 17-21-203-007 |
| 12 Parcel 6 | 17-21-204-001 |
| 13 Parcel 7 | 17-21-206-001 |
| 14 Parcel 8 | 17-21-207-001 |
| 15 Parcel 9 | 17-21-208-004 |
| 16 Parcel 10 | 17-21-208-005 |
| 17 Parcel 11 | 17-21-209-006 |
| 18 Parcel 12 | 17-21-209-007 |
| 19 Parcel 13 | 17-21-210-002 |
| 20 Parcel 14 | 17-21-210-003 |
| 21 Parcel 15 | 17-21-210-004 |
| 22 Parcel 16 | 17-21-210-005 |
| 23 Parcel 17 | 17-21-210-006 |
| 24 Parcel 18 | 17-21-210-007 |
| 25 Parcel 19 | 17-21-210-086 |
| 26 Parcel 20 | 17-21-210-090 |
| 27 Parcel 21 | 17-21-210-092 |
| 28 Parcel 22 | 17-21-210-095 |
| 29 Parcel 23 | 17-21-502-001 |
| 30 Parcel 24 | 17-21-503-003 |
| **Valuation Parameters** | |
| 31 Date of Inspection | October 19, 2012; March 25, 2014; and May 9, 2014 |
| 32 Date of Report | May 14, 2014 |
| 33 Date of Value | April 1, 2014 |
| 34 Type of Value | Market Value |
| 35 Premise of Value | As Is |
| 36 Interest Appraised | Fee Simple |
| **Project Numbers** | |
| 37 Stout Risius Ross Project Number | 4926823 |
| **Land Description** | |
| 38 Gross Land Area (Acres) | 59.47 |
| 39 Gross Land Area (SF) | 2,590,519 |
| 40 Zoning District | DS-3, Downtown Service District |
| 41 Flood Zone | X |
| 42 Flood Plain Map Number | 17031C0507J |
| 43 Flood Plain Map Date | August 19, 2008 |

Valuation & Financial Opinions



# I. SUMMARY OF SALIENT DATA

| Summary of Salient Data and Conclusions | | |
|---|---|---|
| **Valuation Assumptions** | | |
| 1  Estimated Exposure Time | | 12 - 16 months |
| 2  Estimated Marketing Period | | 12 - 16 months |
| 3  Highest and Best Use (As Vacant) | | Mixed-Use Development |
| **Financial Indicators** | | |
| 4  Discount Rate | | 18.0% |
| **Value Conclusions** | Total | Per Developable Parcel [a] |
| 5  Income Capitalization Approach Conclusion | $61,000,000 | $2,541,667 |
| 6  **Market Value Conclusion** | $61,000,000 | $2,541,667 |
| [a] The subject is planned for 24 developable parcels. | | |

Chicago, Illinois

# Section II

# Assignment Overview

# II. ASSIGNMENT OVERVIEW

### Subject Overview

The subject is vacant land. According to PD 904, the subject contains 59.47 gross acres and 30.95 net (developable) acres. The subject is the proposed Riverside Park development located at the southwest corner of Roosevelt Road and Clark Street, Chicago, Illinois 60605.

### Legal Description

The tax assessor's office identifies the subject as parcel numbers 17-21-202-001; 17-21-203-004; 17-21-203-005; 17-21-203-006; 17-21-203-007; 17-21-204-001; 17-21-206-001; 17-21-207-001; 17-21-208-004; 17-21-208-005; 17-21-209-006; 17-21-209-007; 17-21-210-002; 17-21-210-003; 17-21-210-004; 17-21-210-005; 17-21-210-006; 17-21-210-007; 17-21-210-086; 17-21-210-090; 17-21-210-092; 17-21-210-095; 17-21-502-001; and 17-21-502-003. A legal description is contained within Exhibit E of this report. The subject is more fully described, legally and physically, within this report.

### Relevant Dates

Our opinion of the market value of the fee simple interest in the subject is determined as of April 1, 2014. The subject was inspected on October 19, 2012 by Ryan T. Korth, MAI, on March 25, 2014 by Nicholas T. McGinn and on May 9, 2014 by John W. VanSanten, MAI, MRICS. This report assumes that the condition of the property at the time of inspection was similar to the condition as of the date of value.

### Ownership History

As of the effective date of this report, title to the subject was held by Riverside District Development LLC. To our knowledge, there have not been any recorded transfers of the subject within the past three years. Furthermore, the property is not currently listed for sale, and there are no outstanding offers or options for the sale of the property.

### Purpose of the Appraisal and Property Rights Appraised

The purpose of this appraisal is to provide an opinion of market value of the fee simple interest in the subject.

### Intended Use and Users of the Appraisal

The intended use of the appraisal is for litigation support purposes by the Law Offices of Joseph D. Ryan, P.C.

### Competency of the Appraiser

We certify that we are competent and have the knowledge and experience required to perform this specific appraisal assignment.

### Scope of Work

The scope of work associated with completion of this assignment includes the following:

- Specific client provided information that was relied upon in preparing this analysis includes conversations with ownership and ownership's representatives.
- Reliance on the allowable development standards detailed in Planned Development #904.
- Inspection of the subject and market area.
- Analysis of location, demographics, and market conditions.



# II. ASSIGNMENT OVERVIEW

- Collection and analysis of current assessment and zoning data.

- Estimation of the highest and best use of the subject.

- Investigation of market data available from public records and commercial sources of data. Search parameters for comparable market data began in the subject's immediate neighborhood and were expanded geographically until sufficient data was found to be able to provide a supportable opinion of market value. The sales data used in this appraisal was either verified with a person or persons directly involved in the transaction or with public records.

- Analysis of the market data found and our opinion of market value, as defined in this report, of the subject as of the indicated date of value using the appropriate valuation approaches. In this case, the income capitalization approach was performed to value the subject. A discounted cash flow analysis is used to analyze the income associated with the sale of components of the land over time. The subject is a large tract that will likely be developed into mixed uses throughout multiple development phases over an extended period. A buyer of the subject would likely sell components of the overall tract during different phases of the development. We utilize the previously approved planned development (PD 904) in our analysis, which identifies 24 development parcels (11 residential parcels, 12 mixed-use parcels, and one retail parcel), in order to estimate the sell-off of the different components of the property to individual developers. We then deduct appropriate expenses and calculate the present value of the net cash flows from the development. The sales comparison approach is used to determine the "retail price" of the smaller development parcels in the mixed-use development. Only sales within the subject's submarket, the South Loop, were used in this analysis.

- Preparation of this summary appraisal report, which presents sufficient information to enable the client and other intended users, as identified, to understand the rationale for the opinions and conclusions, including reconciliation of the data and approaches to value. The report includes photographs of the subject; a description of the subject's neighborhood, the site, and any improvements on the site; a description of the zoning; a highest and best use analysis, a map of the comparable market data used; and a reconciliation of the data and approaches to value. All other data and analyses found and/or used in the course of this appraisal assignment is retained in the appraisal file.



# II. ASSIGNMENT OVERVIEW

### Exposure Time and Marketing Period

Due to the unique characteristics of the subject, sales of similar properties are extremely rare. Large development land sales throughout the entire Chicago market were analyzed. Based on this information, the estimated exposure time is 12 - 16 months. The estimated marketing period is 12 - 16 months, based on the same information.

| Exposure Time | | | |
|---|---|---|---|
| Data Source | Exposure Time (Months) | | |
| | Range | | Average |
| 1 Comparable Sales Data | 0.6 | - | 44.0 | 12.8 |
| 2 Concluded Exposure Time | | | **12 - 16 months** |

| Marketing Period | | | |
|---|---|---|---|
| Data Source | Marketing Period (Months) | | |
| | Range | | Average |
| 1 Comparable Sales Data | 0.6 | - | 44.0 | 12.8 |
| 2 Concluded Marketing Period | | | **12 - 16 months** |

Valuation & Financial Opinions     **SRR** STOUT|RISIUS|ROSS

# Section III

# Regional Overview

## III. REGIONAL OVERVIEW



**Regional Map**

# III. REGIONAL OVERVIEW

## Chicago Metropolitan Regional Overview

The subject is located within the geographical region referred to as the Chicago-Naperville-Joliet IL-IN-WI Core Based Statistical Area (Chicago CBSA) in the Midwest portion of the United States. The Chicago CBSA was originally comprised of Cook, DuPage, Kane, Lake, and Will Counties in Illinois, along with Lake County, Indiana. As surrounding counties gained population, they met the criteria to be added to the CBSA. Today, the Chicago CBSA is comprised of Cook, DeKalb, DuPage, Grundy, Kane, Kendall, Lake, McHenry, and Will Counties in northeast Illinois; Jasper, Lake, Newton, and Porter Counties in northwest Indiana; and Kenosha County in southern Wisconsin. It is the third-largest metropolitan area by population in the country according to the U.S. Census Bureau. As of 2010, the Chicago CBSA was the 25th most-populous region in the world, and had the fourth-largest Gross Domestic Product in the world. The Chicago CBSA enjoys proximity to many of the nation's largest metropolitan markets. Approximately 50.0% of the population of the United States is within 500 miles of the region. Though it has much expanded since the original boundaries, the Chicago CBSA is still anchored by Cook County and the city of Chicago, which is the economic, population, and real estate center of the region. The subject is located in the city of Chicago, in eastern Cook County. Therefore, the following sections detail demographic, income, and employment information for the Chicago CBSA, Cook County, and the city of Chicago.

## 1. 1. Population and Income Characteristics

Based on information compiled by Nielsen SiteReports, the population and income characteristics for the Chicago CBSA, Cook County, and Chicago are analyzed. The population trends for each area are displayed in the following chart.

| Population | | | |
|---|---|---|---|
| | 2010 Census | 2014 Estimate | 2019 Projection |
| 1 Chicago CBSA | 9,461,105 | 9,557,430 | 9,665,731 |
| 2 Annual Percentage Change | | 0.25% | 0.23% |
| 3 Cook County | 5,194,675 | 5,253,507 | 5,318,365 |
| 4 Annual Percentage Change | | 0.28% | 0.25% |
| 5 Chicago | 2,695,598 | 2,719,725 | 2,745,877 |
| 6 Annual Percentage Change | | 0.22% | 0.19% |
| Source: Nielsen SiteReports. | | | |

The 2014 estimate for total population in the Chicago CBSA is 9,557,430, representing a 0.25% annual growth rate since the 2010 census. The population for the Chicago CBSA is forecasted to grow through 2019 at a rate of 0.23% per year. The 2014 estimate for total population in Cook County and Chicago is 5,253,507 and 2,719,725, respectively. As shown above, the population for Cook County increased at an annual rate of 0.28% between 2010 and 2014. The projected total population for 2019 indicates a 0.25% annual increase for Cook County during the next five years. Chicago recorded a 0.22% increase between 2010 and 2014. The projected total population for 2019 indicates a 0.19% population increase for Chicago during the next five years.

In addition to population trends, household trends in the subject's area are analyzed. The following chart displays the historical and projected household trends for the Chicago CBSA, Cook County and city of Chicago. The data in the chart is compiled by Nielsen SiteReports.

Valuation & Financial Opinions 

# III. REGIONAL OVERVIEW

| Households | | | |
|---|---|---|---|
| | 2010 Census | 2014 Estimate | 2019 Projection |
| 1 Chicago CBSA | 3,475,726 | 3,531,674 | 3,589,679 |
| 2 Annual Percentage Change | | 0.40% | 0.33% |
| 3 Cook County | 1,966,356 | 2,004,807 | 2,044,271 |
| 4 Annual Percentage Change | | 0.49% | 0.39% |
| 5 Chicago | 1,045,500 | 1,067,812 | 1,089,538 |
| 6 Annual Percentage Change | | 0.53% | 0.40% |

Source: Nielsen SiteReports.

As displayed, the 2014 estimate for total number of households in the Chicago CBSA is 3,531,674, which represents a growth of 0.40% annually from the 2010 census. Through 2018, household growth is expected to increase by 0.33% annually for the Chicago CBSA. The 2014 estimate for total households in Cook County and Chicago is 2,004,807 and 1,067,812, respectively. Total households for Cook County increased at 0.49% per year since 2010 and are projected to grow at 0.39% per year through 2019. The number of households in Chicago increased at a rate of 0.53% annually between 2010 and 2014 and the rate of growth is expected to drop slightly over the next five years. Overall, population and household trends indicate a stable to slightly increasing population base in the subject's area.

Additional information from Nielsen SiteReports indicates the region has a large middle-to-upper-income population base. Current median household incomes are approximately $57,500 for the Chicago CBSA, $51,500 for Cook County, and $45,000 for Chicago. The 2013 average family size in the subject's region is roughly three. Owner occupied housing units comprise 65.9% of total housing units in the Chicago CBSA, 58.1% in Cook County, and 44.9% in Chicago. Renter occupied housing units comprise 34.1% of total housing units in the Chicago CBSA, 41.9% in Cook County, and 55.1% in Chicago. The 2013 median home value in the Chicago CBSA is approximately $208,000, comparable to the median home value of roughly $213,500 found in Cook County, and $215,000 in Chicago.

## 2. 2. Economic and Employment Profile

Nielsen SiteReports estimates that 63.1% of the occupations in the Chicago CBSA, 62.6% of the occupations in Cook County, and 61.4% of the occupations in the city of Chicago can be classified as white-collar, which includes executive and managerial, professional specialty, technical support, sales, and administrative support occupations. Blue-collar occupations include precision, production, craft and repair, machine operator, transportation and material moving, farming, and laborers. These occupations represent approximately 36.9% of the occupations in the Chicago CBSA, 37.4% in Cook County, and 39.4% in the city of Chicago.

The dominance of the public sector is evident in the following chart, which presents the major employers in Cook County. The data in the chart was published in the Crain's Chicago Business 2013 Book of Lists.

Valuation & Financial Opinions



# III. REGIONAL OVERVIEW



The largest employer in Cook County is the U.S. Government, followed by the Chicago Public Schools, the City of Chicago, and Cook County. Various sectors of government account for roughly 175,000 jobs in Cook County. As shown above, the health care, service, manufacturing, and finance industries are also major areas of employment in Cook County.

### 3. 3. Unemployment Profile

The employment situation in the United States improved throughout 2013. The nation began the year with a jobless rate of 8.1%, and as of December 2013, the unemployment rate has improved to 6.5%. However, according to the Bureau of Labor Statistics (BLS), total nonfarm payrolls decreased by 270,000 in December 2013. The largest losses in employment for the month were seen in service providing, food services and drinking places, construction, and manufacturing. Although the unemployment rate has improved in 2013, this drop in payrolls highlights the frailty of the broader economic recovery.

The number of long-term unemployed, defined as those unemployed for 27 weeks or more, is estimated at 3.6 million for January 2014, which represents little change from the prior month. Although this statistic has remained relatively flat over recent months, it remains an alarmingly high number. Roughly 35.8% of unemployed persons are now considered long-term unemployed. In addition, the number of people employed part-time for economic reasons, who are also known as involuntary part-time workers, was measured at 7.3 million in January 2014, essentially unchanged from the previous month.

In general, the employment situation has improved since the recession of 2008/2009 at the national and local levels. The rates of the nation and the Chicago MSA peaked in 2010 and have trended downward ever since. During 2011 alone, national payroll employment grew by nearly two million. However, job growth remains slower than anticipated. The employment figures of December 2013 show that the recovery process is still fragile and it is not certain whether or not significant improvement will continue in the coming months.

The following table indicates the trend of annual unemployment rates from 2003 through 2012, as well as rates for December 2013, for Cook County, the Chicago CBSA, the state of Illinois, and the United States. The figures presented are non-seasonally adjusted rates reported by the Bureau of Labor Statistics (BLS).

| Unemployment Rate | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013[a] |
| 1 Cook County | 7.4% | 6.7% | 6.4% | 4.8% | 5.2% | 6.4% | 10.4% | 10.8% | 10.4% | 9.2% | 8.6% |
| 2 Chicago MSA | 6.8% | 6.2% | 5.9% | 4.6% | 4.9% | 6.2% | 10.1% | 10.5% | 9.9% | 8.8% | 8.3% |
| 3 Illinois | 6.7% | 6.2% | 5.8% | 4.6% | 5.1% | 6.4% | 10.0% | 10.4% | 9.7% | 8.9% | 8.6% |
| 4 United States | 6.0% | 5.5% | 5.1% | 4.6% | 4.6% | 5.8% | 9.3% | 9.6% | 8.9% | 8.1% | 6.5% |

[a] December.
Source: Bureau of Labor Statistics.

Valuation & Financial Opinions



# III.  REGIONAL OVERVIEW

The average unemployment rate in Cook County was 7.4% in 2003, while the Chicago CBSA posted a rate of 6.8%.  The state of Illinois had a similar unemployment rate of 6.7% for 2003.  All three were above the national average of 5.8% at that time.  After decreasing consistently from 2003 through 2006, the unemployment rate began to rise in 2007 and then spiked during the recession of 2008/2009.  Unemployment peaked in 2010 and has enjoyed a downward trend ever since.  The unemployment rate in the Chicago MSA was 8.3% during December 2013, which is higher than the national rate of 6.5%.  The gradual recovery from the worst recession in modern-day history is expected to continue in the near future.

### 4. 4. Transportation Infrastructure

The Chicago Metropolitan Area has one of the primary transportation hubs in the United States.  Its extensive transportation facilities give local firms ready access to national and international markets and suppliers, as well as provide travelers with convenient traveling alternatives.  Cook County and the city of Chicago are easily accessible via the interstate freeway system, state highways and county roads.  In total the area has nine major interstate highways: I-94, I-90, I-290, I-55, I-57, I-80, I-294, I-355, and I-88.  These highways, in conjunction with the area's other major roadways, provide easy travel within the region and excellent connections to other major markets in Illinois and nearby states.  Specifically, Interstate 94 connects with Milwaukee to the north and Detroit to the east, while Interstate 55 runs southwest to the city of Springfield.

An additional frequented transportation option in the Chicago Metropolitan Area is the El.  The El is a rapid transit system serving the Chicago area, which gets its name from the circular routing of its elevated tracks.  It is the third busiest rail mass transit system in the U.S., and is one of the only rapid transit systems to offer 24-hour transportation service.  The El consists of eight rail lines totaling over 100 miles of track, with street level, elevated, and underground lines.  There are over 140 stations available for boarding and departures around the metropolitan area.  This is one of the most widely used transportation options in the Chicago Metropolitan Area; however, it is not the most frequented.  The most predominant mode of transportation is the extensive bus network.  Rail service is another transportation resource for the Chicago region, and is provided by several major American railways including Amtrak.  In addition, the region is located along Lake Michigan, which helps to attract businesses and residents to the area.

Two major airports serve the Chicago Metropolitan Area.  The O'Hare International Airport is the area's largest and primary airport.  O'Hare International Airport has a strong international presence.  With flights to over 60 foreign destinations, it is consistently one of busiest airports in the world.  Also serving the Chicago region is Midway International Airport.  Midway is the second-largest passenger airport in the Chicago region, and is the second-busiest airport in Illinois after O'Hare.  Both airports are served by numerous domestic, international and air-taxi carriers.

### Summary

Population levels in the Chicago Metropolitan Area have increased slightly in recent years and this trend is projected to continue in the near future.  At the same time, income levels have increased slightly and they are also expected to continue a moderate climb in the near future.  Environmental, social, and economic forces have created a diverse economic base for the area; however, due to the severe decline of the national economy, unemployment increased significantly between 2008 and 2010.  Unemployment moderated during 2011, 2012 and 2013, a signal that a recovery is in progress.  The economy is predicted to experience measured growth in the near future.



# Section IV

# **Neighborhood Analysis**

# IV. NEIGHBORHOOD ANALYSIS

## Neighborhood Map



Valuation & Financial Opinions

**SRR**
STOUT|RISIUS|ROSS

# IV.  NEIGHBORHOOD ANALYSIS

**Neighborhood Overview**

The subject is located at the southwest corner of Roosevelt Road and Clark Street in Chicago's South Loop neighborhood.  The boundaries of the South Loop neighborhood can be defined as follows:  Congress Parkway to the north, Lake Michigan to the east, Cermak Road to the south and the Chicago River to the west.

**Land Use**

The South Loop neighborhood is located immediately south of Chicago's Loop, which contains the City's central business district ("CBD").  As is typical of a dense, urban neighborhood, the South Loop contains a variety of land uses.  The land located along Lake Michigan contains a variety of recreational and entertainment destinations, most of which are owned by public entities.  Grant Park, a large public park adjacent to the CBD, offers a variety of sport fields, tennis courts, a large public fountain, music venues and the Art Institute of Chicago.  The Park plays host to numerous events throughout the warmer months of the year.  The Museum Campus is located just south of Grant Park and includes the Field Museum of Natural History, the Shedd Aquarium, Adler Planetarium, Soldier Field (home of the Chicago Bears), Burnham Harbor, and Northerly Island, home to a large live music venue.  McCormick Place, a massive convention center containing approximately 2.2 million square feet of exhibit space and over 350,000 square feet of meeting room space, is located just south of the Museum Campus.  There is also a long lakeside trail that is popular among runners, bicyclers and walkers.  The trail is 18 miles long, it runs along the majority of the eastern side of the City, and it provides access to many destinations, including Navy Pier, Grant Park, the Museum Campus, and a number of harbors and public beaches.

The remainder of the neighborhood contains a mix of office, residential, retail and industrial uses.  The highest density of development is located in the northern section, nearest the Loop, and the eastern section, nearest the Lake.  The majority of office uses are located in the northern section of the neighborhood, nearest the CBD.  There are also a few hotels in the northeastern section, primarily along Michigan Avenue.  Industrial uses are primarily located south of Roosevelt Road, between State Street and Calumet Avenue.  Retail uses are located throughout the neighborhood, and primarily consist of smaller, street level spaces, oftentimes at the base of a mid- or high-rise building.  The nearest collection of larger retail uses is located along Roosevelt Road, immediately east and west of the river.

Much of the neighborhood's land area is used for residential purposes.  Residential uses run the gamut of housing options, including townhomes and detached single family homes, low-, mid- and high-rise condominium buildings, converted industrial loft buildings and a variety of apartment buildings.  The area includes two large master-planned communities, Dearborn Park (Phases I and II) and Central Station.

Dearborn Park encompasses the areas bound by Polk Street and 15th Street to the north and south, and State Street and Clark Street to the east and west.  Built upon a vacated rail yard, the completion of this community was considered one of the most successful urban renewal projects in the United States.  Dearborn Park contains a broad array of housing options, including single family homes, mid- and high-rise condominium buildings, townhouses and rental housing for the elderly.  This community was constructed between the late 1970's and the early-1990's.

The Central Station community contains approximately 73 acres of land running along the west side of Lakeshore Drive, bound by Roosevelt Road to the north and McCormick Place to the south.  Like Dearborn Park, this community was primarily constructed upon vacated rail yards.  Central Station also contains a vast array of housing options, including some of the largest condominium towers in the area.  Construction in this community began in the early 1990's and continues to this day.  The earlier construction started with town homes; however, the density of construction has increase significantly over the years as the demand for housing and land prices have increased in the area.

Although much of the South Loop is densely developed, the neighborhood also includes a significant amount of undeveloped land, which is primarily located along the western edge of the neighborhood, north and south of Roosevelt Road.

Valuation & Financial Opinions 

# IV.  NEIGHBORHOOD ANALYSIS

## Growth and New Development

The majority of the neighborhood was once home to industrial users, including many large rail yards.  In the late 1940's and 1950's rail usage declined precipitously and many industrial users drifted away to newer locations with lower barriers to entry.  Despite the South Loop's close proximity to the CBD, the interstate system and Lake Michigan, redevelopment of the area moved very slowly, partly due to the growth of urban sprawl and the popularity of suburban living.   The Dearborn Park development was the first major redevelopment project in the area and it started a trend of renewal.  During the construction of Dearborn Park, conversion of some of the loft-style buildings in the northern sections of the South Loop was also occurring.  The Central Station community started to develop while Dearborn Park was nearing completion.  After Mayor Daley moved his family to a town home in Central Station, confidence in the area grew significantly, which spurred further development; the momentum of the redevelopment movement in the South Loop has continued (and increased) ever since.

Redevelopment in the area has not been limited to master planned communities; developers have converted many industrial buildings to loft-style condominiums and redeveloped smaller sites that were previously improved with dated industrial and/or office buildings.  Many mid- and high-rise condominium buildings have been constructed upon sites throughout the neighborhood.  In many cases, these sites were assembled by purchasing a number of adjacent parcels from separate owners.   Sellers of these properties were often approached without formally offering their properties for sale.

The housing boom of the 1990's and 2000's further fueled development in the South Loop.  Until the summer of 2007, when the subprime mortgage crisis became apparent, a seemingly endless number of development projects were proposed in the neighborhood.   The following is a list of large residential projects that have been constructed in the South Loop since 2000.  The list also includes properties that are under construction.

# IV.  NEIGHBORHOOD ANALYSIS

| | | Recent Residential Development - South Loop | | | |
|---|---|---|---|---|---|
| | Year Built [a] | Name | Address | Residential Units | Property Type |
| | **Residential** | | | | |
| 1 | 2000 | One East 14th Place | 5 East 14th Place | 105 | Condo |
| 2 | 2001 | Dearborn Tower | 1530 S. State Street | 400 | Condo |
| 3 | 2001 | One East 15th Place | 1529 South State Street | 140 | Condo |
| 4 | 2002 | 41 East Eighth | 41 East Eighth Street | 300 | Condo |
| 5 | 2002 | Museum Park Tower I | 1322 South Prairie Avenue | 210 | Condo |
| 6 | 2003 | Prairie House Tower | 1515 South Prairie Avenue | 180 | Condo |
| 7 | 2003 | Prairie District Tower | 1717 South Prairie Avenue | 175 | Condo |
| 8 | 2003 | Prairie Avenue Lofts | 221 East Cullerton Avenue | 140 | Condo |
| 9 | 2003 | Museum Park Tower II | 1335 South Prairie Avenue | 170 | Condo |
| 10 | 2004 | University Center of Chicago | 525 South State Street | 700 | Dormitory |
| 11 | 2004 | Vue20 | 1845 South Michigan Avenue | 140 | Condo |
| 12 | 2004 | One East Fifteenth Place | 1529 South State Street | 143 | Condo |
| 13 | 2004 | 1111 South Wabash | 111 South Wabash Avenue | 250 | Condo |
| 14 | 2004 | The Lofts at Museum Park I | 125 E. 13th Street | 150 | Condo |
| 15 | 2004 | 212 E. Cullerton | 212 East Cullerton Street | 115 | Condo |
| 16 | 2004 | Museum Park Tower III | 233 East 13th Street | 205 | Condo |
| 17 | 2005 | 600 South Wabash Studios | 600-620 South Wabash Avenue | 125 | Apartment |
| 18 | 2005 | Michigan Avenue Tower I | 1250 South Michigan Avenue | 230 | Condo |
| 19 | 2005 | State Place Condos | 1101 South State Street | 140 | Condo |
| 20 | 2005 | Lakeside on the Park | 1250 South Indiana Avenue | 170 | Condo |
| 21 | 2006 | Sky55 | 1255 South Michigan Avenue | 400 | Apartment |
| 22 | 2006 | Amli 900 | 900 South Clark Street | 450 | Apartment |
| 23 | 2006 | Lofts at Museum Park II | 1305 South Michigan Avenue | 200 | Condo |
| 24 | 2006 | 1620 South Michigan | 1620 South Michigan Avenue | 250 | Condo |
| 25 | 2006 | Pointe 1900 Residences | 1900 South State Street | 130 | Condo |
| 26 | 2006 | Lakeside Tower | 1600 South Indiana Avenue | 140 | Condo |
| 27 | 2006 | 1720 South Michigan | 1720 South Michigan Avenue | 500 | Condo |
| 28 | 2006 | Burnham Park Plaza | 40 East 9th Street | 105 | Condo |
| 29 | 2006 | Prairie Pointe | 1600 South Prairie Avenue | 155 | Condo |
| 30 | 2006 | Museum Park Tower IV | 1235 South Prairie Avenue | 275 | Condo |
| 31 | 2006 | Museum Park Place 1 | 1841 South Calumet Avenue | 190 | Condo |
| 32 | 2007 | Vision on State | 1255 South State Street | 254 | Condo |
| 33 | 2007 | The Columbian | 1160 South Michigan Avenue | 222 | Condo |
| 34 | 2008 | 1401 S. State | 1401 South State Street | 278 | Apartment |
| 35 | 2008 | The Lex | 2138 South Indiana Avenue | 296 | Condo |
| 36 | 2008 | Vetro | 611 South Wells Street | 233 | Condo |
| 37 | 2008 | Marquee | 1454 South Michigan Avenue | 208 | Condo |
| 38 | 2008 | Michigan Avenue Tower II | 1400 South Michigan Avenue | 270 | Condo |
| 39 | 2008 | Burnham Point | 730 South Clark Street | 298 | Condo |
| 40 | 2008 | 1600 Museum Park | 1629 South Prairie Avenue | 275 | Condo |
| 41 | 2008 | One Museum Park East | 1211 South Prairie Avenue | 289 | Condo |
| 42 | 2008 | 1400 Museum Park | 100 East 14th Street | 260 | Condo |
| 43 | 2008 | Prairie District Lofts | 1727 South Indiana Avenue | 116 | Condo |
| 44 | 2008 | Chess Lofts | 320 East 21st Street | 119 | Condo |
| 45 | 2009 | Astoria Tower | 8 East 9th Street | 248 | Apartment |
| 46 | 2009 | The Guild | 1555 South Wabash Avenue | 176 | Apartment |
| 47 | 2009 | Museum Park Place South | 1901 South Calumet Avenue | 284 | Condo |
| 48 | 2010 | Roosevelt Collection | 150 West Roosevelt Road | 342 | Condo |
| 49 | 2010 | Terrazio | 1935 South Wabash Avenue | 180 | Condo |
| 50 | 2010 | Museum Park West | 1201 South Prairie Avenue | 298 | Condo |
| 51 | 2014 | AMLI Lofts | 850 South Clark Street | 398 | Apartment |
| 52 | 2016 | CMK Apartment Building | 1333 South Wabash Avenue | 307 | Apartment |
| 53 | 2016 | 1000 South Clark | 1000 South Clark Street | 469 | Apartment/Condo |
| 54 | 2016 | 700 South Wells Street | 700 South Wells Street | 700 | Apartment/Condo |
| 55 | 2016 | SEC 9th Street & State Street | SEC 9th Street and State Street | 396 | Apartment/Condo |

[a]   Includes expected completion date.

Valuation & Financial Opinions

**SRR** STOUT RISIUS ROSS

# IV. NEIGHBORHOOD ANALYSIS

This list is not exhaustive; a number of smaller projects were completed throughout the area and there are many other projects currently in the planning stage. It is clear from this list that development in the area increased significantly between 2000 and 2008 and then tapered off dramatically in response to the recession. Construction activity has picked up as of late due to the gradual improvement in the economy.

Although many of the residential buildings listed above contain commercial space on the first floor, commercial development in the area did not experience the same boom between 2000 and 2008. However, the pace of commercial development appears to be increasing. Recent noteworthy commercial projects include the following:

- In 2007 an approximately 150,000 square foot Home Depot store was completed at 555 West Roosevelt Road, and a 95,000 square foot, multi-story shopping center was constructed shortly thereafter at the same location.
- The Roosevelt Collection, a mixed-use property located at 150 West Roosevelt Road was completed in 2010. The property offers approximately 400,000 square feet of retail space and 342 apartment units. The project was originally planned for over 600 condominium units, but was scaled back, and the condo units were ultimately rented due to the weakness of the for-sale housing market during the recession. At first, absorption of the retail space was slow, but significant progress has been made lately and the shopping center is mostly full.
- In 2013 a Mariano's grocery store was completed at 1615 South Clark Street. This building contains approximately 65,000 square feet of space.
- The Maxwell shopping center is under construction at 1001-1021 South Clinton Street. This property is expected to be completed in late 2014. The center will be approximately 230,000 square feet, it is almost entirely pre-leased, and tenants include the following: Nordstrom Rack, Burlington, Dick's Sporting Goods, TJ Maxx, Pier One and Men's Warehouse.
- A two-story school, The British School of Chicago, is being constructed on a two-acre site at 951 South Wells Street, just north of the Roosevelt Collection. This property is expected to deliver in late 2015.

Due to the boom in residential construction, there has been a considerable increase in demand for complimentary land uses in the area, especially retail stores. Although many of the residential buildings in the area offer first floor retail space, these spaces are relatively small. Specifically, there is substantial demand for mid- and big-box stores, which often have a difficult time finding sufficient space to enter the market. Roosevelt Road is emerging as a major retail corridor, and additional retail construction is expected to occur along the road, both east and west of the Chicago River.

## Neighborhood Life Cycle

According to *The Appraisal of Real Estate, Thirteenth Edition,* published by the Appraisal Institute, the life patterns of neighborhoods and districts typically follow a four-stage life cycle. These stages are defined as follows.

- Growth – A period during which the market area gains public favor and acceptance.
- Stability – A period of equilibrium without marked gains or losses.
- Decline – A period of diminishing demand.
- Revitalization – A period of renewal, redevelopment, modernization, and increasing demand.

Based on the definitions listed above, most of the South Loop neighborhood is in the revitalization stage of its lifecycle.

## Infrastructure and Transportation Systems

Congress Parkway and Roosevelt Road, major area arterials, run in an east/west direction throughout the neighborhood. Each provides access to the interstate system and Lakeshore Drive. Lakeshore Drive runs



# IV.  NEIGHBORHOOD ANALYSIS

along the eastern edge of the neighborhood and provides access to a variety of destinations along the lakefront and linkages to other area roadways.  A number of other streets run in a north/south direction throughout the neighborhood and provide easy vehicular travel to the CBD, including State Street and Michigan Avenue.

The Chicago Transit Authority (CTA) provides local commuter rail service via the "El," as well as fixed bus route service throughout the neighborhood.  The nearest El stop is located along Roosevelt Road, approximately three blocks from the subject.  CTA bus stops are located along the majority of heavily traveled streets, including Roosevelt Road and Clark Street.  Metra provides commuter rail service to Chicago and a variety of suburban locations.  The nearest Metra station is located along Columbus Drive (the Museum Campus / 11th Street station), approximately one-half mile east of the subject.  Amtrak, a provider of long distance commuter rail, provides service from Union Station, which is located approximately one mile northwest of the subject.  O'Hare and Midway International Airports are both located within 15 miles of the subject and are accessible by public transportation.

### Conclusion

The subject neighborhood is well located, with excellent access to the interstate system, Lakeshore Drive, the Chicago CBD and a variety of recreational amenities.  The area has grown in favor over the last 25 years and a period of revitalization is well underway.  Prior to the recent recession, vacant land and dated industrial buildings were being developed/redeveloped into mid- and high-rise residential buildings at an unprecedented pace.  After the onset of the recent recession, construction came to a halt.  As the economy continues its gradual recovery, developer confidence appears to have reached its highest point in five-plus years.  New projects are underway and a variety of new construction projects are planned for the near term.  It appears that the long term growth trend in the area is being revived.  It is likely that real estate values will increase in the near future.

# Section V

# **Market Analysis**

# V. MARKET ANALYSIS

## General Background

The subject is located in the South Loop neighborhood, which is located on the south side of the city of Chicago. A map of the South Loop area was provided at the beginning of the Neighborhood Analysis section of this report.

## Population and Income Characteristics

The following table presents population and household statistics compiled by Cubit Planning, Inc. for the South Loop Neighborhood and the city of Chicago.

| Population | | |
|---|---|---|
| | South Loop | Chicago |
| 1  1990 Population | 10,099 | 2,783,726 |
| 2  2000 Population | 15,118 | 2,896,016 |
| 3  2010 Population | 32,108 | 2,695,598 |
| 4  Annual Growth 1990 - 2000 | 4.1% | 0.4% |
| 5  Annual Growth 2000 - 2010 | 7.8% | -0.7% |
| Source: Cubit Planning, Inc. | | |

| Households | | |
|---|---|---|
| | South Loop | Chicago |
| 1  1990 Households | 5,669 | 1,025,174 |
| 2  2000 Households | 8,504 | 1,061,928 |
| 3  2010 Households | 18,058 | 1,045,560 |
| 4  Annual Growth 1990 - 2000 | 4.1% | 0.4% |
| 5  Annual Growth 2000 - 2010 | 7.8% | -0.2% |
| Source: Cubit Planning, Inc. | | |

As shown in the tables above, the population and number of households in the South Loop have increase dramatically since 1990. The rate of population and household growth was 7.8% between 2000 and 2010 in the South Loop. Based on the increased popularity of the area, the number of under construction/proposed projects, and the amount of land available for development/redevelopment, it appears that growth will continue.



# V. MARKET ANALYSIS

The income characteristics of the South Loop and city of Chicago are presented in the following table.

| Household Income Levels | | |
|---|---|---|
| | South Loop | Chicago |
| 1 2000 Median Household Income | $54,579 | $38,625 |
| 2 2010 Median Household Income | 74,809 | 44,776 |
| Source: Cubit Planning, Inc. | | |

As shown in the table above, the median household income in the South Loop is much higher than that of the city of Chicago. Additionally, the median income within the neighborhood increased greatly between 2000 and 2010, which is primarily a result of the rapid development of high-end housing in the area.

**Retail Market**

**1. Chicago Metropolitan Area Retail Overview**

The following chart displays quarterly retail market statistics for Metropolitan Chicago from 2008 through the first quarter of 2014. The data in the chart is from the first quarter 2014 Chicago Retail Market Report compiled by CoStar Group, Inc (Costar). The data includes all existing, under construction and under renovation retail buildings. All rental rates reported are calculated using a triple net rate.

| | Metropolitan Chicago Retail Market | | | | | |
|---|---|---|---|---|---|---|
| Period | Existing Inventory | Total SF | Vacancy Rate | SF of Net Absorption | SF Under Construction | Quoted Rental Rate |
| 1 Q1 2014 | 36,634 | 505,932,986 | 8.7% | 2,053,198 | 1,589,485 | $15.64 |
| 2 Q4 2013 | 36,625 | 505,735,285 | 9.1% | (3,918,231) | 1,914,138 | $15.80 |
| 3 Q3 2013 | 36,602 | 505,364,994 | 8.2% | 1,287,764 | 1,617,010 | $15.81 |
| 4 Q2 2013 | 36,592 | 504,361,966 | 8.3% | 1,010,538 | 2,565,657 | $15.72 |
| 5 Q1 2013 | 36,582 | 503,787,557 | 8.4% | 1,203,270 | 1,874,067 | $15.85 |
| 6 Q4 2012 | 36,569 | 503,506,017 | 8.6% | 577,900 | 2,068,045 | $15.66 |
| 7 Q3 2012 | 36,569 | 503,483,174 | 8.7% | (803,052) | 2,004,435 | $15.82 |
| 8 Q2 2012 | 36,566 | 503,366,941 | 8.5% | 11,624 | 1,158,542 | $15.77 |
| 9 Q1 2012 | 36,556 | 503,083,304 | 8.5% | 1,193,483 | 1,132,801 | $15.93 |
| 10 Q4 2011 | 36,547 | 502,744,856 | 8.6% | (838,810) | 931,564 | $16.00 |
| 11 Q3 2011 | 36,542 | 502,525,765 | 8.4% | 1,449,211 | 891,502 | $16.06 |
| 12 Q2 2011 | 36,535 | 502,587,838 | 8.7% | (267,666) | 362,541 | $16.01 |
| 13 Q1 2011 | 35,622 | 502,186,825 | 8.6% | 1,073,644 | 667,149 | $16.39 |
| 14 2010 | 36,506 | 501,830,432 | 8.7% | 1,670,337 | 1,149,391 | $16.12 |
| 15 2009 | 36,416 | 500,071,967 | 8.8% | 265,416 | 1,760,770 | $16.91 |
| 16 2008 | 36,178 | 495,866,893 | 8.0% | 5,300,514 | 3,907,168 | $17.99 |
| Source: CoStar Group, Inc. | | | | | | |

Vacancy in the Chicago MSA has fluctuated between 8.0% and 9.1% during the last six years. The market vacancy rate was on a downward trend from Q3 2012 through Q3 2013, but the rate jumped nearly one percent in Q4 2013. A considerable amount of this increase was due to the shuttering of all Dominick's grocery stores in the market. Although some of these stores were absorbed by other retailers, some are likely



# V. MARKET ANALYSIS

to remain vacant due to the ages and sizes of the buildings. Despite the jump in vacancy, the market is generally strengthening along with the broader economy.

Absorption fluctuated between positive and negative numbers during 2011 and 2012, signaling volatility and frailty in the market. However, positive net absorption has been recorded in five of the last six quarters. As would be expected, construction nearly halted after the full effects of the recession took hold. Although the pace of construction has increased during the last two years, it is still very low when compared to historical data. Rental rates fell sharply in the wake of the 2008/2009 recession and have remained fairly stable since 2012 as landlords have tried to fill vacant space and keep current tenants in place.

## 2. Market Analysis

CoStar divides the Chicago metropolitan area into 11 markets, and then divides these markets into submarkets, which are discussed below. The 11 Chicago markets are as follows: Metro Chicago; North; Northwest; East/West Corridor; Near West; North Chicago; O'Hare; South Chicago; South Suburban; Indiana; and Kenosha County. According to Costar, the subject is located in the Metro Chicago Market, which primarily covers the downtown Chicago area. The following chart displays market statistics for the Metro Chicago market from the second quarter of 2010 through the first quarter of 2014. The data in the chart is also from the First Quarter 2014 Chicago Retail Market Report.

| | Period | Existing Inventory | Total SF | Vacancy Rate | SF of Net Absorption | SF Under Construction | Quoted Rental Rate |
|---|---|---|---|---|---|---|---|
| **Metro Chicago Market** | | | | | | | |
| 1 | Q1 2014 | 687 | 15,954,397 | 8.5% | 9,690 | 265,236 | $38.90 |
| 2 | Q4 2013 | 687 | 15,954,397 | 8.6% | 6,849 | 265,236 | $40.64 |
| 3 | Q3 2013 | 686 | 15,939,397 | 8.5% | 43,196 | 280,236 | $37.59 |
| 4 | Q2 2013 | 687 | 15,940,161 | 8.8% | 33,738 | 280,236 | $34.49 |
| 5 | Q1 2013 | 688 | 15,942,661 | 9.1% | 125,859 | 50,236 | $35.50 |
| 6 | Q4 2012 | 687 | 15,846,798 | 9.3% | 39,239 | 146,099 | $36.21 |
| 7 | Q3 2012 | 685 | 15,798,798 | 9.3% | 197,929 | 194,099 | $35.92 |
| 8 | Q2 2012 | 683 | 15,709,657 | 10.0% | (52,874) | 248,004 | $36.19 |
| 9 | Q1 2012 | 681 | 15,683,286 | 9.5% | (16,280) | 211,375 | $36.47 |
| 10 | Q4 2011 | 681 | 15,681,110 | 9.4% | 85,667 | 102,371 | $34.92 |
| 11 | Q3 2011 | 681 | 15,681,110 | 10.0% | 69,252 | 94,121 | $34.02 |
| 12 | Q2 2011 | 680 | 15,666,210 | 10.3% | (26,124) | 27,400 | $33.98 |
| 13 | Q1 2011 | 679 | 15,561,210 | 9.5% | (7,633) | 132,400 | $33.97 |
| 14 | Q4 2010 | 679 | 15,561,210 | 9.5% | 354,778 | 105,000 | $31.22 |
| 15 | Q3 2010 | 676 | 15,150,363 | 9.4% | 16,176 | 515,847 | $32.34 |
| 16 | Q2 2010 | 675 | 15,145,080 | 9.5% | (99,549) | 416,130 | $28.81 |

Source: CoStar Group, Inc.

Vacancy in the Chicago Metro market has fluctuated between 8.5% and 10.3% during the last four years. The market vacancy rate has been on a downward trend since Q2 2012 and is currently at its lowest rate since the start of the 2008/2009 recession. During the last seven quarters, the market has experienced positive net absorption. The amount of space under construction has remained relatively muted since the recession due to the relatively high vacancy rate and a lack of confidence in the market. However, the average asking rental rate has generally increased during the last year, a sign that the amount of quality space available to tenants is shrinking.

The Metro Chicago retail market is divided into seven submarkets, as defined by Costar. The subject is in the South Loop submarket. The following map provides boundaries of all submarkets in the Chicago metropolitan area. Although the map is labeled "Chicago Office Submarket Overview," the boundaries also apply to



# V. MARKET ANALYSIS

CoStar's retail submarkets. The following table provides first quarter 2014 data for each submarket in the Metro Chicago market.



**Chicago Office Submarket Overview**

Copyright © 1997-2006 CoStar Realty Information, Inc. All rights reserved

| | Metro Chicago Retail Submarkets | | | | | |
|---|---|---|---|---|---|---|
| | Submarket | Existing Inventory | Total SF | Vacancy Rate | YTD Net Absorption | SF Under Construction | Quoted Rental Rate |
| 1 | Central Loop | 27 | 614,565 | 34.0% | (17,274) | 0 | $45.91 |
| 2 | East Loop | 29 | 2,548,230 | 2.0% | 2,368 | 35,236 | $50.23 |
| 3 | North Michigan Avenue | 107 | 4,753,141 | 9.7% | (1,374) | 0 | $56.69 |
| 4 | River North | 197 | 2,904,804 | 2.6% | 8,281 | 0 | $28.31 |
| 5 | River West | 216 | 2,673,373 | 6.6% | 20,809 | 0 | $30.35 |
| 6 | South Loop | 52 | 1,697,744 | 15.5% | 5,086 | 230,000 | $27.59 |
| 7 | West Loop | 59 | 762,540 | 16.3% | (8,206) | 0 | $23.81 |
| 8 | **Total Metro Chicago** | **687** | **15,954,397** | **8.5%** | **9,690** | **265,236** | **$38.90** |

Source: CoStar Group, Inc.

Valuation & Financial Opinions 

# V. MARKET ANALYSIS

The subject is located in the South Loop submarket which is one of the smallest in the Metro Chicago market. The South Loop submarket has the only major development project, The Maxwell shopping center, currently under construction. As discussed in the Neighborhood Analysis section of this report, the Maxwell shopping center is located at 1001-1021 South Clinton Avenue and is expected to deliver in the second half of 2014. This center is located just north of Roosevelt Road and has attracted some big name tenants. The property is almost entirely pre-leased.

### 2.1. City of Chicago Department of Planning and Development Report

The strong demand for additional retail space in the area is supported by a report that was completed for the City of Chicago Department of Planning and Development in May of 2003. Although the report is nearly eleven years old, it is still relevant today because, as previously described, commercial development occurred at a much slower pace than residential development between 2000 and 2008. Additionally, the effects of the 2008/2009 recession halted any proposed development for approximately five years.

The City engaged Goodman Williams Group, URS Corporation and Real Estate Planning Group to complete the analysis, which focused on the demand for retail space in the South Loop, specifically at the proposed Riverside Park development site and elsewhere along Roosevelt Road. The following excerpts provide some of the report's findings/conclusions:

> *The primary trade area for Riverside Park is large, including neighborhoods in the Central Area, portions of the West and Southwest Sides, and much of the South Side of Chicago, extending all the way to 95th Street. The size of this trade area is based in part on our analysis of patrons at the Dominick's at the South Loop Marketplace and the relatively limited inventory of existing retailing on the south side.*

> *The 278,000 households in this primary trade area are likely to constitute approximately 75% to 80% of future sales at Riverside Park. According to analyses completed by Shorebank Advisory Services for the City of Chicago, $500 million in expenditure potential is leaking from the 24 South Side communities alone. Using conservative estimates of potential per-square-foot sales, we estimate that these dollars could support in excess of two million square feet of additional retail space.*

> *The remaining 20% to 25% of sales at Riverside Park is likely to come from city residents living outside the primary trade area, suburbanites and tourists. Interviews with retailers suggest that a Roosevelt Road store could cannibalize a portion of sales from existing stores at North and Clybourn – a not unwelcome outcome given the exceptional performance (and congestion) occurring in that retail cluster. In addition to capturing some market share from the North and Clybourn area, Riverside Park is likely to capture market share from the Ford City Shopping Center, located on the south side of Chicago, as well as gaining market share from surrounding south suburban centers, such as River Oaks Center in Calumet City and Evergreen Plaza in Evergreen Park. An additional impact will be to shift more spending and retail employment into Chicago from the south suburban communities.*

> *The growth projections completed for the Central Area Plan indicated that an annual average of nearly 2,000 new residents will be added to the South Loop and Near South side over the next two decades. We also projected sizable increases in the downtown employment base. This ongoing residential and employment growth will further strengthen demand for retail development along Roosevelt Road.*

> *In sum, we see more than adequate market support at the current time for the proposed 600,000 square feet of space at Riverside Park. Over time, we anticipate between two and three million square feet of retail space being developed along the Roosevelt Road Corridor, which will emerge as the fourth major retail concentration serving the Central Area, along with State Street, Michigan Avenue, and North and Clybourn.*



# V. MARKET ANALYSIS

### 3. Retail Demand

As previously stated, population within the subject's neighborhood has grown rapidly during the last twenty five years. The median household income in the neighborhood is significantly higher than that of the broader area, which contributes greatly to the population's consumption of retail goods and services. As discussed in the Neighborhood Analysis section of this report, residential construction mushroomed in the South Loop neighborhood between 2000 and 2008, but retail development occurred at a much slower pace. As a result, there is significant pent-up demand for retail space in the area, especially for mid- and big-box stores. This is supported by the strong pre-leasing of the sole shopping center currently under construction in the Roosevelt Road retail corridor.

The following chart details the projected absorption period for the retail space at the subject. According to CoStar, the current vacant supply of retail space in the Metro Chicago market, which includes most space in the downtown area, is approximately 1,360,000 SF, and there is approximately 270,000 SF under construction. Therefore, the total available retail space is 1,630,000 SF.

As mentioned, the vacancy rate has decreased recently and continued improvement of the market is predicted. Average annual absorption of 350,000 SF is projected, which represents 2.2% of the total market. The average absorption projection takes into consideration the current market conditions and the predictions related to future growth and development in the subject's area.

Based on these figures, it will take 4.42 years to absorb the current available space in the market. The projected retail space at the subject will contain approximately 480,000 SF, which is an estimate based on 680,000 SF of commercial space. We estimate a capture rate of 15.00% for the subject, which is higher than the subject's pro rata share of the market. This is considered reasonable due to the fact that the subject will be a new project in a strong retail location that will be surrounded by a growing residential population. The projected annual absorption is calculated to be 52,500 SF, and the projected absorption time is 9.14 years for the retail space at the subject.

| Retail Absorption Analysis | |
|---|---:|
| 1  Existing Supply (Vacant SF) | 1,360,000 |
| 2  Under Construction | 270,000 |
| 3  Available Space | 1,630,000 |
| 4  Frictional Vacancy | 5.0% |
| 5  Total Available | 1,548,500 |
| | |
| 6  Projected Absorption | 350,000 |
| 7  Absorption Period (Years) | 4.42 |
| | |
| 8  Subject Property Space [a] | 480,000 |
| 9  Percent of Market | 3.71% |
| | |
| 10  Capture Rate | 15.00% |
| 11  Projected Annual Absorption | 52,500 |
| | |
| 12  Absorption Period (Years) | 9.14 |

[a] Estimated SF, based on 680,000 SF of commercial space at the subject.

### 4. Conclusion

In general, the Chicago retail market has improved modestly during the last two years. This has been due to the gradual economic recovery in the area, including gradual job growth. Although conditions have improved

Valuation & Financial Opinions 

# V. MARKET ANALYSIS

slightly, the vacancy rate is still higher than pre-recession levels and construction still remains muted. However, construction is likely to increase as vacancy continues to fall and rents start to rise.

The Metro Chicago market, which contains the majority of downtown retail space, has been improving and is likely to continue to do so in the near future. The only major project under construction in the South Loop submarket has attracted many big name tenants and has experienced strong pre-leasing. It is likely that market conditions will continue to improve in the near future.

**Office Market**

**1. Metropolitan Chicago Office Market Overview**

The following chart displays office market statistics for Metropolitan Chicago from 2004 through the first quarter of 2014. The data in the chart is from the first quarter 2014 Chicago Office Market Report compiled by CoStar Group, Inc (Costar). The data includes all existing, under construction and under renovation office buildings. Additionally, all classes of space (A, B and C) are included in these figures. All rental rates reported have been converted to a full service equivalent.

| | Period | Existing Inventory | Total SF | Vacancy Rate | SF of Net Absorption | SF Under Construction | Quoted Rental Rate |
|---|---|---|---|---|---|---|---|
| | | | **Metropolitan Chicago Office Market** | | | | |
| 1 | 1Q 2014 | 12,914 | 459,890,959 | 14.3% | (373,777) | 2,230,026 | $23.11 |
| 2 | 4Q 2013 | 12,912 | 459,838,773 | 14.2% | 147,248 | 2,207,653 | $23.44 |
| 3 | 3Q 2013 | 12,908 | 459,634,573 | 14.2% | 478,452 | 2,219,853 | $22.75 |
| 4 | 2Q 2013 | 12,905 | 459,372,273 | 14.2% | 1,049,524 | 2,315,867 | $22.82 |
| 5 | 1Q 2013 | 12,906 | 459,459,654 | 14.5% | 729,581 | 2,497,207 | $23.05 |
| 6 | 2012 | 12,904 | 459,380,769 | 14.6% | 2,247,968 | 1,312,402 | $23.13 |
| 7 | 2011 | 12,898 | 460,181,826 | 15.3% | 1,296,605 | 1,038,266 | $22.70 |
| 8 | 2010 | 12,886 | 460,193,574 | 15.5% | 701 | 964,121 | $23.00 |
| 9 | 2009 | 12,857 | 459,438,226 | 15.5% | (7,576,279) | 1,422,131 | $22.87 |
| 10 | 2008 | 12,790 | 454,449,070 | 13.0% | 290,142 | 2,612,826 | $24.18 |
| 11 | 2007 | 12,636 | 449,982,778 | 12.2% | 6,133,821 | 8,223,007 | $24.24 |
| 12 | 2006 | 12,481 | 446,843,437 | 12.9% | 9,831,774 | 7,095,472 | $22.80 |
| 13 | 2005 | 12,270 | 441,930,092 | 14.2% | 6,254,848 | 6,055,341 | $23.02 |
| 14 | 2004 | 12,099 | 437,039,464 | 14.6% | 4,205,066 | 6,146,725 | $23.63 |

Source: CoStar Group, Inc.

Vacancy in the Chicago MSA has fluctuated between 12.2% and 15.5% during the last ten years. The market vacancy rate has generally been on a downward trend since 2010.

Absorption has fluctuated greatly. Prior to the 2008/2009 recession, the market experienced four consecutive years of strong absorption, but in 2009, absorption turned sharply negative, resulting in a dramatic increase in the vacancy rate. Absorption was basically flat in 2010, but has been positive for each of the last three years. Despite the fact that negative absorption was recorded in Q1 2014, the general consensus is that the Chicago office market is strengthening.

As market fundamentals have slowly improved, new construction has returned, albeit at a historically slow pace. The majority of construction underway is occurring in the central business district ("CBD"), which has outperformed the suburban market since the recession. Average asking rental rates have remained relatively flat over the last few years as landlords have attempted to absorb excess space.



# V. MARKET ANALYSIS

**2. Office Market Analysis**

CoStar divides the Chicago metropolitan area into 11 markets, and then divides these markets into submarkets, which are discussed below. The 11 Chicago markets are as follows: Metro Chicago; North; Northwest; East/West Corridor; Near West; North Chicago; O'Hare; South Chicago; South Suburban; Indiana; and Kenosha County. According to Costar, the subject is located in the Metro Chicago Market, which primarily covers the downtown Chicago area. The following chart displays market statistics for the Metro Chicago market from the second quarter of 2010 through the first quarter of 2014. The data in the chart is also from the First Quarter 2014 Chicago Office Market Report.

| | Period | Existing Inventory | Total SF | Vacancy Rate | SF of Net Absorption | SF Under Construction | Quoted Rental Rate |
|---|---|---|---|---|---|---|---|
| | **Metro Chicago Market** | | | | | | |
| 1 | Q1 2014 | 877 | 176,396,328 | 12.4% | (153,103) | 1,756,467 | $30.21 |
| 2 | Q4 2013 | 877 | 176,396,328 | 12.4% | (84,476) | 1,756,467 | $30.40 |
| 3 | Q3 2013 | 877 | 176,396,328 | 12.3% | 366,502 | 1,756,467 | $29.83 |
| 4 | Q2 2013 | 877 | 176,396,328 | 12.5% | 311,587 | 1,756,467 | $29.95 |
| 5 | Q1 2013 | 878 | 176,456,468 | 12.7% | 13,586 | 1,756,467 | $30.15 |
| 6 | Q4 2012 | 878 | 176,456,468 | 12.7% | 517,872 | 689,067 | $29.83 |
| 7 | Q3 2012 | 878 | 176,456,468 | 13.0% | 272,749 | 0 | $29.43 |
| 8 | Q2 2012 | 878 | 176,456,468 | 13.2% | 45,815 | 0 | $29.32 |
| 9 | Q1 2012 | 878 | 176,456,468 | 13.2% | (31,217) | 0 | $28.95 |
| 10 | Q4 2011 | 881 | 176,752,312 | 13.3% | 289,042 | 0 | $29.46 |
| 11 | Q3 2011 | 882 | 176,808,312 | 13.5% | 226,439 | 0 | $28.56 |
| 12 | Q2 2011 | 884 | 176,833,030 | 13.7% | 397,288 | 0 | $28.51 |
| 13 | Q1 2011 | 883 | 176,824,341 | 13.9% | 301,134 | 8,689 | $28.38 |
| 14 | Q4 2010 | 883 | 176,824,341 | 14.1% | 177,424 | 8,689 | $29.26 |
| 15 | Q3 2010 | 883 | 176,824,341 | 14.2% | 54,055 | 8,689 | $28.43 |
| 16 | Q2 2010 | 883 | 176,824,341 | 14.2% | 369,456 | 0 | $28.40 |

Source: CoStar Group, Inc.

Vacancy in the Chicago Metro market has fluctuated between 12.4% and 14.2% during the last four years. The market vacancy rate has been on a downward trend during this entire period, with the exception of the last two quarters. Despite the slight uptick in vacancy during Q4 2013 and Q1 2014, the market is generally strengthening along with the broader economy. Thirteen of the last sixteen quarters have experienced positive net absorption. The amount of space under construction halted at the onset of the 2008/2009 recession and remained relatively muted until 2013. Although construction has picked up, it is still occurring at a slow pace when compared to historical trends. As vacancy has fallen, asking rental rates have increased slightly. The average rate has increased approximately six percent since 2010.

The Metro Chicago office market is divided into seven submarkets, as defined by Costar. The subject is in the South Loop submarket. The map presented in the retail market analysis provides the boundaries of these submarkets. The following table provides first quarter 2014 data for each submarket in the Metro Chicago market.



# V. MARKET ANALYSIS

| Metro Chicago Submarkets | | | | | | |
|---|---|---|---|---|---|---|
| Submarket | Existing Inventory | Total SF | Vacancy Rate | YTD Net Absorption | SF Under Construction | Quoted Rental Rate |
| 1 Central Loop | 109 | 48,167,570 | 11.6% | (29,563) | 0 | $29.42 |
| 2 East Loop | 87 | 28,232,150 | 15.9% | (71,381) | 0 | $30.50 |
| 3 North Michigan Avenue | 94 | 17,925,369 | 15.8% | (114,668) | 0 | $24.07 |
| 4 River North | 243 | 19,633,415 | 9.6% | (81,510) | 0 | $30.68 |
| 5 River West | 156 | 5,339,952 | 10.2% | 36,366 | 689,067 | $19.71 |
| 6 South Loop | 40 | 4,605,030 | 9.3% | (3,683) | 0 | $22.20 |
| 7 West Loop | 148 | 52,492,842 | 11.8% | 111,336 | 1,067,400 | $33.50 |
| 8 **Total Metro Chicago** | **877** | **176,396,328** | **12.4%** | **(153,103)** | **1,756,467** | **$30.21** |

Source: CoStar Group, Inc.

The South Loop submarket is the smallest in the Metro Chicago market. However, it also has the lowest vacancy rate, which was estimated at 9.3% in the first quarter. The average rental rate in the South Loop is lower than those of the CBD submarkets, which include the Central Loop, East Loop, River North and West Loop.

### 3. Office Demand

The following chart details the projected absorption period for the office space at the subject. The current vacant supply of office space in the Chicago Downtown Market is approximately 22,000,000 SF, and there is approximately 1,800,000 SF under construction. Therefore, the total available office space is 23,800,000 SF. Absorption has generally increased during the last three years and the market is expected to improve in the future. We project average absorption of 2,500,000 SF in the following analysis, which represents 1.4% of the total market. Based on this rate of absorption, it will take 8.57 years to absorb the available space in the market.

The projected office space at the subject will contain approximately 200,000 SF, which is an estimate based on 680,000 SF of commercial space at the development. We estimate a capture rate of 0.75% for the subject, which is higher than the subject's pro rata market share. Although we acknowledge that the subject is not located within the CBD, it will offer new construction space within a premier mixed-use development. Additionally, it will be supported by a rapidly increasing South Loop population and significant adjacent retail space. For these reasons, we believe that a capture rate of 0.75% is reasonable. The projected annual absorption at the subject is calculated to be 18,750 SF, and the projected absorption time is approximately 10.67 years.



# V. MARKET ANALYSIS

| Office Absorption Analysis | |
|---|---|
| 1 Existing Supply (Vacant SF) | 22,000,000 |
| 2 Under Construction | 1,800,000 |
| 3 Available Space | 23,800,000 |
| 4 Frictional Vacancy | 10.0% |
| 5 Total Available | 21,420,000 |
| | |
| 6 Projected Absorption | 2,500,000 |
| 7 Absorption Period (Years) | 8.57 |
| | |
| 8 Subject Property Space [a] | 200,000 |
| 9 Percent of Market | 0.17% |
| | |
| 10 Capture Rate | 0.75% |
| 11 Fair Share of Absorption | 18,750 |
| | |
| 12 Absorption Period (Years) | 10.67 |

[a] Estimated SF, based on 680,000 SF of commercial space at the subject.

## 4. Conclusion

In general, the Chicago office market has experienced modest improvement during the last three years. This has been due to the gradual economic recovery in the area.

The Metro Chicago market, which contains the majority of downtown office space, has also been improving and is performing better than the suburban market. Construction has remained relatively muted since the recession. This has helped strengthen fundamentals and will likely continue to do so in the near future. With limited supply coming to market in the near future and the economic recovery likely to continue, the Metro Chicago office market is likely to improve in the near term.

## Multi-Family (Apartment) Market Analysis

### 1. Chicago Metropolitan Area Multi-Family Market Overview

The Chicago multi-family market has been strengthening during the past four years. According to Hendricks Berkadia, vacancy reached a cyclical high of more than six percent in 2008, but quickly recovered during 2009 and 2010. The overall market vacancy rate has generally fluctuated between 5.0% and 6.0% since that time and the most recent data show a rate of 5.7%.

Rental rates fell in 2009, but have increased ever since. Growth has ranged between 1.0% and 4.0% during this time and was measured in Q1 2014 at 1.5%. Generally speaking, rental rate growth has moderated during the past three years.

The rental market fared comparatively well during the recession and subsequent recovery because many homeowners were forced from their homes due to foreclosure, and many would-be buyers decided to hold off on purchasing a home or found it increasingly difficult to qualify for a mortgage. Since 2010, moderate economic growth has also aided the sector's recovery.

Annual net absorption fluctuated between 0 and 12,000 units during the 2008-2013 timeframe. While other sectors of the real estate industry were struggling, the Chicago apartment market experienced strong positive net absorption of approximately 12,000 units in 2009 and 2010. Absorption fell sharply in 2011 and 2012, but returned in 2013, when approximately 10,000 units were absorbed. The pace of new construction was very low during 2010, 2011 and 2012, but it increased dramatically in 2013, when approximately 5,000 units were



# V. MARKET ANALYSIS

built.  Based on permitting activity, deliveries are expected to drop; approximately 4,000 units per year are expected to be delivered during 2014 and 2015.

Hendricks Berkadia breaks the Chicago apartment market into 25 submarkets.  The following map provides geographic borders for each of the submarkets and the following table highlights submarket characteristics of the seven submarkets that account for the majority of space in the city of Chicago.



| | | | |
|---|---|---|---|
| ☐ Right - Lincoln Park/Old Town | | ☐ Right Upper - Rogers Park/Uptown | |
| ☐ Right - City West | | ■ Right - Belmont to Montrose | |
| ☐ Right Lower - Gold Coast/River North | | ☐ Middle Right - Oak Park | |
| ■ Right Lower - The Loop | | ☐ Middle - Glen Ellyn/Wheaton | |
| ▦ Right - South Shore | | ☐ Middle - O'Hare | |
| ▦ Lower Right - Southeast Cook County | | ▦ Upper Left - McHenry County | |
| ■ Lower - Southwest Cook County | | ■ Left - Kane County | |
| ▦ Middle - Downers Grove | | ▦ Lower - Joliet | |
| ☐ Lower - Woodridge/Lisle | | ☐ Middle - Wheeling | |
| ▦ Lower Left - Aurora/Naperville | | ▦ Upper Right - Glenview/Evanston | |
| ☐ Glendale Heights/Lombard | | ☐ Left - Dekalb County | |
| ☐ Middle - Schaumburg/Hoffman | | ☐ Lower - Kendall County | |
| ▦ Upper - Palatine | | | |

Valuation & Financial Opinions   

# V. MARKET ANALYSIS

| Chicago Multi-Family Submarkets | | | | | | |
|---|---|---|---|---|---|---|
| | Vacancy Rate | | Average Rent Increase | | Average Rent | |
| Submarket | Q1 2013 | Q1 2014 | Q1 2013 | Q1 2014 | Q1 2013 | Q1 2014 |
| 1 Belmont to Montrose | 5.5% | 8.8% | 4.0% | 2.8% | $1,661 | $1,708 |
| 2 City West | 3.4% | 7.0% | 0.5% | 1.7% | 2,006 | 2,040 |
| 3 Gold Coast/River North | 4.8% | 8.4% | 2.7% | -3.0% | 2,100 | 2,037 |
| 4 Lincoln Park/Old Town | 2.6% | 2.5% | 4.8% | 2.4% | 1,715 | 1,756 |
| 5 Rogers Park/Uptown | 3.1% | 3.1% | 1.8% | 2.4% | 894 | 916 |
| 6 South Shore | 6.0% | 7.2% | 0.5% | 1.9% | 1,385 | 1,412 |
| 7 The Loop | 5.5% | 6.4% | 5.2% | 1.3% | 1,873 | 1,897 |
| 8 Market Total [a] | 5.3% | 5.7% | 2.3% | 1.5% | 1,320 | 1,339 |

Source: Hendricks Berkadia Apartment Update 2014, 1st Quarter.
[a] Includes all space in the Chicago Market, not just the submarkets highlighted in this table.

The South Loop neighborhood is partially located within The Loop submarket and partially located within the South Shore submarket. Each of these submarkets experienced an increase in vacancy during the last year. This is largely due to the increase in supply experienced during 2013. Despite the increase in vacancy, rents continued to increase.

According to Marcus & Millichap, the median sale price for apartment properties fluctuated between $70,000 and $75,000 per unit between 2010 and 2013 and transaction velocity has generally increased. However, it appears that prices may be near their peak, and many investors are being priced out of the market. As supply increases and rental rate growth moderates, capitalization rates are expected to stabilize or increase slightly and transaction velocity is expected to decrease.

## 2. Demand Factors

As discussed in the Neighborhood Analysis section of this report, the South Loop is transitioning from a largely industrial area to a highly desirable residential neighborhood. Significant population and household growth occurred between 1990 and 2010 and although this growth was temporarily stunted by the recession of 2008/2009, it is likely to continue in the future.

The following demographic data, which was provided by Cubit Planning, Inc., applies to the South Loop neighborhood only. This information helps highlight some of the macro trends occurring in the area:

- The number of households increased by 2,835, or an annual compound rate of 4.1%, between 1990 and 2000.

- Household growth accelerated between 2000 and 2010, when 9,554 households were added. This represents a 7.8% annual compound increase.

- The median household income grew from $54,579 in 1990 to $74,809 in 2010, a compound increase of 3.2% per year.

- The percentage of homes that are owner occupied increased from 40.4% in 2000 to 48.8% in 2010.

Continued growth in population is likely to occur, although it will likely occur at a slower pace than it did between 2000 and 2010. Median household income will also likely increase as more professionals are drawn to the area's increasing stock of high-end apartment and condominium units.

Valuation & Financial Opinions



# V. MARKET ANALYSIS

### 3. Conclusion

The Chicago metropolitan multi-family market has been improving for the past four years. In fact, notwithstanding a brief setback during the 2008/2009 recession, the market has been strengthening for nearly a decade. Rental rates have increased substantially during this period and investment activity has been very strong. In response to improved fundamentals, new construction spiked during 2013 and significant supply is expected to hit the market in 2014 and 2015. The market is generally in a stage of expansion; the primary questions investors and developers are asking themselves revolve around how much more supply the market can handle before vacancy substantially and rents start to slip. We expect the multi-family market to continue to improve in the near term, but reach a state of equilibrium within a couple of years.

## Single Family Residential Market

### 1. Chicago Metropolitan Area Single Family Residential Market Overview

After five straight years of price depreciation, the single family housing market started to reverse course in late 2012. This was true at the national level and within the Chicago MSA. According to the S&P Case Shiller Index, between 2007 and 2011, home prices decreased at an average annual rate of 8.3% in the Chicago market. This was followed by increases of 3.4% and 10.8% in 2012 and 2013, respectively. Although the market has improved, as of January 2014, prices were still more than 25% lower than they were at the height of the market.

There are a variety of reasons for the turnaround in housing, including investor participation in the market, the gradual improvement in the broader economy, record affordability due to reduced prices and low mortgage rates, and the increased cost of renting. Other factors included the strength of the stock market; the S&P 500 index increased at a compound annual rate in excess of 14 percent between January of 2009 and January of 2014 and is currently hovering around record high levels. Additionally, the unemployment rate has fallen considerably during the last four years.

### 2. Submarket Residential Demand

The subject is located in the Downtown Chicago residential market. The City of Chicago and Midwest Real Estate Data, LLC ("MRED"), a multiple listing service, separate the City into 77 Community Areas. The subject is located within portions of Community Area 32 (the "Loop") and Community Area 33 (the "Near South Side"). The combination of these two areas is generally bound by the Chicago River to the north and west, Lake Michigan to the east and 26th Street to the south. This market area is analyzed in the following subsections.

#### 2.1. Sales Activity

All of the proposed for-sale homes at the subject are attached (condominiums or townhomes). This is typical of the market area. The following data was gathered from MRED and displays general sales trends for attached single family homes in the subject's market area.



# V. MARKET ANALYSIS

| | Attached Home Sales Activity - Loop and Near South Side | | |
|---|---|---|---|
| | Year | Number of Sales | Average Sale Price | Average Marketing Time (Days) |
| 1 | 2000 | 811 | $217,400 | 30 |
| 2 | 2001 | 703 | $283,591 | 78 |
| 3 | 2002 | 1,277 | $300,869 | 67 |
| 4 | 2003 | 1,531 | $313,325 | 93 |
| 5 | 2004 | 1,758 | $328,520 | 130 |
| 6 | 2005 | 1,862 | $380,154 | 105 |
| 7 | 2006 | 2,565 | $371,878 | 115 |
| 8 | 2007 | 2,124 | $438,008 | 102 |
| 9 | 2008 | 2,113 | $530,984 | 126 |
| 10 | 2009 | 1,295 | $449,351 | 248 |
| 11 | 2010 | 1,370 | $493,029 | 252 |
| 12 | 2011 | 997 | $358,221 | 221 |
| 13 | 2012 | 1,401 | $377,433 | 138 |
| 14 | 2013 | 1,703 | $434,885 | 76 |

Source: MRED, LLC

The data shows a dramatic increase in sales activity, increasing from a low of 703 units in 2001 to a high of 2,565 units in 2006. However, transaction activity fell significantly thereafter and reached a post-recession low of 997 units in 2011. Since that time, activity has picked up and marketing times have fallen considerably.

## 3. Demand Factors

Factors that influence demand for housing in the market area were studied. This included analyzing the demographic and economic composition of the area as well as any new commercial developments that may create new jobs and housing. Most of the demographic data used in this analysis, including population, number of households and income levels, was presented previously in this section.

### 3.1. Residential Demand Projection

As reported previously, the number of households in the South Loop submarket grew significantly between 1990 and 2010. An increase of 12,389 households occurred during this period, which represents an annual compound increase of approximately six percent. The following analysis projects a growth rate of 5.0% per year between 2010 and 2025. This is considered reasonable because it appears that the long term trend of growth in the area is likely to continue and a number of planned residential projects are already under construction or have been announced. Additionally, there is still a significant amount of land available for development/redevelopment in the area.

At the time of the 2010 census, the homeownership rate in the South Loop was 48.8%. However, this rate has been increasing and it is likely to increase further once condominium development returns to the area. The following projection assumes a 55.0% homeownership rate.

The following table provides historical demographic data and a projection of housing demand in the South Loop neighborhood for the year 2025.

Valuation & Financial Opinions



# V. MARKET ANALYSIS

| Residential Demand Analysis | | | |
|---|---|---|---|
| | | South Loop | |
| | **1990** | **2010** | **2025 (Projection)** |
| 1 Total Number of Households | 5,669 | 18,058 | 37,541 |
| 2 Total Increase in Households from Previous Period | | 12,389 | 19,483 |
| 3 Annual Growth in Households from Previous Period | | 6.0% | 5.0% |
| 4 Average Annual Growth per Year | | | 1,299 |
| 5 Owner-Occupied Percentage | | 48.8% | 55.0% |
| 6 Forecasted Increase in Owner-Occupied Demand | | | 10,716 |
| 7 Average Annual Growth per Year | | | 714 |
| 8 Renter-Occupied Percentage | | 51.2% | 45.0% |
| 9 Forecasted Increase in Renter-Occupied Demand | | | 8,767 |
| 10 Average Annual Growth per Year | | | 584 |

This analysis projects an increase of 19,483 housing units between 2010 and 2025, or an average rate of 1,299 per year. Assuming a 55.0% homeownership rate, there will be an average annual increase of 714 owner-occupied units and 584 renter-occupied units during the period.

### 3.2. Affordability of For-Sale Housing

Since a large portion of the subject's residential units will be for sale (versus for rent), the extent to which households will be able to afford the single-family residential product at the subject is important to the analysis of the property. Based on the range of new construction attached home prices in the South Loop, it is likely that the subject's units will start at a minimum price of $200,000 and increase from there. As reported in the following table, using typical residential mortgage underwriting guidelines, a household income of approximately $56,495 is required to purchase a home of this price. The calculations assume the general rules of thumb that a 20% down payment will be made, and the total housing payment will represent approximately 30% of household income.

| Affordability Analysis - Single Family Homes | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Loan Amount | Interest Rate | Term (Years) | Monthly PITI Payment | X | Months | Annual Housing Expense | Gross Income Factor | Annual Income Requirement |
| 1 | $160,000 | 4.50% | 30 | $1,412 | X 12 = | | $16,948 | 30.0% | $56,495 |

The following table provides a breakdown of household income levels in the South Loop as of the 2010 census, as well as an estimate for the current date. The table also provides an implied affordable home price for each income level, which is based on a calculation similar to that presented above. The information is presented in order to estimate the percentage of the local population that can afford a particular home price.



# V. MARKET ANALYSIS

| Home Affordability Estimate | | | |
|---|---|---|---|
| Household Income | Affordable Home Price (Rounded) | Percentage of Households | |
| | | Year 2010 | Year 2014 (Est.) |
| 1 $60,000+ | $212,000+ | 60.2% | 60.0% |
| 2 75,000+ | 266,000+ | 49.9% | 50.0% |
| 3 100,000+ | 354,000+ | 37.9% | 38.0% |
| 4 125,000+ | 443,000+ | 28.2% | 30.0% |
| 5 150,000+ | 531,000+ | 21.5% | 22.0% |
| 6 200,000+ | 708,000+ | 11.7% | 12.0% |
| Source: Cubit Planning, Inc. | | | |

Based on this analysis, an estimated 60.0% of households could afford a home of at least $212,000, 38.0% could afford a home of at least $354,000 and 12.0% could afford a home of at least $708,000.

The figures above include all households, not just owner-occupied households. Generally speaking, the incomes of owner-occupied households are higher than those of renter-occupied households. We estimate that approximately 80.0% of the area's owner-occupied households will be able to afford a home in the Riverside Park community.

| Owner-Occupied Residential Demand Analysis | | | |
|---|---|---|---|
| | South Loop | | |
| | 1990 | 2010 | 2025 (Projection) |
| 1 Total Number of Households | 5,669 | 18,058 | 37,541 |
| 2 Total Increase in Households from Previous Period | | 12,389 | 19,483 |
| 3 Owner-Occupied Percentage | | | 55.0% |
| 4 Forecasted Increase in Owner-Occupied Demand | | | 10,716 |
| 5 Percentage Able to Afford Subject-Type Housing | | | 80.0% |
| 6 Forecasted Demand Increase for Subject-Type Housing | | | 8,573 |
| 7 Average Annual Demand for Subject-Type Housing | | | 572 |

As reported in the table above, owner-occupied housing is projected to increase by 10,716 units between 2010 and 2025 and approximately 80.0% of the area's owner-occupied households will be able to afford a home at the subject. These assumptions lead to an average annual demand increase of 572 owner-occupied units, which equates to approximately 5,700 units over a ten year period and 8,600 units over a 15-year period.

The subject is planned for 4,614 units. Based on these figures, it is very likely that some of the subject's sites will be developed with rental housing in order to minimize the overall absorption period for the project, and to take advantage of the strength of the multi-family market and the likely increase in demand for rental units in the South Loop.

**4. Demand Conclusion**

The population and number of households in the South Loop each increased significantly between 1990 and 2010. Although the growth was stunted during the recession of 2008/2009, the long term growth trend is likely to continue. The gradual improvement of the housing market will increase for-sale home values and eventually justify additional condominium development.



# V. MARKET ANALYSIS

## Market Analysis Conclusion

The previous analysis helps us to project sales of mixed-use land in the DCF analysis. As shown, the retail, office and residential markets are all improving. Additionally, it appears that there is pent-up demand for retail space in the neighborhood due to the recent growth in population and a lack of available sites for desirable mid- and big-box stores.

The subject's developable parcels will likely be sold to a variety of "sub-developers," who will initiate construction after the purchase. In some cases, it is possible that developers will purchase the parcels well in advance of vertical construction. The lag time between the purchase of a parcel and construction will help to absorb the supply of vacant space and create demand for additional new construction.

Sales are projected to commence in 2014, and are generally expected to start in the northern portion of the site and gradually spread south. The rationale behind this development pattern is three-fold: First, due to the access restrictions created by the railroad tracks along Clark Street and the elevation of Roosevelt Road (discussed in the Legal and Physical Description section of this report), construction within the community is not likely to occur without the extension of Wells Street and an access point at the northeast corner of the site. Second, the plazas and shopping center that anchor the community will be located in the northern section. The completion of these improvements will create an identity for the community and offer potential buyers a variety of amenities. Third, the progression from north to south will allow for the phasing of infrastructure construction over time.

The first sale is projected to occur in 2014 (Year 1 of the projection), at which time nine mixed-use parcels located at the north end of the site are projected to sell. This includes parcels A1, A2, A3, A4, A5, A6, A9, A10 and A11. Based on conversations with ownership, these nine parcels would most likely be sold to a single developer due to the parking and infrastructure requirements necessary to develop this portion of the property. In Year 2 of the projection, one mixed-use parcel and one retail parcel, both of which are located at the northeast corner of the site, are projected to sell. In Year 3, two mixed use parcels along the riverfront are projected to sell, and two parcels planned for townhomes are projected to sell in Year 4. Development gradually moves south until the last parcel is sold, which is projected to occur in Year 9. This time frame is concluded to be appropriate based on the Market Analysis for the retail, office, and residential space at the property.

The total absorption timeframe for the subject is supported by the absorption timeframes of Dearborn Park and Central Station, which were described briefly in the Neighborhood Analysis section of this report. Dearborn Park, which includes approximately 51 acres of land, was constructed between the late 1970's and the early 1990's. This was the first major redevelopment project in the South Loop and it started the revitalization of the area; as a result, absorption was significantly slower than can be expected for a project now.

Central Station contains approximately 73 acres of land located west of Lakeshore Drive, between Roosevelt Road and McCormick Place. After accounting for right-of-way and other dedicated public areas, the net site area is approximately 56 acres. The development plan allows a maximum FAR of 5.02 and allows a variety of uses, including up to 6,385 residential units, 3,500 hotel rooms, 5.6 million square feet of office space, 920,000 square feet of retail/commercial space and 2 million square feet of exhibit, mart and institutional space. A large portion of the plan calls for development above the existing railway via air rights.

The planned development for this community was approved by the City in 1990 and has been amended a number of time since. Development began in the early 1990's with a variety of townhome projects along South Indiana Avenue and South Prairie Avenue. In the early 2000's, large condominium buildings began to spring up throughout the community, quickly increasing in density as the area grew in popularity. Generally speaking, the pace of construction in the community increased dramatically after the year 2000, although it halted at the onset of the 2008/2009 recession. However, no construction has occurred on the air rights parcels.

Valuation & Financial Opinions



# V. MARKET ANALYSIS

Approximately half of Central Station's 56-acre net (developable) site area is contained within the air rights parcels above the existing railway. The remaining half (the "non-air rights land") is located west of the railway. At the present time, approximately 25 of this community's 28 acres of non-air rights land has been developed, or is planned for near term development.

It is reasonable to assume that absorption of the subject's parcels would occur quicker than it did for either of these other master planned communities due to the increased desirability of the South Loop and the subject's location along the Chicago River and Roosevelt Road. As a reminder, the absorption analysis contained herein projects the sale of the development parcels only; the total timeframe for construction of the improvements and absorption of all of the improved space will be longer.

# Section VI

# Legal and Physical Description

# VI.  LEGAL AND PHYSICAL DESCRIPTION

### Legal and Physical Description of the Land

The subject site is located at the southwest corner of West Roosevelt Road and South Clark Street.  The site boundaries are West Roosevelt Road to the north, South Clark Street to the east, the Chicago River to the west, and 16th Street to the south.  In 1928, the South Branch of the Chicago River between Polk Street and 18th Street was straightened and moved 0.25 miles (400 m) west to make room for a railroad terminal.  Before this time, a portion of the River traversed the subject site.  Many other locations along the prior river path have been proposed as wetlands; however, there is no indication of this within the subject's boundaries.

The subject was approved as Planned Development ("PD") 904 by the City of Chicago in March of 2004.  However, development of the planned community never began, and the approval expired six years later.  The property was recently re-zoned for uses that are not consistent with the prior approval.  Based on our analysis, the highest and best use of the subject is consistent with the previously approved planned development.  Additionally, because the City previously approved PD 904, it is likely that they would approve a similar plan in the future.  For these reasons, PD 904 is described herein and our analysis of the subject is based on the characteristics of this approval.

**General Description:**    The subject is vacant land located within a previously approved planned development district known as Riverside Park.  Based on PD 904, the site contains 59.47 gross acres, of which 30.95 acres are considered developable.  The developable area has been divided into 24 parcels.  Areas within the property that are not designated for development include areas for public space, public parks, a riverwalk, and roadways.  The property was previously permitted for 4,614 dwelling units and 680,000 SF of commercial space.  The commercial component included retail and office space, and the residential component included town homes, lofts, mid-rise, and high-rise residential development.  The following chart identifies the subject parcels.  A site plan highlighting these parcels is displayed at the end of this section.



# VI. LEGAL AND PHYSICAL DESCRIPTION

| Parcel | Development Type | Net Area |
|--------|------------------|----------|
| A1 | Mixed Use | 35,783 |
| A2 | Mixed Use | 54,608 |
| A3 | Mixed Use | 29,431 |
| A4 | Mixed Use | 33,404 |
| A5 | Mixed Use | 52,054 |
| A6 | Mixed Use | 248,847 |
| A7 | Mixed Use | 31,342 |
| A8 | Retail | 25,435 |
| A9 | Mixed Use | 16,000 |
| A10 | Mixed Use | 17,398 |
| A11 | Mixed Use | 17,584 |
| B1 | Mixed Use | 63,720 |
| B2 | Mixed Use | 54,190 |
| C1 | Residential | 102,213 |
| C2 | Residential | 45,764 |
| D1 | Residential | 75,528 |
| D2 | Residential | 75,528 |
| D3 | Residential | 71,200 |
| D4 | Residential | 70,996 |
| E1 | Residential | 40,847 |
| E2 | Residential | 60,660 |
| E3 | Public Park | |
| E4 | Residential | 22,442 |
| F1 | Residential | 52712 |
| F2 | Residential | 50,501 |
| F3 | Public Park | |
| F4 | Public Park | |
| G1 | Public Park | |
| G2 | Public Park | |
| G3 | Public Park | |
| G4 | Public Park | |
| | | 1,348,187 |

**Frontage:** The subject has approximately 1,061 feet of frontage along West Roosevelt Road and 2,609 feet along South Clark Street.

**Access:** The property does not currently have vehicular access. Access to the property is discussed later in this section.

**Shape / Configuration:** The subject's site has a rectangular shape.

**Topography / Terrain:** The subject site sits approximately 38 feet below the surface of West Roosevelt Road due to the bridge elevation over the Chicago River. Otherwise, the site is generally level.

**Soil Conditions:** It is assumed that the soil's load-bearing capacity is sufficient to support the proposed structures. Evidence to the contrary was not observed during the physical inspection of the property. In addition, the site's drainage appears to be adequate.

**Land Use Restrictions:** Numerous easements and encumbrances exist on the subject site. The existence of these easements and encumbrances on the property were

Valuation & Financial Opinions 

# VI.  LEGAL AND PHYSICAL DESCRIPTION

considered during the development and approval of the PD.  As such, none are concluded to affect the market value of the property.

**Flood Hazard:**    According to Community Panel No. 17031C0507J, National Flood Insurance Rate Map program, effective August 19, 2008, the subject is located in Zone X, an area of minimal flooding.

**Wetlands:**    As previously discussed, the subject site used to be in the path of the Chicago River.  However, none of the subject's area has been proposed as wetlands based on the Chicago Master Plan.

**Environmental Issues:**    According to ownership's representatives, as of 2005, environmental remediation and mass grading of the site were expected to cost $6,000,000 combined.

**Utilities:**    All Available.

**Functional Utility:**    The subject site is well located, with adequate road frontage and visibility. Within the subject site there are significant geographical and man-made restraints that impede the development of the property.  Roosevelt Road is elevated approximately 38 feet from the subject at the northern boundary of the site.  As such, there are circulation and access issues related to the development potential at the north end of the site.  The subject also contains numerous railroad lines.  Access to the eastern portion of the site is limited by the railroad line running the length of the property.  These tracks also limit development potential and access to the northeastern portion of the site. Additional rail lines located at the southern portion of the site limit development near 16th Street.  Lastly, the Chicago River limits access to the property from the west.  The plans in PD 904 incorporate the existing challenges created by these restraints.

Significant infrastructure improvements, including road extensions, utility extensions, installation of riverwalk improvements and others, are required in order to make development feasible.  As previously mentioned, the cost associated with these improvements has been estimated at $98 million.  This report assumes that all costs related to infrastructure improvements upon/within those portions of the site allocated as right-of-way areas, public property, parks and open spaces will be funded through Tax Increment Financing (TIF) funds.

# VI. LEGAL AND PHYSICAL DESCRIPTION

**Aerial Image (Approximate Site Boundaries Highlighted in Yellow)**



# VI. LEGAL AND PHYSICAL DESCRIPTION

## Zoning

As previously discussed, the property was approved as PD 904 by the City of Chicago in March of 2004. However, development of the planned community never began, and the approval expired six years later. The property was recently re-zoned to DS-3, Downtown Service District. According to the City of Chicago zoning ordinance, the intent of this district is to "accommodate commercial and service uses that are essential for the livelihood of businesses and residents of the downtown area and surrounding neighborhoods. The district regulations allow a mix of small-scale office, commercial services, public uses, transportation and communication services, and industrial uses." Residential uses are not allowed.

Based on our analysis, the highest and best use of the subject is consistent with the previously approved planned development, not with those allowed in the DS-3 district. Additionally, because the City previously approved PD 904, it is likely that they would approve a similar plan in the future. For these reasons, PD 904 is described herein and our analysis of the subject is based on the characteristics of this prior approval. The plan calls for retail, office, and residential uses, as well as a variety of public parks and open spaces. The residential component includes a mixture of townhomes, low-rise and mid-rise buildings, and high-rise towers.

The Near South Community Plan, which was issued in April 2003, serves as a guide for future development in the subject's area. This report states that the goal for the subject's immediate area is to promote growth of residential neighborhoods and create a strong commercial environment in an urban context that is bolstered by the neighborhood's existing development. We are not aware of an updated version of this plan. Although it is nearly eleven years old, it still appears to be relevant given the land use trends that have occurred in the area. This plan supports the type of development allowed by PD 904.

The following chart details the development requirements for the subject per PD 904.

| Parcel | Development Type | Net Land Area (SF) | Maximum FAR | Maximum FAR SF | Maximum Dwelling Units | Maximum Comm. Area | Parking | Maximum Building Height |
|---|---|---|---|---|---|---|---|---|
| A1 | Mixed Use | 35,783 | 6.00 | 214,698 | 125 | 43,000 | a, b | 115 feet |
| A2 | Mixed Use | 54,608 | 6.30 | 344,030 | 225 | 63,000 | a, b | 115 feet |
| A3 | Mixed Use | 29,431 | 6.60 | 194,245 | 125 | 32,000 | a, b | 115 feet |
| A4 | Mixed Use | 33,404 | 6.60 | 220,466 | 125 | 39,000 | a, b | 115 feet |
| A5 | Mixed Use | 52,054 | 7.20 | 374,789 | 240 | 100,000 | a, b | 340 feet |
| A6 | Mixed Use | 248,847 | 4.00 | 995,388 | 589 | 287,000 | a, b, c | 310 feet |
| A7 | Mixed Use | 31,342 | 13.10 | 410,580 | 300 | 25,000 | a, b, c | 420 feet |
| A8 | Retail | 25,435 | 1.00 | 25,435 | | 25,000 | a, b | 35 feet |
| A9 | Mixed Use | 16,000 | 18.50 | 296,000 | 240 | 2,000 | a, b | 370 feet |
| A10 | Mixed Use | 17,398 | 11.30 | 196,597 | 144 | 2,000 | a, b | 280 feet |
| A11 | Mixed Use | 17,584 | 11.10 | 195,182 | 144 | 2,000 | a, b | 270 feet |
| B1 | Mixed Use | 63,720 | 3.10 | 197,532 | 144 | 20,000 | a, b | 100 feet |
| B2 | Mixed Use | 54,190 | 3.10 | 167,989 | 124 | 20,000 | a, b | 100 feet |
| C1 | Residential | 102,213 | 2.00 | 204,426 | 65 | | c, d | 55 feet |
| C2 | Residential | 45,764 | 2.00 | 91,528 | 32 | | c, d | 55 feet |
| D1 | Residential | 75,528 | 1.60 | 120,845 | 54 | | c, d | 45 feet |
| D2 | Residential | 75,528 | 1.60 | 120,845 | 54 | | c, d | 45 feet |
| D3 | Residential | 71,200 | 1.00 | 71,200 | 54 | | c, d | 45 feet |
| D4 | Residential | 70,996 | 1.70 | 120,693 | 54 | | c, d | 45 feet |
| E1 | Residential | 40,847 | 6.60 | 269,590 | 183 | 2,000 | b, c, e | 250 feet |
| E2 | Residential | 60,660 | 5.20 | 315,432 | 193 | 2,000 | b, c, e | 250 feet |
| E3 | Public Park | | | | | | | |
| E4 | Residential | 22,442 | 17.30 | 388,247 | 300 | 2,000 | b, e | 420 feet |
| F1 | Residential | 52,712 | 14.10 | 743,239 | 600 | 2,000 | b, e | 420 feet |
| F2 | Residential | 50,501 | 12.50 | 631,263 | 500 | 2,000 | b, e | 340 feet |
| F3 | Public Park | | | | | | | |
| F4 | Public Park | | | | | | | |
| G1 | Public Park | | | | | | | |
| G2 | Public Park | | | | | | | |
| G3 | Public Park | | | | | | | |
| G4 | Public Park | | | | | | | |
| | | 1,348,187 | 5.17 | 6,910,240 | 4,614 | 680,000 | | |

a Parking ratio = min of 3 spaces per 1,000 SF, max of 4.5 spaces per 1,000 SF of leasable area (commercial)
b Parking ratio = min of 0.7 spaces per dwelling units, max of 1.2 spaces per dwelling unit (residential)
c Parking ratio = 1 space per DU, max of 2 per DU (townhouses)
d Detached SF or multi-family, parking ratio, FAR and height must be maintained.
e Retail less than 10,000 SF, no additional parking required

Valuation & Financial Opinions



# VI.  LEGAL AND PHYSICAL DESCRIPTION

### 1. Non-Developable Areas

- Portions of the subject are allocated as right of way areas for public streets.  This area totals 699,794 square feet, or 16.07 acres, which equates to 27.01% of the gross site area.
- The areas planned for public parks, open space, and dedicated public areas totals 542,538 square feet, or 12.45 acres, which equates to 20.94% of the gross site area.

### 2. Maximum Building Height

- The range of maximum building height varies from 35 feet to 420 feet, depending on the parcel.

### 3. Parking Requirements

- Retail/commercial space requires a minimum of three spaces per 1,000 SF, with the following exception:  No additional parking is required for buildings that contain fewer than 10,000 SF of retail space.
- Parking requirements for residential space are a minimum of 0.7 spaces per dwelling unit.
- Parking requirements for townhomes are a minimum of one space per dwelling unit.

### 4. Overall Density

- Based on the above requirements, the maximum FAR for the entire property is 5.17.  The maximum number of dwelling units allowed is 4,614 and the maximum amount of commercial space is 680,000 SF.

## Proposed Improvements Description

The following description regarding the construction details of the proposed improvements is based on an examination of PD 904 and discussions with the owner's representatives.  The subject is vacant land, and does not contain any improvements as of the valuation date.

## General Data

| | |
|---|---|
| Building Size: | The table provided in the zoning discussion details the potential building size for each development parcel.  The table provides the net developable area of each development parcel, the maximum floor area ratio per parcel, the maximum dwelling units per parcel, and the maximum allowable commercial space per parcel. |

## Site Improvements

| | |
|---|---|
| Site Access/Circulation: | As previously discussed, geographical and man-made restrictions impede the development design of the subject.  The design of the planned development includes construction of South Wells Street continuing from West Roosevelt Road to the southern portion of the site. This will provide the primary north-south vehicular route through the property.  13th Street will also provide entrance to the property from the northeast, and South Wentworth Avenue will provide access to the south end of the property. |
| Parking Ratio: | The table provided in the zoning discussion details the parking requirements for each development parcel. |
| Landscaping: | A variety of open spaces, public parks and landscaped pedestrian avenues are planned. |

Valuation & Financial Opinions



# VI. LEGAL AND PHYSICAL DESCRIPTION

**Other:**            The property contains geographical and man-made boundaries, which include the Chicago River to the west, Roosevelt Road to the north, and Clark Street to the east.

# VI. LEGAL AND PHYSICAL DESCRIPTION

**Site Plan (Per PD)**



# VI. LEGAL AND PHYSICAL DESCRIPTION

**Generalized Land Use Plan (Per PD)**



# VI. LEGAL AND PHYSICAL DESCRIPTION

**Net Developable Area Plan (Per PD)**



# Section VII

# Real Estate Taxes

# VII. REAL ESTATE TAXES

## Real Estate Tax Overview

Property taxes in the state of Illinois represent ad valorem taxes, or a tax in relation to the value of a property. Taxes are administered on a county basis; the subject is located within Cook County. The Cook County Assessor is responsible for estimating the market value of each property within the county. After the market value is determined, an assessment factor is applied, thus yielding the assessed value. The assessed value is then multiplied by an equalization factor in order to determine the equalized assessed valuation (EAV). The equalization factor is determined by the Illinois Department of Revenue each year to ensure an equal assessment level among all 102 counties in the state. After the budgets of all government taxing authorities are approved, the required tax rate can be determined. Multiplying a property's equalized assessed value by the appropriate tax rate yields the property's real estate tax obligation.

Assessment factors in Cook County vary by property type. Additionally, the Cook County Board passed Ordinance No. 08-O-51in 2008. This ordinance revamped the statutory assessment classification level for all classes of real property in Cook County. The changes went into effect for tax year 2009 (payable in 2010). This ordinance changed the assessment level of vacant land from 22 percent of its estimated market value to 10 percent.

Real property taxes in Cook County are payable in arrears, which means property owners pay taxes each year based upon the prior year's assessed value and tax rate. The annual tax bill is due in two installments. While properties are not reassessed annually, a property's tax liability can fluctuate year to year based upon changes in the state equalization factor and/or the tax rate.

# VII. REAL ESTATE TAXES

## 1. Subject Tax Data

The assessed value and real estate taxes for the subject are presented in the following table.

| | Parcel Identification Number | Market Value | Assessed Value | Equalized Assessed Value | Tax Rate Per $100 | Property Taxes |
|---|---|---|---|---|---|---|
| | **Assessed Value and Taxes for Tax Year 2012 (Payable 2013)** | | | | | |
| 1 | 17-21-202-001 | $325,500 | $32,550 | $91,322 | 6.3960 | $5,841 |
| 2 | 17-21-203-004 | 2,040,870 | 204,087 | 572,586 | 6.3960 | 36,623 |
| 3 | 17-21-203-005 | 8,912,420 | 891,242 | 2,500,469 | 6.3960 | 159,930 |
| 4 | 17-21-203-006 | 525,300 | 52,530 | 147,378 | 6.3960 | 9,426 |
| 5 | 17-21-203-007 | 3,371,120 | 337,112 | 945,801 | 6.3960 | 60,493 |
| 6 | 17-21-204-001 | 555,320 | 55,532 | 155,801 | 6.3960 | 9,965 |
| 7 | 17-21-206-001 | 370,620 | 37,062 | 103,981 | 6.3960 | 6,651 |
| 8 | 17-21-207-001 | 2,033,000 | 203,300 | 570,378 | 6.3960 | 36,481 |
| 9 | 17-21-208-004 | 609,520 | 60,952 | 171,007 | 6.3960 | 10,938 |
| 10 | 17-21-208-005 | 1,265,250 | 126,525 | 354,979 | 6.3960 | 22,704 |
| 11 | 17-21-209-006 | 657,170 | 65,717 | 184,376 | 6.3960 | 11,793 |
| 12 | 17-21-209-007 | 6,245,000 | 624,500 | 1,752,097 | 6.3960 | 112,064 |
| 13 | 17-21-210-002 | 451,210 | 45,121 | 126,591 | 6.3960 | 8,097 |
| 14 | 17-21-210-003 | 1,193,880 | 119,388 | 334,955 | 6.3960 | 21,424 |
| 15 | 17-21-210-004 | 721,460 | 72,146 | 202,413 | 6.3960 | 12,946 |
| 16 | 17-21-210-005 | 811,930 | 81,193 | 227,795 | 6.3960 | 14,570 |
| 17 | 17-21-210-006 | 1,595,030 | 159,503 | 447,502 | 6.3960 | 28,622 |
| 18 | 17-21-210-007 | 559,430 | 55,943 | 156,954 | 6.3960 | 10,039 |
| 19 | 17-21-210-086 | 5,886,080 | 588,608 | 1,651,399 | 6.3960 | 105,623 |
| 20 | 17-21-210-090 | 1,780,700 | 178,070 | 499,593 | 6.3960 | 31,954 |
| 21 | 17-21-210-092 | 7,063,900 | 706,390 | 1,981,848 | 6.3960 | 126,759 |
| 22 | 17-21-210-095 | 4,878,750 | 487,875 | 1,368,782 | 6.3960 | 87,547 |
| 23 | 17-21-502-001 | 1,000,000 | 100,000 | 280,560 | 6.3960 | 17,945 |
| 24 | 17-21-503-003 | 3,783,210 | 394,085 | 1,105,645 | 6.3960 | 70,717 |
| 25 | Total | $56,636,670 | $5,679,431 | $15,934,212 | | $1,019,150 |
| 26 | Municipality | | | | | Chicago |
| 27 | Township | | | | South Township and West Township | |

Source: Cook County Assessor

According to the Cook County Treasurer's office, real property taxes are current; there are no delinquent taxes encumbering the subject.

Valuation & Financial Opinions



# Section VIII

# Highest and Best Use

# VIII. HIGHEST AND BEST USE

## Highest and Best Use as if Vacant

### 1. Criterion 1 - Legally Permissible

The subject is zoned DS-3, Downtown Service District. According to the City of Chicago zoning ordinance, the intent of this district is to "accommodate commercial and service uses that are essential for the livelihood of businesses and residents of the downtown area and surrounding neighborhoods. The district regulations allow a mix of small-scale office, commercial services, public uses, transportation and communication services, and industrial uses." Residential uses are not allowed.

As discussed throughout this report, the subject was approved by the City as Planned Development 904 in March of 2004. This approval allowed a mixed-use (commercial and residential) development and a variety of building types, including town homes, mid-rise buildings and high-rise towers. Because construction never commenced, the approval expired in 2010.

The Near South Community Plan, which was issued in April 2003, serves as a guide for future development in the subject's area. This report states that the goal for the subject's immediate area is to promote growth of residential neighborhoods and create a strong commercial environment in an urban context that is bolstered by the neighborhood's existing development. We are not aware of an updated version of this plan. Although it is nearly eleven years old, it still appears to be relevant given the land use trends that have occurred in the area. This plan supports the type of development allowed by PD 904. Based on this, the best evidence of what would likely be approved by the City is PD 904.

### 2. Criterion 2 - Physically Possible

The subject has access to all utilities, is generally level, and is rectangular in shape. Additionally, it is not located in a hazardous flood zone. The site contains 59.47 acres and has adequate frontage. The subject site is capable of supporting future development of various types.

The subject's net size, shape, road frontage, accessibility, visibility, and topography do not physically limit its potential use. However, some limitations on development exist based on geographical and man-made restrictions at the subject. Additionally, significant infrastructure improvements, including road extensions, utility extensions, etc. are required in order to make development feasible. As previously mentioned, the cost associated with these improvements has been estimated at $98 million based on PD 904. This report assumes that all costs related to infrastructure improvements upon/within those portions of the site allocated as right-of-way areas, public property, parks and open spaces will be funded through Tax Increment Financing (TIF) funds.

### 3. Criterion 3 - Financially Feasible

The financially feasible uses of the property (those uses that will produce the highest net return) are analyzed. As discussed in the Neighborhood Analysis and Market Analysis sections of this report, the subject's area is in a state of transition, and the area has seen a dramatic increase in the demand for housing and retail services during the past twenty five years. Given the local market trends and the breadth of development options available, mixed-use development with residential, retail and office space will provide the highest return.

### 4. Criterion 4 - Maximally Productive

The analysis indicates that the most productive use of the subject site is for mixed-use development. This use is legally permissible, physically possible, and financially feasible.

Valuation & Financial Opinions 

# VIII. HIGHEST AND BEST USE

### 5. Conclusion – Highest and Best Use As if Vacant

Based on our analysis, the highest and best use of the subject is for mixed-use development, including residential, retail and office components. The City of Chicago previously approved PD 904, which defined a plan for a mixed-use community. Additionally, the Near South Community Plan supports this type of development at the subject. The current zoning designation is inconsistent with the subject's highest and best use, and we assume that re-zoning will occur prior to development. Because the City previously approved PD 904, it is likely that they would approve a similar plan in the future. We conclude that the highest and best use of the subject is mixed-use, consistent with the previously approved PD.

Valuation & Financial Opinions



# Section IX

# Sales Comparison Approach

# IX. SALES COMPARISON APPROACH

### Land Valuation Analysis

The comparable sales utilized in the land valuation analysis were compiled from our research of sales of comparable vacant land in the subject's market. The comparables were chosen based upon date of transfer, size, location and highest and best use. A map of the sales, as well as detailed information regarding these sales is presented on the following pages.

The subject is a large property, and based on the PD previously approved by the City, it is slated to be developed with mixed uses throughout multiple development phases over an extended period. As previously discussed, the subject is divided into 24 developable parcels that are likely to be sold off (and subsequently developed) over an extended period of time. The following analysis is conducted to determine the market value of the subject's 24 developable parcels. The Income Capitalization Approach section of this report provides a projected sell off schedule and employs the discounted cash flow method in order to estimate the present value of the subject based on its income potential.

As described in the Legal and Physical Description section of this report, some of the developable parcels are planned for residential use, others are planned for mixed-use, and one is planned for strictly retail use. In addition, we have concluded that nine of the parcels at the north end of the development site would likely sell in a single transaction. For these reasons, we have grouped the subject's sites into the following three categories for valuation purposes:

- **Residential Sites:** These sites are planned for town home and condominium uses. The sites include very little retail use, which is only allowed on the ground floor of the planned condominium buildings. This category includes the following 11 parcels: C1, C2, D1, D2, D3, D4, E1, E2, E4, F1 and F2, which are located in the southern section of the site. The average net site area of these parcels is 60,763 square feet, the average FAR is 4.60 and the average allowable building size is 279,755 square feet.

- **Large Mixed-Use Site:** This is the large site that is assumed to sell to a single developer. The site includes 580,000 of the subject's allowable 680,000 square feet of commercial space. This category includes the following nine parcels: A1, A2, A3, A4, A5, A6, A9, A10, and A11, which are located at the northern end of the site. Because the following analysis assumes that these sites will sell in a single transaction, this site is evaluated in aggregate. The total net site area of these parcels is 505,109 square feet, or 11.6 acres, the total allowable FAR is 6.00 and the allowable total building size is 3,031,396 square feet.

- **Mixed-Use and Retail Sites:** The mixed-use sites are planned for lower level commercial space and upper level condominium units. The retail parcel is planned for a single-story retail building. This category includes the following four parcels: A7, A8, B1 and B2, which are located in the northeastern and northwestern sections of the site. The average net site area of these parcels is 43,672 square feet, the average FAR is 4.59 and the average allowable building size is 200,384 square feet.

The following pages provide a table summarizing the seven comparable sales used in this analysis, as well as a map showing the location of each comparable property. More detailed descriptions of the comparables are provided in Exhibit D. Additionally, this section provides three separate adjustments grids, one for each land category described above.

The allowable building density of a particular property is a significant contributor to its value. This is especially true in dense, urban areas, like the subject's. For this reason, the unit of comparison used in the following analysis is price per square foot of allowable building area (FAR SF).

Valuation & Financial Opinions



# IX. SALES COMPARISON APPROACH

**Summary of Comparable Land Sales**

| | Subject Property [a] | Comparable Sale Number 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| 1 Address | Southwest Corner of Roosevelt Road and Clark Street | 1400 South Wabash Avenue | 630 South Wabash Avenue | 1210 & 1259 South Indiana Avenue | 609-673 South State Street | 2020-2100 South Clark Street | 800-860 South Clark Street | 1943-1947 South Prairie Avenue |
| 2 Location | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois |
| **Property Data** | | | | | | | | |
| 3 Site Size (SF) | 56,174 | 25,425 | 15,722 | 131,882 | 55,592 | 30,000 | 193,554 | 18,113 |
| 4 Site Size (Acres) | 1.29 | 0.58 | 0.36 | 3.02 | 1.29 | 0.69 | 3.53 | 0.42 |
| 5 Max Floor Area Ratio | 5.13 | 7.00 | 12.00 | 7.65 | 12.00 | 4.39 | 7.00 | 3.00 |
| 6 Max Floor Area (SF) | 287,827 | 177,962 | 188,664 | 1,007,387 | 671,904 | 131,709 | 1,074,978 | 54,339 |
| 7 Configuration | Rectangular | Rectangular | Rectangular | Rectangular | Rectangular | Irregular | Rectangular | Rectangular |
| 8 Topography | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level |
| 9 Zoning | DX-5, Downtown Service District | DX-7, Downtown Mixed-Use | DX-12, Downtown Mixed-Use | PD 499, Planned Development | DX-12, Downtown Mixed-Use | PD 1190, Planned Development | DX-7, Downtown Mixed-Use | DX-5, Downtown Mixed-Use |
| 10 Highest & Best Use | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development |
| 11 Utilities | All Available | All Available | All Available | All Available | All Available | All Available | All Available | All Available |
| **Transaction Details** | | | | | | | | |
| 12 Transaction Date [b] | April 1, 2014 | April 1, 2014 | April 1, 2014 | November 8, 2012 | October 25, 2012 | June 26, 2012 | May 17, 2012 | December 19, 2011 |
| 13 Conditions of Sale | | Confirmed Listing | Confirmed Listing | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale |
| 14 Sale Price | | $4,500,000 | $2,750,000 | $29,575,000 | $12,250,000 | $1,200,000 | $12,200,000 | $1,535,000 |
| 15 Price per Square Foot | | $176.98 | $174.91 | $224.21 | $218.76 | $40.00 | $60.10 | $84.19 |
| 16 Price per Max Floor Area Foot | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.64 | $28.06 |

[a] Reflects the characteristics of the average developable subject parcel; there are 24 parcels in total.
[b] Transaction date identified for subject is valuation date for analysis.

# IX. SALES COMPARISON APPROACH



**Comparable Land Sales**

Valuation & Financial Opinions

**SRR**
STOUT|RISIUS|ROSS

# IX. SALES COMPARISON APPROACH

## Description of Adjustments

Listed below is a description of the comparisons made between the subject and the comparable sales with respect to each of these elements of comparison.

### 1. Real Property Rights Conveyed

Property rights adjustments account for differences in the property rights conveyed in the transaction. Some transactions convey more rights to the use of the property than other transactions.

All of the comparable sales conveyed the full bundle of rights. As such, no adjustments are necessary.

### 2. Financing Terms

Some transactions may include a premium or discount for attractive or unfavorable financing, respectively. Adjustments to the transaction price must be made to remove this difference. Typically, the comparable properties are adjusted to a cash or cash-equivalent basis.

The financing terms of all the comparable sales are at market terms and no adjustments are applied.

### 3. Conditions of Sale

A condition of sale adjustment is made to reflect the motivations of buyers and sellers when they are not typically motivated and/or purchases do not reflect arm's-length transactions. Adjustments should be made to those transactions that are conducted at prices considered to be below or above the price at which the property would exchange between willing buyers and willing sellers. This category is also used to account the deviation between listing price and closing price when comparable property offerings are used in the analysis.

Comparables 1 and 2 are listed for sale. Comparable 1 is adjusted to reflect the typical spread between asking and sale price for similar properties in the subject's market. Although comparable 2 is also a listing, it is not adjusted because the listing agent explained that the property has already been under contract at the asking price once and it is about to go under contract at the asking price again. To our knowledge, the remaining sales represent arm's length transactions between willing buyers and sellers; no adjustments are made.

### 4. Expenditures Immediately After Purchase

Some properties require the purchaser to make expenditures immediately after the acquisition of the property. For example, the local government may require safety problems to be corrected within a short period of time following the sale. Market participants consider these expenditures when buying and selling property.

Comparable 3 was improved with a single-story building at the time of sale. The cost related to demolition of the existing improvements was to be incurred by the buyer. We have estimated the size of the improvements and applied demolition costs consistent with the Marshall Valuation Service ("MVS") manual. No adjustments are made to the other sales.

### 5. Market Conditions

The next adjustment is made to reflect both changes in the market since the sale of the comparable property and the purchasing power of money over time. In appreciating markets, positive adjustments must be made to the comparable properties to reflect the improving market conditions since the sale of the property. In depreciating markets, negative adjustments must be made.

The comparables sold between December 2011 and April 2014 (active listings). As discussed in the Market Analysis section of this report, market conditions for retail, office and residential properties improved during this period.



# IX.  SALES COMPARISON APPROACH

The S&P/Case-Shiller Indices provide trends in home values based on repeat sales of individual properties. A condominium index specific to the Chicago market is provided.  This index posted gains of 5.3% and 14.0% during 2012 and 2013, respectively.  The index applicable to all single family homes in the Chicago market posted gains of 3.4% and 10.8% during the same period.

The Moody's/RCA CPPI index provides trends in commercial property values based on repeat sales of individual properties.  This index does not provide market-specific data.  The national all-property index posted gains of 7.8% and 16.5% during 2012 and 2013, respectively.

Generally speaking, the development market has strengthened during the last two-plus years.  For this reason, an annual upward adjustment of 5.0% is applied to each of the sales.

Applying adjustments for the aforementioned elements of comparison yields an adjusted price subtotal for each comparable sale, from which remaining adjustments can be made.  These adjustments are described below.

**6. Location**

Adjustments for location consider frontage, corner exposure, visibility, traffic counts, proximity to the CBD, proximity to popular recreational areas and entertainment venues and the density of surrounding development.

The subject sites will be located within a large, master-planned, mixed-use community.  The community will contain a variety of complimentary land uses that will benefit one another.  Additionally, there will be a variety of plazas, parks, open spaces and a riverwalk throughout the community.  None of the comparable sales benefit from a similar mix of complimentary uses, and none benefit from direct access to the river.  These factors are considered in our adjustments to the comparables.

The Mixed-Use and Retail sites are located at the north end of the planned community, along Roosevelt Road, while the Residential sites are located at the southern end of the community.  Because the northern end of the community has superior visibility and exposure to vehicular traffic, it is considered superior in terms of location.

**7. Size**

Our adjustments in this category focus on the amount of building area (FAR SF) that is permitted for each comparable.  Generally, sites allowing less buildable area sell for higher per square foot rates than sites allowing more buildable area, all other factors being equal.  This relationship is true for the subject's market.

The magnitudes of these adjustments vary depending on the land category being analyzed (Residential Sites, Large Mixed-Use Site, and Mixed-Use and Retail Sites).

**8. Configuration**

The subject's sites generally have rectangular configurations, which maximize their development potential based on the site plan.  Comparable 5 has a very narrow, irregular configuration, which would inhibit development of a portion of the site.  For this reason, the comparable is considered inferior to the subject and an upward adjustment is applied.

**9. Topography**

The subject site is generally level, but it sits approximately 38 feet below Roosevelt Road.  The fact that the site sits so far below the surface of the road complicates the development plan.  However, the existing plan has taken this factor into consideration and as a result, no adjustments are necessary.

Valuation & Financial Opinions



# IX.  SALES COMPARISON APPROACH

**10. Zoning**

All of the land sales allow mixed-use development, like the subject.  Differences in allowed density are inherently considered in this analysis because maximum buildable floor area (FAR SF) is used as the unit of comparison.  Therefore, the sales are similar to the subject, and no adjustments are necessary.

**11. Highest and Best Use**

All of the comparable land sales have the same highest and best use as the subject; no adjustments are necessary.

**12. Utilities**

All of the land sales have similar available utilities to the subject and no adjustments are necessary.

**13. Other Factors**

No other factors necessitate adjustments to the land sales.


**Adjustment Grids**

The following three adjustment grids provide the quantitative analysis and conclusion for each of the three categories of developable parcels.

Valuation & Financial Opinions



# IX. SALES COMPARISON APPROACH

**Land Valuation – Residential Sites**

| # | | Subject Property [a] | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Comparable Sale Number | | | |
| 1 | Property | Southwest Corner of Roosevelt Road and Clark Street | 1400 South Wabash Avenue | 63rd South Wabash Avenue | 1210 & 1250 South Indiana Avenue | 506-673 South State Street | 2020-2100 South Clark Street | 800-880 South Clark Street | 1943-1947 South Prairie Avenue |
| 2 | Location | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois |
| 3 | Sale Date | | 1-Apr-14 | 1-Apr-14 | 8-Nov-12 | 25-Oct-12 | 25-Jun-12 | 17-May-12 | 19-Dec-11 |
| 4 | Conditions of Sale | | Confirmed Listing | Confirmed Listing | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale |
| 5 | Location Rating | Good | Similar | Superior | Superior | Superior | Inferior | Inferior | Similar |
| 6 | Site Size (SF) | 60,763 | 25,426 | 15,722 | 131,682 | 55,992 | 30,000 | 153,254 | 18,113 |
| 7 | Max Floor Area Ratio | 4.60 | 7.00 | 12.00 | 7.65 | 12.00 | 4.39 | 7.00 | 3.00 |
| 8 | Max Floor Area (SF) | 279,755 | 177,982 | 188,664 | 1,007,367 | 671,904 | 131,700 | 1,074,878 | 54,339 |
| 9 | Configuration | Rectangular | Rectangular | Rectangular | Rectangular | Rectangular | Irregular | Rectangular | Rectangular |
| 10 | Topography | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level |
| 11 | Zoning | DX-5, Downtown Service District | DX-7, Downtown Mixed-Use | DX-12, Downtown Mixed-Use | PD 469, Planned Development | DX-12, Downtown Mixed-Use | PD 1100, Planned Development | DX-7, Downtown Mixed-Use | DX-3, Downtown Mixed-Use |
| 12 | Highest & Best Use | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development |
| 13 | Utilities | All Available | All Available | All Available | All Available | All Available | All Available | All Available | All Available |
| 14 | Sale Price | | $4,500,000 | $2,750,000 | $29,525,000 | $12,250,000 | $1,200,000 | $12,300,000 | $1,625,000 |
| 15 | Price per Max Floor Area Foot | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $29.06 |
| 16 | Property Rights Conveyed | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 17 | Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $29.06 |
| 18 | Financing Terms | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 19 | Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $29.06 |
| 20 | Conditions of Sale | | -20.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 21 | Adjusted Price | | $20.23 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $29.06 |
| 22 | Expenditures Immediately After Purchase | | $0.00 | $0.00 | $0.10 | $0.00 | $0.00 | $0.00 | $0.00 |
| 23 | Adjusted Price | | $20.23 | $14.58 | $29.41 | $18.23 | $9.11 | $11.44 | $29.06 |
| 24 | Market Conditions | | 0.0% | 0.0% | 7.5% | 7.5% | 8.8% | 9.4% | 11.2% |
| 25 | Adjusted Price Subtotal | | $20.23 | $14.58 | $31.47 | $19.54 | $9.91 | $12.52 | $32.26 |
| 26 | Location | | -10.0% | -10.0% | -25.0% | -10.0% | 25.0% | 10.0% | 0.0% |
| 28 | Configuration | | -10.0% | -10.0% | 20.0% | 15.0% | -15.0% | 20.0% | -30.0% |
| 29 | Topography | | 0.0% | 0.0% | 0.0% | 0.0% | 30.0% | 0.0% | 0.0% |
| 30 | Zoning | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 31 | Highest and Best Use | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 32 | Utilities | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 33 | Other Factors | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 34 | Total Other Adjustments | | 0.0% | 0.0% | -5.0% | 5.0% | 40.0% | 30.0% | -30.0% |
| 35 | Final Adjusted Price per Floor Area Foot [b] | | $20.23 | $11.66 | $29.89 | $20.52 | $13.88 | $16.27 | $21.98 |

**Per Floor Area Foot**

| | |
|---|---|
| 36 High | $23.89 |
| 37 Average | $19.19 |
| 38 Low | $11.66 |
| 39 Value Conclusion – Residential Sites | $20.00 |

[a] Represents the characteristics of the average market data.
[b] Equal to adjusted price subtotal times (1 + total other adjustments).

# IX. SALES COMPARISON APPROACH

**Land Valuation - Large Mixed-Use Site**

| | Subject Property[a] | Comparable Sale Number 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| 1 Property | Southwest Corner of Roosevelt Road and Clark Street | 1400 South Wabash Avenue | 630 South Wabash Avenue | 1210 & 1259 South Indiana Avenue | 505-673 South State Street | 2020-2100 South Clark Street | 800-850 South Clark Street | 1943-1947 South Prairie Avenue |
| Location | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois |
| 2 Sale Date | | 1-Apr-14 | 1-Apr-14 | 8-Nov-12 | 25-Oct-12 | 26-Jun-12 | 17-May-12 | 19-Dec-11 |
| 3 Conditions of Sale | | Confirmed Listing | Confirmed Listing | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale |
| 4 Location Rating | Good | Inferior | Similar | Superior | Similar | Inferior | Inferior | Inferior |
| 5 Site Size (SF) | 505,109 | 25,425 | 15,722 | 131,682 | 55,932 | 30,000 | 153,554 | 18,113 |
| 6 Site Size (Acres) | 11.6 | 0.6 | 0.4 | 3.0 | 1.3 | 0.7 | 3.5 | 0.4 |
| 7 Max Floor Area Ratio | 6.00 | 7.00 | 12.00 | 7.85 | 12.00 | 4.39 | 7.00 | 3.00 |
| 8 Max Floor Area (SF) | 3,031,206 | 177,982 | 188,664 | 1,037,387 | 671,004 | 131,700 | 1,074,878 | 54,339 |
| 9 Configuration | Rectangular | Rectangular | Rectangular | Rectangular | Rectangular | Irregular | Rectangular | Rectangular |
| 10 Topography | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level |
| 11 Zoning | DS-3, Downtown Service District | DX-7, Downtown Service District | DX-12, Downtown Mixed-Use | PD 489, Planned Development | DX-12, Downtown Mixed-Use | PD 1100, Planned Development | DX-7, Downtown Mixed-Use | DX-3, Downtown Mixed-Use |
| 12 Highest & Best Use | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development |
| 13 Utilities | All Available | All Available | All Available | All Available | All Available | All Available | All Available | All Available |
| 14 Sale Price | | $4,500,000 | $2,750,000 | $29,525,000 | $12,250,000 | $1,200,000 | $12,300,000 | $1,525,000 |
| 16 Price per Max Floor Area Foot | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 17 Property/Rights Conveyed | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 18 Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 19 Financing Terms | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 20 Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 21 Conditions of Sale | | -20.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 22 Adjusted Price | | $20.23 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 23 Expenditures Immediately After Purchase | | $0.00 | $0.00 | $0.10 | $0.00 | $0.00 | $0.00 | $0.00 |
| 24 Adjusted Price | | $20.23 | $14.58 | $29.41 | $18.23 | $9.11 | $11.44 | $28.06 |
| 25 Market Conditions | | 0.0% | 0.0% | 7.0% | 7.2% | 8.5% | 9.4% | 11.4% |
| 26 Adjusted Price Subtotal | | $20.23 | $14.58 | $31.47 | $19.54 | $9.91 | $12.52 | $31.26 |
| 27 Location | | 20.0% | 0.0% | -15.0% | 0.0% | 30.0% | 20.0% | 10.0% |
| 28 Size | | -40.0% | -40.0% | -20.0% | -30.0% | -40.0% | -20.0% | -50.0% |
| 29 Configuration | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 Topography | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 31 Zoning | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 32 Highest and Best Use | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 33 Utilities | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 34 Other Factors | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 35 Total Other Adjustments | | -20.0% | -40.0% | -35.9% | -30.0% | 20.0% | 0.0% | -40.0% |
| 36 Adjusted Price per Floor Area Foot [b] | | $16.18 | $8.75 | $20.45 | $13.68 | $11.80 | $12.52 | $18.76 |

**Per Floor Area Foot**

| Indicated Value | |
|---|---|
| 37 High | $20.45 |
| 38 Average | $14.61 |
| 39 Low | $8.75 |

| 40 Value Conclusion - Large Mixed-Use Site | $15.00 |
|---|---|

[a] Represents the characteristics of the large mixed-use site only.
[b] Equal to adjusted price subtotal times [1 + total other adjustments].

---

Southwest Corner of Roosevelt Road & Clark Street — 65 —
Chicago, Illinois

Valuation & Financial Opinions 

# IX. SALES COMPARISON APPROACH

**Land Valuation - Mixed-Use and Retail Sites**

| | Subject Property [a] | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| | | | | | Comparable Sale Number | | | | |
| 1 Property | Southwest Corner of Roosevelt Road and Clark Street | 1400 South Wabash Avenue | 630 South Wabash Avenue | 1210 & 1259 South Indiana Avenue | 909-973 South State Street | 2002-2100 South Clark Street | 800-850 South Clark Street | 1943-1947 South Prairie Avenue |
| 2 Location | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois | Chicago, Illinois |
| 3 Sale Date | | 1-Apr-14 | 1-Apr-14 | 8-Nov-12 | 25-Oct-12 | 25-Jun-12 | 17-May-12 | 19-Dec-11 |
| 4 Conditions of Sale | | Confirmed Listing | Confirmed Listing | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale | Confirmed Sale |
| 5 Location Rating | Good | Inferior | Similar | Superior | Similar | Inferior | Inferior | Inferior |
| 6 Size | 43,572 | 25,426 | 15,722 | 131,682 | 55,992 | 30,000 | 153,554 | 18,113 |
| 7 Max Floor Area Ratio | 4.59 | 7.00 | 12.00 | 7.65 | 12.00 | 4.39 | 7.00 | 3.00 |
| 8 Max Floor Area (SF) | 200,384 | 177,982 | 188,664 | 1,007,367 | 671,904 | 131,700 | 1,074,878 | 54,339 |
| 9 Configuration | Rectangular | Rectangular | Rectangular | Rectangular | Rectangular | Irregular | Rectangular | Rectangular |
| 10 Topography | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level | Generally Level |
| 11 Zoning | DS-3, Downtown Service District | DX-7, Downtown Mixed-Use | DX-12, Downtown Mixed-Use | PD 489, Planned Development | DX-12, Downtown Mixed-Use | PD 1100, Planned Development | DX-7, Downtown Mixed-Use | DX-3, Downtown Mixed-Use |
| 12 Highest & Best Use | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development | Mixed-Use Development |
| 13 Utilities | All Available | All Available | All Available | All Available | All Available | All Available | All Available | All Available |
| 14 Sale Price | | $4,500,000 | $2,750,000 | $30,825,000 | $12,245,000 | $1,200,000 | $12,300,000 | $1,525,000 |
| 15 Price per Max Floor Area Foot | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 16 Property Rights Conveyed | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 17 Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 18 Financing Terms | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 19 Adjusted Price | | $25.28 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 20 Conditions of Sale | | -20.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 21 Adjusted Price | | $20.23 | $14.58 | $29.31 | $18.23 | $9.11 | $11.44 | $28.06 |
| 22 Expenditures Immediately After Purchase | | $0.00 | $0.00 | $0.10 | $0.00 | $0.00 | $0.00 | $0.00 |
| 23 Adjusted Price | | $20.23 | $14.58 | $29.41 | $18.23 | $9.11 | $11.44 | $28.06 |
| 24 Market Conditions | | 0.0% | 0.0% | 7.5% | 7.5% | 8.8% | 9.4% | 11.4% |
| 25 Adjusted Price Subtotal | | $20.23 | $14.58 | $31.47 | $19.54 | $9.91 | $12.52 | $31.26 |
| 26 Location | | 20.0% | 0.0% | -20.0% | 0.0% | 30.0% | 20.0% | 10.0% |
| 27 Size | | 0.0% | 0.0% | 0.0% | 20.0% | -10.0% | 0.0% | -25.0% |
| 28 Configuration | | 0.0% | 0.0% | 0.0% | 0.0% | 30.0% | 0.0% | 0.0% |
| 29 Topography | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 30 Zoning | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 31 Highest and Best Use | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 32 Utilities | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 33 Other Factors | | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| 34 Total Other Adjustments | | 20.0% | 0.0% | 5.0% | 20.0% | 50.0% | 45.0% | -15.0% |
| 35 Final Adjusted Price per Floor Area Foot [b] | | $24.27 | $14.58 | $33.04 | $23.45 | $14.87 | $18.15 | $26.57 |

**Indicated Value** — Per Floor Area Foot

| | |
|---|---|
| 36 High | $33.04 |
| 37 Average | $22.13 |
| 38 Low | $14.58 |

| | |
|---|---|
| 39 Value Conclusion - Mixed-Use and Retail Sites | $23.00 |

[a] Represents the characteristics of the average mixed-use and retail site.
[b] Equal to adjusted price subtotal times (1 + total other adjustments).

Valuation & Financial Opinions



# IX.  SALES COMPARISON APPROACH

### Conclusion of Land Value

**Residential Sites:**  The residential parcels are all situated in the southern half of the site.  The adjusted prices of comparables 1, 2, 4, 6 and 7 are given primary consideration because they have the lowest magnitude of gross adjustment.  However, we place limited weight on comparable 2 because it is an outlier and based on information gathered from the broker, it appears that it may be listed below market value.  For these reasons, comparables 1, 4, 6 and 7 are given primary weight.  The average adjusted price of these four comparables is $19.73 PSF of FAR.  Although it is a listing, considerable weight is given to comparable 1 because it is located in close proximity of the subject. The adjusted price of this comparable is $20.23 PSF of FAR.  We conclude to an estimated value of $20.00 PSF of FAR for these parcels.

**Large Mixed-Use Site:**  The subject's Large Mixed-Use Site is comprised of the nine parcels in the northern section that are expected to sell in a single transaction.  This site contains 11.60 acres of developable area and allows 3,031,396 square feet of development.  Additionally, this site contains 580,000 of the subject's allowable 680,000 square feet of commercial space and will benefit from Roosevelt Road visibility.  Sales 3, 4 and 6 are given significant weight because they are most similar in terms of size.  The average adjusted price of these three comparables is $15.55 SF of FAR.

Although the information is dated, we also consider the sale of 700 South Wells Street that occurred in February of 2008.  This property contains 6.6 acres of land, it allows a 7.0 FAR (over two million square feet of building area) and it offers substantial frontage along the Chicago River.  The property sold for $32.5 million, or $16.20 PSF of FAR.  This sale occurred when many signs of the impending recession were already clear.  The market deteriorated further after the sale and then subsequently rebounded.  Because the subject's Large Mixed-Use site allows over three million square feet of development and this comparable allows approximately two million square feet, it is reasonable to assume that the subject would sell for a lower price PSF of FAR.

After considering all of these factors, we conclude to a value of $15.00 PSF of FAR.

**Mixed-Use and Retail Sites:**  When compared to the residential parcels, the mixed-use and retail parcels benefit from superior visibility (along Roosevelt Road and/or Clark Street) and two of the parcels (B1 and B2) are located directly along the planned riverwalk.  We give significant weight to sales 1, 2, 4, 6 and 7 because they have the lowest magnitude of gross adjustment.  Although comparable 2 does not receive any adjustments, it is an outlier and it appears that the property may be listed below market value based on information gathered from the listing agent.  For this reason, the adjusted prices of comparables 1, 4, 6 and 7 are given primary weight.  The average adjusted price of these four comparables is $23.11 PSF of FAR.  Although it is a listing, considerable weight is given to comparable 1, which is located in close proximity of the subject.  The adjusted price of this comparable is $24.27 PSF of FAR.  We estimate the value of these sites at $23.00 PSF of FAR.

Valuation & Financial Opinions



# Section X

# Income Capitalization Approach

# X. INCOME CAPITALIZATION APPROACH

## Analysis

The income capitalization approach converts the future economic benefits of owning real property into a present value estimate. The most frequently used methods of income capitalization are direct capitalization and yield capitalization. The following discussion provides additional detail regarding each of these methods, defines the method(s) that are used in this appraisal, and explains the reasoning behind the exclusion/inclusion of certain methods.

Direct capitalization estimates the value of real property by dividing a single year's net operating income by an overall capitalization rate ("OAR"), also called a "going-in" capitalization rate. Typically, net operating income is projected for the year following the date of value. This requires an estimate of both future income (e.g., rental income, expense reimbursement income, percentage rent, and other income) and future expenses (e.g., real estate taxes, insurance, management fees, utilities, maintenance and repairs, and any other expected expenses). In addition, vacancy and collection losses must be estimated and deducted. Income and expenses are estimated by analyzing the subject's historical performance, considering management's expectations for future performance, and researching comparable properties' financial results. After net operating income is projected, an appropriate OAR must be estimated. The OAR may be estimated through an analysis of market sales, current debt and equity terms, investor surveys, and/or discussions with market participants.

Yield capitalization, also known as the discounted cash flow ("DCF") method, estimates the value of real property by converting individual future cash flows into present value. This method is typically used for properties that generate uneven cash flow patterns. Like the direct capitalization method, this method relies on a projection of future income potential, which is typically based on an analysis of the subject's historical performance, management's expectations for future performance, and comparable properties' financial results. Each future cash flow (typically an annual figure) is discounted at an appropriate yield rate. The yield rate may be estimated through an analysis of current debt and equity terms, investor surveys, and/or discussions with market participants.

The subject is a large master-planned development with a variety of parcels that will be sold off over an extended period of time. Parcel sales are likely to fluctuate from year-to-year and as a result, cash flows are likely to be uneven. For this reason, the discounted cash flow method is employed herein. Sales of the subject's parcels are projected to occur on an annual basis, with the sale of the last parcel signaling the end of the projection period. The projection period is also referred to as the "absorption period" or "sell-out period." The inputs required to estimate the subject's cash flows include the following:

- The probable sale price(s) of the development parcels;
- The rate at which the parcels will sell (the absorption rate);
- The developer's expenses over the sell-out period; and
- The appropriate discount rate, which represents the developer's required rate of return.

The resulting value is the market value of the subject to a single purchaser as of the valuation date.

## Discounted Cash Flow Analysis

As previously discussed, the discounted cash flow method is most appropriate for the subject. A potential buyer would project the revenue associated with the sale of the developable land parcels over time and the appropriate construction and operating expenses that must be incurred to achieve these sales. The projections in the following analysis are provided on an annual basis. The annual cash flows are discounted to a present value in order to determine an appropriate value at the beginning of the projection period. The following discussion provides a deeper analysis of projected revenue and expenses.



# X. INCOME CAPITALIZATION APPROACH

## Revenue Analysis

In order to arrive at a value conclusion for the subject, it is essential to analyze the sources of revenue available to a fee simple owner. The sale of developable vacant land parcels is the main source of revenue for the subject. In addition, reimbursements for condominium association dues are also included as a revenue line item (discussed further below). There are two essential assumptions that are necessary to arrive at annual revenue figures; the market value of the developable parcels and the number of years required to sell all of the developable parcels (the absorption period).

### 1. Sites Sold

As of the valuation date, we assume that all of the subject's developable parcels are available for sale. The land will be sold in phases over time. As discussed in the Market Analysis section of this report, we estimate that it will take more than ten years for the subject's completed space to be absorbed. The land associated with each phase will be sold prior to construction of that phase's improvements. We conclude that the absorption of the land will take nine years.

As noted previously, based on discussions with the developer, nine of the subject's parcels are likely to be purchased by a single developer. The reason for this assumption is that there will be significant shared parking and infrastructure improvements serving these properties, which include the majority of the subject's commercial space. These parcels comprise the subject's Large Mixed-Use Site and include parcels A1, A2, A3, A4, A5, A6, A9, A10 and A11. This section of the property will serve as an anchor for the entire development, with open plazas set among a lifestyle shopping center offering a variety of retail, restaurant, service and entertainment options. The developer will likely want to sell/develop this portion of the project first because it is important to complete the infrastructure in this section of the site in order to allow access to the remainder of the community. Additionally, developing this area first will help establish the identity for the larger development. After the Large Mixed-Use Site is sold, we project the sale of the two parcels at the southwest corner of Roosevelt Road and Clark Street (A7 and A8) during Year 2. Going forward, we project the sale of between one and three developable parcels per year, following a gradual progression toward the southern border of the overall development.

### 2. Retail Price of Land per Phase

The average price of each developable parcel is based upon the analysis conducted in the Sales Comparison Approach section of this report.

As discussed in the Market Analysis section of this report, the residential, retail and office markets have been improving in the subject's area and this trend is expected to continue in the near future. We apply annual increases of 3.0% to each of the comparables to account for improving market conditions.

### 3. Conclusion of Revenue

Based on the sale of the nine mixed-use parcels to a single developer during Year 1, revenue is projected to be $45,470,940. The revenue estimates for each year are presented in the discounted cash flow analysis schedule at the end of this section.

## Operating Expenses

### 1. Sales Commissions

Sales commissions are an expense paid by the developer to a broker who successfully completes the sale of the land in each phase. These expenses are conditional upon sales and are inherently linked to the revenue assumption above. The sales commissions are concluded to be 2.0% of revenue, or $909,419 in Year 1.

Valuation & Financial Opinions



# X. INCOME CAPITALIZATION APPROACH

### 2. Site Preparation

Site preparation costs represent the expenses required for mass grading of the land and environmental remediation. These steps are required prior to the installation of any infrastructure and development upon any of the 24 developable sites. According to the owner, as of 2005, mass grading and environmental remediation costs were estimated at six million dollars. We assume that this cost inflated by 3.0% per year, which results in a revised estimate of $7,800,000. The following projection assumes that the costs are incurred over a two year period, starting in Year 1 of the analysis.

These costs account for preparing the site only. As previously discussed, our analysis assumes that all infrastructure expenses, including the installation of streets, utility extensions, riverwalk improvements, parks and open spaces, etc., will be funded through tax increment financing (TIF). The cost of these improvements has been estimated at approximately $98 million by the owner.

### 3. Real Estate Taxes

Real estate taxes are based on the assessed value of the land in the development that remains to be sold each year. This is a typical cost for subdivision developers. During Year 1, it is projected that the developer will incur the full real estate cost. The Real Estate Taxes section of this report provides a breakdown of the subject's 2012 real estate tax obligation, which is payable in 2013. The 2012 obligation of $1,019,150 is inflated by 3.0% in order to estimate the tax obligation for tax year 2013, which is payable in 2014 (Year 1 of the analysis). Real estate taxes are projected to be $1,049,724 in Year 1.

### 4. Administration and Overhead

Administration and Overhead expense includes office salaries, advertising, professional fees, and other office-related expenses. This expense is estimated as a percentage of revenue and typically ranges from 3.0% to 5.0% for developments of this type. Administration and Overhead expense is projected to be 4.0% of overall revenue during each year of the absorption period.

Page 21802 of Planned Development 904 states that the developer is required to pay $400,000 to the City to help offset the costs of roadway improvements at one of four locations along Roosevelt Road. According to ownership, this payment was never made. Upon rezoning of the site, we assume that a similar payment would be required. As a result, this expense is added to the Administrative and Overhead expenses in Year 1 of our projection.

### 5. Condominium Association Dues

Condominium Association Dues are fees associated with the general maintenance and upkeep of the subject. Based on the Planned Development at the property, more than 20% of the land is designated as public space. Therefore, the individual developers must pay for the upkeep of this open space, much like a residential condominium owner pays monthly fees related to the common areas of the property.

Condominium Association Dues were estimated at $0.50 per square foot of developable land area in 2005, increasing at a rate of 3.0% annually. Therefore, the dues for the current year are estimated at $0.65 per square foot. We expect that very few (if any) of these common areas will be completed in Year 1 of the analysis. As a result, this expense is not incurred until Year 2 of the projection.

It is estimated that the current owners of the property will incur this expense for the entire development. As development parcels are sold off, the sub-developers will be required to reimburse the master developer for these expenses based on a pro-rata share of net developable land area. After the property is 60% sold, this responsibility will transfer to the association of sub-developers at the property. At this time, the master developer will only pay for his remaining pro-rata share based on developable land area.



# X. INCOME CAPITALIZATION APPROACH

### Cash Flow

Subtracting total operating expenses of $8,077,981 from the first year revenues of $45,470,940, yields a cash flow of $37,392,959 in Year 1.

### Discount Rate

The *Korpacz Real Estate Investor Survey*, National Development Land Market, is analyzed to support an estimate of the discount rate. According to the fourth quarter 2013 survey, respondents reported a range of internal rates of return, including developer's profit, of 10.00% to 25.00% with an average of 18.31%. In the following analysis, we apply a discount rate, including developer's profit, of 18.0%.

### Totals

The Totals column in the following table shows the total sell out price for the land parcels, less the total expenses for the entire development over the nine-year projection period. The figures in this column represent total cash flows over the entire projection period and do not account for rates of return required by a potential buyer/developer. These figures should not be confused with the present value of the cash flows.

A schedule showing the calculations of the discounted cash flow analysis is presented on the following page.



# X. INCOME CAPITALIZATION APPROACH

| Discounted Cash Flow Analysis | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year Ending | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | Totals |
| **Income** | | | | | | | | | | |
| Development Parcels Sold | | | | | | | | | | |
| Parcel 1 | A1 | A7 | B1 | D1 | C1 | D3 | E4 | F1 | F2 | |
| Parcel 2 | A2 | A8 | B2 | D2 | C2 | C4 | | | | |
| Parcel 3 | A3 | | | | E1 | E2 | | | | |
| Parcel 4 | A4 | | | | | | | | | |
| Parcel 5 | A5 | | | | | | | | | |
| Parcel 6 | A6 | | | | | | | | | |
| Parcel 7 | A9 | | | | | | | | | |
| Parcel 8 | A10 | | | | | | | | | |
| Parcel 9 | A11 | | | | | | | | | |
| Net Developable Area Sold (SF) | | | | | | | | | | |
| Parcel 1 | 35,783 | 31,342 | 53,720 | 75,528 | 102,213 | 71,200 | 22,442 | 52,712 | 50,501 | |
| Parcel 2 | 54,606 | 25,435 | 54,190 | 75,528 | 43,764 | 70,996 | | | | |
| Parcel 3 | 29,431 | | | | 49,847 | 60,660 | | | | |
| Parcel 4 | 33,404 | | | | | | | | | |
| Parcel 5 | 52,054 | | | | | | | | | |
| Parcel 6 | 248,847 | | | | | | | | | |
| Parcel 7 | 16,000 | | | | | | | | | |
| Parcel 8 | 17,398 | | | | | | | | | |
| Parcel 9 | 17,564 | | | | | | | | | |
| Maximum Floor Area Ratio | | | | | | | | | | |
| Parcel 1 | 6.0 | 13.10 | 3.10 | 1.60 | 2.00 | 1.00 | 17.30 | 14.10 | 12.50 | |
| Parcel 2 | 6.3 | 1.00 | 3.10 | 1.60 | 2.00 | 1.70 | | | | |
| Parcel 3 | 6.6 | | | | 6.60 | 5.20 | | | | |
| Parcel 4 | 6.6 | | | | | | | | | |
| Parcel 5 | 7.2 | | | | | | | | | |
| Parcel 6 | 4.0 | | | | | | | | | |
| Parcel 7 | 18.5 | | | | | | | | | |
| Parcel 8 | 11.3 | | | | | | | | | |
| Parcel 9 | 11.1 | | | | | | | | | |
| Total Development Parcels Sold | 9 | 2 | 2 | 2 | 3 | 3 | 1 | 1 | 1 | 24 |
| | | | | | | | | | | |
| Total SF of Land Area Sold | 505,109 | 56,777 | 117,910 | 151,056 | 195,824 | 202,856 | 22,442 | 52,712 | 50,501 | |
| Cumulative Land Area Sold | 505,109 | 561,866 | 679,796 | 830,832 | 1,019,676 | 1,222,532 | 1,244,974 | 1,297,686 | 1,348,187 | 1,348,187 |
| | | | | | | | | | | |
| Total Buildable Area (FAR SF) Sold | 3,031,396 | 436,015 | 365,521 | 241,690 | 565,544 | 507,325 | 388,247 | 743,239 | 631,263 | 6,910,240 |
| Cumulative FAR SF Sold | 3,031,396 | 3,467,411 | 3,832,932 | 4,074,622 | 4,640,166 | 5,147,491 | 5,535,738 | 6,278,977 | 6,910,240 | |
| | | | | | | | | | | |
| Growth Rate | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | 3.00% | |
| | | | | | | | | | | |
| Price per Floor Area Foot (Residential Land) | 20.00 | 20.60 | 21.22 | 21.85 | 22.51 | 23.19 | 23.88 | 24.60 | 25.34 | |
| Price per Floor Area Foot (Large Mixed-Use Parcel) | 15.00 | 15.45 | 15.91 | 16.39 | 16.88 | 17.39 | 17.91 | 18.45 | 19.00 | |
| Price per Floor Area Foot (Mixed-Use Land) | 23.00 | 23.69 | 24.40 | 25.13 | 25.89 | 26.66 | 27.46 | 28.29 | 29.14 | |
| | | | | | | | | | | |
| Development Parcel Income | 45,470,940 | 10,329,200 | 8,918,968 | 5,282,015 | 12,730,500 | 11,762,579 | 9,271,735 | 18,281,809 | 15,993,289 | 138,041,035 |
| Condo Association Dues (Reimbursements) | 0 | 328,321 | 365,226 | 441,667 | 0 | 0 | 0 | 0 | 0 | 1,535,414 |
| | | | | | | | | | | |
| Total Income | 45,470,940 | 10,657,521 | 9,284,194 | 5,723,682 | 12,730,500 | 11,762,579 | 9,271,735 | 18,281,809 | 15,993,289 | 139,176,449 |
| | | | | | | | | | | |
| **Expenses** | | | | | | | | | | |
| Sales Commissions | 909,419 | 206,584 | 178,379 | 105,640 | 254,610 | 235,252 | 185,435 | 365,636 | 319,866 | |
| Site Preparation | 3,900,000 | 3,900,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Property Taxes | 1,049,724 | 676,130 | 649,514 | 568,679 | 453,363 | 296,525 | 116,623 | 98,837 | 49,611 | |
| Administration and Overhead | 2,218,838 | 413,166 | 356,769 | 211,281 | 509,220 | 470,903 | 370,869 | 731,272 | 639,732 | |
| Condominium Association Fees | 0 | 592,611 | 929,690 | 957,560 | 376,472 | 247,642 | 97,525 | 82,510 | 41,583 | |
| | | | | | | | | | | |
| Total Expenses | 8,077,981 | 6,098,493 | 2,114,342 | 1,843,180 | 1,595,665 | 1,249,822 | 770,652 | 1,278,256 | 1,050,951 | 24,079,382 |
| | | | | | | | | | | |
| Cash Flow | 37,392,959 | 4,559,028 | 7,169,853 | 3,880,702 | 11,134,834 | 10,512,757 | 8,501,083 | 17,003,553 | 14,942,338 | 115,097,058 |
| | | | | | | | | | | |
| Present Value Factor (18% Discount Rate) | 0.8475 | 0.7182 | 0.6086 | 0.5158 | 0.4371 | 0.3704 | 0.3139 | 0.2660 | 0.2255 | |
| | | | | | | | | | | |
| Present Value of Cash Flow | 31,688,948 | 3,274,223 | 4,363,794 | 2,001,623 | 4,867,139 | 3,894,257 | 2,658,703 | 4,523,854 | 3,368,632 | |
| | | | | | | | | | | |
| Total Present Value of Cash Flows | 60,651,112 | ◄ | | | | | | | | |

| ROUNDED | $61,000,000 |
|---|---|

| VALUE PER FAR SF | $8.83 |
|---|---|

| AVERAGE VALUE PER PARCEL | $2,541,667 |
|---|---|



# X. INCOME CAPITALIZATION APPROACH

### Conclusion of Value

As shown in the previous schedule, the discounted cash flow analysis results in a value conclusion of $61,000,000 (rounded). This equates to an average price of $2,541,667 per developable parcel.

| Income Capitalization Approach Conclusion | |
|---|---|
| | Indicated Value (Rounded) |
| 1 Income Capitalization - Discounted Cash Flow | 61,000,000 |
| 2 Concluded Market Value (Rounded) | $61,000,000 |

# Section XI

# Reconciliation of Value



# XI. RECONCILIATION OF VALUE

### Reconciliation and Value Conclusion

Reconciliation is utilized to support a reliable and defensible value opinion. The three primary criteria considered in the reconciliation of value are appropriateness, accuracy, and quantity of evidence. The value conclusion for each applicable approach is presented in the following table.

| Summary of Market Value Conclusions | |
| --- | --- |
| Approach to Value | Market Value Indications April 1, 2014 |
| 1 Cost Approach | Not Applied |
| 2 Sales Comparison Approach | Not Applied |
| 3 Income Capitalization Approach | $61,000,000 |

### Conclusion of Market Value

Based on the analysis presented in this report, with primary weight placed on the Income Capitalization Approach, the market value of the fee simple interest in the subject is concluded to be:

| Market Value Conclusion | | | |
| --- | --- | --- | --- |
| Premise | Interest Appraised | Valuation Date | Market Value Conclusion |
| 1 Market Value | Fee Simple | April 1, 2014 | $61,000,000 |

Extraordinary Assumption: This report assumes that all costs related to infrastructure improvements upon/within those portions of the site allocated as right-of-way areas, public property, parks and open spaces will be funded through Tax Increment Financing (TIF) funds. This includes, but is not limited to, all public streets, riverwalk improvements and utility extensions throughout the property. The cost associated with these improvements has been estimated at $98 million.

Valuation & Financial Opinions 

# Section XII

# Certification

# XII. CERTIFICATION

I certify, except as otherwise noted in this appraisal report, that to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, and unbiased professional analyses, opinions, conclusions, and recommendations;.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or the parties involved with this assignment.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report was prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation, as well as the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute.

- Stout Risius Ross, Inc. has appraised the subject with effective dates of April 2009 and January 2012. John W. VanSanten, MAI, MRICS and Ryan T. Korth, MAI did not work on the 2009 assignment.

- Appraisers are required to be licensed in accordance with their respective state licensing laws and regulations. John W. VanSanten, MAI, MRICS and Ryan T. Korth, MAI are State Certified General Real Estate Appraisers in the State of Illinois.

- John W. VanSanten, MAI, MRICS, Ryan T. Korth, MAI and Nicholas T. McGinn have made personal inspections of the subject.

- Nicholas T. McGinn provided significant professional assistance to the persons signing this report in terms of research, analysis and report writing.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- This appraisal is not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

- As of the date of this report, John W. VanSanten, MAI, MRICS and Ryan T. Korth, MAI have completed the requirements under the continuing education program of the Appraisal Institute.


John W. VanSanten, MAI, MRICS
Illinois Certified General Appraiser
License #: 553.001073
Expiration Date: September 30, 2015

Ryan T. Korth, MAI
Illinois Certified General Appraiser
License #: 553.002141
Expiration Date: September 30, 2015



# Exhibit A

# Assumptions and Limiting Conditions

# A. ASSUMPTIONS AND LIMITING CONDITIONS

This appraisal report is based on the following general assumptions:

- This report is for the client to which it is addressed and is to be used by said client only for the purpose stated in the report. No reliance is to be placed on this report for any other purpose, nor shall it be published, distributed, or shown to other parties except to the party to whom the report is addressed.

- No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the subject is assumed to be good and marketable unless otherwise stated.

- The subject is appraised free and clear of all liens and encumbrances unless otherwise stated.

- Responsible ownership and competent property management are assumed.

- The information furnished by others is believed to be reliable. However, no warranty is given for its accuracy. We reserve the right to make appropriate revisions in the event of discovery of additional data.

- All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the subject.

- It is assumed that there are no hidden or unapparent conditions of the subject, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

- It is assumed that the subject is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the report.

- It is assumed that the subject conforms to all applicable zoning and use regulations and restrictions unless a nonconformity has been identified, described, and considered in the appraisal report.

- It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value opinion contained in this report is based.

- It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the subject described and that there is no encroachment or trespass unless noted in this report.

- Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the subject, was not observed. We have no knowledge of the existence of such materials on or in the subject. However, we are not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation, and other potentially hazardous materials may affect the value of the subject. The opinion of value is predicated on the assumption that there is no such material on or in the subject that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey and analysis of the property to determine whether or not it conforms to the various detailed requirements of the ADA. It is possible that a compliance survey of the subject, together with a detailed analysis of the requirements of the ADA, could reveal that the subject is not in compliance with one or more of the requirements of the ADA. If so, this fact could have a negative effect upon the value of the subject. Since we have no direct evidence relating to this issue, possible non-compliance with the requirements of the ADA is not considered in our value opinion of the subject.

Valuation & Financial Opinions



# A. ASSUMPTIONS AND LIMITING CONDITIONS

- This report covers only the real property described herein. Unless specifically stated to the contrary, it does not include consideration of mineral rights or related right of entry, nor personal property or the removal thereof. Values reported herein are not intended to be valid in any other context, nor are any conclusions as to unit values applicable to any other property or utilization that are specifically identified herein.

- The conclusions stated herein, including values that are expressed in terms of the U.S. Dollar, apply only as of the valuation date and are based on prevailing physical and economic conditions and available information at that time. No representation is made as to the effect of subsequent events.

This appraisal report is based on the following general limiting conditions:

- Date(s) and definitions of value, together with other definitions and assumptions on which the analyses are based, are set forth in the appropriate sections of this report. These are to be considered part of the limiting conditions as if included here in their entirety.

- Any allocation of the total value presented in this report between the land and improvements applies only under the stated program of utilization. The separate values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

- Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any other person than the party to whom it is addressed without our prior written consent, and then only with proper written qualification and only in its entirety.

- We, by reason of this report, are not required to give further consultation or testimony or to be in attendance in court with reference to the subject unless arrangements have been previously made.

- This report has not been prepared for syndication purposes nor is it to be used for syndication purposes without our consent and then only with proper qualifications.

- Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraiser.

- Any value opinions provided in this report apply to the entire property and any proration or division of the total into fractional interests will invalidate the value opinions, unless such proration or division of interests has been set forth in the report.

- If the subject is proposed, only preliminary plans and specifications were available for use in the preparation of this appraisal. If the plans and specifications change, we reserve the right to amend this appraisal.

- Any proposed improvements are assumed to have been completed unless otherwise stipulated; any construction is assumed to conform to the building plans referenced in the report.

- We assume that the reader or user of this report has been provided with copies of available building plans and all leases and amendments, if any, that encumber the subject.

- If no legal description or survey was furnished, we used other methods as described in the report to ascertain the physical dimensions and acreage of the subject. Should a survey prove this information to be inaccurate, it may be necessary for this appraisal to be adjusted.

- The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changing future economic conditions.



# Exhibit B

# Appraisal Definitions

# B. APPRAISAL DEFINITIONS

The following definition is taken from Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA") Regulations, per final rule, 12 CFR Part 34, (Docket No. 90-16), Federal Register, Volume 56 Number 165, March 31, 1994, effective June 7, 1994, Rules & Regulations.

- ■ Market Value:  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and passing of title from seller to buyer under conditions whereby:

    1.  Buyer and seller are typically motivated;

    2.  Both parties are well informed or well advised, and acting in what they consider their own best interests;

    3.  A reasonable time is allowed for exposure in the open market;

    4.  Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

    5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

The following definition is taken from Treas. Regs. §20.2031-1(b) and §25.2512-1; Rev. Rul. 59-60, 1959-1 C.B. 237:

- ■ Fair Market Value:  The price at which a property would exchange between a willing buyer and a willing seller, when the former is not under any compulsion to buy, and the latter is not under any compulsion to sell, both having reasonable knowledge of the relevant facts.

The following definitions are taken from *The Dictionary of Real Property Appraisal, Fifth Edition (2010)*, published by the Appraisal Institute.

- ■ Cash-Equivalent Price:  The price of a property with above- or below-market financing expressed in terms of the price that would have been paid in an all-cash sale.

- ■ Contract Rent:  The actual rental income specified in a lease.

- ■ Cost Approach:  A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of (or replacement for) the existing structure, including an entrepreneurial incentive, deducting depreciation from the total cost, and adding the estimated land value.  Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised.

- ■ Deferred Maintenance:  Needed repairs or replacement of items that should have taken place during the course of normal maintenance.

- ■ Direct Capitalization:  A method used to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor.  Direct capitalization employs capitalization rates and multipliers extracted or developed from market data.  Only a single year's income is used.  Yield and value changes are implied but not identified.

- ■ Discounted Cash Flow (DCF) Analysis:  The procedure in which a discount rate is applied to a set of projected income streams and a reversion.  The analyst specifies the quantity, variability, timing, and duration of the income streams and the quantity and timing of the reversion, and discounts each to its present value at a specified yield rate.

- ■ Disposition Value:  See Liquidation Value.

- ■ Distress Sale:  A sale involving a seller acting under duress.



# B. APPRAISAL DEFINITIONS

- **External Obsolescence**: An element of depreciation; a diminution in value caused by negative externalities and generally incurable on the part of the owner, landlord, or tenant.

- **Extraordinary Assumption**: An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2012-2013 ed.)

- **Fee Simple Estate**: Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

- **Functional Obsolescence**: The impairment of functional capacity of a property according to market tastes and standards.

- **Going-Concern Value**: (1) The market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern*. (2) The value of an operating business enterprise. Goodwill may be separately measured but is an integral component of going-concern value when it exists and is recognizable.

- **Gross Lease**: A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called *full-service lease.*

- **Highest and Best Use**: The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity. Alternatively, the probable use of land or improved property—specific with respect to the user and timing of the use—that is adequately supported and results in the highest present value.

- **Hypothetical Condition**: A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis. Hypothetical conditions assume conditions contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP, 2012-2013 ed.)

- **Income Capitalization Approach**: A set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate.

- **Insurable Value**: A type of value for insurance purposes.

- **Leased Fee Interest**: A freehold (ownership interest) where the possessory interest has been granted to another party by creation of a contractual landlord-tenant relationship (i.e., a lease).

- **Leasehold Interest**: The tenant's possessory interest created by a lease.

- **Liquidation Value**: The most probable price that a specified interest in real property should bring under the following conditions:

    1. Consummation of a sale within a short time period.

    2. The property is subjected to market conditions prevailing as of the date of valuation.

---



## B. APPRAISAL DEFINITIONS

3. Both the buyer and seller are acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. Both parties are acting in what they consider to be their best interests.

7. A normal marketing effort is not possible due to the brief exposure time.

8. Payment will be made in cash in U.S. dollars or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can be modified to provide for valuation with specified financing terms.

- <u>Market Rent</u>: The most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

- <u>Personal Property</u>: (1) Identifiable tangible objects that are considered by the general public as being "personal"—for example, furnishings, artwork, antiques, gems and jewelry, collectibles, machinery and equipment; all tangible property that is not classified as real estate. (USPAP, 2012-2013 ed.) (2) Consists of every kind of property that is not real property; movable without damage to itself or the real estate; subdivided into tangible and intangible.

- <u>Physical Deterioration</u>: The wear and tear that begins when a building is completed and placed into service.

- <u>Real Property</u>: The interests, benefits, and rights inherent in the ownership of real estate. (USPAP, 2012-2013 ed.)

- <u>Real Property (as listed in the IVS Glossary)</u>: All the rights, interests, and benefits related to the ownership of real estate. *Real property* is a legal concept distinct from *real estate*, which is a physical asset. There may also be potential limitations upon ownership rights to real property.

- <u>Restricted Use Appraisal Report</u>: A written report prepared under Standards Rule 2-2(c) or 8-2(c) of the Uniform Standards of Professional Appraisal Practice (2012-2013 ed.).

- <u>Sales Comparison Approach</u>: The process of deriving a value indication for the subject property by comparing market information for similar properties with the property being appraised, identifying appropriate units of comparison, and making qualitative comparisons with or quantitative adjustments to the sale prices (or unit prices, as appropriate) of the comparable properties based on relevant, market-derived elements of comparison.

- <u>Sales Comparison Approach (as listed in the IVS Glossary)</u>: A comparative approach to value that considers the sales of similar or substitute properties and related market data and establishes a value estimate by processes involving comparison. In general, a property being valued (a subject property) is compared with sales of similar properties that have been transacted in the open market. Listings and offerings may also be considered. A general way of estimating a value indication for personal property or an ownership interest in personal property, using one or more methods that compare the subject to similar properties or to ownership interests in similar properties. This approach to the valuation of personal property is dependent upon the Valuer's market knowledge and experience as well as recorded data on comparable items.

- <u>Self-Contained Appraisal Report</u>: A written appraisal report prepared under Standards Rule 2-2(a) or 8-2(a) of the Uniform Standards of Professional Appraisal Practice (2012-2013 ed.). A self-contained appraisal report sets forth the data considered, the appraisal procedures followed, and the reasoning employed in the appraisal, addressing each item in the depth and detail required by its significance to



# B. APPRAISAL DEFINITIONS

the appraisal and providing sufficient information so that the client and the users of the report will understand the appraisal and not be misled or confused.

- Summary Appraisal Report:  A written report prepared under Standards Rule 2-2(b) or 8-2(b) of the Uniform Standards of Professional Appraisal Practice (2012-2013 ed.).

- Triple Net Lease (listed in dictionary as net net net lease):  A lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management.  Also called *NNN*, *triple net lease*, or *fully net lease*.

- Vacancy and Collection Loss:  A deduction from potential gross income (*PGI*) made to reflect income reductions due to vacancies, tenant turnover, and nonpayment of rent; also called *vacancy and credit loss* or *vacancy and contingency loss*.  Often vacancy and collection loss is expressed as a percentage of potential gross income and should reflect the competitive market.  Its treatment can differ according to the interest being appraised, property type, capitalization method, and whether the property is at stabilized occupancy.



# Exhibit C

## Subject Photographs

## C. SUBJECT PHOTOGRAPHS



View of the subject (looking south)



View of the subject (looking southwest)



View of the subject (looking southwest)



View of the subject (looking west)

# Exhibit D

## Comparable Property Data Sheets

# D. COMPARABLE PROPERTY DATA SHEETS

**Land Sale No. 1**



**Property Identification**

| | |
|---|---|
| Record ID | 1649 |
| Property Type | Vacant Land |
| Property Name | Development Site |
| Address | 1400 South Wabash Avenue, Chicago, Cook County, Illinois 60605 |
| Tax ID | 17-22-106-026 thru -028 |
| MSA | Chicago-Joliet-Naperville, IL-IN-WI |
| Market Type | Urban |

**Sale Data**

| | |
|---|---|
| Grantor | Listing |
| Sale Date | April 1, 2014 |
| Property Rights | Fee Simple |
| Marketing Time | 9 months |
| Conditions of Sale | Listing |
| Verification | Jess Cioffoletti - Terra Nova Group; 630-780-1015, March 24, 2014;  Other sources: CoStar & LoopNet, Confirmed by Nick McGinn |

| | |
|---|---|
| Sale Price | $4,500,000 |

---

Southwest Corner of Roosevelt Road & Clark Street   **- 90 -**   Chicago, Illinois



# D. COMPARABLE PROPERTY DATA SHEETS

**Land Data**
| | |
|---|---|
| Zoning | DX-7, Downtown Mixed-Use, Mixed-Use |
| Topography | Generally Level |
| Utilities | All Available |
| Shape | Rectangular |

**Land Size Information**
| | |
|---|---|
| Gross Land Size | 0.58 Acres or 25,426 SF |

**Indicators**
| | |
|---|---|
| Sale Price/Gross SF | $176.98 |
| Max FAR | 7.0 |
| Sale Price/Max FAR Foot | $25.28 |

**Remarks**
This is an active listing for a tract of vacant land that is currently improved with a surface parking lot. The property is being marketed for retail and multi-family development and has been listed for approximately nine months. According to the listing agent, there have been a couple of offers on the property, but they were signficantly lower than the owner was willing to accept. The agent believes this property will sell within the next six months for a price within 10% of asking. This property is zoned DX-7, which allows a maximum FAR of 7.0.



# D. COMPARABLE PROPERTY DATA SHEETS

Land Sale No. 2



**Property Identification**

| | |
|---|---|
| Record ID | 1714 |
| Property Type | Vacant Land |
| Property Name | Development Site |
| Address | 630 South Wabash Avenue, Chicago, Cook County, Illinois 60605 |
| Tax ID | 17-15-300-019, -020 |
| MSA | Chicago-Joliet-Naperville, IL-IN-WI |
| Market Type | Urban |

**Sale Data**

| | |
|---|---|
| Grantor | Listing |
| Sale Date | April 01, 2014 |
| Property Rights | Fee Simple |
| Conditions of Sale | Current Listing |
| Verification | Mark Nelson - NelsonHill; March 24, 2014;  Other sources: CoStar; LoopNet; Listing Flyer, Confirmed by Nick McGinn |
| Sale Price | $2,750,000 |

Valuation & Financial Opinions 

# D. COMPARABLE PROPERTY DATA SHEETS

**Land Data**
Zoning                      DX-12, Downtown Mixed-Use, Mixed-Use
Topography                  Generally Level
Utilities                   All Available
Shape                       Rectangular

**Land Size Information**
Gross Land Size             0.36 Acres or 15,722 SF

**Indicators**
Sale Price/Gross SF         $174.88
Max FAR                     12.0
Sale Price/Max FAR Foot     $14.58

**Remarks**
This is a listing for vacant land in the South Loop. The property is zoned DX-12, which allows a maximum FAR of 12.0. According to the listing agent, the property property has received a lot of interest from potential buyers. The property was previously under contract at that asking price, but the deal fell through. However, it is about to go under contract with another buyer, again at the full asking price.



# D.  COMPARABLE PROPERTY DATA SHEETS

Land Sale No. 3



**Property Identification**

| | |
|---|---|
| Record ID | 1651 |
| Property Type | Vacant Land |
| Property Name | Central Station Development Sites |
| Address | 1210 & 1259 South Indiana Avenue, Chicago, Cook County, Illinois 60605 |
| Tax ID | 17-22-102-022, -023; 17-22-110-129 |
| MSA | Chicago-Joliet-Naperville, IL-IN-WI |
| Market Type | Urban |

**Sale Data**

| | |
|---|---|
| Grantor | Central Station LLC |
| Grantee | S Loop Chicago Development LLC |
| Sale Date | November 08, 2012 |
| Deed Book/Page | Doc #1235929083, et. al |
| Property Rights | Fee Simple |
| Conditions of Sale | Arm's Length |
| Verification | Other sources: Public Records & CoStar, Confirmed by Nick McGinn |
| Sale Price | $29,525,000 |

Valuation & Financial Opinions 

# D. COMPARABLE PROPERTY DATA SHEETS

**Land Data**
Zoning                  Planned Development 499, Planned Development
Topography              Generally Level
Utilities               All Available
Shape                   Rectangular

**Land Size Information**
Gross Land Size         3.02 Acres or 131,682 SF

**Indicators**
Sale Price/Gross SF     $224.21
Max FAR                 7.65
Sale Price/Max FAR Foot $29.31

**Remarks**
This is the sale of two development sites in the Central Station community, which is located adjacent to Michigan Avenue, Grant Park and the Museum Campus / lakefront. This sale involved the transfer of two separate sites, which were transferred via two separate deeds. One of the sites was improved with a single-story sales office for the Museum Park high-rise condominium buildings located adjacent to the property. This building was demolished subsequent to the sale. The cost of demolition is estimated at $100,000 based on data gathered from the MVS manual. This property is located within a planned development district and is approved for an FAR of 7.65.



## D. COMPARABLE PROPERTY DATA SHEETS

**Land Sale No. 4**



**Property Identification**
Record ID                1652
Property Type            Vacant Land
Property Name            Development Site
Address                  609-673 South State Street, Chicago, Cook County, Illinois
                         60605
Tax ID                   17-15-300-001, et. al
MSA                      Chicago-Joliet-Naperville, IL-IN-WI
Market Type              Urban

**Sale Data**
Grantor                  National Council of Young Mens Christian Associations
Grantee                  609 South State Holdings LLC
Sale Date                October 25, 2012
Deed Book/Page           Doc. #1230410043
Property Rights          Fee Simple
Conditions of Sale       Arm's Length
Verification             Stephen Simsic - U.S. Equities Realty; 312-456-7000, March 24,
                         2014;  Other sources: CoStar; Public Records, Confirmed by
                         Nick McGinn

Sale Price               $12,250,000

Valuation & Financial Opinions   

# D.  COMPARABLE PROPERTY DATA SHEETS

**Land Data**
| | |
|---|---|
| **Zoning** | DX-12, Downtown Mixed-Use, Mixed-Use |
| **Topography** | Generally Level |
| **Utilities** | All Available |
| **Shape** | Rectangular |

**Land Size Information**
| | |
|---|---|
| **Gross Land Size** | 1.29 Acres or 55,992 SF |

**Indicators**
| | |
|---|---|
| **Sale Price/Gross SF** | $218.78 |
| **Max FAR** | 12.0 |
| **Sale Price/Max FAR Foot** | $18.23 |

**Remarks**

This is the sale of a develoment parcel with substantial frontage along State Street in downtown Chicago. The property is located three blocks west of Grant Park and was improved with a surface parking lot at the time of sale. The buyer did not have near term development plans for the property; they were considering holding it for development or holding it for re-sale. This property is zoned DX-12, which allows a maximum FAR of 12.0.



# D. COMPARABLE PROPERTY DATA SHEETS

Land Sale No. 5



**Property Identification**
Record ID                1653
Property Type            Vacant Land
Property Name            Development Site
Address                  2020-2100 South Clark Street, Chicago, Cook County, Illinois
                         60616
Tax ID                   17-21-422-012, et. al
MSA                      Chicago-Joliet-Naperville, IL-IN-WI
Market Type              Urban

**Sale Data**
Grantor                  Cathay New Asia Community Development Corporation
Grantee                  Archer Clark LLC
Sale Date                June 26, 2012
Deed Book/Page           Doc. #1219333002
Property Rights          Fee Simple
Conditions of Sale       Arm's Length
Verification             Other sources: CoStar; Public Records, Confirmed by Nick
                         McGinn

Sale Price               $1,200,000



# D.  COMPARABLE PROPERTY DATA SHEETS

**Land Data**

| | |
|---|---|
| **Zoning** | Planned Development 1100, Planned Development |
| **Topography** | Generally Level |
| **Utilities** | All Available |
| **Shape** | Irregular |

**Land Size Information**

| | |
|---|---|
| **Gross Land Size** | 0.69 Acres or 30,000 SF |

**Indicators**

| | |
|---|---|
| **Sale Price/Gross SF** | $40.00 |
| **Max FAR** | 4.39 |
| **Sale Price/Max FAR Foot** | $9.11 |

**Remarks**

This is an REO sale of an irregularly shaped parcel located at the southwest corner of Archer Avenue and Clark Street.  The property is zoned Planned Development 1100, which allows the construction of a 15-story hotel with street-level commercial space.  The maximum FAR under the planned development is 4.39.

Valuation & Financial Opinions



# D. COMPARABLE PROPERTY DATA SHEETS

**Land Sale No. 6**



**Property Identification**

| | |
|---|---|
| Record ID | 1654 |
| Property Type | Vacant Land |
| Property Name | AMLI Lofts Site |
| Address | 800-880 South Clark Street, Chicago, Cook County, Illinois 60605 |
| Tax ID | 17-16-411-005 thru -007 |
| MSA | Chicago-Joliet-Naperville, IL-IN-WI |
| Market Type | Urban |

**Sale Data**

| | |
|---|---|
| Grantor | Avalon Clark & Polk LLC |
| Grantee | PPF AMLI 800-888 S Clark Associates |
| Sale Date | May 17, 2012 |
| Deed Book/Page | Doc. #1214531128 |
| Property Rights | Fee Simple |
| Conditions of Sale | Arm's Length |
| Verification | Other sources: Public Records; Seller 10-Q; CoStar; Listing Flyer, Confirmed by Nick McGinn |
| Sale Price | $12,300,000 |

Valuation & Financial Opinions 

# D. COMPARABLE PROPERTY DATA SHEETS

**Land Data**
| | |
|---|---|
| **Zoning** | DX-7, Downtown Mixed-Use, Mixed-Use |
| **Topography** | Generally Level |
| **Utilities** | All Available |
| **Shape** | Rectangular |

**Land Size Information**
| | |
|---|---|
| **Gross Land Size** | 3.53 Acres or 153,554 SF |

**Indicators**
| | |
|---|---|
| **Sale Price/Gross SF** | $80.10 |
| **Max FAR** | 7.0 |
| **Sale Price/Max FAR Foot** | $11.44 |

**Remarks**
This is the sale of a development site that was improved with a surface parking lot at the time of sale. The property is planned for AMLI Lofts, an apartment development that will contain two 11-story buildings with street-level commercial space. This property is zoned DX-7, which allows a maximum FAR of 7.0. This site sold in 2005 for approximately $13.4 million and in 2007 for approximately $23 million.

Valuation & Financial Opinions



# D. COMPARABLE PROPERTY DATA SHEETS

**Land Sale No. 7**



**Property Identification**

| | |
|---|---|
| **Record ID** | 1655 |
| **Property Type** | Vacant Land |
| **Property Name** | Development Site |
| **Address** | 1943-1947 South Prairie Avenue, Chicago, Cook County, Illinois 60616 |
| **Tax ID** | 17-22-309-014, 015, -033 |
| **MSA** | Chicago-Joliet-Naperville, IL-IN-WI |
| **Market Type** | Urban |

**Sale Data**

| | |
|---|---|
| **Grantor** | 1943 South Prairie LLC |
| **Grantee** | Chicago Title Land Trust Co. Trust #8002358555 |
| **Sale Date** | December 19, 2011 |
| **Deed Book/Page** | Doc. #1136331115, et. al |
| **Property Rights** | Fee Simple |
| **Conditions of Sale** | Arm's Length |
| **Verification** | Other sources: CoStar; Public Records, Confirmed by Nick McGinn |
| | |
| **Sale Price** | $1,525,000 |



# D.  COMPARABLE PROPERTY DATA SHEETS

**Land Data**

| | |
|---|---|
| Zoning | DX-3, Downtown Mixed-Use, Mixed-Use |
| Topography | Generally Level |
| Utilities | All Available |
| Shape | Rectangular |

**Land Size Information**

| | |
|---|---|
| Gross Land Size | 0.42 Acres or 18,113 SF |

**Indicators**

| | |
|---|---|
| Sale Price/Gross SF | $84.19 |
| Max FAR | 3.0 |
| Sale Price/Max FAR Foot | $28.06 |

**Remarks**

This is the sale of a development site that was improved with a surface parking lot at the time of sale.  The property was sold in two transactions on the same date.  This was reportedly a short sale.  The property is zoned DX-3, which allows a maximum FAR of 3.0.



# Exhibit E

## Planned Development #904

# E. PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES

*14065*
21783

*Reclassijkation Of Area Shown On Map Number 4-F.*
*(As Amended)*
*(Application Number 14065)* *RBPD 904*

*Be It Ordained by the City Council of the City of Chicago:*

SECTION 1. That the Chicago Zoning Ordinance be amended by changing all the M2-5 General Manufacturing District symbols and indications as shown on Map Number 4-F in the area bounded by:

the centerline of West Roosevelt Road; the west line of South Clark Street; the south line of West 16" Street (previously vacated); a line 188.40 feet west of and parallel to the west line of South Clark Street; the north line of West 16th Street (previously vacated); and the south branch of the Chicago River, with the exception and exclusion of an irregularly shaped parcel along the St. Charles Air Line rail road right-of-way located north of West 16" Street and west of South Clark Street (the entire parcel to be rezoned is more particularly described in Exhibit A),

to those of a C3-4 Commercial-Manufacturing District and a corresponding use district is hereby established in the area above described.

SECTION 2. That the Chicago Zoning Ordinance be amended by changing all the C3-4 Commercial-Manufacturing District symbols and indications as shown on Map Number 4-F in the area bounded by:

the centerline of West Roosevelt Road; the west line of South Clark Street; the south line of West 16th Street (previously vacated); a line 188.40 feet west of and parallel to the west line of South Clark Street; the north line of West 16" Street (previously vacated); and the south branch of the Chicago River, with the exception and exclusion of an irregularly shaped parcel along the St. Charles Air Line rail road right-of-way located north of West 16" Street and west of South Clark Street (the entire parcel to be rezoned is more particularly described in Exhibit A),

as described in Section 1 above, to those of a Residential-Business Planned Development Number 904 and a corresponding use district is hereby established in the area above described.

SECTION 3. This ordinance shall be in force and effect from and after its passage and due publication.



# E. PLANNED DEVELOPMENT #904

Exhibit "A" and Plan of Development Statements referred to in this ordinance read as follows:

*Exhibit "A".*

*Legal Description.*

Parcel 1:

That part of the east fraction and the west fraction of the northeast quarter and the southeast quarter of Section 2 1, Township 39 North, Range 14, East of the Third Principal Meridian, together with the south branch of the Chicago River (now filled and abandoned) as it existed on or prior to July 8, 1926, all taken as a tract, bounded and described as follows:

commencing at the point of intersection of the original south line of West Roosevelt Road (said original south line being parallel with and 33.00 feet south of the north line of the east fraction of the northeast quarter of the aforesaid Section 21) with a straight line herein referred to as "Line A". Said "Line A" being described as follows:

beginning at a point 45 feet, measured at right angles, north of the north line and 447.89 feet, measured parallel with the north line of West Roosevelt Road, east of the centerline of Dodge Street, now vacated, produced northerly; thence southeasterly to a point 760 feet east of the centerline of Dodge Street, now vacated, and 860 feet south of the south line of West Roosevelt Road as widened, said south line as widened, being 85 feet south of and parallel with the north line of the east fraction of the northeast quarter of the aforesaid Section 21); thence south 17 degrees, 04 minutes, 50 seconds east along said "Line A", 92.37 feet to the point of beginning, said point of beginning being 36.27 feet south of said south line of West Roosevelt Road as widened; thence northerly 89.1 feet along the arc of a circle, convex to the southwest, having a radius of 1,910.08 feet and whose chord bears north 10 degrees, 27 minutes, 24 seconds west to a point on the aforesaid original south line of West Roosevelt Road, said point being 723.93 feet west of the west line of South Clark Street as widened per order of the City Council passed May 15, 1846, being a line 20.00 feet west of and parallel with the east line of Lots 1 to 5, both inclusive, in the Assessor's Second Division of the east fraction of the northeast quarter of the aforesaid Section 21; thence northerly 7.09 feet along the northerly extension of the aforesaid arc, convex to the southwest having a radius of 1,910.08 feet and



# E. PLANNED DEVELOPMENT #904

whose chord bears north 09 degrees, 00 minutes, 13 seconds west to a point on a line drawn 26.00 feet south of and parallel with the north line of the east fraction of the northeast quarter of the aforesaid Section 21; thence south 89 degrees, 57 minutes, 15 seconds east along said parallel line 328.85 feet; thence south 06 degrees, 43 minutes, 03 seconds east 46.61 feet; thence north 83 degrees, 16 minutes, 58 seconds east 2.50 feet; thence north 06 degrees, 43 minutes, 03 seconds west 10.62 feet to a point on the south line of Lot 9 in Blanchard's Subdivision of part of the east fraction of the northeast quarter of the aforesaid Section 21; thence south 89 degrees, 57 minutes, 15 seconds east along said south line of Lot 9, a distance of 29.50 feet to the southeast corner of said Lot 9; thence north 00 degrees, 01 minutes, 02 seconds west, 35.44 feet along the east line of said Lot 9 to a point on a line drawn 26.00 feet south of and parallel with the east fraction of the northeast quarter of the aforesaid Section 21; thence south 89 degrees, 57 minutes, 15 seconds east along said parallel line 360.05 feet to the point of intersection with a line drawn from a point in the north line of West Roosevelt Road, said point being 20.00 feet west of the east line of Block 107 in School Section Addition to Chicago in the southeast quarter of Section 16, township and range aforesaid to a point in the south line of West Roosevelt Road as widened, said point being 20.00 feet west of the east line of Lots 1 to 5, both inclusive, in Block 2 in the aforesaid Assessor's Second Division; thence south 00 degrees, 01 minutes, 52 seconds west along the last described line, 59.00 feet to the south line of West Roosevelt Road as widened; thence south 00 degrees, 01 minutes, 02 seconds east along the west line of South Clark Street (and its southerly extension) being the east line of Blocks 2, 3, 13, 14, 15 and 17 in the aforesaid Assessor's Second Division and along the east line of Lots 49 to 56, both inclusive, in Walker Greer and Other's Subdivision of the Uhlich Tract in the east fraction of the northeast quarter of the aforesaid Section 2 1 and along the east line of Blocks 27, 27½, 28, 29, 34 and 35, a distance of 2,608.68 feet to the point of intersection with the south line of West 16° Street, said south line being 33.00 feet south of and parallel with the south line of the east fraction of the northeast quarter of the aforesaid Section 21; thence north 89 degrees, 56 minutes, 32 seconds west 77.70 feet along said line 33.00 feet south of and parallel with the south line of the east fraction of the fractional northeast quarter of Section 2 1 to the east line of the west half of Block 4 in Canal Trustees' New Subdivision of blocks in the east fraction of the southeast quarter of Section 21; thence north 00 degrees, 0 1 minutes, 02 seconds west along the northerly extension of the east line of the west half of Block 4 aforesaid 33.0 feet to the south line of the east fraction of the fractional northeast quarter of Section 21; thence north 89 degrees, 56 minutes, 32 seconds west along said south line of the east fraction of fractional northeast quarter aforesaid 843.42 feet to the center thread of the south branch of the Chicago River as it existed on or prior to July 8, 1926; thence north 31 degrees, 15 minutes, 32 seconds east 6.01 feet along said center thread to the point of intersection with the south line of the west fraction of said



# E. PLANNED DEVELOPMENT #904

northeast quarter of Section 21; thence south 89 degrees, 59 minutes, 58 seconds west 90.03 feet along said line to the intersection with the east line of the new channel of the south branch of the Chicago River as established in an ordinance passed by the City Council of the City of Chicago on July 8, 1926; thence north 00 degrees, 17 minutes, 30 seconds west along said east line 315.00 feet; thence north 89 degrees, 59 minutes, 58 seconds east along a line parallel with the south line of the west fraction of the northeast quarter of the aforesaid Section 21, a distance of 230.02 feet to the intersection with the easterly face of the westerly dock line of the south branch of the Chicago River as it existed on July 8, 1926; thence north 20 degrees, 26 minutes, 28 seconds east along the easterly face of said westerly dock line which forms an angle of 69 degrees, 33 minutes, 30 seconds to the left of the easterly extension of the last described course 21.47 feet; thence north 54 degrees, 58 minutes, 58 seconds east along a line which forms an angle of 34 degrees, 32 minutes, 30 seconds to the right of the last described course extended northeasterly 141.64 feet to a point on the easterly face of the westerly dock line of the south branch of the Chicago River as it existed on July 8, 1926; thence north 44 degrees, 50 minutes, 10 seconds east along the easterly face of said westerly dock line 92.48 feet to a point which is 619.10 feet east of the west line of the aforesaid new channel and 2,088.56 feet south of the south line of West Roosevelt Road as widened (said south line being 85.00 feet south of and parallel with the north line of the aforesaid northeast quarter of Section 21); thence northeasterly 373.88 feet along a curved line, convex to the southeast having a radius of 478.34 feet to a point which is 760.00 feet east of the centerline of Dodge Street, now vacated, produced south and 1,751.17 feet south of the aforesaid south line of West Roosevelt Road as widened; thence north 00 degrees, 07 minutes, 44 seconds west 428.22 feet along a line 760.00 feet east of and parallel with the southerly extension of the centerline of vacated Dodge Street to a point 1,322.95 feet south of the south line of West Roosevelt Road as widened, said point being also 453.99 feet west of the west line of South Clark Street; thence northwesterly 274.21 feet along the arc of a circle convex to the northeast, having a radius of 1,273.57 feet and whose chord bears north 06 degrees, 18 minutes, 54 seconds west to a point 1,050.95 feet south of the south line of West Roosevelt Road as widened and 483.86 feet west of the west line of said South Clark Street; thence north 12 degrees, 27 minutes, 09 seconds west 1,020.09 feet to a point which is 55.04 feet south of the south line of West Roosevelt Road as widened and 703.52 feet west of the west line of the aforesaid South Clark Street as widened per order of the City Council passed May 15, 1846; thence northwesterly 19.22 feet along the arc of a circle convex to the west, having a radius of 1,910.08 feet and whose chord bears north 12 degrees, 27 minutes, 42 seconds west to the hereinabove designated point of beginning, in Cook County, Illinois.



# E.  PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES          21787

Excepting from Parcel 1 the property described as follows:

(Exception Parcel 1)

All that part of Lot 3, in Block 34, in the Assessor's Second Division of the east fractional northeast quarter of Section 21, Township 39 North, Range 14, East of the Third Principal Meridian, more particularly described as follows:

commencing at a point on the south line of Lot 3, a distance of 335.00 feet west of the west line of South Clark Street, measured along the south line of said Lot 3; thence northwesterly at an angle of 06 degrees, 18 minutes with the south line of said Lot 3, a distance of 164.45 feet to a point 18.07 feet north from the south line of said Lot 3 measured at right angles thereto; thence northwesterly a distance of 25.16 feet to a point 26.8 feet north of the south line of said Lot 3 measured at right angles thereto; thence northwesterly at an angle of 26 degrees, 36 minutes with the last described course, a distance of 3 1.9 1 feet to a point on the easterly dock line of the south branch of the Chicago River; thence southwesterly along said dock line, a distance of 73.00 feet to a point on the south line of said Lot 3; thence east along the south line of said Lot 3, a distance of 262.35 feet to the point of beginning, in Cook County, Illinois.

Also excepting from Parcel 1:

(Exception Parcel 2)

That part of Block 35 in Assessor's Second Division described as follows:

beginning in the west line of South Clark Street 81 feet north of the north line of West 16" Street; thence north along the west line of South Clark Street 35 feet; thence northwesterly on a curved line deflecting to the right having a radius of 375 feet, a distance of 135.2 feet; thence northwesterly on a straight line tangent from said curved line 101 feet to a point 30 feet south at right angles from the north line of said Block 35 and 227.6 feet west of the west line of South Clark Street; thence west parallel with the north line of said Lot 35 and 30 feet south at right angles therefrom 141.6 feet; thence southeasterly on a curved line deflecting to the right with a radius of 375 feet, a distance of 108.2 feet to a point, a distance of 52 feet south at right angles from the line of said Lot 35; thence southeasterly on a straight line parallel with the third above described line a distance of 32.4 feet southwesterly at right angles therefrom 136.9 feet; thence southeasterly on a curved line with a radius of 391 feet, a distance of 138 feet to the point of beginning, in Cook County, Illinois.



# E. PLANNED DEVELOPMENT #904

21788          JOURNAL--CITY COUNCIL--CHICAGO          3/31/2004

Also excepting from Parcel 1:

(Exception Parcel 3)

The north 30 feet of Block 35 in Assessor's Second Division aforesaid, excepting therefrom that part thereof described as follows:

beginning on the west line of South Clark Street 205.3 feet north of the north line of West 16th Street and in the north line of Block 35 aforesaid; thence west along the north line of said block 335 feet; thence southeasterly on a curved line deflecting to the right with a radius of 407.8 feet, a distance of 86 feet to a point 21 feet south at right angles from the north line of said Lot 35; thence southeasterly 26 feet to a point a distance of 30 feet south at right angles from the north line of said Lot 35; thence east on a line parallel with said north line and 30 feet south at right angles therefrom 227.6 feet to the west line of South Clark Street; thence north on the west line of South Clark Street 30 feet to the point of beginning, in Cook County, Illinois.

Parcel 2:

A tract of land lying easterly of and adjoining the easterly boundary line of the new channel of the south branch of the Chicago River, said tract of land comprised of part of the original bed of said south branch of the Chicago River (abandoned), together with sundry lots, blocks and vacated streets and alleys adjoining said lots and blocks, in Canal Addition, a subdivision of the west fraction of the northeast quarter of Section 21, Township 39 North, Range 14, East of the Third Principal Meridian, bounded and described as follows:

beginning on the north line of the northeast quarter of said Section 2 1 at a point of intersection of said line with the easterly boundary line of the new channel of the south branch of the Chicago River, said point being 1,016.47 feet west of the northward extension of the west line of South Clark Street, and running; thence north 89 degrees, 55 minutes, 29 seconds east along said north line, a distance of 287.476 feet to an intersection with arc of a circle, convex to the southwest with a radius of 1,910.08 feet, the southerly terminus of said arc being a point which is 55.04 feet south of the south line of West Roosevelt Road, as widened, and 703.52 feet west of the west line of said South Clark Street; thence southeastwardly along said arc, a distance of 142.4 15 feet to the aforementioned southerly terminus of said arc; thence south 12 degrees, 35 minutes, 58 seconds east along a straight line, tangent to the last described arc of a circle (the southerly terminus of said straight line being a point which is 1,185.34 feet south of said south line of West Roosevelt Road, as widened, and 560 feet east of said easterly boundary line of the new channel of the south branch of the



# E. PLANNED DEVELOPMENT #904

Chicago River), a distance of 1,020.25 feet to a point of a curve; thence southwardly along the arc of a circle convex to the east, tangent to the last described straight line and having a radius of 1,273.57 feet, a distance of 274.145 feet to a point which is 1,322.95 feet south of said south line of West Roosevelt Road, as widened, and 560.00 feet east of said easterly boundary line of the new channel of the south branch of the Chicago River; thence south 00 degrees, 15 minutes, 58 seconds east along a straight line which is parallel with the aforesaid easterly boundary line of the new channel of the south branch of the Chicago River, a distance of 428.214 feet to a point of a curve; thence southwestwardly along the arc of a circle, convex to the southeast, tangent to the last described straight line and having a radius of 478.34 feet, a distance of 373.878 feet to a point which is 2,088.58 feet south of said south line of West Roosevelt Road, as widened, and 419.08 feet east of the easterly boundary line of the new channel of the south branch of the Chicago River; thence south 44 degrees, 31 minutes, 02 seconds west along a straight line, tangent to the last described arc of a circle, a distance of 92.474 feet; thence south 54 degrees, 49 minutes, 32 seconds west along a straight line, a distance of 141.64 feet; thence south 20 degrees, 17 minutes, 02 seconds west along a straight line, a distance of 21.393 feet to an intersection with a line which is 315 feet north from and parallel with the easterly extension of the centerline of West 16th Street; thence south 89 degrees, 50 minutes, 55 seconds west along said parallel line, a distance of 229.778 feet to an intersection with the aforesaid easterly boundary line of the new channel of the south branch of the Chicago River; thence north 00 degrees, 26 minutes, 02 seconds west along said easterly boundary line, a distance of 883.948 feet to an angle point in said line; and thence north 00 degrees, 15 minutes, 58 seconds west continuing along said easterly boundary line, a distance of 1,457.308 feet to the point of beginning, in Cook County, Illinois.

Parcel 3:

A non-exclusive easement for ingress and egress for the benefit of Parcels 1 and 2 as created by memorandum of declaration of easement dated November 24, 1999, and recorded December 2, 1999 as Document Number 09127751, and modified by first amendment to a declaration of easement dated February 28, 2001 and recorded March 14, 2001 as Document Number 0010200264 and rerecorded March 2 1, 2001 as Document Number 00 10224736, described as follows:

the east 35 feet of the following described property:

a tract of land lying easterly of and adjoining the easterly boundary line of the new channel of the south branch of the Chicago River, said tract of land comprised of part of the original bed of said south branch of the Chicago River (abandoned),



# E. PLANNED DEVELOPMENT #904

together with sundry lots and blocks in School Section Addition to Chicago, being a subdivision of Section 16, Township 39 North, Range 14, East of the Third Principal Meridian, bounded and described as follows:

beginning on the south line of the southeast quarter of said Section 16, at the point of intersection of said line with the easterly boundary line of the new channel of the south branch of the Chicago River, said point being 1,016.47 feet west of the northward extension of the west line of South Clark Street and running; thence north 89 degrees, 55 minutes, 29 seconds east along said south line, a distance of 287.476 feet to an intersection with an arc of a circle, convex to the southwest, with a radius of 1,910.08 feet, the southerly terminus of said arc being a point which is 55.04 feet south of the south line of West Roosevelt Road, as widened, and 703.52 feet west of the west line of said South Clark Street; thence north westwardly along said arc, a distance of 90.946 feet to a point which is 57.28 feet north of the north line of said West Roosevelt Road, and 739.73 feet west of said west line of South Clark Street; thence north 05 degrees, 34 minutes, 54 seconds west along a straight line a distance of 508.47 feet to a point which is 280.80 feet south of the south line of West Taylor Street and 787.91 feet west of said west line of South Clark Street; thence northwardly along the arc of a circle convex to the west with a radius of 1,910.08 feet, a distance of 180.16 feet to a point which is 100.90 feet south of said south line of West Taylor Street and 796.52 feet west of said west line of South Clark Street; thence north 00 degrees, 11 minutes, 05 seconds, west along a straight line, said distance of 100.90 feet to said south line of West Taylor Street; thence south 89 degrees, 68 minutes, 30 seconds west along said south line of West Taylor Street, a distance of 299.47 feet to an intersection with the aforesaid easterly boundary line of the new channel of the south branch of the Chicago River; thence south 05 degrees, 35 minutes, 30 seconds east along said easterly boundary line a distance of 837.84 feet to a point which is 9.96 feet north of the north line of said West Roosevelt Road; and thence south 00 degrees, 15 minutes, 58 seconds east, continuing along said easterly boundary line a distance of 42.96 feet to the point of beginning, in Cook County, Illinois.

Parcel 4:

A non-exclusive, irrevocable, temporary easement for the benefit of Parcels 1 and 2 as created by easement agreement dated March 20,200 1 and recorded April 17, 2001 as Document Number 0010311632 for the purpose of staging, storage and construction of the Wells Street extension over the following described land:



# E. PLANNED DEVELOPMENT #904

a parcel of land 10 feet wide, running the full length, north to south, of the following described property and adjoining the western boundary of the following described property:

a parcel of land comprised of a part of Blocks 105 and 106 in School Section Addition to Chicago, in Section 16, Township 39 North, Range 14 East of the Third Principal Meridian, in Cook County, Illinois and also a part of Lots 12 and 13 in Stowell's Subdivision of Blocks 106 and 107 in said School Section Addition to Chicago, which parcel of land is bounded and described as follows:

commencing at a point on the north line of said Block 105 (said north line being also the south line of West Taylor Street) said point being 5.00 feet, as measured along said north line east of the intersection of said north line with the southward extension of the west line of Block 104 in said School Section Addition (said west line being along the east line of South Wells Street, 60 feet wide) and running; thence westwardly along said north line of Block 105, a distance of 65.0 feet to the point of beginning of the hereinafter described parcel; thence southwardly along a line parallel with said west line of Block 104, a distance of 100.90 feet; thence southwardly along a curved line tangential to the last described course, convex to the west and having a radius of 1,910.08 feet, an arc distance of 180.16 feet to the point of tangency, said point being 280.98 feet south from said south line of South Taylor Street, produced east, measured parallel with the west line of South Clark Street and 787.91 feet west of the west line of South Clark Street, as now established, measured parallel with the south line of South Taylor Street; thence southwardly along a straight line, a distance of 508.47 feet to a point of curve, said point of curve being 57.29 feet north from the north line of West Roosevelt Road, as now widened, measured parallel to the west line of South Clark Street and 739.73 feet west from the west line of South Clark Street, as now established, measured parallel with the north line of West Roosevelt Road; thence southwardly along a curved line tangential to the last described course, convex to the west and having a radius of 1,910.08 feet, a distance of 57.64 feet to a point on the north line of West Roosevelt Road, as now widened, said point being 733.41 feet west of the west line of South Clark Street, as now established, as measured along the north line of West Roosevelt Road, as now widened; thence westwardly along said north line of West Roosevelt Road, as widened, a distance of 67.59 feet to an intersection with a line which is 65.00 feet westerly of and parallel with the southward extension of the west line of Block 104 in said School Section Addition; thence northwardly along said parallel line, a distance of 843.83 feet to an intersection with said north line of Block 105; thence east along said north line of Block 105, a distance of 5.00 feet to the point of beginning; and

Valuation & Financial Opinions 

# E.  PLANNED DEVELOPMENT #904

a parcel within the southerly extended east and west lines of Cacciatore Wells Street parcel from the north line of West Roosevelt Road, as widened, to the northerly line of the Venture Property.

Parcel 5:

An undivided one-half interest in that part of vacated West 16" Street in the east fraction of the southeast quarter of Section 21, Township 39 North, Range 14, East of the Third Principal Meridian, described as follows:

beginning at the northeast corner of the west half of Lot 1 in Block 4 in Canal Trustees New Subdivision of blocks in the east fraction of the southeast quarter of Section 21, Township 39 North, Range 14, East of the Third Principal Meridian; thence north 89 degrees, 56 minutes, 32 seconds west along the north line of Lot 1, being the south line of vacated West 16" Street for a distance of 110.70 feet to the centerline of vacated South LaSalle Street; thence north 00 degrees, 01 minutes, 02 seconds west along the northerly extension thereof 33.0 feet to the south line of the east fractional northeast quarter of Section 21 aforesaid; thence north 89 degrees, 56 minutes, 32 seconds east along the last described 110.70 feet to the northerly extension of the east line of the west half of Block 4 aforesaid; thence south 00 degrees, 01 minutes, 02 seconds east along the last described line 33.0 feet to the point of beginning, in Cook County, Illinois.

Permanent Index Numbers:

| | |
|---|---|
| 17-21-202-001-0000 | 17-21-210-098-0000 |
| 17-21-203-006-0000 | 17-21-203-004-0000 |
| 17-21-206-001-0000 | 17-21-203-007-0000 |
| 17-21-208-005-0000 | 17-21-207-001-0000 |
| 17-21-210-002-0000 | 17-21-209-006-0000 |
| 17-21-210-005-0000 | 17-21-210-003-0000 |
| 17-21-210-062-0000 | 17-21-210-006-0000 |
| 17-21-210-090-0000 | 17-21-210-064-0000 |



# E. PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES          21793

17-21-210-092-0000          17-21-210-004-0000

17-21-502-001-0000          17-21-210-007-0000

17-21-203-005-0000          17-21-210-086-0000

17-21-204-001-0000          17-21-210-095-0000

17-21-208-004-0000          17-21-503-003-0000

17-21-209-007-0000

Common Address:

A portion of the property in the area bounded on the east by South Clark Street, on the south by West 16th Street, on the west by the south branch of the Chicago River and on the north by West Roosevelt Road, Chicago, Illinois.

*Residential-Business-Waterway Planned Development Number 904.*

*Plan Of Development Statements.*

1. The area delineated herein as a Residential-Business-Waterway Planned Development (the "Planned Development") consists of approximately two million six hundred fifty-six thousand seven hundred seventy-four (2,656,774) square feet (sixty and ninety-nine hundredths (60.99) acres) (the "Property") site area which is owned and controlled by the applicant Roosevelt/Clark Development, L.P. (the "Applicant"), and which is depicted on the attached Planned Development Boundary and Property Line Map. The Property is divided into seven (7) subareas as shown on the Subarea Map.

2. All official reviews, approvals or permits that are necessary to construct improvements in accordance with this Planned Development are required to be obtained by the Applicant or its successors, assignees or grantees. The intended dedication and vacation of streets and alleys within (or adjacent to and affecting) the Property are identified on the Public Way Dedication Plan and the Public Way Vacation Plan. Any dedication or vacation of streets or alleys, or easements, or adjustments ofrights-of-way, or consolidation or resubdivision of parcels, shall require a separate submittal on behalf of the Applicant or its successors, assignees or grantees and approval by the City Council.



# E. PLANNED DEVELOPMENT #904

3. The requirements, obligations and conditions contained with this Planned Development shall be binding upon the Applicant, its successors, assigns, grantees and lessees, and if different than the Applicant, the legal title-holder(s) or any ground lessor(s). All rights granted hereunder to the Applicant shall inure to the benefit of the Applicant, its successors, assigns, grantees and lessees and, if different than the Applicant, the legal titleholder(s) or any ground lessor(s).

4. This plan of development consists of these seventeen (17) statements and the following described exhibits, dated March 11, 2004 (collectively, the "Plans") (all of which are incorporated herein and made a part hereof by this reference):

| | |
|---|---|
| Exhibit 1 | Bulk Regulations and Data Table; |
| Exhibit 2 | Existing Zoning Map; |
| Exhibit 3 | Existing Land-Use Map; |
| Exhibit 4 | Planned Development Boundary and Property Line Map; |
| Exhibit 5 | Generalized Land-Use Plan; |
| Exhibit 6 | Site Plan; |
| Exhibit 7 | Net Developable Area Plan; |
| Exhibit 8 | Pedestrian Access Plan; |
| Exhibit 9 | Landscape Plan; |
| Exhibit 10 | Access and Circulation Plan; |
| Exhibit 11 | Subarea Map; |
| Exhibit 12 | Public Way Dedication Plan; |
| Exhibit 13 | Public Way Vacation Plan; |
| Exhibit 14 | Master Plan and Design Standards; |
| Exhibit 15 | Public Open Space Improvements Phasing Timeline; |
| Exhibit 16 | Riverside Park Energy Requirement; and |
| Exhibit 17 | Table of Permitted Uses in Subareas A and B. |



# E.  PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES          21795

Full-size sets of the Plans are on file with the Department of Planning and Development ("D.P.D."). This Planned Development is applicable to the Property and these and no other controls shall apply. This plan and development is in conformity with the intent and purposes of the Chicago Zoning Ordinance, Title 17 of the Municipal Code of the City of Chicago (the "City"), and all requirements thereof, and satisfies the established criteria for approval as a Planned Development.

5.  The following uses shall be permitted within the area delineated herein as a Residential-Business-Waterway Planned Development:

For Subareas A and B: All uses identified in the Table of Permitted Uses (Exhibit 17) shall be permitted uses in Subareas A and B.

The Property owned by the Applicant within the Planned Development located under elevated Roosevelt Road (but not located within any subarea be used for vehicular access, parking and storage, subject to the review and approval of the Commissioner of D.P.D. (the "Commissioner").

For Subareas C and D: Single-family, attached and detached, and multiple-family dwelling units shall be allowed, along with accessory parking, open space and accessory uses; and home occupations.

For Subareas E and F: Dwelling units, single-family, attached and detached, and multiple dwelling unit buildings; accessory parking; home occupations; parks, recreational uses, publicly owned park field houses and publicly owned schools, park concessions and accessory uses; railroad facilities; residential support service uses and accessory uses. The permitted commercial and retail uses in the residential buildings are residential support services; commercial uses provided primarily to serve the needs of residents in large, multi-unit residential buildings or residents within the immediate area. The following are considered residential support services: restaurants with or without service of alcohol; financial services (except pawn shops, consumer loan agencies and payday loan stores which shall not be permitted); medical service; office; personal service and retail sales (such as, but not limited to dry cleaners, tailors, shoe repair, pharmacy, drug stores, et cetera). Residential support services may be located only on the first two (2) floors of a multiple dwelling unit building. Individual business, service or office uses are limited to a maximum of five thousand (5,000) square feet in area per use in a building. The Commissioner shall have the authority to modify these restrictions administratively; similarly, the Commissioner shall have the authority to make minor changes to these restrictions. Additional floor area requirements per use may be approved

by the Commissioner as a minor change or administrative modification to the Planned Development uses.

For Subarea G: Parks, recreational uses, publicly owned park field houses; accessory uses; boat moorings and boat docks; park concessions and accessory uses.

For all subareas: Temporary and interim uses shall include construction and construction staging, concrete crushing and recycling, surface parking lots. All temporary and interim uses shall be subject to the review and approval of the Commissioner.

6. Business identification and temporary signs are permitted upon the subject Property subject to the review and approval of the Commissioner, consistent with the provisions of the Chicago Zoning Ordinance.

7. Any service drives or any other means of ingress or egress, including for emergency vehicles, shall be adequately designed and paved in accordance with the provisions of the Municipal Code and the regulations of the Chicago Department of Transportation ("C.D.O.T.") in effect at the time of review and permitted by the City. There shall be no parking or storage of garbage receptacles within such paved areas or within fire lanes. Off-street parking and ingress and egress shall be subject to the review and approval of C.D.O.T. and D.P.D.. Compact spaces measuring less than eight and one-half (8½) feet by nineteen (19) feet may be provided within a garage once the Applicant has satisfied the minimum off-street parking requirements, subject to the review and approval of C.D.O.T.. For purposes of this Planned Development, a "compact space" shall be a minimum of eight (8) feet by sixteen (16) feet. All work proposed in the public way must be designed and constructed in accordance with the C.D.O.T. Construction Standard for Work in the Public Way and in compliance with the Municipal Code of the City. Closure of all or any part of any public streets or alleys during demolition or construction shall be subject to the review and approval of C.D.O.T.

8. In addition to the maximum height of any building or any appurtenance thereto, the height of any improvement shall also be subject to height limitations approved by the Federal Aviation Administration.

9. The maximum permitted floor area ratio ("F.A.R.") shall be in accordance with the attached Bulk Regulations and Data Table. For purposes of F.A.R. calculations and floor area measurements, the definitions in the Chicago Zoning Ordinance shall apply.



# E. PLANNED DEVELOPMENT #904

3/31/2004        REPORTS OF COMMITTEES        21797

10. This Planned Development shall be subject to the "Rules, Regulations and Procedures in Relation to Planned Development Amendments" as promulgated by the Commissioner and in effect on the date of the adoption of this Planned Development.

11. Improvements of the Property, including but not limited to public open space improvements, landscaping and all entrances and exits to the parking areas, shall be designed and installed in substantial conformance with an approved Development Parcel Site Plan (as described in Statement 12).

    (A)    Construction of Public Improvements.

         No certificate of occupancy shall be issued for any improvement located within a parcel in the Planned Development until such time as the Applicant for the certificate produces evidence that construction of public improvements (other than open space, as addressed in paragraph (B) below) related to the improvement located within a parcel in said development has been completed, is under construction or is under contract for construction, or that adequate access can be provided, all as certified by C.D.O.T. and approved by D.P.D.

    (B)    Public Open Space Improvements.

         River Edge Improvements: Applicant may construct the river edge pedestrian route in phases as the adjoining development of private property occurs, and generally in accordance with the Public Open Space Improvements Phasing Timeline attached hereto as Exhibit 15. Design and construction of the river edge pedestrian route shall be subject to approval by the Chicago Park District (the "Park District") and the Chicago Fire Department and in compliance with the Riverside Park Master Plan and Design Standards.

         In addition, Applicant agrees to permit connection of the Riverside trail (for bicycling, jogging and other recreation) constructed as part of this Planned Development to related improvements on neighboring properties. Finally, Applicant acknowledges the desirability of widening the Riverside trail connection beneath the St. Charles Airline railroad bridge, and the Applicant will use reasonable efforts to explore the possibility of expanding that connection and to pursue implementation of such expanded



# E. Planned Development #904

connection provided that such expanded connection is both legally permissible and financially feasible.

Public Park/Open Space Public Improvements: Public open space improvements within the Planned Development shall be completed and dedicated to the City of Chicago or the Park District, in accordance with the Public Open Space Improvements Phasing Timeline attached hereto as Exhibit 15, provided that: (i) dedication of property to the Park District for public parks and construction of such parks shall be subject to separate agreement between the Park District and the Applicant; (ii) all design work shall be in compliance with the Riverside Park Master Plan and Design Standards and Park District standards, consistent with availability of adequate levels of public funding, and Applicant shall assist the Park District in the development of conceptual plans for the parks which are to be dedicated to the Park District; (iii) prior to dedication of property in Subarea F4 to the Park District (or as otherwise directed pursuant to clause (iv)(B)), Applicant shall first offer to donate land in Subarea F4, not to exceed two (2) acres in size, to the Chicago Board of Education, for the development of an elementary school that will serve the residents of the Planned Development and residents of neighboring communities; and (iv) with respect to Subarea F4: (A) Applicant may convey such property to a not-for-profit organization(s) whose mission is to conserve land for open space, parks and natural spaces (as an example, but not a limitation, Trust for Public Land) (an "Open Space Organization") during the period that is prior to the time that Applicant is required to offer all of Parcel F4 for dedication to the Park District (as described on Exhibit 15); and (B) if the St. Charles Airline (along with any interest in easement which the Applicant, its successors and assigns may have therein, (the "St. CA Interest")) is not conveyed to the City by December 3 1, 2010, Applicant shall either dedicate all of Parcel F4 (including the St. CA Interest), (although not yet developed as a park) to the Park District, or shall convey such property (including the St. CA Interest) as directed by the Park District, to a governmental entity or an Open Space Organization.

Other Public Open Space Improvements: other public open space improvements shall be constructed in accordance with the timetable described on the Public Open Space Improvements Phasing Timeline attached hereto as Exhibit 15.

Valuation & Financial Opinions 

# E. Planned Development #904

(C) Interim Building Design Of Exterior Walls.

The City acknowledges that the proposed development may occur in phases over several years, and, that as a result, the exterior walls of certain buildings, parking garages and structures, may be interim in nature, particularly the exterior walls of the plinth and parking garage proposed for Subarea A. The exterior walls of any structure, including the walls of the plinth, parking garage and the walls which will be visible adjacent to development Parcels A6, A9, A10 and A1 1, facing or visible from the public way shall be designed and constructed to avoid a monotonous and blank appearance through the use of materials, texture and detail.

(D) Interim Land Uses And Landscaping.

Applicant shall use its best efforts to maintain the site, prior to construction of improvements thereon, in a manner so as to avoid unnecessary water runoff and wind blown soils. To accomplish this goal, after grading, Applicant shall, as may be practical, "hydro seed" and subsequently mow areas not under construction and not being used in connection with construction activities. Hazardous uses are to be fenced.

12.  Prior to the issuance by the D.P.D. of a determination pursuant to Section 11.11-3(b) of the Chicago Zoning Ordinance ("Part II Approval") for development or redevelopment of any development parcels within the Planned Development, other than alterations to existing buildings which do not increase their height or alter their footprints, a Development Parcel Site Plan for the proposed development, including parking areas, shall be submitted to the Commissioner for approval. No Part II Approval shall be granted until the Development Parcel Site Plan has been approved by the Commissioner. Following approval of a Development Parcel Site Plan by the Commissioner, the approved plan shall be kept on permanent file with the D.P.D. and shall be deemed to be an integral part of this Planned Development. The approved Development Parcel Site Plan may be changed by the provisions of Section 11.11-3(c) of the Chicago Zoning Ordinance. A Development Parcel Site Plan shall, at a minimum, provide the following information with respect to the proposed improvements:

(1)  the boundaries of the development parcel;



# E. PLANNED DEVELOPMENT #904

(2)   the site plans for the improvements;

(3)   the location and dimensions of all loading berths, curb cuts and parking spaces;

(4)   a landscaping plan, including adjacent parkways;

(5)   the pedestrian circulation routes;

(6)   the location of any adjacent public improvements;

(7)   a sign plan which includes, but is not limited to the size, location and type of signs proposed;

(8)   preliminary building sections and elevations of the improvements with a preliminary building materials list;

(9)   statistical information applicable to the development parcel limited to the following:

    (a)   floor area and floor area ratio;

    (b)   uses to be established;

    (c)   building heights; and

    (d)   all setbacks, required and provided.

(10)   storm water management requirements, if applicable;

(11)   a plan for providing interim facades as per paragraph 11 (C) above, if applicable; and

(12)   a plan for construction staging and restoration, if applicable.

A Development Parcel Site Plan shall include such other information as may be necessary to illustrate conformance with the applicable provisions of this Planned Development. Review and approval of the Development Parcel Site Plan for the development parcels by the Commissioner is intended to assure that specific development proposals conform to the

Valuation & Financial Opinions  

# E. PLANNED DEVELOPMENT #904

Riverside Park Master Plan and Design Standards, which are incorporated herein as Exhibit 14. To the extent that a Development Parcel Site Plan provides for standards or requirements that constitute minor variations from the Riverside Park Master Plan and Design Standards and affect only that development parcel, approval of such Development Parcel Site Plan shall be deemed approval by the Commissioner of such variations.

13. The terms, conditions and exhibits of this Planned Development may be modified administratively by the Commissioner, upon the application for such a modification by the Applicant, and after a determination by the Commissioner that such a modification is minor in nature, appropriate, and consistent with the nature of the improvements contemplated in this Planned Development and the purposes underlying the provisions hereof. Any modification of the requirements of this statement by the Commissioner shall be deemed to be a minor change in the Planned Development as contemplated by Section 11.11-3(c) of the Chicago Zoning Ordinance. Such minor changes may include: changes to the Site Plan; a reallocation of dwelling units and/or floor area (including retail/ commercial floor area) from one subarea to another subarea, or from one development parcel to another development parcel within a subarea; so long as the maximum dwelling unit count, F.A.R., or maximum retail/commercial area, as applicable, for the Planned Development is not exceeded; changes in use of the Property from one subarea to another subarea, or from one development parcel to another development parcel; modifications to the Master Plan and Design Standards; and modifications to the Riverside Park Energy Requirements. With regard to Subarea A6, the Applicant may request a minor modification of the Planned Development to develop this subarea in a different configuration from the Site Plan (Exhibit 6), so long as it is consistent with the Bulk Regulations and Data Table. Moreover, notwithstanding the provisions of sub-clauses (3), (4) and (5) of Section 11.11-3(c) of the Chicago Zoning Ordinance, such minor changes may also include a reduction in the minimum required distance between structures, a reduction in periphery setbacks, an increase in the maximum percent of land covered for total net site area, an increase in the maximum height of town home buildings located in any subarea, or other changes to the Site Plan or plan of development. For minor changes requested by the Applicant or with the Applicant's written approval, the consent of all parcel owners is not required.

14. The Applicant acknowledges that it is in the public interest to design, construct and maintain all buildings in a manner that promotes and



# E. PLANNED DEVELOPMENT #904

maximizes the conservation of energy resources. Accordingly, the Applicant shall use its best and reasonable efforts to comply with the Riverside Park Energy Requirements as set forth on Exhibit 16. For town homes, the applicable requirements shall be the Energy Star Rating standards set forth on Exhibit 16, or such other energy efficiency requirements as D.P.D. shall, upon request of the Applicant, determine to be acceptable at the time that Applicant applies for a building permit for the construction of town homes.

15. The Applicant acknowledges that it is in the public interest to design, construct and maintain the project in a manner that promotes, enables and maximizes universal access throughout the Property. Plans for all buildings and improvements on the Property shall be reviewed and approved by the Mayor's Office for People with Disabilities ("M.O.P.D.") to ensure compliance with all applicable laws and regulations related to access for persons with disabilities. No approvals shall be granted pursuant to Section 11.11-3(b) of the Chicago Zoning Ordinance unless the Director of M.O.P.D. has reviewed detailed construction drawings for each building or improvement to confirm compliance.

16. The change in land-use contemplated by this Planned Development will generate a significant increase in automobile trips to and from the site. This increase in trip generation will result in the need for off-site public infrastructure improvements to increase the capacity of Roosevelt Road. The Applicant agrees to make a one-time cash contribution of Four Hundred Thousand Dollars ($400,000) to a fund designated by the City for the express purpose of making these improvements.

Contributions to this fund will be used to off-set the cost of one (1) or more of the following improvements: (A) Roosevelt Road traffic signal inter-connection (Lake Shore Drive to I-94); (B) modifications to ramp at I-94/Roosevelt Road; (C) modifications to the median located on Roosevelt Road between Lake Shore Drive and I-94; and (D) other modifications to Roosevelt Road between Lake Shore Drive and I-94. The payment of this contribution shall be on a pro rata basis, made at the time of Part Ii Approval, based upon the proportional square footage of each retail development to the maximum square footage of retail uses in the Planned Development.

The Applicant shall participate in a Roosevelt Road Corridor association such as a traffic management association, a special service area, or similar

Valuation & Financial Opinions 

# E. PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES          21803

entity and shall share in the funding of the entity in a manner proportionate to the Applicant's traffic impact on the corridor as determined by the Department of Planning and Development and the Department of Transportation. A formula shall be devised to calculate this impact including but not limited to one (1) or more of the following: trip generation, peak hour volumes, store footage, number of parking spaces, or other such quantifiable measurements. This formula shall be developed jointly by the Department of Planning and the Department of Transportation. The entity shall provide services that enhance traffic flow in the corridor including but not limited to a trolley to convey shoppers between developments information to provide shoppers with alternate routes to corridor developments and shall commit to a shared parking arrangement among entity members to minimize short vehicular trips between proximate developments.

17.  If no development has commenced within six (6) years following adoption of this Planned Development, then this Planned Development shall expire and the zoning of the Property shall automatically revert to that of the C3-4 Commercial-Manufacturing District.

[Exhibit 1 -- Bulk Regulations and Data Table; Exhibit 2 -- Existing Zoning Map; Exhibit 3 -- Existing Land-Use Map; Exhibit 4 -- Planned Development Boundary and Property Line Map; Exhibit 5 -- Generalized Land-Use Plan; Exhibit 6 -- Site Plan; Exhibit 7 -- Net Developable Area Plan; Exhibit 8 -- Pedestrian Access Plan; Exhibit 9 -- Landscape Plan; Exhibit 10 -- Access and Circulation Plan; Exhibit 11 -- Subarea Map; Exhibit 12 -- Public Way Dedication Plan; Exhibition 13 -- Public Way Vacation Plan; Exhibit 15 -- Public Open Space Phasing Timeline; Exhibit 16 -- Energy Requirements; and Exhibit 17 -- Table of Permitted Uses in Subareas A and B referred to in these Plan of Development Statements printed on pages 21804 through 21822 of this Journal.]

[Exhibit 14 -- Master Plan and Design Standards referred to in these Residential-Business-Waterway Plan of Development Statements omitted for printing purposes but on file and available for public inspection in the Office of the City Clerk.]



# E. PLANNED DEVELOPMENT #904

21804     JOURNAL--CITY COUNCIL--CHICAGO     3/31/2004

*Exhibit 1.*

Bulk Regulations And Data Table.

Gross Site Area as per PD boundary map   1,661,144 sf
Area Existing Dedicated ROW Area (1)   661,533 sf

    Sub-Total   2,324,519 sf

Area F   Proposed Depicted ROW Area   (600,791) sf

    Sub-Total   1,666,723 sf

Area F   Proposed Dedicated Public Property Area   (137,379) sf

    Sub-Total   1,733,143 sf

Area   Proposed Public Park & Open Space Area   (244,229) sf

Net Developable Site Area   1,346,167 sf

(1) Vacation of existing ROW as depicted on Exhibit 13 has not been included.

| Development Parcel | Development Type | Net Developable Area (DF) | Maximum Area/Ratio | Maximum Dwelling Units | Maximum Retail/Commercial Area (DF) [E] | Parking Ratio | Maximum Building Height ft |
|---|---|---|---|---|---|---|---|
| A1 | Mixed Use | 38,713 | 6.0 | 125 | 42,000 | d, b | 110 ft. |
| A2 | Mixed Use | 34,808 | 3.0 | 225 | 63,000 | b, b | 110 ft. |
| A3 | Mixed Use | 28,421 | 3.8 | 125 | 32,920 | b, b | 110 ft. |
| A4 | Mixed Use | 23,404 | 3.6 | 125 | 38,300 | b, b | 110 ft. |
| A5 | Mixed Use | 52,054 | 7.2 | 240 | 100,000 | b, b | 240 ft. |
| A6 | Mixed Use | 248,942 | 4.9 | 549 | 250,000 | m, b, e | 310 ft. |
| A7 | Mixed Use | 31,542 | 11.1 | 308 | 36,200 | b, b, e | 420 ft. |
| A8 | Retail | 25,413 | 1.0 | — | 26,000 | b, e | 36 ft. |
| A9 | Mixed Use | 16,666 | 18.5 | 249 | 2,060 | b, e | 370 ft. |
| A10 | Mixed Use | 17,364 | 11.3 | 144 | 2,664 | b, e | 290 ft. |
| A11 | Mixed Use | 17,364 | 11.1 | 144 | 7,966 | b, e | 270 ft. |
| B1 | Mixed Use | 83,720 | 3.1 | 144 | 20,000 | d, b | 130 ft. |
| B2 | Mixed Use | 34,190 | 5.1 | 124 | 20,800 | b, e | 500 ft. |
| C1 | Residential | 102,213 | 2.6 | 91 | | e, d | 55 ft. |
| C2 | Residential | 43,764 | 2.6 | 37 | | e, d | 55 ft. |
| D1 | Residential | 76,521 | 1.6 | 54 | | e, d | 46 ft. |
| D2 | Residential | 78,521 | 1.6 | 54 | | e, d | 46 ft. |
| D3 | Residential | 73,200 | 1.7 | 54 | | e, d | 46 ft. |
| D4 | Residential | 70,904 | 1.7 | 54 | | e, d | 46 ft. |
| E1 | Residential | 40,847 | 4.0 | 153 | 3000 (h) | b, n, e | 250 ft. |
| E2 | Residential | 66,602 | 3.3 | 183 | 3000 (h) | b, d, e | 360 ft. |
| E4 | Residential | | | | | | |
| E5 | Residential | 22,442 | 17.3 | 500 | 2600 (h) | b, e | 420 ft. |
| E6 | Metra ROW | | | | | | |
| F1 | Residential | 52,312 | 14.1 | 572 | 2000 (h) | b, e | 450 ft. |
| F2 | Residential | 58,581 | 12.1 | 586 | 3000 (h) | b, e | 540 ft. |
| F3 | Public Park | | | | | | |
| F4 | Public Park | | | | | | |
| G1 | Public Park | | | | | | |
| G2 | Public Park | | | | | | |
| G3 | Public Park | | | | | | |
| G4 | Public Park | | | | | | |
| Total | | 1,346,167 | 6.17 | 4,514 | 675,444 | — | — |

Note:
[a] Parking ratio for retail uses shall be a minimum of 1 space per 1,000 SF up to a maximum of 3 spaces per 1,000 SF of maximum area.
[b] Parking ratio for multi-family residential shall be a minimum of 0.1 spaces per dwelling unit up to a maximum of 2.0 spaces per dwelling unit.
[c] Parking ratio for residential townhomes shall be 1.0 minimum of 1 space per dwelling unit up to a maximum of 2 spaces per dwelling unit.
If detached single-family or multiple-family developments are scheduled then zero parking ratio [a] and [b] applies.
[e] If detached single-family or multiple-family developments are scheduled, the parking ratio, (d) and [e](b) from this structure shall be abandoned.
[d] For retail less than 10,000 SF, no additional parking is required.
[f] Height measured at curb level at front of primary entrance.
[g] For Mixed Use buildings, Maximum Retail/Commercial Area is based upon the immediate retail/commercial area. For non-Mixed Use buildings, Maximum Retail/Commercial Area is based upon the F.A.R. Floor Area as defined in the Chicago Zoning Ordinance.
Maximum Retail/Commercial Area can be transferred between Development Parcels with the approval of the Commissioner of the Department of Planning and Development.
Commercial Retail Area is defined as the area measured from inside face of glass windows, to the centerline of all dividing partitions that bound each individual retail space.
[h] Residential square meters as defined in Statement 3 (Individual Retains, services other are not limited to a maximum of 5,000 square feet in area per use in a building).

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
853 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 60622
DATE:
March 11, 2004

**RIVERSIDE PARK**
BULK REGULATION
AND DATA TABLE

PROPERTY ADDRESS:
SW CORNER ROOSEVELT AND CLARK
CHICAGO, ILLINOIS

EXHIBIT 1

Valuation & Financial Opinions 

# E. PLANNED DEVELOPMENT #904

Exhibit 2.

Existing Zoning Map.



# E. PLANNED DEVELOPMENT #904

21806        JOURNAL--CITY  COUNCIL--CHICAGO        3/31/2004

*Exhibit 3.*

Existing  Land-Use  Map.



# E. PLANNED DEVELOPMENT #904

3/31/2004     REPORTS OF COMMITTEES     *21807*

*Exhibit 4.*

Planned Development Boundary And Property Line Map.



Valuation & Financial Opinions



# E. PLANNED DEVELOPMENT #904



21808     JOURNAL--CITY COUNCIL--CHICAGO     3/31/2004

*Exhibit 5.*

Generalized Land-Use Plan.

Valuation & Financial Opinions 

# E. PLANNED DEVELOPMENT #904



3/31/2004          REPORTS OF COMMITTEES          21809

*Exhibit 6.*

Site Plan.



# E. PLANNED DEVELOPMENT #904

21810          JOURNAL--CITY COUNCIL--CHICAGO          3/31/2004

*Exhibit 7.*

Net Developable Area Plan.





# E. PLANNED DEVELOPMENT #904



3/31/2004          REPORTS OF COMMITTEES          21811

*Exhibit 8.*

Pedestrian Access Plan.

# E. PLANNED DEVELOPMENT #904

*Exhibit 9.*

Landscape   Plan.



# E.  PLANNED DEVELOPMENT #904

*Exhibit 10.*

Access And Circulation Plan.



RIVERSIDE PARK
ACCESS AND CIRCULATION PLAN

EXHIBIT 10

# E. PLANNED DEVELOPMENT #904

21814        JOURNAL--CITY COUNCIL--CHICAGO        3/31/2004

*Exhibit II.*

Subarea Map.





# E. PLANNED DEVELOPMENT #904

3/31/2004            REPORTS OF COMMITTEES            21815

*Exhibit 12.*

Public Way Dedication Plan.



# E. PLANNED DEVELOPMENT #904



2 1816          JOURNAL--CITY COUNCIL--CHICAGO          3/31/2004

*Exhibit 13.*

Public Way Vacation Plan.



# E. PLANNED DEVELOPMENT #904

Exhibit 15.

Public Open Space Improvements Phasing Timeline.

| Public Open Space Improvements Phasing Timeline | | |
|---|---|---|
| Parcels | Description of Public Space | Timeline for Completion |
| Area Between A1 and A4 | Public Right Of Way for Pedestrians | Construction (and offering for dedication) of plaza and stairs down to Wells Street to be completed no later than the occupancy of all buildings on Parcel A1 and A4. |
| Area Between A4 and A6 | Public Right Of Way for Pedestrians | Construction (and offering for dedication) of plaza (or a portion thereof, as hereinafter provided) and stairs down to Wells Street to be completed no later than the earlier of occupancy of future buildings on Parcel A4 or the retail portion of Parcel A6. A portion of the plaza may be left unfinished or temporarily closed at a future date as necessary for construction of the later-developed parcel. The entire plaza must be completed no later than the occupancy of Parcel A4 and the northwest corner of Parcel A6. |
| Area Between B1 and B2 | Public Plaza | Construction (and offering for dedication) of plaza to be completed no later than occupancy of buildings on Parcel B1 and B2. |
| E3 | Public Park | Construction (and offering for dedication) of park to be completed no later than earlier of occupancy of future town homes on Parcel D2 or of future high-rise buildings on Parcels E2 or E4. |
| F3 | Public Park | Construction (and offering for dedication) of park to be completed no later than the occupancy of future high-rise buildings on Parcels E4 and F2. |
| F4 | Public Park | Phasing shall be undertaken as follows: No later than the initial occupancy of Parcel F1, the F4 property immediately to the east of the F1 residential building shall be landscaped. No later than the completion of construction of the Wells-Wentworth connector, the F4 property immediately north and east of said connector to, such roadway shall be landscaped. At the time that the St. Charles AirLine Right-of-Way located on the F4 property is conveyed to the City of Chicago, all of the F4 property shall be developed (and offered for dedication) as a park; subject, however, to the provisions of Statement 31 (B), clause (Ic/B). |
| G1 | Public Park | Construction of park to be completed in five phases corresponding to the initial occupancy of the adjacent buildings on Parcels B1, B2, C1, C2 and F1, respectively. The entire river walk must be completed and dedicated to the Park District no later than December 31, 2010, regardless of development on adjacent parcels. |
| G2 | Public Park | Construction of park to be completed no later than the occupancy of the high-rise buildings on Parcels A8, A10 and A11; provided that entire river walk must be completed and dedicated to the Park District no later than December 31, 2010, regardless of development on adjacent parcels. |
| G3 | Public Park | Construction of park to be completed no later than the earlier of occupancy of Parcels B2 or C1; provided that entire river walk must be completed and dedicated to the Park District no later than December 31, 2010, regardless of development on adjacent parcels. |
| G4 | Public Park | Construction of park to be completed no later than the earlier of occupancy of Parcels C1 or C2; provided that entire river walk must be completed and dedicated to the Park District no later than December 31, 2010, regardless of development on adjacent parcels. |

Public Right Of Way and Public Plazas will be dedicated by the Applicant to the City of Chicago. Public Parks will be dedicated by the Applicant to the Chicago Park District.

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
853 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 60622
DATE:
March 11, 2004

RIVERSIDE PARK
PUBLIC OPEN SPACE
IMPROVEMENTS
PHASING TIMELINE

PROPERTY ADDRESS:
SW CORNER ROOSEVELT AND CLARK
CHICAGO, ILLINOIS

EXHIBIT 15



# E. PLANNED DEVELOPMENT #904

*Exhibit 16.*

Energy Requirements.
(Page 1 of 2)

| Building Type | Requirements | | |
|---|---|---|---|
| Retail / Commercial Only (10,000 square feet and larger) | Comply with the Chicago Energy Code and comply with one of the following options: | | |
| | 1. | Minimum 75% of gross roof area (excluding equipment, housekeeping and window washing paths) covered with an extensive green roof, with remaining roof area covered with roofing material that complies with the Energy Star standards for solar reflectance; LEED Certification[2] is encouraged; OR | |
| | 2. | Minimum 50% of gross roof area (excluding equipment, housekeeping and window washing paths) covered with a" extensive green roof, with remaining roof area covered with roofing material that complies with the Energy Star standards for solar reflectance; and obtain the minimum level of LEED Certification[3]. | |
| Mixed-Use With Market-Rate Residential Above Retail / Commercial (10,000 square feet and larger) | Comply with the Chicago Energy Code, comply with the Temporary Roofing Requirement (below) and comply with the following requirement: | | |
| | Minimum 50% of gross roof area (excluding equipment, housekeeping and window washing paths) covered with extensive green roof, with the remaining roof area covered with roofing material that complies with the Energy Star standards for solar reflectance[4]; and overall building compliance with Energy Star program is encouraged. Green Residential Building Guidelines as drafted are encouraged. | | |
| | Temporary Roof Requirement: In the event the residential component above retail is built in a later stage than the initial retail component, a temporary extensive green roof is required to be provided on 75% of the gross retail roof area (excluding equipment, housekeeping and window washing paths), or 50% if the building is LEED certified, with the remaining roof area covered with roofing that complies with the Energy Star standards for solar reflectance.[5] | | |

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
233 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 40422
DATE:
March 11, 2004

RIVERSIDE PARK
ENERGY REQUIREMENTS

PROPERTY ADDRESS:
SW CORNER ROOSEVELT/CLARK
CHICAGO, ILLINOIS

EXHIBIT 16



# E. PLANNED DEVELOPMENT #904

3/31/2004      REPORTS OF COMMITTEES      21819

*Exhibit 16.*

Energy Requirements.
(Page 2 of 2)

| Building Type | Requirements |
|---|---|
| **Market-Rate** Multi-Family Residential (Over Four Stories) | Comply with the Chicago Energy Code and comply with the following requirement: |
| | Minimum 50% of gross roof area (excluding equipment, housekeeping and window washing paths) covered with extensive green roof system, with the remaining roof area covered with roofing material that complies with the Energy Star standards for Solar reflectance; and overall building compliance with Energy Star program is encouraged. Green Residential Building Guidelines as drafted are encouraged. |
| Market-Rate Residential (Four Stories and Lower) Including All Townhomes | Compliance with the Chicago Energy Code, minimum LEED Certification is encouraged, offer extensive green roof and roof-top garden as upgrades to townhome purchasers in coordination with a green roof education program developed by and in coordination with the City of Chicago, and comply with Energy Star Certification with HERS score not less than 86. |
| Non-Market-Rate Residential and Other Types of Buildings | To be determined according to building type. |

Notes:

1. Extensive green roofs are defined as a roof-top system that includes proper waterproofing, drainage, erosion/filtration controls, growing media/soil and living plants with a total system thickness generally between two inches and six inches. Thicker or intensive green roofs are not required.

2. LEED Certification is based upon the minimum certification standards of the U.S. Green Building Council, Leadership in Energy & Environmental Design, version 2.1.

3. EPA/DOE Energy Star standards for roofing solar reflectivity are as follows: Low-sloped roofs (2:12 or less): 0.65 minimum initial reflectance, 0.50 minimum three-year reflectance. Steep-slope roofs (greater than 2:12): 0.25 minimum initial reflectance, 0.15 minimum three-year reflectance

4. Riverside Park Storm-water Management Plan, prepared by Conservation Design Forum, dated November 4, 2003.

5. During site plan review, each Development Parcel of the Planned Development may present an alternative approach in meeting the Energy Star HERS score of 86. Any variation to the requirements listed above must be approved by the Department of Planning and Development.

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
953 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 66522
DATE:
March 11, 2004

RIVERSIDE PARK

ENERGY REQUIREMENTS

PROPERTY ADDRESS:
SW CORNER ROOSEVELT/CLARK
CHICAGO, ILLINOIS

EXHIBIT 16

---

Southwest Corner of Roosevelt Road & Clark Street - 141 -
Chicago, Illinois     Valuation & Financial Opinions



# E. PLANNED DEVELOPMENT #904

21820      JOURNAL--CITY COUNCIL--CHICAGO      3/31/2004

*Exhibit 17.*

Table Of Permitted Uses In Subareas A and
(Page 1 of 3)

| USE GROUP |
|---|
| Use Category |
| Specific Use Type |
| **RESIDENTIAL** |
| Household Living |
| Artist Live/Work Space, above ground floor |
| Artist Live/Work Space, ground floor |
| Dwelling Units located at or above the ground floor |
| Home Occupations |
| Townhouse |
| Two-Flat |
| Group Living |
| Assisted Living (Elderly Custodial Care) |
| Nursing Home (Skilled Nursing Care) |
| **PUBLIC AND CIVIC** |
| Colleges and Universities |
| Cultural Exhibits and Libraries |
| DayCare |
| Hospital |
| Lodge or Private Club |
| Parks and Recreation |
| Community Centers, Recreation Buildings and Similar Assembly Use |
| Postal Service |
| Public Safety Services |
| Religious Assembly |
| School |
| Utilities and Services, Minor |

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
262 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 60622
DATE:
March 11, 2004

RIVERSIDE PARK.
TABLE OF
PERMITTED USES IN
SUB-AREAS A & B

PROPERTY ADDRESS:
SW CORNER ROOSEVELT AND CLARK
CHICAGO, ILLINOIS

EXHIBIT 17

Valuation & Financial Opinions 

# E. PLANNED DEVELOPMENT #904

3/31/2004          REPORTS OF COMMITTEES          21821

*Exhibit 17.*

Table Of Permitted Uses in Subareas A And B.
(Page 2 of 3)

| USE GROUP | | |
|---|---|---|
| Use Category | | |
| | Specific Use Type | |
| **COMMERCIAL** | | |
| Amusements | | |
| Animal Services | | |
| Artist Work or Sales Space | | |
| Business Equipment Sales and Service | | |
| Business Support Services | | |
| Communication Service Establishments | | |
| Drive-Through Facility | | |
| Eating and Drinking Establishments, Indoor and Outdoor | | |
| Entertainment and Spectator Sports | | |
| Financial Services (except pay day loan stores and pawn shops) | | |
| Food and Beverage Retail Sales | | |
| | Liquor Store (package goods) | |
| | Liquor Sales (as accessory use) | |
| Fortune Telling Service | | |
| Funeral and Interment Service | | |
| | Undertaking | |
| Lodging | | |
| | Bed and Breakfast | |
| | Hotel/Motel | |
| Medical Service | | |
| Office | | |
| Parking, Accessory, Non-Accessory and Outdoor Surface Parking Lots. (Outdoor surface parking lots shall be subject to the approval of the Commissioner of the Department of Planning and Development) | | |
| Personal Service | | |
| Repair Service, Consumer | | |

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.
853 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 60622
DATE:
March 11, 2004

RIVERSIDE PARK

TABLE OF
PERMITTED USES IN
SUB-AREAS A & B

PROPERTY ADDRESS:
SW CORNER ROOSEVELT AND CLARK
CHICAGO, ILLINOIS

EXHIBIT 17

---



# E. PLANNED DEVELOPMENT #904

21822          JOURNAL--CITY COUNCIL--CHICAGO          3/31/2004

*Exhibit 17.*

Table Of Permitted Uses In Subareas A And B.
(Page 3 of 3)

| USE |
| --- |
| **Use Category** |
| Specific Use Type |
| Retail Sales, General |
| Sports and Recreation, Participant |
| Entertainment Cabaret |
| Indoor |
| Theaters, live and movies |
| Vehicle Sales and Service |
| Auto Supply/Accessory Sales |
| Car Wash or Cleaning Service |
| Light Equipment Sales/Rental, Indoor (e.g., auto, motorcycle and boat sales) |
| Light Equipment Sales/Rental, Outdoor (e.g., auto, motorcycle and boat sales) (subject to the approval of the Commissioner of the Department of Planning and Development) |
| Manufacturing, Production and Industrial Services |
| Artisan |
| Public Utilities |
| Recycling Facilities |
| Any building, portion of building or area in which recyclable material is temporarily collected, stored, or processed by manual separation for the purpose of marketing the material for use as raw material in the manufacturing process of new, reused or reconstituted products |
| Warehouse and Freight Movement |
| Wireless Communication Facilities |
| Co-located |
| Freestanding (Towers) (subject to the approval of the Commissioner of the Department of Planning and Development) |

APPLICANT:
ROOSEVELT/CLARK DEVELOPMENT, L.P.,
835 NORTH ELSTON AVENUE
CHICAGO, ILLINOIS 60622
DATE:
March 11, 2004

RIVERSIDE PARK

TABLE OF
PERMITTED USES IN
SUB-AREAS A & B

PROPERTY ADDRESS:
SW CORNER ROOSEVELT AND CLARK
CHICAGO, ILLINOIS

EXHIBIT 17



# Exhibit F

## Appraisal Licenses

Southwest Corner of Roosevelt Road & Clark Street
Chicago, Illinois
- 145 -
Valuation & Financial Opinions
**SRR**
STOUT|RISIUS|ROSS

# F. APPRAISAL LICENSES





# Exhibit G

# **Statement of Qualifications**

# G. STATEMENT OF QUALIFICATIONS

## John W. VanSanten, MAI, MRICS

John W. VanSanten is a Managing Director for the real estate practice within the Valuation & Financial Opinions Group of Stout Risius Ross (SRR). He has more than 20 years of extensive experience in real estate valuations of all types of commercial and special use properties, with a particular emphasis on healthcare properties. He has prepared and reviewed valuation and feasibility studies for litigation support, conventional financing, synthetic lease transactions, bond financing, ad valorem, condemnation, estate, purchase accounting, financial reporting, federal tax disputes, fair rental studies, and insurance purposes.

Mr. VanSanten has been qualified as an expert witness and has testified numerous times in federal, state, and local jurisdictions around the country. He has provided expert witness testimony in federal bankruptcy court and state courts in Delaware, Illinois, Pennsylvania, and Wisconsin. He has also provided testimony for IRS tax disputes. In addition, testimony has been provided before several administrative hearing bodies including the Illinois Property Tax Appeal Board, the County Board of Review in several counties in Illinois, and before hearing bodies in California, Florida, Nebraska, Wisconsin, Iowa, Ohio, and Arizona.

Mr. VanSanten co-authored the valuation section of the Real Estate Taxation Manual for the Illinois Institute for Continuing Legal Education. He is also a sought-after speaker throughout the nation on valuation principals and procedures and has spoken numerous times regarding the valuation of healthcare properties and other valuation issues.

Prior to joining SRR, Mr. VanSanten was a Director with Huron Consulting Group's healthcare practice. During his tenure with Huron, he was retained by outside counsel in several lawsuits to provide valuation services and expert testimony. Prior to that, he was the Vice President for Real Estate Analysis Corporation where he focused primarily on litigation support including tax appeal and eminent domain cases.

Mr. VanSanten is a Member of the Board of Directors of the Chicago Chapter of the Appraisal Institute, the General Experience Sub-Committee and the Property Use Classification System Committee of the Appraisal Institute, and the Institute of Professionals in Taxation. He is also an Advisor to the Real Estate Club at DePaul University and a Past President of the Chicago Real Estate Council.

**Managing Director**
Direct
+1.312.752.3384
Mobile
+1.312.714.7349
jvansanten@srr.com

**Education**

M.B.A.
DePaul University
*Finance and Real Estate*

B.A.
Augustana College
*Business and Economics*

**Professional Designations**

MAI – Appraisal Institute

MRICS – Royal Institute of Chartered Surveyors

Certified General Real Estate Appraiser
*Various states*



## G. STATEMENT OF QUALIFICATIONS

# Ryan T. Korth, MAI

Ryan T. Korth is a Vice President in the real estate practice within the Valuation & Financial Opinions Group. His concentration is in real estate valuation and advisory services. Mr. Korth is responsible for management, client liaison, and appraisal production.

Mr. Korth's experience includes assignments completed in over 30 states as well as various international locations throughout Europe, Asia, and Mexico. His experience includes engagements for local, national, and international clients for a variety of purposes including purchase price allocation, asset impairment testing, financing, estate and gift taxation, ad valorem taxation, marital dissolution, property insurance placement purposes. Of these assignments, many have been multiple-property portfolios.

Mr. Korth has appraised numerous property types, including, but not limited to, industrial facilities of various types, multi-family complexes, general and medical office buildings, freestanding retail buildings, neighborhood shopping centers, full-service and limited-service hotels, golf courses, and vacant land. In addition, he has significant specialized experience in the valuation of healthcare related properties including skilled nursing facilities, assisted living facilities, continuing care retirement communities (CCRCs), hospitals, surgery centers, and medical office buildings. Among the numerous healthcare related assignments, many have involved the determination of Fair Market Rent for Stark Compliance purposes.

Mr. Korth is licensed as a certified general real estate appraiser in the states of Michigan, Illinois, Indiana, and Wisconsin. Additionally, he is a designated member of the Appraisal Institute.

**Vice President**
**Direct**
**+1.312.752.3387**
**Mobile**
**+1.312.771.3925**
**rkorth@srr.com**

**Education**

B.S.
Oakland University
*General Management*

**Professional Designations**

MAI – Appraisal Institute

Certified General Real Estate Appraiser

Valuation & Financial Opinions

