IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SEMIR D. SIRAZI, GREENSTONE                )
CAPITAL L.L.C. and MARDINI, INC.,          )
                                            )
                Plaintiffs,                 )   Case No. 1:12-CV-00653
                                            )
        v.                                  )   Judge William T. Hart
                                            )
GENERAL MEDITERRANEAN                       )
HOLDING, SA, ORIFARM, SA, and               )
NADHMI AUCHI,                               )
                                            )
                Defendants.                 )

**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A
MATTER OF LAW OR IN THE ALTERNATIVE FOR NEW TRIAL**

# TABLE OF CONTENTS

**Page**

Background ...........................................................................................................................1

Argument .............................................................................................................................2

I. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' REMAINING CLAIMS. ...................................................2

    A. Judgment as a matter of law should be entered in favor of Defendants on the civil conspiracy claim. ...................................................................2

    B. Plaintiffs' tortious interference claim fails as a matter of law. ...............5

        1. Plaintiffs failed to prove a breach of the underlying Settlement Agreement. ...................................................................5

        2. Defendants had no knowledge of the pertinent provisions of the Settlement Agreement. ...............................................................6

        3. Defendants did not induce or incite Mr. Rezko to breach the Settlement Agreement. ...............................................................9

        4. Defendants' actions were not the proximate cause of Plaintiffs' alleged damages. ...................................................................9

    C. Plaintiffs' unjust enrichment claim fails as a matter of law...................11

    D. Punitive damages were not warranted on the evidence presented. ........12

II. A NEW TRIAL IS WARRANTED.................................................................13

    A. A new trial or remittitur is warranted on the grounds the jury's verdict was excessive. ...................................................................14

    B. Plaintiffs' reliance on discredited agency theories to introduce improper arguments prejudiced Defendants and warrants a new trial. ..................16

    C. Plaintiffs' references to "fraud," "concealment," and "schemes" at trial prejudiced its outcome. ...................................................................18

    D. The Court's exclusion of rebuttal evidence warrants a new trial...........19

Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, defendants General Mediterranean Holding, SA ("GMH"), Orifarm, SA ("Orifarm"), and Nadhmi Auchi (collectively, "Defendants") renew their motion for judgment as a matter of law and, in the alternative, move for a new trial, remittitur, and/or amendment to the judgment. Judgment as a matter of law should be entered against Plaintiffs on the remaining three claims – civil conspiracy, tortious interference, and unjust enrichment – because they are not supported by the evidence.

## BACKGROUND

In May 2006, Semir Sirazi entered into a Settlement Agreement with Tony Rezko regarding $17 million in defaulted, unsecured debt, virtually all of it junk fees and default interest accruing at a rate of 40 percent, compounded monthly. Mr. Rezko agreed to provide Mr. Sirazi with a security interest in distributions from his Heritage shares, but not the shares themselves. Within two months, Mr. Rezko defaulted again. Over the next two years, Mr. Sirazi did absolutely nothing to protect his security interest.

GMH subsequently acquired the majority of Mr. Rezko's Heritage shares in two separate transactions that closed in July 2007 and February 2008. Through this litigation, Mr. Sirazi has sought to turn GMH and its chairman, Mr. Auchi, into Mr. Rezko's personal guarantors, simply because GMH bought some of Mr. Rezko's shares. Notably, Plaintiffs did not sue the other 30 people who purchased shares. At the close of Plaintiffs' case, the Court dismissed Plaintiffs' fraud claim, but permitted the claims for civil conspiracy, tortious interference, and unjust enrichment to proceed. Defendants renew their motion for judgment as a matter of law as to these claims.

**ARGUMENT**

**I.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' REMAINING CLAIMS.**

Plaintiffs' claims have no legally sufficient evidentiary basis, and Defendants are entitled to judgment as a matter of law.  *See Winters v. Fru-Con, Inc.*, 498 F.3d 734, 745-46 (7th Cir. 2007).  Plaintiffs' civil conspiracy and unjust enrichment claims cannot survive after the dismissal of the underlying fraud that Plaintiffs failed to prove at trial.  To the extent Plaintiffs contend their civil conspiracy claim is predicated on a statutory violation, they are wrong as a matter of law.  Similarly, Plaintiffs' tortious interference claim fails because there was no underlying breach of contract, and Plaintiffs failed to prove Defendants' knowing interference with their non-existent contract rights.  Finally, the punitive damages awarded by the jury lack any rational basis and are legally deficient.

**A.    Judgment as a matter of law should be entered in favor of Defendants on the civil conspiracy claim.**

Civil conspiracy is "not an independent tort."  *Indeck N. Am. Power Fund L.P. v. Norweb, PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000).  Where a plaintiff's underlying tort claim fails, "the claim for a conspiracy also fails."  *Id.*  Here, Plaintiffs' conspiracy claim falls with their fraud claim, which has already been dismissed.  The Court reserved ruling on this issue at trial (Tr. 847:2-3), but should now enter judgment as a matter of law.

Plaintiffs will presumably fall back to their secondary argument that Defendants conspired with Mr. Rezko to violate Section 315.01 of Article 9 of the Uniform Commercial Code ("Section 315.01"), which defines certain conduct as a Class 3 felony.  This theory too fails as a matter of law.  Section 315.01 is not an underlying "tort"; and it does not provide for a private cause of action, much less one that could support a conspiracy claim.  *See, e.g., Champion Parts, Inc. v. Oppenheimer & Co.*, 878 F.2d 1003, 1007-08 (7th Cir. 1989) (Illinois

civil conspiracy claim requires an underlying tort; Illinois law does not recognize a cause of action for conspiracy to violate statutory rights); *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 500 (S.D. Ill. 1999) ("The criminal statutes, which do not create a private right of action, are not a valid basis for civil conspiracy liability in most states."); *Scott v. Aldi, Inc.*, 703 N.E.2d 526, 529 (Ill. App. Ct. 1998) (noting that the purpose of a civil conspiracy claim is to extend tort liability); *Galinski v. Kessler*, 480 N.E.2d 1176, 1179 (Ill. App. Ct. 1985) (finding no implied private right of action in barratry statute and dismissing conspiracy claim).

In *CSY Liquidating Corp. v. Harris Trust & Sav. Bank*, the Seventh Circuit considered this very question: "whether the tort of conspiracy can be used to create the very remedy for a statutory violation that the legislature did not want created, provided only that the defendant committed the violation in concert with someone else." 162 F.3d 929, 931 (7th Cir. 1998). The Seventh Circuit noted that doing so would put it "on a collision course with legislative intent." *Id.* "We doubt that [civil conspiracy] has so ambitious an office." *Id*.

Even if Section 315.01 could in theory support a civil conspiracy claim, Plaintiffs failed to adduce sufficient evidence that Mr. Rezko violated it. Section 315.01 bars a debtor from "willfully and wrongfully" failing to pay proceeds from the sale of encumbered property to a creditor within 10 days, but only in two limited circumstances: (a) where the debtor has "no right of sale" under the security agreement, or (b) the security agreement requires debtor to "account" to the secured party for all proceeds **and** the debtor fails to pay the amounts due under the security agreement. 810 ILCS 5/9-315.01 (2001).

Plaintiffs failed to adduce sufficient evidence that either circumstance applies on these facts. The Settlement Agreement did not prohibit sales. To be sure, it actively encouraged sales through the Offering (*see* JX100 § 4(a)), and simply required consent for other types of sales

(JX100 § 5(d)(iii)). Likewise, the Settlement Agreement did not require Mr. Rezko to "account" for any sales or pay any proceeds over to Mr. Sirazi, unless and until Mr. Rezko collected at least $14.25 million in Distributions and paid them to other creditors in his "sole discretion." (JX100 § 4(b)).

Plaintiffs' suggestion at closing that this waterfall provision terminated upon default is baseless. The parties did not agree to make the waterfall provision "subject to" the default provisions; and the "Remedies upon Default" do not purport to cut off the waterfall or include an alternative payment structure. (*Compare* JX100 § 12 (explaining Plaintiffs' "Remedies upon Default"), *with* JX100 § 4(d) (confirming Plaintiffs' right to accelerate debt, but not modify the waterfall, in event of default)).

There was also insufficient evidence of any "agreement" to violate Section 315.01, especially under the applicable clear and convincing standard. *See McClure v. Owens Corning Fiberglass Corp.*, 720 N.E.2d 242, 258 (Ill. 1999). Defendants could not have entered into an agreement to violate Section 315.01 because: (a) for the reasons set forth above, Mr. Rezko did not have that obligation; (b) there was no evidence Defendants were ever told by anyone that Mr. Rezko had an obligation to pay proceeds to Mr. Sirazi; (c) Defendants were told by Mr. Rezko, Freeborn & Peters, and Kirkland & Ellis the Heritage shares were "unencumbered" as of the July 2007 Transaction; (d) Defendants were told Mr. Sirazi's security interest was in "Distributions" – not "proceeds" – and was invalid; and (e) there was no evidence Defendants were told what Mr. Rezko planned to do with the funds once paid. (Tr. 185:4-19; 265:14-24; 434:14-18; 501:12-24; 585:21-586:23; 586:24-587:12; 591:22-593:3); *see also McClure*, 720 N.E.2d at 258 ("Accidental, inadvertent, or negligent participation in a common scheme does not amount to conspiracy. . . . Mere knowledge of the fraudulent or illegal actions of another is also not enough

to show a conspiracy" because "[a] defendant who innocently performs an act which happens to fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy.").

Finally, GMH's wire transfer to Mr. Rezko's counsel, at Mr. Rezko's direction, is not a sufficient act in furtherance of a conspiracy. Sending funds to counsel was effectively the same as sending it to Mr. Rezko, which GMH was unequivocally entitled to do. (Tr. 355:18-356:2.)

**B.      Plaintiffs' tortious interference claim fails as a matter of law.**

Plaintiffs' tortious interference claim is predicated on the allegation that Defendants "incited" two breaches of the "Secured Collateral" provisions in Section 5 of the Settlement Agreement: (1) Mr. Rezko's "failure" to pay proceeds from those shares over to Mr. Sirazi once they were sold; and (2) Mr. Rezko's "failure" to obtain Mr. Sirazi's consent prior to selling Heritage shares. (*See* D.E. 496 at 24 (Jury Instruction describing "pertinent provisions").) This claim fails as a matter of law because (1) there was no underlying breach; (2) Plaintiffs failed to prove Defendants acted with the requisite knowledge or intent; (3) Plaintiffs failed to prove that Defendants "incited" Mr. Rezko to do anything; and (4) there is no proximate causation between the alleged interference and Plaintiffs' damages.

1.      Plaintiffs failed to prove a breach of the underlying Settlement Agreement.

As an initial matter, there has been no actionable breach of Section 5 of the Settlement Agreement because Plaintiffs did not issue a default notice or otherwise provide Mr. Rezko with an opportunity to cure, both of which – as Mr. Sirazi's own counsel conceded at trial – were necessary conditions to declaring a default under Section 5. (Tr. 303:20-305:22.) Because Plaintiffs did not perform their obligation to provide the requisite notice and opportunity to cure,

their contract-based claim fails as a matter of law.[1]  *Aeroground, Inc. v. Centerpoint Props. Trust*, No. 10-cv-652, 2013 WL 1437730, at *5 (N.D. Ill. Apr. 9, 2013).

In addition, the Settlement Agreement did not require Mr. Rezko to pay over the proceeds to Mr. Sirazi in the first place.  If Plaintiffs had wanted to ensure they received the "Distributions," all they had to do was foreclose and take them.  Plaintiffs were fully aware of their post-default UCC remedies.  They were referenced in the July 2006 payment default letter; and their counsel testified he knew of Plaintiffs' post-default UCC right to, among other things, foreclose in as little as 21 days, take direct title to the distributional interests, and/or issue notices to Heritage, GMH, and others to pay Mr. Sirazi directly any distributions otherwise due to Mr. Rezko.  (JX76; Tr. 267:3-269:8; 312:20-22.)  Plaintiffs simply chose not to exercise those remedies in the two years after they called a payment default in July 2006.  (Tr. 176:7-20.)  If they had done so, they would have eliminated – not just mitigated – their damages because any payments would have come directly to Plaintiffs.  *Cf. Estate of Escobedo v. Martin*, 702 F.3d 388, 403-05 (7th Cir. 2012) (affirming judgment as a matter of law on defendants' affirmative defense).

## 2.    Defendants had no knowledge of the pertinent provisions of the Settlement Agreement.

Plaintiffs also failed to meet their burden to prove Defendants' knowledge of the two provisions in Section 5 or Defendants' intent to induce.  Turning first to the consent provision, Plaintiffs adduced no evidence whatsoever that Defendants were provided a copy of the Settlement Agreement or otherwise made aware of the consent provision.  In fact, Plaintiffs effectively admitted this glaring hole in their case at closing when their counsel cited as the sole

---

[1] It is undisputed that Mr. Sirazi issued one – and only one – default letter, on July 18, 2006, and then never spoke to Mr. Rezko substantively again.  (Tr. 296:16-22; 305:4-22.)  None of the payment defaults listed in that letter form the basis for Plaintiffs' claims in this case.

basis of GMH's knowledge an internal email that Heritage's counsel Ed Wynn sent to Heritage's CEO Michael Rumman in August 2006. (Tr. 858:17-19.) But it is undisputed that this email, PX28, was never forwarded to GMH. No witness testified that Mr. Sirazi's consent rights were otherwise mentioned to GMH, including at the October 2006 call or in the October 25th "Strategy to Unencumber Heritage" memorandum on which Plaintiffs based their case. (*See* JX15; JX16; Tr. 47:2-50:3; 857:19-858:9; 899:25-901:14.)

Plaintiffs may still cling to the argument that Mr. Wynn, Mr. Rumman, and even Mr. Rezko's knowledge and actions should be attributed to GMH under an agency theory and thus they need not show GMH had actual knowledge of the contract provisions. That is poppycock. Defendants moved to exclude Plaintiffs' agency theory prior to trial as unsupported by the evidence and prejudicial. Though the theory was presented to the jury, it was not supported by evidence. Mr. Wynn was never called to the stand, and Plaintiffs asked Mr. Rumman no agency-related questions. (Tr. 779:14-781:25.) To the extent Plaintiffs point to Mr. Al-Miqdadi's testimony, it was patently insufficient to establish that Wynn, Rumman, or Rezko were agents of GMH. While GMH had a mutuality of interest with the property manager Heritage, GMH had no control over its employees. (Tr. 383:6-13; 490:12-14; 490:15-492:22.)

Plaintiffs also failed to establish that GMH had knowledge of Mr. Rezko's purported obligation to pay to Mr. Sirazi the proceeds of any sale of Heritage shares or intended to cause its breach. As set forth above, no such provision exists in the Settlement Agreement. But even if it did, there was no evidence that its existence was communicated to GMH. It is not referenced in the agenda for the 2006 Conference Call or the October 25th Strategy Memo; and no witness testified this information was conveyed to GMH. (JX15; JX16; Tr. 184:4-185:20; 265:14-24; 400:2-25; 434:14-24.) As Plaintiffs repeatedly pointed out, GMH was only told: "Mr. Rezko

granted to Mr. Semir Sirazi a security interest in his Heritage distributions . . . pursuant to a Settlement Agreement . . . MT did not consent to this transaction." (JX15 at 2-3.) Of course, the default rule is that a debtor is free to use collateral proceeds as he sees fit unless the lender forecloses and takes title. Thus, even if GMH knew Mr. Sirazi held a security interest in distributions, GMH could not have known it required Mr. Rezko to pay him all sale proceeds.

Indeed, there was insufficient evidence that GMH knew Mr. Sirazi still held a security interest of any sort at the time of the July 2007 Transaction. In October 2006, GMH was told Mr. Sirazi's security interest in distributions was invalid. (Tr. 503:21-24.) In the intervening nine months, Freeborn & Peters, Kirkland & Ellis, and Mr. Rezko all confirmed in writing the Heritage shares GMH was purchasing were "unencumbered." (Tr. 510:9-512:24; 585:21-586:23; 586:24-587:12; 591:22-593:3.) Though an "unofficial" copy of Exhibit A to Mr. Sirazi's Financing Statement appeared in a UCC search ordered by Attorney John Doe on February 6, 2008 (*see* PX379 at R023047), that document is irrelevant to the July 2007 Transaction, which makes up all but $3.8 million of Plaintiffs' damages claim.[2]

Also irrelevant to the July 2007 Transaction is John Doe's January 31, 2008 email to Mr. Al-Miqdadi regarding Mr. Rezko's arrest warrant. (PX380.) Mr. Al-Miqdadi did not recall receiving or reviewing the email, which in any event only contained the first 13 pages of the warrant. (Tr. 472:25-473:4.) No evidence was offered that anyone at GMH received the two

---

[2] The UCC search does not establish the requisite knowledge as to February 2008 either because: (1) no official copy of Exhibit A was included and thus the filing remained defective; (2) Exhibit A contains no direction that proceeds be paid to Mr. Sirazi, it simply states he holds a security interest in "distributions"; (3) as Mr. Gertz reluctantly confirmed at trial, the consent requirement could have been, but was not, included in Exhibit A (Tr. 290:20- 291:24); (4) Mr. Rezko's criminal counsel had already confirmed to GMH there was no order precluding GMH from sending funds to Mr. Rezko's attorneys (JX110); and (5) there was no evidence that PX379 was obtained by GMH's counsel, much less reviewed, prior to the February 11, 2008 closing [February 6th is merely the order date].

pages (20 and 21) referencing the Settlement Agreement. In any event, the warrant does not reference a "consent" provision; and it does not reference a requirement that Mr. Rezko pay over all proceeds of sales to Mr. Sirazi. At best, it states a dispute may arise between creditors over competing security interests. (PX240 at 21.)

3. Defendants did not induce or incite Mr. Rezko to breach the Settlement Agreement.

There was insufficient evidence that GMH incited Mr. Rezko to breach the Settlement Agreement. Mr. Rezko had been in breach of his obligations to Mr. Sirazi continuously since October 2003 – a period of four years – before GMH ever became involved. (*See* PX354.) With regard to proceeds from the sale of shares, Mr. Rezko entered into at least 30 other transactions – both before and after the July 2007 Transaction – in which he sold Heritage shares. (Tr. 178:19-23; 180:23-181:2.) Mr. Rezko did not pay any proceeds from these sales to Mr. Sirazi either. Moreover, it was Mr. Rezko who directed GMH what to do with the purchase money in "direction letters," not the other way around. (*See* PX276.) And Mr. Rezko and Mr. Al-Miqdadi both testified that what Mr. Rezko did with the funds after they were paid was up to him. (Tr. 501:12-24; Rezko Tr. 59:22-61:9.)

4. Defendants' actions were not the proximate cause of Plaintiffs' alleged damages.

Tortious interference damages "are necessarily limited to damages proximately caused by the act of interference and do not extend to any other breach of the contract that the contracting party happened to commit." *Palla v. Bio-One, Inc.*, 424 S.W.3d 722, 726 (Tex. App. 2014). In other words, a defendant cannot be held liable for a breach he did not induce. Here, Mr. Rezko breached his Settlement Agreement by failing to make required payments in July 2006, and had been in perpetual breach of its predecessor agreements since October 2003. (*See* JX76; PX354.)

Thus, before GMH ever became involved, Mr. Rezko owed Plaintiffs millions of dollars on a defaulted contract that he could not repay.

As an initial matter, the amount Mr. Rezko owed to Mr. Sirazi under the Settlement Agreement could have been no more than $7.9 million. The Republic Bank Loan, which makes up $5 million of Plaintiffs' contract claim, was paid off in full by Mutual Bank; and the Settlement Agreement was not amended to make the "Mutual Bank Loan" an obligation under the Settlement Agreement. (Tr. 301:6-302:16.) Even Mr. Sirazi's own counsel, Mr. Gertz, confirmed at trial that the Mutual Bank Loan was a "new note" and not an "assignment" of the Republic Bank Loan that might be covered by the Settlement Agreement.[3]

Regardless of the amount, it was not GMH who caused Mr. Rezko to default or to owe Mr. Sirazi money, yet this is the exact same damages that Plaintiffs seek to recover from GMH. Plaintiffs and their damages expert simply assumed at trial that their breach of contract damages were the same as their tortious interference damages. Plaintiffs took a document they labeled "Summary of Amounts Owed Under the Settlement Agreement" – which sets forth virtually the same amounts Mr. Rezko owed as of the July 2006 default notice – and rechristened it their "damages" calculation. (*See, e.g.*, Tr. 878:3-16 (describing "damages" as the PX330 Summary).) Plaintiffs did not offer any evidence that Defendants' actions somehow increased the amounts Mr. Rezko owed or caused his payment default.

To the extent Plaintiffs argue Defendants did not proximately cause Mr. Rezko to owe them money, but rather caused Mr. Rezko not to pay amounts owed, there is still insufficient evidence to support the jury's verdict. Mr. Rezko decided what to do with his money (PX276);

---

[3] This $7.9 million amount should operate as a hard cap on Plaintiffs' damages in this case. To the extent the Court has held otherwise, it would be reversible error under a plain reading of the contract.

and, in any event, the Settlement Agreement did not require Mr. Rezko to pay Mr. Sirazi directly from proceeds of Heritage shares. Section 4(b) contains the Settlement Agreement's waterfall provision. (JX100 § 4(b).) Under Section 4(b), up to $14.25 million in Distributions (and proceeds) were to go to any creditors selected by Mr. Rezko in his "sole discretion" before Sirazi was paid a penny. Because the proceeds were significantly less than this amount – $3.8 million – Plaintiffs would never have received a cent absent exercising foreclosure remedies.[4]

### C. Plaintiffs' unjust enrichment claim fails as a matter of law.

As set forth in Mr. Auchi's renewed Rule 50(b) motion, because the Court disposed of Plaintiffs' predicate fraud claim, Plaintiffs' unjust enrichment claim falls with it. (D.E. 500 (citing *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).) In addition, GMH and Orifarm were not and could not have been unjustly enriched because they did not receive any "proceeds" from the sale. GMH was the purchaser, not the seller of the Heritage shares. GMH paid the proceeds to Rezko to acquire them; it did not receive proceeds.[5] (D.E. 500 (citing 810 ILCS 5/9-102(a)(64) (2014).)

---

[4] Plaintiffs' failure to come forward with a written loan history reflecting principal, fees, interest, and credits – the only admissible, non-hearsay evidence of loan amounts owed – is likewise fatal to their claims. *Cf. In re Holstein, Mack & Klein*, No. 97 B 29997, 2000 WL 343795, at *7 (N.D. Ill. Mar. 31, 2000). Mr. Sirazi's oral recollection was hearsay, unreliable, and insufficient to support the verdict. For instance, if a loan history had been produced, it presumably would have reflected the $524,000 in payments Plaintiffs had already received from Mr. Rezko. Yet Plaintiffs' own expert admitted he had not even heard about this offset. (Tr. 675:25-676:2.)

[5] Plaintiffs also argue that debt forgiveness somehow constitutes proceeds retained by GMH. The argument is nonsensical and unsupported by the evidence. Again, GMH was the purchaser. It sent debt forgiveness to Mr. Rezko, and received in exchange the Heritage shares – not money or debt forgiveness. If Plaintiffs' unjust enrichment claim had sought the return of the Heritage shares – or even their monetary equivalent – then the claim might make sense. But Plaintiffs long ago abandoned any claims based on the return or value of the Heritage shares, and actively sought to exclude this evidence at trial.

**D.  Punitive damages were not warranted on the evidence presented.**

Whether to submit punitive damages to the jury is a question of law for the trial court. *Kempner Mobile Elecs. Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 714 (7th Cir. 2005).  Punitive damages are not favored under Illinois law.  *See Europlast, Ltd. v. Oak Switch Sys., Inc.*, 10 F.3d 1266, 1276 (7th Cir. 1993).  Illinois allows punitive damages only when misconduct is "outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others."  *Styx v. Wells Fargo Bank, N.A.*, No. 09 C 5960, 2010 WL 1253971, at *3 (N.D. Ill. Mar. 24, 2010).  In the absence of this evidence, the jury should not be permitted to measure punitive damages.  *See Europlast*, 10 F.3d at 1277 (reversing punitive damage award due to "little if any evidence of 'gross,' 'wanton' or 'malicious' conduct").

Here, Plaintiffs did not meet the high punitive damages threshold; and the award is against the weight of the evidence.  GMH did not act maliciously or outrageously.  To the contrary, GMH had a legitimate purpose in buying Mr. Rezko's shares: removing him from ownership to permit development of the Property once he had been indicted.  It is also undisputed that GMH was told that Mr. Sirazi's security interest in distributions was invalid. (Tr. 507:22-25.)  This alone is enough to warrant reversal of the punitive damage award.  *See Jeppesen v. Rust*, 8 F.3d 1235, 1237 (7th Cir. 1993) (reversing punitive damages award where plaintiff's "principal contention" was that defendants violated the terms of a joint venture and defendants denied the existence of the joint venture).  In addition, two law firms, Kirkland & Ellis and Freeborn & Peters, confirmed to GMH the shares were unencumbered.  (JX83; Tr. 504:15-505:8.)  And Mr. Rezko personally represented and warranted he owned the Heritage shares free and clear.  (Tr. 511:12-22.)

Even if punitive damages were otherwise appropriate, Plaintiffs' unjust enrichment claim cannot support them. The jury awarded $5 million in punitive damages against Mr. Auchi in connection with Plaintiffs' unjust enrichment claim, though that equitable theory cannot support a punitive damages award and must be reversed. One must also reasonably assume the jury awarded $5 million in punitive damages against GMH – the same figure – under that same unjust enrichment theory, and not on the other counts. Because an unjust enrichment claim cannot support punitive damages, the award should be reversed.

## II.    A NEW TRIAL IS WARRANTED.

In the alternative, Defendants are entitled to a new trial under Rule 59 because the jury's verdict was excessive and bears no rational relationship to Plaintiffs' legal claims.[6] Further, Plaintiffs relied on an agency theory, which they never tied up, to make improper arguments that prejudiced Defendants. Defendants were also prejudiced by Plaintiffs' references to "fraud," "concealment," and "schemes," despite their fraud claim being dismissed. In addition, Defendants were not permitted to introduce critical evidence refuting Plaintiffs' theories.

Under Rule 59, the Court may order a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Courts enjoy a greater degree of discretion when ruling on motions for a new trial than when ruling on motions for judgment as a matter of law. *See, e.g.*, *Plyler v. Whirlpool Corp.*, 751 F.3d 509, 513 (7th Cir. 2014) (indicating that "[o]ur review of a decision denying a

---

[6] At a minimum, a jury award must be set aside or reduced if it is not supported by the evidence. *See Avitia v. Metro. Club of Chi., Inc.,* 49 F.3d 1219, 1229 (7th Cir. 1995). "Judges and juries must not be casual with other people's money." *Id*. The Seventh Circuit "take[s] seriously the responsibility of an appellate court to review the sufficiency of the evidence to support the award of damages." *Id*. If a damages award is not rationally connected to the evidence, then either the district court or an appellate court can order a remittitur, if the plaintiff is willing to accept it, or a new trial if the plaintiff is unwilling to accept the reduced award. *Int'l Fin. Servs. Corp v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 739 (7th Cir. 2004).

new trial is 'extremely deferential'"). Instead of merely inquiring into the sufficiency of the evidence, the court may grant a motion for a new trial if it determines that, for any reason, the trial was not fair to the movant. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 250 (1940).

A.     **A new trial or remittitur is warranted on the grounds the jury's verdict was excessive.**

In the alternative to granting judgment as a matter of law, the Court should issue a remittitur or order a new trial because there is no rational nexus between Plaintiffs' claims and the amount of damages awarded. Because a general verdict form was used, it is impossible to determine how the jury allocated the compensatory damages amongst the various counts. That said, none of the claims could have supported the damages awarded.

With regard to civil conspiracy, the underlying "unlawful conduct" cited by Plaintiffs in support of this claim is a provision of the UCC that contemplates a $10,000 civil fine and no private cause of action. To the extent the $12.9 million verdict is attributable to this claim, it is grossly excessive, at least 1,290 times what the primary violator's penalty would be.

Plaintiffs' unjust enrichment claim fell with their fraud claim. But even if it did not, a $12.9 million award is grossly excessive. Plaintiffs deliberately chose not to offer any evidence of the value of the shares GMH acquired; and, for the reasons set forth above, any other measure of damages is nonsensical and unsupported.[7]

Plaintiffs' tortious interference damages are excessive because they made no effort at trial to parse them from their breach of contract damages, simply assuming that both could and should be treated as one and the same. (*See, e.g.*, Tr. 878:3-16 (describing "damages" as the PX330

---

[7] Even if one were to consider the debt forgiveness provided to Mr. Rezko as "retained" by GMH, Plaintiffs offered no evidence of its "value." Plaintiffs will claim it should be valued at the number recorded on GMH's books, but both Mr. Al-Miqdadi and Plaintiffs' expert confirmed this was simply the "cost," not the value, of the debt. (Tr. 643:6 (Polash: GMH "recorded [debt forgiveness] at their *cost* of $31.8 million") (emphasis added); Tr. 521:18-23.)

Summary).) But they are not the same. Mr. Rezko breached his contract with Mr. Sirazi in July 2006 and owed him approximately $7.9 million as of that date – well before GMH is alleged to have done anything. Absent evidence of proximate cause, the jury's compensatory damage award based on that figure (plus the $5 million Mutual Bank loan) is grossly excessive.

In any event, Plaintiffs' overall damages should be capped at no more than $3.8 million – the proceeds from the February 2008 Transaction. As noted above, Plaintiffs' evidence of knowledge and intent boils down to a couple of 2008 documents from John Doe's files. For the reasons set forth above, those emails are insufficient to support any judgment. But even Plaintiffs concede those emails could only be relevant to the February 2008 Transaction. (*See* Tr. 935:13-15 ("So this is January, right? So this is after they close the first transaction but before the second, right? So they still have a chance, maybe, to do the right thing.").) Accordingly, any damages based on the July 7, 2007 Transaction, all but $3.8 million, are *per se* excessive.

Pursuant to Rule 59(e), the verdict must also be reduced by $524,093.84, in the event it is not set aside in its entirety or the case retried. It is undisputed that Plaintiffs received $524,093.84 from Mr. Rezko's bankruptcy estate. (*See* PX374; PX375; PX376.) This represents an offset against Plaintiffs' claims, yet it is clear that neither Plaintiffs' expert William Polash nor the jury took this figure into account. (*See* Tr. 675:25-676:2 ("I was not aware of that . . . .").) The $12.9 million compensatory verdict reflects the amounts Plaintiffs claim they were owed under the Settlement Agreement, less the $5 million in interest Plaintiffs were seeking but which the jury declined to award. (*See* PX330.) This number must be reduced further – by $524,093.84 – to reflect amounts received by Plaintiffs and to prevent a double recovery. (*See* Tr. 563:1-4 (Plaintiffs' counsel: "we are prepared to offset that at the close of

trial . . . .").)  Otherwise, there is no rational nexus between the evidence presented and the jury award.

### B. Plaintiffs' reliance on discredited agency theories to introduce improper arguments prejudiced Defendants and warrants a new trial.

In their trial brief, Defendants moved to bar Plaintiffs from claiming Messrs. Rezko, Wynn, and Rumman were GMH's agents because the theory was not borne out by any evidence in the case and had not been pled in Plaintiffs' complaint.  (*See* D.E. 480 at 2-4.)  The Court effectively denied Defendants' requested relief and adopted Plaintiffs' general jury instruction on agency over Defendants' objection, leaving it for the jury to decide who was an agent of whom.[8] (D.E. 496 at 17.)

Plaintiffs then abused this broad Agency Instruction to make closing arguments that blatantly ignored the underlying law and other applicable jury instructions, presumably under the erroneous premise that Mr. Rezko's knowledge and actions could be attributed to GMH as an agent.  For instance, Plaintiffs bore the burden at trial of proving Defendants induced a breach of Rezko's obligation to pay proceeds of Heritage share sales over to Mr. Sirazi ***once he received them***.  (*See* D.E. 496 at 24 (requiring "***Rezko pay*** plaintiffs proceeds from Rezko's sale of his Heritage or MT Property ownership interests.") (emphasis added).)  This makes sense.  A purchaser pays the seller for the goods it buys.  A buyer is not required to pay the seller's lender, even if the buyer knows the seller holds the goods subject to a security interest.  During rebuttal, Plaintiffs' counsel sought to turn this instruction on its head, misstating the law to argue GMH

---

[8] To the extent an agency instruction was appropriate, Defendants submit it should have been the more narrow construction offered by Defendants.  That instruction clarified: (1) it is Plaintiffs' burden to prove an agency relationship, and (2) control is a necessary predicate to finding an agency relationship.  (Docket 452 at 39.)  The instruction given did not affirmatively state control is a necessary element of agency, but rather cryptically suggested the "exercise" of control was not required to find an agency relationship.  (D.E. 496 at 17.)

owed a direct obligation to Mr. Sirazi and effectively merging GMH's obligations with Mr. Rezko's

> When that deal was done and the proceeds were created, those proceeds belonged to Mr. Sirazi. So it is not a matter of GMH just throwing them out in the air and saying, hey, I don't know . . . your [Rezko's] contractual obligation. If you want to violate the law, that's okay with you. That's not how it works. . . . The wrongful conduct on GMH's part occurred at that very moment when those proceeds were created.

(Tr. 929:20-930:8.) But GMH had every right to pay Mr. Rezko, the seller, for the shares it purchased. That is exactly "how it works." GMH could also have thrown the proceeds "out in the air" and told Mr. Rezko to do whatever he wanted with them, as long as it did not knowingly incite him to breach his contract.

Plaintiffs turned to agency arguments to plug the other glaring hole in their case as well: the fact that none of the Defendants ever saw the Settlement Agreement, the breach of which they are alleged to have induced. For instance, Plaintiffs introduced an August 2006 Wynn Email, PX28, that was never sent to or received by any party to this case. The premise of the Court's ruling admitting this exhibit into evidence prior to trial was that Plaintiffs would meet their burden to establish agency and tie up the admissibility of this and other documents – which are otherwise inadmissible hearsay – by demonstrating Wynn and Rumman were GMH's agents. But, as noted above, Plaintiffs failed to meet this burden.

The bottom line is that Plaintiffs' failure to tie up their agency theory led to the admission of myriad emails (including PX28) and other improper arguments that served as the only possible basis for finding GMH had the requisite knowledge or intent to commit a tort. The improper admission of this evidence prejudiced Defendants. If judgment as a matter of law is

not granted, a new trial is required where Plaintiffs must prove the elements of their claims based on GMH's direct knowledge and actions, not inadmissible innuendo and hearsay.

### C. Plaintiffs' references to "fraud," "concealment," and "schemes" at trial prejudiced its outcome.

On May 26, 2015, Defendants moved *in limine* to bar Plaintiffs from introducing at trial a disclosure-based fraud theory they had recently espoused. (*See* D.E. 448.) In a May 29, 2015 pretrial order, the Court reserved ruling on Defendants' motion to exclude this argument and supporting evidence. (D.E. 468.) Nevertheless, Plaintiffs chose to make fraud the centerpiece of their case and the focus of their opening statement to the jury, presumably in an effort to color the jury's view of Defendants. Plaintiffs argued GMH worked with Rezko in a "scheme" and "fraud" to "conceal" facts from Mr. Sirazi. (Tr. 53:6-17.)

Before the case went to the jury, the Court granted Defendants' Rule 50(a) motion and dismissed Plaintiffs' fraud claim on the grounds that Mr. Rezko owed no disclosure duties to Mr. Sirazi and thus could not have actionably concealed facts from him. (D.E. 488.) Unfortunately, the horse had already left the barn. Plaintiffs' statements about fraud, concealment, and schemes appear to have affected the outcome of the case and prejudiced Defendants. This is reflected in the large punitive damage award – $10 million – that is untethered to the claims that were actually presented to the jury. Mr. Auchi is a perfect example. The remedy for unjust enrichment is simply the return of an unjustly obtained benefit. Nevertheless, the jury assessed a $5 million punitive damage award against Mr. Auchi, while dismissing the intentional tort claims asserted against him.

To order a new trial based on the admission of improper evidence, there need only be "a significant chance . . . that the ruling affected the outcome of the trial." *Smith v. Hunt*, 707 F.3d 803, 808 (7th Cir. 2013). Defendants have met that burden. There is a likelihood that references

to "fraud" and "schemes" colored the jury's view. The prejudice to Defendants might have been ameliorated if their request to instruct the jury had been granted, but it was denied. (Tr. 848:19-24.) A modified version of the Seventh Circuit's pattern instruction for "Withdrawal of Claims" probably would have sufficed. Accordingly, to the extent the remaining claims are not dismissed, Defendants respectfully request that they be retried to a jury in a trial where no prejudicial references to "fraud," "concealment," or "schemes" are permitted.

### D.    The Court's exclusion of rebuttal evidence warrants a new trial.

The Court excluded many of Defendants' exhibits directed to lack of intent and inducement. This evidence included: (1) Freeborn & Peters' written representations that the Heritage shares were "unencumbered," and that there were no other "economic interest holders" in Heritage (DX285; DX427; DX437; DX465); (2) Freeborn & Peters' representations to third parties at or around the time of the July 2007 Transaction that no further consent was required to sell Heritage shares (DX282; DX283); (3) deal documents reflecting Mr. Rezko's sale of Heritage shares to thirty other purchasers (DX472); (4) Kirkland & Ellis notes reflecting their knowledge of the very Sirazi Agreement that Plaintiffs argued was hidden from them (DX428); and (5) proof that GMH sought and obtained confirmation that the "funds [to purchase Rezko's shares in the February 2008 Transaction] may be disbursed pursuant to a letter of direction, and without a court order, *for any purpose*."[9]  (PX158 (excluded over parties' objections) (emphasis added).)

This evidence would have demonstrated that GMH acted prudently and rebutted claims of intent or inducement. Mr. Rezko did not need GMH's "incitement" to sell his Heritage shares. Mr. Rezko was already selling shares to third-parties before GMH acquired anything

---

[9] The Court also erred in excluding DX500, Mr. Gertz's UCC search that revealed his failure to attach Exhibit A to the UCC Financing Statement.

(DX465); and he continued to sell shares to tens of others between the July 2007 and February 2008 Transactions. This evidence confirms GMH and others were also repeatedly informed no further consent was required for Mr. Rezko to sell his shares once Mr. Rumman had been bought out. A new trial where these documents come into evidence is warranted.

The Court's preclusion of Defendants' justification, waiver, and laches defenses without explanation, in a *sua sponte* order, likewise warrants a new trial.

Wherefore, for the foregoing reasons, Defendants respectfully request that their motion for judgment as a matter of law be granted. In the alternative, a new trial should be ordered or a remittitur issued reducing Plaintiffs' damages to no more than $3.8 million, less the $524,093.84 Plaintiffs have already been paid: $3,275,906.16.

Respectfully submitted,

General Mediterranean Holding, SA
and Nadhmi Auchi

By     */s/ William J. Dorsey*
       Gil M. Soffer (ARDC # 6201959)
       William J. Dorsey (ARDC #6271181)
       KATTEN MUCHIN ROSENMAN LLP
       525 W. Monroe Street
       Chicago, IL  60661-3693
       Telephone:  (312) 902-5200
       gil.soffer@kattenlaw.com
       william.dorsey@kattenlaw.com

       *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, William J. Dorsey, an attorney, state that service of this notice and accompanying document(s) was accomplished upon the individual(s) listed above pursuant to Electronic Case Filing as to Filing Users and in compliance with LR 5.5 as to any party who is not a Filing User or represented by a Filing User on July 23, 2015.

*/s/ William J. Dorsey*
William J. Dorsey

109719332