IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SEMIR D. SIRAZI, GREENSTONE CAPITAL L.L.C. and MARDINI, INC., | ) ) ) | |
| Plaintiffs, | ) | Case No. 1:12-cv-00653 |
| v. | ) ) | Judge William T. Hart |
| GENERAL MEDITERRANEAN HOLDING, SA, ORIFARM, SA, and NADHMI AUCHI, | ) ) ) ) | |
| Defendants. | ) | |

## **VOL. 1 OF TRIAL EXHIBITS**

Plaintiffs hereby file the following trial exhibits, offered by one or more parties, for

inclusion in the record on appeal:

PX 3
PX 4
PX 7
PX 8
PX 9
PX 10
PX 18
PX 22
PX 24
PX 27
PX 28
PX 30
PX 31
PX 32
PX 34
PX 39
PX 50
PX 53
PX 66
PX 70
PX 71
PX 72
PX 79
PX 81

PX 87
PX 97
PX 101
PX 107
PX 116
PX 121
PX 122
PX 124
PX 125
PX 126
PX 127
PX 128
PX 131
PX 137
PX 145
PX 146
PX 147
PX 149
PX 150
PX 151
PX 162
PX 164
PX 166
PX 167
PX 168
PX 169
PX 170
PX 171
PX 173
PX 174

Gregory J. Scandaglia                        Respectfully submitted,
William J. Ryan
Michael S. Shapiro                           SEMIR D. SIRAZI, GREENSTONE
SCANDAGLIA & RYAN                            CAPITAL L.L.C. and MARDINI, INC.
55 E. Monroe Street, Suite 3440
Chicago, Illinois 60603
(312) 580-2020                               By:     /s/ Michael S. Shapiro
                                                     One of Their Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2015, a copy of the foregoing **VOL. 1 OF TRIAL EXHIBITS** was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

| | |
|---|---|
| Joseph D. Ryan | Patricia S. Spratt |
| Scott B. Dolezal | Shefsky & Froelich |
| Jonathan C. Huckabay | pspratt@taftlaw.com |
| Joseph D. Ryan, P.C. | |
| jryan@ryanlawoffices.com | |
| sdolezal@ryanlawoffices.com | |
| jhuckabay@ryanlawoffices.com | |
| | |
| Terrence J. Sheahan | Gil M. Soffer |
| Freeborn & Peters | William J. Dorsey |
| tsheahan@freebornpeters.com | Katten Muchin and Rosenman, LLP |
| | Gil.soffer@kattenlaw.com |
| | William.Dorsey@kattenlaw.com |

/s/ Michael S. Shapiro

Scandaglia & Ryan
55 East Monroe Street, Suite 3440
Chicago, Illinois 60603
Phone: (312) 580-2020
Fax: (312) 782-3806
E-mail: mshapiro@scandagliaryan.com

Name of Offeree: _____     No. _____

## HERITAGE DEVELOPMENT PARTNERS, LLC
### an Illinois limited liability company

### CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM
#### Up to 28 Class A Units at $1,250,000 per Unit

March 17, 2006

THESE SECURITIES HAVE CERTAIN RESTRICTIONS WHICH AFFECT THEIR AVAILABILITY AND TRANSFERABILITY. INVESTORS ARE ADVISED TO REVIEW THE OPERATING AGREEMENT OF HERITAGE DEVELOPMENT PARTNERS, LLC ("HERITAGE") ATTACHED TO THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM") AS EXHIBIT C.

THE OFFERING CONTEMPLATED BY THIS MEMORANDUM IS BEING MADE PURSUANT ONLY TO THE FEDERAL AND STATE SECURITIES LAWS OF THE UNITED STATES OF AMERICA AND IS NOT QUALIFIED AND DOES NOT CONSTITUTE AN OFFER OF SECURITIES IN ANY OTHER JURISDICTIONS WHERE ADDITIONAL LEGAL REQUIREMENTS AND COMPLIANCE WITH THE LAWS OF SUCH JURISDICTIONS NOT CONTEMPLATED BY HERITAGE WOULD OTHERWISE RENDER THE OFFER VOID OR RESULT IN THE VIOLATION OF SUCH LAWS.



**EXHIBIT**
#4 JP
7-1-13 mm
PENGAD 800-631-6989

**TRIAL EXHIBIT**

**PX 3**

HDP 0048
CONFIDENTIAL

## IMPORTANT INFORMATION

THE CLASS A MEMBERSHIP INTERESTS (THE "UNITS") IN HERITAGE DEVELOPMENT PARTNERS, LLC, AN ILLINOIS LIMITED LIABILITY COMPANY ("HERITAGE"), BEING OFFERED HEREBY HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSIONS OR ANY OTHER REGULATORY AUTHORITY. NONE OF THE FOREGOING AUTHORITIES HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM (THIS "MEMORANDUM"). ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE UNITS ARE OFFERED ONLY TO ACCREDITED INVESTORS AND WILL BE SOLD IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT") AND APPLICABLE STATE SECURITIES LAWS.

THIS OFFERING INVOLVES CERTAIN RISKS. PURCHASERS OF THE SECURITIES BEING OFFERED HEREBY (THE "INVESTORS") WILL NOT BE ABLE TO LIQUIDATE THEIR INVESTMENT IN THE EVENT OF AN EMERGENCY OR IN ANY OTHER CIRCUMSTANCE, EXCEPT AS EXPRESSLY PROVIDED IN THE HERITAGE OPERATING AGREEMENT (THE "HERITAGE OPERATING AGREEMENT"). POTENTIAL INVESTORS ARE STRONGLY URGED TO CAREFULLY REVIEW THE DISCUSSIONS UNDER THE HEADINGS "RISK FACTORS."

NO PUBLIC MARKET FOR THE UNITS IS LIKELY TO DEVELOP; THIS OFFERING IS SUITABLE ONLY FOR PERSONS OF ADEQUATE MEANS WHO HAVE NO NEED FOR LIQUIDITY IN THEIR INVESTMENT SINCE THE UNITS MAY NOT BE SOLD UNLESS, AMONG OTHER THINGS, THEY ARE SUBSEQUENTLY REGISTERED UNDER THE SECURITIES ACT OR AN EXEMPTION FROM SUCH REGISTRATION IS AVAILABLE.

PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, TAX OR INVESTMENT ADVICE. EACH INVESTOR SHOULD CONSULT HIS OR HER OWN COUNSEL, ACCOUNTANT OR INVESTMENT ADVISOR AS TO LEGAL, TAX AND RELATED MATTERS CONCERNING AN INVESTMENT BY HIM OR HER IN THE UNITS.

NO RULINGS HAVE BEEN SOUGHT FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX MATTERS DESCRIBED IN THIS MEMORANDUM.

DURING THE COURSE OF THE OFFERING AND PRIOR TO SALE, EACH PROSPECTIVE INVESTOR AND HIS OR HER REPRESENTATIVES, IF ANY, ARE INVITED TO ASK QUESTIONS OF AND OBTAIN ADDITIONAL INFORMATION FROM HERITAGE CONCERNING THE TERMS AND CONDITIONS OF THE OFFERING, HERITAGE, OR ANY MATTER REFERRED TO HEREIN OR RELATED TO THIS

HDP 0049
CONFIDENTIAL

OFFERING. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS. COPIES OF THE COMPLETE DOCUMENTS ARE ATTACHED AS EXHIBITS HERETO. PROSPECTIVE INVESTORS ARE REFERRED TO SUCH DOCUMENTS FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF THE PARTIES THERETO, AND ALL SUCH SUMMARIES CONTAINED HEREIN ARE QUALIFIED IN THEIR ENTIRETY BY THIS REFERENCE TO THE COMPLETE DOCUMENTS FURNISHED HEREWITH AS EXHIBITS. ALL OTHER DOCUMENTS RELATING TO THIS INVESTMENT, AND NOT ATTACHED HERETO, WILL BE MADE AVAILABLE TO PROSPECTIVE INVESTORS OR THEIR REPRESENTATIVES UPON REQUEST.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN WHICH SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED. THIS MEMORANDUM HAS BEEN PREPARED SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THE OFFERING AND ANY REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM IN WHOLE OR IN PART, OR THE REVIEW OR CONSIDERATION OF ANY OF ITS CONTENTS, WITHOUT THE PRIOR WRITTEN CONSENT OF HERITAGE IS PROHIBITED.

THE PROSPECTIVE INVESTOR TO WHOM THIS MEMORANDUM IS BEING DELIVERED, BY ACCEPTING DELIVERY OF THIS MEMORANDUM, AGREES TO RETURN IT AND ALL ENCLOSED DOCUMENTS TO HERITAGE IF THE PROSPECTIVE INVESTOR DOES NOT SUBSCRIBE FOR ANY OF THE UNITS.

HDP 0050
CONFIDENTIAL

# Table of Contents

Page

Summary of the Offering..................................................................................1
Overview of Deal Structure..............................................................................3
Background of Owner and Developer...............................................................4
Legend Requirements.......................................................................................5
Suitability Standards for Investors...................................................................6
The Project.......................................................................................................7
The Project Team.............................................................................................8
Description of Class A Units...........................................................................11
Risk Factors....................................................................................................13
Additional Inquiries........................................................................................19

Exhibits

A   Photographs of the Site and the Scale Model............................A-1
B   Operating Agreement of Riverside District Development, LLC..........B-1
C   Operating Agreement of Heritage Development Partners, LLC...........C-1
D   Subscription Agreement..........................................................D-1

HDP 0051
CONFIDENTIAL

## PRIVATE PLACEMENT MEMORANDUM

## HERITAGE DEVELOPMENT PARTNERS, LLC

### Up to 28 Class A Units At $1,250,000 Per Unit

## SUMMARY OF THE OFFERING

OFFERING AMOUNT:  UP TO $35,000,000
INVESTMENT AMOUNT:  UP TO 28 PREFERRED CLASS A UNITS
PURCHASE PRICE:  $1,250,000 EACH

INVESTMENT STRUCTURE:

- Heritage and General Mediterranean Holdings, SA ("GMH") are each equity holders in Riverside District Development LLC ("RDD"), which owns a 62 Acre parcel of undeveloped real estate located at the corner of Clark Street and Roosevelt Road in Chicago, Illinois (the "Riverside District Property").

- To date, GMH has invested approximately $137,764,950 in the Riverside District Property and is obligated to make additional capital contributions to RDD on a monthly basis to fund RDD's operating expenses as set forth in a budget approved by GMH. GMH is entitled to receive from RDD a preferred distribution of its invested capital, plus a 12% per annum preferred return (the "GMH Priority Payment").

- Following receipt by GMH of the GMH Priority Payment, Heritage and GMH will share equally in net distributions by RDD.

- Holders of Units (the "Class A Members") in Heritage will receive all preferred distributions of net cash received by Heritage (following payment of Heritage's operating expenses) until the purchase price for Units is repaid in full.

- Thereafter, each Class A Member will receive a distribution of 1% of the net cash received by Heritage for each Unit owned. Assuming all 28 Units are sold in this offering, the Class A Members will hold 28% of the equity in Heritage and the holder of Class B Units (the "Class B Members") will hold the remaining 72% of the ownership in Heritage.

- If RDD has entered into one or more contracts covering the sale of the entire Riverside District Property on or before December 31, 2006, Heritage has the option to redeem all of the Class A Units if: (i) Heritage, in good faith, determines that such contracts are with bona fide purchasers; (ii) written notice is given to the Class A Members of Heritage's plan to redeem the Class A Units; and (iii) the purchase price is paid in full on or before June 30, 2007. If Heritage elects to redeem the Class A Units, the purchase price to be paid to the Class A Members will be an amount sufficient to cause the cumulative amount distributed to the Class A Members to equal the sum of (x) an annual return on the capital contribution of each Class A Member equal to 20% plus (y) a return of all capital contributions made by the Class A Members.

- If the Units are not redeemed, each Class A Member may benefit from profits of special purpose entities that may be formed by Heritage to undertake the vertical development of Phase II of the Riverside District Property (the "Vertical Development Entities"), as more fully described herein.

1

HDP 0052
CONFIDENTIAL

USE OF PROCEEDS:

The Proceeds will be used for the capital needs of Heritage and to make an unsecured loan to Antoin Rezko, one of Heritage's owners and founders, in the amount of up to $30,000,000. Mr. Rezko anticipates that he will repay the loan from payments made to him by Heritage under the terms and conditions of a services agreement which is described herein.

HDP 0053
CONFIDENTIAL

## OVERVIEW OF DEAL STRUCTURE

RIVERSIDE DISTRICT PROPERTY
(62 ACRES AT ROOSEVELT ROAD AND THE CHICAGO
RIVER, CHICAGO, ILLINOIS)

*SUBJECT TO A FIRST MORTGAGE OF $22,750,000 IN FAVOR OF
BROADWAY BANK

OWNED BY:

RDD

**GMH**

ENTITLED TO INVESTED
CAPITAL (WHICH,
AS OF THE DATE OF THIS
MEMORANDUM, IS
$137,764,950)* PLUS A 12%
ANNUAL PREFERRED RETURN
ON INVESTED CAPITAL,

THEREAFTER:

50% OF NET CASH

*NOTE: GMH IS OBLIGATED
TO ADVANCE ADDITIONAL
WORKING CAPITAL TO RDD ON
A MONTHLY BASIS

**HERITAGE**

AFTER PAYMENT OF GMH
INVESTED CAPITAL AND 12%
ANNUAL PREFERRED RETURN

50% OF NET CASH

UNITS:
- RETURN OF CAPITAL (UP.
  TO $35 MILLION TOTAL)
- UP TO 28% OF HERITAGE
  SHARE OF NET CASH

CLASS B UNITS:
REMAINING SHARE
OF NET CASH TO MT LLC

This foregoing summary does not purport to be complete. Reference should be made to the body of this Memorandum for additional information on all matters covered in this summary.

3

HDP 0054
CONFIDENTIAL

## BACKGROUND OF OWNER AND DEVELOPER

Heritage is an Illinois limited liability company managed by Heritage Property Development, Inc. ("HPDI"), an Illinois corporation owned by Antoin S. Rezko ("Mr Rezko") and Michael M. Rumman ("Mr. Rumman"). Heritage was formed for the purpose of developing the Riverside District Property. A photograph of the Riverside District Property with a site plan superimposed thereon and photographs of the scale model of the development are attached to this Memorandum as Exhibit A.

The current owner of the Riverside District Property is RDD, an Illinois limited liability company, with GMH and Heritage as its members. GMH is a large multi-national holding company, headquartered in Luxembourg. GMH has extensive experience in real estate development, construction and management throughout the world.

RDD has engaged Heritage as the exclusive developer of the Riverside District Property. To reflect the business arrangement between Heritage and RDD, Heritage and GMH have entered into an Operating Agreement (the "RDD Operating Agreement"), summarized herein, and attached as Exhibit B to this Memorandum. Pursuant to the Operating Agreement, Heritage is a 50% member of RDD, and entitled to receive 50% of the net distributions from the sale and development of the Riverside District Property following the GMH Priority Payment which is approximately $137,764,950 as of the date of this Memorandum. Under RDD's Operating Agreement (the "RDD Operating Agreement"), GMH is obligated to provide working capital to meet the ongoing operating cash needs the Riverside District Property. Therefore, the amount of the GMH Priority Payment will be increasing on a monthly basis but may decrease to the extent of any interim sales of parcels of the Riverside District Property or other distributions that result in a return of capital to GMH. GMH and Heritage intend that RDD be treated as a partnership for federal income tax purposes.

Heritage is offering to sell to certain prospective investors up to 28 Units at a purchase price of $1,250,000 per Unit for aggregate offering proceeds of up to $35,000,000 (the "Offering"). Each Unit will represent 1% of the equity of Heritage and following completion of this Offering will represent up to a total of 28% of the equity in Heritage. There is no minimum amount of Units that will be accepted. Heritage may reject any subscription, in whole or in part, in its sole and absolute discretion. This Offering shall remain open until 11:59 pm, Chicago time, March 31, 2006, unless HPDI elects, in its sole discretion, to extend the expiration date for up to an additional 60 days (the "Expiration Date"). **FOR A DISCUSSION OF THE RISKS ASSOCIATED WITH THIS OFFERING PLEASE SEE THE SECTION OF THIS MEMORANDUM ENTITLED "RISK FACTORS" BEGINNING ON PAGE 11.**

This Transaction is being offered only to a limited number of individuals or entities who qualify as "Accredited Investors" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended (the "1933 Act").

The proceeds from the sale of the Units will be used by Heritage for working capital needs and to make an unsecured loan of approximately $30,000,000 to Mr. Rezko on or about the Expiration Date. The loan will be evidenced by a promissory note (the "Note") that will: (i) mature on the ten year anniversary of the date of the promissory Note evidencing the loan; (ii)

4

HDP 0055
CONFIDENTIAL

carry an interest rate of 5% compounded annually; and (ii) be payable in 10 annual installments, each consisting of principal and interest. Please note that the terms of loan to Mr. Rezko: (i) were not negotiated at arms-length; and (ii) were determined by HDPI. A copy of the Note is available upon request.

Mr. Rezko anticipates that he will repay this loan from payments made to him under a Services Agreement to be entered into between Mr. Rezko and Heritage (the "Services Agreement") pursuant to which Mr. Rezko will provide services to Heritage which include identifying and securing financing for the development of the Riverside District Property, providing consulting services to senior management on general management matters and general project strategy, and acting as Heritage's primary representative with respect to the project. Mr. Rezko's annual consulting fee will be $3,000,000 and the Services Agreement will be terminable by either party on not less than 90 days prior written notice. The termination of the Services Agreement, however, will not affect Mr. Rezko's obligations under the loan. As long as the Services Agreement remains in effect, no cash (other than interest payments to be made by Mr. Rezko) will be made with respect to the loan. Instead, as amounts are earned by Mr. Rezko under the Services Agreement, such amounts will be credited by Heritage against the amounts owed by Mr. Rezko under the Note. The effect of the Services Agreement is that, as an economic matter, the Note will not be repaid by Mr. Rezko since the money that Mr. Rezko intends to use to repay the Note is itself coming from Heritage and there are no assured sources of funds to make such payments. See "RISK FACTORS-Conflicts of Interest" " hereinafter set forth. A copy of the Services Agreement is available upon request.

Heritage believes that, based on the expected sales revenues from lots within the Riverside District Property, plus fees and profits to be earned from individual developments of lots within the Riverside District Property, it will earn sufficient funds to return the capital contributed by the Class A Members and generate an attractive return to the Class A Members.

## LEGEND REQUIREMENTS

**FOR ALL INVESTORS:**



HDP 0056
CONFIDENTIAL

BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

## SUITABILITY STANDARDS FOR INVESTORS



6



## THE PROJECT

The Riverside District Property, a 62-acre parcel along the Chicago River, within blocks of Lake Michigan, Chicago's Central Business District, and Millennium Park, is the largest contiguous, undeveloped tract of land under private ownership in central Chicago, Illinois. It is intended to create a destination area with amenities for the surrounding urban communities which have experienced significant residential growth during the past fifteen years and where strong residential and retail demand persists. Currently, the primary market in the area surrounding the Riverside District Property is greatly underserved by existing retail and restaurants. RDD plans to address those needs by providing additional residential living opportunities, commercial and retail amenities, waterfront access, and public park space.

Heritage/RDD has retained the following service providers to provide the following services: (i) *Antunovich Associates* will provide planning and architecture services for the site; (ii) *Knight E/A*, Inc will provide site engineering and infrastructure services; and (iii) *The McGarey Group* will provide is retail and leasing services.

The Riverside District Property has received Planned Unit Development Zoning approval from the Chicago City Council, reflected in PD 904, and there are more than 20 letters of intent with retail tenants representing approximately 45% of the total retail space. The first stage of construction, mass grading of the property, is expected to begin in the next several months.

The Riverside District Property has received authorization by the City of Chicago under PD 904 for vertical development of up to 4,614 dwelling units, up to 670,000 square feet of retail commercial space, and a minimum of 5,318 and a maximum of 8,780 commercial parking spaces for either sale or lease. Subject to the terms and conditions of the RDD Operating Agreement, RDD is currently contemplating dividing the Property into Two Phases. Phase I would be an approximately thirty-one (31) acre, mixed-use, retail and residential development, upon which approximately 670,000 square feet of retail/commercial space may be constructed, as well as approximately 2000 residential units. Phase II consists of an approximately thirty-one (31) acre residential parcel, upon which up to 2614 residential units may be constructed. The allocation, use, design the master plan and the economies of land sales and vertical development rights between Phase I and Phase II may and in all likelihood will vary significantly from the master plan, design, use and allocations and economics indicated in this Memorandum based on market conditions, governmental reviews and approvals, and many other factors.

HDP 0058
CONFIDENTIAL

Phase II will be subdivided into individual parcels which RDD intends to sell to third-parties (including both unaffiliated third parties and the Vertical Development Entities). In cases where a parcel is sold to, and developed by, Vertical Development Entities, to the extent that Heritage participates in any such Vertical Development Entities, Class A Members may receive additional benefits from the profits of such Vertical Development Entities. See "DESCRIPTION OF CLASS A UNITS" "Additional Potential Benefits to Class A Members" hereinafter set forth.

RDD has entered into a Real Estate Purchase Agreement to sell a significant portion of the Phase I site (the "Purchase Agreement") to DeBartolo Development, LLC, one of the premier retail developers in the United States. The purchase price is $105,000,000. The buyer has options over the balance of the Phase I parcels which, if fully exercised, would generate an additional $64,350,000 for the residential development rights, and $5,712,480 for the retail development rights. The Purchase Agreement is subject to a 45 day due diligence inspection period, and significant other closing conditions. If the transaction closes, and all the options are exercised, the proceeds would be sufficient to repay the debt on the property, return all of GMH's invested capital, and pay GMH its preferred return, enabling Heritage to receive 50% of all cash distributions from parcel sales with respect to all of Phase II. There can be no assurance, however, that all of the closing conditions will be satisfied and the sale will close. A copy of the Purchase Agreement is available upon request, provided that the investor requesting a copy sign a non-disclosure agreement agreeing not to disclose the contents of the Purchase Agreement or make any statements regarding the subject matter of the Purchase Agreement to third-parties.

## THE PROJECT TEAM

### Heritage Development Partners, LLC

Heritage is an Illinois limited liability company that has been retained by RDD as the exclusive developer of the Riverside District Property. Heritage's only asset is its rights to receive distributions under the RDD Operating Agreement between Heritage and GMH. The principal asset of RDD is the Riverside District Property. It is not anticipated that Heritage will own any other assets except its equity interest in RDD and its potential interest in any Vertical Development Entities which may be formed. See "DESCRIPTION OF CLASS A UNITS-Additional Potential Benefits to Class A Members" hereinafter set forth.

The Heritage ownership structure consists of Class A Units and Class B Units. The Class B Units are owned 100% by MT Property Holdings, LLC, ("MT"), an Illinois limited liability Company, of which Mssrs. Rezko and Rumman are co-members and co-managers (the biographies of Mssrs. Rezko and Rumman are set forth below). Pursuant to Heritage's Operating Agreement (the "Heritage Operating Agreement"), only the holders of Class B Units (the "Class B Members") are entitled to vote. The Class A Members are entitled to receive distributions (following payment of Heritage's operating expenses) but do not have the right to vote on or approve actions of Heritage. Additionally, the Class B Members will have no less than 72% ownership interest in Heritage. The Heritage Operating Agreement is attached hereto as Exhibit C.

8

**Management of Heritage**

Heritage is managed by HPDI an Illinois corporation owned and operated by, Mr. Rezko and Mr. Rumman, the owners and founders of Heritage. Mr. Rezko has extensive real estate development experience and Mr. Rumman has equally extensive experience leading major organizations.

*Antoin S. ("Tony") Rezko*

Mr. Rezko is the Chairman of HPDI and as such, is responsible for providing overall guidance to Heritage in its real estate development efforts. Mr. Rezko has been involved in the real estate development industry for over 20 years. He is also Chairman and Chief Executive Officer of Rezmar Corporation, a real estate development company he founded more than 17 years ago ("Rezmar"). At Rezmar, Mr Rezko has been responsible for the daily operations of property acquisition, planning, development, management, sales and marketing which tendered the construction that resulted in the successful sale and rental of thousands of residential units worth several hundred million dollars.

Mr. Rezko has co-founded Heritage in order to develop the Riverside District Property.

Mr. Rezko is also a successful entrepreneur owning over 50 restaurants in five mid-western states that employ over 3,000 people. Mr. Rezko also serves and has served as a member of many corporate, municipal, and civic Boards, including the National Board of Governors for St. Jude Children's Research Hospital.

Mr. Rezko is a graduate of the Illinois Institute of Technology with both a Bachelor of Science Degree in Civil Engineering and a Master of Science degree in Construction.

See "RISK FACTORS-Additional Considerations" for further information concerning Mr. Rezko.

*Michael M. Rumman*

Mr. Rumman is the Chief Executive Officer of HPDI, and as such, is responsible for day-to-day management and leadership of Heritage

Previous to founding Heritage, Mr. Rumman was appointed by Illinois Governor Rod Blagojevich in January 2003 to his Cabinet and held the position of Director of the State of Illinois Department of Central Management Services (CMS). As a state agency, CMS manages the business of government and oversees all procurement, real estate, information technology, health benefits, internal audits, public information and personnel.

Prior to joining the State of Illinois, Mr. Rumman was an advisor on various energy initiatives for Accenture Corporation. Previously, he was Chief Executive Officer and a board member for Veritel Corporation, a company that manufactures and distributes voice verification biometrics systems for network and physical access security. Other board members included Jack Kemp a former Vice Presidential candidate and Ron Packard, Chief Executive Officer of K 12.

9

HDP 0060
CONFIDENTIAL

Prior to Veritel, Mr. Rumman was President of Peoples Energy Services (PES), an unregulated affiliate of the Peoples Energy Corporation in Chicago. During his four-year tenure he led the company's growth from $10,000,000 annually to over $200,000,000. During the same period, Mr. Rumman completed six competitor acquisitions, making PBS the second largest unregulated energy company in the Midwest.

Previous positions include Vice President of LG&E Energy and Director of Midwest Operations for Tenneco Corporation. Mr. Rumman began his business career in the management program of General Motors Corporation.

Mr. Rumman serves as Chairman of SECA, which procured over $3,000,000 last year for various local and national charities. Mr. Rumman was recognized by Crain's Chicago Business as one of their "40 Under 40" business leaders. He is also a member of the Economic Club of Chicago and the Young Presidents Organization (YPO). He holds a BA in economics from the University of Michigan and an MBA from Northwestern University.

## Riverside District Development, LLC

The Manager of RDD is HPDI. Although HPDI is the manager of RDD, GMH, as the owner of Preferred Units of RDD has control over significant aspects of RDD. GMH owns 100% of the Preferred Units and 50% of the Common Units of RDD; Heritage owns the other 50% of the Common Units of RDD.

As of the current date, GMH and its affiliates have made capital contributions to RDD consisting of the Riverside District Property and other contributions of cash, debt and equity, in the sum of approximately $137,764,950. In addition to the $137,764,950 in invested capital, RDD borrowed $22,750,000 from Broadway Bank secured by a current first mortgage on the Riverside District Property (the "First Mortgage"). In addition, GMH is entitled to a preferred return of 12% per annum on the total amount of invested capital in RDD. The current amount of the preferred return to date is included in the $137,764,950 referenced in the preceding sentence; and the preferred return will continue to accrue on the unpaid balance of contributed capital and any unpaid portion of the preferred return. In addition, the amount of GMH's invested capital balance will increase, and will be further subject to the 12% preferred return, as GMH continues to make capital contributions to support the capital requirements of the project. Under the terms of the Operating Agreement, as holder of 100% of the Preferred Units of RDD, GMH is entitled to receive all net cash distributions of RDD until the total amount of its capital contributions and the preferred return have been paid in full. Heritage shares 50% of the net cash distributions of RDD only after GMH is paid the total amount of its capital contributions plus the preferred return. A copy of the RDD Operating Agreement is attached hereto as Exhibit B.

## General Mediterranean Holding SA (GMH)

A holding company for investments, GMH was established in 1979. Headquartered in Luxembourg, the Company engages in the following sectors: banking and finance, real estate and construction, hotel and leisure, as well as industrial trading and pharmaceuticals and aviation. Determined to provide the best in value and service to its clientele and shareholders, GMH's focus is to build a stronger and more diverse group that spans the world, encompassing

HDP 0061
CONFIDENTIAL

the Americas and the Caribbean, Europe, the Middle East, Africa, and Asia and Pacific Presently, the Company employs a workforce of over 5,000 professionals who staff a host of Company offices and networks around the globe. Consolidated group assets exceed US$ 2.25 Billion.

*Nadhmi Auchi*

Mr. Nadhmi Auchi is Chairman of GMH and is well known for his deal making abilities. Credited with creating over 120 companies,



## DESCRIPTION OF CLASS A UNITS

**Distribution Rights**

The Class A Members will receive a distribution of 100% of the net cash distributed to Heritage from RDD as provided in the Heritage Operating Agreement, after (i) all the distributions to GMH have been made as described herein, and (ii) after payment of all costs, fees, financings, commissions, reserves and other expenses, including any paid to Heritage or any affiliate of Heritage, or its officers, managers, employees, agents and assigns; until the Purchase Price of the Units is repaid in full. Thereafter, each Class A Member will receive a distribution of 1% per Unit of the net cash distributed to Heritage. There is no guarantee that there will be any net cash available for Distribution to the Class A Members.

**No Voting Rights**

The Class A Members do not have voting rights under the Heritage Operating Agreement, except as may be required by law. Therefore, the Class A Members do not have the power to remove the manager of Heritage which, as of the date hereof, is HPDI.

HDP 0062
CONFIDENTIAL

## Redemption of Class A Units by Heritage

Notwithstanding anything else in this Memorandum, if RDD has entered into one or more contracts covering the sale of the entire Riverside District Property on or before December 31, 2006, Heritage has the option to redeem all of the Class A Units if: (i) Heritage, in good faith, determines that such contracts are with bona fide purchasers; (ii) written notice is given to the Class A Members of Heritage's plan to redeem the Class A Units; and (iii) the purchase price is paid in full on or before June 30, 2007. If Heritage elects to redeem the Class A Units, the purchase price to be paid to the Class A Members will be an amount sufficient to cause the cumulative amount distributed to the Class A Members to equal the sum of (x) an annual return on the capital contribution of each Class A Member equal to 20% plus (y) a return of all capital contributions made by the Class A Members. As a result of such redemption, any and all past, present, future, vested or contingent rights of the Class A Members related directly or indirectly to Heritage shall terminate.

## Additional Potential Benefits to Class A Members

If the Units are not redeemed as provided herein, Heritage or its principals, Mssrs. Rezko and Rumman, may create one or more Vertical Development Entities referenced in this Memorandum. If Heritage is a member/partner in any of these Vertical Development Entities, then each Class A Member will be entitled to receive pro rata distributions (equal to such Class A Member's indirect ownership interest in the Vertical Development Entity through such Class A Member's direct ownership interest in Heritage) from sales proceeds from the sale of such parcel following the development thereof (the "Bonus Interest"). However, it is impossible to predict the cash required to acquire and develop any Phase II parcel at this time, and therefore, the amount of Heritage's percentage of ownership and distribution rights cannot be predicted. As a result, the Bonus Interest cannot be predicted either. Any distributions to Heritage, as an owner of a Vertical Development Entity, will be subordinate to any distribution rights of GMH in such Vertical Development Entity which will include a priority return of capital and a preferred return in favor GMH.

Distributions from such Vertical Development Entity(ies) shall be from the net cash distributions of the Vertical Development Entity(ies) to Heritage, assuming Heritage is a member of the particular Vertical Development Entity, after payment of any preferred return and return of capital to the other investors, under the operating agreements or other governing instruments for one or more of the Vertical Development Entities. There is no guarantee that there will be any net cash available for distribution to the Class A Member from the Vertical Development Entity(ies), or that any of the Vertical Development Entities will in fact be formed. The Class A Members will not have the right of first offer to invest in the Vertical Development Entities and the only participation rights of the Class A Members in the Vertical Development Entities will derive from Heritage's ownership interest in such Vertical Development Entities, if any.

HDP 0063
CONFIDENTIAL



HDP 0064
CONFIDENTIAL



14

HDP 0065
CONFIDENTIAL



HDP 0066
CONFIDENTIAL



**General Investment Risks**



<u>Conflicts of Interest</u>. Heritage and Mr. Rezko are subject to a conflict of interest arising out of the $30,000,000 loan from Heritage to Mr. Rezko. Mr. Rezko is a founder and principal of Heritage and controls HPDI, the manager of Heritage. As a result, Mr. Rezko has the ability to make or influence major decisions of Heritage. The fact that Heritage is funding a personal

16

HDP 0067
CONFIDENTIAL

loan to Mr. Rezko, who plans to repay the loan using payments to be received by Mr. Rezko from Heritage under the Services Agreement, may be considered to be a conflict of interest.



**Specific Risks Associated with this Investment**

*Risks Associated with City of Chicago.*

17

HDP 0068
CONFIDENTIAL



*Miscellaneous Risks*



HDP 0069
CONFIDENTIAL

**Additional Considerations**

In addition to the risk factors set forth above, prospective investors are advised as follows:

(1) Heritage's principal equity holder, Mr. Rezko, has experienced extensive media controversy regarding his business and political affiliations. There have been numerous articles in the various media outlets and investors are advised to review these items. Furthermore, Mr Rezko's dealings have been the subject of various governmental inquiries. These facts may have an adverse effect on RDD's ability to obtain financial commitments and entitlements; and



## ADDITIONAL INQUIRIES



993309_9.DOC

19

HDP 0070
CONFIDENTIAL

## Almiqdadi

| | |
|---|---|
| **From:** | Michael Rumman [michaelrumman@sbcglobal.net] |
| **Sent:** | 26 July 2005 17:21 |
| **To:** | Almiqdadi |
| **Subject:** | RE: New Hire |

Thanks Mohammad, I will strive very hard to meet your expectations. The best manner to handle Ed's employment will be to make him a consultant for the month of August. If all goes according to schedule, we will close with GMH by September 1, at that point Rezmar International will be the developer and I believe all employees including Ed and myself should be transitioned to this company. I believe the developer agreement lays out the procedures for handling costs for the project and it would be our intent to follow those procedures.

Thanks again.
Michael

*Almiqdadi <almiqdadi@gmhsa.com>* wrote:

Dear Mike;
We hereby authorize you to hire Mr. Edward Wynn. As I stated in our phone conversation me and Mr. Auchi have a lot of faith in you and we believe that you will try your best to serve the interest of the shareholders. Would Ed's employment be in the form of a contract, if it is for how long?

Best regards

Mohammad Hashim Al-Miqdadi
Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
England
Phone 0044(0) 20 7602 7055
Fax    0044(0) 20 7603 5533
almiqdadi@gmhsa.com

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or return the original message to us at the above address . Thank you.

26/07/2005

TRIAL EXHIBIT

PX 4

**From:** Michael Rumman [mailto:michaelrumman@sbcglobal.net]
**Sent:** 26 July 2005 15:32
**To:** Almiqdadi
**Subject:** Fwd: New Hire

Hello Mohammad, just for clarity, the seven days on the Ed Wynn hire is actually today per the email below.

Thanks Michael

Note: forwarded message attached.

26/07/2005

CONFIDENTIAL SIRAZI - G000162

| | |
|---|---|
| **From:** | Edward Wynn |
| **To:** | Heidi von Dachenhausen |
| **Sent:** | 4/26/2006 9:32:36 AM |
| **Subject:** | CONFIDENTIAL |

Heidi,

Would you let me know when Tony has the conversation with Mr. Auchi regarding funding?  It's somewhat urgent given end-of-month timing.

Thanks,

Ed



EXHIBIT
#9ID
7-14-13 mn

TRIAL EXHIBIT

PX 7

GMH Native 076273

| | |
|---|---|
| **From:** | Edward Wynn |
| **To:** | Michael Rumman; Laura Martinez |
| **Sent:** | 5/9/2006 6:32:50 PM |
| **Subject:** | Re: Proposal |

Will do

-----Original Message-----
From: Michael Rumman
To: Edward Wynn; Laura Martinez
Sent: Tue May 09 18:22:16 2006
Subject: FW: Proposal

Please use the 7 day operating procedure on this request.

From: Michael Rumman
Sent: Tuesday, May 09, 2006 6:15 PM
To: 'Almiqdadi'
Subject: FW: Proposal

Mohammad, this email is a follow up to the recent discussion/funding that Mr. Auchi sent. You will recall that Mr. Auchi upon sending the money requested that we find additional funding locally and that we return the $1.2 million upon funding of the new loan. Attached you will find a term sheet for a loan that will replace the Broadway bank loan and give us sufficient working capital through the end of the year. I think you will be very pleased with the terms of this loan as they are substantially improved over the Broadway loan. We can discuss this in our meeting, but per our procedures, I will need your approval as soon as possible to initiate this process.

Thank you

Michael

From: Tom Pacocha [mailto:TPacocha@MutualBanking.Com]
Sent: Tuesday, May 09, 2006 3:44 PM
To: Michael Rumman
Subject: Proposal

Attached is a Proposal Letter in conjunction with the Riverside Park Project.

It was a pleasure meeting all of you. Have a safe flight.



TRIAL EXHIBIT

PX 8



EXHIBIT
#10 D
7-11-13

GMH Native 076636

**From:** Edward Wynn
**To:** Michael Rumman
**Sent:** 5/12/2006 6:43:34 AM
**Subject:** RE: 300k

To confirm, from RDD?

I'll e-mail him and confirm it happened when I get to the office.

Ed

---

**From:** Michael Rumman
**Sent:** Fri 5/12/2006 6:42 AM
**To:** Edward Wynn
**Subject:** 300k

Ed, Tony has received approval directly from Mr. Auchi for an advance from the funds recently wired to RDD. Please ask Bob where to wire 300k this morning.

Thank you
Michael
----------------------
Sent from my BlackBerry Wireless Handheld



EXHIBIT

#1/FD

7-11-8MM

TRIAL EXHIBIT

PX 9

GMH Native 076701

| | |
|---|---|
| **From:** | Michael Rumman |
| **To:** | Edward Wynn |
| **CC:** | Robert Williams; Stephanie Michaels; Antoin Rezko |
| **Sent:** | 5/18/2006 1:00:50 PM |
| **Subject:** | Additional Funds to Tony |

Ed, last week Tony received authorization directly from Mr. Auchi to use up $500,000 of the $1.2 million recently funded for a period not to exceed 30 days. Last week Tony used $300,000 and has requested an additional $158,828.81. Of this money, $50,000 was committed to be returned by this coming Monday and the remainder within a week after that, but in no circumstance to exceed the time Mr. Auchi authorized the use of these funds. I am very conscious of our cash flow situation and recognize the need we have for upcoming obligations and I will make certain Tony is also aware.



**TRIAL EXHIBIT**

**PX 10**

GMH Native 089579

| | |
|---|---|
| From: | Licata, Anthony R. |
| To: | Michael Rumman; Edward Wynn |
| Sent: | 5/4/2006 10:22:12 AM |
| Subject: | FW: Status |

FYI...

Please note we have not included the Semir release of Dan in this list of items, at Tony's request.

ARL

——Original Message——
From: Licata, Anthony R.
Sent: Thursday, May 04, 2006 10:21 AM
To: 'Steven F. Ginsberg'; bschwartz@lplegal.com; 'Richard S. Lauter'; dmahru@radiandevelopment.com
Cc: ARezko@rezmar.com
Subject: Status

Currently, we have the Royal purchase contract signed by Royal, and the forbearance agreement, signed by the Bank.

Neither Dan nor Tony has signed.

Dan has asked that we configure the Chicago Hudson LLC so that Tony alone will sign for it, in order to facilitate other transactions he is pursuing. Dan has delivered a putative abandonment of his interest, and has released Tony if Tony solely signs on behalf of the LLC. Tony is willing to do so as part of a comprehensive settlement of their outstanding issues. Those items, as I understand them are:

1) There is some guy named Barry Levy who loaned $300k to Rezmar about two years ago. As I understand it, Rezmar owes the guy $300k, plus interest at 10% interest per year, PLUS Rezmar agreed to give Barry a credit of $100k on a unit Levy is buying at the Peterson Development. Of the $300k loan, Dan apparently got $200k for his own business use; the other $100k went to Rezmar. Tony feels Dan should be accountable for $200k of principal, interest of $40k on that amount, and at least a share of the $100k credit which has to be given to Levy. Tony/Rezmar has to be accountable for the $100k which it got, $20K of interest on that amount, and the balance of the $100k credit. I suggest that it might be fair to split the cost of the $100k credit in the same ratio that Dan and Tony used the original $300k loan, i.e., $66.7k to Dan, $33.3k to Tony.

2) Dan signed an Option Agreement giving certain rights to Republic Bank over the 62 acre parcel at Roosevelt/Clark. Auchi agreed to close subject to the document, but on Tony's pledge that the Partnership would cause it to be released. A lawsuit has been filed against Republic Bank to quiet title and get rid of the Option. No one can predict at this time whether that action will be successful, or how much may have to be paid to get rid of it. Tony has proposed to release Dan from the Partnership's possible claims against Dan on this item, if Dan will indemnify the Partnership from any costs, not to exceed $400,000.

3) Dan has proposed to settle items 1 and 2 by giving Tony a $600,000 credit against the $1.5 million Tony owes Dan on his buyout note. Dan also has agreed to relinquish any claims to interest or principal on the $3 million note owed to limited partners of the Roosevelt/Clark partnership.

4) The "equity loan" for the Irving Park deal has to be renewed. The Bank wants Dan to "re-up" on his guarantee, which would include an increase in principal by $300k. Dan has declined to do so.

GMH Native 089331



TRIAL EXHIBIT

PX 18



EXHIBIT

#21=D

7H3 MM

5) There are a number of cross-claims for amounts purportedly owed by Dan to Rezmar, and owed by Rezmar to Dan. I believe Rezmar thinks Dan owes about $90k (one-half of the $180k paid to DeStefano); Dan claims about $400,000 is owed for rent on the Elston building, loans to Rezmar from Dan's father's estate, and loans to Automatic Ice.

We are trying to get Dan and Tony together tomorrow morning at breakfast to resolve these items. I will attend; Dan's counsel is invited and welcome. The goal is to resolve these open items (I hope there's nothing else!!!), get Dan and Tony to sign the Royal Contract and the Bank Forbearance Agreement, and then green-light Lauter et al. to file the bankruptcy case. I understand the filing papers are ready to go. If Tony needs to sign anything in connection with filing the petition, Sonny should bring it if he's coming to the meeting, or pdf it to me and I'll get Tony to sign.

In the meantime, I'm trying to reach Royal to see how they're coming in their discussions with Centrum. If that's going well, maybe we'll extend the May 5 filing deadline in the contract.

I'm deeply grateful to everyone for the opportunity to work on such a challenging assignment.

ARL

This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Thank You.

Circular 230 Notice: Pursuant to regulations governing practice before the Internal Revenue Service, unless expressly stated otherwise, any tax advice contained herein or in any attachment hereto cannot be used, and is not intended to be used, by a taxpayer for (i) the purpose of avoiding tax penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) the promotion or marketing of any tax-related matter or program.

GMH Native 089332

**Almiqdadi**

From:          Michael Rumman [MRumman@hdpco.com]
Sent:          18 October 2006 22:19
To:            Almiqdadi
Subject:       FW: Review of Draft

Attachments:   Memo to Mohammed 10-12.doc



Memo to
nmed 10-12.doc

　　　　Mohammad, it may also be good to have this memo cut for the call tomorrow.
The opening paragraph clearly states the legal implications from Tony's circumstances
as it relates to the land. Neither document addresses the event of elective or forced
bankruptcy by Tony.

-----Original Message-----
From: Michael Rumman
Sent: Friday, October 13, 2006 11:15 AM
To: 'almiqdadi@gmhsa.com'
Subject: Fw: Review of Draft

Mohammad, per our discussion you will find a memo that outlines our conversation
yesterday. Needless to say, circumstances are evolvi <<Memo to Mohammed 10-12.doc>> ng
rapidly and I recommend that we have more discussion versus less in the coming days.
Also, please keep in mind that I will need as much perspective and guidance as
possible in our evolving circumstances.

Michael
----------------------------
Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Edward Wynn
To: Michael Rumman
Sent: Fri Oct 13 11:04:58 2006
Subject: FW: Review of Draft

From: Gustman, David [mailto:dgustman@freebornpeters.com]
Sent: Friday, October 13, 2006 9:40 AM
To: Edward Wynn
Cc: Michael Rumman; Kelly, Michael
Subject: RE: Review of Draft

Ed and Michael:

Michael Kelly and I have reviewed and think this is a fair presentation.

We should probably schedule a time early next week to get together again to discuss
strategy.

I am free anytime noon through end of day Monday or Tuesday through 1pm.

EXHIBIT
#25
7-1-13 nm

**TRIAL EXHIBIT**

**PX 22**

1

Mohammed,

This e-mail is a follow-up to our conversation yesterday.

First and foremost, we believe that Tony's indictment has no current legal effect on Riverside District Development or the Riverside District Property. The allegations in the indictment do not relate to the Property, RDD or Heritage. Indeed, those allegations all pre-date the formation of RDD and Heritage and RDD's purchase of the Property. Nor do the forfeiture provisions of the indictment include any of Tony's interests related to the Property. Currently, Tony does not have a management role with the Company, and I have full ability to maintain operational status, consistent with our Operating Agreement and established procedures.

RDD continues to have four options with regard to the Property. The first, based on our meeting with the brokers yesterday, selling all or a portion of the Property has been affected by the announcement of the indictment. The companies which previously expressed a strong interest in purchasing the Property have raised concerns, including General Growth, which may withdraw its submission. Although selling the property will provide a return of principal and a capital gain, Tony's continued ownership is decreasing the value achievable from a sale and may cause the City to reconsider its development of the Wells-Wentworth Connector.

Second, holding the property, defined as removing the Property from the market and waiting for an uncertain period to re-list or develop the Property, would potentially increase the Property's value, but would delay recognition of such a return. Moreover, the current zoning of the property expires, under the terms of the Planned Development Ordinance, if no development has commenced by March 31, 2010.

Third, we can develop the property, which may be the most attractive alternative. The first development option is to hire a company with a strong expertise in retail construction to develop the property for a fee. The standard compensation for this is six percent plus fees and incentives. This option enables RDD to realize a higher value for the Property by unleashing its full retail potential, while mitigating the risks associated with creating our own development entity.

The second development option is to create a partnership with an experienced development entity, under which RDD would contribute the land as equity, and the other entity would fund the development costs. This option reduces the full profit potential of the first development option, but mitigates risk by putting the partnered company's capital at risk with your land equity.

As discussed in London, it is optimal to find a vehicle for Tony's shares to be sold to GMH, regardless of which strategy we take. As we discussed, Tony has certain encumbrances on his ownership interests that need to be addressed as part of such a

CONFIDENTIAL SIRAZI - G005277

transaction. We also need to resolve the second mortgage or cash infusion issues we discussed.

I look forward to discussing these matters will you in more detail.

CONFIDENTIAL SIRAZI - G005278

**Almiqdadi**

| | |
|---|---|
| **From:** | Michael Rumman [MRumman@hdpco.com] |
| **Sent:** | 19 October 2006 16:28 |
| **To:** | Manal El Zobaidi |
| **Cc:** | Almiqdadi |
| **Subject:** | Today |

Mr. Auchi:

As a follow up to our conversation today, I am prepared to offer my immediate resignation as the manager of RDD and offer my sincere apologies for letting you down. Having said that, for my own personal integrity, I ask that you be aware of certain facts:

• Not one dollar benefited me from any of Tony's transactions and in fact they substantially diluted my interests in Heritage.

• The Semir Sharazi agreement was done completely without my knowledge.

• The loan between Dan and Tony and the limited partners, which encumbered Heritage, was executed by Tony despite my overwhelming objection.

• At no time, including the present, have any of the transactions done by Tony violated the operating agreement that is in place with GMH. GMHs rights are fully protected with no restrictions on decisions you may choose to make. All of these transactions only encumber the "distribution" that would go to Tony. The only reason these encumbrances are now relevant, is because of our desire to exit him from the company so we can effectively transact with buyers, lenders and the city.

Having said all of the above, this does not excuse the fact that I did not share more information with you at the time. Despite my strong recommendations to do so, I was convinced otherwise and for this I apologize. As I said above I am prepared to immediately resign as the manager from RDD. If you are interested in continuing to work with me, I give you my word this will never happen again and would ask that we clarify each others expectations moving forward.

Sincerely,
Michael Rumman

\-----------------------

Sent from my BlackBerry Wireless Handheld



19/10/2006

CONFIDENTIAL SIRAZI - G005274

TRIAL EXHIBIT

PX 24

From:       Michael Rumman [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=MRUMMAN]
Sent:       8/4/2006 3:22:36 PM
Received:   8/4/2006 3:22:36 PM
To:         Antoin Rezko [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=ARezko];
Subject:    Fw: Emailing: SettlementAgmt_20060803144826

Heidi its important tony sees this.

Sent from my BlackBerry Wireless Handheld

——Original Message——
From: Edward Wynn
To: Michael Rumman
Sent: Fri Aug 04 10:43:55 2006
Subject: Re: Emailing: SettlementAgmt_20060803144826

Privileged

Michael

Neither Heritage nor MT are parties to this agreement and I do not believe I received it until now

I note the following;

—the representations and warranties are false since Tony did not own 80% of Heritage on the date of execution
—the agreement was violated when Tony received the Mirza funds
—the agreement was violated when Tony pledged interests to Mirza and to Malek and will be violated if any other pledges are made
—the sale of interests, if money was received after 5-3, also violates the agreement
—the remedies are all directed at Tony and Rezmar and again neither Heritage, MT or RDD are parties

As a result of now knowing about this agreement, I need to consult with the attorney who handled it to determine what steps we need to take with regard to additional pledges, etc.

Ed

——Original Message——
From: Michael Rumman
To: Edward Wynn
Sent: Thu Aug 03 17:18:30 2006
Subject: Fw: Emailing: SettlementAgmt_20060803144826

Ed could you look at this and see what was pledged as it relates to heritage.

Sent from my BlackBerry Wireless Handheld

——Original Message——
From: Licata, Anthony R. <alicata@Shefskylaw.com>
To: Michael Rumman
Sent: Thu Aug 03 14:48:05 2006
Subject: FW: Emailing: SettlementAgmt_20060803144826

here's the signed copy of the settlement agreement with Semir, which you asked for this morning.

——Original Message——



SIRAZI - H027007

TRIAL EXHIBIT

PX 27

```
From:        Michael Rumman [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=MRUMMAN]
Sent:        8/15/2006 1:10:09 PM
Received:    8/15/2006 1:10:06 PM
To:          Antoin Rezko [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=ARezko];
CC:          Edward Wynn [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=EWynn];
Subject:     FW: Checklist
```

Tony, in the event we make a presentation to Yusuf's partner for class A or B equity in Heritage, I asked Ed to provide a road map of what must occur given the various agreements that have been signed.  Please review this document so we can keep these things in mind if he is interested.

---

**From:** Edward Wynn
**Sent:** Tuesday, August 15, 2006 12:59 PM
**To:** Michael Rumman
**Subject:** Checklist

PRIVILEGED

Michael,

Following is a checklist of items that must be resolved related to any additional monetization of Tony's shares in Heritage or MT:

1.      Must resolve/payoff obligations in Sirazi agreement per my e-mail on August 4, 2006.

2.      May not sell more than 7 units of Heritage unless Mirza (Samir Financial) loan is paid off in full. (Samir Financial agreements limit sales of Heritage units to 10 in total.)

3.      Must payoff or reserve funds to satisfy Heritage guarantee of Mahru obligation re:  loan to Limited Partnership.

4.      Must comply with requirements relating to list of investors provided PPM materials; must provide PPM materials and have sign documents, including subscription agreements, from additional investors.

5.      Outside counsel review and determination that any and all monetization of shares does not violate any prospective or pending agreements re:  Tony's other business ventures/workouts.

6.      Must withdraw any pending pledges and ensure that sale/pledges of shares do not exceed permitted amount under RDD Operating agreement.



**TRIAL EXHIBIT**

**PX 28**



EXHIBIT

#31-D

SIRAZI - H027011

Again, these items are based on what I have knowledge of to date. There may be additional items of which I am unaware, which is the reason for including item #5 above. In addition to these items, consideration should be given to the existing Class A investors and determine whether to redeem those shares.

Ed

SIRAZI - H027012

69

From:        Edward Wynn [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=EWYNN]
Sent:        8/21/2006 12:50:04 PM
Received:    8/21/2006 12:50:04 PM
To:          Michael Rumman [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=MRumman];Antoin Rezko [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=ARezko];Licata, Anthony R. [alicata@Shefskylaw.com];
CC:          Heidi VonDachenhausen [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=Hvondachenhausen];
Subject:     Broadway Bank

PRIVILEGED

Everyone,

Tony Licata asked me to call Nick Dezano at Broadway Bank, which I just did. Apparently, Broadway and Tony
Rezko are contemplating some type of transaction in which he would borrow money from the Bank and pledge a
unit.

Nick believed the "unit" to be a parcel of the property, e.g. a residential unit. He did mention the number 35, which
I believe is a reference to the 35 Class A Units offered in the PPM. He also mentioned that this matter is
time-sensitive, i.e. it has to be done by tomorrow, and somehow Mr. Dezano has the impression that I am Tony
Rezko's attorney related to this matter.

First, as I have previously informed one or all of you:

*   I am not Tony's personal attorney. I represent Heritage and Riverside District. Nor do I represent Rezmar or
    any of the Rezmar-related entities. Apparently, this transaction relates to Hudson.
*   If the reference is to a purchase of some of the 35 Class A units, those units are by subscription only. If the
    transaction contemplates selling one of those to Broadway, then that is via the subscription documents.
*   If the reference is to a pledge of 35 Class A units, Tony owns none of those Class A units, and therefore there
    is nothing for him to pledge. The Class A units are units of Heritage, and Heritage does not "own" them; only
    the subscribing investors do.
*   If the reference is to Tony's interests in MT, his ownership vehicle in Heritage, he does not have any units he
    can pledge at this time until the matters in my e-mail of last week are resolved, specifically:

    *   Tony's agreement with Sirazi, which from my read—again I wasn't involved with it—would prohibit his
        pledging his MT interests until Sirazi is paid off or consents.
    *   Tony's agreement with Mirza limits the number of sales of Heritage units to 10. I do not know where we
        stand on this, given the Tony has not provided—as several times requested—a list of entities/individuals to
        whom he has distributed the subscription materials. Until that is resolved, no more of the units may be
        subscribed.
    *   Tony has a number of pledges of his interests in MT out to other parties (some I'm aware of and some,
        I'm afraid, I'm not aware of). Until that is accounted for Tony may be pledging more than he is permitted
        to under the terms of the RDD operating agreement.

*   I do not have availability this afternoon to "turn on a dime" and get this done. I have a doctor's appointment in
    less than an hour, and will not be in the office afterwards. In any event, there are far too many issues that
    need to be resolved anyway, and until I have guidance on the exact nature of the transaction and have
    assurance from Tony's attorneys about the matters set forth above, it would be inappropriate for me to begin
    any legal work on this relating to Heritage or RDD.

Please let me know how you wish to proceed.

Ed

**TRIAL EXHIBIT**

**PX 30**



SIRAZI - H027170

SIRAZI - H027171

# M E M O R A N D U M

**TO:**   **Antoin S. Rezko, Chairman**
     **Michael M. Rumman, Chief Executive Officer**

**FROM:**  **H. Edward Wynn, Chief Administrative Officer and General Counsel**
     **Heritage Development Partners, LLC**

**DATE:**  **August 23, 2006**

**RE:**   **Monetization or Pledge of Interests**

The purpose of this memorandum is to reiterate the restrictions related to monetizing or pledging interests in Heritage Development Partners, LLC ("Heritage"), and MT Property Holdings, LLC ("MT"). To continue with any pledges or subscriptions that are not already executed, I need Mr. Rezko's written confirmation regarding those pledges to ensure that those pledges or subscriptions are lawfully made.

## Background

Heritage owns 50% of the Interests in Riverside District Development, LLC ("RDD"). Pursuant to Section 9.12 of the RDD Operating Agreement, Mr. Rezko must maintain a majority of interests in Heritage or a majority of voting rights in Heritage. Heritage, in turn, has two Classes of Interests: Class A are preferred, non-voting interests. Class B are common, voting interests. The Class B interests are held by MT. MT is held as follows: 78.4% by Mr. Rezko; 19.6% by Mr. Rumman, and 2% by Mr. Wynn. Currently, two and one-half of the Class A interests have been subscribed to, with a portion of one interest not being fully funded at this time.

Under the terms of a Forbearance Agreement in conjunction with certain loans to Mr. Rezko from Mirza, Heritage has agreed to issue no more than 10 Class A interests.

Mr. Rezko has executed pledges for 8.25 of his 78.4 units in MT, and—to my knowledge—has offered to pledge an addition 6.0 of those units.

I recently learned that Mr. Rezko entered into an agreement with Semir Sirazi relating to his interests in MT and Heritage. As outlined in my August 4, 2006 e-mail, hat agreement contains representations and warranties that are inconsistent with Mr. Rezko's ownership of units as described above. It is my understanding that the Sirazi Agreement has now been breached for other reasons.

## Discussion

Class A Interests in Heritage

**TRIAL EXHIBIT**

**PX 31**

SIRAZI - H027175

**EXHIBIT**

#34 JD

7-1-13 NM

PENGAD 800-631-6989

Heritage may not lawfully subscribe more than 7 additional Class A Interests in Heritage unless and until the loan from Mirza is fully satisfied.

Mr. Rezko may not pledge any Class A Interests in Heritage, since he is not the owner of any such interests.

Mr. Rezko may solicit subscriptions for Class A Interests in Heritage only if they meet the conditions described in those subscription documents, and in doing so, he must provide me with the name of each individual he provides the documents and the corresponding number of the documents in advance. No more subscription documents will be permitted to be distributed until a full accounting of all documents previously given to Mr. Rezko is made.

Subscriptions to Class A Interests must be done exactly as provided in those documents. If there are any questions, Mr. Rezko must confer in advance with me and Mr. Licata at Shefsky & Froelich, who prepared the documents.

No subscriptions to Class A Interests may occur unless such subscriptions are confirmed as consistent with the Sirazi Agreement or it is confirmed that that Agreement is no longer valid.

Mr. Rezko's Interests in MT

Mr. Rezko cannot pledge more than 28.39 units he holds in MT. To date, and to my knowledge, he has executed pledges for 8.25 such units; he has proposed pledges totaling 6 units outstanding, leaving 12.09 units which may be pledged or sold.

Mr. Rezko needs to confirm that there are no other executed or proposed pledges and must confirm, though Mr. Licata, that the Sirazi agreement does not effect pledges or sales of MT units or that the Sirazi agreement is no longer in effect.

Other Issues



## Conclusion

Before proceeding further with any monetization or pledges of Heritage or MT Interests, Mr. Rezko needs to undertake the actions described and make the confirmations set forth in this memorandum, and to update those confirmation each time an additional monetization or pledge of interests in either entity is undertaken. Because of the potential issues relating to the Sirazi Agreement, I suggest that Mr. Licata be part of the discussions and action plan related to the topics of this memorandum.

As always, if you have any questions, please do not hesitate to contact me.

| | |
|---|---|
| **From:** | Edward Wynn |
| **To:** | Heidi VonDachenhausen; 'gmurphy@mhlitigation.com' |
| **CC:** | Michael Rumman |
| **Sent:** | 9/13/2006 4:23:15 PM |
| **Subject:** | Pledge of ASR Interests |

Heidi and Gene

Per my prior emails to Tony, I cannot participate as counsel for Heritage in any additional pledges of Tony's interests in the Property until the issues in those emails are satisfactorily resolved. For that reason, I will not be calling back the attorney from GE that Gene referred to me until these matters are resolved.

Ed



EXHIBIT
PENGAD 800-631-6989
#35 ID
7-11-13 AM

TRIAL EXHIBIT
PX 32

GMH Native 078962

```
From:        Edward Wynn [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=EWYNN]
Sent:        9/19/2006 12:02:45 PM
Received:    9/19/2006 12:02:00 PM
To:          concierge.riy@fourseasons.com [concierge.riy@fourseasons.com];
Subject:     Documents for Mr. Tony Rezko--1 of 3
Attachments: INSTRU~1.DOC; CONFID~1.PDF;
```

Dear Sir,


I will be sending you 3 emails with attachments for Mr. Tony Rezko, who is a guest at the hotel.  If you would be so kind as to print the e-mails and the attachment and give them to Mr. Rezko at your earliest convenience.


If you have any difficulty printing these materials, please call my secretary, Laura Martinez at 312.546.5022.


Thank you,


Ed Wynn



SIRAZI - H027187



Tony,

Attached are the documents Tony Licata's firm prepared for your use in selling additional Class A shares in Heritage. As to these documents, and based on Tony's advise, please note the following:

- You must present all three attached documents to any potential investor. The first document is the original PPM, the second is a supplement which updates key matters since the original PPM date, and the third is the subscription agreement.
- Until and unless you have obtained the consent of Mr. Mirza you may not sell more than a total of eight (8) units. This is because those loan agreements restrict Heritage from selling more than 10 units in total and we have sold just less than 2 units currently.
- The investor must complete and sign the subscription agreement (detailed instructions are below). Only Michael may countersign this (as is noted on the signature page) in Chicago. Specifically, you may not sign this on behalf of Heritage.
- After the purchaser signs the documents, he may provide the funds (check or wire—further details below), or wait for the document to be executed by Michael and then provide the funds.
- Please note that any funds can be transferred to you as provided in these materials and under the loan agreement, you must resolve with Tony Licata, the issues of Mr. Sirazi's right to distributions under the agreement you have with him, which Tony Licata negotiated on your behalf.
- Any checks must be made payable to Heritage Development Partners, LLC. If funds are sent via wire, the following are the wire transfer instructions:

Bank: Fifth/Third Bank
Routing Number # 042000314
Account Number # 7233373971
(Heritage Development Partners, LLC)

**Instructions for Completing Subscription Agreement**

- Cover Page: Write the name of the investor where noted at the top of the page.
- Page 1 of the Form (after the instruction pages):
  o Write in the number of units, using the numbers 1 – 8.
  o In the line, "Total Investment Amount," multiply the number of units by $1,250,000 and enter the total on that line.
  o The Purchaser should complete the rest of the information on this page. If there is a Co-Purchaser, that personal or entity should complete that section. If the information is not available (e.g. the individual or entity does not have a Federal Tax ID or Social Security Number), that information may be left blank.

SIRAZI - H027188

- Page 2 of the Form
  - o The Purchaser should check whichever one (and only one) of the statements that apply.
- Subscription Letter/Agreement
  - o Page 2: Check one of the statements on this page.
  - o Page 7: (Signature Page):
    - At top, place City/Country in which the document is being signed and the date of signature
    - Fill in the number of units immediately below the bold language and above the signature lines. The number must match the numbers of units from page 1 of the form.
    - The Purchaser should sign one of the signature blocks, based on who they are: an Individual, an Entity, or an IRA Investor (unlikely).
  - o Page 8-11: If, and only if, the purchaser is an entity, they should complete one – and only one – of these pages, as follows:
    - If they are a corporation: Page 8
    - If they are a partnership: Page 9
    - If they are a limited liability company: Page 10
    - If they are a trust: Page 11

SIRAZI - H027189

From:       Michael Rumman [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=MRUMMAN]
Sent:       11/1/2006 12:14:11 PM
Received:   11/1/2006 12:14:11 PM
To:         Edward Wynn [/O=ROOSEVELTCLARK/OU=FIRST ADMINISTRATIVE
GROUP/CN=RECIPIENTS/CN=EWynn];'ALicata@shefskylaw.com' [ALicata@shefskylaw.com];
Subject:    Re: Sirazi/Rezmar:  Settlement Agreement Exhibit

Tony, I think the short answer is we don't want to release this information.  Though we may work towards an
agreement with samir, we don't have to make it easier for him. Thoughts.

Sent from my BlackBerry Wireless Handheld

-----Original Message-----
From: Edward Wynn
To: Licata, Anthony R. <alicata@Shefskylaw.com>
CC: Michael Rumman
Sent: Wed Nov 01 11:12:09 2006
Subject: RE: Sirazi/Rezmar:  Settlement Agreement Exhibit

Tony,


Under the operating agreement, a Member has a right to inspect the books and records of the Company.  While
there is no explicit confidentiality provision, there is a confidentiality provision regarding mediation or arbitration of
disputes which requires that company information and documents be kept confidential.  Maintaining the
confidentiality of corporate documents from third parties is consistent with this provision.


In addition, the request for release of this information would need to come from the Member himself, at which
time, the entity would consider whether this information should be released consistent with the Agreement.


Ed




From: Licata, Anthony R. [mailto:alicata@Shefskylaw.com]
Sent: Wednesday, November 01, 2006 10:07 AM
To: Edward Wynn
Subject: RE: Sirazi/Rezmar: Settlement Agreement Exhibit


With the utmost respect, can't Tony as the 80%  shareholder, direct that these copies be given?  I'm just afraid that
if the copies aren't given, it will just provoke them into doing whatever they're going to do, sooner.




From: Edward Wynn [mailto:EWynn@hdpco.com]
Sent: Tuesday, October 31, 2006 6:59 PM

TRIAL EXHIBIT

PX 39

EXHIBIT

#42 ID

7-11-13 MM

PENGAD 800-631-6989

SIRAZI - H027317

To: Licata, Anthony R.
Subject: Re: Sirazi/Rezmar: Settlement Agreement Exhibit

Tony,

I think the only response is one consistent with mr previous email. Since Heritage was not a party to this transaction and did not consent to it, we would not provide copies of our non-public, corporate documents.

Thanks,

Ed

——Original Message——
From: Licata, Anthony R. <alicata@Shefskylaw.com>
To: Edward Wynn
Sent: Tue Oct 31 17:50:08 2006
Subject: FW: Sirazi/Rezmar: Settlement Agreement Exhibit

    How should I respond to this?


From: Gertz, Craig M. [mailto:CGertz@daspinaument.com]
Sent: Tuesday, October 31, 2006 5:34 PM
To: Licata, Anthony R.
Cc: Ssirazi@aol.com
Subject: Sirazi/Rezmar: Settlement Agreement Exhibit

Tony:

As you may recall, neither of us were involved in the actual preparation of the execution counterparts of the Settlement Agreement dated as of May 5, 2006, by and among Semir D. Sirazi, Rezmar Corporation, Antoin Rezko and certain other parties.

It turned out that the execution counterparts prepared by our respective clients failed to include the required Exhibit B to that agreement. Specifically, the parties were to have attached the current articles of organization and operating agreement (and all amendments thereto) for Heritage Development Partners, LLC.

I would greatly appreciate it if you could secure from your client these documents so that the parties may attached them as Exhibit B to this agreement.

Please feel free to contact me with any questions or problems. Thanks!
Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com <mailto:cgertz@daspinaument.com>

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of

SIRAZI - H027318

any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Thank you.

Circular 230 Notice:  Pursuant to regulations governing practice before the Internal Revenue Service, unless expressly stated otherwise, any tax advice contained herein or in any attachment hereto cannot be used, and is not intended to be used, by a taxpayer for (i) the purpose of avoiding tax penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) the promotion or marketing of any tax-related matter or program.

This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Thank you.

Circular 230 Notice:  Pursuant to regulations governing practice before the Internal Revenue Service, unless expressly stated otherwise, any tax advice contained herein or in any attachment hereto cannot be used, and is not intended to be used, by a taxpayer for (i) the purpose of avoiding tax penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) the promotion or marketing of any tax-related matter or program.

SIRAZI - H027319

# DASPIN AUMENT
## LLP

227 West Monroe Street, Suite 3500
Chicago, Illinois 60606
312.258.1600 ph  312.258.1955 fx
www.daspinaument.com

**Craig M. Gertz**

(312) 258-3793
cgertz@daspinaument.com

February 20, 2006

**VIA FEDERAL EXPRESS**

REZMAR CORPORATION
ANTOIN S. REZKO
DANIEL S. MAHRU
c/o Rezmar Development Co.
853 N. Elston Avenue
Chicago, Illinois 60622

Re:    **LINE OF CREDIT ENHANCEMENT AND PLEDGE AGREEMENT**

Gentlemen:

This firm represents SEMIR D. SIRAZI with respect to, among other matters, that certain Line of Credit Enhancement and Pledge Agreement dated as of August 1, 2003 (the "**Agreement**") by and among REZMAR CORPORATION, an Illinois corporation, ANTOIN S. REZKO and DANIEL S. MAHRU (sometimes collectively referred to herein as "**Borrowers**") and Dr. Sirazi, as Collateral Provider, or his nominee or assignee ("**Sirazi**").  All terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

As you know:

•      Borrowers have failed to make scheduled payments of the Monthly Collateral Fee on numerous occasions from and after November 2003 as required under <u>Section 5(b)</u> of the Agreement and have to date failed to cure such defaults;

•      Borrowers have failed to make any required monthly payments of Existing Debt Interest from and after August 1, 2004 as required under <u>Section 5(a)</u> of the Agreement, and have to date failed to cure such defaults;

•      Borrowers have failed to make payments of the Applicable Share of RC Payments in accordance with <u>Section 6(c)</u> of the Agreement; and

•      the Loan (as amended) was not repaid by Borrowers on or before February 1, 2006, as required under the Loan Documents (as amended); such failure to repay the Loan in full by such date constituted a default under the Loan; and such default under the Loan constituted a default of Borrowers under the Agreement as of such date in accordance with <u>Section 11(a)</u> of the Agreement.

100367.00002.22877012.1

**TRIAL EXHIBIT**

**PX 50**

exhibitsticker.com

February 20, 2006
Page 2

This notice is not required under the terms and conditions of the Agreement and/or the Guarantee thereto. Nonetheless, we hereby give notice to Borrowers on behalf of Sirazi that:

• Borrowers have failed to cure all outstanding defaults under the Agreement (including but not limited to those defaults identified above) within the time frames permitted under the Agreement;

• Borrowers have failed to dispute the existence of any such defaults after numerous demand notices from Sirazi; and

• As a result, Sirazi is entitled to exercise all rights and seek any and all remedies available to him under the Agreement and/or the Guarantee executed by Messrs. Rezko and Mahru in connection with the Agreement, and any and all remedies available to him at law, in equity or otherwise, all as permitted under the Agreement.

The foregoing does not (i) operate as a waiver of any other default which may exist under the Agreement, or (ii) operate as a waiver of any right, remedy, power of privilege of Sirazi under the Agreement, (iii) prejudice or preclude any other further exercise of any right or remedy provided by law or in equity, (iv) entitle Borrowers to any other or further notice or demand whatsoever, or (v) in any way modify, change, impair, effect, or diminish or release any of Borrowers' liability under or pursuant to the Agreement or any other liability that Borrowers may have to Sirazi.

Respectfully yours,

Craig M. Gertz

cc: Semir Sirazi (via e-mail)
Mr. Daniel Mahru (via Federal Express)
Radiant Development
3725 North Talman Street
Chicago, Illinois 60618

100367.00002.22877012.1

Subj:    RE: Comments on Credit Enhancement Agreement
Date:    2/21/2006 6:53:05 P.M. Central Standard Time
From:    CGertz@daspinaument.com
To:      ssirazi@aol.com

Well, I don't think this is getting resolved by tomorrow morning, especially since these comments are not specific, but more "general" comments which still need to set down exactly in writing.

My brief review of the numerous comments show a bunch of things to be worked out. I have no idea how much influence this lawyer has on the deal, especially since he is looking to have impact on a lot of business terms.

A couple of general comments:

1.  Tony apparently does not own all of Heritage. We need to get a better handle on ownership structure, and his ability to control Heritage.

2.  They are looking to sell up to 28% of the LLC interests in Heritage. Again, what does that leave left for you?

3.  Heritage may not already own a portion of Riverside District yet? If not, what value does Heritage have? Moreover, it appears that Heritage may not ultimately have any control over Riverside, thus reducing potential value.

4.  This lawyer is complaining about the rate of interest under the agreement, as well as Rezmar paying your costs and fees, based on the rate of interest (which you still are not being paid).

5.  This lawyer wants to specifically identify all Existing Debt and not have this agreement protect you for any additional debt incurred under the Previous Agreement (i.e. any additional interest going forward).

6.  This revised draft would remove any right for you to review and audit Rezmar's records and get semi-annual financial information, except to the extent Rezmar is required to provide it to Republic Bank.

We also don't have any exhibits to the agreement yet.

Let me know what other comments that you have and how you would like me to proceed with this.

Thanks.


Craig M. Gertz
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, Illinois 60606
Tel: (312) 258-3793
Fax: (312) 258-1955

**From:** Edward Wynn [mailto:EWynn@hdpco.com]
**Sent:** Tuesday, February 21, 2006 5:37 PM
**To:** Craig M. Gertz
**Cc:** Robert Williams; arezko@rezmar.com
**Subject:** Comments on Credit Enhancement Agreement

Craig,

I am counsel for Heritage Development Partners, LLC, and was asked by Tony Rezko to review the above-referenced agreement. Attached is a red-lined version of the proposed agreement, marked to show my comments and changes.

TRIAL EXHIBIT

PX 53

EXHIBIT
146 JD

Tuesday, February 28, 2006 America Online: Ssirazi

SS 04048

In the interest of time, I am sending my comments and changes to you without having had the opportunity to fully review them, or the agreement, with either Mr. Rezko or Mr. Williams, whom I have copied on this e-mail. For that reason, these comments and changes--as well as the rest of the agreement--are subject to further review and revision based upon Mssrs. Rezko's and Williams' review and my further review of their comments with them.

Thanks,

Ed

H. Edward Wynn
Chief Administrative Officer and General Counsel
Heritage Development Partners, LLC
233 South Wacker Drive, Suite 9500
Chicago, IL 60606
Phone: 312.546.5038
Facsimile: 312.546.5050
E-mail: ewynn@hpdco.com

**Paredes, Cristina**

| | |
|---|---|
| **From:** | Craig M. Gertz |
| **Sent:** | Thursday, February 23, 2006 7:56 AM |
| **To:** | 'arezko@rezmar.com'; 'Edward Wynn'; 'Robert Williams'; 'msreenan@rezmar.com' |
| **Cc:** | 'Ssirazi@aol.com' |
| **Subject:** | Sirazi/Rezmar: Revised Credit Enhancement Agreement |
| **Attachments:** | GMS_Rezmar_ 2006 Credit Enhancement Agreement v3.DOC; Sirazi_Rezmar_ Latest Changes Credit Enhancement Agreement 0223.DOC; Sirazi_Rezmar_ Cumulative Changes Credit Enhancement Agreement 0223.DOC |

I spoke with Semir yesterday and have revised the draft Credit Enhancement Agreement accordingly.

For your convenience, I have attached for your review:

1.  A clean version, suitable for execution;

2.  A blackline showing the changes from the revised draft circulated yesterday. These changes include: (a) changing the collateral from Tony's ownership interest in Heritage to all distribution to which Tony would be entitled as holder of the ownership interests in Heritage; and (b) removing all references to and restrictions relating to Riverside.

3.  An additional blackline showing the cumulative changes to the initial draft based on Ed's cumulative comments.

I need from you ASAP:

A.  an Exhibit B (the Heritage articles of organization and operating agreement); and

B.  an Exhibit D (a statement of the outstanding shares in Rezmar, such as the most recent annual report).

I hope that Tony should be in a position now to be able to sign this agreement.

If so, please fax or PDF to me Tony's signatures ASAP (and have the originals delivered to my attention). Upon receipt, I will send you Semir's signatures and will ensure that Spero at Republic Bank gets his fully executed loan extension this morning.

Thanks!

Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com

1

**TRIAL EXHIBIT**

**PX 66**

*This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.*

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

LINE OF CREDIT ENHANCEMENT AGREEMENT



## LINE OF CREDIT ENHANCEMENT AGREEMENT

dd

## LINE OF CREDIT ENHANCEMENT AGREEMENT



dd

**Paredes, Cristina**

| | |
|---|---|
| **From:** | Edward Wynn <EWynn@hdpco.com> |
| **Sent:** | Friday, February 24, 2006 2:11 PM |
| **To:** | Gertz, Craig M.; arezko@rezmar.com; Robert Williams |
| **Cc:** | Ssirazi@aol.com |
| **Subject:** | RE: Sirazi/Rezmar: Revised Credit Enhancement Agreement |

Craig,

Thank you for your e-mail. Based on my discussion with Tony, I do not believe there was a discussion of a Monday meeting.

I do understand that a meeting had been set for Friday at 1:30. I am available for that meeting, and absent further mutual agreement of our clients, it is best to keep that meeting. However, at your convenience, I am available to meet or discuss directly with you the issues in my e-mail any time next week.

Ed

---

**From:** Craig M. Gertz [mailto:CGertz@daspinaument.com]
**Sent:** Friday, February 24, 2006 11:24 AM
**To:** Edward Wynn; arezko@rezmar.com; Robert Williams; msreenan@rezmar.com
**Cc:** Ssirazi@aol.com
**Subject:** RE: Sirazi/Rezmar: Revised Credit Enhancement Agreement

At Tony's suggestion, he and Semir have agreed to a face to face meeting at Rezmar's offices this Monday, February 27th, at 1:00 pm, in an attempt to resolve the obviously numerous material issues that Ed has raised and any other issues and questions that Rezmar and/or Tony may have.

I plan to be in attendance, so I would appreciate it if Mike and/or Ed will confirm their attendance.

It is our goal either to resolve all outstanding issues and question and sign up an agreement by Monday or to move on and have Semir exercise his alternatives.

Thanks.

Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com

*This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.*

1

**TRIAL EXHIBIT**

**PX 70**

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

**From:** Edward Wynn [mailto:EWynn@hdpco.com]
**Sent:** Friday, February 24, 2006 10:39 AM
**To:** Ssirazi@aol.com; Craig M. Gertz; arezko@rezmar.com; Robert Williams; msreenan@rezmar.com
**Subject:** RE: Sirazi/Rezmar: Revised Credit Enhancement Agreement

Semir,

Thank you for your e-mail. I am sorry that you find my response to your attorney unacceptable. (To avoid a potential issue of communicating directly with an opposing party represented by counsel, I note that your e-mail was directed to me, and copied to Craig; and I am copying Craig on this response.)

While I cannot comment on the historical background and recitation of conversations in your e-mail because I do not have knowledge of them, that background is irrelevant. My review is (and was) based solely on the proposed agreement. The fact that you were attempting to include Heritage in the agreement, compelled me to undertake that review, as Heritage's counsel. [As an aside, I would note that many of the factual statements in your e-mail are at odds with the February 20, 2006 Memo you provided to Mssrs. Rezko and Rumman. In that memo, you clearly characterize each and every one of the purported obligations to you and your affiliates as being obligations of Rezmar alone, not Heritage, not Roosevelt\Clark. Indeed, neither Heritage nor Roosevelt\Clark appear anywhere in that document. This, I believe, validates my continued concern about why Heritage would be included in any restated agreement, which by your own admission, relates solely to Rezmar obligations.]

Nonetheless, once Heritage was interjected into the proposed agreement, it was my obligation, as counsel to Heritage, to review the proposed agreement and identify potential issues, which is exactly what I did. Originally, as my e-mail to Craig noted, I was under the misimpression that you had a loan--separate from the loan Republic Bank made to Rezmar-- to Rezmar, and to Tony and Dan. That is precisely why I have asked for a schedule of such loans, to make sure that they were clearly referenced so that there would be no ambiguity about the parties' obligations.

It was only yesterday morning that I learned—to my complete surprise and frankly, shock--that there was no separate loan, and that the $14 million amount referenced as a loan in the most recent document, was nothing more than an accumulation of "fees" from your having given $5 million in collateral to secure the Republic Bank loan—which collateral remains under your control, i.e. it has not been taken by the bank. (Perhaps this should have been apparent to me, or I should have pressed harder to get a schedule of the "loans" constituting the $14 million, though in all fairness, I have raised this consistently.) If I am mistaken on this point, I again reiterate my request for the documentation related to those loans, and a schedule of those loans for my review.

This discovery raised a new set of issues. Because my relationship with Craig has been nothing but professional and cordial, I highlighted these issues generally, anticipating both further research on my part and further discussions between Craig and me after that research. While that would still be my preferred approach, in light of your e-mail, let me now state the underlying issues very clearly, based on my preliminary factual and legal research yesterday:



I trust that this clarifies the matters raised in your e-mail and provides a framework for continued discussions between the clients and their counsel regarding this matter.

Sincerely,

Ed

---

**From:** Ssirazi@aol.com [mailto:Ssirazi@aol.com]
**Sent:** Thursday, February 23, 2006 5:11 PM
**To:** Edward Wynn; CGertz@daspinaument.com; arezko@rezmar.com; Robert Williams; msreenan@rezmar.com
**Subject:** Re: Sirazi/Rezmar: Revised Credit Enhancement Agreement

Ed,

The response you gave to Craig Gertz concerning "Credit Enhancement Agreement" is not acceptable!

I don't understand where you get your direction about this agreement since when I talked to Tony he agrees to accept the terms and then you start objecting to the agreement. I would like to point out to you that Heritage Development Partners was created as an entity from the previous LLC partnership structure of Roosevelt and Clark Development. As per my agreement I could have stopped the sale of the property and create a huge problem for Tony and Dan. We had several meetings about this subject and Tony promised to resolve it amicably. You cannot say to me and my attorney that Heritage is a separate entity that has nothing to do with Roosevelt and Clark Development LLC. This was a know fact and it was created to deal with liability issues and to allow Michael to participate in the deal. You cannot ignore the previous credit enhancement agreement and object to it. Please also note that Tony, Rezmar and Dan have been informed about the total amount of due to me during our meetings and I provided them with summary every time we met; there was no dispute as to the accuracy to the amount due to Sirazi. If Tony has any issue then he can ask Bob Williams to run his numbers as per the defaulted agreement and compare the results. The total due amount of about $14.7 is accurate and there is no reason to object to it since it is stipulated in the agreement.

The only way to resolve these issues for you, Tony, Craig and I get on the telephone and discuss these issues and find a final resolution by the end of Friday. I am not willing to wait for next week Friday to finalize this agreement.,I am available from 7:00 am to 10:00 am Chicago time on Friday. I can be reached at 847-778 1732.

Semir

From:           Edward Wynn
Sent:           Wednesday, March 01, 2006 01:41 PM
To:             Licata, Anthony R.
Subject:        Revised Term Sheet
Attachments:    TERM SHEET.doc

Tony,

Please see the attached with a revision Tony requested.

Ed

P.S.  This time I really will attach it!

**TRIAL EXHIBIT**

**PX 71**

SF 104207

Redact

TERM SHEET
CREDIT ENHANCEMENT AGREEMENT

1.  Rezmar/Rezko will cause the Republic Bank loan to be paid in full, and Sirazi guarantee released no later than May 1, 2006.

2.  Rezmar/Rezko will pay Sirazi a sum to be negotiated in full satisfaction of all obligations between Sirazi and Rezmar/Rezko.

3.  The amount in 2 will be paid over an agreed upon number of years, at an agreed upon interest rate (non-compounded), with no prepayment penalty.

4.  In event that Rezmar/Rezko defaults on obligation to repay the sum set forth in 2 on the terms set out in 3:

    a.  Rezko will assign to Sirazi all distributions Rezko is entitled to receive from Rezmar or Heritage.

    b.  The interest rate converts to a default rate from the date of such default.

SF 104208

**Paredes, Cristina**

| | |
|---|---|
| **From:** | Craig M. Gertz |
| **Sent:** | Wednesday, March 01, 2006 4:22 PM |
| **To:** | 'alicata@shefskylaw.com' |
| **Subject:** | FW: Sirazi/Rezmar: Revised Credit Enhancement Agreement |
| **Attachments:** | GMS_Rezmar_ 2006 Credit Enhancement Agreement v3.DOC; Sirazi_Rezmar_ Latest Changes Credit Enhancement Agreement 0223.DOC; Sirazi_Rezmar_ Cumulative Changes Credit Enhancement Agreement 0223.DOC |

Tony:

Great seeing you today. Per our conversation, here is the last e-mail that I sent to Tony and Ed, which represents the last draft circulated for the replacement Rezmar credit enhancement agreement, together with a cumulative blackline against the original agreement in 2003 (and a blackline showing the changes that I had made based on Ed's original set of comments).

Please let me know if I can be of any further assistance at this point. Thanks!

Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com

*This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.*

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

**From:** Craig M. Gertz
**Sent:** Thursday, February 23, 2006 7:56 AM
**To:** 'arezko@rezmar.com'; 'Edward Wynn'; 'Robert Williams'; 'msreenan@rezmar.com'
**Cc:** 'Ssirazi@aol.com'
**Subject:** Sirazi/Rezmar: Revised Credit Enhancement Agreement

I spoke with Semir yesterday and have revised the draft Credit Enhancement Agreement accordingly.

For your convenience, I have attached for your review:

1

TRIAL EXHIBIT

PX 72

1. A clean version, suitable for execution;

2. A blackline showing the changes from the revised draft circulated yesterday. These changes include: (a) changing the collateral from Tony's ownership interest in Heritage to all distribution to which Tony would be entitled as holder of the ownership interests in Heritage; and (b) removing all references to and restrictions relating to Riverside.

3. An additional blackline showing the cumulative changes to the initial draft based on Ed's cumulative comments.

I need from you ASAP:

A. an Exhibit B (the Heritage articles of organization and operating agreement); and

B. an Exhibit D (a statement of the outstanding shares in Rezmar, such as the most recent annual report).

I hope that Tony should be in a position now to be able to sign this agreement.

If so, please fax or PDF to me Tony's signatures ASAP (and have the originals delivered to my attention). Upon receipt, I will send you Semir's signatures and will ensure that Spero at Republic Bank gets his fully executed loan extension this morning.

Thanks!

Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com

*This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.*

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

## LINE OF CREDIT ENHANCEMENT AGREEMENT



## LINE OF CREDIT ENHANCEMENT AGREEMENT



dd

## LINE OF CREDIT ENHANCEMENT AGREEMENT



| | |
|---|---|
| **From:** | Licata, Anthony R. |
| **Sent:** | Tuesday, March 21, 2006 01:47 PM |
| **To:** | 'Michael Rumman' |
| **Subject:** | RE: Semir Status |

Yes, Semir probably would...but if we can get Semir to drop Dan's guarantee, doesn't that put Tony in position to trade something with Dan to get that?

-----Original Message-----
**From:** Michael Rumman [mailto:MRumman@hdpco.com]
**Sent:** Tuesday, March 21, 2006 12:45 PM
**To:** Licata, Anthony R.; ARezko@rezmar.com; Edward Wynn
**Subject:** RE: Semir Status

The dan part is confusing to me. If tony comes to an agreement and it later fails to meet his commitment why won't semir want to retain the option to pursue dan?

**From:** Licata, Anthony R. [mailto:alicata@Shefskylaw.com]
**Sent:** Tuesday, March 21, 2006 11:38 AM
**To:** ARezko@rezmar.com; Michael Rumman; Edward Wynn
**Subject:** Semir Status

I spoke with Semir's attorney today, and told him that based on my conversation with Tony and Mike yesterday, Semir and Tony need to have another discussion about how much Tony is going to pay in settlement, and how it's going to be paid.

I also told him that I think as part of any final document, Semir should release Dan from his obligations to Semir, insofar as Tony has already indemnified Dan, we might as well get Dan out of our hair on this issue.

ARL

This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Thank you.

Circular 230 Notice: Pursuant to regulations governing practice before the Internal Revenue Service, unless expressly stated otherwise, any tax advice contained herein or in any attachment hereto cannot be used, and is not intended to be used, by a taxpayer for (i) the purpose of avoiding tax penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) the promotion or marke program.

**Privileged**

SFP001028

**TRIAL EXHIBIT**

**PX 79**

**Paredes, Cristina**

| | |
|---|---|
| **From:** | Ssirazi@aol.com |
| **Sent:** | Wednesday, March 29, 2006 8:14 PM |
| **To:** | alicata@Shefskylaw.com |
| **Subject:** | Rezko/Rezmar Settlement Discussion |

I just wanted to make sure that what I communicated to you this afternoon is summarized to avoid any misunderstanding. I have also filled in the points we didn't address. I will agree to the following:

1) Line of Credit Agreement

   i) $7.2M final settlement: $3.6M paid immediately with the initial sale of Heritage interest,
   ii) $3.6M note is issued for three year period with 12% per year compounded annual interest,
   iii) From the initial sale of Heritage interest, Republic Bank is paid $5M first, then $0.5M paid to BankOne, now J.P. Morgan (real estate loan), $0.5M to Amerimark Bank, then $0.4M to First Bank (these are all "real estate loans" as presented by Bob Williams) and Semir Sirazi's collateral with Republic Bank is released.
   iv) Semir Sirazi is paid $3.6M after the above bank payments are made.
   v) Any amounts received above $11M (after all of the above payments are made), 25% of the proceeds from the sale of Heritage interest is paid to Semir Sirazi until $3.6M note plus any due interest is fully paid, the remaining 75% of the proceeds can be used to pay other bank loans related to the real estate and food side of the business as Rezko desires. However, Broadway Bank loan of $1M must be paid in the second phase sale of Heritage interest.

2) Greenstone Capital: $1.2M is paid immediately with the initial sale of $11M Heritage interest after the banks (real estate loans) and Semir Sirazi payment of $3.6M are made.

3) Mardini Inc: The current balance of  over $300K is fully paid with the initial sale of Heritage interest. Monthly payments of $20,833.33 must continue until April 30, 2010 as per the agreement

4) If there is any default under these terms then I will keep my rights to sue for the original amounts.

If you have any questions, please call me on my cell at 847-778 1732. I appreciate your involvement in settling this very important issue and hope that Tony/Rezmar agree to these terms to avoid any potential litigation.

Best regards,

Semir Sirazi

1

**TRIAL EXHIBIT**

**PX 81**

**Paredes, Cristina**

| | |
|---|---|
| **From:** | Licata, Anthony R. <alicata@Shefskylaw.com> |
| **Sent:** | Monday, April 10, 2006 10:36 AM |
| **To:** | Gertz, Craig M.; ssirazi@aol.com |
| **Cc:** | 'Edward Wynn' |
| **Subject:** | Line of Credit Agreement with Serazi.DOC |
| **Attachments:** | Line of Credit Agreement with Serazi.DOC |

Following up on my discussion with Semir last week, I've attached a draft of the Line of Credit Agreement which I think reflects our meeting. Tony Rezko is out of the country, and has not seen this draft, so it's subject to his approval in all respect, but I wanted to get it out for your review and comment.

ARL

This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication and its attachments without reading, printing or saving in any manner. Thank you.

Circular 230 Notice:  Pursuant to regulations governing practice before the Internal Revenue Service, unless expressly stated otherwise, any tax advice contained herein or in any attachment hereto cannot be used, and is not intended to be used, by a taxpayer for (i) the purpose of avoiding tax penalties that may be imposed on the taxpayer under the Internal Revenue Code or (ii) the promotion or marketing of any tax-related matter or program.

1

TRIAL EXHIBIT

PX 87

DRAFT FOR DISCUSSION PURPOSES ONLY: April 6, 2006

## LINE OF CREDIT ENHANCEMENT AGREEMENT



## Paredes, Cristina

| | |
|---|---|
| **From:** | Gertz, Craig M. |
| **Sent:** | Tuesday, May 16, 2006 4:43 PM |
| **To:** | 'Licata, Anthony R.' |
| **Cc:** | 'Ssirazi@aol.com' |
| **Subject:** | RE: Documents |
| **Attachments:** | GMS_Rezmar_ Settlement Agreement v6.DOC |

Tony:

Semir is in California today and tomorrow. We can exchange faxes for now, with originals to follow. Work for you?

Semir, can you fax me the attached. Let's make three (3) originals?

Craig M. Gertz, Esq.
Daspin & Aument, LLP
227 West Monroe Street, Suite 3500
Chicago, IL 60606
Phone: 312.258.3793
Fax: 312.258.1955
E-Mail: cgertz@daspinaument.com

*This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address. Thank You.*

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION:

DISCLOSURE UNDER TREASURY CIRCULAR 230: Any advice contained herein (and any attachments hereto) relating to U.S. federal taxation may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties. Advice that complies with Treasury Circular 230's "covered opinion" requirements (and thus, may be relied on to avoid tax penalties) may be obtained by contacting the author of this document.

---

**From:** Licata, Anthony R. [mailto:alicata@Shefskylaw.com]
**Sent:** Tuesday, May 16, 2006 3:53 PM
**To:** Gertz, Craig M.
**Subject:** Documents

I have fax signature pages of Tony's signature on the settlement agreement, etc. How do you want to handle this?
This communication, along with any documents, files or attachments, is intended only for the use of the addressee and may contain legally privileged and confidential information. If you are not the intended recipient, you are hereby notified that any dissemination, distribution or copying of any information contained in or attached to this communication is strictly prohibited. If you have received this message in error, please notify the sender immediately and destroy the original communication

1

TRIAL EXHIBIT

PX 97

and its attachments without reading, printing or saving in
any manner. Thank you.

Circular 230 Notice:  Pursuant to regulations governing
practice before the Internal Revenue Service, unless
expressly stated otherwise, any tax advice contained
herein or in any attachment hereto cannot be used, and
is not intended to be used, by a taxpayer for (i) the
purpose of avoiding tax penalties that may be imposed on
the taxpayer under the Internal Revenue Code or (ii) the promotion or marketing of any
tax-related matter or
program.

# SETTLEMENT AGREEMENT



**CORPORATION SERVICE COMPANY**
www.incspot.com

CSC- Chicago
Suite 2320
33 No. LaSalle Street
Chicago, IL 60602-2607
312-372-4450
312-372-1956 (Fax)

Matter#   NOT PROVIDED
Project Id :
Additional Reference : NOT PROVIDED

Order#        114852-1
Order Date    05/17/2006

Entity Name :        ANTOIN S. REZKO   (Debtor)/ SEMIR D. SIRAZI   (Secured Party)

Jurisdiction :       IL-SECRETARY OF STATE

Request for :        UCC Filing
File Type :          ORIGINAL

Result :             Filed

File Number :        10971799
Filing Date :        05/18/2006

Ordered by MR CRAIG M. GERTZ at DASPIN & AUMENT, LLP

Thank you for using CSC.  For real-time 24 hour access to the status of any order placed with CSC, access our website at www.incspot.com.

If you have any questions concerning this order or IncSpot,  please feel free to contact us.

Kim Leonard
kleonard@cscinfo.com

The responsibility for verification of the files and determination of the information therein lies with the filing officer; we accept no liability for errors or omissions.

**TRIAL EXHIBIT**

**PX 101**

RECEIVED
SECRETARY OF STATE
UNIFORM COMM. CODE DIV.

2006 MAY 18 AM 8: 26

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGEMENT TO: (Name and Address)

CRAIG McCRERY
DASSIN & AUMENT, LLC
227   MONROE STREET SUITE 3500
CHICAGO, IL 60606

UCU105/18/06:01:5990:
20.00 MO
SOSIL 09:22  10971799 FS

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY.

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| REZKO | ANTOIN | S. | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 853 N. ELSTON AVENUE | CHICAGO | IL | 60622 | |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any  ☑ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any  ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| SIRAZI | SEMIR | D. | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 500 ELMWOOD AVENUE | WILMETTE | IL | 60091 | |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF.

| 5. ALTERNATIVE DESIGNATION (if applicable): | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS. Attach Addendum | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | All Debtors | Debtor 1 | Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

ILLINOIS SECRETARY OF STATE                    114852 - CRE

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

ACKNOWLEDGEMENT
COPY

## Exhibit A: Description of Collateral

This financing statement covers all right, title and interest of the debtor described in the financing statement ("Debtor") in and to the Distributions (as hereinafter defined), and in, under and to all proceeds (including claims against third parties), products, offspring, rents, revenues, issues, profits, royalties, income, benefits, additions and accessions to or of such Distributions, and all replacements and substitutions of such items.

For purposes of this financing statement, all capitalized terms shall have the meaning ascribed thereto as provided below:

"Company" shall collectively mean Heritage Development Partners, LLC, an Illinois limited liability company, and any and all successors to such limited liability company from time to time.

"Distributions" shall collectively mean: (A) all certificates of membership interests (resulting from or in connection with the exercise of stock or certificate splits, reclassifications, warrants, options, non-cash dividends, mergers, consolidations, and all other distributions), all dividends, payments, returns of capital, deferred payments, money and other distributions of any and every kind whatsoever (whether in cash or in kind) paid or payable at any time on or in respect of, and all proceeds of, any of the Ownership Interests or any documents or instruments creating, evidencing, constituting or relating to any of the Ownership Interests, of whatever kind or description, real or personal, whether in the ordinary course of business or in partial or total liquidation or dissolution, or as part of or in connection with any recapitalization, reclassification of capital, or reorganization or reduction of capital, or otherwise; and (B) all gross proceeds of all loans and other indebtedness received by Debtor from the Company (directly or indirectly), whether or not derived from the Offering or secured by any of the Ownership Interests and whether or not in exchange for any services rendered by Debtor.

"Ownership Interests" shall mean all of the shares, partnership interests, membership interests, beneficial interests and other ownership interests, representing direct or indirect ownership or other economic interests in and to the Company and owned by Debtor from time to time.

Information relative to the security interest created hereby may be obtained by application to Secured Party.

ACKNOWLEDGEMENT
COPY

# DASPIN AUMENT
## LLP

227 West Monroe Street, Suite 3500
Chicago, Illinois 60606
312.258.1600 ph  312.258.1955 fx
www.daspinaument.com

**Craig M. Gertz**

(312) 258-3793
cgertz@daspinaument.com

July 18, 2006

**VIA FEDERAL EXPRESS**

REZMAR CORPORATION
ANTOIN S. REZKO
c/o Rezmar Development Co.
853 N. Elston Avenue
Chicago, Illinois 60622

Re:  SETTLEMENT AGREEMENT

Gentlemen:

This firm represents SEMIR D. SIRAZI ("**Sirazi**"), GREENSTONE CAPITAL L.L.C. and MARDINI, INC. (together with Sirazi, collectively, the "**Creditors**"), with respect to, among other matters: (a) that certain Settlement Agreement dated as of May 5, 2006 (the "**Agreement**") by and ANTOIN S. REZKO ("**Rezko**") and REZMAR CORPORATION, an Illinois corporation, and ("**Rezmar**" and, together with Rezko, collectively the "**Borrowers**") and the Creditors; (b) that certain Guarantee made as of May 5, 2006, by Rezko for the benefit of the Creditors as part of the Agreement (the "**Guarantee**"); and (c) that certain Agreed Debt Note dated May 5, 2006 by Rezmar to the order of Sirazi in the principal amount of $3,000,000 (the "**Agreed Debt Note**"). All terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

As you know:

- Borrowers have failed to repay the Republic Bank Loan (as amended and/or assigned in accordance with the New Loan Extension) and all other Republic Bank Loan Obligations in full on or before the Resolution Date of July 17, 2006, in accordance with Section 3(b)(iii) and Section 4(b)(i) of the Agreement.

- Borrowers have failed to pay Sirazi the New Loan Extension Fee of $100,000 on or before the Resolution Date of July 17, 2006, in accordance with Section 3(b)(iii) of the Agreement.

- Borrowers have failed to repay, as part of the Agreed Debt: (a) Sirazi in the amount of Three Million Dollars ($3,000,000); (b) to Greenstone in the amount of One Million Two Hundred Thousand Dollars ($1,200,000); and (c) to Mardini in the amount of Five Hundred Thousand Dollars ($500,000), all on or before the Resolution Date of July 17, 2006, in accordance with Section 4(c) of the Agreement.

100367.00002.22882059.1



TRIAL EXHIBIT

**PX 107**

EXHIBIT

81

GMH Native 016829

July 18, 2006
Page 2

- Borrowers have failed to pay all outstanding legal costs incurred by this firm and related to the preparation of the Agreement and related documents and any ancillary documentation, currently in an amount equal to $11,572.55, in accordance with Section 9 of the Agreement.

This notice is not required under the terms and conditions of the Agreement and/or the Guarantee thereto or the Note. Nonetheless, we hereby give notice to Borrowers on behalf of the Creditors that:

- The failure of Borrowers to repay the Republic Bank Loan (as amended and/or assigned in accordance with the New Loan Extension) and all other Republic Bank Loan Obligations in full on or before the Resolution Date of July 17, 2006, in accordance with Section 3(b)(iii) and Section 4(b)(i) of the Agreement, and to pay Sirazi the New Loan Extension Fee of $100,000 on or before the Resolution Date of July 17, 2006, in accordance with Section 3(b)(iii) of the Agreement, each constituted an immediate event of default of Borrowers under the Agreement and the Agreed Debt Note as of July 17, 2006, without any right of Borrowers to notice of or opportunity to cure such default.

- The failure of Borrowers to repay, as part of the Agreed Debt: (a) Sirazi in the amount of Three Million Dollars ($3,000,000); (b) to Greenstone in the amount of One Million Two Hundred Thousand Dollars ($1,200,000); and (c) to Mardini in the amount of Five Hundred Thousand Dollars ($500,000), all on or before the Resolution Date of July 17, 2006, in accordance with Section 4(c) of the Agreement, each constituted an immediate event of default of Borrowers under the Agreement and the Agreed Debt Note as of July 17, 2006, without any right of Borrowers to notice of or opportunity to cure such default.

In accordance with Section 4(d) of the Agreement and with the Agreed Debt Note, we on behalf of Sirazi and the other Creditors hereby: (a) accelerate the maturity date of the Agreed Debt Note and all outstanding principal and accrued interest thereunder; (b) increase the interest rate payable under the Agreed Debt Note to the Default Rate of Twenty Four Percent (24%) per annum; and (c) demand the immediate repayment to Creditors of the entire Agreed Debt of $7,700,000, plus all interest accrued to date, the New Loan Extension Fee, and all interest on the Agreed Debt and the New Loan Extension Fee accruing from and after the date hereof at the Default Rate until repaid in full.

Pursuant to Section 11 of the Agreement, Borrowers are entitled to cure their failure to pay all outstanding legal costs incurred by this firm and related to the preparation of the Agreement and related documents and any ancillary documentation, currently in an amount equal to $11,572.55, in accordance with Section 9 of the Agreement, within thirty (30) days of this notice.

The Creditors hereby demand that the Borrowers immediately cease from drawing upon the Republic Bank Loan (as amended and/or assigned) until such defaults are cured, in accordance with Section 12(a) of the Agreement.

Furthermore, the Creditors hereby demand the full and immediate payment of all amounts due and payable by Borrowers to each of the Creditors under the Agreement and the Agreed Debt Note (including but not limited to the Agreed Debt and all interest due and payable hereunder and under the Agreed Debt Note) by Rezko, as the guarantor, in accordance with the Guarantee.

100367.00002.22882059.1

July 18, 2006
Page 3

In addition, each of the Creditors reserves the right to exercise any and all of the following remedies in accordance with the provisions of the Agreement and the Agreed Debt Note:

i)      Any Creditor may exercise from time to time any rights and remedies available to it under at law or in equity;

ii)     If permitted under the terms and conditions of the Republic Bank Loan Documents (as amended and/or assigned), Sirazi may exercise any and all rights of Lender against Borrowers under the Republic Bank Loan Documents (as amended and/or assigned), to the extent Lender has exercised its rights against Sirazi in connection with the Collateral/Guaranty;

iii)    Sirazi, on his own behalf and as agent for the Creditors, exercise any and all rights and remedies against the Secured Collateral in accordance with the UCC; and

iv)     The Creditors may, without demand or notice of any kind, appropriate and apply toward the payment of such of the Liabilities, and in such order or application, as the Creditors may from time to time elect, any balances, credits, deposits, accounts or moneys of Borrowers held, in any capacity, by, or in transit to, any of the Creditors.

Pursuant to Section 12(b) of the Agreement, Borrowers are required to pay to each of the Creditors, on demand, all costs expended for collection of any payments due under the Agreement or under the Agreed Debt Note and all costs, including reasonable attorney's fees and expenses, incurred by each of the Creditors in connection with a suit at law or equity to enforce the terms and conditions of the Agreement (including but not limited to any remedies thereunder), whether or not such suit shall ever have been filed or have proceeded to judgment, together with interest thereon at the Default Rate, and such costs shall be deemed to be part of the Liabilities.

The foregoing does not and shall not (i) operate as a waiver of any other default which may exist under the Agreement, the Guarantee or the Agreed Debt Note, or (ii) operate as a waiver of any right, remedy, power of privilege of Sirazi or any other Credtior under the Agreement, the Guarantee or the Agreed Debt Note, (iii) prejudice or preclude any other further exercise of any right or remedy provided by law or in equity, (iv) entitle Borrowers to any other or further notice or demand whatsoever, or (v) in any way modify, change, impair, effect, or diminish any of Borrowers' liability under or pursuant to the Agreement, the Guarantee or the Agreed Debt Note or any other liability that Borrowers may have to Sirazi or any other Creditor.

Respectfully yours,

Craig M. Gertz

cc:    Dr. Semir D. Sirazi (via e-mail)
       Anthony R. Licata, Esq. (via e-mail)

100367.00002.22882059.1

From:      Michael Rumman
To:        Almiqdadi
Sent:      11/13/2006 10:28:13 AM
Subject:   Questions?

What is the status of the capital contributions to pay past due obligations and November obligations?

What employees are you asking me to terminate?  Which are you asking to keep and under what terms?

Have you retained John Karuso or any other lawyer and what duties have you assigned them?

I understand you are asking that I modify my current agreement with the company. Please confirm what it is you are asking of me?

What do you want me to do with the equity position:
    Tony shares
    Malik
    Mirza
    Sirazi
    Limited partner:

Should I begin speaking with the building about reaching some agreement on the lease?

Please email me your responses so I have clear direction on these issues.

Thank you
Michael

PLAINTIFF'S
EXHIBIT
47
12.5.12  AU
ALL-STATE LEGAL®

TRIAL EXHIBIT
PX 116

GMH Native 064105



GENERAL MEDITERRANEAN HOLDING

**Facsimile Transmission**

To:   Mr. Ali Sherwani
From: Mohammed Al-Miqdadi
Date: March 30th, 2007

---

Please arrange to transfer the payment of US $3.5 million (Three million and five hundred thousand US dollars) to the account of Freeborn & Peters LLP. This will be a personal loan to Mr. Tony Rezko Guaranteed by him personally, account details are as follow;

Amount                  US $3,500,000.00
                        **Three million and five hundred thousand US Dollars**

**WIRE TRANSFER FUNDS TO:**

Bank:                   **THE NORTHERN TRUST COMPANY**
                        **50 SOUTH LASALLE STREET**
                        **CHICAGO, ILLINOIS 60675**

Swift Code:             **CNOR US 44**

Credit To:              **FREEBORN & PETERS LLP**

Account No:             7080204

Value Date:             **April 2nd, 2007**

Authorised by:

Mohammed Al Miqdadi                          Nadhmi Auchi

**TRIAL EXHIBIT**

**PX 121**

PLAINTIFF'S EXHIBIT
48
12.5.12

CONFIDENTIAL SIRAZI - G016724

Freeborn & Peters LLP

March 5, 2007

**VIA FEDERAL EXPRESS**

Mr. Nadhmi Auchi
President
General Mediterranean Holdings, S.A.
137-143 Hammersmith Rd.
London W140QL
UNITED KINGDOM

Attorneys at Law

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
312.360.6000

David C. Gustman
Partner
Direct 312.360.6515
Fax 312.360.6571
dgustman@
freebornpeters.com

Chicago

Springfield

Dear Mr. Auchi:

    Enclosed herewith please find a check in the amount of $10,000,000.00 made payable to General Mediterranean Holdings, as a deposit from Garrett Kelleher regarding Riverside (RDD). By agreement with Mr. Kelleher, this may only be deposited by GMH after you have signed the Letter of Intent dated March 6, 2007 and the Refunding Agreement. I am enclosing another version of the Refunding Agreement with the change you requested. We are checking with Mr. Kelleher to confirm he agrees with the change you have requested and will let you know Tuesday.

Very truly yours,

David C. Gustman

DCG/lf

cc:    William E. Russell, Esq.
        Antoin S. Rezko

Enclosure



**TRIAL EXHIBIT**

**PX 122**

PLAINTIFF'S
EXHIBIT
55
12.5.12

CONFIDENTIAL - SIRAZI G007659

March 6, 2007

Riverside District Development, LLC

Re:     LETTER OF INTENT
        Approx. 62 acres bounded by 16th St., Clark St., Roosevelt Rd., and the Chicago River (the
        "Property")

Dear Mr. Auchi:

I, Garrett Kelleher, hereby submit this Letter of Intent to acquire the above captioned property
through one or more entities I will create for such purpose.

**PROPERTY:**  The Property shall be conveyed to Purchaser's designee at Closing in fee simple, free
of all mortgages, encumbrances, liens, leaseholds, contracts, and claims, and subject only to those
currently existing easements and covenants as shall be disclosed to Purchaser, and real estate taxes,
utilities and other items customarily pro rated at Closing.  Without further consideration, Seller shall
assign to Purchaser at Closing all surveys (including physical, topographical, soil and environmental
surveys), all designs and plans, budgets, and financial data, models and promotional materials, trade
names, existing zoning applications and any other intellectual property related to the Property or its
development, free of any lien or obligation to consultants who may have developed such work
product.

**PURCHASE PRICE:**  The purchase price is US $255,000,000 (the "Purchase Price").  In addition
to the Purchase Price, the Purchaser shall be paid 10% of the "profit" on the development, to be
defined and paid as shall be determined in the Contract (the "Profit Interest").

**EARNEST MONEY:**  Upon the execution of this Letter of Intent and refunding agreement from
GMH, Purchaser shall deposit with General Mediterranean Holdings, S.A. ("GMH") for the benefit
of the Seller, US $10,000,000 (the "Earnest Money") to be used as GMH pleases.  The Earnest
Money shall be applied to the Purchase Price at Closing.  If the Conditions of Closing are not
satisfied, GMH shall refund the full Earnest Money.  The refunding of the Earnest Money shall be
guaranteed by GMH to Purchaser's satisfaction.   The refunding obligation of the Earnest Money
hereunder shall constitute an encumbrance upon the Property.

**CARRY FEE:**  After 30 days from the date hereof, Purchaser shall pay Seller US $200,000 per
month (pro rated for any partial month) until Closing, which fee shall not be credited against the
Purchase Price.

**PAYMENT OF PURCHASE PRICE:**  The Purchase Price shall be paid in cash at a single closing,
subject to customary prorations, exclusive of any Profit Interest.



PLAINTIFF'S
EXHIBIT

ALL-STATE LEGAL®

S3

m.A

TRIAL EXHIBIT

PX 124

CONFIDENTIAL SIRAZI  G005822

**CONTRACT:** The parties shall enter in a definitive Real Estate Sales Contract (the "Contract") within fifteen (15) days hereof. The Contract will contain customary representations and warranties as shall be mutually agreed by the parties.

**CLOSING:** The property will be conveyed at a single closing provided all conditions are satisfied or waived. Closing shall take place in escrow. Seller shall provide Purchaser title insurance with extended coverages as shall be agreed and specified in the Contract.

**TIME OF CLOSING:** The Closing shall take place within one hundred and twenty (120) days hereof.

**CONDITIONS FOR CLOSING:** The following are the conditions precedent for closing:

    (i)    Due Diligence to the absolute satisfaction of Purchaser;

    (ii)    Financing adequate for Purchaser to effect the acquisition.

**ACCELERATION:** It is agreed by the parties that the closing can be accelerated with no penalties.

**PRORATIONS:** Real estate taxes and other proratable items shall be prorated as of the date of the closing.

**POSSESSION:** Possession shall be given to the Purchaser at the time of closing.

**DUE DILIGENCE PERIOD:** The Due Diligence period shall begin on the date hereof and continue until Closing. During this Due Diligence period Purchaser shall be permitted to enter upon the subject property for the purpose of making soil, environmental, geological and such other tests as Purchaser deems necessary to determine the feasibility of the project. Purchaser may, during this period, appraise the viability of the proposed project. If, during the Due Diligence period Purchaser, in its sole discretion, determines that the project is not feasible, Purchaser may give Seller and GMH notice of the termination of the contract, which shall cause the contract to become null and void and GMH shall return the Earnest Money deposit to Purchaser within five (5) business days. If, during the Due Diligence period, Purchaser does not provide notice of termination to Seller, then the parties shall proceed with the terms of the agreement and the Earnest Money shall be applied to the Purchase Price at the time of closing.

*(15) FIFTEEN*

**DUE DILIGENCE INFORMATION:** Seller shall promptly provide to Purchaser all information relative to the property if available, including but not limited to soils studies, environmental or archeological studies, topographical surveys, and existing liens, claims and litigation affecting the Property.

**CONFIDENTIALITY:** This Letter of Intent shall be considered confidential between the parties and their respective advisors.

**MARKETING OF PROPERTY:** Seller agrees not to market the property during the time the parties are attempting to negotiate a formal Purchase Agreement.

**BROKER:** Seller and Purchaser are not represented by any broker or agent. Seller shall indemnify Purchaser for any broker or agent previously retained by Seller.

*M.A*

2

**WAIVER OF CONFLICT:** The parties hereby acknowledge that Freeborn & Peters LLP has previously represented the parties to this Agreement on legal matters, including matters related to this Property, and may continue to represent the respective parties in the future.

This letter is solely an expression of certain terms and conditions and does not include all of the essential terms required in order for there to be a contract between the parties. Such essential terms that are missing include but are not limited to provisions for default and remedies, notice provisions, and extension provisions. The parties hereto expressly acknowledge and agree that this letter is not and shall not be construed as an offer, an acceptance of an offer, or a contract for purchase or sale of the property or, except as to the paragraphs on Earnest Money, Confidentiality, Marketing of Property and Conflicts above, otherwise create a binding or legally enforceable contractual relationship between the parties. Neither party shall have any rights or obligations to the other of any kind under this letter of intent except as to the paragraphs on Confidentiality, Marketing of Property and Conflicts.

Sincerely,

_____        Witness: _____
Garrett Kelleher

Accepted:

RIVERSIDE DISTRICT DEVELOPMENT, LLC

By: Illinois Developers, LLC

By: _____
Its Manager

By: _MOHAMMED AL-MOADIE_
Its: _DIRECTOR_

_____        Witness: A. Whittleg___
Nadhmi Auchi

_____        Witness: _____
Antoin R. Rezko

Effective: _____
              Date

THIS AGREEMENT WILL TAKE EFFECT WHEN FUNDS ARE RECEIVED INTO
OUR SMH BANK ACCOUNT, IF FUNDS ARE NOT RECEIVED BY MARCH
14TH 2007, THEN THIS AGREEMENT BECOMES VOID AND NULL.

CONFIDENTIAL SIRAZI - G005824

**Almiqdadi**

**From:** Almiqdadi
**Sent:** 18 October 2006 16:45
**To:** 'Michael Rumman'
**Subject:** RE: RDD

Dear Mike;
This is very good. On a different matter, I still need a professional opinion form Freeborn & Peters or who ever you spoke to at the time as to the exposure we have considering Tony's situation? Many thanks.

Mohammed Al-Miqdadi  BSc, MBA(Hons)
Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
United Kingdom
Phone 0044(0) 20 7602 7055
Fax    0044(0) 20 7603 5533
almiqdadi@gmhsa.com
www.gmhsa.com

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or return the original message to us at the above address . Thank you.

**From:** Michael Rumman [mailto:MRumman@hdpco.com]
**Sent:** 18 October 2006 16:29
**To:** Almiqdadi
**Subject:** FW: Contact Information Below

Mohammad,

FYI: I have spoke to the two gentlemen below and we have a follow up conversation tomorrow in advance of your Friday meeting with them.

Michael

**From:** Silvers, Nicholas [mailto:nicholas.silvers@credit-suisse.com]
**Sent:** Wednesday, October 18, 2006 10:03 AM
**To:** Michael Rumman

18/10/2006

EXHIBIT
215
1.23.14  AW

CONFIDENTIAL SIRAZI - G005289

TRIAL EXHIBIT
PX 125

**Maha Al Mufti**

| | |
|---|---|
| **From:** | Maha Al Mufti |
| **Sent:** | 24 April 2007 13:25 |
| **To:** | 'jcooper@freebornpeters.com' |
| **Subject:** | Rezko's Promissory Note |
| **Importance:** | High |

Dear Joel,

Pertaining to the $3.5 million loan by Fintrade Services SA to Mr. Rezko, please note that we are still awaiting to receive an original copy of the executed Promissory Note signed with Mr. Tony Rezko. Please let me know when will you send the P.N.

Regards,
Maha Al Mufti
P/A to Mr. Mohammed Al Miqdadi / Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
Tel: +44 20 7605 1817
Fax: +44 20 7603 5533



EXHIBIT
216
1.23.14   AW

CONFIDENTIAL SIRAZI - G009669

TRIAL EXHIBIT

PX 126

4/24/2007

**Maha Al Mufti**

| | |
|---|---|
| **From:** | Cooper, Joel [jcooper@freebornpeters.com] |
| **Sent:** | 04 May 2007 15:03 |
| **To:** | Maha Al Mufti |
| **Cc:** | John Caruso |
| **Subject:** | RE: Rezko's Promissory Note |

Thank you -- we would request that you return the original note in error to us marked "Canceled".

Thank you, and enjoy your weekend.

Joel Cooper

**Joel T. Cooper**
**Freeborn & Peters**
**311 South Wacker Drive**
**Suite 3000**
**Chicago, Illinois 60606-6677**
**312 360-6262 - Direct Dial**
**312 360-6573 - Fax**
**Confidentiality Notice:** This email and its attachments (if any) contain confidential information of the sender which is legally privileged. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this email. If you have received this email in error, please immediately notify the sender at jcooper@freebornpeters.com and permanently delete any copies of this email (digital or paper) in your possession.

**Virus Protection:** Although we have taken steps to ensure that this email and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this email and any attachments for the presence of viruses.

**Internet Email Security:** Please note that this email is sent without encryption and has been created in the knowledge that Internet email is most commonly sent without encryption. Unencrypted email is not a secure communications medium. Also, please note that it is possible to spoof or fake the return address found in the From section of an Internet email. There is no guarantee that the sender listed in the From section actually sent the email. We advise that you understand and observe this lack of security when emailing us.

**IRS CIRCULAR 230 NOTICE.** Neither this message nor the attachments thereto is intended or written for the purpose of avoiding any penalties that may be imposed under the Internal Revenue Code of 1986, as amended.

**Freeborn & Peters LLP**
http://www.freebornpeters.com

**From:** Maha Al Mufti [mailto:almufti@gmhsa.com]
**Sent:** Friday, May 04, 2007 8:58 AM
**To:** Cooper, Joel
**Subject:** RE: Rezko's Promissory Note

**EXHIBIT**
**217**
1.23.14   AW

**TRIAL EXHIBIT**
**PX 127**

CONFIDENTIAL SIRAZI - G016729

5/8/2007

Many thanks for your response, I'll await to receive the new executed original from you then we will destroy the old one or mark it cancelled.
Regards and have a good weekend,
Maha Al Mufti
P/A to Mr. Mohammed Al Miqdadi / Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
Tel: +44 20 7605 1817
Fax: +44 20 7603 5533
.... .... . .......... ... ......... ........ ....... ...... .... .. .... ........... . ....... .... ... ..... ...... ... . . . .......... .. .. ......

**From:** Cooper, Joel [mailto:jcooper@freebornpeters.com]
**Sent:** 04 May 2007 14:57
**To:** Maha Al Mufti
**Cc:** John Caruso
**Subject:** RE: Rezko's Promissory Note

Sir,

I apologize for the error.  Tony will be in my office later this morning and he will execute the revised Promissory Note and I will PDF same to you and then forward the original thereof to your attention.  That note will be deemed delivered in trust and the trust will be dissolved at such time as we receive back from you marked "Cancelled" the $3.5 million note previously forwarded to you in error.

Alternatively, at your option, we can deliver the revised note to John Caruso under the above trust and he can cause substitution of the note and re-delivery to me of the original note in error.

As always, if you have any questions or comments please do not hesitate to contact me.

Joel Cooper


**Joel T. Cooper**
**Freeborn & Peters**
**311 South Wacker Drive**
**Suite 3000**
**Chicago, Illinois 60606-6677**
**312 360-6262 - Direct Dial**
**312 360-6573 - Fax**

**Confidentiality Notice:** This email and its attachments (if any) contain confidential information of the sender which is legally privileged. The information is intended only for the use by the direct addressees of the original sender of this email. If you are not an intended recipient of the original sender (or responsible for delivering the message to such person), you are hereby notified that any review, disclosure, copying, distribution or the taking of any action in reliance of the contents of and attachments to this email is strictly prohibited. We do not waive attorney-client or work product privilege by the transmission of this email. If you have received this email in error, please immediately notify the sender at jcooper@freebornpeters.com and permanently delete any copies of this email (digital or paper) in your possession.

**Virus Protection:** Although we have taken steps to ensure that this email and its attachments (if any) are free from any virus, the recipient should, in keeping with good computing practice, also check this email and any attachments for the presence of viruses.

**Internet Email Security:** Please note that this email is sent without encryption and has been created in the knowledge that Internet email is most commonly sent without encryption. Unencrypted email is not a secure communications medium. Also, please note that it is possible to spoof or fake the return address found in the From section of an Internet email. There is no guarantee that the sender listed in the From section actually sent the email. We advise that you

understand and observe this lack of security when emailing us.

**IRS CIRCULAR 230 NOTICE.** Neither this message nor the attachments thereto is intended or written for the purpose of avoiding any penalties that may be imposed under the Internal Revenue Code of 1986, as amended.

**Freeborn & Peters LLP**
http://www.freebornpeters.com

**From:** Maha Al Mufti [mailto:almufti@gmhsa.com]
**Sent:** Friday, May 04, 2007 7:45 AM
**To:** Cooper, Joel
**Subject:** Rezko's Promissory Note
**Importance:** High

Dear Mr. Cooper,
Please note that we still have not received the executed Promissory Note of the $3.5 million loan to Mr. Rezko, where the lender's name would have changed from GMH to Fintrade Services S.A.
Regards,
Maha Al Mufti
P/A to Mr. Mohammed Al Miqdadi / Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
Tel: +44 20 7605 1817
Fax: +44 20 7603 5533

**From:** Maha Al Mufti
**Sent:** 24 April 2007 13:25
**To:** 'jcooper@freebornpeters.com'
**Subject:** Rezko's Promissory Note
**Importance:** High

Dear Joel,

Pertaining to the $3.5 million loan by Fintrade Services SA to Mr. Rezko, please note that we are still awaiting to receive an original copy of the executed Promissory Note signed with Mr. Tony Rezko. Please let me know when will you send the P.N.

Regards,
Maha Al Mufti
P/A to Mr. Mohammed Al Miqdadi / Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
Tel: +44 20 7605 1817
Fax: +44 20 7603 5533

CONFIDENTIAL SIRAZI - G016731

**Afaf Asfour**

| | |
|---|---|
| **From:** | Michael Rumman [MRumman@hdpco.com] |
| **Sent:** | 28 June 2007 14:10 |
| **To:** | Afaf Asfour |
| **Subject:** | Mr. Auchi Letter |
| **Attachments:** | Auchi Letter 6-28-07.doc |

Hello Miss Afaf,

It was nice speaking to you today. I have been to your offices many times and I look forward to meeting in person. Attached is the letter to Mr. Auchi. I would appreciate it if you could get this to him today. If by some chance he needs it, my cell phone number in America is 312-218-3593.

Thank you
Michael Ruman

TRIAL EXHIBIT

PX 128

EXHIBIT

218

1.23.14    AW

CONFIDENTIAL - SIRAZI G007078

28/06/2007

June 28, 2007
Dear Mr. Auchi,

I am sending this letter out of respect for you before taking legal action in the US courts. I am not clear on how circumstances have evolved to a point where GMH views me as its enemy. Nevertheless, it's important for my own peace of mind that I recap certain facts to you so they can be properly considered during the next stage of events.

Let me begin by saying, through out our relationship I have acted with the pinnacle of integrity and I will always do so. When the company had insufficient funds to pay its bills, because of our inability to get funding, I reduced my own compensation in an effort to help the company. Though many would consider this to be an unusual sacrifice, I thought as the leader of the company this was my duty to do so. Frankly, after the audit was complete I thought recognition may be given for taking such a step, but instead it has been used as leverage against me.

Further, when you and Tony requested that ████████████████ resources to do so were not readily available. Subsequently, I personally funded the costs out of my own pocket, having received assurances from you and Tony to reimburse these expenses. This was over $300,000 to me, but I have been too embarrassed to even raise it with you.

In December I was asked by GMH to leave the company at the end of February. Though very disappointed, I of course agreed. I was further asked to take a 50% cut in pay, which I also agreed to do with the understanding that I would receive my deferred compensation. More importantly, I diligently worked during this period to ensure a smooth transition and attempted to preserve what I thought was a good relationship with GMH. Simultaneously, GMH prudently decided to launch a detailed audit of the company to ensure all finances were appropriately used. I realized given unfortunate events at other GMH company's, this was important and I did all I could to support this effort. Further, it was committed this audit would be complete in January and to my amazement it continued into May. I must tell you Mr. Auchi, I was again disappointed when the audit was finalized and every dollar properly accounted for, that I received no positive feedback nor received the $205,000 immediately.

From our last one on one conversation in October of 2006, when you said I consider you family and would like you to stay, I have remained professional with uncompromising integrity. During this frustrating period, I have had many options at my disposal to act in an appropriate, but self serving manner, but have always chosen the high road. However, I must say your organization has not reciprocated and has handled this matter with surprising disrespect. Perhaps it was naïve for me to expect appreciation, but I will not accept disrespect. If it were not enough that I deferred my compensation, ████████ ████████ and have always put you ahead of myself, now your organization is using my goodwill to strong arm the purchase of my stock by withholding my compensation. Enough is enough and this is now a matter of principle.

CONFIDENTIAL - SIRAZI G007079

Perhaps naively, over the past seven months I have been attempting to preserve a personal relationship with you and GMH, but now I feel this is a one way effort. Nevertheless, no matter what happens legally from here forward, I want you to know it has been a genuine honor knowing you and I ████████████████████

Sincerely,
Michael Rumman

Attorney-Client Work Product
Privileged and Confidential

# *M E M O R A N D U M*

| | |
|---|---|
| *TO:* | **Mohammed Al-Miqdadi** |
| *FROM:* | **John G. Caruso** |
| *DATE:* | **December 6, 2006** |
| *RE:* | **Riverside District Development** |

You have asked us to review certain materials provided by Michael M. Rumman regarding the approximately 61 acres of unimproved land generally located south of Roosevelt Road, east of the Chicago River, north of 16th Street and west of Clark Street in Chicago, Illinois (the "Property"). To date, we have received the documentation described on Exhibit A from Mr. Rumman. Specifically, you have asked us to provide you with our recommendation as to how to proceed with respect to the various ongoing matters related to the Property as described in the materials provided by Mr. Rumman. However, as we have discussed, our recommendations are qualified by the fact that the information we have received to date from Mr. Rumman represents a small percentage of the documentation available with respect to the Property.

Based on the information we have received to date, it appears that the following matters need to be addressed in the near term with respect to the Property:

1. Mr. Antoin Rezko's direct and/or indirect interest in the Property;

2. The tax structure of the ownership of the Property;

3. The extension of Wells Street through the Property; — 14th Street

4. The vacation of former streets located on the Property;

5. The location of the proposed intersection of LaSalle Street and Roosevelt Road adjacent to the Property;

6. The ownership of the land located under Roosevelt Road on or adjacent to the Property;

7. The relocation of certain easements in favor of Commonwealth Edison, Metra and MCI/Verizon that affect the Property;

P000002

TRIAL EXHIBIT

PX 131

KE003152

December 6, 2006
Page 2

8.  The "lien" filed by Republic Bank regarding its alleged option to purchase
    or lease a portion of the Property; and

9.  The litigation matters filed by Mr. Joseph Cacciatore or an affiliated
    entity.

### Antoin Rezko's direct and/or indirect interest in the Property

The owner of the Property is Riverside District Development, LLC, an Illinois
limited liability company ("RDD"). RDD has two members: General Mediterranean
Holding, SA ("GMH"), which holds 51% of the Voting Units, and Heritage Development
Partners, LLC ("Heritage"), which holds 49% of the Voting Units. The manager of RDD
is Heritage Property Development, Inc. ("HPDI"). Antoin Rezko ("Rezko") does not
have any interest in GMH or HPDI but currently holds 80% of the membership interests
in Heritage. However, Rezko has pledged a portion, if not all, of his interest in Heritage
to various parties.

The City of Chicago has indicated that it will not approve or act on any further
requests of RDD so long as Rezko, who is under criminal indictment, has a direct or
indirect interest in the Property. In addition, in connection with marketing the Property,
potential purchasers have been reluctant to enter into negotiations to purchase any portion
of the Property so long as Rezko has a direct or indirect interest in the Property.
Accordingly, it is our understanding that all parties holding an interest in RDD, including
Rezko, believe that Rezko should divest himself of all direct and indirect interests in the
Property, including without limitation, his interest in Heritage. We agree with this course
of action.

Upon your request, we would prepare and negotiate a proposed acquisition
agreement for Rezko's membership interests in Heritage. We would need to review the
operating agreement for Heritage, all current liabilities of Heritage (including existing
contracts), all information related to pledges of Rezko's interest in Heritage and various
lien searches related to Rezko and Heritage. In addition, the transaction would need to be
structured, to the extent possible, to withstand any challenge to the acquisition of Rezko's
membership interests in Heritage in the context of a potential future bankruptcy of Rezko.

### Tax structure of the ownership of the Property

As noted above, RDD is the owner of the Property. In order to minimize tax
liability in the form of long-term capital gains treatment for any increase in the value of
the Property, RDD was organized to hold title to the Property but not "develop" the
Property. At the time RDD acquired the Property, the law firm of Freeborn & Peters
advised GMH regarding the tax structure and has provided ongoing advice to GMH
regarding various activities with respect to the Property to ensure that such activities do
not constitute "development activities". As it is our understanding that Freeborn & Peters

P000003

KE003153

December 6, 2006
Page 3

is or will be representing Rezko in all civil litigation matters with respect to the Property and otherwise, we recommend that GMH retain substitute to advise GMH with respect to tax matters on a going forward basis.

## Development Matters

RDD retained the law firm of Shefsky & Froelich to represent RDD in negotiations with the City of Chicago regarding; (i) the extension of Wells Street through the Property, (ii) the vacation of former streets located on the Property, (iii) the location of the proposed intersection of LaSalle Street and Roosevelt Road adjacent to the Property, and (iv) the ownership of the land located under Roosevelt Road on or adjacent to the Property (the "Existing Development Matters"). As it is our understanding that the substantive issues related to the Existing Development Matters have been resolved with the City of Chicago and, upon receiving evidence that Rezko no longer has a direct or indirect interest in the Property, the City of Chicago will act on the Existing Development Matters, we recommend that Shefsky & Froelich continue to be retained to complete the Existing Development Matters.

## Relocation of Commonwealth Edison, Metra and MCI/Verizon Easements

Ken Haldeman, on behalf of RDD, has held initial discussions with Commonwealth Edison, Metra and MCI/Verizon regarding the relocation of certain easements on the Property. To date, outside counsel has not been retained to assist in the negotiation and documentation of the relocation of such easements. While not an immediate priority, we recommend that our firm be retained to assist Mr. Haldeman in the negotiation and documentation of the relocation of these easements.

## Republic Bank Litigation

At the time RDD acquired the Property, Republic Bank recorded a document against the Property alleging that Republic Bank holds an option to purchase and/or lease a portion of the Property. RDD retained Freeborn & Peters to initiate a quiet title action to extinguish any alleged interest held by Republic Bank in the Property. As it is our understanding that Freeborn & Peters is or will be representing Rezko in all civil litigation matters with respect to the Property and otherwise, subject to our review of the filings to date and the status of the litigation, we recommend that GMH consider obtaining substitute counsel for this litigation.

## Cacciatore Litigation

It is our understanding that Mr. Joseph Cacciatore, personally or on behalf of an affiliated entity ("Cacciatore"), has filed three actions with respect to the Property; (i) an action seeking discovery and depositions related to the sale of the Property to RDD ("Discovery Litigation"), (ii) an action regarding an alleged 2002 agreement between

December 6, 2006
Page 4

Rezko, Dan Mahru and Cacciatore with respect to the Property ("2002 Agreement Litigation"), and (iii) an action regarding a two million dollar note related to the Property ("Note Litigation"). As with the Republic Bank matter, we have received very limited information regarding the Cacciatore litigation. However, it is understanding that GMH has only been named (but not served) in the Discovery Litigation. Heritage, among other parties, is named in the 2002 Agreement Litigation and the Note Litigation. Freeborn & Peters has been representing GMH, as well as Heritage and other parties, in the Cacciatore litigation matters. As it is our understanding that Freeborn & Peters is or will be representing Rezko in all civil litigation matters with respect to the Property and otherwise, subject to our review of the filings to date and the status of the litigation, we recommend that GMH consider obtaining substitute counsel to represent GMH and, if and when GMH obtains a controlling interest in Heritage, Heritage in connection with the Cacciatore litigation.

## Miscellaneous Matters

In the Memorandum to Michael M. Rumman from H. Edward Wynn, dated November 15, 2006 (the "Wynn Memorandum"), reference is made to the appeal of the real estate taxes for the Property. Pursuant to our discussion, we have requested that Field and Goldberg, LLC, a firm specializing in real property tax issues, review at no cost the current status of the real estate taxes, whether a tax appeal should be filed, the cost of such appeal (on a contingency fee basis) and the timing of any such appeal. However, based on Field and Goldberg, LLC's initial analysis, while RDD still has the right to appeal the real property taxes, as the current assessed value of the Property appears low, as noted in the Wynn Memorandum, there does not appear to be a basis for an appeal.

Finally, you asked whether GMH has the right to remove HPDI as manager of RDD. The Amended and Restated Operating Agreement of Riverside District Development LLC provides that if all the members of RDD desire to remove the manager based on their review, or for any good faith reason, they may do so. In addition, as the holder of a majority of the Voting Units, GMH has the right to remove the manager for "Cause." However, this may be a difficult standard to meet as Cause is defined as (i) willful and wonton misconduct, reckless conduct, gross negligence, or fraud, or (ii) repeated bad faith performance of a manager's duties.

Please contact me after you have had an opportunity to review this memorandum so we can discuss how you would like to proceed.

P000005

KE003155

December 6, 2006
Page 5

## EXHIBIT A

1.  Memorandum from H. Edward Wynn to Michael M. Rumman, dated November 15, 2006 Re Status of Currently Pending Matters.

2.  Amended and Restated Operating Agreement of Riverside District Development LLC, effective as of January 1, 2006.

3.  Excel Spreadsheet of Riverside Park 2006 Accrued Property Taxes.

4.  Brokerage Letter Agreement, dated May 19, 2006, by and between Eastdil Secured Broker Services, Inc., U.S. Equities Realty, LLC and Riverside District Development, LLC.

5.  Heritage Development Partners, Summary of Existing Insurance.

6.  Heritage Development Partners LLC – Expenditures of $50,000 or Greater as of March 30, 2006.

7.  Undated and unsigned letter from H. Edward Wynn to Ms. Sanchez regarding the vacation of streets on the Property.

8.  Unsigned letter dated May 31, 2006 from H. Edward Wynn to Mr. Larry Larson and Ms. Andrea Yao of the City of Chicago regarding the vacation of streets on the Property.

9.  Planned Development Number 904.

P000006

KE003156

Attorney-Client Work Product
Privileged and Confidential

# *MEMORANDUM*

TO: **Mohammed Al-Miqdadi**

FROM: **John G. Caruso**

DATE: **April 23, 2007**

RE: ***Acquisition of Antoin Rezko's Interests in Riverside District Development LLC***

## I. INTRODUCTION.

You have indicated that General Mediterranean Holding SA ("GMH") desires to acquire Antoin Rezko's ("Rezko") interest in the property located West of Clark Street, South of Roosevelt Road, East of the Chicago River and North of 16th Street in Chicago, Illinois (the "Property"). The current title holder of the Property is Riverside District Development LLC ("RDD"). In connection with the proposed acquisition of Rezko's interest in the Property, I have received and reviewed the documentation described on Exhibit A. Based on the information received to date, an organizational chart of RDD is attached hereto as Exhibit B. As noted in the attached organizational chart, Rezko's interest in the Property is held through MT Property Holding, LLC ("MT"). Accordingly, it is my understanding that GMH desires to acquire Rezko's interest in MT.

This memorandum contains comments and/or proposed changes to the operating agreements of RDD, Heritage Development Partners, LLC ("Heritage") and MT in connection with GMH's acquisition of Rezko's interest in MT. More detailed summaries of the operating agreements of RDD, Heritage and MT are attached hereto as Exhibits C, D and E, respectively.

## II. RDD OPERATING AGREEMENT

As you are aware, GMH currently holds a fifty percent (50%) ownership interest and fifty-one percent (51%) voting interest in RDD. The current manager of RDD is Heritage Property Development, Inc. ("HPDI"), which is an entity controlled by Michael Rumman ("Rumman"). While the manager under the operating agreement for RDD has limited rights, as GMH will hold in excess of an eight-five percent (85%) interest in RDD upon acquiring Rezko's interest in MT, GMH should have the right to select the manager of RDD. The only other proposed change to the operating agreement of RDD is with respect to Section 9.12, which currently provides that Rezko shall not voluntarily disassociate himself from controlling management of Heritage. In connection with

TRIAL EXHIBIT

PX 137

P001042

KE004171

April 23, 2007
Page 2

GMH's acquisition of Rezko's interest in MT, the RDD operating agreement should be amended to delete this provision.

## II. HERITAGE OPERATING AGREEMENT

MT currently holds a 98.1% interest in Heritage. Upon GMH's acquisition of Rezko's interest in MT, GMH will hold in excess of a Seventy-Five percent (75%) interest in Heritage. As with RDD, the manager of Heritage is currently HPDI. However, unlike RDD, the manager under the Heritage operating agreement has significant rights and powers that it may exercise without the consent of the members of Heritage. Accordingly, a new manager selected by GMH should be put in place at the time of GMH's acquisition of Rezko's interest in MT. The Heritage operating agreement also provides that, so long as Rumman is a member of MT, Heritage shall not borrow money, issue units or make distributions without Rumman's prior written consent. In connection with GMH's acquisition of Rezko's interest in MT, GMH should request that the Heritage operating agreement be amended to delete these special consent rights provided to Rumman. Finally, the Heritage operating agreement provides that no member shall transfer any units or interest in units in Heritage without the manager's consent. Unless the manager of Heritage is an entity selected by GMH, the Heritage operating agreement should be amended to provide for more reasonable restrictions upon the transfer of units in Heritage.

## III. MT OPERATING AGREEMENT

Rezko currently holds in excess of a seventy-seven percent (77%) interest in MT and Rumman has an approximate twenty percent (20%) interest in MT. The MT operating agreement provides for a preferred return to the holder of the Class A Units which is Rumman. It appears that such preferred return is to provide for disbursements that would otherwise be payable to Rumman but for liability incurred in connection with a public offering of certain shares in Heritage. Rezko should confirm the basis of such preferred return to Rumman. After the payment of the preferred return to Rumman, the MT operating agreement provides for distributions to the Class A, B and C unit holders based upon MT's interest in Heritage. The MT operating agreement provides that upon the reduction of MT's interest in Heritage, the Class A unit holder's (Rumman's) pro rata share of net cash shall increase and the Class B unit holder's (Rezko's) pro rata share of net cash shall decrease. As all unit holders of MT would be entitled to the proceeds of MT's sale of any interest in Heritage, such sale should not result in the increase in one unit holder's pro rata share of net cash over another unit holder. Rezko should confirm the basis of this distribution waterfall. Finally, the MT operating agreement provides that no member may transfer membership rights without the unanimous consent of all members. Accordingly, Rumman's consent will be required for the transfer of Rezko's interest in MT to GMH.

P001043
KE004172

April 23, 2007
Page 3

Please contact me after you have had an opportunity to review this memorandum so we can discuss how you would like to proceed.

P001044

KE004173

April 23, 2007
Page 4


## EXHIBIT A

1. Amended and Restated Operating Agreement of Riverside District Development LLC, effective as of January 1, 2006.

2. Heritage Development Partners, LLC Operating Agreement, effective as of January 1, 2006.

3. Amended and Restated Operating Agreement of MT Property Holdings, LLC, effective as of January 1, 2006.

P001045

KE004174

KE004175

P001046

# RIVERSIDE DISTRICT DEVELOPMENT LLC
## Organizational Chart

As of
04/20/07



**EXHIBIT B**

April 23, 2007
Page 5

# KIRKLAND & ELLIS LLP

### AND AFFILIATED PARTNERSHIPS

200 East Randolph Drive
Chicago, Illinois 60601

(312) 861-2000

Facsimile:
(312) 861-2200

www.kirkland.com

December 7 2007

Mohammed Al-Miqdadi
Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London, England  W14 0QL

Re:    Disengagement Letter

Dear Mohammed:

We are pleased to have represented General Mediterranean Holding, S.A. ("you") in the proposed acquisition of certain membership interests in the entity or entities that directly or indirectly own an interest in an approximately 35 acre parcel of land located in Las Vegas, Nevada (the "Las Vegas Matter") and in connection with the acquisition of certain membership interests in the entities that directly or indirectly own an interest in the approximately 61 acre parcel of land located south of Roosevelt Road, east of the Chicago River, west of Clark Street and north of 16th Street (the "RDD Matter").  However, contrary to our retainer agreement with respect to the Las Vegas Matter, you have not paid our invoices on time.  In addition, over the last few weeks you have not responded to a number of my inquiries regarding the RDD Matter.

Accordingly, at this time we intend withdraw from our representation of you in connection with both the Las Vegas and RDD Matters.  If you retain new counsel, we will be willing to discuss the Las Vegas and RDD Matters with such counsel.

I will return to Ken Haldeman the files that he provided to me related to the RDD Matter within the next ten (10) days.  I believe copies of all other material documents related to the Las Vegas and RDD Matters have been delivered to you.  However, if you wish to have any other documents related to these matters, please do not hesitate to contact me.  Consistent with our firm's standard practice, we will be destroying your files in five (5) years.

**TRIAL EXHIBIT**

**PX 145**

P000070

EXHIBIT

# 168 JD

Hong Kong     London     Los Angeles     Munich     New York     San Francisco     Washington, D.C.

KE003220

KIRKLAND & ELLIS LLP

Within the next ten (10) days, I will provide you with final invoices with respect to the Las Vegas and RDD Matters. To the extent any retainer has not been applied, such funds shall be returned to you. To the extent there are any outstanding fees and expenses after the application of the retainers, we would anticipate that you would promptly pay such outstanding amounts.

I appreciated the opportunity to work with you on these matters.

Very truly yours,

KIRKLAND & ELLIS LLP

By

P000071

- 2 -

KE003221

| | |
|---|---|
| **From:** | Almiqdadi <almiqdadi@gmhsa.com> |
| **Sent:** | Tuesday, January 29, 2008 1:37 PM (GMT) |
| **To:** | John Caruso <jcaruso@kirkland.com> |
| **Subject:** | RE: RDD |
| **Attach:** | image001.jpg |

Yes, you can release the documents relating to the proposed most recent transaction with Rezko as well.


Mohammed Al-Miqdadi  BSc, MBA(Hons)

Director of Project Development

General Mediterranean Holding S.A.

LincolnHouse

137-143 Hammersmith Road

LondonW14 0QL

United Kingdom

Phone 0044(0) 20 7602 7055

Fax    0044(0) 20 7603 5533

almiqdadi@gmhsa.com

www.gmhsa.com

[IMAGE]

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone or return the original message to us at the above address.  Thank you.





TRIAL EXHIBIT

PX 146

KE013262

From:John Caruso [mailto:jcaruso@kirkland.com]
Sent: 29 January 2008 00:27
To: Almiqdadi
Subject: RDD

Please confirm that I can release the documents for the most recent transaction with Rezko as well.

John G. Caruso
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois60601
312-861-2172 Phone
312-861-2200 Fax
jcaruso@kirkland.com

IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

************************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited

KE013263

and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************** - image001.jpg

KE013264

1001a

---

## General

**From:** Almiqdadi [almiqdadi@gmhsa.com]
**Sent:** Thursday, January 31, 2008 8:05 AM
**To:** Attorney John Doe
**Subject:** FW: Unit Purchase Agreement
**Attachments:** Executed Unit Purchase Agreement .pdf; Executed Loan Forgiveness Agreement.pdf; Executed Assignment.pdf; Executed Letter of Direction.pdf

Dear Attorney John Doe

Attached are the agreements associated with Mr. Rezko's unit purchase. Thanks.

**Mohammed Al-Miqdadi BSc, MBA(Hons)**
Director of Project Development
General Mediterranean Holding S.A.
Lincoln House
137-143 Hammersmith Road
London W14 0QL
United Kingdom
Phone 0044(0) 20 7602 7055
Fax 0044(0) 20 7603 5533
almiqdadi@gmhsa.com
www.gmhsa.com



General Mediterranean Holding

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or return the original message to us at the above address. Thank you.

**TRIAL EXHIBIT**

**PX 147**

**From:** John Caruso [mailto:jcaruso@kirkland.com]
**Sent:** 04 January 2008 21:47
**To:** Almiqdadi
**Subject:** Fw: Unit Purchase Agreement

Attached are the final versions of the following conveyance documents:



EXHIBIT

1

CONFIDENTIAL SIRAZI - R022908

1. Unit Purchase Agreement
2. Loan Forgiveness Agreement
3. Assignment
4. Letter of Direction

John G. Caruso
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois 60601
312-861-2172 Phone
312-861-2200 Fax
jcaruso@kirkland.com

========================
IRS Circular 230 Disclosure:

To ensure compliance with requirements imposed by the U.S. Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding tax-related penalties under the U.S. Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matters addressed herein.

========================


*********************************************************
The information contained in this communication is
confidential, may be attorney-client privileged, may
constitute inside information, and is intended only for
the use of the addressee. It is the property of
Kirkland & Ellis LLP or Kirkland & Ellis International LLP.
Unauthorized use, disclosure or copying of this
communication or any part thereof is strictly prohibited
and may be unlawful. If you have received this
communication in error, please notify us immediately by
return e-mail or by e-mail to postmaster@kirkland.com, and
destroy this communication and all copies thereof,
including all attachments.
*********************************************************

CONFIDENTIAL SIRAZI - R022909

## UNIT PURCHASE AGREEMENT

THIS UNIT PURCHASE AGREEMENT (this "Agreement"), dated as of December _____, 2007, is between Orifarm S.A., a Luxembourg corporation, with a principal place of business located at 3B Boulevard Prince Henri, L - 1724 Luxembourg ("Buyer"), and Antoin J. Rezko, an Illinois resident residing at 1250 Chestnut Avenue, Wilmette, Illinois 60091 ("Seller").

## RECITALS

A.      Pursuant to that certain promissory note (the "Note") dated July 24, 2007, General Mediterranean Holding, S.A. ("GMH") an affiliate of Buyer, loaned $200,000.00 to Seller (the "Loan"), subject to the terms and conditions contained therein.

B.      Seller and Buyer desire to enter into this Agreement pursuant to which Buyer will purchase from the Seller, and the Seller will sell to Buyer, 18.6698 Class B Units (the "Interests") of MT Property Holdings, LLC, an Illinois limited liability company, (the "Company") in exchange for (i) GMH's forgiveness of the Loan; (ii) Buyer's payment to Seller of the sum of Three Million Eight Hundred Thousand and No/100 Dollars ($3,800,000.00); and (iii) certain other consideration set forth herein.

## AGREEMENT

In consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      **Purchase and Sale of the Interests.**

    (a)      Basic Transaction.  Seller agrees to sell and Buyer agrees to buy, the Interests for the Purchase Price (as defined below) upon the terms and subject to the conditions set forth herein.  The effect of such sale is that the Seller hereby irrevocably assign and deliver to the Buyer (or Buyer's assigns) all of Seller's right, title and interest in the Interests, including all rights to any distributions thereon, free of liens or encumbrances, and that Buyer becomes the sole Member of the Company subject to the terms of the Operating Agreement of MT Property Holdings, LLC, as amended, (the "Operating Agreement").

    (b)      Purchase Price.  At Closing (as hereinafter defined), Buyer shall provide Seller the following as consideration for the Interests (collectively, the "Purchase Price"):

        (i)      Loan Forgiveness.  That certain Loan Forgiveness Agreement in the form attached hereto as Exhibit A, providing for the forgiveness of the Loan.

        (ii)      Cash Consideration.  The sum of Three Million Eight Hundred Thousand and No/100 Dollars ($3,800,000.00) to be paid directly to Seller or

CONFIDENTIAL SIRAZI - R022910

pursuant to the written direction of Buyer delivered to Seller not less than two (2) business days prior to the Closing Date (as hereinafter defined).

(c) <u>Deliveries at Closing</u>. At the Closing, Seller will deliver or cause to be delivered to Buyer an executed assignment of Units in a form reasonably acceptable to Buyer.

(d) <u>The Closing</u>. The closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place on December _____, 2007 or such other date as the Buyer and the Seller may mutually determine (the "<u>Closing Date</u>").

2. **Representations and Warranties**. The Seller represents and warrants to the Buyer that, to the Seller's Knowledge (as hereinafter defined), the statements contained in this Section 2 are correct and complete as of the date of this Agreement and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the date of this Agreement throughout this Section 2), except as set forth in the Disclosure Schedule delivered by the Seller to the Buyer on the date hereof and initialed by Buyer and Seller (the "<u>Disclosure Schedule</u>"). Nothing in the Disclosure Schedule shall be deemed adequate to disclose an exception to a representation or warranty made herein, however, unless the Disclosure Schedule identifies the exception with reasonable particularity. For purposes of this Agreement, the Seller will be deemed to have "Knowledge" of a particular fact or other matter only if: (a) the Seller is actually aware of that fact or matter; and (b) neither Buyer nor Mohammed Al Miqdadi has been provided with written notice of that fact or matter. The Disclosure Schedule will be arranged in paragraphs corresponding to the lettered and numbered paragraphs contained in this Section 2.

(a) Seller is the record owner and holder of the Interests and Seller has not previously assigned, transferred, hypothecated, or in any other manner disposed of or encumbered all or any part of the Interests or any rights relating thereto.

(b) Seller owns the Interests free and clear of all restrictions on transfers, liens, taxes, encumbrances, security agreements, security interests, options, claims, community property interests, conditions, equitable interests, charges, or restrictions of any other person or entity.

(c) The Interests represent Seller's only interest in the Company and Seller's sole remaining interest, direct or indirect, in RDD (as hereinafter defined) and the approximately sixty-two (62) acres of unimproved land with the approximate boundaries of 16th Street on the South, Roosevelt Road on the North, the Chicago River on the West and Clark Street on the East, located in the City of Chicago, County of Cook and State of Illinois (the "<u>Property</u>"). Seller is not the beneficiary of any right of first refusal, preemptive right or other right to acquire an interest of the Company or any other equity interest in the Company.

(d) All of the representations and warranties contained in this Section 2 and elsewhere in this Agreement are true and correct on the date of this Agreement.

(e) The Seller has full power and authority to execute and deliver this Agreement and to perform his obligations hereunder. This Agreement constitutes the valid and

CONFIDENTIAL SIRAZI - R022911

legally binding obligation of the Seller, enforceable in accordance with its terms and conditions. The Seller need not give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency in order to consummate the transactions contemplated by this Agreement.

(f)    Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will (A) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which the Seller is subject or (B) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or by which he is bound or to which any of his assets is subject.

(g)    Attached hereto as <u>Exhibit B</u> and made a part hereof, is a true and correct copy of the Operating Agreement.

(h)    The Company is a limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation. The Company is duly authorized to conduct business and is in good standing under the laws of each jurisdiction where such qualification is required. The Company has full corporate power and authority and all licenses, permits, and authorizations necessary to carry on the businesses in which it is engaged and to own and use the properties owned and used by it. Section 2(h) of the Disclosure Schedule lists the members of the Company. The Company does not have any managers or officers. The Company is not in default under or in violation of any provision of its articles or organization or the Operating Agreement.

(i)    The entire authorized membership interests of the Company consist of 100 Class B Units (the "<u>MT Units</u>"), all of which are issued and outstanding. The MT Units have been duly authorized, are validly issued, fully paid, and nonassessable, and are held of record by the parties as set forth in Section 2(i) of the Disclosure Schedule. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require the Company to issue, sell, or otherwise cause to become outstanding any of its membership interests. There are no outstanding or authorized profit participation, or similar rights with respect to the Company. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the membership interests of the Company.

(j)    The Company has no liabilities (and there is no basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any of them giving rise to any liabilities), except for liabilities set forth on Section 2(j) of the Disclosure Schedule (none of which results from, arises out of, relates to, is in the nature of, or was caused by any breach of contract, breach of warranty, tort, infringement, or violation of law).

CONFIDENTIAL SIRAZI - R022912

(k)    The Company has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges thereunder) of federal, state, local, and foreign governments (and all agencies thereof), and no action, suit, proceeding, hearing, investigation, charge, complaint, claim, demand, or notice has been filed or commenced against any of them alleging any failure so to comply.

(l)    Tax Matters.

    (i)    All taxes owed by the Company (whether or not shown on any tax return) have been paid. No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction;

    (ii)    The Company has withheld and paid all taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party;

    (iii)    Neither Seller nor any member or manager (or employee responsible for tax matters) of the Company expects any authority to assess any additional taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any tax liability of the Company either (A) claimed or raised by any authority in writing or (B) as to which any of Seller and the managers and members (and employees responsible for tax matters) of the Company has knowledge based upon personal contact with any agent of such authority. No federal, state, local, or foreign income Tax Returns have been filed with respect to the Company for taxable periods ended on or after December 31, 2006. No federal, state, local, or foreign income Tax Returns have been audited, and indicates none of those aforementioned Tax Returns are currently the subject of audit. There are no examination reports or statements of deficiencies assessed against or agreed to by the Company since December 31, 2006;

    (iv)    The Company has not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency;

(m)    The Company does not own, lease or sublease any real property.

(n)    Section 2(n) of the Disclosure Schedule lists the following contracts and other agreements to which the Company is a party:

    (i)    any agreement (or group of related agreements) for the lease of personal property to or from any person;

CONFIDENTIAL SIRAZI - R022913

    (ii)    any agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or for the furnishing or receipt of services;

    (iii)    any agreement concerning a partnership or joint venture;

    (iv)    any agreement (or group of related agreements) under which it has created, incurred, assumed, or guaranteed any indebtedness for borrowed money, or any capitalized lease obligation;

    (v)    any agreement concerning confidentiality or non-competition;

    (vi)    any agreement with the Seller or any affiliate of the Seller;

    (vii)    any profit sharing, stock option, stock purchase, stock appreciation, deferred compensation, severance, or other material plan or arrangement for the benefit of its current or former directors, officers, and employees;

    (viii)    any collective bargaining agreement;

    (ix)    any agreement for the employment of any individual on a full time, part time, consulting, or other basis;

    (x)    any agreement under which it has advanced or loaned any amount to any of its members, mangers, directors, officers, and employees; or

    (xi)    any agreement under which the consequences of a default or termination could have a material adverse effect on the business, financial condition, operations, results of operations, or future prospects of the Company.

The Seller has delivered to the Buyer a correct and complete copy of each written agreement listed in Section 2(n) of the Disclosure Schedule (as amended to date) and a written summary setting forth the terms and conditions of each oral agreement referred to in Section 2(n) of the Disclosure Schedule. With respect to each such agreement: (A) the agreement is legal, valid, binding, enforceable, and in full force and effect; (B) the agreement will continue to be legal, valid, binding, enforceable, and in full force and effect on identical terms following the consummation of the transactions contemplated hereby; (C) no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (D) no party has repudiated any provision of the agreement.

    (o)    There are no outstanding powers of attorney executed on behalf of the Company.

CONFIDENTIAL SIRAZI - R022914

(p)     Section 2(p) of the Disclosure Schedule sets forth each instance in which the Company (i) is subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is a party or, to the knowledge of Seller is threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator. None of the actions, suits, proceedings, hearings, and investigations set forth in Section 2(p) of the Disclosure Schedule could result in any material adverse change in the business, financial condition, operations, results of operations, or future prospects of the Company. Seller has no reason to believe that any such action, suit, proceeding, hearing, or investigation may be brought or threatened against the Company.

(q)     The Company does not currently have any employees. A list of all former employees of the Company is attached hereto as Section 2(q) of the Disclosure Schedule.

(r)     Employee Benefit Plans; Labor Matters.

    (i)     With respect to each employee benefit plan, program, arrangement or contract (including, without limitation, any (x) "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (y) any medical, hospital, disability, salary continuation, leave of absence, educational assistance, pension, and retirement plan, program, arrangement or contract and (z) and any bonus, deferred compensation, stock bonus, stock purchase, restricted stock, stock option, employment, termination, change in control and severance plan, program, arrangement and contract) to which the Company is or was a party, which is or was maintained or contributed to by the Company (the "Company Benefit Plans"), each such Company Benefit Plan is listed on Section 2(r) of the Disclosure Schedule.

    (ii)    With respect to the Company Benefit Plans, no event has occurred and there exists no condition or set of circumstances, in connection with which the Company would be subject to any liability under ERISA, the Internal Revenue Code (the "Code") or any other applicable law which, individually or in the aggregate, would reasonably be expected to have a material adverse effect on the Company.

    (iii)   The Company is not a party to any collective bargaining or other labor union contracts and no collective bargaining agreement is being negotiated by the Company. There is no pending labor dispute, strike or work stoppage against the Company. There is no pending charge or complaint against the Company by the National Labor Relations Board or any comparable state agency.

CONFIDENTIAL SIRAZI - R022915

(iv)    As of the date hereof, there is no pending or threatened litigation relating to the Company Benefit Plans.

(v)    Except as set forth on Section 2(r) of the Disclosure Schedule, neither the execution of this Agreement, nor the consummation of the transactions contemplated hereby will (w) entitle any employees of the Company to severance pay or any increase in severance pay upon any termination of employment after the date hereof, (x) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Company Benefit Plans, (y) limit or restrict the right of the Company or, after the consummation of the transactions contemplated hereby, to merge, amend or terminate any of the Company Benefit Plans or (z) result in payments under any of the Company Benefit Plans which would not be deductible under Section 280G of the Code.

(s)    The Company is not a guarantor or otherwise is liable for any liability or obligation (including indebtedness) of any other person.

(t)    The Seller and its affiliates do not own any asset, tangible or intangible, which are used in the business of the Company.

(u)    The representations and warranties contained in this Section 2 do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements and information contained in this Section 2 not misleading.

3.   **Indemnification.**  The representations and warranties set forth in Section 2 of this Agreement shall survive the closing of the transaction contemplated by this Agreement. Seller hereby agrees to indemnify, defend and hold Buyer harmless from or against any and all claims, actions or causes of action, encumbrances, suits, demands, assessments, judgments, losses, liabilities, damages, obligations, costs and expenses (including, without limitation, reasonable attorneys' fees to the extent permitted by law, and accounting fees and investigation costs) that may be suffered, sustained, incurred or required to be paid by any party arising out of, or relating to any breach of any representation or warranty contained in Section 2 or any covenant, obligation or agreement contained herein. In addition, notwithstanding any provision to the contrary contained herein or in the Operating Agreement, Seller hereby agrees to indemnify, defend and hold the Company and Buyer harmless from or against any and all claims, actions or causes of action, encumbrances, suits, demands, assessments, judgments, losses, liabilities, damages, obligations, costs and expenses (including, without limitation, reasonable attorneys' fees to the extent permitted by law, and accounting fees and investigation costs) that may be suffered, sustained, incurred or required to be paid by the Buyer or the Company arising out of, or relating to any matter disclosed on Section 2(p) of the Disclosure Schedule.

CONFIDENTIAL SIRAZI - R022916

4.  **Acknowledgement of Ongoing Negotiations.** By entering into this Agreement, Seller expressly acknowledges that Riverside District Development, LLC ("RDD") has been negotiating the sale of the Property with, among others, the DeBartolo Group, U.S. Equities, Shelbourne Development, and Garrett Kelleher. These negotiations are ongoing and may result in an agreement for sale of the Property at any time with these parties or with others. By entering into this Agreement, Seller agrees to forego the proceeds and benefits (if any) that may result from these or future negotiations and expressly acknowledge that Seller is selling the Interests knowing that a sale could take place at any time.

5.  **Other Acknowledgements.** Seller has considered and expressly agrees to each of the following:

> (a)  Seller has not relied upon any representation of any party, including (i) Buyer; (ii) the Company, (iii) RDD; (iv) General Mediterranean Holdings, SA; or (v) or any of the foregoing parties' attorneys, agents or other representatives concerning the nature, value or extent of the Interests, the Property, or the status of the ongoing efforts to sell the Property.

> (b)  No person or entity has promised or induced Seller to enter into this Agreement except as expressly set forth herein.

> (c)  Seller has entered into this Agreement voluntarily and without reliance on any statement or representation by anyone, except as set forth herein.

> (d)  Seller desires no additional information from Buyer or the other entities involved in order to evaluate the transaction contemplated by this Agreement.

> (e)  Seller has read and individually, or with the assistance of legal counsel, fully understand the transaction contemplated by this Agreement and the meaning of its provisions.

> (f)  Seller is legally competent to execute this Agreement and to accept full responsibility therefor.

6.  **Waiver of Distributions.** Seller waives, as of the closing, any right, interest or title Seller may have to any distributions, whether or not declared or otherwise accrued, on the Interests.

7.  **Release.** By entering into this Agreement, Seller hereby fully and forever waives, releases, and discharges, and covenants not to sue (i) Buyer; (ii) the Company; (iii) RDD; (iv) GMH; (v) all past and present officers, members, creditors, agents, employees, independent contractors, partners, accountants, advisors, and investors in the foregoing; and/or (vi) the respective predecessors, successors, assigns, subsidiaries, affiliates, heirs, executors, and administrators of all the foregoing (hereinafter collectively referred to as the "Released Parties") with respect to any and all claims, demands, promises, or causes of action of any nature whatsoever, whether known or unknown, foreseen or unforeseen, and whether or not in litigation, which Seller ever had or may have, or which could be asserted by Seller or by another on Seller's behalf. Further, Seller covenants that he will not bring, assert, claim, or prosecute

CONFIDENTIAL SIRAZI - R022917

any action, lawsuit, or legal or other proceedings of any kind whatsoever against any of the Released Parties. The release made pursuant to this Section 8 shall include, but shall not be limited to, any and all claims against the Released Parties for amounts owed to Seller pursuant to employment, services, management, or other agreements.

8. **Miscellaneous.**

    (a) *Successors and Assigns.* This Agreement is binding upon and inure to the benefit of the successors and assigns of the parties hereto.

    (b) *Severability.* In the event that any portion of this Agreement is held to be invalid or unenforceable for any reason, the parties agree that said invalidity or unenforceability shall not affect the other portions of this Agreement and that the remaining covenants, terms and conditions or portions hereof shall remain in full force and effect and any court of competent jurisdiction may so modify the objectionable provision as to make it valid, reasonable and enforceable.

    (c) *Revocation of Earlier Agreements.* Any and all prior agreements relating to the transfer of the Interests made and entered between the parties herein, whether individually or collectively, are hereby revoked and terminated. This Agreement supersedes any prior agreements between the parties hereto on this subject.

    (d) *Arm's Length Negotiation and Counsel.* Seller acknowledges that Seller has negotiated the terms of this Agreement in an arm's length negotiation and have made an independent evaluation that the Purchase Price is fair and equitable. SELLER FURTHER ACKNOWLEDGES THAT HE WAS EITHER REPRESENTED BY COUNSEL OF HIS CHOICE OR WAS ADVISED TO SEEK THE ADVICE OF COUNSEL IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

    (e) *Confidentiality.* The Seller will treat and hold any information concerning the businesses and affairs of the Company that is not already generally available to the public ("Confidential Information") as such, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to the Buyer or destroy, at the request and option of the Buyer, all tangible embodiments (and all copies) of the Confidential Information which are in his possession. In the event that the Seller is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Seller will notify the Buyer promptly of the request or requirement so that the Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 8(e). If, in the absence of a protective order or the receipt of a waiver hereunder, the Seller is, on the advice of counsel, compelled to disclose any Confidential Information to any tribunal or else stand liable for contempt, the Seller may disclose the Confidential Information to the tribunal; provided, however, that the disclosing Seller shall use his or its reasonable best efforts to obtain, at the reasonable request of the Buyer,

1428096v2

-9-

CONFIDENTIAL SIRAZI - R022918

an order or other assurance that confidential treatment will be accorded to such portion of the Confidential Information required to be disclosed as the Buyer shall designate. The foregoing provisions shall not apply to any Confidential Information which is generally available to the public immediately prior to the time of disclosure

(f) *Counterparts; Facsimile.* This Agreement may be executed in separate counterparts (including by means of facsimile), each of which is deemed to be an original and all of which taken together constitute one and the same agreement. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(g) *Governing Law.* This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Illinois without giving effect to any choice or conflict of law provision or rule (whether of the State of Illinois or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Illinois.

(h) *Expenses.* Buyer and Seller will each bear his or its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby. The Seller agrees that Buyer has not borne and will not bear any of the Seller's costs and expenses (including any of their legal fees and expenses) in connection with this Agreement or any of the transactions contemplated hereby.

CONFIDENTIAL SIRAZI - R022919

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first written above.

BUYER:                          ORIFARM S.A.

                                By: _____
                                Its: _____

SELLER:                         _____
                                ANTOIN S. REZKO

CONFIDENTIAL SIRAZI - R022920

## EXHIBIT A

LOAN FORGIVENESS AGREEMENT

A-1

CONFIDENTIAL SIRAZI - R022921

## LOAN FORGIVENESS AGREEMENT

THIS LOAN FORGIVENESS AGREEMENT (this "Agreement") is made by General Mediterranean Holding SA, a Luxembourg corporation (the "Lender") and Antoin S. Rezko, an Illinois resident (the "Borrower").

A.   Pursuant to that certain promissory note (the "Note") dated July 24, 2007, Lender has loaned $200,000 to Borrower (the "Loan"), subject to the terms and conditions contained therein.

B.   Pursuant to that certain Unit Purchase Agreement, dated December ____, 2007 (the "Unit Purchase Agreement"), Orifarm S.A., an affiliate of Lender ("Orifarm"), has agreed to acquire from Borrower and Borrower has agreed to transfer to Orifarm certain Class B Units (the "Interests") of MT Property Holdings, LLC, an Illinois limited liability company in consideration of the forgiveness by Lender of the Loan and other consideration, as set forth in the Unit Purchase Agreement.

In consideration of the mutual covenants contained herein, the parties agree as follows:

1.   Immediately upon execution of this Agreement, Lender shall be conclusively deemed to have forgiven the Loan in their entirety, released any and all collateral with respect thereto, and fully released Borrower from any and all covenants, agreements and obligations under the Notes and any other documents evidencing the Loan. Without limiting the generality of the foregoing, Lender acknowledges and agrees that upon such forgiveness and release, Lender shall have no right to receive repayment from Borrower of any principal or interest on the Loan, or any loan fee or similar payment on account of the Loan.

2.   Notwithstanding the foregoing, to the extent the Unit Purchase Agreement or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or any consideration received thereunder is required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Loan or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment, proceeds or other consideration for the forgiveness of such Loan had not been received by Lender.

3.   This Agreement may be signed by facsimile and/or in counterpart and the delivery of the executed facsimiles shall constitute the delivery of the executed original.

IN WITNESS WHEREOF, the parties have entered into this Loan Forgiveness Agreement as of December ____, 2007.

**[End of Text – Execution Page to Follow]**

CONFIDENTIAL SIRAZI - R022922

SIGNATURE PAGE TO
LOAN FORGIVENESS AGREEMENT

_____

ANTOIN S. REZKO

**GENERAL MEDITERRANEAN HOLDING SA,**
a Luxembourg corporation

_____

By: _____

Its: _____

CONFIDENTIAL SIRAZI - R022923

## EXHIBIT B

Amended and Restated Operating Agreement

of

MT Property Holdings, LLC

[SEE ATTACHED]

CONFIDENTIAL SIRAZI - R022924

## LOAN FORGIVENESS AGREEMENT

THIS LOAN FORGIVENESS AGREEMENT (this "Agreement") is made by General Mediterranean Holding SA, a Luxembourg corporation (the "Lender") and Antoin S. Rezko, an Illinois resident (the "Borrower").

A.     Pursuant to that certain promissory note (the "Note") dated July 24, 2007, Lender has loaned $200,000 to Borrower (the "Loan"), subject to the terms and conditions contained therein.

B.     Pursuant to that certain Unit Purchase Agreement, dated December _____, 2007 (the "Unit Purchase Agreement"), Orifarm S.A., an affiliate of Lender ("Orifarm"), has agreed to acquire from Borrower and Borrower has agreed to transfer to Orifarm certain Class B Units (the "Interests") of MT Property Holdings, LLC, an Illinois limited liability company in consideration of the forgiveness by Lender of the Loan and other consideration, as set forth in the Unit Purchase Agreement.

In consideration of the mutual covenants contained herein, the parties agree as follows:

1.     Immediately upon execution of this Agreement, Lender shall be conclusively deemed to have forgiven the Loan in their entirety, released any and all collateral with respect thereto, and fully released Borrower from any and all covenants, agreements and obligations under the Notes and any other documents evidencing the Loan. Without limiting the generality of the foregoing, Lender acknowledges and agrees that upon such forgiveness and release, Lender shall have no right to receive repayment from Borrower of any principal or interest on the Loan, or any loan fee or similar payment on account of the Loan.

2.     Notwithstanding the foregoing, to the extent the Unit Purchase Agreement or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or any consideration received thereunder is required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Loan or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment, proceeds or other consideration for the forgiveness of such Loan had not been received by Lender.

3.     This Agreement may be signed by facsimile and/or in counterpart and the delivery of the executed facsimiles shall constitute the delivery of the executed original.

IN WITNESS WHEREOF, the parties have entered into this Loan Forgiveness Agreement as of December _____, 2007.

**[End of Text – Execution Page to Follow]**

CONFIDENTIAL SIRAZI - R022925

SIGNATURE PAGE TO
LOAN FORGIVENESS AGREEMENT


_____
ANTOIN S. REZKO


**GENERAL MEDITERRANEAN HOLDING SA,**
a Luxembourg corporation

_____

By: _____

Its: _____

CONFIDENTIAL SIRAZI - R022926

## MT PROPERTY HOLDINGS, LLC
## ASSIGNMENT OF MEMBERSHIP INTERESTS

### ASSIGNMENT

For value received, the undersigned, Antoin S. Rezko ("Assignor"), hereby sells, assigns and transfers to Orifarm, S.A. (the "Assignee"), 18.6698 Class B Units in MT PROPERTY HOLDINGS, LLC an Illinois limited liability company, together with all rights, benefits, titles and interests accruing thereunder at any time and from time to time, including, without limitation, any and all rights to receive distributions on account of such Units and all voting rights. Capitalized terms not defined herein shall have the meaning ascribed to them in the Amended and Restated Operating Agreement of the Company effective as of January 1, 2006 (as amended from time to time).

Date: _____          _____
                               Antoin S. Rezko

### ACCEPTANCE

The Assignee hereby accepts the assignment of the above Units in the Company.

Date: _____          **ORIFARM, S.A.**

                               _____

                               By:_____

                               Its:_____

1440251v1

CONFIDENTIAL SIRAZI - R022927

# ANTOIN S. REZKO

December 5, 2007

**Via Electronic Mail**

Mr. Mohammad Al-Miqdadi
Orifarm, S.A.
3B Boulevard Prince Henri, L - 1724
Luxembourg

      Re:    Direction for Cash Purchase Price

Dear Mohammad:

Pursuant to Section I(b)(iii) of the Unit Purchase Agreement, I hereby direct that the entire $3.8 million cash consideration be wired directly to the Freeborn & Peters LLP Client Trust Account. Wire instructions are as follows:

          SEND TO:
          THE NORTHERN TRUST COMPANY
          50 SOUTH LASALLE STREET
          CHICAGO, ILLINOIS 60675
          SWIFT CODE: CNOR US 44

          FOR CREDIT TO:     FREEBORN & PETERS
                             CLIENT TRUST ACCOUNT

          ACCOUNT NO. 615560

          NOTIFY UPON RECEIPT: DONNA CANNON @ 312/360-6241

Very truly yours,

Antoin Rezko

CONFIDENTIAL SIRAZI - R022928

**Maha Al Mufti**

| | |
|---|---|
| **From:** | John Caruso [jcaruso@schainlaw.com] |
| **Sent:** | 22 November 2006 22:45 |
| **To:** | Almiqdadi |
| **Subject:** | FW: Revised Status Memorandum |
| **Attachments:** | Status Memorandum.doc |

Attached is the summary I received from Michael Rumman.

**John G. Caruso**
**Schain, Burney, Ross & Citron, Ltd.**
**222 N. LaSalle Street, Suite 1910**
**Chicago, IL 60601-1102**
**Main Ph: 312-332-0200**
**Direct Ph: 312-422-4303**
**Fax: 312-332-4514**
**E-mail: jcaruso@schainlaw.com**

Important: The pages accompanying this e-mail originate from the law firm of Schain, Burney, Ross & Citron, Ltd. ("SBRC") and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. The information is intended for the use of the individual or entity named. It is prohibited for anyone else to view, disclose, copy, distribute or use the contents of this message if you are not the intended recipient. Please notify the sender, by electronic mail or telephone -- (312) 332-0200, of any unintended recipients and delete the original message without making any copies. The contents may not be copied or distributed without this disclaimer. All personal messages express views solely of the sender, which are not to be attributed to SBRC.

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free. No responsibility is accepted by SBRC for any loss or damage arising in any way from its use.

**From:** Michael Rumman [mailto:MRumman@hdpco.com]
**Sent:** Tuesday, November 21, 2006 8:06 PM
**To:** John Caruso
**Subject:** FW: Revised Status Memorandum

**From:** Edward Wynn
**Sent:** Wed 11/15/2006 3:04 PM
**To:** Michael Rumman
**Subject:** Revised Status Memorandum

**TRIAL EXHIBIT**

**PX 149**

Michael,

Attached is the memorandum which reflects our recent conversation. Specifically, I added a section describing the La Salle Street intersection, utility and easement issues; and I added a substantial paragraph regarding the need to restructure the entities to obtain required City approvals.

In addition, I would propose to provide the following documents with the memorandum in separate e-mails:

1. The RDD Operating Agreement
2. PD 904

1

SIRAZI - G029023

3.      The Real Estate Valuation analysis (since any appeal must be filed by 11/27)
4.      The US Equities/Eastdil brokerage agreement
5.      A summary of insurance
6.      The contract/expenditure summary previously provided to GMH.

Ed

SIRAZI - G029024

DRAFT—11/4/06

PRIVILEGED AND CONFIDENTIAL
Attorney-Client Privileged

### M E M O R A N D U M

TO:        Michael M. Rumman

FROM:   H. Edward Wynn

DATE:    November 15, 2006

RE:        Status of Currently Pending Matters

This memorandum is in response to your request to provide background and current status on the pending legal and administrative matters relating to the Riverside District Property.

#### Background

The Riverside District Property (the "Property") is approximately 61 acres of vacant land located at Clark Street and Roosevelt Road in Chicago. The owner of the Property is Riverside District Development, LLC ("RDD"). RDD purchased the Property for approximately $131 million in a two-stage closing transaction which was fully completed on November 1, 2005.

#### Organizational Structure/Strategy

RDD is an Illinois limited liability company which has two members: General Mediterranean Holding, SA ("GMH") and Heritage Development Partners, LLC ("Heritage"). GMH holds 51% of the voting interests; Heritage holds the remaining 49%. The Operating Agreement provided that GMH had a Preferred Capital balance in the amount of $133,983,384, which was increased by additional capital contributions, and on which a Preferred Return of 12% is compounded at the end of each calendar year. The amount of GMH's Capital Preference as of November 1 was approximately $148,644,211. After the return of GMH's Capital Preference, returns are split equally between the members. RDD is a member-managed limited liability company; its current Manager is Heritage Property Development, Inc. ("HPDI"), an Illinois corporation. (HDPI's sole shareholder is Michael Rumman.)

Heritage has two classes of interest holders: Class A interests are non-voting, but preferred. There are 1.89% Class A membership interests, with a total capital preference of $2.365 million. Class B interests are held by MT Properties, LLC, an Illinois limited

TRIAL EXHIBIT

PX 150

CONFIDENTIAL SIRAZI - G005688

liability company, whose members are Messrs. Rezko and Rumman. Mr. Rezko, subject to certain pledges and other matters, holds 80% of the interests; Mr. Rumman holds the remaining 20%. MT approved one of the pledges (to Samir Financial) and had prior knowledge of one of the other pledge (to Dr. Malek).



As previously described to GMH, Mr. Rezko's continued ownership of any interests in any of the entities related to the Property is problematic because, as discussed in more detail below, City action is required on certain matters regarding the Property and the City may be unwilling to take any action related to the Property given Mr. Rezko's current situation. Thus, to obtain these City approvals, RDD must devise and implement a strategy that would remove Mr. Rezko from any interest in entities related to the Property, in compliance with all applicable laws governing this matter. As part of such a strategy, RDD will need to address pending issues related to Mr. Rezko's interests, including the Malek and Samir Financial pledges discussed above, as well as any other pledges or agreements Mr. Rezko may have made with regard to his interests, as well as the claim by the former Limited Partnership under a Promissory Note from Messrs. Rezko and Mahru in favor of the Limited Partners, which—as discussed below—is the subject of a agreement Mr. Rezko executed purporting to have Heritage assume that obligation.

Property Status



CONFIDENTIAL SIRAZI - G005689

*5° Zoning issues*

Zoning/Entitlements. Current zoning and entitlements to the Property are as provided in an approved Planned Development Ordinance of the City of Chicago, PD904. Under PD904, the property is zoned for commercial and residential development, with entitlements for 670,000 square feet of commercial space and 4614 residential units. There are conditions and other restrictions in PD904, including that the PD, including approved zoning and entitlements, will expire automatically on March 31, 2010, if no development has begun on the Property.

Wells-Wentworth Connector. The City, consistent with its Master Development Plan, has begun steps to construct a major street through the Property that would extend Wells Street north of the Property underneath Roosevelt Road and then connect it to Wentworth Avenue, south of the Property. Construction of this road will add value to the Property, but also will require dedication of the land underneath and adjoining the road to the City. RDD, as successor in interest to an agreement with the property owners to the north, has an option to require construction of the Connector, at is cost. That option must be exercised, if at all, by December 31, 2006. RDD will need to decide before that time whether it wishes to exercise that option. If it fails to do so, and the City fails to construct Wells-Wentworth, these failures may prevent construction of the road.

Vacation/Dedication. The City had long taken the position that land under certain former streets which no longer exist on the Property still belong to the City. After extensive research earlier this year, we determined that the City did not own this land and persuaded the Department of Transportation to introduce an ordinance clarifying this issue in RDD's favor and without requiring Economic Disclosure Statements ("EDSs") from the Property owners. (I have separately provided you with the file reflecting this research.) Unfortunately, as a result of Mr. Rezko's recent legal issues, the Department of Transportation is no longer willing to introduce the ordinance without EDSs, and may not be willing to introduce it at all.

As discussed above, RDD also needs to dedicate certain land for Wells-Wentworth, 16th Street, and for public parks and other space (as required in the PD) to the City. We had planned to do this via an ordinance separate from the vacation ordinance and had prepared EDSs for this purpose. The rationale was that because we were giving to, rather than getting any from, the City, the ordinance would not be controversial. However, as a result of Mr. Rezko's recent legal issues, the City has informed us that the vacation and dedication must be presented in a single ordinance, and they are re-reviewing the matter. In addition, if there are any additional structural changes to the entities—and I understand that RDD and/or GMH are planning such changes—the EDSs we have previously prepared will have to be revised to reflect those changes.

Other Issues. Currently, there are discussions among the City Department of Transportation, the Illinois Department of Transportation, Centrum and Heritage/RDD regarding the placement of the intersection of LaSalle Street at Roosevelt Road. The placement of the intersection will affect the building design of both the Centrum Property and the Property. Specifically, RDD will need to determine the position and strategy to

*2,000 · Additional · Permanent · Units*

CONFIDENTIAL SIRAZI - G005690

take in these negotiations, which will require RDD to make certain determinations and decisions regarding the design of the Property. In addition, to develop the Property or to increase it value for sale, RDD will need to resolve various issues with utilities and easement holders, specifically: 1) negotiating agreements with ComEd for relocation and re-establishment of its facilities on the Property and 2) finalizing an agreement with MCI (and reimbursing it for) relocation of its fiber optic facility, which runs through the Property, and 3) concluding various easement issues with Metra. Mr. Haldeman has been the lead on these matters for the company, and can provide more detailed information.

## Ownership of Land under Roosevelt Road

There is currently a dispute with the City regarding the ownership of the land under Roosevelt Road. The City believes that it owns all the land under the road; RDD, based on extensive research, believes that it owns slightly more than half of that land based on the current title and the title insurance policy. The title insurance company, Chicago Title, agrees with RDD's position. However, the City has maintained its position. To resolve this matter, we had proposed to prepare, and I had begun, a memorandum to demonstrate to the City that RDD owned this land. The essence of the City's position is a 1911 ordinance. However, that ordinance is irrelevant since it pre-dated the change in the course of the Chicago River through the Property. As a result of that action, the City's Trustee (as approved in ordinance) conveyed the land, including the portion of land under Roosevelt Road, to RDD's predecessor-in-interest, which is confirmed by all surveys and all title insurance commitments. Although the City has recently been more amendable to our position, as a result of Mr. Rezko's legal issues, it is insisting on incontrovertible proof of RDD's ownership. To provide this proof, I have recommended to Mr. Haldeman that we have the surveyor verify the ownership by identifying the specific conveyances (by description) in the Deed to support out claim. (I will separately provide you relevant documentation related to this issue.)

## Republic Bank Filing

Shortly before the sale of the Property to RDD, Republic Bank made a "filing" against the Property. The filing is based upon an option agreement between Republic Bank and the Limited Partnership from whom RDD purchased the Property. The agreement purported gives Republic Bank an option to purchase, if available, a one-acre lot on the Property for a drive-through banking facility or lease space for a bank branch in the commercial zone of the property, each at a 15% discount from fair market value, which is not defined in the agreement. Most notably, the agreement does not provide that it binds successors or assigns, or in any other way provide that it is an obligation attaching to (or running with) the land. Mr. Dan Mahru, a former general partner of the Limited Partnership, signed the agreement on behalf of the Partnership. It is believed that no consideration was provided to the Partnership for granting the option, but rather than Mr. Mahru received any consideration personally.

Upon learning of the filing, Shefsky & Froelich, outside counsel for the Limited Partnership, discussed the matter with [ Attorney John Doe ] outside counsel for GMH, and it was decided that the sale would proceed, but the filing would be challenged.

On behalf of RDD, Freeborn & Peters brought a "quiet title" action seeking to have the court remove the filing from the Property. There were two bases for the action: First, that the option agreement could not bind RDD since it did not "run with the land." Second, that the option agreement violated the Rule against Perpetuities, since it was not certain that it would vest, if at all, within 21 years of a life in being. The strategy was to bring a motion for summary judgment on these issues since both involve solely an issue of law.

Recognizing that this was the likely strategy and knowing that a motion for summary judgment could only be filed after Republic answered the complaint, Republic Bank filed a series of motions in lieu of filing an answer to the Complaint. The motions were dismissed in virtually all regards, except that the Court ordered that the Partnership be added as a necessary party, which was done. Most recently, Republic Bank filed a motion to dismiss the complaint because the Rule against Perpetuities argument was invalid. Because the hearing date was not set until December, and the goal was to resolve the case by February, we decided to dismiss that claim (since the Judge had already opined that he was unsure whether it would prevail), and then seek an order requiring Republic Bank to file an answer. That motion was granted. Of course, Republic Bank said it may file another motion, but the Judge warned them that they had already filed several motions before and he would expect an answer. The answer is due November 15. After the answer is filed, the strategy is to file a motion for summary judgment. This claim must be resolved before any subsequent sale of the Property or it is likely that the purchaser will require a reduction in the purchase price to reflect this potential defect in the title.

### Mortgage/Taxes

There is currently a $27 million first mortgage on the Property in favor of Mutual Bank. There is an interest reserve and the only payment RDD is required to make is for the tax escrow. That amount is due on the 14th of each month in the amount of approximately $57,927.68. The November payment is currently due and owing, but there are insufficient funds to make the payment. If payment is not made, the Bank may declare the mortgage in default. The loan is due on July 14, 2007.

The Property is currently substantially under-assessed. Recently, about half of the parcels were re-assessed and their assessed value substantially increased. Based on analysis I provided you late last week, the property is still—even with these increased assessments—significantly under-assessed, and there does not appear to be a basis to challenge the re-assessments. If RDD decides to challenge the re-assessments, the appeal must be filed no later than November 27, 2006.   *can still appeal at 2015*

*~~approved of parties~~*

### Brokerage Agreement

RDD currently has a brokerage agreement with US Equities/Eastdil Secured. It is an exclusive brokerage agreement through March 31, 2007. A copy of the agreement is attached. RDD retains the right not to reject all offers. RDD has agreed to pay a commission of 1.25%, on the terms and conditions provided in the agreement. Expenses are capped, also as provided in the agreement.

### Insurance

As required by the mortgage loan agreements, RDD maintains liability insurance on the Property. In addition, RDD and related entities maintain directors and officers' coverage, general liability insurance regarding the leased space, as well as separate insurance on the models of the Property. Attached is a list of basic information about each policy. Heritage maintains an insurance binder with all relevant information, which I will provide you separately.

### Contract Status

Other than brokerage and loan agreements, RDD currently has only two contracts, both of which were approved by GMH: a contract with EPI for environmental services and a contract with Res Publica for public relations services.

RDD's other vendor relationships are not pursuant to contract and may be terminated at any time.

I have previously provided you with a list of accounts payable. I would also note that if RDD decides to stop work with any or all of these vendors, it should provide stop work and final invoice notices to such vendors.

In addition, there are five contracts which the prior Partnership entered into which RDD/Heritage have been receiving services and paying. However, those contracts were not assumed by RDD/Heritage. Those contracts, including their expiration dates, monthly amounts, and potential termination liability are listed in an attached document. These vendors may make an argument that RDD and Heritage are liable under the agreements. As noted, however, none of the agreements are assignable or are assignable with consent, which would negate such an argument. Specifically, regarding the lease, Heritage attempted to use a provision in the lease to permit assignment to it from the Partnership; however, the Lessor failed to acknowledge the assignment and subsequently provided an amendment to the lease which would have permitted the assignment. Inexplicably, however, after the Lessor provided the amendment, it refused to execute it.

Regardless of whether RDD or Heritage have liability under the former partnership agreements, those agreements cover equipment that RDD and Heritage are using, including the phone system, a server and copiers. If RDD wishes to stop paying under those contracts, then it will no longer be able to use the equipment provided under those contracts. The office furniture is owned, and excess furniture should be liquidated used

CONFIDENTIAL SIRAZI - G005693

in negotiations with the lessor. Attached is additional detail about leased computer equipment.

## Litigation

Riverside District Consulting ("RDC"), an entity controlled by Mr. Joseph Cacciatore, has filed an action against GMH and other individuals and entities seeking discovery and depositions related to the sale transaction. Because RDC could not serve GMH, it attempted to serve an alias summons on you in your role as Heritage. Freeborn & Peters is reviewing this alias summons, but their initial conclusion is that it is not valid.

Subsequently, RDC filed an action against Heritage, Messrs. Mahru and Rezko and you, based on an alleged 2002 agreement between RDC and Messrs. Mahru and Rezko. I have provided a full analysis of that agreement and litigation to Freeborn & Peters, and the strategy is to move to dismiss the case as to you and Heritage.

In addition, Mr. Cacciatore's attorney, on behalf of the Partnership has filed an action against Messrs. Mahru and Rezko, as well as Heritage related to a promissory note in the amount of $2 million and $1 million allegedly held in reserve at the closing of the sale transaction. Mr. Rezko on behalf of Heritage, and over your objection, entered into an agreement under which Heritage assumed the $2 million note. Based on discussions with outside counsel, the ability of Mr. Cacciatore's attorney to represent the Partnership is at serious question; in addition, Heritage may have defenses to assumption of the note. This litigation may affect RDD to the extent that Mr. Rezko transfers interest in Heritage to RDD.

## Administrative Matters

Banking Accounts. Heritage and HPDI on behalf of RDD, maintain bank accounts at Fifth Third Bank. RDD has an operating account, from which expenses are paid; Heritage has a payroll account and an operating account. Because the RDD operating agreement was not executed until March 2006, all employees are Heritage employees and are paid from a Heritage payroll account. Michael Rumman and I are the signatories to the accounts and Laura Gohkman and I have access to view account information on line. I will provide you with the account access information and show you how to change the password, and would ask that Laura Martinez prepare documentation to remove me as a signatory to the accounts.

Personnel. You are the only employee with an employment agreement. Because RDD is not providing severance to exiting employees, I believe that we cannot seek standard releases since there would be no consideration for such a release. In general, such releases are advisable and cost-effective, to avoid any potential employment litigation. I have separately provided to you information regarding payroll, accrued vacation/leave time, and benefit costs. In that regard, I note that there may be statutory obligations requiring prompt payment of accrued vacation/leave time, which RDD should consider in making decisions regarding payment of such time.

CONFIDENTIAL SIRAZI - G005694

Heritage employees are covered by standard benefit plans, including health, dental and life. We will terminate life insurance coverage effective November 30. Terminated employees will be provided COBRA coverage. However, you should note that should fewer than two active employees remain covered by health insurance, COBRA coverage for all employees will be reduced to nine months and benefits will be reduced. Work related to COBRA and insurance matters will be transitioned from Mary Wilk to Laura Martinez.

<u>Company Records</u>. Company records are generally retained in electronic format, and we use an off-site back-up service for records. It is RDD's decision as to whether to continue such a service. In addition, paper copies of records are kept in file cabinets located outside the offices. Recently, Laura Martinez and I reviewed and reorganized the files, particularly the prior Partnership files. RDD needs to determine how it would like to continue to maintain these records. Financial records are kept in the accounting office and a similar decision regarding their maintenance should be made. Many of these records will be required for preparation of tax returns.

<u>Information Technology</u>. Heritage has a discounted, per-hour, as-needed contract for information technology services. Currently, even though Heritage has a separate contract from Rezmar, the vendor is refusing to provide services to Heritage due to Rezmar's non-payment. We believe this position is in error, but pending decisions from RDD relating to accounts payable and future status, and because we have not yet needed IT services, we have not pressed this issue.

CONFIDENTIAL SIRAZI - G005695



**Riverside District
Market Analysis &
Development** *Recommendations*

November 16, 2009

JONES LANG
LASALLE

GMH Native 094762

TRIAL EXHIBIT

PX 151

# Table of Contents

| | | |
|---|---|---|
| I. | Executive Summary | 3 |
| II. | Economic Analysis | 7 |
| III. | Demographic Analysis | 31 |
| IV. | Local Market Analysis | 35 |
| a. | Condominium | 36 |
| b. | Apartment | 45 |
| c. | Retail | 54 |
| d. | Student Housing | 64 |
| e. | Senior Housing | 70 |
| f. | Hospitality | 83 |
| g. | Office | 92 |

| | | |
|---|---|---|
| V. | Development Recommendations & Financial Analysis | 99 |
| a. | Site Plan | 100 |
| b. | Pad Pricing | 104 |
| c. | Absorption Schedule | 110 |
| d. | Financial Analysis | 118 |
| e. | Value-Add Opportunities | 128 |
| f. | TIF Cost / Benefit Assessment | 130 |



**Final Draft**

GMH Native 094763



I. Executive Summary

JONES LANG
LaSalle

**Final Draft**

GMH Native 094764

## Executive Summary

### Market Analysis

- There is not an immediate development opportunity at the Riverside District as the Downtown Chicago land development market is at a stand-still due to: wide-spread national economic weakness, lack of construction financing, residential and commercial oversupply, tepid absorption rates and a gradual recovery forecast.

- The Downtown Chicago real estate market will recover in-line with the national economy and real estate market; the recovery will be driven by financial system stabilization, which will slowly improve to reach full recovery between 2013 and 2016.

- Strong demographic growth will continue in the South Loop, which may result in relative strength versus the national market.

- The Riverside District is well-positioned to capture approximately one third of the South Loop submarket's new construction residential absorption.

- There is currently sufficient surplus retail demand to form a cluster of retail stores fronting Roosevelt Road totaling approximately 130,000 sq. ft. The cluster could include anchors such as Menard's / Lowe's and Dick's Sporting Goods, with inline tenants such GNC, Cricket, Pottery Barn, Gymboree, restaurants and outparcel tenants such as Baby's "R" Us and Pep Boys. However, retail demand upon market recovery and development feasibility may evolve based on retail gaps and demand at the time of development.

- Seniors housing demand offers the opportunity for two large CCRC's at the Riverside District.

- Ongoing growth in the South Loop's higher education sector, combined with the Riverside District's location near existing education facilities and public transportation, indicate the potential for a student housing project near Roosevelt Road.

- The South Loop is a tertiary hotel market and the Riverside District is only expected to support one mid-scale hotel several years after market recovery.

- The South Loop currently exhibits minimal office demand and unless an office anchor tenant or user is found, it is not expected that there will be any future demand for office product at Riverside District.


GMH Native 094765

## Executive Summary

### Recommended Site Plan & Product Mix

- Base density of 5.25 FAR based on existing PD-904. Additional density up to 8.0 FAR would increase residential unit counts, but minimally impact other property types due to lack of demand. Product type locations based on traffic patterns, view corridors and physical site constraints. Quantity of each product type dictated by absorption rates.

- Areas shaded light blue represent potential locations for lifestyle retail. Without an attraction such as an entertainment district along Wells, it will be a challenge to build more than 50,000 square feet of retail solely based on demand from Riverside District residents.

- The tallest buildings should be located immediately north and south of the central park and near Roosevelt Road. Building heights should be lowest at the south end of the development to align with adjacent neighborhood density and market demand originating from north side.

- Buildings should be oriented facing north-to-south so as to maximize skyline views and park views and minimize westward views.

- Parking structures supporting buildings on the east side of the property should abut the Metra rail line to provide a sound buffer for residential towers.



**Riverside District : FAR 5.25**

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 4,447,059 | 3,780,000 | 3,375 |
| Apartment | 1,400,000 | 1,190,000 | 1,400 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 7,019,306 | 5,860,000 | 5,500 |

* Hotel classified as commercial and does not contribute to D.U. total

Lifestyle Retail + Residential
Residential
Anchored Retail
Hotel or Student Housing
Parks & Open Space

JONES LANG LASALLE

## Final Draft

Executive Summary

GMH Native 094766

## Executive Summary

### Base Absorption Schedule – 5.25 FAR



Sales / Leasing Schedule

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▣ Retail | 140,000 | 5,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▣ Hotel | 0 | 0 | 82,500 | 67,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▣ Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▣ Senior Housing | 188,571 | 154,286 | 0 | 188,571 | 154,286 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▣ Apartment | 0 | 0 | 119,167 | 130,000 | 144,167 | 104,000 | 104,000 | 194,000 | 104,000 | 158,167 | 176,667 | 130,000 | 0 |
| ▣ Condo | 356,424 | 407,612 | 498,729 | 558,682 | 592,941 | 523,435 | 494,447 | 394,965 | 425,929 | 193,694 | 0 | 0 | 0 |

GMH Native 094767

## Executive Summary

### Financial Analysis

Two exit scenarios were analyzed under three potential density levels:

1. Pad Sale Program : GMH sells all pads as absorption rates allow, but does not participate in vertical development.

2. Self-Develop Program : GMH develops all vertical product.

In order for GMH to fully recoup all invested equity without retaining maximum development risk, JLL recommends a blend of the two exit scenarios. JLL recommends that GMH participate in the early development via retained land equity interests. This approach will enhance long-term cash flow to a level between the pad sale and self develop programs listed below. Furthermore, retaining land equity in early pads will spur vertical development by easing financing requirements on initial phases.

#### 1. Pad Sale Program

Anticipated cash flow based on a pad sale program totals between $140 million at a 5.25 FAR and $258 million at an 8.0 FAR. The last pad sale would take place in 2021 at a 5.25 FAR or in 2027 at an 8.0 FAR.

| Pad Sale Program | 5.25 FAR | 6.5 FAR | 8.0 FAR |
|---|---|---|---|
| Pad Sale Proceeds | $188,387,804 | $249,136,219 | $318,525,711 |
| Infrastructure | ($30,000,000) | ($30,000,000) | ($30,000,000) |
| Soft Costs | ($13,164,725) | ($17,230,855) | ($21,214,230) |
| Transaction Costs | ($5,651,634) | ($7,474,087) | ($9,555,771) |
| Total Cash Flows | $139,571,445 | $194,431,278 | $257,755,710 |

#### 2. Self-Develop Program

Anticipated cash flow based on a self-develop program totals between $648 million at a 5.25 FAR and $1.16 billon at an 8.0 FAR. The project would be sold out in 2026 at a 5.25 FAR or in 2030 at an 8.0 FAR.

| Self-Develop Program | 5.25 FAR | 6.5 FAR | 8.0 FAR |
|---|---|---|---|
| Revenues | $2,808,615,383 | $3,835,264,310 | $5,003,395,329 |
| Vertical HC & SC | ($2,117,767,518) | ($2,900,574,496) | ($3,794,922,233) |
| Infrastructure | ($30,000,000) | ($30,000,000) | ($30,000,000) |
| Soft Costs | ($13,164,725) | ($17,230,855) | ($21,214,230) |
| Cash Flow | $647,683,140 | $887,458,960 | $1,157,258,866 |

 JONES LANG LASALLE

**Final Draft**

Executive Summary

GMH Native 094768



II. Economic Analysis

JONES LANG LaSalle

Final Draft

8

GMH Native 094769



1. Economy

JONES LANG
LASALLE®

**Final Draft**          National Market Analysis    9

GMH Native 094770

**GDP rebound in 2ⁿᵈ half of 2009 may be temporary due to ongoing deleveraging, employment rebound expected in late 2010 / early 2011, sustained long-term recovery beyond stimulus effects uncertain**

- GDP turned positive in the 3ʳᵈ quarter of 2009 as effects of federal stimulus and completion of initial corporate downsizings spurred growth quarter-over-quarter.

- The current U.S. debt-to-GDP ratio of 3.5x represents an all-time high and is unsustainable. The only methods to reduce this ratio are increasing taxes or reducing

- Job losses are mounting with 6.6 million jobs shed since December 2007, including 3.6 million lost in 2009 through July. The pace of job losses is lessening in the 2ⁿᵈ half of 2009 as stimulus programs included in the $787 billion American Recovery and Reinvestment Act mitigate losses.

- Consumer sentiment, often viewed as a leading indicator, bounced from an all-time low in February 2009 but has since faded downward. Prior recessions typically experience many false bounces prior to bottoming.

- A sustained recovery will be difficult without bank balance sheet stability, which will be hampered by residential mortgage, credit card, HELOC and consumer loan write-downs through 2013 and CMBS / commercial mortgage write-downs through 2015. As a result, the time frame for a sustained recovery is still uncertain.

- Beyond these challenges is the problem of paying down the US national debt. The most likely course of action will be keeping federal spending at elevated levels and raising taxes substantially, which will inhibit a meaningful long-term recovery.

 JONES LANG LASALLE

**Final Draft**

GMH Native 094771

## Gross Domestic Product

**GDP turns positive in 3ʳᵈ quarter 2009**

- The 1ˢᵗ quarter of 2009 witnessed the most rapid GDP contraction in real GDP since 1982, posting an annualized decline of 6.4%.

- GDP increased at a rate of 3.5% in the 3ʳᵈ quarter as expected.

- The long-term outlook for GDP growth is difficult to estimate as growth of the real economy without government stimulus is dependent upon private employment growth and credit availability, neither of which have shown decisive signs of recovery.

- Long-term national debt solutions will all be detrimental to GDP growth, indicating that GDP will face downward pressure for many years.



Source: Bureau of Economic Analysis, Moody's



## Final Draft

Economy  11

GMH Native 094772

# Gross Domestic Product

### Debt-to-GDP Comparison



## Overall Debt Relative to GDP is Unsustainable

- The GDP bounce in the 3rd quarter of 2009 was orchestrated by the government taking on more debt to bail-out companies and try to create jobs.
- In the long-run, the US economy's high debt levels can only be solved through tax increases or massive budget cuts, both of which will have significant ramifications for economic growth.



## Final Draft

Economy

GMH Native 094773



## Government Intervention



Source: Jones Lang LaSalle, Moody's Economy.com

- With the Fed Funds rate at a historic low range of 0% - 0.25% the Federal Reserve has indicated that it will employ all available tools including increased lending to help restore economic growth
- Over time, the Fed must unwind its balance sheet and withdraw much of its monetary support;  However, with inflation expectations anchored and the recovery still in its infancy and not yet self-sustaining, such action would likely be premature before Q2 2010

 JONES LANG LASALLE®

**Final Draft**

Economy

GMH Native 094774

## Employment



Employment Change —■— Unemployment Rate

### Rapid job losses lessen during the 2nd half of 2009

- 7.1 million jobs have been lost since the start of 2008. Unemployment rate has surged by 550 basis points since its low of 4.6% to 10.1% in October 2009. Contraction in labor market goes beyond employment statistics as discouraged workers discontinue searching and full-time job seekers secure only part-time employment, implying effective unemployment rate of over 15%.

- Total of net 4.0 million jobs lost in 2009; However, losses have been concentrated in the first half of the year as stimulus funds begin flowing through real economy and business reach peak efficiency after lay-offs.



JONES LANG LASALLE

**Final Draft**

Economy 14

GMH Native 094775



# Recession Severity

### Current Recession's Job Losses as % of Total Employment vs. Notable Recessions of Past 40 Years



Source: Jones Lang LaSalle, Moody's Economy.com, Bureau of Labor Statistics

### Extent of job losses more severe than past recessions

- Rate of job losses is most severe of any recession during the past 40 years
- Slope of recovery will likely be U-shaped at best or L-shaped at worst as many of the recently lost financial jobs will not reappear
- Federal stimulus programs provide support in certain sectors, including: healthcare, construction and government

**JONES LANG LASALLE**

## Final Draft

Economy 15

GMH Native 094776

# Consumer Confidence

**Confidence measures not yet indicating a recovery**

- Consumer confidence bounced up to 54.9 in May 2009 from an all-time low of 25.3 in February, implying that the general public is either optimistic about a government stimulus or becoming accustomed to the recessionary environment. Since the bounce, confidence has faded somewhat to 47.7.

- In past recessions, consumer confidence typically bounces several times prior to positive job creation as people look for "green shoots" signaling evidence of a recovery

- It is likely that the recent bounce in consumer confidence will also prove to be premature as employment gains are not expected until late in 2010

**Consumer Confidence Index, (Index 1985=100, SA)**



Consumer Confidence ——— Unemployment Rate

Source: Jones Lang LaSalle, Bureau of Economic Analysis



**Final Draft**

Economy

GMH Native 094777

## Loan Write-downs

### Anticipated losses on assets of $2.6 trillion

- The effects of this balance sheet driven recession will not disappear until banks and financial institutions achieve asset stability

- Total losses on bad debt are estimated to be $2.6 trillion.

- 49% of losses projected to be borne by banks, 37% by other financial firms and 14% by the government

- Magnitude of residential write-downs generally understood, but commercial mortgage write-downs are the next significant challenge for the U.S. government to understand and solve

- HELOC and consumer loans have yet to make headlines, but will also be a problem



**Expected Total Losses on Assets**

Source: Moody's Economy.com, Jones Lang LaSalle



GMH Native 094778

## Residential RE Debt Outlook

**Residential loan resets will subside by 2013**

- Residential mortgage resets will end in 2013, representing a major milestone in the economic recovery.

- Banks and investors should be able to quantify capital needs dictated by write-downs on these loans prior to the actual reset and eventual foreclosure.

- Sub-prime resets (dark blue) are almost complete; the next wave of resets will be on option ARM's (yellow) and Alt-A (green) mortgages

- Once option ARM and Alt-A mortgage write-downs are determined, banks and investors will understand the financial system's health and the credit availability will expand

- Recently, default rates on prime mortgages with fixed rates and healthy down payments has been evident. This is a product of economic stress, which may exacerbate overall mortgage write-downs.



**Residential Mortgage Reset Schedule**

Source: Credit Suisse Structured Finance/RMBS Research Team



**Final Draft**

Economy

GMH Native 094779

## Commercial RE Debt Outlook

**Commercial debt refinancing will be problem through 2013**

- $1.4 trillion of commercial mortgages will mature from 2009 to 2013 with a projected funding shortfall of $400 billion

- The percentage of commercial loans 30 days or more behind payments is currently 2.5% and rising

- Write-downs on commercial mortgages are estimated to be $370 billion; however, valuing commercial property in a market with few sales comps has been difficult and this number is somewhat speculative at this point in time

- If maturing CMBS does not receive substantial government support, resulting market distress will drive cap rates higher in a short amount of time and reduce commercial real estate values across the spectrum

- The federal government's TALF program will be utilized to refinance a portion of AAA rated CMBS, but credit downgrades are threatening to eliminate this option for non top-rated CMBS



**Commercial Mortgage Maturities by Owner**

| Year | CMBS Fixed Rate | CMBS Floating Rate | Insurance Company | Bank / Thrift | Total by Year |
|------|-----------------|--------------------|-------------------|---------------|---------------|
| 2009 | $17.5 | $1.5 | $16.8 | $168.1 | $204.0 |
| 2010 | $32.3 | $6.2 | $19.8 | $188.3 | $246.6 |
| 2011 | $44.1 | $17.8 | $23.1 | $210.9 | $295.9 |
| 2012 | $57.5 | $17.7 | $28.1 | $230.2 | $337.5 |
| 2013 | $40.9 | $0.7 | $24.8 | $264.6 | $331.0 |
| 2014 | $54.2 | $0.0 | $20.6 | $0.0 | $74.8 |
| 2015 | $104.5 | $0.0 | $25.7 | $0.0 | $130.2 |
| 2016 | $133.9 | $0.0 | $27.3 | $0.0 | $161.2 |
| 2017 | $148.2 | $0.0 | $21.4 | $0.0 | $169.6 |
| 2018 | $6.1 | $0.0 | $16.3 | $0.0 | $22.4 |
| | $639.4 | $43.9 | $221.9 | $1,068.1 | $1,973.3 |


GMH Native 094780



# Recovery Process



**Economic / Value Recovery**

JONES LANG LASALLE

**Final Draft**

Economy 20

GMH Native 094781



## 2. Residential Real Estate

JONES LANG LASALLE

**Final Draft**

National Market Analysis 21

GMH Native 094782

## Residential Executive Summary

The housing recovery will commence in late-2010 as prices bottom. However, ongoing foreclosures will cause the price curve to be flat until all toxic mortgages have reset and exited the system. As a result, a full recovery and return to normalcy is not expected until 2014 after the last large wave of option ARM driven foreclosures occurs.

### Housing prices to bottom in 2010

- Housing affordability has reached equilibrium in relation to household income
- Home prices may fall an additional 5 – 10% based on long-term price trend line and ongoing economic weakness.

### Demand sapped by job losses, negative sentiment and lack of mortgage availability

- Job losses are expected to continue at least through mid-2010, dampening housing demand
- Historically low mortgage rates have benefited existing homeowners with strong credit seeking to refinance, but has not resulted in a meaningful amount of home purchases
- Consumer sentiment needs to rebound significantly before home buyers re-emerge

### Oversupply will be ongoing until option ARM mortgages are out of the banking system

- Foreclosures on subprime mortgages will continue through mid-2010; foreclosures on option ARM's will continue through mid-2013; foreclosures on Alt-A and prime mortgages are increasing at unexpected rates due to employment losses and will be an issue until the economy rebounds
- Job creation and mortgage financing are a necessity for a market bottom; job creation is expected to commence in late 2010, but mortgage financing will not be available until bank balance sheets are stabilized and transparent, the timing of which is highly uncertain due to a schedule of resets through 2013 and ongoing government intervention

 JONES LANG LASALLE

**Final Draft**     For-Sale Residential  22

GMH Native 094783

## Affordability

### Housing affordability is above equilibrium

- An increasingly severe housing correction has made owning a home much more affordable. Housing affordability reached 73% as of the 1st quarter 2009, 7% above equilibrium.

- Despite improving affordability, mortgage debt must be available to borrowers in order for the market to bottom; otherwise, housing prices will continue to move beyond equilibrium.

- Mortgage financing will not be available until U.S. banks stabilize their capital base and foreclosures cease, two goals that federal stimulus packages have failed to achieve.

- Despite record low mortgage rates, the largest U.S. banks receiving TARP funds continue to reduce lending.



*Source: National Association of Home Builders*

Affordability Index = percentage of households that can afford the median mortgage payment.

 JONES LANG LASALLE

**Final Draft**

For-Sale Residential  23

GMH Native 094784

## Residential Price Outlook

### Home prices have stabilized

- Home prices in the top ten U.S. cities are 12% above the long-term average established from 1987 to 1999.

- Home prices topped in June 2006 at a level 80% above the long-term average and have since declined by 30%.

- Home prices may decline below the long-term average as stimulus effects wear off.

- A high level of existing supply combined with an uncertain long-term job outlook indicates that home prices may form a long trough rather than a "V" bottom.



**10-City Composite**
**S&P/Case-Shiller Home Price Index**

~~~~ S&P/Case-Shiller Home Price Index
—— S&P/Case-Shiller Home Price Index Growth Rate 1987 - 1999

*Source: S&P / Case-Schiller, updated January 2009*



JONES LANG
LASALLE

## Final Draft

For-Sale Residential 24

GMH Native 094785

## Residential Supply Outlook

**Homeowner vacancy at all time high**

- The homeowner vacancy rate, which is comprised of unoccupied non-rental housing stock, is at its highest point since the statistic was first tracked in 1954

- 2.6% of non-rental homes are vacant, representing 2.3 million units.

- 10% of homes built in the past decade are vacant.

- Vacancy is expected to stagnate or increase throughout 2009 as minimal demand is matched with continued foreclosures.

- Home vacancy will need to decline before any meaningful rebound can occur in the housing market.



**Homeowner Vacancy Rate**

*Source: US Census Bureau*

 JONES LANG LASALLE'

**Final Draft**

For-Sale Residential 25

GMH Native 094786

## Housing Starts



#### U.S. Housing Starts

*Source: US Census Bureau*

### Demand for home lots at all-time low as oversupply halts all construction

- In previous down-cycles, housing starts decreased between 3 and 5 years before bottoming

- Starts have decreased for 3 years thus far and continue to fall, indicating diminishing demand for finished lots despite historically low levels in 2008

- The unprecedented 14-year period of expansion leading up to the housing top in 2007 indicates a larger oversupply than in previous cycles and a correspondingly longer corrective period beyond 5 years

 JONES LANG LASALLE

**Final Draft**

For-Sale Residential 28

GMH Native 094787

## Subprime Loan Resets

**The majority of <u>subprime</u> resets were complete at year-end 2008**

- Recent subprime resets are the result of rampant subprime lending from 2005 to 2006

- Interest rates resets on subprime loans began in 2007 and continued through the end of 2008

- The majority of subprime lending occurred in "bubble markets" in California, Florida, Arizona and Nevada; as a result, these states have experienced the highest levels of mortgage defaults, corresponding foreclosures and resulting median home price declines



*Source: LoanPerformance, Deutche Bank via Pershing Square Capital*



**Final Draft**

For-Sale Residential

GMH Native 094788

## Subprime Foreclosures

**Subprime resets will result in foreclosures through mid-2010**

- Approximately 30% of subprime resets are expected to result in default

- Due to the lag between the time of reset, default and foreclosure, subprime resets today will affect the market 12 to 18 months after reset

- Home foreclosures due to <u>subprime</u> loans are expected to end in mid-2010

- However, problems do not end in mid-2010. Option ARM mortgages will cause the next large wave of foreclosures



*Source: LoanPerformance, Deutche Bank via Pershing Square Capital*



**Final Draft**

For-Sale Residential

GMH Native 094789

## Option ARM Resets

**Charts on previous pages misses option ARM resets that will surge in 2010 - 2011**

- Option ARMs give the borrower the option each month of paying: 30-year fixed, 15-year fixed, interest only or only a portion of interest. Due to current economic and housing conditions, most borrowers using option ARMs are choosing interest only or partial interest

- Many consider option ARMs worse than subprime because option ARMs put the homeowner at risk of negative amortization and reset to a much higher monthly payment, sometimes double the monthly payment prior to reset

- Goldman Sachs estimates that 61% of the $750 billion outstanding option ARM loans will default

- 33% of option ARMs were delinquent or in foreclosure as of April 2009

- 55% of borrowers with option ARMs owe more than the value of their home according to JP Morgan



*Source: Credit Suisse via Pershing Square Capital*

 JONES LANG LASALLE

**Final Draft** For-Sale Residential

GMH Native 094790

## Geographic Option ARM Concentration



**MAP OF MISERY**
THE PERCENTAGE OF NEW AND REFINANCED MORTGAGES INTO LOANS WITH PAYMENT OPTIONS

**Final Draft**   For-Sale Residential   30

GMH Native 094791



III. Demographic Analysis

JONES LANG LASALLE

**Final Draft**

31

GMH Native 094792

## National Demographic Trends

### Baby Boomers

75 million baby boomers born between 1946 and 1964 are now between the age of 45 and 65. This group is wealthy due to a steadily upward trending economy and stock market during its working years, although recent stock market declines have reduced net worth somewhat.

Within this group, "empty-nesters" will continue to drive demand for mid to upper priced condominiums for the next five to ten years.

Furthermore, the US market is just entering a phase of significant senior housing demand as the baby boomers age. Senior housing projects should have diverse levels of care, including: independent living, assisted living, and nursing facilities to appeal to baby boomers.

### Echo Boomers

The equally large echo boomers are now aged 9 to 27. This group will also dictate trends across the economy and real estate market as it ages. Echo boomers are already straining university systems and student housing facilities as those born in 1990 (the highest birth year from 1982 – 2000) enter college in 2009.

They have buoyed the apartment market over the past several years as college graduates enter the work force and will next have growing impact on entry level and trade-up homes and older echo boomers start the process of household formation.

### Immigration

Net immigration, both legal and illegal, adds 1.25 million to the US population annually and is expected to add a total of 105 million from 2009 to 2060. Given the low incomes and household wealth of this group, this trend will create demand for affordable housing and will have as much impact on market-rate residential product.



US Birth Rates



**Final Draft**

Demographic Analysis

GMH Native 094793

## National Demographic Trends

The age of a person born at the peak of the baby boomer era in 1957 is 52 while the largest portion of echo boomers born in 1990 is 19. The diagram below illustrates South Loop residential product types that will be impacted most by these two age cohorts:

|  | 2010 | 2015 | 2020 | 2025 | 2030 |
|---|---|---|---|---|---|
| **Baby Boomers** | Middle Market to Luxury Condos | Middle Market to Luxury Condos IL Senior Housing | Middle Market to Luxury Condos IL & AL Senior Housing | IL, AL, Nursing Senior Housing | AL, Nursing Senior Housing |
| **Age** | 53 | 58 | 63 | 68 | 73 |
| **Echo Boomers** | Student Housing | Apartments, Entry Level Condos | Entry Level Condos, Trade-up Condos | Trade-up Condos, Luxury Condos | Middle Market to Luxury Condos |
| **Age** | 19 | 24 | 29 | 34 | 39 |

 JONES LANG LASALLE®

**Final Draft**

Demographic Analysis 33

GMH Native 094794



## South Loop Demographics



**Downtown Market**

**South Loop Submarket**

### Household Comparison : South Loop vs Downtown*

| | South Loop | | Downtown | |
| | HH's | Annual Growth | HH's | Annual Growth |
|---|---|---|---|---|
| 2014 Projection | 20,837 | 2.90% | 94,783 | 1.83% |
| 2009 Estimate | 18,065 | 4.75% | 86,551 | 2.66% |
| 2000 Census | 11,901 | 3.61% | 68,308 | 2.84% |
| 1990 Census | 8,344 | | 51,616 | |
| | | | | |
| Household Income | $75,865 | | $102,149 | |
| | | | | |
| 2009 Est. Median Age | 39.16 | | 40.53 | |
| 2009 Average HH Size | 1.89 | | 1.67 | |
| Family Households | 7,382 | 40.86% | 29,229 | 33.77% |
| Nonfamily Households | 10,684 | 59.14% | 57,322 | 66.23% |
| | | | | |
| Owner Occupied | 6,748 | 37.35% | 36,159 | 41.78% |
| Renter Occupied | 11,317 | 62.65% | 50,391 | 58.22% |

\* South Loop & Downtown are defined by residential submarket boundaries
*Source : Claritas*

### Demographic Summary

South Loop's lower condo sales prices and apartment rents relative to central and northern areas of downtown attract younger people and families. This lower price point comprises a larger buyer pool, driving higher population growth. Annual population growth in the South Loop of 4.75% has outpaced Downtown as a whole by over 2% annually since 2000. Projections assume reversions to the mean, but could certainly exceed 3% if the economy rebounds faster than expected.



**JONES LANG LASALLE**

## Final Draft

Demographic Analysis    34

GMH Native 094795



## IV. Local Market Analysis

In This Section

A.  Condominium
B.  Apartment
C.  Student Housing
D.  Seniors Housing
E.  Retail
F.  Hospitality
G.  Office

JONES LANG
LaSALLE

**Final Draft**

GMH Native 094796



A. Condominium

JONES LANG LaSALLE

**Final Draft**

Local Market Analysis

GMH Native 094797

# Condominium Executive Summary

### Downtown Chicago Condominium Market Overview

The downtown Chicago condominium market will gradually recover alongside the national housing market starting in late-2010. The recovery will gradually accelerate as job creation re-emerges in 2010, downtown's supply overhang is absorbed and mortgage financing becomes more available.

- Long-term population growth downtown, forecasted at 2% downtown and over 3% in the South Loop, will support ongoing condominium absorption once the US economy has recovered.

- Chicago condo prices have declined 16% since topping in September 2007 compared to a 26% decline in single family prices. Condo pricing is expected to catch up to single family home prices as owners of distressed developments opt to auction unsold inventory.

- Condo absorption in 2009 has increased to 349 though the $2^{nd}$ quarter after an all time low of 85 in all of 2008 due to:
  - Pent-up demand emerging from households previously waiting for lower prices before buying
  - Speculators attracted to diminished price levels

- Unsold condo inventory of 3,952 units plus units under contract that will not close upon delivery represents between 2 and 3 years of supply at stabilized levels. Given the gradual nature of the anticipated market recovery, current inventory will require between 3 to 5 years to absorb.

- Upon full recovery, the downtown condominium market will average 2,300 sales annually, a similar level to the period from 1998 to 2003. The South Loop will capture 40% of downtown condominium sales, implying annual absorption of 930 units in the South Loop.

### Riverside District Forecast

- Riverside District will capture a similar share of market absorption as Central Station due similarities in land area and location, indicating average annual condo sales of 390 units after market recovery.

- Based on comparable projects and forecasted price levels, condominium pricing at Riverside District will average from $300 to $400 per square foot during initial stages of development.

 JONES LANG LASALLE

**Final Draft**

Condominium   37

GMH Native 094798

## Chicago Condominium Submarkets

Downtown Chicago is comprised of six residential submarkets shown on the map. Below is an overview of characteristics of each submarket.



### South Loop

The South Loop is the fastest growing area of Downtown Chicago due to land availability, proximity to the downtown employment core, public transportation options and frontage along Lake Michigan and Grant Park. Buyers in the South Loop are generally first-time buyers, trade-down baby boomers and speculators.

### River West / West Loop

River West / West Loop is very similar to the South Loop in its growth and buyer characteristics. Overall, price points are the lowest in the Downtown market because it is the only submarket without water or park views. Furthermore, the West Loop does not benefit from pedestrian rail access.

### River North

River North is a more affluent submarket than the South Loop and West Loop because its eastern portion abuts Michigan Avenue providing access to high-end retail and its southern portion the Chicago River, which offers excellent views. Buyers are typically 2nd home purchasers or baby boomers.

### Loop / New East Side & South Streeterville

These two affluent submarkets offer lake / park views and are located near Michigan Avenue retail. Price points are similar within the two submarkets and trail only the Gold Coast. There are few land sites remaining as most have been developed.

### Gold Coast

The Gold Coast is the most affluent area in Downtown Chicago. The neighborhood contains the highest-end retail in the city along north Michigan Avenue and Oak Street. Land is extremely scarce and price points are the highest in the city. Buyers are typically wealthy baby boomers and affluent households looking for a non-primary residence in the city.


JONES LANG
LASALLE

## Final Draft

Condominium 38

GMH Native 094799

# New Construction Condo Price Points

## Lake / Park Views and Proximity to North Michigan Ave. Generate Price Premiums

The map shows list price / sq. ft. on new construction condominium projects currently marketing units for sale.

Luxury condominium projects with price points at $500+ per square foot have historically been developed near North Michigan Avenue or on property fronting Lake Michigan or Grant Park. Accordingly, the highest priced projects are located along Michigan Avenue in the Gold Coast ($761/sf) and South Streeterville ($540/sf), or adjacent to Grant Park in the Loop ($579) and eastern portions of the South Loop.

Projects located further west generally range in price from $300 to $400 per square foot; areas include: West Loop, southern and western South Loop, western River North and western Gold Coast



| New Construction Condo : Avg. List Price / SF | |
|---|---|
| Submarket | $ / SF |
| West Loop | $322 |
| **South Loop** | **$382** |
| South Streeterville | $540 |
| River North | $458 |
| Near North | $321 |
| Loop/New Eastside | $579 |
| Gold Coast | $761 |
| Market Average | $388 |



**Final Draft**

Condominium

GMH Native 094800

## Condo Price Performance

### Condominium Prices Face Downward Pressure

Downtown Chicago condominium values have fallen 16% since topping in September 2007. Downtown condominium price performance has outperformed single family units, which have fallen 26% since their top in 2006.

Condominium value declines tend to lag single family declines due to the nature of condominium development. There is pressure on condo developers to keep prices high in order to achieve their pro forma pricing until they are able to exit their projects. This phenomenon is illustrated by the fact that condo values topped a whole year later than single family home values.

Condominium unit prices have downside potential during 2009 and 2010 as developers are forced to auction units and speculators continue to lose units to foreclosure. These trends have gained momentum in 2009 after two years of near zero net absorption have forced developers and speculators to drop pricing on unsold units.



Downtown Chicago
S&P/Case-Shiller Condo Price Index

 JONES LANG LASALLE

**Final Draft**  Condominium 40

GMH Native 094801

# Condominium Absorption

**Downtown Will Slowly Reach Stabilized Absorption at 2,300 Sales Annually**

After averaging 3,753 condo sales annually from 2004 to 2007, the downtown condo market recorded just 85 sales in 2008. Absorption is expected to gradually increase over the next three years as prices continue to fall and the economy slowly stabilizes. There are currently 3,952 unsold units being marketed downtown, the majority of which will be delivered in 2009 or are already in completed buildings. This inventory, combined with units under contract that will default upon delivery, indicate that there is between two and three years of supply at stabilized levels. However, given a very gradual absorption recovery, the time frame is likely longer than three years.

Timing and velocity of the national economic and housing market recovery is far more impactful to future prospects for the Riverside District than unsold inventory in the market. Unsold inventory will not be an issue once development is again feasible.

**South Loop Will Slowly Reach Stabilization at 900 – 950 Annual Sales**

The South Loop has historically captured approximately 40% of downtown condo sales. Assuming that the downtown market recovers in 5 years to annual figures seen in 1998 – 2003 of 2,300 per year, the South Loop will average approximately 930 condo sales per year.



Downtown Chicago
New Construction Condominium New Contracts



South Loop
New Construction Condominium New Contracts



| Market Capture by Submarket Submarket | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|---|
| West Loop | 26% | 22% | 13% | 14% | 28% | 111% | 34% |
| South Loop | 24% | 35% | 41% | 46% | 41% | -147% | 65% |
| South Streeterville | 8% | 5% | 15% | 8% | 12% | 128% | 8% |
| River North | 28% | 18% | 13% | 10% | 7% | 11% | -2% |
| Near North | 2% | 1% | 1% | 5% | 2% | -55% | 3% |
| Loop/New Eastside | 9% | 16% | 15% | 15% | 7% | 21% | 2% |
| Gold Coast | 2% | 2% | 1% | 2% | 4% | 32% | 0% |
| Totals | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

JONES LANG LASALLE

## Final Draft

Condominium    41

GMH Native 094802



## Existing Supply

### South Loop Condo Pad Sales Still 3 to 5 Years Away

The South Loop contains 1,206 unsold new construction condos, representing 37% of downtown unsold inventory. This percentage of unsold units is consistent with historical market absorption, indicating that the South Loop is performing in-line with the downtown market during the current recession.

Once the housing market recovers and reaches stabilized absorption levels of 2,320 annually, the South Loop will capture 40% of sales, or 930 units per year. As a result, unsold inventory plus units under contract that will default upon delivery represents approximately two years of stabilized supply. This will translate into approximately 3 to 5 years of supply as the market gradually recovers.





| Projects Currently Engaged in Marketing | | | |
|---|---|---|---|
| Submarket | Total Units | Unsold | % of Total |
| West Loop | 2,409 | 905 | 21% |
| **South Loop** | **4,177** | **1,206** | **37%** |
| Streeterville | 2,107 | 972 | 18% |
| River North | 1,313 | 495 | 12% |
| Near North | 360 | 159 | 3% |
| Loop / New Eastside | 619 | 55 | 5% |
| Gold Coast | 408 | 160 | 4% |
| Downtown Totals | 11,393 | 3,952 | 100% |

JONES LANG LASALLE

## Final Draft

Condominium 42

GMH Native 094803



## Absorption Forecast

### Riverside District Long-term Absorption – 390 units per year

Due to location and size similarities, Riverside District's long-term annual absorption can be estimated by analyzing Central Station's historical absorption.

At 72 acres, Central Station is similar in size to the Riverside District's 62 acres. Their locations are also similar, both along Roosevelt Road extending southward. Central Station benefits from excellent water views along its eastern side whereas Riverside does not. This amenity would manifest itself in higher price points rather than higher absorption. Riverside benefits from more proximate access to the "El" train at Roosevelt Station and retail along Roosevelt Road. Riverside District's river views also aid somewhat in boosting sales prices per square foot.

From 2000 – 2007, Central Station recorded condo sales of 500 units annually, representing 17 percent of downtown market-wide absorption and 33 percent of absorption in the South Loop. Given that Central Station is mostly built-out, Riverside District should benefit from a similar level of market share. Assuming 17 percent market capture, the Riverside District should average 390 condo sales per year, totaling between one and two pad sites annually.




JONES LANG
LASALLE

## Final Draft

Condominium 43

GMH Native 094804

# South Loop Project Inventory



| | South Loop - New Construction Condo Projects Currently Marketing Units | | | | |
|---|---|---|---|---|---|
| | Project | $ / SF | Units | Units Sold | % Under Contract |
| 1 | One Museum Park | $639 | 289 | 230 | 80% |
| 2 | One Museum Park West | $589 | 298 | 208 | 70% |
| 3 | The Columbian | $493 | 220 | 169 | 77% |
| 4 | The Lofts at Roosevelt Collection[1] | $431 | N/A | N/A | N/A |
| 5 | Astoria Tower | $425 | 248 | 174 | 70% |
| 6 | 1400 Museum Park | $397 | 260 | 254 | 98% |
| 7 | 1600 Museum Park | $389 | 274 | 134 | 49% |
| 8 | Library Tower | $388 | 184 | 89 | 48% |
| 9 | Museum Park Place South | $384 | 288 | 128 | 44% |
| 10 | Michigan Avenue Tower II | $382 | 269 | 242 | 90% |
| 11 | Lexington Park | $368 | 333 | 174 | 52% |
| 12 | One Place | $359 | 96 | 76 | 79% |
| 13 | 1349 S. Wabash | $357 | 79 | 36 | 46% |
| 14 | Marquee Tower | $350 | 214 | 169 | 79% |
| 15 | Terrazio | $330 | 180 | 74 | 41% |
| 16 | 1555 S. Wabash | $330 | 176 | 92 | 52% |
| 17 | 1720 S. Michigan | $323 | 498 | 484 | 97% |
| 18 | Coliseum Park | $322 | 39 | 20 | 51% |
| 19 | Vetro[2] | $261 | 232 | 218 | 94% |
| | South Loop Totals | $382 | 4,177 | 2,971 | 71% |

1: Project will be converted to apartments. Pricing reflects Q2 2009 before conversion announcement.
   Project had been approx. 50% pre-sold since 2007.

2: List price was $342 / sf before auction in March 2009 which yielded average price of $258 / sf. Remaining
   units priced at $261 / sf.



**Final Draft**

Condominium 44

GMH Native 094805



B. Apartment

JONES LANG
LASALLE

**Final Draft**

Local Market Analysis

GMH Native 094806

## Apartment Executive Summary

### Downtown Chicago Apartment Market Overview

The downtown Chicago apartment market has performed better than the condo sector during the recession because households unable or unwilling to buy condos are renting apartments instead. However, a general over-supply in residential product combined with wide-spread job losses has negatively affected the apartment sector and will continue to weigh on rents and occupancy rates in the near term.

- After peaking at $2.35 per square foot in the 3rd quarter of 2007, Class-A effective rents have fallen 7.7% to their current level of $2.17 per square foot.

- 2,716 units are currently under construction for delivery from winter 2009 to 2011. This additional supply will place downward pressure on rental rates.

- Upon full recovery, the downtown apartment market will average 1,000 unit deliveries annually, an elevated level versus historical norms due to increased apartment demand from "echo-boomers".

- The South Loop submarket is expected to capture a larger portion of apartment development moving forward than in previous years due to its high-growth rate, lake views, public transportation options, relatively affordable land, and availability of land. The recently delivered Sky55, AMLI 900, Burnham Pointe and 1401 S. State are indications of this momentum.

### Riverside District Forecast

- A reasonable estimate for South Loop apartment development market capture is 40% (400 units) based on historical market capture for condominium development. If the Riverside District captures 33% of this (similar to its condominium market share), it will realize absorption of approximately 130 units annually.

- Based on comparable projects and forecasted rent levels, condominium pricing at Riverside District will average from $300 to $400 per square foot during initial stages of development.

 JONES LANG LASALLE'

**Final Draft**

Apartment 46

GMH Native 094807

# Chicago Apartment Submarkets

The apartment market is delineated by the same submarkets as the condominium market; however, apartment demand is driven by a younger demographic. Below is an overview of residential submarkets from an apartment perspective.



## South Loop

The South Loop was historically a low-rent area with older inventory. This has changed with the development of Sky55, AMLI 900, Burnham Pointe and 1401 S. State, three of which were delivered in 2008. The South Loop is expected to capture increasing share of new apartment projects due to its availability of land, relatively low land costs and public transportation. Rents will be pressured downward through 2010 due to the South Loop's oversupply of condominiums.

## River West / West Loop

The West Loop submarket is dominated by the Presidential Towers project, which holds 2,346 units and comprises the West Loops entire Class-B inventory. Three new projects, including two at K Station and one at 180 N. Jefferson, comprise the Class-A inventory. These new projects market to young professionals working in the West Loop office submarket.

## River North

There are three apartment projects under construction in River North, all of which were previously planned as condominium developments. River North is well positioned for ongoing apartment development due because it is located near the Loop and West Loop office markets, land pricing is low enough to support apartment projects, and there are still numerous vacant land sites.

## Loop / New East Side

The Loop / New East Side is primarily comprised of buildings within the 28-acre Lakeshore East project, which contains four projects developed over the past year, including the Shoreham, MDA City, The Tides and The Aqua. This submarket is popular with graduate students at nearby Northwestern and the Univ. of Chicago, which is accessible in 15 minutes via a train station directly west of Lakeshore East. Proximity to the lake and Millennium Park are also important drivers.

## South Streeterville

Streeterville is a heavily populated market driven by its proximity to Lake Michigan, Michigan Ave. shopping and Northwestern Memorial Hospital. Students at Northwestern are a primary demand driver for apartments.

## Gold Coast

Gold Coast is the most affluent residential neighborhood in Chicago and achieves the highest rents as a result. Few apartment projects are feasible in this submarket due to high land costs. Apartment inventory has been reduced significantly over the past 5 years due to numerous condo conversions.


JONES LANG LASALLE

**Final Draft**     Apartment

GMH Native 094808

# Apartment Submarket Comparison

| Class A Stabilized | | | | | | | |
|---|---|---|---|---|---|---|---|
| Submarket | # Units | Avg. Size | # Vacant | Occupancy | Gross $ / SF | Eff $ / SF | Concessions |
| Gold Coast | 1,668 | 791 | 63 | 96.22% | $2.26 | $2.16 | 4.30% |
| River North | 2,100 | 864 | 116 | 94.48% | $2.53 | $2.35 | 6.90% |
| Streeterville | 1,224 | 885 | 39 | 96.81% | $2.19 | $2.09 | 3.30% |
| New East Side / Loop | 1,338 | 876 | 173 | 87.07% | $2.21 | $2.07 | 5.10% |
| West Loop | 1,075 | 778 | 71 | 93.40% | $2.44 | $2.19 | 10.90% |
| South Loop | 326 | 1,079 | 31 | 90.49% | $2.03 | $2.03 | 0.00% |
| Totals - Class A | 7,731 | 851 | 493 | 93.62% | $2.32 | $2.18 | 5.10% |

| Class A Unstabilized | | | | | | | |
|---|---|---|---|---|---|---|---|
| Submarket | # Units | Avg. Size | # Vacant | Occupancy | Gross $ / SF | Eff $ / SF | Concessions |
| South Loop | 1,016 | 822 | 396 | 61.02% | $2.37 | $2.13 | 9.80% |
| New East Side / Loop | 1,082 | 781 | 352 | 67.47% | $2.66 | $2.28 | 14.10% |
| Totals - Class A | 2,098 | 801 | 748 | 64.35% | $2.51 | $2.20 | 11.90% |

| Class B Stabilized | | | | | | | |
|---|---|---|---|---|---|---|---|
| Class B Summary - Stabilized | # Units | Avg. Size | # Vacant | Occupancy | Gross $ / SF | Eff $ / SF | Concessions |
| Gold Coast | 1,367 | 780 | 81 | 94.10% | $1.99 | $1.88 | 4.00% |
| River North | 749 | 732 | 45 | 94.00% | $1.80 | $1.80 | 0.00% |
| Streeterville | 2,168 | 724 | 197 | 90.90% | $2.05 | $1.86 | 8.30% |
| New East Side / Loop | 1,082 | 825 | 112 | 89.60% | $2.07 | $1.97 | 11.30% |
| West Loop | 2,346 | 637 | 176 | 92.50% | $1.89 | $1.89 | 0.00% |
| South Loop | 1,184 | 730 | 81 | 93.20% | $2.12 | $1.93 | 6.40% |
| Totals - Class A | 8,896 | 723 | 692 | 92.22% | $1.99 | $1.89 | 5.00% |

 JONES LANG LASALLE'

## Final Draft

Apartment 48

GMH Native 094809

# Effective Rental Rates

**Apartments Proximate to Employment / Retail / Entertainment Districts and Public Transit Garner Highest Rents**

The map shows effective monthly rental rate / sq. ft. for existing apartment buildings in the downtown market. Effective rent is net of concessions such as free rent and the waiving of move-in and/or application fees

Rental rates for apartment buildings are significantly driven by the age of the building. Essentially, recently constructed buildings have newer finishes, nicer amenities and more marketable floor-plans than older projects, which drives higher rental rates.

Projects located within extremely affluent residential areas such as the Gold Coast or along Michigan Avenue garner higher rents than less affluent areas. Convenient access to employment corridors and public transportation are also significant determinants of rental rates.

Effective rents of the four projects recently delivered in the South Loop range from $1.94 to $2.06 per square foot. Apartment development at the Riverside District would garner similar rates.



Prices Per Sq Ft
- ● $2.25 to $2.50
- ○ $2.00 to $2.24
- ● $1.99 and less



**Final Draft**

Apartment 49

GMH Native 094810



## Rent Trends

### Effective Rents Have Stabilized, But Have Downside Potential

After peaking at $2.35 per square foot in the $3^{rd}$ quarter of 2007, Class-A effective rents have fallen to 7.7 percent to their current level of $2.17 per square foot.

Class-A rents rebounded in the first two quarters of 2009 after a dramatic fall in the $4^{th}$ quarter of 2008. However, Class-B rents have continued to slide each of the past four quarters. Class-B building owners required larger rate reductions and higher concessions in order to keep tenants in the face of decreasing market-wide occupancy rates.

The spread between Class A and Class B rents expanded to 9.9 percent as a result of the Class-B market's underperformance. This spread expansion should continue until the historical equilibrium is reached at approximately 12 percent.

2,716 units are currently under construction for delivery from winter 2009 to 2011. This additional supply will place downward pressure on rental rates. The ongoing risks of economic shocks also leaves the apartment market vulnerable to rent declines.



**Effective Rent Trends***



## Final Draft

Apartment

GMH Native 094811

## Historical & Projected Supply

**Downtown Supply**

The record number of apartment deliveries from 2008 to 2010 is a result of the cooling condominium market in 2006 - 2007, which ultimately collapsed in 2008. Financing for condo projects dried up, but was readily available for apartment projects through August 2008 prompting unusually high apartment development.

The long-term rate of apartment deliveries will be greater to the period from 1999 to 2007, which was not affected by the drying up of condo development financing, due to the effect of "echo-boomers" entering the rental market. This period averaged 735 units of new supply per year, or roughly apartment two projects annually. Furthermore, apartments should continue to show relative strength over historical figures because of ongoing constraints in mortgage financing. As a result, a reasonable estimate of apartment absorption over the next 10 years is 1,000 units per year.

The chart on the right also illustrates how the overheated condominium market drove a record rate of condo conversions, totaling 4,500 from 2003 to 2007. The combination of zero condo conversions plus significant deliveries through 2011 will place pressure on apartment rents.

**Riverside District Apartment Absorption : 130 units / year (one pad every two years)**

The South Loop is expected to capture a larger portion of apartment development moving forward than in previous years due to its high-growth rate, lake views, public transportation options, relatively affordable land, and availability of land. The recently delivered Sky55, AMLI 900, Burnham Pointe and 1401 S. State are indications of this momentum.

A reasonable estimate for South Loop apartment development market capture is 40% (400 units) based on historical market capture for condominium development. If the Riverside District captures 33% of this (similar to its condominium market share), it will realize absorption of approximately 130 units annually, indicating one pad sale every two years.



**Downtown Apartment Supply**
Additions / Subtractions (Condo Conversions)

| Year | Downtown Chicago Supply Change | | |
|------|-----------|-------------|--------------|
|      | Deliveries | Conversions | Net Additions |
| 1999 | 809 | -897 | (88) |
| 2000 | 605 | 0 | 605 |
| 2001 | 0 | -448 | (448) |
| 2002 | 1,017 | 0 | 1,017 |
| 2003 | 1,324 | -645 | 679 |
| 2004 | 274 | -783 | (509) |
| 2005 | 909 | -2440 | (1,531) |
| 2006 | 1,257 | -293 | 964 |
| 2007 | 420 | -308 | 112 |
| 2008 | 1,074 | 0 | 1,074 |
| 2009 | 955 | 0 | 955 |
| 2010 | 2,249 | 0 | 2,249 |
| 2011 | 329 | 0 | 329 |
| Total | 12,122 | (5,814) | 6,308 |

 JONES LANG LaSALLE

## Final Draft

Apartment ₅₁

GMH Native 094812

## Projects Under Construction

### Eight Projects Will Be Delivered Through 2011

There are eight apartment projects totaling 3,058 units currently under construction. These projects were planned in 2008 at a time when the apartment market seemed to avoid the collapse that befell the condominium market. Furthermore, construction financing was still available for apartment projects.

The Lofts at Roosevelt Collection is the sole apartment project in the South Loop currently under construction. It was marketed as a condo project until mid-2009, when the developer, Centrum, decided to cancel all contracts and lease-up as apartments upon completion. Because it was planned as a condo project, Lofts at Roosevelt Collection will achieve a lower rental rate per sq. ft. due to larger unit sizes. Per unit rental rates will be similar to or greater than competitive apartment units. Furthermore, amenity packages of condo projects are less competitive than apartment buildings, adding to Centrum's challenge.



| | Apartment Project | # Units | Delivery Date |
|---|---|---|---|
| 1 | The Streeter - Phase 2 | 480 | 2009 |
| 2 | Echelon at K Station | 848 | 2010 |
| 3 | 215 W. Washington | 389 | 2010 |
| 4 | Lofts Roosevelt Collection | 342 | 2011 |
| 5 | Flair Tower | 198 | 2010 |
| 6 | EnV | 251 | 2010 |
| 7 | Parc Huron | 221 | 2010 |
| 8 | NWC Lake & Wells | 329 | 2011 |



JONES LANG LASALLE

## Final Draft

Apartment 52

GMH Native 094813

## South Loop Existing Inventory

### South Loop Now Established Apartment Market

The South Loop's four new apartment projects: Sky55, 1401 S. State, AMLI 900 and Burnham Pointe, are not yet stabilized, but have recorded healthy occupancy growth albeit at lower rents than were underwritten in their pro formas. Effective rental rates after concessions range from $1.94 per square foot to $2.06 per square foot. Stabilized properties range from $1.86 per square foot to $1.95 per square foot, with Fisher Building City Apartments garnering a premium due to its location at the northern edge of the South Loop.

The Riverside District's location is comparable to AMLI 900 and Burnham Pointe. Accordingly, forecasted rent for apartments at the Riverside District would currently be in the range of $2.03 to $2.06 per square foot.

The Riverside District will likely garner a rent premium because it will be a master planned project with a higher level of streetscapes and green space. As a result, its anticipated rental rates would likely exceed the AMLI 900 and Burnham Pointe and fall in the range of $2.10 to $2.15 per square foot.



| | Building | # Units | Avg. Size | # Vacant | Occupancy | Gross $ / SF | Eff $ / SF | Concessions | Class |
|---|----------|---------|-----------|----------|-----------|--------------|------------|-------------|-------|
| 1 | Sky55 | 326 | 1,079 | 31 | 90.2% | $2.03 | $2.03 | 0.0% | A |
| 2 | 1401 S. State | 278 | 855 | 35 | 87.1% | $2.33 | $1.94 | 16.8% | A |
| 3 | AMLI 900 | 440 | 854 | 87 | 80.0% | $2.06 | $2.06 | 0.0% | A |
| 4 | Burnham Pointe | 298 | 984 | 76 | 74.2% | $2.38 | $2.02 | 15.3% | A |
| 5 | Fisher City Apartments | 184 | 794 | 13 | 92.9% | $2.16 | $2.16 | 0.0% | B |
| 6 | 1130 S. Michigan | 656 | 740 | 51 | 92.2% | $2.13 | $1.86 | 12.5% | B |
| 7 | 1212 S. Michigan | 344 | 678 | 17 | 95.1% | $2.09 | $1.95 | 6.7% | B |



JONES LANG
LASALLE

## Final Draft

Apartment 53

GMH Native 094814



C. Retail

JONES LANG LaSALLE

**Final Draft**

Local Market Analysis

GMH Native 094815

## Retail Executive Summary

### Roosevelt Corridor Retail Market Overview

- Roosevelt Road contains a number of large retailers, including: The Home Depot, Whole Foods, Dominick's, Target, Jewel Osco, Bed Bath & Beyond, LA Fitness, DSQ Shoe Warehouse. This existing inventory leaves no obvious category gaps in the trade area.

- Based on market analysis, supply gaps exist in the following categories, Motor Vehicle and Parts Dealers, Gasoline Stations, Home Center, General Merchandise, Lawn & Garden, Furniture & Home Furnishings, Appliances & Electronics, Sporting Goods, Children's Clothes, Health & Personal Care.

- Of opportunity categories listed, the following do not have sufficient surplus demand to necessitate another large-format store <u>but there still may be an opportunity for smaller format stores</u>: Motor Vehicle and Parts Dealers, General Merchandise, Sporting Goods, Appliances & Electronics.

- Retailers that could profit sufficiently from supply gaps to justify an additional store on Roosevelt include: Menard's or Lowe's with large garden center, Pottery Barn, Land of Nod, Restoration Hardware, Pep Boys, Advanced Auto, Napa Auto Parts, small format independent appliance retailer, Oreck, Cricket, Dick's Sporting Goods (small format), Sports Authority (small format), Play it Again Sports, Vitamin Shoppe, GNC, small format children's clothing store (Gymboree, Carters), Babies "R" Us.

- Based on the demand / supply analysis, there is not sufficient surplus demand for an IKEA; however, it would be prudent to re-open conversations as no retailer has entered the market to fill the gap that they had planned on filling previously.

### Riverside District Forecast

- There is sufficient surplus retail demand in certain categories to form a cluster of stores near Roosevelt Road. The cluster could include anchors such as Menard's / Lowe's and Dick's Sporting Goods, with inline tenants such GNC, Cricket, Pottery Barn, Gymboree, restaurants and outparcel tenants such as Baby's "R" Us and Pep Boys.

- Additional retail to serve the local residential population within Riverside District would be housed at ground-level in residential buildings, with tenants such as salons, restaurants, independent boutique stores, etc. If the project were able to attract a day-time use such as a large office tenant or entertainment venue, additional retail demand would be generated.


JONES LANG
LaSALLE

**Final Draft**

Retail 55

GMH Native 094816

## Retail Opportunity

**Issues**

- Identify key retail segments currently under-served in the South Loop Trade

- Identify the target national/regional chains with the identified segments not serving the South Loop

 JONES LANG LaSALLE

**Final Draft**

Retail | 56

GMH Native 094817

## Methodology

Confirm and document existing national/regional retail development

Generate demographic data for estimated primary trade area:
- Trade area boundaries
  - Randolph Rd to north
  - Ashland Ave to west
  - Lake Shore Dr to east
  - 54th St to South

Generate retail expenditure supply and demand for estimated trade area

Prioritize retail categories with high demand/low supply

Compile list of target (missing) retailers for each of the prioritized retail categories

 JONES LANG LASALLE

**Final Draft**

Retail 5/

GMH Native 094818

# Primary Trade Area Map



**Final Draft**

JONES LANG
LaSalle

Retail 58

GMH Native 094819

## Primary Trade Area Retail Sector Supply/Demand

| Category | Trade Area Demand | Trade Area Supply | Opportunity |
|---|---|---|---|
| Motor Vehicle and Parts Dealers-441 | $353,850,889 | $158,961,260 | $194,889,629 |
| Gasoline Stations | $318,782,832 | $147,189,250 | $171,593,582 |
| Home Centers-44411 | $91,519,654 | $30,136,634 | $61,383,020 |
| Other General Merchandise Stores-4529 | $201,378,859 | $147,263,325 | $54,115,534 |
| Lawn, Garden Equipment, Supplies Stores-4442 | $23,522,513 | $837,828 | $22,684,685 |
| Furniture and Home Furnishings Stores-442 | $57,079,902 | $34,685,724 | $22,394,178 |
| Appliances, TVs, Electronics Stores-44311 | $53,240,805 | $39,739,242 | $13,501,563 |
| Sporting Goods Stores-45111 | $17,125,429 | $4,620,273 | $12,505,156 |
| Children's, Infants Clothing Stores-44813 | $6,194,509 | $2,070,448 | $4,124,061 |
| Other Health and Personal Care Stores-44619 | $10,852,970 | $8,834,692 | $2,018,278 |



**Final Draft**

Retail 59

GMH Native 094820

# Qualifying Opportunity

## Categories with Opportunity Issues

<u>Motor Vehicles (Auto Dealers/Auto Parts):</u>  Auto dealer segment is shrinking, not expanding

<u>Other General Merchandise (Warehouse or Superstore):</u>  Not enough sales opportunity to support category

<u>Sporting Goods:</u>  Opportunity sales may be slightly less than necessary for small format Dick's/Sports Authority

<u>Appliances/TV's Electronics (Households appliances, radio, TV, cell phone):</u>  Opportunity sales not large enough to support another major consumer electronics player
- Best Buy in the market
- Circuit City closed
- Radio Shack in market
- Major Cell Phone Carriers in place



GMH Native 094821



## Retail Categories

Retailers noted in the following pages:

1. Do not currently operate in the estimated trade area
2. Are possibilities to fulfill opportunity
3. Do not represent a recommended tenant mix



GMH Native 094822

## Target Retailers by Category

**Motor Vehicles (Auto Dealers/Auto Parts)**
- Advanced Auto
- Napa Auto Parts
- Pep Boys

**Gasoline Stations**
- Shell

**Home Centers/Lawn & Garden**
- Menard's or Lowe's with large garden center
- Menard's more experience in urban environment

**Furniture/Home Furnishings**
- Pottery Barn
- Pottery Barn Kids
- Land of Nod
- Restoration Hardware



JONES LANG
LASALLE

**Final Draft**

Retail 62

GMH Native 094823

## Target Retailers by Category

Appliances/TV's Electronics: Households appliances, radio, TV, cell phone
- Small format independent household appliance retailer
- Oreck Vacuums
- Cricket

Sporting Goods
- Small format Sports Authority
- Small format (1 level) Dick's Sporting Goods
- Play it Again Sports

Other Health and Personal Care
- Vitamin/Health Food Stores
- Vitamin Shoppe
- GNC

Children's/Infant Clothing
- Small format children's clothing store: Carter's, Gymboree
- Babies R Us (fulfills Children's apparel and Furniture)


JONES LANG LaSALLE

**Final Draft**

Retail 63

GMH Native 094824



D. Student Housing

Jones Lang LaSalle

**Final Draft**

Local Market Analysis

GMH Native 094825

## Student Housing Executive Summary

### South Loop Student Housing Market Overview

- Echo boomers (currently age 9 to 27) are straining university systems and student housing facilities as those born in 1990, representing the largest single year of echo boomers, enter college in 2009.

- There are 24 institutions of higher education with facilities in the South Loop and Loop with total enrollment of 65,524. Enrollment has grown at a rate of 5.8% annually from 2004 to 2009.

- 20% of students attending Loop & South Loop schools live in the Loop area, representing 13,105 students. Given annual enrollment growth of 5.8%, 760 additional students will require housing each year in student housing facilities or apartments, implying the need for several hundred additional student housing beds in the Loop and South Loop annually.

- Columbia College, DePaul University, Roosevelt University and the School of the Art Institute have significant local residential student populations. These institutions drive the majority of student housing demand.

### Riverside District Forecast

- All student housing projects located within one mile of the Riverside District serve Columbia College, with the University Center also housing students from DePaul and Roosevelt. Columbia operates numerous facilities in the area and is the most obvious demand source.

- The transition of commuter students living off-campus to residential students living on-campus represents a growth opportunity not captured in enrollment growth data. Riverside District's location near the Roosevelt "El" station stop is crucial to capturing student housing demand.

- 

 JONES LANG
LASALLE

GMH Native 094826

# Loop & South Loop Student Statistics

There are 24 institutions of higher education with facilities in the South Loop and Loop with total enrollment of 65,524. Enrollment has grown at a rate of 5.8% annually over the past five years.

Higher education institutions occupy 7.3 million square feet of space for administration, class rooms, meeting space, libraries, theatres, etc. Additionally, there are 9 student housing buildings totaling 5,285 beds that house students from 5 universities. Students typically commute from outside of the Loop to attend the 19 remaining universities.

In 2004, the Central Loop Alliance conducted a survey among students in the South Loop and Loop regarding spending habits, housing, work, class-load, and retail preferences. Below are key findings:

| Topic | Student Response | Implication for Riverside District |
|---|---|---|
| # of Students Living in the Loop Area | 20% live in the Loop area, representing 13,105 students. | Annual student housing demand will growing at 5.8% or 760 beds per year |
| Method of transportation to class | 67% of students ride the "El" train lines. 29% report using the CTA bus system. 13% take Metra lines into Union Station. | Students should be open to using the Roosevelt Red Line and Orange Line to commute northward from Roosevelt Road |
| Retail spending | The top three store types by student spending totals include fast food, drinks (bars / cafes), and drug stores. | Retail uses in conjunction with student housing should target these uses |
| Real estate opinions | Students are interested in more affordable parking and residential alternatives near their campus and feel that most projects are too expensive | Students will continue to prefer student housing over apartments in the Loop to save money |
| Student jobs | 60% of students are employed, 59% are employed full-time. 40% are employed in the Loop area. | Students employed in the Loop area represent a student housing growth opportunity above the 20% that already live in the Loop area |
| Time spent in Loop | 83% take 3 or 4 classes per semester | Most students spend a significant amount of time during the day in the Loop and South Loop |



GMH Native 094827

# Loop & South Loop Universities Overview



### South Loop & Central Loop Institutions of Higher Education

| | Institution | Enrollment | Student Residences |
|---|---|---|---|
| 1 | Columbia College Chicago | 12,464 | Local |
| 2 | DePaul University | 13,230 | Local |
| 3 | Robert Morris College | 2,497 | Local |
| 4 | Roosevelt University | 4,468 | Local |
| 5 | School of the Art Institute | 3,095 | Local |
| 6 | Adler School of Professional Psychology | 634 | Commuter |
| 7 | American Academy of Art | 387 | Commuter |
| 8 | Argosy University | 1,237 | Commuter |
| 9 | Chicago School of Professional Psychology | 1,466 | Commuter |
| 10 | East-West University | 1,144 | Commuter |
| 11 | Everest College | 486 | Commuter |
| 12 | Harold Washington College | 10,633 | Commuter |
| 13 | Harrington College of Design | 1,418 | Commuter |
| 14 | Illinois School of Health Careers | 290 | Commuter |
| 15 | Institute For Clinical Social Work | 85 | Commuter |
| 16 | International Academy of Design and Technology | 2,335 | Commuter |
| 17 | John Marshall Law School | 1,549 | Commuter |
| 18 | Lake Forest Graduate School of Management | 97 | Commuter |
| 19 | MacCormac College | 171 | Commuter |
| 20 | National-Louis University | 3,564 | Commuter |
| 21 | Spertus Institute | 326 | Commuter |
| 22 | Taylor Business Institute | 250 | Commuter |
| 23 | The Illinois Institute of Art | 2,867 | Commuter |
| 24 | Westwood College | 831 | Commuter |
| | 2009 Total: | 65,524 | |
| | 2005 Total: | 52,230 | |



**Final Draft**

Student Housing

GMH Native 094828

## Higher Education Facility Locations

Higher education institutions have historically purchased vacant buildings along Michigan Ave, Wabash Ave and State St. University expansion southward will continue as vacant buildings and development sites become scarce. The South Loop's 9.3% office vacancy rate is an indication that it will be harder for universities or developers to acquire buildings for retrofit to classrooms or student housing. The Riverside District is well-positioned to capture demand for student housing and new non-residential facilities.

### Higher Ed. Non-Residential Space Utilization

| | Institution | Sq. Ft. |
|---|---|---|
| 1 | DePaul University | 1,453,497 |
| 2 | Columbia College Chicago | 1,309,332 |
| 3 | School of the Art Institute | 1,307,206 |
| 4 | Roosevelt University | 827,378 |
| 5 | Harold Washington College | 365,412 |
| 6 | John Marshall Law School | 254,000 |
| 7 | Robert Morris College | 210,864 |
| 8 | East-West University | 142,511 |
| 9 | National-Louis University | 128,000 |
| 10 | Spertus Institute | 104,000 |
| 11 | International Academy of Design and Technology | 93,800 |
| 12 | Harrington College of Design | 78,000 |
| 13 | The Illinois Institute of Art | 65,000 |
| 14 | Westwood College | 31,575 |
| 15 | Adler School of Professional Psychology | 27,528 |
| 16 | Illinois School of Health Careers | 19,000 |
| 17 | Lake Forest Graduate School of Management | 4,821 |
| | Totals* | 6,421,924 |

* as of 2005, 2009 update pending

**Buildings of Ten Largest Real Estate Occupiers and Student Housing**



GMH Native 094829

## Student Housing Alternatives

### Columbia Primary Demand Source, DePaul, Roosevelt Secondary

All student housing projects located within one mile of the Riverside District serve Columbia College, with the University Center also housing students from DePaul and Roosevelt. Columbia operates numerous facilities in the area and is the most obvious demand source. In fact, a planned student housing project at 1140 S. Wabash is in discussions with Columbia to master lease a block of beds in order to kick-off the project.

The transition of commuter students living off-campus to residential students living on-campus represents a growth opportunity not captured in enrollment growth data. Riverside Districts location near the Roosevelt "El" station stop is crucial to capturing student housing demand.



| Student Housing Facilities | | | |
|---|---|---|---|
| | Building | Beds | Primary University Served |
| 1 | University Center | 1700 | Columbia, Depaul, Roosevelt |
| 2 | Planned Project* | 860 | Columbia |
| 3 | 2 E. 8th Residence | 844 | Columbia |
| 4 | Dwight Lofts | 694 | Columbia |
| 5 | 162 N. State | 491 | School of the Art Institute |
| 6 | Buckingham Residence Hall | 456 | Columbia |
| 7 | Fornelli Hall | 450 | Roosevelt, Robert Morris |
| 8 | 731 S. Plymouth | 345 | Columbia |
| 9 | The Chicago Building | 196 | School of the Art Institute |
| 10 | 18 E. Congress Residence | 109 | Columbia |

* Proposed by condo developer Frank Giles. City-owned property, City has not yet voted to sell


GMH Native 094830



E. Seniors Housing

JONES LANG LASALLE

**Final Draft**

Seniors Housing

GMH Native 094831



Seniors Housing

**South Loop Market Overview**

- 75 million baby boomers born between 1946 and 1964 are now between the age of 45 and 65. Overall, this group is relatively wealthy in comparison to previous generations due to a steadily upward trending economy and stock market during its working years.

- The US market is just entering a phase of significant senior housing demand as the baby boomers come into retirement age.

- Healthier lifestyles have led to longer life expectancies further creating demand for seniors housing product in the United States.

- More and more seniors are electing locate in urban environments near family and existing social networks.

- Trends in Seniors Housing are to provide communities offering diverse levels of care, including: independent living, assisted living, and nursing facilities to appeal to baby boomers.

**Riverside District Forecast**

- Growth in the 75+ demographic over the next five years will create additional demand for seniors housing units that are not currently met in the marketplace. It is anticipated that approximately 500 to 600 market rate units will be supportable in the South Loop.

- Demand persists in South Loop for affordable seniors housing units; however, lack of liquidity in tax credit market is a hindrance in the current development of affordable product.



JONES LANG
LASALLE

**Final Draft**

Senior Housing

GMH Native 094832

# Defining Market Support – Seniors Housing

## Existing and Planned Inventory

The inventory of the PMA is important to determine the alternative choices that a prospective resident may have when choosing a seniors housing community. Although the absolute number of units/beds in the PMA is important, it is also critical to ear mark the metropolitan projects that are most competitive in terms of service levels to the proposed project at the subject property.

## Available Units

As the economy has softened and demand for seniors housing product has followed suit, many properties are experiencing more occupancy decline than in years past. These available units will serve as competition for proposed product and will reduce the absorption levels of the proposed development.

## Primary Market Area

The primary market area (PMA) is usually defined by the area encompassing the majority of prospective residents for the proposed project. The concept is that most prospective residents will move to a seniors housing facility that is within close proximity of their current primary residence. An assumption is then made to determine the percentage draw of age and income qualified households that would originate from the PMA versus other geographic areas. Riverside District offers a geographic location that will draw from a larger area as residents look to move to a more compact, all encompassing community providing services such as retail, restaurants, parks and community services. The primary market area as well as the competitive landscape is defined within a 5 mile radius on the forthcoming slides.

## Age and Income Qualification

In order to qualify for residency in seniors housing communities, the resident must be of certain age requirements, usually 62 years of age. Furthermore, they must demonstrate sufficient financial resources to pay the initial entrance fee, required monthly services fees and any other expenses. A minimum criteria is used to identify prospective residents that would be eligible for residence within an independent living unit at the project. Usually the minimum required income is 1.5 to 1.7 times the monthly service fees.

## Penetration Rates

Penetration rates help measure the degree to which is a market is either underserved or saturated. The goal of the developer is to take all of the aforementioned indicators to determine at what percentage of prospective residents must they capture in order to achieve stabilization of the proposed project. A penetration rate is calculated on the market as well as the project to determine how much of the market share a project must take to be successful and whether the market as a whole will support additional units. Typical project rates are around 5% and market rates are below 15%.


JONES LANG
LaSALLE

**Final Draft**

Seniors Housing  72

GMH Native 094833

## Inventory & Available Units – Independent Living

### Independent Living Properties

Independent Living (IL) properties are properties that have a majority of IL units, but may also provide Assisted Living and Nursing Care Beds. Property amenities typically include communal dining, housekeeping, transportation, emergency call and social programming services. All of the services are usually included in the monthly rental rates.

### Existing and Proposed Inventory

Over the past 3.5 years, the number of units has increased from 23,557 to 24,469 in metro Chicago. During the same period, the occupancy has fallen below 90% reflecting the overall softening of the economy, with the most significant drop in 2008. In the same period, the number of units under construction has dropped as projects have been completed and new starts have not replaced them in the supply pipeline.

### Rental Growth

Rental rates for IL properties in metro Chicago have grown approximately 3% year over year in the past 4 years. A major growth in rates was witnessed between 2006 and 2007 as the popularity of IL units peaks. Since the end of 2007, rental rate growth has fallen back to more historical norms as the demand for units has softened with the economic downturn.



Independent Living Supply - Metro Chicago



Independent Living Rent Statistics - Metro Chicago



JONES LANG LaSALLE

**Final Draft**

Seniors Housing

GMH Native 094834



## Inventory & Available Units - Assisted Living

### Assisted Living Properties

Assisted Living (AL) properties are properties that have a majority of AL and Memory Care (MC) service units. Residents receive personal care services such as bathing, dressing, eating, walking and toileting. Twenty-four hour oversight is included, but twenty-four hour medical care is not.

### Existing and Proposed Inventory

Over the past 3.5 years, the number of units has increased from 6,989 to 8,241 in metro Chicago. During the same period, the occupancy has fallen below 90% reflecting the overall softening of the economy with the most significant drop in 2008. In the same period, the number of units under construction has dropped from a peak of 1011 in 2008 to 451 units in 2009 as projects have been completed and new starts have not replaced them.

### Rental Growth

Rental rates for AL properties are higher than IL units due to the level of service provided to residents. As shown in the chart, rates in metro Chicago have grown approximately 3% year over year in the past 4 years to $3,853. A major growth in rates was witnessed between 2006 and 2007 followed by a significant decline in 2008 and 2009. The growth rates have fallen due to the high cost of care associated with AL units and service levels. Rental rates for MC units are typically much higher than AL units with rents of $5,125 witnessed in Cook County in 2009 year to date.



Assisted Living Supply - Metro Chicago



Assisted Living Rent Statistics - Metro Chicago



GMH Native 094835

## Inventory & Available Units – Nursing Care

### Nursing Care Properties

Nursing Care (NC) properties are properties that have a majority of NC beds. These properties are generally licensed long-term health care and residential properties that serve residents that require constant medical supervision or significant physical assistance and use of medical devices.

### Existing and Proposed Inventory

The number of beds provided in the metro Chicago area has remained relatively flat for the past four years while the occupancy levels have fallen slightly. As shown in the chart to the right, very few predominately nursing care properties are under construction as most of the projects now focus on providing a mix of IL, AL and NC unit types.

### Rental Growth

Rental rates for NC beds are quoted on a per night basis as opposed to a monthly rental rate to reflect varying lengths of stay for residents. Daily rates have grown steadily over the past 4 years with significant rate increases in 2006 and 2007. A pullback in rental growth rates was witnessed in 2008 and 2009 due to softening economic conditions.



Nursing Care Supply - Metro Chicago



Nursing Care Rent Statistics - Metro Chicago



**Final Draft**

Seniors Housing  15

GMH Native 094836

## Inventory & Available Units – CCRC's

### Continuing Care Retirement Communities (CCRCs)

CCRCs are retirement communities that must include Independent Living units as well as Nursing Beds, but they often offer Assisted Living and Memory Care units as well. CCRCs typically have two different payment types – entrance fee and rental properties. Entrance Fee properties charge a lump sum of monies for the right to occupy a residence plus a set monthly charge. Non entrance fee rental properties do not charge an initial lump sum amount; however, they typically have higher monthly rental rates that are subject to annual market increases. The bar chart below depicts the monthly rent ranges for surveyed properties that may or may not charge entrance fees. As shown, the majority of properties not charging entrance fees have monthly rates between $3,000 and $4,000; whereas, the majority of properties with entrance fee charges have monthly rates between $2,000 and $3,000.

| CCRC KEY METRICS | | |
|---|---|---|
| | Key Metrics | |
| | Entrance Fee | Rental |
| Stabilized Occupancy | 88.9% | 88.7% |
| YoY Rent Growth | 0.0% | 2.7% |
| Quarterly Absorption | 40 | 25 |
| Quarterly Inventory Growth | 88 | -2 |
| Inventory | 10,207 | 8,302 |
| Penetration | 3.3% | 2.0% |

**Monthly Rent Ranges for Participating CCRC's**



| CCRC - Entrance Fee Properties | |
|---|---|
| Unit Type | Average Entrance Fee ('09) |
| Studios | $98,859 |
| 1 Bedroom | $183,571 |
| 2 Bedroom | $273,301 |
| 3 Bedroom | $406,029 |

The table above breaks down the average entrance fees for select unit types as of 2nd quarter 2009 in metropolitan Chicago. As shown, the approximate range is $100,000 to $400,000 depending on the unit size.



## Final Draft

Seniors Housing  76

GMH Native 094837

## Primary Market Area - Seniors Housing Units

| Primarily Independent Living Communities | Address | Totals |
|---|---|---|
| Cottage View Terrace | 4801 South Cottage Grove | 97 |
| Frances Larry Apartments | 824 East 53rd Street | 61 |
| G&A Senior Residences at Eastgate Village | 300 East 26th Street | 117 |
| Good Shepard Tower | 55 East Garfield | 60 |
| Greencastle of Kenwood | 4909 South Cottage Grove | 60 |
| Hallmark Chicago | 2960 North Lake Shore Drive | 341 |
| Margaret Ford Manor | 4500 South Wabash Avenue | 60 |
| Senior Suites of Central Station | 1430 South Indiana Avenue | 93 |
| South Shore Manor | 5249 South Martin Luther King | 33 |
| TE Brown Apartments Retirement Homes | 3601 South Wells | 116 |
| The Clare at Water Tower | 55 East Pearson Street | 337 |
| Vincennes Court | 4747 South King Drive | 20 |
| Totals | | 1,395 |

| Primarily Assisted Living Communities | Address | Totals |
|---|---|---|
| Pioneer Gardens | 3800 South King Drive | 120 |
| Rush Barton | 1245 South Wood Street | 139 |
| Sunrise of Lincoln Park | 2710 North Clark Street | 63 |
| Totals | | 322 |

| Primarily Nursing Care Communities | Address | Totals |
|---|---|---|
| Avenue Care Center | 4505 South Drexel Avenue | 155 |
| Boulevard Care Center | 3405 South Michigan Avenue | 115 |
| Bronzeville Park Skilled Nursing & Living Center | 3400 South Indiana | 302 |
| California Gardens Nursing & Rehabilitation Center | 2829 South California Avenue | 297 |
| Center Home for Hispanic Elderly | 1401 North California Avenue | 156 |
| Community Care Center | 4314 South Wabash Avenue | 204 |
| International Village | 4815 South Western Avenue | 207 |
| Lakeview Nursing & Rehabilitation Center | 735 West Diversey | 176 |
| Lincoln Park Terrace | 2732 North Hampden Court | 109 |
| Park House | 2320 South Lawndale | 106 |
| St. Agnes Health Care Center | 17255 South Wabash | 197 |
| The Imperial & The Pavilion Ivy Apartments | 2437 North Southport Avenue | 366 |
| Warren Barr Pavilion | 66 West Oak Street | 270 |
| William Dawson Nursing Center | 3500 South Giles Avenue | 245 |
| Totals | | 2,907 |



◉ Independent Living Communities    ★ Riverside District
◌ Assisted Living Communities    ◯ 3-mile Primary Market Area
● Nursing Care Communities    ◯ 5-mile Primary Market Area



JONES LANG
LaSALLE

## Final Draft

Seniors Housing

GMH Native 094838

## Demographics – Age & Income Qualification

## Age and Income Qualification

Seniors housing communities are age restricted developments where all residents are over the age of 55 and most are over the age of 75. The large majority of possible residents come from within the PMA, most of the time averaging 75% of the resident pool. Prospective residents must meet one of two criteria in order to meet financial qualification levels. The first is to earn at least 1.5X the average market rent and the second is to have equity in a home over $300,000 The following table breaks down the numbers of potential candidates for senior housing within that PMA that meet both income and age requirements.

| Age & Financially Qualified Residents Assumptions | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Age and Financial Qualifications | 2009 | 2014 | | | Age and Financial Qualifications | 2009 | 2014 | | | |
| Required Income MSF (Market Rate) | $4,236 | $4,954 | | | Required Income MSF (Low Income) | $1,500 | $1,755 | | | |
| Required Annual Income | $50,832 | $59,443 | | | Required Annual Income | $18,000 | $21,057 | | | |
| Year | 2009 | | 2014 | | Year | 2009 | | 2014 | | |
| Age Bracket | % Qualified | # Qualified | % Qualified | # Qualified | Age Bracket | % Qualified | # Qualified | % Qualified | # Qualified | |
| 55-59 | 44.09% | 5,086 | 41.43% | 5,326 | 55-59 | 70.05% | 8,084 | 73.15% | 9,404 | |
| 60-64 | 42.40% | 4,017 | 36.81% | 3,871 | 60-64 | 68.37% | 6,478 | 69.54% | 7,313 | |
| 65-69 | 30.34% | 2,206 | 26.46% | 2,248 | 65-69 | 60.54% | 4,402 | 63.71% | 5,410 | |
| 70-74 | 24.99% | 1,367 | 21.52% | 1,311 | 70-74 | 55.69% | 3,083 | 60.12% | 3,663 | |
| 75-79 | 23.51% | 1,004 | 19.20% | 837 | 75-79 | 56.46% | 2,411 | 62.22% | 2,713 | |
| 80-84 | 18.41% | 620 | 14.89% | 456 | 80-84 | 51.40% | 1,731 | 58.07% | 1,717 | |
| Over 85 | 16.57% | 601 | 12.62% | 474 | Over 85 | 48.07% | 1,744 | 52.57% | 1,944 | |
| Totals | | 14,903 | | 14,523 | Totals | | 27,913 | | 32,164 | |


JONES LANG
LASALLE

**Final Draft**

Seniors Housing 78

GMH Native 094839

## Market Penetration

Market penetration rates help measure the degree to which the market is either underserved or saturated and represents the market capture of age and financially qualified residents. Based on industry standards, Jones Lang LaSalle used the following ratios for market rate and low income units:

| Age Brackets | Penetration Rates | |
| --- | --- | --- |
| | Mkt Rate | Low Income |
| Aged 55+ | 2.00% | 3.50% |
| Aged 65+ | 3.50% | 6.00% |
| Aged 75+ | 6.50% | 10.00% |

JONES LANG LASALLE

**Final Draft**

Seniors Housing 79

GMH Native 094840

## Intermediate-term Market Rate Seniors Housing Demand

### Demand for Market Rate Seniors Housing in the next 4 years

Demand exists for seniors housing at Riverside District in the intermediate term due to a shortage of units serving the 75+ age brackets. However, in the short-term (1to 2 years) financing will be difficult to achieve for new developments based on stresses in the overall economy and continued uneasiness in the real estate markets. Once the market stabilizes, approximately 300 units of supply could be absorbed at Riverside based on income and age qualified persons.

Demand for market rate housing driven by the 75+ demographic due to greater penetration of the age bracket. **The 300 additional units represents 1 pad sale between 2012 and 2014,** depending on continued economic recovery.



#### Age 55+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income Based | Home Based |
| Existing Competitive Units | 831 | 831 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 55+ | 100% | 100% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 55+ | 563 | 563 |
| Financially-Qualified Households Age 55+ | 14,903 | 13,088 |
| Assumed Penetration Rate | 2.00% | 2.00% |
| Supportable Additional Units | 0 | 0 |

#### Age 65+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income | Home Value |
| Existing Competitive Units | 831 | 831 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 65+ | 90% | 90% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 65+ | 507 | 507 |
| Financially-Qualified Households Age 65+ | 8,815 | 6,260 |
| Assumed Penetration Rate | 3.50% | 3.50% |
| Total Additional Units | 0 | 0 |

#### Age 75+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income Based | Home Based |
| Existing Competitive Units | 831 | 831 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 75+ | 75% | 75% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 75+ | 423 | 423 |
| Financially-Qualified Households Age 75+ | 2,225 | 2,760 |
| Assumed Penetration Rate | 6.50% | 6.50% |
| Total Additional Units | 264 | 352 |



JONES LANG LASALLE

**Final Draft**

Seniors Housing

GMH Native 094841

## Long-term Market Rate Seniors Housing Demand

### Long-term demand for Market Rate Seniors Housing

Long-term growth trends in the primary market area combined with an expectant rebound in the housing market should fuel demand for an additional Seniors Housing pad at Riverside District. As shown in the tables to the right, an additional 300 units in addition to the previously described units are supportable on-site.

Demand for market rate housing driven by the 75+ demographic due to greater penetration of the age bracket. The **300 additional units represents an additional 1 pad sale by 2014.**



Age 55+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income Based | Home Based |
| Existing Competitive Units + Riverside Developed Units | 831 | 831 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 55+ | 100% | 100% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 55+ | 563 | 563 |
| Financially-Qualified Households Age 55+ | 14,523 | 16,976 |
| Assumed Penetration Rate | 2.00% | 2.00% |
| Supportable Additional Units | 0 | 0 |

Age 65+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income | Home Value |
| Existing Competitive Units + Riverside Developed Units | 831 | 831 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 65+ | 90% | 90% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 65+ | 507 | 507 |
| Financially-Qualified Households Age 65+ | 9,197 | 8,153 |
| Assumed Penetration Rate | 3.50% | 3.50% |
| Supportable Additional Units | 0 | 0 |

Age 75+, Market Rate

| | Primary Market Area | |
| --- | --- | --- |
| | Income Based | Home Based |
| Existing Competitive Units + Riverside Developed Units | 1,115 | 1,183 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 75+ | 75% | 75% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 75+ | 567 | 602 |
| Financially-Qualified Households Age 75+ | 1,767 | 3,364 |
| Assumed Penetration Rate | 6.60% | 6.60% |
| Supportable Additional Units | 1,225 | 1,429 |


JONES LANG LASALLE

**Final Draft**

Seniors Housing 81

GMH Native 094842

## Affordable Seniors Housing Demand

### Shortage of affordable seniors housing units

The City of Chicago has an immediate need for the development of affordable seniors housing units across all age brackets within the PMA. However, in order for affordable housing to be financially viable, tax credits must be competed for and obtained from the State of Illinois. The worth of the tax credits must be assessed in the fixed income market. Historically, tax credits were worth between $0.90 and $0.95 to the $1; however, with the collapse of the bond markets, the value of the tax credits fell drastically. This drop in value adversely affected the financial viability of affordable developments. Once the fixed income markets stabilize, affordable seniors housing should be considered as a viable product type and should **warrant development of at least 1 pad**.

#### Age 55+, Low Income

| | Primary Market Area | |
|---|---|---|
| | Income Based | Home Based |
| Existing Competitive Units | 564 | 564 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 55+ | 100% | 100% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 55+ | 382 | 382 |
| Financially-Qualified Households Age 55+ | 27,913 | 27,913 |
| Assumed Penetration Rate | 3.5% | 3.5% |
| Supportable Additional Units | 877 | 877 |

#### Age 65+, Low Income

| | Primary Market Area | |
|---|---|---|
| | Income Based | Home Based |
| Existing Competitive Units | 564 | 564 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 65+ | 90% | 90% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 65+ | 344 | 344 |
| Financially-Qualified Households Age 65+ | 13,351 | 13,351 |
| Assumed Penetration Rate | 6.00% | 6.00% |
| Supportable Additional Units | 749 | 749 |

#### Age 75+, Low Income

| | Primary Market Area | |
|---|---|---|
| | Income Based | Home Based |
| Existing Competitive Units | 564 | 564 |
| Assumptions: | | |
| Residents Originating from the PMA | 75% | 75% |
| Residents Age 65+ | 75% | 75% |
| Stabilized Occupancy | 90% | 90% |
| Total Units to be Occupied by PMA Seniors Age 75+ | 287 | 287 |
| Financially-Qualified Households Age 75+ | 5,886 | 5,886 |
| Assumed Penetration Rate | 10.00% | 10.00% |
| Supportable Additional Units | 1,157 | 1,157 |


JONES LANG LASALLE

## Final Draft

Seniors Housing 82

GMH Native 094843



F. Hospitality

JONES LANG LASALLE

**Final Draft**

Local Market Analysis

GMH Native 094844

## Hospitality Executive Summary

### Downtown Hospitality Market Overview

- Downtown Chicago exhibits excellent long-term hotel fundamentals as demand has increased in 16 of the last 22 years, while supply has increased in 15 of these years.

- Over the past three years, 13 hotels have opened downtown representing 2,744 rooms. Development has occurred primarily just west of Michigan Avenue between Lake Street and Chicago Avenue. This area is the strongest tourist corridor due to adjacency to North Michigan Avenue retail, River North / Gold Coast restaurants, nearby Navy Pier and proximity to Millennium Park. There are four hotels currently under construction, three in River North and one in the Loop, totaling 1,412 rooms.

- Chicago's downtown lodging performance growth has decelerated, in 2009, with a RevPAR decline of 21.7% compared to the first six months of 2008 due to severe declines in leisure and business travel tied to the recession.

- The South Loop has not yet garnered serious interest from national hotel chains for new development because of competing market strength and brand saturation in established hotel districts including River North, the Loop and near Michigan Avenue.

- McCormick Place has not generated new development beyond the Hyatt Regency McCormick Place. This is not unusual as hotels dependent upon convention centers need to be attached to the convention center to justify the wide swings in occupancy.

### Riverside District Forecast

- Hotel development is not feasible in the near term due to Riverside's tertiary hotel location in the South Loop combined with extremely poor hotel market fundamentals during the current recession.

- Upon an economic rebound, the location will be capable of supporting a mid-scale extended stay or possibly upscale, but not a luxury brand. Potential flags include:
  - Starwood Hotels (aloft brand)
  - Hilton (Embassy Suites brand)
  - Kimpton (boutique brands)

    These brands at the Riverside District would appeal to a budget conscious traveler visiting McCormick Place, the downtown office district or family in the South Loop.

 JONES LANG LASALLE®

**Final Draft**

Hospitality 84

GMH Native 094845

## Hotel Demand

### Visitor and Airport Volume Trending Up Long-Term

Chicago's visitor volume has trended upward over the past ten years due to a diverse mix of tourist attractions including the "Magnificent Mile" shopping district, Navy Pier, and well-attended annual festivals.

The Chicago MSA has excellent air linkages as a result of two airports: O'Hare International Airport and Midway International Airport. Chicago's airports serve over 70 commercial and cargo airlines with over 3,000 aircraft departures and arrivals taking place everyday, connecting Chicago to more than 210 cities worldwide.

Air travel at O'Hare and Midway has grown over the past ten years, but declined in 2008 and 2009 due to economic conditions.

O'Hare International, a major hub for American and United Airlines, is the busiest airport in the nation in terms of takeoffs, landings and cargo volume and the second busiest in terms of passenger volume. In 2008, O'Hare served 70.8 million passengers with 881,556 takeoffs and landings. Furthermore, currently underway is the $6.6 billion O'Hare Modernization Program, a twenty-year initiative that is aimed at reconfiguring intersecting runways to reduce delays and increase capacity at the Airport. The program is projected to create 195,000 new jobs and add an additional $18 billion in annual economic activity for the region.

Midway International, a major hub for Southwest Airlines, serviced over 17.3 million passengers in 2008. In 2004, the $927 million Midway Terminal Development Program was completed, which included a new terminal building, new concourses and new roadways. The Program took eight years to complete and improved the accessibility of Chicago, increasing domestic and international volumes.





 JONES LANG LaSalle

## Final Draft

Hospitality

GMH Native 094846

## Hotel Demand

### Chicago is a Leading Convention Destination with Growing Tourism Sector

Chicago is one of the nation's leading convention cities with McCormick Place representing the largest convention center in the U.S., containing 2.6 million sq ft and attracting more than three million visitors annually. In August 2007, McCormick Place West opened. The $800 million expansion is comprised of 470,000 sq ft of space, including Chicago's largest ballroom at 100,000 sq ft. The booking pace for McCormick Place and Navy Pier is lagging in 2010 and 2011 due to current economic conditions. The booking pace for 2012 and 2013 is presently 133% and 147% of target, respectively, highlighting the strong future demand for large events in the city.



The primary marketing organization for the Chicago hotel industry is the Chicago Convention and Tourism Bureau (CCTB). One of the organization's main goals is to attract large out of town groups, requiring large room blocks, to Chicago. The CCTB tracks the advance room nights booked by the CCTB for 2009 through 2016, and compares these actual bookings to a "pace target" in each year. If actual bookings (red bars) equal the pace target (blue line), this would be an indication that eventual bookings in a given year would equal the consumption benchmark (green line).

As group demand remains weak, many meeting planners have gained negotiating leverage. Some meeting planners are seeking discounted pricing for future years as part of their contracts to book events in 2009 and 2010. This strategy has fueled room night bookings significantly above the pace target for 2012 and 2013, as meeting planners attempt to lock in today's discounted rates. The data suggests a significant recovery in group business will occur in 2012 and 2013.



**Current bookings "pace" target in order to achieve future bookings goal of 2.1 million room nights**



**Final Draft**          Hospitality

GMH Native 094847

## Hotel Supply vs. Demand

### Thin Supply Pipeline Should Benefit Medium-Term Market Performance

Demand and supply both exhibit a long-term growth trend in Chicago. Demand has increased in 16 of the last 22 years in Chicago, while supply has increased in 15 of these years. The chart to the right shows year-over-year changes in supply and demand between 1988 and 2008.

The largest year-over-year declines in demand, in descending order, occurred in 1991, 2001, and 2008 corresponding with the three most recent national economic recessions. In 2001 demand declined by 10.8%, reflecting a national downturn in travel due to economic conditions, geopolitical concerns, and the terrorist attacks that took place in September of 2001. Demand increased each year since then. After relatively little supply growth in Chicago between 2003 and 2007, supply increased by 5.2% in 2008, thereby exacerbating the negative effects of the economic recession. Corresponding with the national economic recession, demand contracted by 1.1% in 2008.

Five consecutive years (2003-2007) of RevPAR increases drew investor and developer attention to the downtown Chicago hotel market, fueling record levels of new supply, much of which came on-line in the last 18 months. This is demonstrative of 2008 and year-to-date 2009 rooms supply growth, at 5.2% and 2.8%, respectively. However, amidst the year-over-year declines in demand observed over the same period, the ability for these new rooms to be fully absorbed by the market has been hampered.

The current supply pipeline has contracted over the last twelve months, as many of the projects that were planned are now postponed or delayed due to the adverse financing climate and high construction costs. Accordingly, nearly 30% of the projects in the pipeline have been cancelled in the last year, the majority of which were affiliated with luxury brands like Mandarin Oriental or Shangri-La.



**Annual Change in Supply & Demand**

■ Room Supply ■ Room Demand

**Downtown Chicago Hotel Supply : 2004 - 2012**

| Year | Status | Total Rooms | Supply Change | Percent Change |
|------|--------|-------------|---------------|----------------|
| 2004 | Actual | 36,209 | 0 | 0.0% |
| 2005 | Actual | 36,573 | 364 | 1.0% |
| 2006 | Actual | 36,385 | -188 | -0.5% |
| 2007 | Actual | 36,381 | -4 | 0.0% |
| 2008 | Actual | 38,256 | 1,875 | 5.2% |
| 2009 | Actual | 39,893 | 1,068 | 2.8% |
| 2010 | Forecast | 41,528 | 871 | 2.2% |
| 2011 | Forecast | 42,343 | 200 | 0.5% |
| 2012 | Forecast | 42,343 | 0 | 0.0% |


JONES LANG LASALLE

## Final Draft

Hospitality

GMH Native 094848

## Hotel Market Trends

### Hotel Market Performance Impacted By Recession

Since 2003, downtown Chicago hotel performance indicators have demonstrated consistent year-over-year growth with an average annual RevPAR growth rate of 7.0% from 2003 to 2008. Chicago's occupancy and ADR reached all-time highs in 2007 and 2008, attaining RevPAR levels of $141 and $137, respectively.

Chicago's downtown lodging performance growth has decelerated, in 2009, with a RevPAR decline of 21.7% compared to the first six months of 2008. This represents a contraction from 2008's year-to-date RevPAR performance, as occupancy levels declined 6.4% and ADR softened 16.2% amidst the challenging economic environment. This compares to the greater U.S.'s hotel performance, which has seen occupancy decline 10.9% and ADR fall 8.7% in the same period.

While the current economic slowdown is impacting hotel operating performance in the short-term, the medium term (two years plus) investor sentiment, as demonstrated in Jones Lang LaSalle Hotel's May 2009 Hotel Investment Sentiment Survey, is showing the largest improvement for Chicago compared to the prior January 2009 survey. This is supported by the cancellation or delay of several high-end hotel developments as well as the likely relocation of meetings and conventions from resort destinations to the city. Furthermore, Chicago represents the fifth-highest sentiment for medium-term operating performance in the U.S. following Boston, Los Angeles, San Francisco and Washington D.C.







JONES LANG
LASALLE

**Final Draft**

Hospitality

GMH Native 094849

## Recent Supply Additions

### Large Supply of Rooms Delivered in 2008 and 2009

Over the past three years, 13 hotels have opened downtown representing 2,744 rooms. Development has occurred primarily just west of Michigan Avenue between Lake Street and Chicago Avenue. This area is the strongest tourist corridor with land available due to adjacency to North Michigan Avenue retail, River North / Gold Coast restaurants, nearby Navy Pier and proximity to Millennium Park.

The most recent hotel opening was the Elysian Chicago in August 2009 in the Gold Coast. The Elysian is a condo-hotel project with 188 condo-hotel units and 52 condo units. Notable projects recently opened in the South Loop are the Renaissance Blackstone, a retrofit of the historic Blackstone Hotel, and the Chicago South Loop Hotel, a new construction project offering low-cost alternative near McCormick Place.



| | Name of Hotel | Location | Type | No. of Rooms | Opening Date |
|---|---|---|---|---|---|
| | **Downtown Supply Additions in Past 3 Years** | | | | |
| 1 | Elysian Chicago | 11 E. Walton | Independent | 188 | Aug-09 |
| 2 | DoubleTree Chicago The Wit | 201 N. State St. | Upper Upscale | 298 | May-09 |
| 3 | La Quinta Chicago Downtown | 1 S. Franklin | Midscale w/o F&B | 233 | Apr-09 |
| 4 | Comfort Suites Chicago | 320 N. Michigan Ave | Midscale w/o F&B | 119 | Apr-09 |
| 5 | Hotel Felix | 111 W. Huron St. | Luxury | 230 | Mar-09 |
| 6 | Club Quarters | 111 W. Adams | Independent | 89 | Jun-08 |
| 7 | Hotel Dana | 660 N. State St. | Luxury | 216 | May-08 |
| 8 | SpringHill Suites | 410 N. Dearborn | Upscale | 253 | Mar-08 |
| 9 | Residence Inn | 410 N. Dearborn | Upscale | 270 | Mar-08 |
| 10 | Renaissance The Blackstone | 636 S. Michigan Ave | Upper Upscale | 330 | Mar-08 |
| 11 | Chicago South Loop Hotel | 2600 S. State St. | Independent | 232 | Mar-08 |
| 12 | Trump Tower Chicago Hotel | 401 N. Wabash Ave | Luxury | 339 | Jan-08 |
| 13 | Hampton Inn Theatre District | 22 W Monroe | Midscale | 135 | Apr-07 |
| | Additions in Room Supply (past 3 years) | | | 2,744 | |



GMH Native 094850

## Projects Under Construction and in Planning

### Under Construction

There are four hotels currently under construction, three in River North and one in the Loop. These hotels represent a mix of luxury boutique and nationally branded projects as well as an upscale extended stay brand. Significant barriers to entry, including increasing energy costs, a lack of available sites, and tightened credit markets continue to be key factors when considering construction of new hotels in Chicago.

### Planned

There are numerous hotels currently in planning; however, all are on hold and none should break ground before the end of 2012. Three projects in latter stages of planning on shown on the map identified as 5, 6 and 7. In November 2006 ECD Company bought 0.14 acres for $3 million with plans for a 165 room aloft hotel (#6 on map) with 5 floors of office. ECD was unable to obtain financing and the project is currently on hold. See Wong is planning to develop the Grand Imperial Hotel (#7 on map) in Chinatown just south of Riverside District. Mr. Wong is expecting a steady flow of Chinese immigrants to boost occupancy levels.



| Hotels Under Construction and in Late Stages of Planning | | | | |
|---|---|---|---|---|
| Name of Hotel | Location | Type | No. of Rooms | Opening Date |
| **Under Construction** | | | | |
| 1 Hotel Palomar | 505 N. State | Independent | 261 | Feb-10 |
| 2 JW Marriott | 208 S. LaSalle | Upper Upscale | 610 | Jun-10 |
| 3 Modern Hotel | 330 N. Wabash | Independent | 335 | Jan-11 |
| 4 Staybridge Suites | 127 W. Huron | Upscale | 206 | Jan-11 |
| Total Under Construction | | | 1,412 | |
| **Late Stages of Planning** | | | | |
| 5 Hyatt Place | Clark & Grand | Upscale | 170 | TBD |
| 6 aloft Chicago Millenium Park | 636 S. Wabash | Upscale | 165 | TBD |
| 7 Grand Imperial Hotel | 2014 S. Clark | Independent | 170 | TBD |
| Total In Late Stages of Planning | | | 505 | |

 JONES LANG LaSALLE

## Final Draft

Hospitality 90

GMH Native 094851

# Riverside Hotel Outlook

### Midscale to Upscale Hotel

The map to the right displays existing hotels in the area. The area around the Riverside District in the South Loop has not yet garnered serious interest from national hotel chains for new development because of market strength and brand saturation in established areas in River North, the Loop and near Michigan Avenue.

Upon an economic rebound, the location will be capable of supporting a mid-scale extended stay or possibly upscale, but not a luxury brand. Potential flags include:

- Starwood Hotels (aloft brand)

- Hilton (Embassy Suites brand)

- Kimpton (boutique brands)

These brands at the Riverside District would appeal to a budget conscious traveler visiting McCormick Place, the downtown office district or family in the South Loop.





GMH Native 094852



G. Office

JONES LANG
LASALLE®

**Final Draft**

Local Market Analysis 92

GMH Native 094853

## Office Executive Summary

### Downtown Office Market Overview

- The South Loop is not a traditional office market, but rather serves as a low cost option with historic and loft-style office space.

- The South Loop contains only 2.2 million square foot of Downtown's total 133.7 million of office inventory. The South Loop has not attracted office development due to:
    - The West Loop and Central Loop have convenient rail / bus connections or direct adjacency to Union Station and Ogilvie Station plus significant hotel, retail and restaurant options.
    - River North, North Michigan Ave and East Loop contain an existing critical mass of office inventory as they have historically been the most popular areas for retail, restaurants and entertainment in downtown.

- Significant office demand has originated from the education sector as institutions have been steadily buying buildings to retrofit or occupancy. This option is more cost effective than new construction. Once existing building supply is occupied, institutions will be forced to construct new buildings. An example of this emerging dynamic is Spertus Institute's construction of their new 130,000 square foot building at 610 South Michigan. .

### Riverside District Forecast

- The Riverside District is located outside of the South Loop office submarket, which ends at the north side of Roosevelt Road. This fringe location for traditional office tenants indicates that odds of a traditional multi-tenant office development in the Riverside District is low.

- As a result, opportunities for office development hinge on demand from higher education institutions and single-tenant build-to-suit developments. Given expansion in South Loop universities, new buildings for local schools represent the best opportunity. This demand source is difficult to forecast and discussions should be opened with Columbia College, DePaul University and Roosevelt University in order to gauge interest.

 JONES LANG LASALLE'

**Final Draft**

Office 93

GMH Native 094854

## Submarket Overview

### South Loop Not An Option For Traditional Office Tenants

The South Loop contains only 2.2 million square foot of Downtown's total 133.7 million of office inventory. The South Loop has not attracted office development due to:

1. The West Loop and Central Loop have convenient rail / bus connections or direct adjacency to Union Station and Ogilvie Station plus significant hotel, retail and restaurant options.

2. River North, North Michigan Ave and East Loop contain an existing critical mass of office inventory as they have historically been the most popular areas for retail, restaurants and entertainment in downtown.





| Submarket | Current Inventory (sf) |
|---|---|
| Central Loop | 41,235,733 |
| East Loop | 23,843,833 |
| North Michigan Avenue | 13,973,647 |
| River North | 12,540,393 |
| South Loop | 2,218,735 |
| West Loop | 39,846,924 |
| CBD market totals | 133,666,265 |


JONES LANG LASALLE'

## Final Draft

Office 94

GMH Native 094855

# Submarket Overview

CBD Submarket Comparison : 2Q2009

| Submarket | Current Inventory | 2009 Completions | YTD Net Absorption | Net Absorption as % of Inventory | Vacancy Rate | Asking Rent (gross / sf) | Under Construction |
|---|---|---|---|---|---|---|---|
| Central Loop | 41,236,733 | 0 | (630,379) | -1.50% | 12.7% | $29.43 | 0 |
| East Loop | 23,843,833 | 0 | (1,170,427) | -4.90% | 18.9% | $29.11 | 850,000 |
| North Michigan Avenue | 13,973,647 | 0 | (202,556) | -1.40% | 10.2% | $32.89 | 0 |
| River North | 12,546,393 | 1,350,000 | 795,576 | 7.10% | 12.0% | $26.61 | 1,173,643 |
| South Loop | 2,218,735 | 0 | 40,230 | 1.80% | 7.5% | $22.11 | 0 |
| West Loop | 39,846,924 | 0 | (193,768) | -0.50% | 13.6% | $33.35 | 1,091,733 |
| CBD market totals | 133,666,265 | 1,350,000 | (1,361,324) | -1.00% | 13.7% | $30.60 | 3,115,376 |

## Vacancy Increasing Across Downtown

Downtown vacancy increased by 1.8% from year-end 2008 to the second quarter 2009 due to negative net absorption in the East Loop, Central Loop, North Michigan Ave and West Loop. River North recorded positive absorption due to the delivery of 300 North LaSalle, which was 85% pre-leased.

## South Loop Office Market Slightly Positive in 2009

The South Loop has recorded slight positive net absorption thus far in 2009. The South Loop is not a traditional office market, but rather serves as a low cost option with historic and loft-style office space. Furthermore, its fundamentals are not reflective of national economic trends as much as Chicago's other submarkets, allowing it to record positive absorption.


JONES LANG LASALLE

## Final Draft

Office 95

GMH Native 094856

## New Supply

**Construction completed—year-to-date**

**1** 300 North LaSalle Street

**Construction in progress**

**2** 353 North Clark Street

**3** 155 North Wacker Drive

**4** 300 East Randolph Street

**Proposed construction**

5 SEC Monroe & Wells Streets

6 Wolf Point

7 301 South Wacker Drive

8 Franklin/Randolph
   (130 North Franklin Street)

9 River Point/444 West Lake Street

10 Union Station

11 540 West Madison Street Phase II

12 601 West Monroe Street

13 625 West Monroe Street

14 Madison West 645

15 401 South Wacker Drive

16 433 West Van Buren Street

17 222 West Randolph Street

18 400 West Randolph Street



 JONES LANG LASALLE

## Final Draft

Office

GMH Native 094857



## Inventory Overview

### Most Class A Inventory Located in West Loop & Loop

At over 25 million square feet, the West Loop contains the highest amount of Class-A inventory of any submarket, with the Central Loop's 14 million square feet placing second.

The South Loop does not contain any Class A buildings as minimal office development has occurred in the South Loop since the 1940's.

Two Class-B buildings located just northwest of Riverside District at 800 S. Canal St. total 975,000 square feet and are owned by Northern Trust. One of the buildings totaling 405,000 square feet is vacant and being marketed for sale.

### Office Demand From Higher Ed. Institutions Will Shift From Existing Buildings to New Construction

Higher education institutions have been steadily buying buildings to retrofit. This option is more cost effective than new construction. Once existing building supply is occupied, institutions will be forced to construct new buildings. An example of this emerging dynamic is Spertus Institute's construction of their new 130,000 square foot building at 610 South Michigan. Spertus had owned this land for many years and decided that constructing a new building on Michigan Ave. was a better alternative than buying an existing building elsewhere.

Although Riverside is not currently in the middle of South Loop's campus, it is in the path of growth southward and is well-positioned to capture demand from universities.



Downtown Office Inventory – By Building Class

- ● Class A
- ○ Class B
- ○ Class C


JONES LANG LASALLE

GMH Native 094858

## Demand From Higher Education Institutions

**Demand For Land To House New University Facilities Likely, But Not Quantifiable Without Opening Discussions**

The Riverside District is the largest contiguous parcel of vacant land south of Downtown and is located between the collective South Loop Campus and UIC Campus.

*South Loop Demand*

Universities in the South Loop Campus have been buying buildings for conversion at a steady rate over the past ten years, but there are still vacant buildings available and numerous vacant land sites available along State, Wabash and Michigan Ave, thorough fares that have a better location than Riverside District for university purposes. At this pace, university demand for parcels in the Riverside District could be between 5 and 10 years away. Discussions should be opened in the near future with university administrators to discuss integrating a campus use into the Riverside District's plan that is more attractive than simply buying a vacant parcel or building along State, Wabash or Michigan, thus negating the supply impact of vacant land located north of Riverside.



*UIC Demand*

UIC is growing rapidly as it transitions from a commuter campus to residential campus. Student housing needs are being met by dorms on-campus, the University Village located south of campus or speculative student housing developments north of campus. However, growing enrollment is also be generating demand for non-residential facilities, which have been recently constructed along Roosevelt Road. The possibility of UIC expanding to Riverside District is low because the campus is not contiguous to Riverside District; however, it is a possibility that should be explored with UIC administrators.



**Final Draft**

Office

GMH Native 094859

# V. Development Recommendations & Financial Analysis

In This Section

A.     Site Plan
B.     Pad Pricing
C.     Absorption Schedule
D.     Financial Analysis
E.     Value-Add Opportunities
F.     TIF Overview



**Final Draft**

59

GMH Native 094860



A. Site Plan

JONES LANG
LaSalle

**Final Draft**  Development Recommendations

GMH Native 094861

## Planning Method

### Design Considerations

Design master plan that will generate price and rent premiums for residential, commercial and institutional uses. Guidelines include:

- Residential: Condominiums, apartments, student housing, senior housing
    - Maximize attractive view corridors of city skyline and minimize westward views of rail yard,
    - Provide one large park, numerous smaller parks, walk-ways and attractive streetscapes,
    - Promote the development of street-level retail for residents,
    - Student housing in particular should have proximate access to public transportation,
    - Senior housing should be relatively secluded from high-traffic areas.

- Retail:
    - Maximize visibility on Roosevelt,
    - Provide adequate access and parking,
    - Capitalize on lack of entertainment district in South Loop.

- Hotel:
    - Provide convenient access to public transportation and taxis by locating near Roosevelt or on Wells-Wentworth connector,
    - Enhance connections to McCormick Place.

- Higher Education:
    - Pads for university non-residential use should be located near student housing uses and proximate to public transportation.

 JONES LANG LASALLE'

**Final Draft**

Site Plan 101

GMH Native 094862

## Planning Method

### Design Considerations

Phasing should make efficient use of infrastructure and avoid infrastructure carry costs. From a market demand perspective, phasing should progress from north to south at the most desirable area of the site which will create momentum for the project. Alternatively, the Well's Wentworth connector should be constructed by 2013, which presents the opportunity to commence construction along this new street.

- Zoning should include flexibility among uses within each parcel and density should be as high as possible even though all FAR may not be used. In reality, building heights will likely not exceed 40 stories on any one building and will average 20 to 30 stories based.

- Design should integrate a mix of uses with ground-level retail, entertainment corridor and parks serving as amenities to all product types.

- The project should include a multitude of product types to maximize pad absorption.

- Residential buildings should vary in price point and design in order to attract as many buyer types as possible to drive absorption.

- The Wells-Wentworth Connector is a sensible avenue for an entertainment district along the river.


JONES LANG
LASALLE

**Final Draft**

Site Plan A02

GMH Native 094863

# Proposed Site Plan

## Recommended Site Plan & Product Mix

- Base density of 5.25 FAR based on existing PD-904. Additional density up to 8.0 FAR would increase residential unit counts. Product type locations based on traffic patterns, view corridors and physical site constraints. Quantity of each product type dictated by absorption rates.

- Areas shaded light blue represent potential locations for lifestyle retail. Without an attraction such as an entertainment district along Wells, it will be a challenge to build more than 50,000 square feet of retail solely based on demand from Riverside District residents.

- The tallest buildings should be located immediately north and south of the central park and near Roosevelt Road. Building heights should be lowest at the south end of the development to align with adjacent neighborhood density and market demand originating from north side.

- Buildings should be oriented facing north-to-south so as to maximize sky-line views and park views and minimize westward views.

- Parking structures supporting buildings on the east side of the property should abut the Metra rail line to provide a sound buffer for residential towers.



### Riverside District : FAR 5.25

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 4,447,059 | 3,780,000 | 3,375 |
| Apartment | 1,400,000 | 1,190,000 | 1,400 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 7,019,306 | 5,860,000 | 5,500 |

\* Hotel classified as commercial and does not contribute to D.U. total

- Lifestyle Retail + Residential
- Residential
- Anchored Retail
- Hotel or Student Housing
- Parks & Open Space

 JONES LANG LaSALLE

 **Final Draft**

Site Plan 103

GMH Native 094864



B. Pad Pricing

**Final Draft** Development Recommendations 104

JONES LANG LASALLE

GMH Native 094865

## Pad Pricing Summary

- Values listed in the table to the right are finished pad prices per unit in 2013.

- There have been virtually no land sales since early 2008 in the South Loop due to the recession.

- Current values are extremely depressed due to a lack of acquisition & development debt and the uncertain economic recovery.

- Land values will quickly rebound once development is again feasible and credit is available.

- 2013 is the assumed year when the market has recovered to support new development in a broad array of product types.

- This analysis assumes that infrastructure is in place in 2013 to allow for immediate vertical development.

- The following pages detail how each pad value was calculated.

| Pad Type | Land Value / Unit* |
|---|---|
| Condominium | $25,000 |
| Apartment | $17,500 |
| Retail | $68 / bldg sq. ft. |
| Hospitality | $25,000 |
| Senior Housing | $29,000 |
| Student Housing | $10,000** |

*Value in 2013*
**$10k per bed*



**Final Draft**

Pad Pricing

GMH Native 094866

# Residential Pad Pricing

## Residential - $25,000 condo / $17,500 apartment

There have been no meaningful land sales in the South Loop since 2007. During the previous cycle, land for condominium development averaged $32,000 in land value per unit. Land for apartment development averaged $18,000 in land value per unit. When the market recovers, land for condo development will be less valuable versus during the peak of the last housing cycle; however, apartment pads should be near levels for the AMLI 900 and Burnham Pointe, which were purchased at reasonable price levels.



### Residential Pad Sales

| | Project Name | Sale Date | Sale Price | Acres | Price / Unit |
|---|---|---|---|---|---|
| **Condominium Projects** | | | | | |
| 1 | S. Michigan & E. 14th | 2/15/2008 | $6,900,000 | 0.49 | |
| 2 | 1935 South Wabash | 5/16/2007 | $6,800,000 | 1.06 | $37,778 |
| 3 | Grand Park 2 | 1/17/2007 | $15,000,000 | | |
| 5 | 1818 South Wabash | 10/3/2006 | $4,305,000 | 0.43 | |
| 6 | The Curve | 8/21/2006 | $10,396,000 | 2.53 | $17,327 |
| 7 | Astoria Tower | 7/31/2006 | $9,715,000 | 1.27 | $39,173 |
| 8 | Library Tower | 4/28/2006 | $7,931,500 | 0.57 | $43,106 |
| 9 | 830 S. Michigan | 4/27/2006 | $13,015,000 | 0.83 | $34,614 |
| 10 | 2300 South Michigan | 3/6/2006 | $3,100,000 | 0.66 | $31,313 |
| 11 | The Columbian | 9/27/2005 | $6,005,000 | 0.38 | $27,295 |
| 12 | 1400 Museum Park | 9/9/2005 | $6,000,000 | 0.56 | $23,077 |
| 13 | 600 S. Wells | 8/31/2005 | $8,600,000 | 1.64 | |
| 14 | Vetro | 8/10/2005 | $7,100,000 | 0.56 | $30,472 |
| 15 | Marquee Michigan Ave | 6/21/2005 | $4,698,000 | 0.69 | $21,953 |
| 16 | Lexington Park | 5/15/2006 | $10,250,000 | 1.00 | $30,781 |
| 18 | 230 E. Cermak | 6/1/2005 | $6,000,000 | 1.23 | |
| 19 | Lakeside Lofts | 1/7/2005 | $4,593,000 | 1.05 | $47,844 |
| **Average Condo Pads** | | | | | $32,061 |
| | | | | | |
| **Apartment Projects** | | | | | |
| 4 | AMLI 900 | 10/5/2008 | $8,900,000 | 2.20 | $20,227 |
| 17 | Burnham Pointe | 1/14/2005 | $4,600,000 | 0.87 | $15,436 |
| **Average Apartment Pads** | | | | | $17,832 |



**JONES LANG LASALLE**

## Final Draft

Pad Pricing 109

GMH Native 094867

## Retail Pad Pricing

- Based on a demand / supply study contained in section 4c, retailers listed on the right-hand table may have an interest in locating to a retail project along Roosevelt Road.

- Store sizes have been identified for purposes of planning. High end estimates were utilized for Furniture / Home Furnishings and Sporting Goods due to higher levels of demand.

- Home Centers do not have a large enough supply gap to support the upper end store size.

- The 2-story target located north of the Riverside District on Roosevelt sold for $62.50 in land value per building square foot in 2003. We assume that a home center store will sell for a similar value. Smaller stores will garner a slightly higher value in land value per store square foot.

- Assuming a single-story project, this project would require between 4.5 and 5.0 acres and generate approximately $8.8 million in land sale proceeds.

- Ideally, residential units could be developed on top of retail to drive additional value and create a mixed-use "front-door" to the project.

| Retail Category | Estimated Min Sq Ft | Estimated Max Sq Ft |
|---|---|---|
| Home Centers | 50,000 | 100,000 |
| Furniture and Home Furnishings | 10,000 | 25,000 |
| Sporting Goods | 2,000 | 10,000 |
| Auto Parts | 1,500 | 2,500 |
| Appliances, TVs, Electronics Stores | 1,000 | 2,000 |
| Children's Infants Clothing Stores | 1,000 | 2,500 |
| Other Health and Personal Care Stores | 1,000 | 2,000 |
| Total Retail Sq. Ft. | 68,500 | 144,000 |

| Category | Land Area | Store Size | $ / Bldg SF | Land Value |
|---|---|---|---|---|
| Home Centers | 1.72 | 75,000 | $62.50 | $4,687,500 |
| Furniture & Home Furnishings | 0.57 | 25,000 | $75.00 | $1,875,000 |
| Sporting Goods | 0.23 | 10,000 | $75.00 | $750,000 |
| Various | 0.46 | 20,000 | $75.00 | $1,500,000 |
| Total Floor Area | 2.98 | 130,000 | $67.79 | $8,812,500 |
| Decked Parking | 1.00 | | | |
| Circulation / Open Area (20%) | 0.80 | | | |
| Total Acres | 4.78 | | | |

 JONES LANG LaSalle

**Final Draft**

Pad Pricing 407

GMH Native 094868

# Hotel & Student Housing Pad Pricing

## Hotel : $30,000 / room

Recent hotel land sale comps for independent and upscale product have ranged from $21,000 per room to $38,000 per room in land value. The Hotel Dana was purchased at a distressed price as a failed condo project. Given the Riverside District's outlying hotel location, pad values for hotels in the Riverside District would not reach the upper range of $38,000 per room. As a result, a reasonable estimate for hotel pad value is $30,000 per room.

| Hotel Land Sales | | | | |
|---|---|---|---|---|
| Hotel | Sale Price | Sale Date | # of Keys | $ / Key |
| Hotel Dana | $4,500,000 | 12/20/2007 | 216 | $20,833 |
| Hotel Palomar | $10,000,000 | 5/19/2006 | 261 | $38,314 |

## Student Housing : $10,000 / bed

Few land sales have occurred for arms-length new construction student housing projects in downtown Chicago, making it difficult to estimate pad pricing. Keith Giles was under contract with the City of Chicago on land planned for 860 student housing beds. This contract has yet to close due to issues not related to pricing. The contract price equates to $9,300 per bed. Furthermore, Jones Lang LaSalle has spoken with prominent Chicago-based student housing developers who estimate pricing at $20,000 per bed for excellent locations. Given that the Riverside District is not located in the midst of university campus located in the South Loop, a reasonable estimate for pad value is $10,000 per bed.



GMH Native 094869

## Senior Housing Pad Pricing

### Senior Housing : $29,000 / unit

Most senior housing developments do not involve a typical land transaction, but rather land is left as implied equity. There are a few examples of arms-length cash transactions, shown below. These will be used to estimate pad value per senior housing unit.

Senior housing pads will most likely be developed as CCRC's which include several levels of care. Independent living units garner the highest land value, assisted living units the second highest and nursing essentially zero land value. Below is a pro rate calculation summing land value attributable to the various units and adjusted for project size.

| Senior Housing Land Sales Address | City, State | Sale Date | Sale Price | Units | $ / Unit | Type |
|---|---|---|---|---|---|---|
| *Independent Living Projects* | | | | | | |
| 1000 Sunset Ridge Rd | Northbrook, IL | 12/14/2007 | $7,200,000 | 144 | $50,000 | Independent |
| 111 3rd St | Elmhurst, IL | 8/14/2007 | $1,500,000 | 32 | $46,875 | Independent |
| **Independent Living Avg.** | | | | | $48,438 | |
| | | | | | | |
| *Assisted Living Projects* | | | | | | |
| 12400 Regency Pky | Huntley, IL | 7/16/2007 | $1,647,000 | 76 | $21,671 | Assisted Living |
| 2684 N. Clark | Chicago, IL | 1/17/2002 | $1,614,375 | 63 | $25,625 | Assisted Living |
| **Assisted Living Avg.** | | | | | $23,648 | |

| Unit Type | % of CCRC | Unit Land Value | Pro Rata Value / Unit |
|---|---|---|---|
| Independent Living Units | 60% | $48,438 | $29,063 |
| Assisted Living Units | 30% | $23,648 | $7,094 |
| Nursing Beds | 10% | $0 | $0 |
| Land Value per Unit | | | $36,157 |
| Project Size Adjustment | -20% | | ($7,231) |
| **Concluded Land Value / Unit** | | | $28,926 |

 JONES LANG LASALLE®

## Final Draft

Pad Pricing 109

GMH Native 094870



C. Absorption Schedule

JONES LANG LaSALLE'

**Final Draft**   Development Recommendations   110

GMH Native 094871

## Scenarios

Three scenarios were analyzed to assess pad sale proceeds and project wide cash flows at escalating densities. Additional density beyond 5.25 FAR will be increase only condominium and apartment components because market demand will not allow increased sizing of retail, hotel, seniors housing or student housing. Development scenarios assume no office component because of the lack of office demand in the South Loop.

All scenarios assume that 10% of residential units are affordable. 10% affordability is required in any PD while 20% affordability is required with TIF assistance. Financial impact of TIF will be evaluated later in the report.

### 1. As-Zoned : 5.25 FAR

This base case scenario assumes that the City of Chicago will not allow a density beyond PD-904, which allows an FAR of 5.17. JLL has rounded up to 5.25 for purposes of this analysis.

### 2. As-Zoned : 6.50 FAR

Any increase in density will be accommodated by additional residential.

### 3. As-Zoned : 8.00 FAR

This scenario analyzes additional residential development.

**Riverside District : FAR 5.25**

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 4,447,059 | 3,780,000 | 3,375 |
| Apartment | 1,400,000 | 1,190,000 | 1,400 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 7,019,306 | 5,860,000 | 5,500 |

\* Hotel classified as commercial and does not contribute to D.U. total

**Riverside District : FAR 6.5**

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 5,929,412 | 5,040,000 | 4,500 |
| Apartment | 1,750,000 | 1,487,500 | 1,750 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 8,851,659 | 7,417,500 | 6,975 |

\* Hotel classified as commercial and does not contribute to D.U. total

**Riverside District : FAR 8.0**

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 7,411,765 | 6,300,000 | 5,625 |
| Apartment | 2,100,000 | 1,785,000 | 2,100 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 10,684,011 | 8,975,000 | 8,450 |

\* Hotel classified as commercial and does not contribute to D.U. total



JONES LANG LASALLE

**Final Draft**

Absorption Schedule

## Absorption Schedule – 5.25 FAR



Sales / Leasing Schedule

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | 140,000 | 5,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hotel | 0 | 0 | 82,500 | 67,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Housing | 188,571 | 154,286 | 0 | 188,571 | 154,286 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apartment | 0 | 0 | 119,167 | 130,000 | 144,167 | 104,000 | 104,000 | 194,000 | 104,000 | 158,167 | 176,667 | 130,000 | |
| Condo | 356,424 | 407,812 | 498,729 | 558,682 | 592,941 | 523,435 | 494,447 | 394,965 | 425,929 | 193,894 | 0 | 0 | 0 |


JONES LANG LASALLE®

## Final Draft

Absorption Schedule 112

GMH Native 094873

## Delivery Schedule – 5.25 FAR



Delivery Schedule

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | 0 | 0 | 130,000 | 5,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 |
| Hotel | 0 | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Housing | 0 | 0 | 342,857 | 0 | 0 | 342,857 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apartment | 0 | 0 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 |
| Condo | 0 | 0 | 296,471 | 296,471 | 592,941 | 592,941 | 592,941 | 592,941 | 296,471 | 592,941 | 296,471 | 296,471 |

GMH Native 094874

## Sales / Leasing Schedule – 6.50 FAR



Sales / Leasing Schedule

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▨ Retail | 140,000 | 5,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▨ Hotel | 0 | 0 | 82,500 | 67,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▨ Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▨ Senior Housing | 188,571 | 154,286 | 0 | 188,571 | 154,286 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| ▨ Apartment | 0 | 0 | 119,167 | 130,000 | 144,167 | 104,000 | 104,000 | 194,000 | 104,000 | 158,167 | 176,667 | 130,000 | 119,250 | 91,000 | 91,000 | 84,563 | 0 | 0 |
| ■ Condo | 356,424 | 407,812 | 498,729 | 558,682 | 592,941 | 523,435 | 494,447 | 394,965 | 425,929 | 483,482 | 537,271 | 592,941 | 82,353 | 0 | 0 | 0 | 0 | 0 |

GMH Native 094875

# Delivery Schedule – 6.50 FAR

**Delivery Schedule**



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | 0 | 0 | 130,000 | 5,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hotel | 0 | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Housing | 0 | 0 | 342,857 | 0 | 0 | 342,857 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apartment | 0 | 0 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 0 |
| Condo | 0 | 0 | 296,471 | 296,471 | 592,941 | 592,941 | 592,941 | 592,941 | 296,471 | 592,941 | 296,471 | 592,941 | 296,471 | 592,941 | 296,471 | 0 | 0 | 0 |



## Final Draft

Absorption Schedule 115

GMH Native 094876

## Sales / Leasing Schedule – 8.00 FAR

Sales / Leasing Schedule



| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | 140,000 | 5,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hotel | 0 | 0 | 82,500 | 67,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Housing | 188,571 | 154,286 | 0 | 188,571 | 154,286 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apartment | 0 | 0 | 119,167 | 130,000 | 144,167 | 104,000 | 104,000 | 194,000 | 104,000 | 158,167 | 176,667 | 130,000 | 119,250 | 91,000 | 134,333 | 188,583 | 104,000 | 98,667 | 0 | 0 |
| Condo | 356,424 | 407,812 | 498,729 | 658,682 | 592,941 | 523,435 | 494,447 | 394,965 | 425,929 | 463,482 | 537,271 | 592,941 | 532,988 | 473,035 | 433,506 | 125,176 | 0 | 0 | 0 | |

JONES LANG LASALLE'

**Final Draft**

Absorption Schedule 116

GMH Native 094877

## Delivery Schedule – 8.00 FAR



Delivery Schedule

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retail | 0 | 0 | 130,000 | 5,000 | 10,000 | 10,000 | 10,000 | 10,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Hotel | 0 | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Student Housing | 0 | 0 | 147,059 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Senior Housing | 0 | 0 | 342,857 | 0 | 342,857 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Apartment | 0 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 0 | 350,000 | 0 | 350,000 | 0 | 0 | 0 | 350,000 | 0 | 350,000 | 0 | 0 |
| Condo | 0 | 0 | 298,471 | 298,471 | 592,941 | 592,941 | 592,941 | 592,941 | 298,471 | 592,941 | 298,471 | 592,941 | 298,471 | 592,941 | 592,941 | 592,941 | 298,471 | 298,471 | 0 | 0 |

JONES LANG
LASALLE

**Final Draft**

Absorption Schedule

GMH Native 094878



D. Financial Analysis

JONES LANG LASALLE'

**Final Draft**  Development Recommendations 118

GMH Native 094879

## Financial Summary

### Financial Analysis

Two exit scenarios were analyzed under three potential density levels:

1. Pad Sale Program : GMH sells all pads as absorption rates allow, but does not participate in vertical development.

2. Self-Develop Program : GMH develops all vertical product.

In order for GMH to fully recoup all invested equity without retaining maximum development risk, JLL recommends a blend of the two exit scenarios. JLL recommends that GMH participate in the early development via retained land equity interests. This approach will enhance long-term cash flow to a level between the pad sale and self develop programs listed below. Furthermore, retaining land equity in early pads will spur vertical development by easing financing requirements on initial phases.

#### 1. Pad Sale Program

Anticipated cash flow based on a pad sale program totals between $140 million at a 5.25 FAR and $258 million at an 8.0 FAR. The last pad sale would take place in 2021 at a 5.25 FAR or in 2027 at an 8.0 FAR.

| Pad Sale Program | 5.25 FAR | 6.5 FAR | 8.0 FAR |
|---|---|---|---|
| Pad Sale Proceeds | $188,387,804 | $249,136,219 | $318,525,711 |
| Infrastructure | ($30,000,000) | ($30,000,000) | ($30,000,000) |
| Soft Costs | ($13,164,725) | ($17,230,855) | ($21,214,230) |
| Transaction Costs | ($5,651,634) | ($7,474,087) | ($9,555,771) |
| Total Cash Flows | $139,571,445 | $194,431,278 | $257,755,710 |

#### 2. Self-Develop Program

Anticipated cash flow based on a self-develop program totals between $648 million at a 5.25 FAR and $1.16 billion at an 8.0 FAR. The project would be sold out in 2026 at a 5.25 FAR or in 2030 at an 8.0 FAR.

| Self-Develop Program | 5.25 FAR | 6.5 FAR | 8.0 FAR |
|---|---|---|---|
| Revenues | $2,808,615,383 | $3,835,264,310 | $5,003,395,329 |
| Vertical HC & SC | ($2,117,767,518) | ($2,900,574,496) | ($3,794,922,233) |
| Infrastructure | ($30,000,000) | ($30,000,000) | ($30,000,000) |
| Soft Costs | ($13,164,725) | ($17,230,855) | ($21,214,230) |
| Cash Flow | $647,683,140 | $887,458,960 | $1,157,258,866 |


JONES LANG LaSALLE

**Final Draft**

Financial Analysis 19

GMH Native 094880

# Financial Assumptions

## Vertical Development Revenue & Cost Assumptions

| Product | Sale Price / NSF | Cost / NSF | Pad Value / Unit |
|---|---|---|---|
| Condo* | $383 | $294 | $30,000 |
| Apartment | $292 | $235 | $20,000 |
| Anchor Retail | $214 | $132 | N/A |
| Lifestyle Retail | $333 | $158 | N/A |
| Senior Housing | $375 | $286 | $29,000 |
| Student Housing | $400 | $265 | $40,000 |
| Hotel | $571 | $429 | $30,000 |

* Includes $30,000 parking sale price ($350 / sf for condo units)

## Timing & Inflation

| | | |
|---|---|---|
| Start Date | 1/1/2013 | |
| Revenue & Cost Inflation | 5.00% | per year |

## Residential Assumptions

| | Max Absorption |
|---|---|
| Condo | 390 |
| Apartment | 130 |
| Affordable Component | 10.00% of residential units |
| Affordable Pricing | $223 psf |

## Cost Assumptions

| | | |
|---|---|---|
| River Wall | $10,000,000 | |
| Other Infrastructure | $20,000,000 | |
| Pad Transaction Costs | 3.00% | of pad revenues |
| Master Development Soft Costs | $3,000,000 | per year |

## Condo Market Cycle

| Year | % of Stabilized Absorption |
|---|---|
| 2013 | 70% |
| 2014 | 80% |
| 2015 | 90% |
| 2016 | 100% |
| 2017 | 100% |
| 2018 | 90% |
| 2019 | 80% |
| 2020 | 70% |
| 2021 | 80% |
| 2022 | 90% |
| 2023 | 100% |
| 2024 | 100% |
| 2025 | 90% |
| 2026 | 80% |
| 2027 | 70% |

## Riverside District : FAR 5.25

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 4,447,059 | 3,780,000 | 3,375 |
| Apartment | 1,400,000 | 1,190,000 | 1,400 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 7,019,306 | 5,860,000 | 5,500 |

* Hotel classified as commercial and does not contribute to D.U. total

## Riverside District : FAR 6.5

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 5,929,412 | 5,040,000 | 4,500 |
| Apartment | 1,750,000 | 1,487,500 | 1,750 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 8,851,659 | 7,417,500 | 6,975 |

* Hotel classified as commercial and does not contribute to D.U. total

## Riverside District : FAR 8.0

| Product Mix | Gross Bldg SF | Net Bldg SF | D.U.'s |
|---|---|---|---|
| Condominium | 7,411,765 | 6,300,000 | 5,625 |
| Apartment | 2,100,000 | 1,785,000 | 2,100 |
| Senior Housing | 685,714 | 480,000 | 600 |
| Anchored Retail | 136,842 | 130,000 | N/A |
| Lifestyle Retail | 52,632 | 50,000 | N/A |
| Hotel | 150,000 | 105,000 | 300* |
| Student Housing | 147,059 | 125,000 | 125 |
| Totals | 10,684,011 | 8,975,000 | 8,450 |

* Hotel classified as commercial and does not contribute to D.U. total

 JONES LANG LASALLE

## Final Draft

Financial Analysis | 20

GMH Native 094881

## Pad Sale Program Cash Flows – 5.25 FAR

| | Totals | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Pad Sale Proceeds** | | | | | | | | | | |
| **Condo** | | | | | | | | | | |
| Pad 1 | 6,060,000 | 6,060,000 | | | | | | | | |
| Pad 2 | 6,285,858 | 6,285,858 | | | | | | | | |
| Pad 3 | 6,520,135 | | 6,520,135 | | | | | | | |
| Pad 4 | 6,735,701 | | | 6,735,701 | | | | | | |
| Pad 5 | 6,930,159 | | | | 6,930,159 | | | | | |
| Pad 6 | 7,130,231 | | | | 7,130,231 | | | | | |
| Pad 7 | 7,306,313 | | | | | 7,306,313 | | | | |
| Pad 8 | 7,486,743 | | | | | 7,486,743 | | | | |
| Pad 9 | 7,671,629 | | | | | 7,671,629 | | | | |
| Pad 10 | 7,861,680 | | | | | | 7,861,680 | | | |
| Pad 11 | 8,088,028 | | | | | | 8,088,028 | | | |
| Pad 12 | 8,321,528 | | | | | | | 8,321,528 | | |
| Pad 13 | 8,596,650 | | | | | | | | 8,596,650 | |
| Pad 14 | 8,917,051 | | | | | | | | 8,917,051 | |
| Pad 15 | 9,249,393 | | | | | | | | | 9,249,393 |
| | | | | | | | | | | |
| **Apartment** | | | | | | | | | | |
| Pad 1 | 6,300,000 | 6,300,000 | | | | | | | | |
| Pad 2 | 7,117,276 | | | 7,117,276 | | | | | | |
| Pad 3 | 8,040,574 | | | | | | 8,040,574 | | | |
| Pad 4 | 9,083,648 | | | | | | | 9,083,648 | | |
| | | | | | | | | | | |
| **Retail** | | | | | | | | | | |
| Anchored Retail | 9,168,421 | 9,168,421 | | | | | | | | |
| Lifestyle Retail | 1,823,550 | 321,674 | 169,884 | 356,067 | 376,148 | 394,955 | 204,822 | | | |
| | | | | | | | | | | |
| **Senior Housing** | | | | | | | | | | |
| Pad 1 | 8,700,000 | 8,700,000 | | | | | | | | |
| Pad 2 | 10,071,338 | | | | 10,071,338 | | | | | |
| | | | | | | | | | | |
| **Student Housing** | | | | | | | | | | |
| Pad 1 | 5,000,000 | 5,000,000 | | | | | | | | |
| | | | | | | | | | | |
| **Hotel** | | | | | | | | | | |
| Pad 1 | 9,922,500 | | | 9,922,500 | | | | | | |
| **Total Revenues** | 188,287,504 | 41,835,954 | 8,690,018 | 31,061,703 | 24,684,029 | 15,553,326 | 24,194,504 | 8,321,528 | 26,597,349 | 9,249,393 |
| Transaction Costs | (5,651,634) | (1,255,079) | (260,701) | (931,851) | (745,521) | (466,600) | (725,835) | (249,646) | (797,920) | (277,482) |
| River Wall | (10,000,000) | (10,000,000) | | | | | | | | |
| Other Infrastructure | (20,000,000) | (20,000,000) | | | | | | | | |
| Soft Costs | (13,164,725) | (2,707,238) | (2,464,865) | (2,098,395) | (1,690,340) | (1,205,091) | (1,034,793) | (779,021) | (527,302) | (300,814) |
| **Total Cash Flows** | 139,571,145 | 7,873,637 | 4,024,453 | 28,031,457 | 22,447,168 | 13,761,636 | 22,433,876 | 7,292,861 | 25,272,127 | 8,671,097 |


JONES LANG LASALLE

## Final Draft

Financial Analysis 121

GMH Native 094882

# Self Develop Program Cash Flows — 5.25 FAR

| Development SF | Totals | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Condo | | | | | | | | | | | | | | |
| Pad 1 | 25,250,614 | | | | | | | | | | | | | |
| Pad 2 | 24,144,168 | | | | | | | | | | | | | |
| Pad 3 | 23,474,250 | | | | | | | | | | | | | |
| Pad 4 | 26,976,302 | | | | | | | | | | | | | |
| Pad 5 | 29,035,027 | | | | | | | | | | | | | |
| Pad 6 | 27,731,169 | | | | | | | | | | | | | |
| Pad 7 | 29,005,414 | | | | | | | | | | | | | |
| Pad 8 | 29,241,568 | | | | | | | | | | | | | |
| Pad 9 | 24,471,608 | | | | | | | | | | | | | |
| Pad 10 | 33,786,668 | | | | | | | | | | | | | |
| Pad 11 | 16,071,508 | | | | | | | | | | | | | |
| Pad 12 | 31,560,956 | | | | | | | | | | | | | |
| Pad 13 | 33,056,486 | | | | | | | | | | | | | |
| Pad 14 | 34,506,558 | | | | | | | | | | | | | |
| Pad 15 | 35,653,195 | | | | | | | | | | | | | |

Financial Analysis — Final Draft

JONES LANG LASALLE

GMH Native 094883

## Pad Sale Program Cash Flows – 6.50 FAR

| | Totals | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pad Sale Proceeds** | | | | | | | | | | | | | | |
| **Condo** | | | | | | | | | | | | | | |
| Pad 1 | 6,060,000 | 6,060,000 | | | | | | | | | | | | |
| Pad 2 | 6,285,858 | 6,285,858 | | | | | | | | | | | | |
| Pad 3 | 6,520,135 | | 6,520,135 | | | | | | | | | | | |
| Pad 4 | 6,735,701 | | | | 6,735,701 | | | | | | | | | |
| Pad 5 | 6,935,159 | | | | 6,935,159 | | | | | | | | | |
| Pad 6 | 7,130,231 | | | | | 7,130,231 | | | | | | | | |
| Pad 7 | 7,306,313 | | | | | 7,306,313 | | | | | | | | |
| Pad 8 | 7,486,743 | | | | | | | 7,486,743 | | | | | | |
| Pad 9 | 7,871,829 | | | | | | | 7,871,829 | | | | | | |
| Pad 10 | 7,861,080 | | | | | | | | 7,861,080 | | | | | |
| Pad 11 | 8,068,028 | | | | | | | | 8,068,028 | | | | | |
| Pad 12 | 8,321,528 | | | | | | | | | 8,321,528 | | | | |
| Pad 13 | 8,596,852 | | | | | | | | | | 8,596,852 | | | |
| Pad 14 | 6,917,051 | | | | | | | | | | 6,917,051 | | | |
| Pad 15 | 9,249,393 | | | | | | | | | | | 9,249,393 | | |
| Pad 16 | 9,555,192 | | | | | | | | | | | 9,555,192 | | |
| Pad 17 | 9,831,049 | | | | | | | | | | | 9,831,049 | | |
| Pad 18 | 10,114,869 | | | | | | | | | | | | 10,114,869 | |
| Pad 19 | 10,364,657 | | | | | | | | | | | | | 10,364,657 |
| Pad 20 | 10,620,612 | | | | | | | | | | | | | 10,620,612 |
| | | | | | | | | | | | | | | |
| **Apartment** | | | | | | | | | | | | | | |
| Pad 1 | 6,300,000 | 6,300,000 | | | | | | | | | | | | |
| Pad 2 | 7,117,276 | | | | | 7,117,276 | | | | | | | | |
| Pad 3 | 8,046,574 | | | | | | | 8,046,574 | | | | | | |
| Pad 4 | 9,083,649 | | | | | | | | | | 9,083,649 | | | |
| Pad 5 | 10,262,036 | | | | | | | | | | | | 10,262,036 | |
| | | | | | | | | | | | | | | |
| **Retail** | | | | | | | | | | | | | | |
| Anchored Retail | 9,168,421 | 9,168,421 | | | | | | | | | | | | |
| Lifestyle Retail | 1,853,550 | 321,674 | 169,684 | 358,087 | 376,148 | 394,955 | 204,622 | | | | | | | |
| | | | | | | | | | | | | | | |
| **Senior Housing** | | | | | | | | | | | | | | |
| Pad 1 | 8,700,000 | 8,700,000 | | | | | | | | | | | | |
| Pad 2 | 10,071,338 | | | | | 10,071,338 | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Student Housing** | | | | | | | | | | | | | | |
| Pad 1 | 5,900,000 | 5,900,000 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | |
| **Hotel** | | | | | | | | | | | | | | |
| Pad 1 | 9,922,500 | | | | 9,922,500 | | | | | | | | | |
| **Total Revenues** | 249,138,219 | 41,825,954 | 6,690,018 | 31,661,703 | 24,884,029 | 15,553,328 | 24,194,504 | 8,321,528 | 28,597,349 | 9,249,393 | 19,386,240 | 20,376,905 | 29,955,269 | |
| Transaction Costs | (7,474,087) | (1,255,078) | (200,701) | (931,851) | (746,521) | (466,600) | (725,835) | (249,646) | (792,920) | (277,482) | (581,587) | (611,307) | (829,558) | |
| River Wall | (10,000,000) | (10,000,000) | | | | | | | | | | | | |
| Other Infrastructure | (20,000,000) | (20,000,000) | | | | | | | | | | | | |
| Soft Costs | (17,232,955) | (2,767,849) | (2,575,644) | (2,295,033) | (1,961,448) | (1,656,069) | (1,441,604) | (1,238,779) | (1,039,167) | (859,563) | (648,874) | (456,067) | (161,603) | |
| **Total Cash Flows** | 194,431,279 | 7,913,033 | 3,913,676 | 27,944,819 | 22,176,060 | 13,430,770 | 22,027,065 | 6,833,103 | 24,760,262 | 8,112,347 | 18,155,779 | 19,350,931 | 28,963,623 | |


JONES LANG LASALLE

**Final Draft**

Financial Analysis 123

GMH Native 094884

## Self Develop Program Cash Flows – 6.50 FAR

| Development Of | Totals | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Condo** | | | | | | | | | | | | | | | | | | |
| Pad 1 | 22,396,514 | (19,181,450) | (39,795,607) | 82,051,591 | | | | | | | | | | | | | | |
| Pad 2 | 34,148,688 | | (30,028,018) | (41,281,019) | 66,561,017 | | | | | | | | | | | | | |
| Pad 3 | 25,048,200 | | | (21,385,419) | (83,874,296) | 110,708,369 | | | | | | | | | | | | |
| Pad 4 | 35,876,332 | | | (14,155,691) | (83,874,296) | 82,906,924 | | | | | | | | | | | | |
| Pad 5 | 28,623,272 | | | | (33,105,288) | (66,068,425) | 105,787,082 | | | | | | | | | | | |
| Pad 6 | 37,381,953 | | | | (7,651,907) | (44,608,421) | 80,822,928 | | | | | | | | | | | |
| Pad 7 | 37,050,938 | | | | | (30,261,328) | (48,571,840) | 107,611,620 | | | | | | | | | | |
| Pad 8 | 38,781,601 | | | | | (7,835,692) | (48,371,840) | 58,462,638 | | | | | | | | | | |
| Pad 9 | 39,471,858 | | | | | | (32,509,450) | (50,790,430) | 112,771,201 | | | | | | | | | |
| Pad 10 | 36,159,668 | | | | | | (9,229,752) | (50,790,430) | 99,214,656 | | | | | | | | | |
| Pad 11 | 31,291,628 | | | | | | | (27,926,483) | (53,329,360) | 114,229,974 | | | | | | | | |
| Pad 12 | 31,958,501 | | | | | | | | (53,329,360) | (55,896,456) | 181,284,374 | | | | | | | |
| Pad 13 | 32,008,416 | | | | | | | | (30,194,391) | (55,896,456) | 107,086,477 | 129,568,297 | | | | | | |
| Pad 14 | 53,264,262 | | | | | | | | | (32,966,156) | (39,794,291) | (91,736,090) | 108,464,730 | | | | | |
| Pad 15 | 35,832,455 | | | | | | | | | | (49,195,428) | (91,736,090) | 108,611,648 | | | | | |
| Pad 16 | 38,237,883 | | | | | | | | | | (9,503,666) | (64,822,300) | 138,068,730 | | | | | |
| Pad 17 | 37,747,834 | | | | | | | | | | | (56,378,261) | (64,822,300) | 171,744,904 | | | | |
| Pad 18 | 38,557,879 | | | | | | | | | | | | (22,806,775) | 145,662,396 | | | | |
| Pad 19 | 39,817,580 | | | | | | | | | | | | (48,064,045) | (71,467,247) | 105,532,173 | | | |
| Pad 20 | 48,800,818 | | | | | | | | | | | | | | | | | |
| **Apartment** | | | | | | | | | | | | | | | | | | |
| Pad 1 | 24,873,150 | (36,791,016) | (37,084,761) | | | | | | | | | | | | | | | |
| Pad 2 | 29,759,600 | | | (19,572,074) | (41,437,267) | 89,852,997 | | | | | | | | | | | | |
| Pad 3 | 55,891,910 | | | | | (21,403,195) | | | | | | | | | | | | |
| Pad 4 | 35,803,524 | | | | | | (45,694,521) | (47,908,747) | 114,283,720 | | | | | | | | | |
| Pad 5 | 59,839,904 | | | | | | | | (25,830,755) | (52,065,544) | (77,401,266) | 129,544,076 | | | | | | |
| Pad 6 | | | | | | | | | | | | | (33,306,515) | (51,221,626) | 141,662,297 | | | 149,417,951 |
| **Total** | | | | | | | | | | | | | | | | | | |
| Anchor/Retail | 13,096,904 | (4,426,734) | (9,164,268) | 38,310,908 | | | | | | | | | | | | | | |
| Lifestyle Retail | 12,237,732 | | (212,017) | (1,546,540) | 475,561 | 2,399,545 | 2,350,107 | 2,540,009 | 3,630,322 | 2,858,607 | | | | | | | | |
| **Senior Housing** | | | | | | | | | | | | | | | | | | |
| Pad 1 | 28,017,350 | (17,245,802) | (30,817,730) | 82,651,818 | | | | | | | | | | | | | | |
| Pad 2 | 32,434,329 | | | | (39,543,321) | (42,921,101) | 96,588,777 | | | | | | | | | | | |
| **Student Housing** | | | | | | | | | | | | | | | | | | |
| Pad 1 | 20,629,577 | (18,843,314) | (17,265,101) | 64,325,690 | | | | | | | | | | | | | | |
| **Yield** | | | | | | | | | | | | | | | | | | |
| Pad 1 | 21,459,533 | | | (12,833,670) | (36,670,290) | 69,919,914 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| Cash Flows | 904,609,810 | (84,066,258) | (171,406,103) | 115,902,001 | (100,300,218) | 101,160,015 | 101,503,695 | 12,961,044 | 170,090,469 | (83,298,657) | 102,946,208 | 37,456,366 | 33,253,809 | 78,442,599 | 210,668,632 | 100,332,173 | | 149,417,951 |
| Raw Wat | (30,000,000) | (30,000,000) | | | | | | | | | | | | | | | | |
| Other Infrastructure | (30,000,000) | (30,000,000) | | | | | | | | | | | | | | | | |
| Soft Costs | (17,730,810) | (2,767,892) | (2,575,641) | (2,283,009) | (1,761,610) | (1,655,909) | (1,441,698) | (1,922,778) | (1,693,147) | (558,642) | (648,824) | (366,907) | (181,896) | (19,561) | (52,715) | (31,975) | | |
| **Total Cash Flows** | 846,458,980 | (126,837,100) | (174,571,744) | 112,902,980 | (102,464,172) | 100,419,807 | 100,062,992 | 14,207,266 | 109,201,242 | (22,130,001) | 102,341,253 | 37,026,461 | 31,691,780 | 76,340,980 | 210,905,352 | 100,300,332 | | 149,417,951 |



**Final Draft**    Financial Analysis _124

GMH Native 094885

## Pad Sale Program Cash Flows – 8.00 FAR

| | Totals | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Pad Sale Proceeds** | | | | | | | | | | | | | | | | |
| **Condo** | | | | | | | | | | | | | | | | |
| Pad 1 | 6,000,000 | 6,000,000 | | | | | | | | | | | | | | |
| Pad 2 | 6,295,658 | 6,295,658 | | | | | | | | | | | | | | |
| Pad 3 | 6,520,135 | | 6,520,135 | | | | | | | | | | | | | |
| Pad 4 | 6,725,201 | | | 6,725,791 | | | | | | | | | | | | |
| Pad 5 | 6,930,459 | | | 6,930,169 | | | | | | | | | | | | |
| Pad 6 | 7,130,231 | | | | 7,130,231 | | | | | | | | | | | |
| Pad 7 | 7,206,343 | | | | 7,306,343 | | | | | | | | | | | |
| Pad 8 | 7,468,743 | | | | | 7,468,743 | | | | | | | | | | |
| Pad 9 | 7,671,629 | | | | | 7,671,629 | | | | | | | | | | |
| Pad 10 | 7,861,080 | | | | | | 7,861,080 | | | | | | | | | |
| Pad 11 | 8,098,028 | | | | | | 8,098,028 | | | | | | | | | |
| Pad 12 | 8,321,528 | | | | | | | 8,321,528 | | | | | | | | |
| Pad 13 | 8,599,650 | | | | | | | | 8,599,650 | | | | | | | |
| Pad 14 | 8,917,051 | | | | | | | | 8,917,051 | | | | | | | |
| Pad 15 | 9,249,393 | | | | | | | | | 9,249,393 | | | | | | |
| Pad 16 | 9,555,192 | | | | | | | | | | 9,555,192 | | | | | |
| Pad 17 | 9,831,049 | | | | | | | | | | 9,831,049 | | | | | |
| Pad 18 | 10,114,663 | | | | | | | | | | | 10,114,663 | | | | |
| Pad 19 | 10,364,657 | | | | | | | | | | | | 10,364,657 | | | |
| Pad 20 | 10,620,812 | | | | | | | | | | | | 10,620,812 | | | |
| Pad 21 | 10,882,889 | | | | | | | | | | | | | 10,882,889 | | |
| Pad 22 | 11,197,079 | | | | | | | | | | | | | 11,197,079 | | |
| Pad 23 | 11,520,334 | | | | | | | | | | | | | | 11,520,334 | |
| Pad 24 | 11,091,214 | | | | | | | | | | | | | | 11,091,214 | |
| Pad 25 | 12,294,697 | | | | | | | | | | | | | | | 12,294,697 |
| **Apartment** | | | | | | | | | | | | | | | | |
| Pad 1 | 6,300,000 | 6,300,000 | | | | | | | | | | | | | | |
| Pad 2 | 7,117,276 | | | 7,117,276 | | | | | | | | | | | | |
| Pad 3 | 8,040,574 | | | | | | 8,040,574 | | | | | | | | | |
| Pad 4 | 9,063,648 | | | | | | | | 9,063,648 | | | | | | | |
| Pad 5 | 10,262,035 | | | | | | | | | | | 10,262,035 | | | | |
| Pad 6 | 11,593,292 | | | | | | | | | | | | | 11,593,292 | | |
| **Retail** | | | | | | | | | | | | | | | | |
| Anchored Retail | 9,168,421 | 9,168,421 | | | | | | | | | | | | | | |
| Lifestyle Retail | 1,823,550 | 221,674 | 199,074 | 356,097 | 378,148 | 294,955 | 294,922 | | | | | | | | | |
| **Senior Housing** | | | | | | | | | | | | | | | | |
| Pad 1 | 8,700,000 | 8,700,000 | | | | | | | | | | | | | | |
| Pad 2 | 10,571,339 | | | | 10,571,339 | | | | | | | | | | | |
| **Student Housing** | | | | | | | | | | | | | | | | |
| Pad 1 | 5,000,000 | 5,000,000 | | | | | | | | | | | | | | |
| **Hotel** | | | | | | | | | | | | | | | | |
| Pad 1 | 9,922,500 | | | 9,922,500 | | | | | | | | | | | | |
| Total Revenues | 318,525,711 | 41,895,954 | 6,693,318 | 31,061,703 | 24,948,026 | 15,553,326 | 24,194,604 | 8,321,528 | 26,597,349 | 9,249,393 | 19,389,240 | 20,376,966 | 20,655,369 | 33,673,259 | 23,421,548 | 12,294,697 |
| Transaction Costs | (9,555,771) | (1,255,679) | (200,701) | (931,851) | (748,521) | (466,902) | (725,936) | (249,646) | (797,920) | (277,482) | (581,587) | (611,303) | (619,558) | (1,009,109) | (700,646) | (368,841) |
| Raw Unf | (10,000,000) | (10,000,000) | | | | | | | | | | | | | | |
| Other Infrastructure | (20,000,000) | (20,000,000) | | | | | | | | | | | | | | |
| Soft Costs | (21,234,330) | (2,607,658) | (2,648,621) | (2,407,653) | (2,520,643) | (1,906,486) | (1,700,675) | (1,540,933) | (1,375,458) | (1,226,667) | (1,062,192) | (853,534) | (848,636) | (485,490) | (307,115) | (147,568) |
| Total Cash Flows | 257,735,710 | 7,773,217 | 3,843,997 | 27,722,199 | 21,692,944 | 12,306,268 | 21,758,794 | 6,531,047 | 24,423,971 | 7,245,264 | 17,730,561 | 18,912,960 | 19,207,075 | 32,187,544 | 22,411,285 | 11,778,177 |


JONES LANG LASALLE

**Final Draft**

Financial Analysis 25

GMH Native 094886

## Self Develop Program Cash Flows – 8.00 FAR

| Development CF | Totals | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Condo** | | | | | | | | | | | | | | | | |
| Pad 1 | 23,230,564 | (19,181,430) | (39,795,837) | 82,257,554 | | | | | | | | | | | | |
| Pad 2 | 24,148,488 | | (30,025,010) | (41,783,449) | 95,561,817 | | | | | | | | | | | |
| Pad 3 | 25,048,200 | | | (41,783,410) | (43,874,690) | 110,709,309 | | | | | | | | | | |
| Pad 4 | 25,976,332 | | | (14,155,600) | (43,874,690) | 83,936,504 | | | | | | | | | | |
| Pad 5 | 26,929,371 | | | | (33,103,981) | (48,068,425) | 105,707,082 | | | | | | | | | |
| Pad 6 | 27,301,360 | | | | (7,281,207) | (48,068,425) | 80,902,320 | | | | | | | | | |
| Pad 7 | 29,058,436 | | | | | (39,561,336) | (48,371,840) | 107,401,630 | | | | | | | | |
| Pad 8 | 29,781,588 | | | | | (7,835,202) | (48,371,840) | 84,969,456 | | | | | | | | |
| Pad 9 | 29,671,858 | | | | | | (32,560,420) | (50,760,438) | 112,771,700 | | | | | | | |
| Pad 10 | 30,190,968 | | | | | | (9,208,752) | (50,760,438) | 89,740,355 | | | | | | | |
| Pad 11 | 31,071,526 | | | | | | | (20,928,468) | (53,529,990) | 114,509,074 | | | | | | |
| Pad 12 | 31,968,505 | | | | | | | | (53,529,990) | (55,906,458) | 141,254,674 | | | | | |
| Pad 13 | 33,035,460 | | | | | | | | (18,060,533) | (55,906,458) | 102,096,427 | | | | | |
| Pad 14 | 34,258,350 | | | | | | | | | (52,966,168) | (59,796,261) | 148,048,797 | | | | |
| Pad 15 | 35,533,105 | | | | | | | | | | (49,105,036) | (61,730,095) | 148,404,200 | | | |
| Pad 16 | 36,707,985 | | | | | | | | | | (5,969,685) | (61,730,095) | 103,443,846 | | | |
| Pad 17 | 37,707,034 | | | | | | | | | | | (20,370,064) | (64,922,903) | 138,968,796 | | |
| Pad 18 | 33,567,379 | | | | | | | | | | | | (64,922,903) | (59,004,645) | 173,743,924 | |
| Pad 19 | 38,617,309 | | | | | | | | | | | | (32,904,774) | (63,004,645) | 140,658,305 | |
| Pad 20 | 40,830,974 | | | | | | | | | | | | | (63,004,645) | (71,457,247) | 150,332,170 |
| Pad 21 | 41,909,456 | | | | | | | | | | | | | (34,447,402) | (71,457,247) | 147,222,819 |
| Pad 22 | 43,615,491 | | | | | | | | | | | | | | (65,843,910) | (75,546,610) |
| Pad 23 | 44,257,509 | | | | | | | | | | | | | | (24,210,802) | (75,546,610) |
| Pad 24 | 45,720,925 | | | | | | | | | | | | | | | (50,432,757) |
| Pad 25 | 47,232,116 | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| **Apartment** | | | | | | | | | | | | | | | | |
| Pad 1 | 24,873,156 | (36,795,916) | 77,584,709 | | | | | | | | | | | | | |
| Pad 2 | 31,700,856 | | | (16,672,674) | (41,413,507) | 83,252,027 | | | | | | | | | | |
| Pad 3 | 35,891,016 | | | | | (21,480,199) | | | | | | | | | | |
| Pad 4 | 35,843,924 | | | | | | (45,684,570) | 114,660,720 | | | | | | | | |
| Pad 5 | 49,839,904 | | | | | | (47,616,747) | (54,490,750) | (32,886,544) | (37,428,024) | 129,544,379 | | | | | |
| Pad 6 | 61,709,112 | | | | | | | | | | (98,300,312) | (21,321,670) | 141,645,887 | | | |
| | | | | | | | | | | | | | (32,533,981) | (87,460,845) | (55,005,613) |
| | | | | | | | | | | | | | | | |
| **Retail** | | | | | | | | | | | | | | | | |
| Anchored Retail | 13,090,984 | (4,435,710) | (6,184,248) | 26,708,058 | | | | | | | | | | | | |
| Lifestyle Retail | 12,397,502 | | (119,847) | (1,640,944) | 471,591 | 2,399,845 | 2,350,197 | 2,569,099 | 3,600,332 | 2,288,047 | | | | | | |
| | | | | | | | | | | | | | | | |
| **Senior Housing** | | | | | | | | | | | | | | | | |
| Pad 1 | 28,017,002 | (17,749,092) | (39,817,733) | 92,551,818 | | | | | | | | | | | | |
| Pad 2 | 32,484,328 | | | (20,543,521) | (42,621,820) | 96,598,777 | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Student Housing** | | | | | | | | | | | | | | | | |
| Pad 1 | 20,439,171 | (10,919,814) | (7,765,919) | 55,125,600 | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| **Hotel** | | | | | | | | | | | | | | | | |
| Pad 1 | 21,430,133 | | | (12,820,504) | (38,638,000) | 63,910,914 | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| Cash Flows | 1,208,674,000 | (84,898,768) | (171,490,153) | 115,892,691 | (126,980,728) | 101,180,815 | 101,504,596 | 55,411,044 | 178,040,409 | 192,905,268 | 37,416,108 | 51,393,686 | 9,482,681 | 12,142,170 | 92,537,574 | |
| River Wall | (30,000,000) | (30,000,000) | | | | | | | | | | | | | | |
| Other Infrastructure | (24,000,000) | (24,000,000) | | | | | | | | | | | | | | |
| Soft Costs | (21,314,289) | (2,607,006) | (2,616,471) | (2,407,653) | (2,139,964) | (1,869,409) | (1,760,815) | (1,040,803) | (1,375,458) | (1,229,653) | (1,052,201) | (861,830) | (648,836) | (466,493) | (307,115) | (147,603) |
| **Total Cash Flows** | 1,157,259,886 | (128,910,519) | (174,144,574) | 112,085,149 | (129,042,296) | 118,254,350 | 98,795,721 | 53,820,209 | 168,604,951 | 192,503,286 | 101,304,105 | 38,184,675 | 20,503,044 | 8,908,568 | 11,843,064 | 92,388,704 |


JONES LANG LaSalle

## Final Draft

Financial Analysis 126

GMH Native 094887

## Self Develop Program Cont... – 8.00 FAR

| | 2028 | 2029 | 2030 |
|---|---|---|---|
| **Development CF** | | | |
| **Costs** | | | |
| Pad 1 | | | |
| Pad 2 | | | |
| Pad 3 | | | |
| Pad 4 | | | |
| Pad 5 | | | |
| Pad 6 | | | |
| Pad 7 | | | |
| Pad 8 | | | |
| Pad 9 | | | |
| Pad 10 | | | |
| Pad 11 | | | |
| Pad 12 | | | |
| Pad 13 | | | |
| Pad 14 | | | |
| Pad 15 | | | |
| Pad 16 | | | |
| Pad 17 | | | |
| Pad 18 | | | |
| Pad 19 | | | |
| Pad 20 | | | |
| Pad 21 | | | |
| Pad 22 | 183,699,990 | | |
| Pad 23 | 143,509,901 | | |
| Pad 24 | (78,702,610) | 174,945,022 | |
| Pad 25 | (78,780,640) | (83,733,972) | 508,757,028 |
| | | | |
| **Apartment** | | | |
| Pad 1 | | | |
| Pad 2 | | | |
| Pad 3 | | | |
| Pad 4 | | | |
| Pad 5 | 119,417,034 | | |
| Pad 6 | | | 105,782,272 |
| | | | |
| **Retail** | | | |
| Anchored Retail | | | |
| Lifestyle Retail | | | |
| | | | |
| **Senior Housing** | | | |
| Pad 1 | | | |
| Pad 2 | | | |
| | | | |
| **Student Housing** | | | |
| Pad 1 | | | |
| | | | |
| **Hotel** | | | |
| Pad 1 | | | |
| | | | |
| **Cash Flows** | 359,041,444 | 93,213,550 | 395,540,500 |
| River Wall | | | |
| Other Infrastructure | | | |
| Soft Costs | | | |
| **Total Cash Flows** | 359,041,444 | 93,213,550 | 395,540,500 |

 JONES LANG LASALLE®

## Final Draft

Financial Analysis

GMH Native 094888



E. Value-Add Opportunities

Jones Lang LaSalle®

**Final Draft**   Development Recommendations   128

GMH Native 094889

## Value Add Opportunities

### New University Campus

The Loop and South Loop contain 24 institutions of higher education. Large schools that currently operate in the market seek to grow in their current locations or expand east onto Michigan Avenue, as opposed to south and west, in order to attract students. However, an opportunity may exist to attract a new university not presently located in the Loop & South Loop. This would drive absorption of residential units and student housing and provide support for additional retail and office components.

### Office Anchor

There is the possibility that TIF monies can be used to subsidize new construction of an office building for companies not currently located in Downtown Chicago. This subsidy could be used to attract a major company whose image aligns with the South Loop location and the project as a whole. A large office anchor that attracts smaller office users who supply, or are customers of, the anchor would drive office demand in Riverside District. Office demand without an office anchor is minimal.

### Entertainment District

The South Loop does not contain many entertainment options, i.e. restaurants, bars, clubs, theatres and tourist attractions. The density of the South Loop population and public transportation access presents an opportunity to develop an entertainment district at the Riverside District. This district would most likely be located along the river to leverage the unique water amenity and the future Wells-Wentworth connector. An entertainment district would also drive demand for additional retail, residential and hotel development.

### New CTA Station

A new Red Line CTA station near the south end of Riverside District, possibly at 18th Street, would justify additional density on the south end of the development, driving additional pad value.

### IKEA

The retail demand / supply analysis concludes that there is not sufficient demand in the retail trade area for a furniture store as large as IKEA. However, IKEA draws from a much larger geographic area than the typical retail trade area. As a result, IKEA may still benefit from locating in the Riverside District. The feasibility of Riverside as a new IKEA location depends on if it would cannibalize sales in IKEA's Bolingbrook store.



GMH Native 094890

F. Tax Increment Financing Overview (To Be Completed Pending Verification of Infrastructure Costs)



**Final Draft** Development Recommendations

GMH Native 094891



# TIF Overview

**TIF provides low-interest financing for upfront for the following eligible costs:**

- Land Acquisition
- Transfer taxes
- Site Work
- Demolition of existing building
- Environmental Remediation
- 50% of Core & Shell Construction – only percentage of building that is affordable housing (example ~15% - 20%)
- A portion of Hard Cost Contingency
- Site Engineering
- Geotech
- A portion of interest on construction loan
- Real Estate Taxes

**Riverside District infrastructure**
The City of Chicago is funding the Wells-Wentworth connection, which will eliminate a substantial infrastructure cost. Remaining infrastructure includes:
- River Wall : $10 million
- Parks & Streets : $20 million (estimate)



**Final Draft**
TIF Overview  131

GMH Native 094892

# Affordable Housing Pricing

**Riverside District : Affordable Housing Analysis**

| Assumptions | | Unit Sizes (sf) | |
|---|---|---|---|
| LTV | 90.00% | Studio | 750 |
| Interest Rate | 5.75% | 1BR | 900 |
| PITI | 28.00% | 2BR | 1,050 |
| Assessments | $350 | 3BR | 2,000 |
| Insurance | 0.50% | | |
| Taxes | 1.50% | | |
| Construction Cost psf | $250 | | |

| Unit Type | 100% Median Income | Affordable Price | Proposed Affordable | Market Price |
|---|---|---|---|---|
| Studio | $52,800 | $147,512 | $187,500 | $281,250 |
| 1BR | $56,550 | $162,146 | $225,000 | $324,000 |
| 2BR | $67,900 | $206,439 | $262,500 | $367,500 |
| 3BR | $78,400 | $247,415 | $500,000 | $670,000 |

*Affordable Price:* City preferred pricing of units based on household median income

*Proposed Affordable:* Developer negotiates with City to break-even on affordable units, in this case to cover construction cost of $250 / sf (includes parking)

*Market Price:* Anticipated market pricing

The City of Chicago's Affordable Requirements Ordinance states that if a project receives financial assistance from the City, the project must contain at least 20% affordable units. The table above shows the "Affordable Price" as calculated by area median income per City defined calculations and the "Proposed Affordable" price, which is the cost of construction.

If the City and developer do not arrive at a price that allows the developer to at least break-even on costs, land value per dwelling unit can be negative and detract significantly from pad values.

 JONES LANG LASALLE

**Final Draft**

TIF Overview 132

GMH Native 094893

## TIF Financial Impact

- Infrastructure costs will stay relatively constant even at higher density levels.

- As a result, TIF makes less financial sense if higher levels of density can be obtained.

- This analysis assumes that affordable apartments do not contribute to apartment building sale values and affordable condominiums are sold for $250,000 per unit as opposed to the market price of $394,000 per unit.

- A special assessment bond may be a better alternative to TIF given the low levels of infrastructure costs versus the size of the project.

- A detailed residual development model should be created in order to fully judge the merits of a TIF or Special Assessment Bond.

| Reduction in Revenue Due to TIF | | |
|---|---|---|
| Density | Pad Sales | Unit Sales |
| 5.25 | ($15,246,072) | ($135,433,073) |
| 6.50 | ($21,685,954) | ($190,681,134) |
| 8.00 | ($29,041,249) | ($253,132,413) |

| Infrastructure Costs Saved | |
|---|---|
| Density | Cost |
| River Wall | $10,000,000 |
| Parks / Streets | $20,000,000 |
| Other* | $5,000,000 |
| Total | $35,000,000 |

\* Engineering, portion of construction loan interest, portion of affordable housing hard costs

 JONES LANG LASALLE

**Final Draft**

TIF Overview 133

GMH Native 094894

# Freeborn & Peters LLP
## MEMORANDUM

*ATTORNEY WORK PRODUCT*
*PRIVILEGED AND CONFIDENTIAL*

To:       File
From:     Edward J. Hannon
Subject:  Heritage Development Partners, LLC.
Date:     February 27, 2006

### Introduction

At this time, we have reviewed an undated draft of the Heritage Development Partners, LLC Confidential Private Placement Memorandum for up to 28 Class A Units at $1,250,000 per Unit (the "Offering Memorandum"). We have been advised by the client that Shefsky & Froelich has been retained to represent of Heritage Development Partners, LLC (the "Company") in connection with the preparation of the Offering Memorandum. The client has also advised us that our review of the Offering Memorandum should be limited to confirming that the structure described in the Offering Memorandum is consistent with the structure contemplated in the operative documents.

In connection with this review, we determined that there are other disclosure issues that Heritage Development Partners, LLC (the "Heritage") may wish to address in a subsequent version of the Offering Memorandum. As a result, the following is intended to set forth both (i) a summary of our review of the Offering Document with respect to its consistency with the operative documents and (ii) a summary of the other disclosure issues that Heritage may wish to address.

### An Overview of the Structure Contemplated in the Operative Documents.



TRIAL EXHIBIT

PX 162

GMH Native 022871



## 2. *The Distribution Structure Set Forth in the RDD Operating Agreement*

Under the RDD Operating Agreement, the parties have stated that as of January 1, 2006, the cumulative amount invested by GMH into RDD as a capital contribution is $155,242,400. The RDD Operating Agreement provides that GMH is obligated to make additional capital contributions to RDD on a monthly basis to fund its operating expenses as set forth in the approved budget. However, the RDD Operating Agreement also allows GMH to have line-item approval of expenditures in excess of $50,000 to a single payee in any calendar year.

The Operating Agreement contains no mechanism to address what redress Heritage or RDD has against GMH if it fails to make a required additional capital contribution. Nonetheless, the RDD Operating Agreement provides that GMH is entitled to a 12% per annum on both (x) the $155, 242,400 capital contribution made as of January 1, 2006 and (y) all additional capital contributions it makes to RDD to fund its operating expenses.

2

GMH Native 022872



### 6. *The Mechanics of the Loan by Heritage to Mr. Rezko*

Under the operative documents, approximately $30 million will be transferred from Heritage to Mr. Rezko in exchange for an unsecured promissory note. The parties will also enter

GMH Native 022873

into a services agreement. It is anticipated that the amounts payable to Mr. Rezko under the services agreement will be the source of funds for his repayment of the principal amount of the loan. However, under the current structure, Mr. Rezko will need additional funds to pay both the interest owed under the promissory note and to pay the federal income tax liabilities (i.e., regular income tax and self-employment tax) that will arise from his receipt of payment under the services agreement.

The services agreement is terminable upon 30 days notice by either party and is intended to be a bona fide agreement that requires Mr. Rezko to perform specific services that are perceived by Heritage to be critical to its ability to successfully develop the property through the Vertical Development Entities.

### 7. *The Mechanics of the Proposed Loan by MT Holdings to Mr. Rumman*

We were recently advised that of the $30 million borrowed by Mr. Rezko, approximately $3,750,000 will be contributed by him to MT Property Holdings, LLC which in turn will lend it to Mr. Rumman.

**The Current Draft of the Offering Memorandum Does Not Accurately Describe the Structure Contemplated in the Operative Documents.**



4

GMH Native 022874



5

GMH Native 022875



6



**6.** ***Additional Disclosure Regarding Mr. Rezko***

- Heritage should consider whether the section of the Offering Memorandum in which Mr. Rezko's biographical information is discussed should be revised to include the information contained in the "Additional Considerations" risk factor.

- Heritage should also consider whether the Offering Memorandum should include a more in-depth discussion of the prior performance of Rezko's transactions for which he has raised capital from third parties. In addition, to the extent that there is prior performance table, Heritage may also want to consider whether it should be included in the Offering Memorandum.

- Heritage should consider whether the "Additional Consideration" risk factor should be revised and moved to a more prominent position in the Offering Memorandum rather than towards the back of the book. Specifically, Heritage should consider whether references to articles about Mr. Rezko are an insufficient method for disclosure of the information contained in such articles. Also, Heritage should consider whether there should be more detail given with respect to the governmental inquiries.

7

GMH Native 022877

- Heritage should also consider including in the Offering Memorandum a discussion of whether, to the extent that any such inquiries of Mr. Rezko are elevated and result in any adverse finding, the finding could affect Mr. Rezko's ability to perform under the Services Agreement and repay the Rezko Note.



8. **Additional Comments**



8

GMH Native 022878



9

GMH Native 022879

As of January 23, 2006

## PRELIMINARY CLOSING CHECKLIST

### $35,000,000 INVESTOR CHECKLIST

**Hertitage -- Roosevelt & Clark**

| PROPERTY: | Approximately 62 Acres located at Roosevelt & Clark Streets, Chicago, Illinois | |
|---|---|---|
| PARTIES: | Proposed Joint Ownership Structure between: | |
| | **Party I** | **Party II** |
| | Heritage Development Partners LLC ("Heritage") | Riverside District Development LLC ("Riverside") |
| | Heritage Property Development, Inc. ("Heritage Manager") | RDD Manager LLC ("Riverside Manager") |
| | MT Property Holdings, LLC ("MT") | General Mediterranean Holdings, S.A., a Luxembourg corporation ("GMH") |
| COUNSEL & OTHER SIGNIFICANT PARTIES: | 1) Freeborn & Peters, LLP ("F&P") <br> 311 South Wacker Drive <br> Suite 3000 <br> Chicago, Illinois 60606 <br><br> Joel T. Cooper, Esq. <br> Telephone: (312) 360-6262 <br> Fax: (312) 360-6573 <br> E-mail: jcooper@freebornpeters.com <br><br> Edward J. Hannon, Esq. <br> Telephone: (312) 360-6754 <br> Fax: (312) 360-6574 <br> E-mail: ehannon@freebornpeters.com | 2) Anthony Licata, Esq. <br> Shefsky & Froelich ("SF") <br> 111 E. Wacker Dr. -- Suite 2800 <br> Chicago, Illinois 60606 <br> Tehephone: 312-836-4028 <br> Fax: 312-275-7587 <br> E-mail: alicata@shyefskylaw.com <br><br> 3) Ed Wynn ("EW") <br> Heritage Development Partners, LLC <br> 233 S. Wacker Dr. -- Suite 9500 <br> Chicago, Illinois 60606 <br> Telephone: (312) 546-5038 <br> Fax: (312) 546-5050 <br> E-mail: ewynn@hdpco.com <br><br> 4) Attorney John Doe |

1028023 v5

GMH Native 020696

TRIAL EXHIBIT

PX 164

| | DOCUMENT DESCRIPTION | DOCUMENT # | RESPONSIBLE PARTIES | SIGNATORIES | STATUS/COMMENTS |
|---|---|---|---|---|---|
| | | | | | |

| | **REAL ESTATE DUE DILIGENCE DOCUMENTS** | | | | |
|---|---|---|---|---|---|
| 1. | Existing Title Commitment | | ███ | | |
| 2. | Recorded Title Documents | | ███ | | |
| 3. | Existing Survey | | ███ | | |
| 4. | Phase I Sale MOU | | ███ | | |
| 5. | Zoning and Land Use Entitlement Documents | | ███ | | |

| | **PARTY 1 DOCUMENTS** | | | | |
|---|---|---|---|---|---|
| | **HERITAGE (HERITAGE DEVELOPMENT PARTNERS LLC)** | | | | |
| 6. | Operating Agreement | 1008913 | F&P | | Drafted |
| 7. | Articles of Organization | | EW | | |
| 8. | Amendment to Articles of Organization | | | | Filed 1/11/06 & sent to Ed Wynn on 1/13/06 |
| 9. | Illinois Good Standing Certificate | | | | N/A |
| 10. | Resolution Authorizing Transaction | | F&P | | |
| 11. | Opinion of Counsel | | | | |
| | | | | | |
| | **HERITAGE MANAGER (HERITAGE PROPERTY DEVELOPMENT, INC. )** | | | | |
| 12. | Articles of Incorporation | | F&P | | Filed 12/28/05 & sent to Ed Wynn on 1/3/06 |
| 13. | By-Laws | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not |

2

GMH Native 020697

| | DOCUMENT DESCRIPTION | DOCUMENT # | RESPONSIBLE PARTIES | SIGNATORIES | STATUS/COMMENTS |
|---|---|---|---|---|---|
| | | | | | received |
| 14. | Pre-Incorporation Subscription Agreement | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not received |
| 15. | Good Standing Certificate | | F&P | | |
| 16. | Consent Resolution in Lieu of 1st Meeting of Shareholders of Heritage Manager. | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not received |
| 17. | Consent of the Board of Directors in Lieu of 1st Meeting of Heritage Manager. | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not received |
| 18. | Stock Certificates | | F&P | | |
| 19. | IRS Application for Employer Identification Number | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not received |
| 20. | IRS Election by a Small Business Corporation | | F&P | | Sent to Ed Wynn for signature 1/3/06- Not received |
| | | | | | |
| | **MT (MT PROPERTY HOLDINGS, LLC)** | | | | |
| 21. | Operating Agreement | | F&P | | |
| 22. | Articles of Organization | | F&P | | Filed 12/28/05 & sent to Ed Wynn on 1/3/06 |
| 23. | Illinois Good Standing Certificate | | F&P | | |
| 24. | Shareholder Agreement | | F&P | | |
| 25. | Resolution Authorizing Transaction | | F&P | | |
| | | | | | |

3

1028023 v5

GMH Native 020698

| | DOCUMENT DESCRIPTION | DOCUMENT # | RESPONSIBLE PARTIES | SIGNATORIES | STATUS/COMMENTS |
|---|---|---|---|---|---|
| | **PARTY II DOCUMENTS** | | | | |
| | **Riverside (Riverside District Development LLC)** | | | | |
| 26. | Operating Agreement | | ■ | | Need to Amend to be Manager-Managed |
| 27. | Amended and Restated Operating Agreement | F&P | | Heritage GMH | Drafted |
| 28. | Articles of Organization | | ■ | | |
| 29. | Amendment to Articles of Organization | F&P | | | Need to Amend to be Manager-Managed |
| 30. | Illinois Good Standing Certificate | | ■ | | |
| 31. | Resolution(s) Authorizing Transaction | | | | |
| 32. | Opinion of Counsel | | | | |
| | | | | | |
| | **RIVERSIDE MANAGER (RIVERSIDE DISTRICT LAND COMPANY, LLC)** | | | | |
| 33. | Operating Agreement | | ■ | | |
| 34. | Amended and Restated Operating Agreement | | | | |
| 35. | Articles of Organization | F&P | | | Filed 12/28/05 & sent to Ed Wynn on 1/3/06 |
| 36 | Amendment to Articles of Organization | F&P | | | |
| 37. | Illinois Good Standing Certificate | F&P | | | N/A |
| 38. | Resolution(s) Authorizing Transaction | | | | |
| 39. | Opinion of Counsel | | | | |
| | | | | | |
| | **GMH (General Mediterranean Holdings, S.A)** | | | | |
| 40. | Operating Agreement | | ■ | | |

4

1028023 v5

GMH Native 020699

| | DOCUMENT DESCRIPTION | DOCUMENT # | RESPONSIBLE PARTIES | SIGNATORIES | STATUS/COMMENTS |
|---|---|---|---|---|---|
| 41. | Articles of Organization | | █ | | |
| 42. | Luxembourg Good Standing Certificate – Luxembourg | | █ | | |
| 43. | Luxembourg Good Standing Certificate – Illinois | | █ | | |
| 44. | Certificate of Authority | | █ | | |
| 45. | Resolution(s) Authorizing Transaction | | █ | | |
| 46. | Opinion of Counsel | | █ | | |
| | **D. INVESTMENT DOCUMENTS** | | | | |
| 47. | Solicitation of Interests | | EW | | |
| 48. | Private Placement Memorandum | | SF | | |
| 49. | Development Services Agreement | | F&P | | |
| 50. | Rezko Note | | F&P | | |

5

1028023 v5

GMH Native 020700

1002

April 2, 2009

**Via Facsimile and Regular Mail**
David H. Hixson
Jenner & Block LLP
330 North Wabash Avenue
Chicago, IL 60611

Re:    MT Property Holdings, LLC

Dear Mr. Hixson:

Our office received your March 24, 2009 correspondence with regard to collecting assets that are the property of the bankruptcy estate for Antoin Rezko ("Debtor"). The Trustee possesses a letter, dated February 8, 2008 ("February 8 Letter"), from the Debtor to Mohammed Al-Miqdadi providing direction regarding the distribution of the $3.8 million in cash consideration the Debtor received for selling the Debtor's interest in MT Property Holdings, LLC ("MT Property") to Orifarm, S.A. The February 8 Letter directs that "$2,000,000.00 should remain in the account of the Law Offices of █████ [Attorney John Doe] for the benefit of the [Debtor]." The Trustee believes that the $2 million the Debtor directed to remain in the account of the Law Offices of [Attorney John Doe] (together with individual attorneys or employees thereof) constitutes property of the Debtor's estate and the Trustee requests that the $2 million be transferred to the Trustee.

Our office immediately contacted you upon receipt of your March 24, 2009 correspondence to advise that [Attorney John Doe], an individual, has never received nor possessed any of the $3.8 million associated with the sale and purchase of the interest in MT Property, including but limited to the $2 million demanded by the Trustee. Similarly, the Law Offices of [Attorney John Doe], an incorporated professional service corporation, has never received nor possessed any of the $3.8 million associated with the sale and purchase of the interest in MT Property, including but limited to the $2 million demanded by the Trustee. We also advised that our office received $3.8 million in funds to complete the purchase of the interest in MT Property and these funds were deposited by the client into the client trust account for the firm. All the funds were distributed immediately upon the completion of the transaction and no funds remain in the trust account. We also advised that all of the funds were transferred in two wire transfers to the trust accounts at the Law Offices of Stetler & Duffy, Ltd. and Freeborn & Peters, LLP.

**TRIAL EXHIBIT**

**PX 166**

CONFIDENTIAL SIRAZI - R023665

David H. Hixson
April 2, 2009
Page 2

You reiterated that you possessed the February 8 Letter, signed by Antoin Rezko, directing funds to remain at this firm. We advised you that we received the February 8 Letter but our client refused to agree to the terms and conditions set forth in the February 8 Letter and a subsequent Letter of Direction was issued directing all the funds to be transferred to the trust accounts at Stetler & Duffy, Ltd. and Freeborn & Peters, LLP. Our office also agreed to provide documentation to support the facts divulged to you in our telephone conference.

Attached as Exhibit A to this correspondence, is a letter, dated February 8, 2008, from Antoin Rezko directing the distribution of the funds to Stetler & Duffy, Ltd., Freeborn & Peters, LLP, and "the Law Offices of ⌐ Attorney John Doe ⌐ for the benefit of the undersigned." We assume that this is the February 8 Letter that you reference in your March 24, 2009 correspondence.

The transaction with Antoin Rezko regarding the interest in MT Property did not close in escrow or in a similar manner. Rather, our client demanded that Mr. Rezko provide executed copies of all documents, including a Letter of Direction, for the review and final approval of our client. If all the terms and conditions in all the documents signed by Antoin Rezko were acceptable to our client, then the client would execute the documents and complete the transaction by transferring the required funds. The client objected to the terms and conditions of the February 8 Letter and refused to agree to or complete the contemplated transaction unless the Letter of Direction was modified.

In subsequent negotiations with the attorneys for Antoin Rezko, it was proposed and agreed to by our client that all of the funds ($3.8 million) would be transferred to the trust accounts at Stetler & Duffy, Ltd. and Freeborn & Peters, LLP. The exact distribution would be $2.8 million to the trust account at Stetler & Duffy, Ltd. and $1 million distribution to the trust account at Freeborn & Peters, LLP. Attached as Exhibit B is a February 11, 2008 email (11:14 a.m.) from Brian Smith, counsel for Antoin Rezko, attaching the proposed amended Letter of Direction (still dated February 8, 2008). Attached as Exhibit C is another email, dated February 11, 2008 (12:40 p.m.) from David Gustman, counsel for Antoin Rezko, providing the same directions to transfer the $3.8 million in two distributions to the trust accounts at Stetler & Duffy, Ltd. and Freeborn & Peters, LLP (the new proposed Letter of Direction is now dated as February 11, 2008). Attached as Exhibit D is another email from Brian Smith, dated February 11, 2008 (2:54 p.m.), indicating that Antoin Rezko executed the amended Letter of Direction, now dated February 11, 2008, and a copy of the February 11, 2008 Letter of Direction was provided as an attachment to the email.

The February 11 Letter of Direction was forwarded to our client along with an email on February 11, 2008 (9:56 p.m.). The email references and discusses the new Letter of Direction and requests confirmation that our office was allowed to release the $3.8 million in our trust account in accordance with the February 11 Letter of Direction (See Exhibit E for a copy of the email and the executed February 11, 2008 Letter of Direction signed by Antoin Rezko). Our office subsequently received from our client an email and

CONFIDENTIAL SIRAZI - R023666

David H. Hixson
April 2, 2009
Page 3

attachment (Exhibit F) on February 12, 2008, advising that the Law Offices of ███████
Attorney John Doe was authorized to release the $3.8 million held in our client trust account in
accordance with the February 11 Letter of Direction provided by Antoin Rezko.

Our office also provides several documents from JPMorgan Chase which confirm the
facts provided by our office. Attached as Exhibit G is the monthly statement of the
IOLTA trust account maintained at our office for the period February 1, 2008 through
February 29, 2008. A review of this document reflects the receipt of $3.8 million into our
trust account from our client on February 6, 2008 and then two wire transfers totaling
$3.8 million on February 12, 2008. One of the transfers was in the amount of $2.8
million to the trust account at Stetler & Duffy, Ltd. and $1 million to the trust account at
Freeborn & Peters, LLP. Attached as Exhibit H, I, and J are memorandums provided by
JPMorgan Chase reflecting the receipt of $3.8 million into our law firm's trust account
and the distribution of $3.8 million to the trust accounts at Stetler & Duffy, Ltd. and
Freeborn & Peters, LLP.

We trust that the explanation in this correspondence along with the attached documents
satisfies your concern as to whether Attorney John Doe , as an individual, the Law Offices of
Attorney John Doe or the trust account maintained at the Law Offices of ███████
Attorney John Doe possesses any funds associated with the purchase of the interest in MT
Property.



Please do not hesitate contacting this office should you have any questions or
comments.

Respectfully,

Attorney John Doe

███████

Enclosures

cc:    Gregg Szilagyi – Tailwind Services, LLC
       (via facsimile and regular mail – w/ enclosures)

CONFIDENTIAL SIRAZI - R023667

February 8, 2008

**Via Electronic Mail**

Mr. Mohammad Al-Miqdadi
Orifarm, S.A.
3B Boulevard Prince Henri, L – 1724
Luxembourg

Re:     Direction for Cash Purchase Price

Dear Mohammad:

Pursuant to Section 1(b)(iii) of the Unit Purchase Agreement, I hereby direct that the $3.8 million cash consideration be applied as follows:

1. $2,000,000.00 should remain in an account of the Law Offices of [Attorney John Doe] for the benefit of the undersigned.

2. $800,000.00 should be wired to the Stetler & Duffy, Ltd. Client Trust Account. Wire Instructions will follow under separate cover.

3. $1,000,000.00 should be wired to the Freeborn & Peters LLP Client Trust Account. Wire instructions are as follows:

> THE NORTHERN TRUST COMPANY
> 50 SOUTH LASALLE STREET
> CHICAGO, ILLINOIS 60675
>
> ABA ROUTING NUMBER 071-000-152
>
> FOR CREDIT TO:    FREEBORN & PETERS LLP
> CLIENT TRUST ACCOUNT
> ACCOUNT NO. 615560
>
> NOTIFY UPON RECEIPT: DONNA CANNON @ 312/360-6241

Very truly yours,

Antoin Rezko

cc: [Attorney John Doe]

1478836v1

**TRIAL EXHIBIT**

**PX 167**

CONFIDENTIAL SIRAZI - R023589

*1227*

**General**

| | |
|---|---|
| **From:** | Attorney John Doe |
| **Sent:** | Monday, February 11, 2008 9:56 PM |
| **To:** | 'Mohammad Al-Miqdadi' |
| **Subject:** | GMH - Purchase of Units |
| **Attachments:** | Letter of Direction.pdf |

We have received signed copies of all the documents requested by us, including all the assignments. Copies of the executed documents were provided as attachments to emails from Brian Smith to you and me. We were also provided with the attached Letter of Direction from Antoin Rezko in an email earlier today (it was sent to your attention as well) and I attach a copy for your convenience. As previously discussed, I would appreciate a letter from GMH stating that I am authorized to release the funds in the trust account and forward the funds in accordance with the instructions contained in the attached letter. All the funds are being transferred to trust accounts at Stetler & Duffy and Freeborn & Peters. The letter to my attention, which can be sent by facsimile and/or by PDF, may merely state that "the Law Offices of Attorney John Doe is authorized to release the Three Million Eight Hundred Thousand Dollars ($3,800.000) held in your client trust account and wire transfer the funds in accordance with the February 11, 2008 Letter of Direction provided by Antoin Rezko."

I will be in my office in the morning so that we may finalize the transaction.

Attorney John Doe
Law Offices of Attorney John Doe



"This email contains proprietary and confidential material for the sole use of the intended recipient. Any review, use, distribution or disclosure by others without the permission of the sender is strictly prohibited. If you are not the intended recipient (or authorized to receive for the recipient), please contact the sender by reply email and delete all copies of the message."

**TRIAL EXHIBIT**

**PX 168**

1

CONFIDENTIAL SIRAZI - R023404

February 11, 2008

**Via Electronic Mail**

Mr. Mohammad Al-Miqdadi
Orifarm, S.A.
3B Boulevard Prince Henri, L - 1724
Luxembourg

      Re:    Direction for Cash Purchase Price

Dear Mohammad:

Pursuant to Section 1(b)(iii) of the Unit Purchase Agreement, I hereby direct that the $3.8 million cash consideration be applied as follows:

1. $2,800,000.00 should be wired to the Stetler & Duffy, Ltd. Client Trust Account. Wire Instructions are as follows:

| | |
|---|---|
| Bank Routing Number: | 071000152 |
| Account Number: | 0002432706 |
| Confirmation Info: | The Northern Trust Company |
| | 50 South LaSalle Street |
| | Chicago, IL 60675 |
| | Bank's Swift Code is: CNORUS44 |
| | (For incoming International wires) |
| | (312) 630-6000 (Main phone number) |

3. $1,000,000.00 should be wired to the Freeborn & Peters LLP Client Trust Account. Wire instructions are as follows:

      THE NORTHERN TRUST COMPANY
      50 SOUTH LASALLE STREET
      CHICAGO, ILLINOIS 60675

      ABA ROUTING NUMBER 071-000-152

      CLIENT TRUST ACCOUNT NO. 615560

      NOTIFY UPON RECEIPT: DONNA CANNON @ 312/360-6241

Very truly yours,

Antoin Rezko

1478836v1

CONFIDENTIAL SIRAZI - R023405

*1228*

## General

| | |
|---|---|
| **From:** | Maha Al Mufti [almufti@gmhsa.com] |
| **Sent:** | Tuesday, February 12, 2008 8:27 AM |
| **To:** | Attorney John Doe |
| **Subject:** | $3.8 mil |
| **Attachments:** | scan.jpg |

**Contacts:** Attorney John Doe

Dear Attorney John Doe
Please find the attached scanned document.
Regards,
Maha Al Mufti
P/A to Mr. Mohammed Al-Miqdadi / Director of Project Development
General Mediterranean Holding
Lincoln House
137-143 Hammersmith Road
London W14 0QL
Tel: +44 20 7605 1817
Fax: +44 20 7603 5533

**TRIAL EXHIBIT**

**PX 169**

1

CONFIDENTIAL SIRAZI - R023406

GENERAL MEDITERRANEAN HOLDING 



Law Offices of | Attorney John Doe |

12th February 2008

Dear | Attorney John Doe |

The Law Offices of | Attorney John Doe | is authorized to release the Three Million Eight Hundred Thousand Dollars ($3,800.000) held in your client trust account and wire transfer the funds in accordance with the February 11, 2008 Letter of Direction provided by Antoin Rezko.

Yours sincerely,

Mohammed Al-Miqdadi
Director of Project Development

Lincoln House
137-143 Hammersmith Road
London W14 0QL England
Tel: +44 (0) 20 7602 7055

Société Anonyi
29, avenue de la Porte-Neu
L-2227 Luxembou
Fax: +352 470 3
R.C. Luxembourg B 164

CONFIDENTIAL SIRAZI - R0264067

**Maha Al Mufti**

| | |
|---|---|
| **From:** | **Attorney John Doe** |
| **Sent:** | 22 February 2008 18:05 |
| **To:** | Almiqdadi |
| **Subject:** | RE: GMH Representations/PRIVILEGED AND CONFIDENTIAL |

I evaluated further my comments in yesterday's telephone conference concerning question No. 7 below. My initial recommendation remains intact. GMH should only answer the question that has been posed to it. If the court desires additional information, Judge St. Eve will inquire of Tom McQueen and GMH then can provide the additional information at that time.

The question is limited to transactions after January 1, 2006 and specifically excludes the $3.5 million provided in 2007 and the more recent 2008 transaction concerning the acquisition of Antoin Rezko's units in MT Property Holdings, LLC, for $4.0 million, which included the forgiveness of a $200,000 note/loan. Thus, based upon the chart provided to me yesterday in an email, there are only two items that are responsive to Judge St. Eve's inquiry. The $22,914,297.92 consolidated note and the $1,409,000 payment, directly or indirectly, to Michael Rumman to purchase the units held and/or controlled by Michael Rumman.

I do not possess any documentation regarding the transaction involving Michael Rumman. I contacted John Caruso this morning and he does not recall the specifics of the transaction and the documents are being held by another attorney at Kirkland & Ellis who is not in the office today. Brian Smith will not discuss the transaction without approval of an attorney with higher authority in his office and David Gustman has not returned my telephone message. I doubt that Freeborn & Peters shall provide any information because they will assert that you were represented by counsel and should have the information. Furthermore, they will not want to take a chance that a piece of information my harm Tony and they were the party who released it while representing Tony. Therefore, it is difficult for me to construct a full and complete proposed response to question No. 7 but, based upon the information that I possess, I suggest the following response:

> There are two items responsive to this inquiry. On June 30, 2006, General Mediterranean Holding ("GMH") and Antoin Rezko entered into and executed various documents, including a Promissory Note, in the amount of $22,914,297.92. The Promissory Note and other documents executed contemporaneously with this transaction did not involve providing any cash payment to Antoin Rezko. Rather, the entire transaction consolidated prior indebtedness and investments involving Antoin Rezko and/or a company affiliated with Antoin Rezko, and GMH and/or a company affiliated with GMH. The prior indebtedness and investments are identified and described in the Promissory Note, which has been provided to the United States Attorney's office.

> The second item involves the purchase and/or assignment of units controlled by Michael Rumman that were associated with the 62 acres in Chicago owned by Riverside District Development, LLC. This transaction involved Antoin Rezko and resulted in Michael Rumman receiving $1,409,000 on or about July 24, 2007 and the units owned and controlled by Michael Rumman being transferred to an affiliate of GMH. Mr. Rezko did not retain any of the funds provided for acquiring the units owned and held by Michael Rumman.

I will place on hold any further investigation and review of documents to complete the chart forwarded to me until I hear from you.

**From:** Almiqdadi [mailto:almiqdadi@gmhsa.com]
**Sent:** Thursday, February 21, 2008 1:17 PM

1

**TRIAL EXHIBIT**

**PX 170**

SIRAZI - G030701

**To:** Attorney John Doe
**Subject:** FW: GMH Representations/PRIVILEGED AND CONFIDENTIAL

Dear Attorney John Doe
Please read E-mail below. Thanks.

## Mohammed Al-Miqdadi  BSc, MBA(Hons)
Director of Project Development
General Mediterranean Holding S.A.
Lincoln House
137-143 Hammersmith Road
London W14 0QL
United Kingdom
Phone 0044(0) 20 7602 7055
Fax    0044(0) 20 7603 5533
almiqdadi@gmhsa.com
www.gmhsa.com



GENERAL MEDITERRANEAN HOLDING

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone or return the original message to us at the above address. Thank you.

---

**From:** Thomas McQueen [mailto:tkmcqueen@sbcglobal.net]
**Sent:** 13 February 2008 03:10
**To:** Almiqdadi
**Cc:** Tom McQueen
**Subject:** GMH Representations/PRIVILEGED AND CONFIDENTIAL

Dear Mohammed:

Here are the seven questions posed for GMH by U. S. Disrtict Judge St. Eve which you and I discussed late Monday and Tuesday. Please confirm the negative answer that you gave me orally on the telephone. When we make reference to "Rezko entity" we mean any entity in which Mr. Rezko holds a known or hidden (but known to GMH or Mr. Auchi) interest.

1.   Has GMH ever had any business dealings with Aiham Al Samarac?

2

SIRAZI - G030702

2.   Beyond the pending transaction to purchase Mr. Rezko's remaining interest in the Riverside Development, are there any other loans not previoulsy disclosed from GMH or Mr. Auchi, either direct or indirect,  to Mr. Rezko or any Rezko entity?

3.   Are either GMH or Mr. Auchi currently dealing, or have they dealt recently, directly with Mr. Rezko?

4.   Is GMH, either directly or indirectly, holding any money, property or other thing of value for Mr. Rezko or any Rezko entity.

5.   Does Mr. Rezko have access to any financial account of GMH or Mr. Auchi from which he could acquire funds?

6.   In the last two years (2006 to date), has Mr. Rezko or any Rezko entity held any position whatsoever (officer, director, ,executive, shareholder, consultant, employee, etc.) with GMH?

The final question will require some detailed and careful explanation:

7.   Besides the current 2008 $4.0 million transaction, the 2007 $3.5 million transaction and $200,000 note/loan in 2007, has GMH made any other payment(s) from 2006 to date to Mr. Rezko or any Rezko entity?

Please confirm the authorization of GMH and, as necessary, Mr. Auchi, for me, as GMH's counsel, to make representations in accordance with your answers before the United States District Court in Chicago.

As always, thank you for your cooperation and prompt assistance.  Best regards,

Thomas K. McQueen
tkm@tmcqueenlaw.com
312-360-5025
847-902-9088 (m)

3

SIRAZI - G030703

**Maha Al Mufti**

| | |
|---|---|
| From: | Thomas McQueen [tkmcqueen@sbcglobal.net] |
| Sent: | 08 February 2008 04:57 |
| To: | Almiqdadi |
| Cc: | Tom McQueen |
| Subject: | GMH Representations/PRIVILEGED AND CONFIDENTIAL |

Dear Mohammed:

Having considered your suggestion, consulting with [Attorney John Doe] and others, I do believe that it would be of greatest benefit if this letter of direction to me was from and signed by Mr. Auchi. As you will see, I include a personal representation from him as well as the representations which you and I have discussed on behalf of GMH. I take no pride in authorship so feel free to expand upon what I have proposed and by all means assure that the text is entirely accurate because it will serve as the basis of the representations that I will make on behalf of GMH SA to the United States District Court in Chicago. Make sure that the date of the $200,000 promissory note is accurate. I propose the following:

Dear Mr. McQueen:

First, let me thank you for serving as counsel to General Mediterranean Holding S.A. (GMH) in relation to questions that have been raised by and representations made by members of the United States Attorney's Office to the United States District Court in Chicago in the pending criminal case of Mr. Rezko. I have had the opportunity to speak with our Director of Project Development, Mr. Mohammed Al-Miqdadi about your several conversations with him and, as Chairman of GMH, you are authorized to make the following representations about the pending transaction between GMH and Mr. Rezko to the Judge of the District Court.

GMH currently holds a partial interest in a real estate development undertaken in Chicago, Illinois by Mr. Rezko. It is GMH's intention, through one of our real estate development subsidiaries, to fund and close a purchase transaction underwhich 18 of the remaining units in the development now held by Mr. Rezko through Riverside District Development will be transferred by Rezko to GMH in return for the sum of $3.8 million. GMH has received representations that, as part of Mr. Rezko's obligations in this transaction, all remaining Rezko interests in the development previously assigned as collateral to various lending institutions have been or are being assigned to those creditors. Therefore, upon the completion of the transaction, Mr. Rezko will no longer have any interest, direct or indirect, in the development.

As you know, during July of 2007, GMH made a loan to Mr. Rezko in the sum of $200,000 which loan was documented by a promissory note from Mr. Rezko. Further to the contemplated transaction, our actual agreement with Mr. Rezko calls for GMH to pay the total sum of $4 million for the remaining 18 units. Only $3.8 million will be transferred, however, as described above, as the balance has been withdrawn to extinguish the Rezko promissory note.

I assure you, and you may represent to the Court, that it is the objective of GMH that Mr. Rezko will be totally removed from participating in this real estate development project at the conclusion of this transaction. Further, neither GMH nor I personally, have any other transactions, loans or obligations pending with or contemplated for Mr. Rezko after the closure of this purchase.

Should you or the Court have any further questions, know that Mr. Al-Miqdadi and I stand ready to assist you in any manner necessary.

The letter should be addressed as follows and sent by email PDF to: tkm@tmcqueenlaw.com

**TRIAL EXHIBIT**

**PX 171**

1

SIRAZI - G031811

Thomas K. McQueen
Attorney at Law
321 South Plymouth Court
10th Floor
Chicago, Illinois 60604


Thank you for all of your assistance, Mohammed.

Very truly yours,


Thomas K. McQueen

SIRAZI - G031812



## General Mediterranean Holding

General Mediterranean Holding (GMH) is an international business group with a highly diverse portfolio worth more than $4 billion. Based in Luxembourg, our 120 companies stretch across six continents and employ roughly 7,000 people worldwide.

GMH consists of four main branches:



- o Real estate
- o Banking and finance
- o Communications and IT
- o Industrial trading and pharmaceuticals

*GMH headquarters in Luxembourg*

Our leadership—an impressive roster of former diplomats, statesmen and businessmen from the US, UK and beyond—understand the international climate for investment, identifying profitable ventures in both the developed and the developing world. Our subsidiaries have built sparkling luxury hotels in Lebanon, telecom towers in Jordan and first-rate hospitals in Luxembourg.



1

**TRIAL EXHIBIT**

**PX 173**

CONFIDENTIAL SIRAZI - G010289



## General Mediterranean Holding

Chairman and CEO Nadhmi Auchi founded the group in 1979. His innovative approach to business and international profile helped propel GMH's precipitous growth over the last 20 years.

### What We Do

Long before the business community fully understood the financial advantages of globalization, GMH seized upon the opportunity to invest in international markets. We spread our capital widely across varied industries and aggressively pursued acquisitions. The result: the birth of over 100 subsidiaries that regularly defy expectations.





*Hotel Le Royal in Luxembourg*

### Real Estate Ventures

GMH's portfolio of luxury hotels and investments in commercial, residential and industrial buildings has experienced enormous growth in recent years. Our developments have not only boosted company profits, they have spurred investment and prosperity in local economies. GMH's real estate holdings are divided into two main branches: hotels and leisure and construction.

a). **Hotels and Leisure.** New technologies continue to transform the way we live and do business. GMH has been at the forefront of these changes catering to business and recreational travelers. Our group built Luxembourg City's only five-star hotel, Le Royal, in the heart of downtown. We have since acquired hotels in Spain, France, Lebanon and Jordan and have plans to invest in ten new hotels in Tangier. Compagnie Européenne d'Hôtellerie, a French subsidiary, owns and operates the Residéal hotel chain. In addition, plans are underway to expand the popular Le Royal Beirut—already replete with a water theme park—to include a maritime tourist complex.

b). **Construction.** Handling everything from engineering to contracting and project management, Soludec is GMH's principal subsidiary in the construction business. Its work within the Grand Duchy of Luxembourg includes the Neudorf Bridge and a modern art museum, in addition to numerous hospitals, offices and residential spaces.

2



## General Mediterranean Holding



### Banking and Finance



GMH entered banking and financial markets with the creation of Compagnie Internationale de Participations Bancaires en Financières SA (CIPAF) in 1982. In 2005, CIPAF posted a €59.7 million profit before minority interests with net assets worth €750.7 million, up from €637.3 in 2004. Our banking conglomerate offers a full range of financial services to private individuals, businesses, agribusinesses and real estate investors. In the 1980s and 90s, CIPAF acquired banks in Luxembourg and Germany, quickly becoming a leader among European banks. Within the CIPAF umbrella are a number of subsidiaries with investments in financial institutions in Jordan, Egypt and North America. *Russia*

### Communications and IT

The 1990s marked the genesis of the Internet age, making global communications faster and easier than ever before. GMH, not one to shy away from fresh opportunities and approaches, wasted no time plunging into the new economy. Among GMH's affiliates is i-vu, an interactive media company which provides unique video and music content for luxury hotels, salons and shops. i-vu is an industry leader with offices in the United States and the Middle East, in addition to its UK headquarters. Always aware of untapped markets, GMH owns the news portal Middle East Online, a bilingual Web site based in London widely read by England's large Arabic-speaking population.

*— AWB*

3

 General Mediterranean Holding

**Industrial Trading and Pharmaceuticals**

As with our other ventures, the developing world proved fertile grounds to expand our industrial trading division. ███████

████████ Plans are underway for another South Asian venture, the Kattupalli Power Project. Our board has already signed off on the land acquisition for our 1,000 megawatt operation, and contract negotiations are progressing smoothly.

Our pharmaceuticals group, Crescent Pharma, performed very well in 2005, increasing turnover from €4 million in 2004 to €7. An additional pharmaceutical subsidiary, Meditech UK Limited, expanded its services in 2004 to include IT consulting and project management.



4

CONFIDENTIAL SIRAZI - G010292

 General Mediterranean Holding

**Riverside District Development: Project Team**

**Ken Haldeman,** a 17 year veteran of residential construction, works directly with GMH and the team's consultants on a daily basis to ensure accountability and progress within the project team.

**Solomon Cordwell Buenz—**an award-winning150-person architecture, interior design and planning firm—is providing planning services to RDD. SCB practices nationally with offices in Chicago and San Francisco. They specialize in the design of urban mixed-use, multi-family residential, corporate office, higher education, laboratory and transportation facilities.

**Knight Engineering & Architects** is a full-service engineering and architectural firm that specializes in a variety of planning, design, and construction management projects. Knight will provide civil engineering services for the project.

**Acosta, Kruse & Zemenides, LLC** will represent RDD in the zoning and "planned development" process. The law firm's Endy Zemenides will be the project's day-to-day lead.

**Terry Teele** is a consultant to RDD. He is lending his experience and expertise in real estate planning and development with a particular emphasis on the project's infrastructural needs.

**Resolute Consulting** is a public affairs and communications firm with vast experience in community outreach and media consulting. Anne-Marie St. Germaine and Greg Goldner will manage Resolute Consulting's activities.

CONFIDENTIAL SIRAZI - G010293

GENERAL MEDITERRANEAN HOLDING



Sir John Bond
Group Chairman
HSBC Holdings Plc
Level 41,
8 Canada Square
London E14 5HQ

30/11/2004

Dear Sir Bond,

I am writing to you on behalf of General Mediterranean Holdings which is a conglomerate company with assets exciding $2 billion dollars. GMH has interest in Banking and Finance, Real Estate and Construction, Hotel and Leisure, Industrial Trading and Pharmaceutical, Aviation and Shipping.

We are interested in acquiring a property in the United States in Chicago. It is a 62 Acres piece of land in Downtown Chicago. It is zoned for multi-use Commercial and Residential. Asking price is $123 million. We are looking for financing on this piece of land.

Please let me know what the next step is so that we can proceed with this matter.

Many Thanks,

Mohammad Hashim Al-Miqdadi
Director of Project Development

**TRIAL EXHIBIT**

**PX 174**

Lincoln House
137-143 Hammersmith Road
London W14 0QL England
Tel: +44 (0) 20 7602 7055
Fax:+44 (0) 20 7603 5533

Société Anonyme
29, avenue de la Porte-Neuve
L-2227 Luxembourg
Tel: +352 470 168
Fax: +352 470 352
R.C. Luxembourg B 16453

CONFIDENTIAL SIRAZI - G004774